# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **DAN McCALEB, Executive Editor** <br> **of THE CENTER SQUARE,** | ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Case No. 3:22-cv-00439** <br><br> **District Judge Richardson** <br> **Magistrate Judge Frensley** |
| **v.** | ) <br> ) <br> ) | |
| **MICHELLE LONG, in her** <br> **official capacity as DIRECTOR of** <br> **TENNESSEE ADMINISTRATIVE** <br> **OFFICE OF THE COURTS,** | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| **Defendant.** | ) | |

---

## PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

Respectfully submitted,


M. E. Buck Dougherty III, TN BPR #022474
James McQuaid, *pro hac vice forthcoming*
LIBERTY JUSTICE CENTER
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
312-637-2280-telephone
312-263-7702-facsimile
bdougherty@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org

**SUPPLEMENTAL BRIEF**

Plaintiff, Dan McCaleb, Executive Editor of The Center Square ("McCaleb" or "Plaintiff"), files his supplemental brief in accordance with the Court's Order (ECF No. 8) regarding the TRO hearing set for Tuesday, June 14, 2022. At the TRO hearing on Plaintiff's motion (ECF No. 5), McCaleb intends to rely upon the: Complaint (ECF No. 1), Declaration of Dan McCaleb (ECF No. 6) ("McCaleb Decl."), and Memorandum of Law (ECF No. 7) ("Memorandum"), along with this supplemental brief and the entire record in this case.

Plaintiff hereby responds to the Court's numbered instructions as set forth in the Order as follows:

**(1) No response required of Plaintiff.**

**(2) No response required of Plaintiff.**

**(3) Plaintiff's supplemental response.**

> **(a) Whether Tennessee Judicial Conference meetings have historically been open to the public and press.**

Plaintiff has no knowledge of the traditions of Tennessee Judicial Conference meetings and whether they have historically been open or closed to the public and press. As indicated in his declaration at ECF No. 6, Page ID 46, ¶15, Plaintiff learned of closure policy #3.04 on or about June 6, 2022, approximately one week ago. The closure policy itself imposes an information lockdown on members and administrative court office staff, although through diligent efforts searching public information on the internet, some information was uncovered regarding Tennessee Judicial Conference meetings as set forth in the Complaint and McCaleb Decl.

1

Unfortunately, little is known of Tennessee Judicial Conference meetings among the public and press. This lack of access is unfortunate because of the lost opportunity where the public could observe these proceedings and perhaps better understand the state court rulemaking process and how certain court rules and procedures are implemented within the state court system. The Tennessee Judicial Conference statute is perhaps the best guide in determining what the General Assembly intended for Tennessee Judicial Conference meetings.

But it is important to point out that comparing Tennessee Judicial Conference meetings *with itself* to determine if *it* has a history of openness would not be a proper comparison analysis under the First Amendment. It's irrelevant in terms of the First Amendment. In fact, that would be no comparison at all, and governing bodies facing a First Amendment right of access challenge could simply say, "that's how we've always done it, so we'll continue doing it our way." The First Amendment demands much more.

The answer to this question as pointed out in the Memorandum is simply to apply the *Richmond Newspapers* test. And the reason is "[b]ecause a tradition of accessibility implies the favorable judgment of *experience.*" *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 589 (1980) (Brennan, J., concurring) (emphasis added). This is the "experience" prong as discussed by the Sixth Circuit panel in applying *Richmond Newspapers*. *Detroit Free Press v. Ashcroft*, 303 F. 3d 681, 700 (6th Cir. 2002). "Substantively, [courts] look to other proceedings that have the

2

same effect" when deciding if the First Amendment attaches to the proceeding in question. *Detroit Free Press*, 303 F. 3d at 702.

As the *Detroit Free Press* three-judge panel explained in paraphrasing the Supreme Court, it's the "walk, talk, and squawk" approach when making a comparative analysis. *Id.* In looking at similar proceedings, courts "should look to proceedings that are similar in *form and substance.*" *Id.* (emphasis added). As demonstrated in Plaintiff's Memorandum, no proceeding could provide a more apt comparison in "form and substance" than comparing federal Judicial Conference meetings with Tennessee Judicial Conference meetings. *See* Memorandum, ECF No. 7, Page ID 70-73. Particularly the comparison as discussed in the Memorandum with Judicial Conference committees considering rules, drafting legislation, and making recommendations to legislative bodies. *See generally* ECF No. 7.

Experience instructs and commands that Judicial Conference bench-bar committees that recommend rules are ordinarily "open to the public." *Swint v. Chambers County Comm'n*, 514 U.S. 35, 48 (1995); 28 U.S.C. § 2073(c)(1). For nearly 34 years the federal Judicial Conference has provided a model and template for similar Judicial Conferences. This experience guides and provides guardrails as to what Judicial Conferences - whether they be federal or state such as the Tennessee Judicial Conference - should look like and how they should perform and discharge their official duties and obligations.

To summarize Plaintiff's position, it's instructive to review and reread the first paragraph of the preliminary statement in Plaintiff's Memorandum. ECF No.

3

7, Page ID 56. There, Plaintiff cited, and paid respect and honored, two distinguished and towering judicial figures in our nation's history. One jurist was named by name. The other was not.

First, the jurist named was of course Justice Brandeis. "Sunlight is said to be the best of disinfectants" was his famous phrase that is commonly used in state and federal open government reform laws enacted in the 1970's known as "Sunshine" laws. A couple of years following his "Sunshine" article, Justice Brandeis was appointed to the United States Supreme Court and took his oath of office where he served a long and profound career on our nations' highest court.[1] His "Sunshine" article was not written while he was a sitting Supreme Court member. It was not written in a groundbreaking constitutional opinion deciding an important and complex question of his day, although Justice Brandeis was certainly involved in many such opinions throughout his storied career. But those words have perhaps had more impact and been more influential over a century later than any Supreme Court opinion he authored. Because his "Sunshine" article embodied higher aspirations to which he fulfilled while a sitting member on the bench, and to which the public expects and are entitled to receive from their government officials.

Second, the other jurist to whom Plaintiff honored, although not actually named by name in the first paragraph, spoke the first five words of Plaintiff's preliminary statement: "Democracies die behind closed doors." ECF No. 7, Page ID 56. That distinguished and influential jurist was Judge Damon J. Keith, author of

---

[1] https://www.supremecourt.gov/about/members_text.aspx.

4

the *Detroit Free Press* opinion in which Plaintiff relied heavily on in his Memorandum.[2] The *Detroit Free Press* three judge panel consisted of Judge Keith and Judge Martha Craig Daughtrey of the Sixth Circuit Court of Appeals, and District Judge James G. Carr sitting by distinction. Like Justice Brandeis' "Sunlight" phrase, Judge Keith's "Democracies die behind closed doors" crystalizes in a few short words higher aspirations to which government officials should aspire and the public are entitled to receive.

After his *Detroit Free Press* opinion, Judge Keith led with his "Democracies die behind closed doors" phrase in a dissenting opinion on a heated voting rights case in which he was one of three panel members at the Sixth Circuit. As explained by Judge Bernice Donald of the Sixth Circuit Court of Appeals in an article paying tribute to Judge Keith's legacy and some of his landmark decisions, "[i]t was not just any dissent.[3] It was a dissent that was shouted from the mountain top and could be heard as it echoed throughout the far reaches of our nation and our nation's history." *Id*. Judge Donald elaborates that Judge Keith "entered an unheard-of 68-page dissent." *Id*.  Judge Donald goes on to state that after Judge Keith opened with "Democracies die behind closed doors" from the *Detroit Free*

---

[2] Judge Keith passed away in 2019 at the age of 96 and was one of the nation's longest serving federal judges. https://www.npr.org/2019/04/28/718077751/judge-damon-j-keith-judicial-giant-and-civil-rights-icon-dies-at-96

[3] Bernice B. Donald, *Lion of Justice: Judge Damon Keith, U.S. Court of Appeals, Sixth Circuit,* Judicature, Volume 101, Number 2 (Summer 2017), *available* at https://judicature.duke.edu/articles/lion-of-justice-judge-damon-keith-u-s-court-of-appeals-sixth-circuit/.

5

*Press* case, he "did not stop there." *Id*. Judge Keith then explained that the "majority ruling took us steps back from the Voting Rights Act of 1965." *Id*.

Next, because Plaintiff has relied so heavily on Judge Keith's *Detroit Free Press* opinion and the fundamental First Amendment principles embodied in the opinion in setting forth his position that the public and press right of access attaches to Tennessee Judicial Conference meetings, it's important to understand the facts and context of the *Detroit Free Press* case.

On September 11, 2001, 19 militants hijacked four planes to carry out suicide attacks against certain targets in the United States.[4] Two of the planes were flown into the Twin Towers of the World Trade Center in New York City. One of the planes was flown into the Pentagon, and the fourth plane crashed in a field in Shanksville, Pennsylvania. *Id*. Nearly 3,000 people died. *Id*.

Ten days later on September 21, 2001, "Chief Immigration Judge Michael Creppy issued a directive (the "Creppy directive") to all United States Immigration Judges requiring closure of special interest cases." *Detroit Free Press*, 303 F. 3d at 682. This directive required that all deportation "proceedings in such cases be closed to the press and public, including family members and friends." *Id*. The Record of the Proceeding was not to be disclosed to anyone except a deportee's attorney or representative, "assuming the file does not contain classified information." *Id*. "This restriction on information includes confirming or denying whether such a case is on the docket or scheduled for a hearing." *Id*.

---

[4] https://www.history.com/topics/21st-century/9-11-attacks.

6

It is against the backdrop of 911 that the *Detroit Free Press* panel issued its opinion and held that the First Amendment right of access attaches to deportation proceedings under the *Richmond Newspapers* "experience and logic" test. The government's claimed compelling interest was national security. The Sixth Circuit panel agreed that national security and preventing terrorism is a compelling government interest. But disagreed the interest was narrowly tailored pursuant to the Creppy directive's blanket closure policy. The panel noted that the district court "invited the Government" to articulate any other basis for closing the deportation proceedings, which were administrative proceedings and not criminal proceedings, but the Government provided the district court with no other reasons for closure. *Detroit Free Press*, 303 F. 3d at 706.

Here, TAOC's blanket closure policy #3.04 is alarmingly similar to the broad sweep of the Creppy directive. It is assumed (and hoped) that the TAOC has not experienced at past Tennessee Judicial Conference meetings "safety and security" concerns approaching the enormous severity of 911. As the Sixth Circuit pointed out in *Detroit Free Press*, to the extent the TAOC can provide this Court with a specific basis for its blanket closure policy #3.04 to assist the Court with determining whether the state has a compelling interest in closing Tennessee Judicial Conference meetings that is also narrowly tailored to fit the claimed interest, Plaintiff welcomes such disclosure.

Finally, since Plaintiff opened with Judge Keith's "Democracies die behind closed doors," it is only fitting to close with Judge Keith's closing remarks in *Detroit Free Press*:

> Lastly, the public's interests are best served by open proceedings. A true democracy is one that operates on faith - faith that government officials are forthcoming and honest, and faith that informed citizens will arrive at logical conclusions. This is a vital reciprocity that America should not discard in these troubling times. Without question, the events of September 11, 2001, left an indelible mark on our nation, but we as a people are united in the wake of the destruction to demonstrate to the world that we are a country deeply committed to preserving the rights and freedoms guaranteed by our democracy. Today, we reflect our commitment to those democratic values by ensuring that our government is held accountable to the people and that First Amendment rights are not impermissibly compromised. Open proceedings, with a vigorous and scrutinizing press serve to ensure the durability of our democracy.

*Detroit Free Press,* 303 F. 3d at 711.

### (b) Whether permitting video or audio access to Tennessee Judicial Conference meetings is feasible.

Plaintiff has no knowledge of whether it is feasible for the TAOC to permit video or audio during meetings. As indicated in his Complaint, Plaintiff is aware of TAOC's considerable virtual infrastructure that it has successfully utilized and employed during the past two years of the pandemic. Compl., ECF No. 1, Page ID 14.

**(4) Plaintiff intends to rely upon the McCaleb Decl. (ECF No. 6, Page ID 44-50) and does not intend to call witnesses at the hearing.**

**(5) At 5:15 pm CT on June 13, 2022, Plaintiff's counsel served a copy of the Court's Order (ECF No. 8) upon the Tennessee Attorney General via electronic mail.**

8

June 14, 2022                    Respectfully submitted,


*/s/ M. E. Buck Dougherty III*
M. E. Buck Dougherty III, TN BPR #022474
James McQuaid, *pro hac vice pending*
LIBERTY JUSTICE CENTER
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
312-637-2280-telephone
423-326-7548-mobile
312-263-7702-facsimile
bdougherty@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org

Attorneys for Plaintiff, Dan McCaleb,
Executive Editor of The Center Square

9

# CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2022, a copy of the foregoing was filed electronically via the Court's CM/ECF filing system. Notice of this filing will be sent by operation of the Court to all parties indicated on the electronic filing receipt. Further, I hereby certify that on June 14, 2022, I sent a copy of the foregoing Memorandum to the Office of the Tennessee Attorney General and Reporter via electronic mail as follows:

Office of the Attorney General & Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
tnattygen@ag.tn.gov

*/s/ M. E. Buck Dougherty III*
M. E. Buck Dougherty III, TN BPR #022474

10