IN THE UNITED STATES DISTRICT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DAN McCALEB, Executive Editor of THE CENTRE SQUARE, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 3:22-cv-00439 |
| MICHELLE LONG, in her official capacity as DIRECTOR of the TENNESSEE ADMINISTRATIVE OFFICE OF THE COURTS, | ) ) ) ) ) |
| Defendant. | ) ) |

**STATE DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendant Michelle Long, in her official capacity as Director of the Tennessee Administrative Office of the Courts, hereby submits this response opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. (DE 5.)

**INTRODUCTION**

Plaintiff, the executive editor of an online news organization, "The Center Square," has filed suit seeking to enforce his alleged First Amendment right of access—but not to any sort of judicial proceedings or any judicial records. Rather, Plaintiff seeks to enforce his alleged First Amendment right of access to the annual meeting of the Tennessee Judicial Conference. But the right of access under the First Amendment has never been construed as a right of access to any

government proceeding. And Plaintiff's only argument that he has a right of access to the meetings of the Tennessee Judicial Conference is based on his assertion that meetings of the Tennessee Judicial Conference are "indistinguishable" from meetings of the Judicial Conference of the United States. However, even a cursory review of the applicable statutes readily demonstrates the fallacy of Plaintiff's argument and without more, Plaintiff simply has no right of access under the First Amendment. Accordingly, Plaintiff's request for extraordinary relief should be denied.

## BACKGROUND

### 1. Judicial Conference of the United States

Congress has established the Judicial Conference of the United States (the "Federal Conference") which consists of the Chief Justice, the chief judge of each circuit court, the chief judge of the Court of International Trade, and a district judge from each judicial circuit. 28 U.S.C.A. § 331. The Federal Conference is specifically charged with multiple duties, including the following:

- To make a comprehensive survey of the condition of business in the courts of the United States and prepare plans for assignment of judges to or from circuits or districts where necessary;

- To submit suggestions and recommendations to the various courts to promote uniformity of management procedures and the expeditious conduct of court business;

- To exercise the authority provided in chapter 16 (complaints against judges and judicial discipline), including holding hearings, take sworn testimony, issue subpoenas and subpoenas duces tecum, make necessary and appropriate orders, and prescribe and modify rules for the exercise of the authority provided in chapter 16;

- To carry on a continuous study of the operation and effect of the general rules of practice and procedure and recommend to the Supreme Court such changes in and additions to those rules for its consideration and adoption, modification or rejection;

- To consult with the Director of the United States Marshals Service on a continuing

2

Case 3:22-cv-00439   Document 10   Filed 06/14/22   Page 2 of 16 PageID #: 93

basis regarding the security requirements for the judicial branch.

28 U.S.C.A. § 331. And the Chief Justice is required to submit to Congress "an annual report of the proceedings of the Judicial Conference and its recommendations for legislation."

In addition to the duties set forth in § 331, the Federal Conference is also charged with "prescribe[ing] and publish[ing] the procedures for the consideration of proposed rules" of procedure and evidence, including bankruptcy rules. 28 U.S.C.A. § 2073(a)(1). The Federal Conference is authorized to appointment committees to assist it "by recommending rules to be prescribed under section 2072 and 2075," as well as a "standing committee on rules of practice, procedure, and evidence." 28 U.S.C.A. § 2703(a)(2), (b). Finally, Congress has directed that any meeting

> for the transaction of business under this chapter *by any committee appointed under this section* shall be open to the public, except when the committee so meeting, in open session and with a majority present, determines that it is in the public interest that all or part of the remainder of the meeting on that day shall be closed to the public, and states the reason for so closing the meeting. Minutes of each meeting for the transaction of business under this chapter shall be maintained by the committee and made available to the public, except that any portion of such minutes, relating to a closed meeting and made available to the public, may contain such deletions as may be necessary to avoid frustrating the purposes of closing the meeting. (emphasis added.)

28 U.S.C.A § 2073(c)(1).

### 2. Tennessee Judicial Conference

In 1953, the Tennessee General Assembly established a judicial conference "whose memberships shall consist of all judges of courts of records whose salary is paid in whole or in part out of the state treasury, including retired judges," i.e., the Tennessee Judicial Conference

3

("TJC").[1]  Tenn. Code Ann. § 17-3-101(a).  The General Assembly further directed that the conference meet annually "for the consideration of any and all matters pertaining to the discharge of the official duties and obligations of its several members, to the end that there shall be a more prompt and efficient administration of justice in the courts of this state."  Tenn. Code Ann. § 17-3-104.  The General Assembly vested full power and authority in the TJC "to prescribe rules of official conduct of all judges" which must be in compliance with the American Bar Association's code of judicial ethics but imposed no other duties on the conference except

> to give consideration to the enactment of laws and rules of procedure that in its judgment may be necessary to the more effective suppression of crime and thus promote peace and good order in the state.  To this end, a committee of its members shall be appointed to draft suitable legislation and submit its recommendations to the general assembly.

Tenn. Code Ann. § 17-3-106-107.

The Tennessee Judicial Conference's (TJC) meeting in June is its annual meeting required by Tennessee Code Annotated section 17-3-104. Historically, that meeting includes a day or a day and a half of closed educational sessions for the judges and it has not been open to the press and the general public.  The judges that attend this meeting do not consider rules, draft legislation or otherwise submit any recommendations to the General Assembly  *See* Declaration of Rachel Harmon attached hereto as Exhibit 1.

### 3. Tennessee Administrative Office of the Courts

In 1993, the Tennessee Administrative Office of the Courts ("AOC") was established by the Tennessee General Assembly for the purpose of assisting "in improving the administration of justice in this state by performing the duties and exercising the powers conferred" by statute.  Tenn.

---

[1] The Judicial Conference also includes active and retired judges, who are licensed attorneys, of the probate courts created by private acts in counties having a population of 300,000 or more based on the 1960 and any subsequent census.  Tenn. Code Ann. § 17-3-101(b).

Code Ann. § 16-3-801. Defendant Long is the current Administrative Director of the AOC and is appointed by and serves at the pleasure of the Tennessee Supreme Court. Tenn. Code Ann. § 16-3-802(a). Director Long works "under the supervision and direction of the chief justice" and, "as the chief administrative officer of the state court system, assist[s] the chief justice in the administration of the state court system to the end that litigation may be expedited and the administration of justice improved." Tenn. Code Ann. § 16-3-803(a).

One of the Administrative Director's statutory duties is to prepare "an annual judicial education plan providing for the orientation and continuing training and education of all elected or appointed judges of trial and appellate courts of record of this state." Tenn. Code Ann. § 16-3-803(f)(1); *see also* Tenn. Code Ann. § 16-3-502(4) (Supreme court may "[a]dopt, upon the recommendation of the administrative director of the courts, an annual plan providing for the orientation of newly elected or appointed judges of trial or appellate courts of record and for the appropriate continuing legal education and training of the judges").

And many of the duties Congress has vested in the Conference, the Tennessee General Assembly has determined to vest the Administrator Director and not the TJC with the duty to

> continuously survey and study the operation of the state court system, the volume and condition of business in the courts of the state, whether of record or not, the procedures employed by those courts, and the quality and responsiveness of all of the courts with regard to the needs of civil litigants and the needs of the criminal justice system throughout the state.

Tenn. Code Ann. § 16-3-803(g). Additionally, the Administrative Director has the statutory duty "to collect, develop and maintain uniform statistical information relate to court caseloads in Tennessee" and to "prepare and distribute an annual report reflecting the operation of the courts of the state and highlighting those changes, innovations, or recommendations made or introduced

5

to enhance the effectiveness of the courts." Tenn. Code Ann. § 16-3-803(i)-(j).

Finally, the Tennessee General Assembly has directed the Administrative Director of the AOC—not the TJC—to "conduct ongoing internal review, analysis and planning for the future needs of the state court system" which should be designed "to devise ways of simplifying court system procedure, expediting the transaction of court system business and correcting weaknesses in the administration of justice." Tenn. Code Ann. § 16-3-803(k).

In response to a concerning disruption by several individuals at a conference in late 2021, and also, in part, to the increase in threats of violence and acts of violence directed toward judges at the federal, state, and local levels, on February 1, 2022, the AOC implemented Policy 3.04 and posted a copy of the policy on its website. *See* Harmon Declaration. The policy did not change the historically closed nature of the conferences, but instead was implemented to expressly address safety and security concerns when the large numbers of state court judges gather together for educational purposes.

Policy 3.04 expressly applies only to "conferences hosted by the AOC," and "conferences" are defined as "formal education-centered gathering of current or former members of the Tennessee Judicial Conference, Tennessee General Sessions Judges Conference, Tennessee Conference of Juvenile and Family Court Judges, Tennessee Municipal Judges Conference, Tennessee State Court Clerks Association, or current appellate law clerks and staff attorneys who work in a full-time or part-time status." *See* Exhibit 1 to Harmon Declaration.

### III. LEGAL STANDARD.

The decision to grant a temporary restraining order falls within the discretion of the trial court and must first satisfy two prerequisites before consideration of the merits of the motion. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). First, the moving party must establish "specific facts in an affidavit or a verified complaint [that] clearly show that

6

immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Second, the moving party must "certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B).

Once these prerequisites are established, a temporary restraining order is evaluated using the same four-factor analysis as a preliminary injunction. *See Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *see also Ohio Republican Party v. Brunner*, 543 F.3d at 361. And those factors are:

> (1) Whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.

*Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). "These factors are not prerequisites but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir.1998). Per the Sixth Circuit:

> There is no power the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction; but that will not be awarded in doubtful cases, or new ones, not coming within well established principles; for it issues erroneously, an irreparable injury is inflicted, for where there can be no redress, it being an act of a

7

> court, not of the party who prays for it. It will be refused till the courts are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act; in such a case the court owes it to its suitors and its own principles to administer the only remedy which the law allows to prevent the commission of such act.

*Detroit Newspapers Publishers Ass 'n v. Detroit Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972), cert. denied, 411 U.S. 967 (1973) (internal citations omitted); see also *MLZ, Inc. v. Fourco Glass Co.*, 470 F.Supp. 273, 278 (M.D. Tenn. 1978).

## IV. ARGUMENT

### A. Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits Against Defendant Long.

Plaintiff argues that under the *Richmond Newspapers* two-part test, he has a First Amendment right of access to Tennessee Judicial Conference meetings. Plaintiff is wrong.

In *Houchins v. KQED*, 438 U.S. 1 (1978), the Supreme Court held that there is no First Amendment right of press access to government-held information and, in the process, rejected the idea of a First Amendment right of *public* access.

> There is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information. Because the Constitution affords no guidelines, absent statutory standards, hundreds of judges would . . . be at large to fashion ad hoc standards, in individual cases, according to their own ideas of what seems "desirable" or "expedient." We, therefore, reject the Court of Appeal's conclusory assertion that the *public and the media* have a First Amendment right to government information . . ..

438 U.S. at 12 (emphasis in original). That Court went on to hold that the First Amendment does not "mandate [ ] a right of access to government information or sources of information within the

government's control" and that "[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act." *Id*. at 14-15.

In *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980), the Supreme Court recognized a right of access under the First Amendment to criminal trial and judicial records filed in those proceedings. Since then, the Sixth Circuit has extended this right of access to civil trials, *Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d 1165, 1178 (6th Cir. 1983), plea agreements, *United States v. DeJournett*, 817 F.3d 479, 484-85 (6th Cir. 2016), and deportation proceedings. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695 (6th Cir. 2002). Additionally, the Sixth Circuit has utilized the *Richmond Newspapers* standard to analyze whether a right of access exists for university disciplinary proceedings, *United States v. Miami Univ*. 294 F.3d 797 (6th Cir. 2002), documents related to the issuance and execution of a search warrant, *In re Search of Fair Fin*. 692 F.3d 424 (6th Cir. 2012), objections to pre-sentence reports, *In re Morning Song Bird Food Litigation*, 831 F.3d 765 (6th Cir. 2016) and summary jury proceedings. *Cincinnati Gas and Elec. Co. v. General Elec. Co*., 854 F.2d 900 (1988).

Under that standard, "[a] First Amendment right of access arises only where (1) the proceeding or document to which access is sought has historically been open to the press and general public, and (2) public access plays a significant positive role in the functioning of the particular process in question." *In re Morning Song Bird Food Litig*., 831 F.3d at 777. Plaintiff asserts that meetings of the TJC meet the first prong of this standard because its meetings are "indistinguishable" from meeting of the Federal Judicial Conference which have historically been open to the public and press for many years. But Plaintiff's assertions are both factually and legally incorrect.

First, Plaintiff is factually incorrect in arguing that TJC meetings are the "quintessential equivalent" to meetings of the Federal Conference. As discussed *supra*, both the make-up and the duties and responsibilities of the Federal Conference and the TJC are substantially different. *Compare* 28 U.S.C.A. §§ 331 and 2073 with Tenn. Code Ann. §§ 17-3-101 – 107. And judges attending TJC meetings do not "consider rules, draft legislation, and then submit their recommendations to the General Assembly" but instead attend educational sessions that have historically been closed to the press and the general public. *See* Harmon Declaration.

Second, Plaintiff is legally incorrect in asserting that *meetings of the Federal Conference* are open to the press and public. Rather, Congress has only required that "[e]ach meeting for the transaction of business . . . *by any committee* appointed [by the Judicial Conference] shall be open to the public," and even then, the committees are vested with the discretion to close their meetings. 28 U.S.C.A. § 2073(c)(1) (emphasis added). Moreover, the business of any committee appointed by the Federal Conference is limited to proposed rules of procedure, evidence and bankruptcy, 28 U.S.C.A. § 2073(a)(2), (b), but the duties and responsibilities of the Federal Conference set forth in 28 U.S.C.A. § 331 are much broader. Yet Plaintiff points to no other statute or provision of law where Congress has required that meetings of the Federal Conference be open to the press and general public, nor has Plaintiff cited to any other evidence demonstrating that *meetings of the Federal Conference* have historically been open. Instead, the only evidence Plaintiff has cited to reflects that meetings of the Standing Committee and the Advisory Rules Committees are open as required by 28 U.S.C.A. § 2073(c)(1). (*See* Memorandum in Support, D.E. 7 at PageID# 71-72.) And Plaintiff has cited to no evidence demonstrating that *meetings of the TJC* have historically been open to the press and general public.

Finally, Plaintiff has, in asserting his First Amendment right of access claim, ignored the

10

plain language of Policy 3.04. That policy expressly states that it only applies to "conferences hosted by the AOC," and "conferences" are defined as "formal education-centered gathering of current or former members of the Tennessee Judicial Conference, Tennessee General Sessions Judges Conference, Tennessee Conference of Juvenile and Family Court Judges, Tennessee Municipal Judges Conference, Tennessee State Court Clerks Association, or current appellate law clerks and staff attorneys who work in a full-time or part-time status." It does not, however, state that it applies to meetings of any committees (including the committee required by Tenn. Code Ann. § 17-3-107). *See* Exhibit 1 to Harmon Declaration.

Thus, with regard to the first prong of the *Richmond Newspaper* standard, Plaintiff has failed to demonstrate that there is a historically recognized right of access to meetings of the TJC.

The second prong of the Richmond Newspaper standard requires the Court to determine whether access "plays a significant positive role in the functioning of the particular process in question." *In re Morning Song Bird Food Litig.*, 831 F.3d at 777. Plaintiff argues that "open Tennessee Judicial Conference meetings would be positive because openness would promote public confidence in the judiciary and transparency in the state court rulemaking process." (D.E. 7 at PageID # 73-74.) But attendees at meetings of the TJC do not engage in rule-making at those meetings or draft legislation. *See* Harmon Declaration. Rather, state court judges attend meetings of the TJC for continuing legal education purposes—as reflected in Policy 3.04.

"[I]t is necessary to consider whether the 'practice in question [furthers] an important or substantial governmental interest unrelated to the suppression of expression' and whether 'the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Cincinnati Gas and Elec. Co. v. General Elec. Co.*, 854 F.2d 900, 904 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32

11

(1984)).  As discussed supra, the Tennessee General Assembly has charged the Administrative Director with the duty to prepare "an annual judicial education plan providing for the orientation and continuing training and education of all elected or appointed judges of trial and appellate courts of record of this state."  Tenn. Code Ann. § 16-3-803(f)(1); *see also* Tenn. Code Ann. § 16-3-502(4) (Supreme court may "[a]dopt, upon the recommendation of the administrative director of the courts, an annual plan providing for the orientation of newly elected or appointed judges of trial or appellate courts of record and for the appropriate continuing legal education and training of the judges").  Public access to the meetings of the TJC would be a hindrance to the AOC's ability to provide a safe space for judicial education and would cause a chilling effect on the necessary discussions and open dialogue that occur among the judges during the educational sessions held during the conferences.  *See* Harmon Declaration.  Thus, allowing access would undermine the substantial government interest in the continuing legal education and training of state trial court and appellate judges and would not play a "significant positive role in the functioning of the particular process in question."  *In re Morning Song Bird Food Litig.*, 831 F.3d at 777.

While the First Amendment right of access covers certain judicial and quasi-judicial proceedings and records filed in those proceedings, neither the Sixth Circuit nor the Supreme Court has ever recognized a First Amendment right of access to meetings of a state judiciary such as the TJC.  Indeed, the Sixth Circuit has recently recognized that the "right of access to government proceedings is not a tool for judges to pry open the doors of state and federal agencies because they believe that public access to this type of information would be a good idea.  It is a qualified right to certain proceedings and documents filed therein and nothing more."  *Phillips v. DeWine*, 841 F.3d 405, 417-20 (6th Cir. 2016) (internal quotations omitted).

12

Accordingly, Plaintiff can demonstrate no likelihood of success on the merits regarding his First Amendment right of access claim and a restraining order/injunction should not issue against Defendant Long.

**B.      Plaintiff is unlikely to suffer irreparable injury absent an injunction.**

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (internal quotation and citation omitted). Thus, where a Plaintiff fails to show a likelihood of success on the merits of their claim that their constitutional rights were violated, the Sixth Circuit has instructed that a finding of irreparable harm is not warranted. *See McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012) (affirming denial of preliminary injunction noting that because plaintiff "does not have a likelihood of success on the merits ... his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails."); *Overstreet*, 305 F.3d at 578 (6th Cir. 2002) (denying injunctive relief noting that plaintiff's "argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit" since he failed to show a likelihood of success on the merits); *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 867 (S.D. Ohio 2008) (denying TRO noting "[p]laintiff has not established a strong likelihood of success on the merits of its misappropriation of trade secrets claim. Because it has not been shown that Defendants misappropriated Plaintiff's trade secrets, irreparable harm cannot be presumed.").

Here, Plaintiff has shown no likelihood of success on the merits of his claim that his First Amendment right of access has been violated and, therefore, his argument that he is irreparably harmed by the alleged deprivation of this right also fails.

### C. Plaintiff's Requested Relief Will Cause Substantial Harm to the State and Will Not Further the Public Interest.

Both the Supreme Court and the Sixth Circuit have recognized that while the preliminary-injunction analysis usually entails consideration of the harm to the opposing party and a weighing the public interest, these two factors "merge when the Government is the opposing party." *Wilson v. Williams*, No. 20-3447, 2020 WL 3056217, at *11 (6th Cir. June 9, 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, Plaintiff seeks an order enjoining Defendant Long from enforcing Policy 3.04 and to provide him with virtual and in-person access to meetings of the Tennessee Judicial Conference. But allowing public access would undermine the substantial government interest in the continuing legal education and training of state trial court and appellate judges as it would be a hindrance to the AOC's ability to provide a safe space for judicial education and would cause a chilling effect on the necessary discussions and open dialogue that occur among the judges during the educational sessions held during the conferences. *See* Harmon Declaration. Thus, the harm to the State and the public interest both militate against granting Plaintiffs' requested relief.

## CONCLUSION

For these reasons, Defendant Long respectfully requests that this Court deny Plaintiff's request for temporary restraining order and/or preliminary injunctive relief.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter


/s/ *Janet M. Kleinfelter*
JANET M. KLEINFELTER (BPR 13889)
Deputy Attorney General
Public Interest Division
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Janet.kleinfelter@ag.tn.gov

**CERTIFICATE OF SERVICE**

       I hereby certify that a true and exact copy of the foregoing documents have been forwarded electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to the parties named below. Parties may access this filing through the Court's electronic filing system.

M. E. Buck Dougherty III
James McQuaid
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, IL 60654
bdoughterty@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org


Date: June 14, 2022                                    /s/ *Janet M. Kleinfelter*
                                                                          JANET M. KLEINFELTER
                                                                           Deputy Attorney General