# Exhibit

# 3

**Report from The Commission on the Future of the Tennessee Judicial System**

Let us begin with some humility. The Tennessee Supreme Court has asked the Commission on the Future of the Tennessee Judicial System to consider the judicial system as it might exist 30 years from now. It is a daunting challenge.

Think back 30 years. Civil rights was a narrowly defined concept. The environment was hardly a branch of science, let alone the law. Drug use was beginning to grow, but its impact on crime and the criminal justice system was still in the distance. For most families, divorce was still a stigma to be avoided.

No commission members would claim to have predicted all the changes in those areas that have so heavily impacted the judicial system of 1996. If we were asked to project the present system to 2026, our choice of scenarios would surely be wrong.

Confronting the critical issues of today, which we will necessarily do to some extent, also risks leading us down improper paths. When caseloads are heavy, for instance, it is a natural reflex to seek more judges, but that reflex fails both to catch up fully with the present problem or address its causes.

The risks of future scenarios and current issues are too great, so the commission's work has turned to a deeper route-to the very goals of the judicial system. We have focused on what the judicial system should be like and what it should do, and then we have considered how that vision differs from the accumulation of past practice.

Our vision, then, is not a prediction of the future or an extension of the present. It is more fundamental, but no less abstract. It is also bound by the tight limits of the broader world. Nevertheless, we welcome the opportunity of looking forward. What is important is that there be an open, ongoing discussion of the future. Specific goals may be moving targets, but an awareness of the values that determine those goals gives a guidance of its own.

**Conflicting Views**

We have heard from many differing perspectives and interests. They have ranged from poignant to protective, and yet each was deep and sincere. But from a wider view, they could not possibly all be "correct," for they conflicted with each other and at times even with themselves. There were different interests, for instance, among prosecutors, defense attorneys, victims and those with a broader public interest, and there was often disagreement even within each group. At times we have had to make choices among these viewpoints, but that is not to say we have simply rejected the others. It is not even to say that we consider one right and another wrong. Our choices often represent a balancing, a weighing of positives, and we acknowledge right off that our recommendations are sometimes leavened by the uncertain nature of such judgments. Take, as an example of ambiguity, the basic disagreement over the four purposes of incarceration.

1. Rehabilitation occurs erratically, and there is good evidence that longer sentences make it less likely.

2. Deterrence may be a factor for some crimes, but not for others, and the sheer volume of repeat offenders undermines many arguments on its behalf.

3. Public safety, the incapacitation of those most likely to commit more crimes, may happen in the aggregate, but making predictions about individuals is an uncertain art. Pushing this purpose also quickly exhausts the funds that any society reasonably wishes to spend.

Which leaves the customary fourth reason. Call it . . .

4. Justice. Call it punishment, call it retribution. What we call it usually depends on whether we are, respectively, a judge, a prosecutor or a victim.

Yet trying to define this purpose becomes an almost theological exercise. A woman who murders her husband after years of abuse at his hands is almost certain never to commit a similar crime in the future. Prison punishment would serve no point for rehabilitation, deterrence or public safety. But if justice is to remain a societal process, not given to individual exercise, what then could the proper sentence possibly be? The question goes beyond just such cases, of course, and there is no demonstrably proper answer.

**Defining Justice**

Justice, whether civil or criminal, remains difficult to define, deeply subject to individual perspective and impossible to measure, yet it goes to the heart of our work.

Justice, after all, attempts to define a shared moral sense, but in a time of less sharing altogether. It makes public rules, but in a time of increasing alienation from public institutions. Precision is further tempered by the flux between private responsibility and a search for blame. Now, to add one more element, come new discoveries of biochemical sources of behavior. Even the degree to which people accept life as unfair or seek recompense for its unfair nesses can change the very nature of justice.

On top of those philosophical issues are the increasing complexity and changing nature of the disputes that now come before the civil courts.

Post-industrial conflicts have come to a pre-industrial court system, largely by default. A civil system that emerged to settle land titles now wrestles with intellectual property. The tort case of one individual against another has become the class-action suit of thousands against an agency of their own government.

The interests of participants in the civil law have become as defined and divided as those within criminal law, which further diminishes consensus about proper change.

**Real-world Limits**

There are, for instance, substantial conflicts between the rhetoric of the system and the reality. From the very beginning, our nation has proclaimed that all men (and now all persons) are equal under the law. Historically, of course, it has not been true.

Judge Learned Hand could thunder: "If we are to keep our democracy, there must be one commandment: Thou shalt not ration justice."

In fact, we ration it every day. Justice is a limited resource, and the present system reflects our means of allocation. Most often the criteria are time and money, from the first threat of a lawsuit to the final step of a plea bargain.

The legal system exists partly in the public sphere, partly in the private. More broadly, we live in a market economy, and it is largely our private economic resources that determine our access to the legal system.

Billion-dollar companies can spend thousands of dollars on platoons of lawyers to fight over a few million dollars, and the outcome may not heavily affect either company. But the person facing repossession of an automobile, an act that could cost him his livelihood and more, is almost certain to face the fight on his own.

This is not just a matter of rich vs. poor, however. The broad middle class also feels priced out of most aspects of the legal system. The rhetoric of equality is important for certain purposes, and obviously the ideals should be important to the judge on the bench. It's also appropriate, though, to acknowledge that private resources make for unequal access and thus distort the very idea of equal justice. We encourage efforts that seek to redress such imbalances and diminish the distortions.

**Economic Limits**

There is not enough money to build all the prisons that some citizens might want. There is not enough money for the preventative programs addressing the so-called root causes of crime. And there is not enough money for the social programs aimed at breaking the links between causes and actions. On the civil side, the judicial system would collapse if every case filed actually went to trial. Justice is rationed in part to those who can afford to wait.

The judicial system has sometimes been a step-child of government spending, since it has no formal standing within the two branches of government that determine funding. This may be evident at the most elemental stages. There is a constant mismatch between what people expect of public officials and what they are willing to pay them, and the judicial system is far from immune to the problem. Saving money with second-class salaries for public defenders and part-time judges, for instance, costs citizens every day in the quality of justice they then encounter.

**Governmental Limits**

There are limits also on what government can do or do well. In discussions of early childhood intervention, for instance, we have often confronted a deep dissatisfaction with public agencies. Sometimes it has seemed that the only thing worse than no court-ordered intervention is court-ordered intervention.

Geography is a substantial limit on government, and Tennessee faces two major problems. First, the state's counties were drawn when the relevant technology was the post office and a day's horseback ride to the county seat. Today, counties remain the basic unit of government, even though the relevant technology is the telephone and a 55 mile-per-hour automobile. Tomorrow brings the computer-based video conference.

In Tennessee, these 95 divisions splinter efforts to consolidate resources, to operate efficiently and to develop expertise, and those effects are felt strongly in the judicial system. Nevertheless, major inertia, backed by everything from political patronage to high school

basketball teams, resists change, and change will have to work around the divisions rather than ignore them.

Likewise, the split between urban and rural interests continues to divide citizens. In the context of the judicial system, sparsely populated counties put a high value on local knowledge, flexible responses and personal accountability of public officials. All those come at the expense of uniform treatment, expertise and professional standards.

Urban centers, by contrast, focus on efficiency, uniformity and detachment. They sometimes focus to a fault, with the judicial system slipping into an impersonal machine to process high volume.

Each side sees its direction as the proper one, and where possible we have tried to accommodate these divided paths. At times, though, it is not possible to address statewide needs and policies with two kinds of responses.

**Historical Limits**

Perhaps the most subtle limit is history, which is the essence of common law. The gradual accumulation of precedent is what makes the legal system a stabilizing influence. But it is also what makes substantial reform so difficult. In contrast, a fast-changing commercial world, a splitting social system and a more complex criminal realm make new demands constantly on the judicial system.

Indeed, part of the reason for the creation of this commission, like similar ones in other states, is that the judicial system is being held accountable for phenomena well beyond its present control. No matter what changes might follow the commission's work, that will still be substantially true. Much of the system's reason for being is to serve as a last resort, when other institutions have failed to resolve differences.

There are changes the system can make, and many of them would address the changed world around us. But in a system that by its nature is tied to the past, both in substance and in ritual, there will have to be conscious efforts to consider new ideas and new ways of doing things.

**Willingness to Change**

As a commission representing both established elements of the present system and interested outsiders, we share the judicial system's pride in its past, but we also urge openness to change that goes beyond marginal improvements.

If there was any item of testimony that we heard just a bit too much, it was, "If it ain't broke, don't fix it." Often, in our judgment, the matter under consideration was indeed broken. The speaker either did not see that it was broken or did not like the fix. But the longer the fix was to be put off, the more expensive it would be, and eventually incrementalism would not be much help.

The journey to a judicial system that will meet the needs of 2026 is unlikely to consist entirely of tiny steps. Nor will it arrive at the proper place if we walk to it backwards, looking fondly at the past rather than to the future.

In the pages to come, the commission makes recommendations for some substantial changes, although not all of them require immediate or one-step implementation. Some represent an overhaul of structure. They aim to balance three elements: the economies of large scale, the expertise of specialization and the public attachment to local institutions. Some go beyond

structure to attitude. The judicial system of the past has traditionally been a vertical, isolated organization, dispensing justice as issues have arrived at the system's doorstep.

In the future, the system will have to collaborate more broadly with other social institutions. It will also have to reconsider where the adversarial tradition is appropriate and where it is not. That tradition has served as the truth-seeking method for much of the law's past, and while it has its faults, by most judgments it has served as well as whatever might be in second place.

Today, though, more issues arrive at the judicial doorstep that in the past might have been settled by other means. Some areas that are ill-suited to the adversarial system, such as domestic relations, have claimed a growing portion of the system's resources. And quasi-administrative functions, ranging from adoption to probate, often do not require the pro-and-con test of competing sides.

**Courage to Change**

If there is a failing in our view of future needs, it is probably in not being bold enough. We, also, too often look backward. When we look forward, there are blinders that narrow our vision.

Provocative notions tend to remain rhetorical. From the procedural (Why should there be any such thing as local rules?) to the philosophical (Why not privatize virtually all commercial litigation?), we have heard ideas that should at least lead to further thought, even if we have not turned them into bold-faced recommendations.

Some goals we have considered are simple, almost glib. Why not, for instance, replace the Latin-laced jargon of the law, which currently excludes the public laity from discussions of the legal clergy, and use plain English instead?

Some goals are almost elegant in their impossibility. Why not create a judicial system so good, so dependable, that no one would have to use it?

We have heard some say, only slightly facetiously, that the test of such ideas should be, "Are they weird enough?". The changes required over the next 30 years may be so great that unless an idea is considered "weird," then it probably does not break sharply enough with the past. As a commission, we would probably be described as responsible citizens, but if there was anything we lacked in our makeup and deliberations, it might have been just a touch of "weirdness," or at least the imagination to consider the unorthodox.

Again, though, there are also conventional ideas that may not be covered in this report that may also be quite important to the broader vision for the judicial system of the future. Some of those ideas and some of our recommendations might seem substantial to those enmeshed in the present system. To others they might seem mundane. In fact, they are radical mostly by comparison to present practice.

From either view, we urge that public discussion of this report be as broad as possible. If it provokes more "weird" ideas, so much the better, for they may go to the heart of matters as clearly as our own formulations.

**Uncertain Future**

We also say explicitly that even though a recommendation or plan is not part of this document, it might still be a perfectly acceptable path for the judicial system.

Much of the future, after all, remains vastly unpredictable. Imagine, for instance, what great good might come of advances in treatment for substance abuse. Effective pharmacology could bring drastic reductions in drug and alcohol use, a change that would have more effect on crime than almost anything the judicial system might do.

Imagine, on the other hand, what great social disturbances might ensue if technology places more people outside the world of work, or even if it continues to widen the gap between the well-off and the increasingly desperate. A judicial system must adapt to such changes, but clearly we cannot anticipate all of them here.

In addition, we have not studied every subject in as much depth as we might have. We have not considered every possibility. And we are not, by any means, the only source of wisdom or innovation for the future. An idea's omission here should not preclude its further consideration.

Nevertheless, this much should also be said: There are important matters wrong with the judicial system now. There is every reason to believe they will continue to be wrong until they are fixed. And we are convinced they can be fixed. We welcome the discussion to come.

**The Pitfalls**

There will, of course, be unintended consequences. Virtually every judge, for instance, dreams of the efficient record-keeping that computer technology could bring to the courts. Not every judge, however, will welcome the measurable accountability that such technology inexorably brings with it.

Some of the unintended consequences of both conventional and technological changes will be beneficial to the system. Others will not. So no matter how closely the judicial system and the General Assembly respond to this report, it is only one point in an on-going process.

## Tomorrow's Vision

The judicial system in the State of Tennessee exists to serve all people by:

♦ Providing a fair, independent, accessible, under-standable and efficient means of determining rights and resolving disputes,

♦ Preserving and interpreting the evolving rule of law,

♦ Protecting all rights and liberties guaranteed by the United States and Tennessee Constitutions.

It is appropriate to begin with a mission, and the statement above is our draft of the judicial system's underlying goals. The Supreme Court and the Judicial Conferences are free to write their own versions, of course, but for now we present these goals as guiding principles for our work. In general, these are words that are often attached to the judicial system, and they warrant some attention phrase by phrase.

**To provide**: By chance, "fair, independent, accessible, understandable and efficient" may have been listed in declining order of accomplishment. In public opinion, at least, the judicial system is sometimes considered fair and independent to a fault. It seems to create numerous

barriers to accessibility and understanding, though, and a description of it as efficient would generally draw derision.

Sometimes the goals themselves can conflict. Rules of procedure written to ensure fairness can undermine efficiency. Criminal plea bargains, made for efficiency, can seem mightily unfair to a victim. Nevertheless, as abstract goals these five adjectives represent a judicial system to satisfy almost anyone.

**To preserve**: Constitutional scholars could spend a career on the phrase preserving and interpreting the evolving rule of law. Should judges interpret the law, or merely apply it? Can law be preserved that is also evolving? Still, the very notion of common law is that it will constitute a dependable norm, a standard to rely upon that offers both moral guidance and practical reference.

We will talk later of moving many disputes out of the traditional judicial setting. Not every drug arrest and not every disputed debt requires full adjudication by a high-seated arbiter. But standards must exist, and despite the whirl of social and commercial change, the normative role of the courts will remain important. Indeed, the more rapidly other parts of life change, the more the public will look to courts for resolution. New issues of biomedical ethics, for instance, wind up in courts much quicker than they wind up in legislatures.

**To protect**: Likewise, individuals can, and often do, have serious disagreements over just precisely which rights and liberties actually fall under constitutional protection. The resolution of those disagreements is clearly a mission of the courts, however, and so is the daily guardianship of those rights and liberties. Executives and legislatures play a role, but history has placed this task most squarely on the judicial branch of government.

From that mission statement for the present, we turn to the future. We believe that a judicial system that aims merely to make small improvements on the past is a judicial system that will fail. The world with which the judicial system deals is not making small changes.

Our vision of the future, therefore, is framed in ideals. We do not precisely predict, for instance, that by the year 2026 all biases will be eliminated. We do have a vision of such a system, and we believe that progress toward the vision is essential, for the judicial system itself will be called upon to mediate all sorts of new disputes that fall along factional lines. These visions, then, are the guiding lights of the recommendations that derive from them:

**In the future:**

- ♦ The primary function of Tennessee's judicial system will be to solve problems. The system will be capable of addressing a vast array of situations, many of which were not contemplated in the past.

- ♦ Problem solving will continue to include the resolution of disputes. The great majority of these disputes will be resolved by the system through innovative and informal processes.

- ♦ Everyone will have full access to an affordable dispute resolution system. It will include related institutions that go beyond formal courts.

- All biases in the system will be eliminated. Race, national origin, religion, gender, age, disability, sexual orientation, financial means and geographic location will not affect the process. Fairness will permeate its decisions and actions.

- The judicial system's organization will be simplified, uniform and coherent. Solving a problem will be accomplished in the same manner and with the same ease throughout the state.

- There will be efficient use of all the judicial system's resources, including personnel, facilities, funding and time. New technology will be fully employed to increase access, decrease cost, emphasize objectivity and facilitate dispute resolution.

- The judicial system will be sensitive, responsive and convenient. It will serve the public, and the public will know how to access and operate the system.

- Decisions of the system will be understandable and sensible. Multiple forms of accountability will inspire public confidence in the processes, personnel and outcomes.

- The judicial system will be proactive. It will cooperate with other social, educational and governmental entities. In both training and vision, its personnel will reach beyond the traditional bounds of the law.

- The judicial system will be a separate, independent and co-equal branch of government. It will exercise leadership in furthering justice.

Again, these are visions, not forecasts. Even if every recommendation in the pages that follow were adopted, the visions would not be entirely accomplished, because they depend on the perfectibility of fallible people.

Many of those people may have fears about the substantial changes implicit in these visions. There are ways to ease those fears and manage those changes to make them more acceptable.

We expect that much of the reaction to this report will focus on means, those specific recommendations we offer in later pages. They are fit subject for debate and disagreement. But disagreement over means should bring us back to these goals, not distract us from them. The visions are a road map to values, not to specific legislation. They will echo through our analysis, and the analysis will elaborate on them.

**Today's Reality**

First, let us pay tribute to recent times. In the past 30 years, Tennessee's judicial system has raised its sights substantially. It has moved beyond inadequate justice-of-the-peace courts, and it has improved in both practices and personnel.

Even during the term of this commission, substantial progress has been made. The recent efforts in judicial evaluation, for instance, are important steps for both quality and accountability.

The progress has not been enough, though. By almost any measure, public confidence in the judicial system has declined substantially in recent years.

It would be easy enough to write off this trend. Virtually all public institutions show similar declines. They show up everywhere, regardless of local variations in quality. They are, perhaps, simply a symptom of a cynical age. But writing off this trend does nothing to remedy the situation. While there is little evidence that a new spirit of community and a restored respect for authority are on the horizon, giving in to the current will only send us farther downstream.

Some of this erosion in public confidence is clearly unjust. The system has improved, rather than gotten worse, and much of the blame laid upon it is for problems far beyond its ability to solve. Social misfits that begin in prenatal neglect, develop in dysfunctional settings and explode in a fury 25 years later can't be counted as a failure of the courts. At least, they can't be fairly counted that way, but they are.

Still, there is a considerable distance between the judicial system people want and the one they have.

## Public Opinion

There are factors within the system that erode confidence, and it's fair to assume that progress on them would mean progress on public trust as well. In too many ways the judicial system is falling short. The commission heard such evidence anecdotally in public testimony. We heard it more formally from experts. The complaints are familiar to almost anyone today, and they are believed most fervently by many who have been dragged into the system as litigants, victims and jurors.

The highest opinions of the judicial system come from those within the system-the judges, lawyers and clerks whose places are secure in the present. Time after time, we heard from them that a few minor improvements might be useful, but that by and large the system was serving the public well.

The public disagrees, and it regards self-satisfaction within the system as a telling fault. Much of the public believes that the judicial system fails to accomplish the five fundamental qualities of its mission statement. Specifically, citizens usually believe the judicial system comes up short in one or more-usually more-of the following, whether demonstrably true or not:

## Fairness

In both civil and criminal courts, the scales of justice are tilted in favor of those with financial resources. Like the rest of society, and despite progress over the years, the judicial system suffers from biases of race, gender and other factors that should not influence the procedures and outcomes of the system, but which too often still do.

There are basic conflicts of goals, particularly within juvenile justice, leading to uneven treatment from one jurisdiction to another.

Lawyers may use procedural rules for every advantage, at the expense of justice. Discovery, for instance, can be so distorted that time and cost have far more influence than merit. Plea bargaining, prison overcrowding and sentencing guidelines make it impossible to predict the time served for a crime. In most cases, the punishment falls short of public expectations about matching the crime.

Discipline of unethical lawyers is secretive and self-protective, and discipline of incompetent lawyers is almost non-existent.

### Independence

The judicial system is too independent, for there is so little accountability. Elections are not sufficient, and little can be done about inadequate or even incompetent judges, clerks and other system personnel.

Parts of the system are so independent that there is no way to manage the system or even analyze it. In some places, basic data is not collected.

In other regards, though, the judicial system is not independent enough. Some parts act as arms of other branches of government. General sessions courts, for instance, often become primary revenue sources for county government.

Likewise, the system as a whole has traditionally played a passive role, unable to be heard even on issues within its expertise, such as legislation that might affect the judicial system. Its passive mode also prevents it from playing a role beyond the dispenser of judicial decisions, although other institutions are turning to more effective early intervention and collaboration.

### Access

Delay and cost provide serious barriers to justice. The price of discovery and expert witnesses has risen disproportionately. Legal services for the indigent are not available in all areas of the state and are overburdened in others. Persons not qualifying for indigent services are often at an even greater disadvantage.

Legal language and complex procedures make it difficult for persons to represent themselves even in simple cases, especially if the opposing sides are represented by counsel. Personnel of the judicial system frequently treat lawyers and judges as the clients of the system and members of the public, including witnesses, victims and jurors, as troublesome outsiders.

### Understanding

Tennessee has one of the more complex and confusing court structures in the nation. Details of the system are difficult and little-known, and simple assistance is difficult to find. In some cases, such as sentencing procedures, the complexity and false fronts foster public cynicism. Education about the judicial system is cursory at best.

### Efficiency

The judicial system is not a system. It lacks the central financial and administrative control that could make it one. The system's structure follows boundaries that do not match efficient administration. There are duplications of efforts among people doing similar jobs, and resources could be redistributed to serve justice better.

Some court levels are so overburdened by caseload that justice becomes a distorted process. Judges seldom play an active role in case management, including discovery, so no one does.

Court schedules are adopted for the convenience of lawyers and judges, not other parties, even when that means massive inconveniences elsewhere.

The system is just beginning to catch up to the enormous potential of new technology, but computerized records are far from being uniform or easily accessible.

Evaluation and accountability are beginning to improve, but are still far short of modern management practices.

Taken together, these problems and perceptions hobble both daily justice and public confidence. They establish a distance between justice and the law that citizens do not understand and increasingly will not tolerate. Correcting them, or even just mitigating them, would bring the judicial system more in line with where it should be today. The next 30 years will bring unpredictable new problems to the system. To prepare for that future, the judicial system must address the problems of today.

In the pages that follow, the commission makes recommendations about those problems, and looks beyond them as well. Our suggestions aim for a system that both improves upon the present and prepares for the flexibility of the future.

In the past, traditional solutions have centered on creating more judgeships, raising pay, building modern courthouses and hiring more deputy clerks. We move well beyond those solutions.

### Flexible Structure

In content, a judicial system is strongly hierarchical. Appeals go up. Decisions are handed down.

In management, it is a splintered structure. Judges, clerks, prosecutors and public defenders often feel accountable to no one. Only major infractions attract oversight. On day-to-day competence, the officials answer only to the electorate, which is usually in a poor position to make any serious evaluation. The public itself knows that this sort of accountability fails; it finds fault with the quantity, quality and consistency of judicial work.

In structure, judicial systems combine the worst aspects of both hierarchy and autonomy. The organizational chart reflects the flow of paper rather than the line of accountability, and the numerous boxes are a sign of divided, uneven and wasted resources.
The divisions made sense in an earlier time, when stable caseloads and rural roads made proximity to the courthouse a fair measure of system efficiency. That condition has changed.

### A Changing Law

Urban, industrial, bureaucratic life has transformed the law, even in rural areas. Yesterday it was increased divorce and growing administrative law. Today it is a rise in crime, domestic violence and environmental cases. Tomorrow it might be coping with an aging population and ethical quandaries of new technology.

If the current trend of redirecting many public services from the federal to the state level continues, state courts can expect new shifts in judicial oversight even among present-day issues. Increased federalization of crimes may be reducing a portion of the state criminal caseload. Legislation along the three-strikes-and-you're-out line is increasing another portion.

So far court adaptations have been mostly additive, and with resources piled on a structure devised largely in 1870. Now, though, the solutions of the past-merely adding resources-meet strong resistance. Public resources are tightening up, and no one reasonably expects any cyclical loosening in the future.

To compound the problem, there is an elevated expectation of fairness, quality and expertise within the judicial system. A heightened sense of individual and group rights, a skeptical (if not cynical) regard for traditional authority and an easier ability to spot outcome disparities-all make for higher demands and more likely dissatisfactions.

**Modern Management**

Tomorrow's judicial system must be governed by strong, clearly defined and accountable management that will command public and legislative respect through effective use of public resources.

In the past, judicial management has rested on the model of an independent, perhaps autocratic, judge. That model makes no more sense for today's judicial system than the table-pounding business owner does for today's corporate world.

The judicial system has been a vast set of islands, laid out in a pattern that is bewildering to the public, each with its own personality quirks and customs. On legal matters there is a clear line of authority, but on administrative matters local sovereigns often reign in isolation.

A public that works in businesses with advanced information systems, performance evaluation and constant change quite naturally resents a system that seems detached, unaccountable and hidebound.

Technology offers some promise in moving toward modern management, and its advantages will be multiplied in a structure built for flexible adaptation to the changes that will surely come.

The structure should serve the interests of the public and of justice, not any particular group of judges, lawyers, or other parties within the judicial system.

It should also be broad enough to change as needs change. The Supreme Court, working with the Administrative Office of the Courts, should be able to make such adjustments by its own authority, responding quickly and without political consideration.

**The Ultimate Court**

The Tennessee Supreme Court should serve as the court of last resort in both civil and criminal matters and as the ultimate authority over the administrative arm of the entire judicial system. This is essentially the case now. However, we do recommend some important changes in the underlying details.

The size and format of the Court have not changed since 1876, when caseloads were minor, when the grand divisions of the state were both grander and more divisive, and when administration was largely a local concern.

♦ Justices of the Supreme Court should be chosen from throughout the state without regard to the grand division in which they might reside. They should be appointed by the governor upon the recommendation of the Tennessee Judicial Selection Commission, as in the present system.

♦ For the sake of continuity, stability and political independence, terms of office should be staggered, so that no more than half the court members are subject to removal or reappointment at any given time.

♦ The members of the Supreme Court select one of their members to serve as presiding or Chief Justice. That person should serve for a four-year term.

- ◆ We suggest that the senior member of the Court, other than the Chief Justice, should be designated as the deputy chief justice, to serve in the absence or disqualification of the Chief Justice or a vacancy in that position.

- ◆ Membership of the Supreme Court has been set at five since 1876. It is easy to envision circumstances under which that will be an inadequate number. We therefore suggest that the number of justices be set by the legislature, rather than by constitutional provision, when recommended by the Supreme Court.

**The Ultimate Authority**

The Supreme Court will remain the ultimate authority of judicial system administration, but it has neither the background nor the mission to oversee detailed aspects of management. It should take on the roles for which it is best suited: broad guidance and final review.

In recent years, the administrative arm of the judicial system has been substantially enhanced, largely through the Administrative Office of the Courts (AOC), working closely with the Chief Justice and other members of the Supreme Court.

The Chief Justice has served as the chief executive officer of the court system, and the other justices have taken on oversight roles as well, especially in dealing with the various commissions and advisory boards reporting to the Court, which number about 30 at any given time. Members of the court have developed various areas of expertise in that regard, although the career path to the court normally does not include much experience as an administrator of a large organization.

In later pages we recommend further enhancement of system administration, with substantially more responsibility placed on the Administrative Office. On a straight-line path, that would require more involvement by the Supreme Court as well.

In fact, the workload will actually require a certain stepping back by the court to a role more like a board of directors of the administrative arm. The director of the AOC will function more like a chief operating officer of the system. The Supreme Court will focus more on board-like functions: policy setting and review; long-range planning; priority establishment; accountability review of the Administrative Office of the Courts and its director.

The Supreme Court, as one example, should not have to determine what kind of computer software would be best for both local case management and statewide data collection. It should, though, be in a position to focus the AOC's attention specifically on those goals.

**Combine and Divide**

Consolidation of lower courts seems to imply making parts of the system bigger. In fact, consolidation should help divide the system. The issue of consolidation raised more alarms from officials within the system than any other issue the commission considered, which may be an indication of just how internally focused the system is. The subject is worth a few words on its own, before we get to specific levels.

If the only points for consolidation were even caseloads and uniform procedures, we might have deep qualms about the strategy as well.

Critics of the strategy focused most often on the expertise of divisions and the efficiency those divisions bring. They then undercut their own arguments by noting the cross-assignments of appeals court judges and overlapping jurisdictions of lower courts. In some jurisdictions, one

judge fills the civil, criminal, equity and juvenile law roles, leading one to wonder why expertise might be so essential in one courthouse but not in another. In fact, we agree that expertise serves important functions, and we do not intend for consolidation to turn more judges into general practitioners.

In present circumstances, though, expertise is frozen into constitutional and statutory structures, often in ways no longer appropriate. Some current bases are too small to justify specialization. Some other bases are misapportioned to changing caseloads, and legislative reaction necessarily lags behind the changes.

Circuit, chancery and some general sessions courts, for instance, are still struggling to adapt to an enormous increase in domestic relations cases, even though that increase began appearing well over 30 years ago.

Consolidation of the base allows flexible divisions according to need, changing as needs change. A wider base would allow for more specialization and expertise rather than less, but the divisions would be based on needs of today rather than on legislation of yesteryear. The consolidations we propose aim to maintain the expertise that exists, gather resources for even greater specialization than is now possible, and open the system to more responsive adjustments.

**A Single Court of Appeals**

Accordingly, we recommend that there be one intermediate court of appeals in Tennessee, with both criminal and civil divisions. When we suggest one court, we do not suggest that each judge will hear an equal mix of civil and criminal cases. We suggest only that the division and personnel now fixed by statute adjust to current caseloads and remain adjustable into the future.

Some appellate judges prefer to deal primarily with criminal cases and some with civil. For the most part, they will continue to do so. But present inequalities in workloads can be evened out, and the appeals court's role in efficient system management can be enhanced.

A number of comments to the commission have objected to the idea of one appeals court-a disproportionate number, in fact, considering the many substantive issues that have not drawn such response. The comments are all the more remarkable considering that almost all other states have only one intermediate appeals court.

While a majority of the commission favors a consolidation of the present two appeals courts, we acknowledge also that this is not the linchpin of judicial reform for Tennessee. Nor, however, would it be the calamity that its critics portray.

Specialization within a consolidated appeals court would be consistent with the principles and structure we prescribe for the rest of the judicial system.

In the future, changes might lead to a third specialization of assigning cases-perhaps for administrative law appeals, or some area that we cannot anticipate at this time. Under the consolidation we propose, the judicial system could establish that division without passing through the hoops of both legislative and judicial politics.

♦ Appeals court judges, as in the present system, should be appointed by the governor after recommendation of the Tennessee Judicial Selection Commission.

♦ The members of the Court of Appeals would select one of their own to serve as presiding judge for a four-year term.

- ♦ As in the Supreme Court, the most senior judge who is not presiding judge would be designated deputy presiding judge, to serve in case of absence, disqualification or vacancy of the presiding judge.

**Consolidated Trial Courts**

The commission recommends a more substantial consolidation of all trial courts, including the present Circuit Court, Criminal Court, Chancery Court, Probate Court, Juvenile Court, General Sessions Court and municipal courts with General Sessions jurisdiction. All of these functions would fall into one grouping, to be known as district courts. Specifically, this would remove the multiple statutory provisions for the patchwork of various courts, often done through locally initiated private acts of the General Assembly.

Again, let us emphasize that this would not abolish the functions of those courts or the specialization of judges. Within each judicial unit, one or more divisions of these districts courts would likely be designated to carry out those various functions. There might, for instance, be a division of district court designated for civil litigation, one for criminal affairs, and one for family law.

Some of the specialized courts now being held experimentally, such as drug courts and environmental courts, might have formal status within certain district court units. As needs develop for similar specialties in the future, the judicial system could shift resources to establish such divisions without special legislation or separate administration.

The commission heard numerous objections to this proposed consolidation, particularly from chancellors. Whenever a commission member explained, though, that there might well be a division of district court devoted to the "fast-track" and equity expertise of Chancery Court, the objections usually diminished.

A consolidated system would also be able to shift resources to even out workloads, a matter of both fairness to individual judges and confidence to a public that is skeptical about judicial diligence.

Consolidation would allow cross-assignment of judges well beyond the present, mostly voluntary, system. This system management would be used routinely to maximize personnel and facility resources, accommodate the special needs that travel to rural areas places on judges, and expand the variety of matters to which many judges are exposed. Every judge appointed to district court would be subject to cross-assignment, although obviously the judge who prefers general trial work will face a far wider range than the one who prefers to focus on family law. Each judge would hold the same title-district court judge-and receive equal pay, to affirm the parity of their positions, regardless of any specialized divisions to which they are assigned.

**Appointed Judges**

Judicial selection has been debated from the state's earliest days. The Constitution of 1796 put the power fully in the legislature, but the Constitution of 1835 took away appointment of justices of the peace and made them subject to popular suffrage. The amendments of 1853, spurred by Jacksonian Democracy, did the same for appellate and trial judges.

Executive appointments during Reconstruction led the Constitution of 1870 to reinforce the requirement for popular elections, but within a short time critics said it was an overreaction.

An 1887 article in the Proceedings of the Bar Association of Tennessee, for instance, argued that "an elective judiciary is not, and can never be, perfectly independent."

About judicial appointment, it said: "It is well known that this is not a position that is popular or that is likely to touch a tender chord in the politician's heart; but it is the way judges should be made, and when they are made in this way, experience demonstrates that they are better judges, and that justice is administered without sale, denial or delay."

The commission agrees, but not without acknowledging that executive appointment imposes a cost on democratic spirit.

We recommend that trial judges be selected in the same manner as members of the Court of Appeals and the Supreme Court. That is, they should be appointed by the governor, after nomination by the Judicial Selection Commission, for eight-year terms, then face retention referendums rather than be required to stand for traditional candidate-vs.-candidate elections.

**No Party Label**

Partisan elections, in particular, undermine the essence of judicial independence. The ethical code that prohibits a judge from being swayed by partisan interests simply does not square with an election in which a judge is a formal representative of those same partisan interests.

The commission did hear serious support for nonpartisan elections, though, at its best from persons who believe that public officials should be directly accountable to the public and that executive appointments diminish public confidence. Those views were admirably democratic, even when expressed by those who acknowledged that the public often has little information on which to evaluate a judge. Even now, in Shelby County for example, the public may make choices in up to 40 judicial elections at one time, with more than 200 candidates on the ballot. In such circumstances, informed choice is an oxymoron.

As electoral proponents note, executive appointment does not remove all politics from the selection process. In fact, though, a great number-in recent years, a majority-of state judges subject to elections obtained their office first through appointments.

On balance, the decisive factor for the commission is the crucial importance of having judges who are free to decide every case on merit, not on how an electoral opponent might use the decision.

In addition, there is a built-in conflict of interest in judicial elections. Their manpower and money invariably come from those with a stake in the judicial system, mostly lawyers and those whose interests bring them frequently into court. Ethical canons require that judges not know who has contributed to their campaigns, but election laws require them to review and sign documents listing the contributors. It is a charade, and the system fundamentally undermines judicial integrity.

The increasing importance of fund-raising in elections compounds the risk that political caution might overrule judicial integrity. The recent rise of special-interest politics also makes reliance on judicial elections increasingly at odds with the general affirmation that elections are supposed to confer. And if the commission's recommendations for district court consolidation are adopted, the electoral area of a judge would be larger and thus require substantially greater fund-raising for a traditional election.

Clearly citizens of Tennessee wish for a system in which they maintain a sense of public accountability. Retention elections fill that role, but as we discuss later, a corollary component is an extensive system of judicial evaluation. Accountability is only as good as the information

upon which it's based. Whether the ballot choice to retain a judge is Yes vs. No, or Judge A vs. Person B, only good information will ensure the public confidence that the ballot is supposed to inspire.

**Full-time Judges**

Arguments for part-time judges are far less credible than those for elected ones. Those judges who also engage in the private practice of law face constant conflicts of interest for themselves and create constant dilemmas for attorneys in their courts.

Resource management under consolidation should remove any logistical necessity for part-time judges, and public faith in the system's integrity can only benefit.

We believe it is still sensible for district attorneys general to stand for election. They represent the public in court; they are appropriately accountable to the public.

Public defenders, on the other hand, represent the criminally accused. Their ethical responsibility is to be an adversary against the public's representative, and that is logically inconsistent with seeking the public's approval every few years. We think they should be selected by appointment.

**Magistrates in the Middle**

Magistrates can play an important middle role, less than judicial decision-making but more than clerical record-keeping. We envision magistrates as the triage officers of the judicial system. We are not even sure magistrate is the proper name, since the position is unlike the various present magistrates. Gatekeeper, dispute facilitator, justice coordinator-all those titles sound a bit stiff, but they do describe what we have in mind.

What we don't intend is for magistrates to become second-tier judges. The tendency in that structure is then to establish second-tier courts, dispensing second-tier justice. Magistrates could have plenty to do as gatekeepers.

They might screen complaint warrants to weed out the groundless, for instance. The practice of "taking you to court with a warrant," the almost limitless ability of citizens to swear out warrants against each other, needs a filter. At present, criminal warrants, issued without fee, are often substituting for civil warrants that require a fee. Warrants that drag citizens into the justice system should be administered in a just manner, and too often now they are not.

Magistrates might also play an important role in the bail bond system. There are many reasons for the faults in that system, but judicial inattention is on the list. Someone in the judicial system should have responsibility for judgment about risk.

Magistrates might sort out issues and facts short of final judgments. For that purpose, we recommend that they be licensed lawyers, chosen by district judges from candidates qualified by the Administrative Office of the Courts.

Magistrates might preside over preliminary hearings and various motions. Even more broadly, they might exercise effective case management, which now falls below the horizon of the trial judge but above the authority of the court clerk.

They might play an important role in referring cases to alternate forums and even to alternate community resources, ranging, say, from counselors to public health agencies. In that framework, the magistrates' success would be judged not just on the volume of the caseload, but on the effective direction of it. Some of that direction would be inside the court system. Some would be toward other problem solvers.

The entire judicial system must move beyond the model of simply processing cases. The magistrate, with more flexibility than a judge but more authority than a clerk, can be a focal point of that movement.

**Mandatory Education**

Continuing education should encompass both procedural and substantive law, plus topics that enhance the overall performance of the judicial system and the public confidence in it. For instance, training for judges and other court personnel should include:

- ♦ Cultural diversity

- ♦ New technology

- ♦ Personal relations, including interaction with the public, juries, unrepresented litigants and professionals

- ♦ Alternative dispute resolution

- ♦ Relations with social services and other agencies

- ♦ New judges should have special training before assuming judicial responsibilities.

**Routine Evaluation**

Full and meaningful evaluation may do more to improve both judicial performance and public confidence than any structural or administrative change we suggest. No matter how well our other recommendations are received by the General Assembly or the broad legal community, the judicial system can make great progress by concentrating its efforts on full development of the emerging system of evaluation.

Evaluation of judges at all levels should include expert application of the law and performance standards for case management. But it should also include broad measures of the full range of judicial actions, and it should seek opinions among all the various parties that come before the court, from litigants to witnesses to jury members.

The commission believes the Supreme Court has made important progress in its recent rule establishing mandatory evaluation procedures. The present evaluation of trial-court judges is used only in confidence for judicial improvement, but we hope that as it is refined and enhanced, and as it becomes routine, it will then become part of the information available to the public that the judicial system serves.

The evaluation is not confidential for members of the appellate courts, and we applaud their willingness to embark on this enhanced public accountability.

Technology can add an important element to public accountability. The advent of computer data bases opens up new forms of analysis that can be enormously useful to judicial evaluation and public confidence.

Statistical studies of judicial actions, for instance, can be powerful weapons in monitoring discrimination. Such studies are already done occasionally by academic researchers or journalists. They would be far more useful if done systematically by the judicial system itself, for behavior can change strikingly when simple but quantified facts are laid open.

**Judicial Clerks**

Every judge should have the assistance of a law-trained judicial clerk. Judicial clerks are no more luxuries for judges than nurses or lab technicians are luxuries for doctors. Clerks who research specialized areas of the law allow judges to be more efficient, freeing them to do what only judges can do: manage and decide cases. This benefit is recognized in state appellate courts, but it holds true in trial courts as well. Trial judges should have access to a salaried judicial clerk on an individual or shared basis, depending on the nature of the judge's caseload.

**A Municipal Maze**

Strictly local municipal courts offer a separate, substandard justice and warrant a thorough review of their own. At their best, the present-day system of city courts is a convenient means for disposing of relatively minor matters, close at hand, with less formality than state courts. They become, in essence, an administrative forum of alternative dispute resolution, with the right to appeal to the state judicial system.

At their worst, they are merely revenue agencies masquerading as courts. Their sole reason for being is the funds that their municipality draws from them. If the funds disappeared, few of the cities would consider the court an important civic service. Their limits and oversight are ill-defined, and their flexibility can sometimes disguise mere arbitrariness.

Municipal courts are a substantial topic unto themselves. There are some 200 to 300 such courts across the state, operating so independently that even obtaining an exact count is difficult. We believe they fall much closer to the worst model than to the best one. A majority of complaints about judges that come to the Administrative Office of the Courts originate with municipal courts.

Another body should take on a full review of municipal courts, but our own review leads to these starting points:

♦ State trial courts should hold sessions in a wide range of locations, as much as possible eliminating the municipal courts' justification for convenience.

♦ Municipal courts across the state should have uniform practices and standards. A maze of private legislative acts built them over the years, but a citizen's experience in any court should not depend on the whims of local history.

♦ Criminal offenses should be defined by state statute, not local ordinance. Municipal governments should neither criminalize actions on their own authority nor mirror state laws just for the sake of their own revenue.

♦ As a bare starting point, municipal courts should be required to report data summarizing caseload and funds. Accountability does not occur in an informational vacuum.

Municipal courts, and the reasons for them, are ripe for change. For instance, if a person could pay a fine for a traffic offense by handing a credit card to the police officer, the public

theater and private inconvenience of a court appearance could be removed. We encourage that sort of change. Merely adding more revenue-gathering municipal courts to the present patchwork demeans their role in public justice. State government will have to take the lead in reform, though, because the financial interest of local government clearly rests with the present system.

**In the Profession**

The legal profession should renew its emphasis on professional responsibility. While the Commission has focused on the judicial system as a part of the broader legal system, our study frequently brought us back to the attorneys practicing within it. Public disenchantment with the judicial system cannot be separated from public feelings about lawyers in general.

Market forces within the legal business are not helping. Concern for revenue production and service marketing builds pressure for a volume business, and that often leads the legal profession directly away from public confidence.

This is not the place to review the whole array of the legal profession, but this much seems clear:

Attorneys must be trained beyond the traditional knowledge and skills of the law. That training must include an enhanced sense of ethics, the countervailing force of market influences. And the legal system must build an effective system of self-regulation, one that the public does not write off as mutual accommodation.

Some of these topics are treated more fully in an appendix, a report by the deans of the state's four law schools and the three present members and one former member of the Tennessee Board of Law Examiners. That group's work was parallel to the Commission's, but its place in considering the state's judicial system is a central one.

**Additional Guardrails**

An adequate system should exist to protect clients against theft or diversion of funds. All attorneys should be required to carry malpractice insurance, to protect clients against gross incompetence or neglect. The regulatory apparatus that disciplines attorneys should enhance public confidence rather than add to skepticism. It might begin by including participation by members of the public.

Too many of the disciplinary proceedings remain too secret for too long. Clearly there is a problem with frivolous complaints, even more of which could be expected if all were made public. But there should be a point at which there is an equivalent of finding probable cause, a threshold at which the balance shifts toward informing the public that a potential problem exists. Likewise, if the disciplinary procedures are meant to support public confidence and accountability, the practice of private reprimands should end.

Evaluation of competence is a difficult area. There are problems with peer review, but consumers should have guidance that is more reliable than phone-book advertising. Certification of specialization is one step now underway, but the legal system should look beyond that single standard. Competence has often been regarded as a matter of subjective judgment, and left untouched as a consequence. New techniques of analysis offer ways to quantify and objectify such issues, though, and the system should look for ways to incorporate those techniques rather than resist them. At the least, judges should be less tolerant of failing competence than is often now the case.

**Modern Support**

The Commission proposes an administrative structure parallel to the judicial structure, which will enhance the professional management of the judicial system, permit efficient use of resources and improve accountability at all levels.

While the Chief Justice is the chief executive officer of the judicial system, the state court administrator should be the chief operating officer of the administrative side of the system. The Supreme Court would have the authority to appoint or dismiss the court administrator, and it would have policy review of the administrative office. That is a natural design for administrative accountability.

But it is not our intention that the court serve as the functional manager of the judicial system. The administrative office will do that, and it will do it best if the court accepts its role in administration as a board of directors.

We recommend an enhanced version of the present Administrative Office of the Courts, providing strong management of the statewide judicial system, and a similar administrative office for each judicial district.

The present AOC's name reflects its relatively subservient status. We suggest a name like Office of Judicial Administration to reflect its larger role. Its director would be the Chief Judicial Administrator.

**High Court Responsibility**

The Supreme Court's special position puts a responsibility on it to share information and control. The Supreme Court's role in the judicial system has become more ambiguous over the years. It has always been the ultimate appellate court, and it has always been the leading administrative and policy body of the judicial system as well. The latter function, however, has come to take a greater and greater portion of the Court's time.

At present, for instance, the Court oversees the inferior state courts, some 35 boards and agencies that report to the Court, and in many ways the entire legal profession. In that sense, it functions as a board of directors the way the TVA Board does-as a day-to-day center of inside direction.

The Court also makes final decisions on policy matters that deeply affect the judicial system, from cameras in the courtroom to limits on appeals. In that sense, it functions as a board of directors the way that state boards of higher education do-as a periodic, outside review of recommendations that usually arise from outside the board.

All of which leads to a question about the Court's proper role in the future. If the administrative side of the judicial system is enhanced, will too much control rest in the Court-especially considering that the Court is ill-prepared by knowledge or experience to play the leading role on some administrative issues?

Following the board-of-directors analogy leads one to envision outside directors chosen for expertise, but that seems unworkable in both conceptual and constitutional terms. This concentration of control does oblige the Supreme Court to look for ways of sharing its responsibilities.

For instance, while the Supreme Court would logically appoint the Chief Judicial Administrator, that person and the administrative office will work with all levels of the judicial system. We recommend, therefore, that the Supreme Court's appointment involve consultation

with the Tennessee Judicial Conference. The Administrator, by example, might be chosen from a list of nominees approved by the Executive Committee of the Tennessee Judicial Conference.

Over time, if an enhanced administrative office develops the expertise and competence that we envision, the Supreme Court may find it easier to back off of its own administrative role and focus more on its judicial and policy roles.

Likewise, to the greatest extent possible the Court should search out expertise elsewhere, and not necessarily just within the legal profession. The broad base of this commission's membership offers an admirable model, and we hope it stands as a useful example to the Supreme Court in the future.

**Judicial Council Role**

The Judicial Council should be a focal point for implementation of judicial system policy. The most obvious limit on the Supreme Court's power as an institution is the General Assembly's responsibility for budgetary and statutory change within the judicial system. The state's Judicial Council is the natural point of resolution.

The Council has an uneven record, but in recent years there are signs that its role is growing. We encourage that trend. Many of our recommendations on the administrative side of the judicial system center on the rational allocation of resources. The Judicial Council, with members representing the legislature, the executive branch, a broad array within the judicial system and others, is the right forum for deliberation on those issues.

Further help could come from better comparative analysis of judicial system staffing and funding. Clear benchmarks could lessen the pull of politics in providing appropriate resources in appropriate places.

**Parallel Consolidation**

The commission recommends changes in administrative structure consistent with the changes we suggest for the courts. Specifically, that includes consolidation of judicial districts and clerks offices. We have not drawn up detailed plans. To a certain extent, they would depend on caseload figures that in some jurisdictions are still rudimentary. Some specifics would be better determined by experienced service providers.

However, we envision 8 to 12 judicial districts, rather than the present 31. The specific number of judges and geographical boundaries may be set by the legislature upon recommendation of the Supreme Court and the Office of Judicial Administration, but there are many other multi-county service divisions at that scale to provide helpful starting points. Districts of that size would allow for both the efficient resource management and the specialization that we have described earlier.

The current system of multiple clerks offices should be eliminated, with a central record-keeping and administrative office for each district. The judicial system should have a uniform docket numbering system to ensure that accurate comparisons and evaluations of workloads can be accomplished.

In addition, the system should permit filing for all courts from all locations to minimize public confusion and maximize limited personnel and resources. Electronic record-keeping should greatly facilitate this change over time.

**District Presiding Judges**

The judges of each district should choose a presiding judge for a term of four years. While the state's experience with presiding judges has been mixed to date, it has often been hampered because the districts were so small that the presiding judge had limited authority over his or her colleagues, and because the presiding judge has had no particular competence in administrative matters. Routine rotation of the role has merely multiplied these limits, often ensuring that presiding judges will avoid anything close to strong management.

We aim to remedy the former with a larger pool from which to select the presiding judge and the latter with a stronger administrative structure. The presiding judge would be the chief judicial officer, not the personnel manager or the clerk's negotiator.

Bigger districts, better data, and greater power-in, for instance, the authority to assign cases-make the presiding judge of the future a substantially enhanced version of the present one.

**District Administrative Office**

Likewise, we recommend a district administrative office for each judicial district and one for the Court of Appeals, each to be headed by a district judicial administrator. The district offices would be responsible for:

- ♦ Implementation and enforcement of judicial system policy.

- ♦ Monitoring of calendar management for all cases within the judicial district.

- ♦ Administration of staff services, including those traditionally performed by clerks, bailiffs, court reporters, probation officers, all other support staff and those retained by the court for professional services.

- ♦ Administration of jury service, victim coordination, witness scheduling and other ancillary services.

- ♦ Administration of personnel, finances and records, including applications of new technology.

- ♦ Liaison with local government, other government agencies, bar associations and other community groups, news media and the general public.

- ♦ Management of facilities.

The district judicial administrator would be selected by the judges of the judicial district from three nominees qualified by the Chief Judicial Administrator. The administrator would then be an employee of the state OJA and would report to the Chief Judicial Administrator. Normal standards of accountability would require that line of authority, and that line of authority works best when it coincides with the power to hire and fire.

**Paired Leadership**

The judicial side of the system and the administrative side would proceed along parallel tracks. The strong district judicial administrator is paired with a strong presiding judge. The two

tracks merge only at the top, in the Supreme Court's authority over the Chief Judicial Administrator.

At first blush, this structure might seem like a creation of a two-headed monster. It is, however, a vast managerial improvement on the present system of any number of judges, multiple numbers of independently elected clerks and appointed clerks and masters, and a state administrative office with limited authority.

It is also no more two-headed than what chiefs of medicine, hospital administrators and their respective staffs deal with successfully on a daily basis. When functioning properly, the two divisions work as a team. But getting them to function properly may require separate lines of authority.

Accountability will flow vertically, along the parallel paths. An important part of personnel evaluation on each side, however, is how well a person deals with the other side. We believe such a structure would allow judges to do what so many of them say they want to do-get back to judging, and leave the details of computers, furniture, budgets and public relations to those who seek such roles. It would also bring some concepts of modern management into a system that is structured to resist them.

**Administrative authority**

The Office of Judicial Administration would have broad authority over the administrative side of the statewide system. Its responsibilities would correspond to those listed for the district offices, but would broaden at the state level beyond the sum of the district parts. For instance, management of finances would include not just review of financial results, but also preparation and administration of the judicial system's budget.

The state office's responsibility also broadens to cover the oversight of uniform and high standards throughout the judicial system. In addition to the statewide equivalents of the district responsibilities, the state office would also be responsible for:

♦ Management of the selection process, continuing education and evaluation of judicial personnel.

♦ Planning, research and evaluation.

The chief judicial administrator should be knowledgeable about judicial functions of the courts, but at least as importantly should also have substantial management training and experience. A similar standard applies to the district judicial administrators.

Some of the administrative responsibilities are self-evident. But it is important to note a shift in administrative strength for the sake of quality and accountability.

Take, for example, the issue of case management. Right now, the judicial system has no comprehensive way to track case scheduling, no way to measure differences among judges concerning efficient case management and no way to bring any such data to bear on either judges or other personnel.

A well-equipped administrative office, armed at best with the cooperation of a presiding judge and at least with the ultimate authority of the Supreme Court, could make a real difference by monitoring the calendar, developing the data, and making them part of judicial evaluation.

Unfortunately, under the present system there are some judges and clerks who believe they answer only to the electorate, which means to no one in particular.

While we do not intend for administrators to sanction judges, we do intend to build performance accountability into the judicial system. Only a stronger administrative office can bring that to bear.

**Better research**

If the judicial system is to function as an independent branch of government, it will have to make better use of research and evaluation. Judicial leaders who aim to hold their own in determination of public policy will need to have better information. Right now, even the most basic data on costs, volumes and outcomes of judicial actions is almost impossible to obtain. Administrative policy is quite hard to set in the absence of administrative data.

Other areas that warrant better information include:

♦ Long-range strategies: For instance, alternatives to traditional dispute resolution, now widely proposed, should be systematically evaluated as they are put into place.

♦ Criminal behavior: What are the best predictors of criminal behavior? If one is single parenting, for instance, should we rethink divorce law or welfare rules or paternity obligations? What works?

♦ Law enforcement: Policy is often set by anecdote. Does three-strikes-and-you're-out legislation actually deter crime, or does it lead to full trials and appeals on the third crime, or does it make juries reluctant to convict? The judicial system should find out.

Most modern businesses that did as little research and development as the judicial system would soon be out of business. The Tennessee Office of Judicial Administration doesn't have to do original research in all these areas. But it should at least be a center for factual information on these issues and how they will affect the judicial system. Often, the research is difficult because the data base is inadequate, and that should be the first priority for improvement.
Technological attitude

New technology offers a chance for the judicial system to be more accessible, informative, productive and efficient. It is a chance that should be seized at every opportunity. It is impossible, of course, to predict the precise face of technology 30 years from now. There are serious estimates that computing power could increase by a factor of a million in the next 20 years. If so, a task that now takes a computer a year could then be done in 30 minutes.

The implications of that change are staggering. It's safe to assume that, if we look back 30 years from now, our beginning suggestions in this area will seem laughably simple. The important point, though, is a matter of attitude. Technology can be a scary thing, because change can be scary. Technology can cause serious dislocations, and we should look for ways to soften that impact through continuing education.

But the system should also look for ways to embrace new technology, because applied properly it can enhance the fundamental mission of the judicial system. A stronger administrative

arm could both foster innovation through diverse pilot projects and foster public access through enforced compatibility.

A system that considers switching from 14-inch paper to 11-inch paper as substantial change, or that resists submission of documents by fax transmission because they lack "original" signatures or seals, is a system far from embracing new technology. The rest of the American economy is not rejecting technology for the sake of protecting jobs or past practices. If the judicial system does so, it will add one more reason for public disdain.

If, on the other hand, the judicial system welcomes new technology and actively uses it to improve both external access and internal management, it will redirect the system's energy toward serving the public.

**For keeping track**

The first goal should be creation of an open, electronic Judicial Information System. Basic data about Tennessee courts are unavailable. Time and again in the Commission's own studies, we were told that the data we sought were not available. No one, for instance, can say even how many cases were filed in any given year, or what their outcomes were.

Some courts seem barely beyond quill pen registry. Others have made halting steps forward, but just recently the judicial computer systems of the four largest counties were not compatible with each other. Documents of Tennessee courts should be filed and maintained electronically. They should be accessible for inspection, but not alteration, by all members of the bar and the public at any time.

Electronic bulletin boards should provide information on the status of every pending matter and offer the opportunity for scheduling of any procedures. Notices and instructions should be simple to understand and easy to use, and computer terminals should be reasonably available in public buildings for convenient access.

The advent of some electronic record-keeping systems has made retrieval of information more restrictive than previous manual methods. The goal of the Judicial Information System should be precisely the opposite. It should broaden access and improve understanding.

Settlement of costs, fines or fees should be authorized by electronic means from remote sites, without requiring a court appearance. When appropriate, such as in minor traffic violations, fines or costs should be payable electronically from the scene of the incident.

The Judicial Information System should be accessible to, and integrated with, information systems of other government agencies.

**For better justice**

Technology also offers avenues for improvement in the judicial process, both in the traditional courtroom and elsewhere. For instance, it is easy to envision immediate electronic transcripts produced by voice-recognition software.

It is easy to envision remote access by interactive video presentation, whether the remote person is an expert witness in California, a prisoner at the jail five blocks away ready for arraignment, or even an appeals court judge unable to reach the site of an oral argument.

It is easy to envision an electronic entry point to the judicial system, especially for the most common disputes-domestic relations, landlord-tenant, etc. Rental-car agencies offer computerized directions to specific destinations; hotels have touch-screen guides to a city. A more sophisticated computer could guide a person through parts of the legal system, spelling out

legal rights and responsibilities, setting out various alternatives, and offering instructions on how to further access the system.

In fact, as artificial intelligence advances, computer models might apply principles of law to individual fact patterns, and thereby offer forecasts of the rights and responsibilities of the parties. The computer, in essence, would provide a mini-trial, and the likely outcome would be a far larger number of cases resolved long before they come to a traditional courtroom.

These ideas may seem dreamy to some people, but they are merely the ones that are relatively easy to envision. There will be many more to consider as time goes on.

Again, though, let us emphasize that the important goal here is not a specific blueprint, but an openness to these new ideas for the sake of improving justice. The worst mistakes would not be in a few experiments that did not turn out as well as planned. The worst mistakes would come from efforts to stifle new technology, from over-estimations of the costs of change and from perverse applications that would diminish justice rather than improve it.

State funding

Responsibility for the financial support of the state judicial system should be assumed by the state government. At present, the state judicial system is like a business that does not receive financial results from its subsidiaries. No one can produce basic total revenue or expense figures for the judicial system because so much of it is controlled locally.

Financing by local government leads to fragmented and disparate levels of financial support, with a resulting unevenness in judicial services. It creates rigidity, and it often leads to inadequate resources. It makes uniform standards and procedures difficult to administer. At its worst, it leads to the direct involvement of the judiciary in local politics.

We have previously recommended that trial courts, which now include the General Sessions courts at the county level, should be consolidated into one level of state trial courts. Our financial recommendation is consistent with that structure, but consistency is not our only reasoning. For accountability and improvement, both the individual budgetary parts and the totals are important. A unified state court budget is the logical means to financial and administrative coherence.

**Sufficient funding**

The state will get what it pays for. Throughout our deliberations, the commission has tried to resist falling back on the usual finding that the judicial system needs more funding. We do not expect major increases in governmental revenues or major changes in public mood, and in many ways our discussions aim at providing better justice with stable or slowly increasing funds.

But it is also fair to say that if the state does not pay judges and administrators anywhere near the amounts common in private practice and business, it risks losing the persons of high caliber who could do so much for the system. If it continues inadequate provision of support services, it risks losing the opportunity for better public service.

The capacity of the judicial system to perform its functions does not depend entirely on the financial resources available to it, but funding is not an irrelevant issue either. Too often the executive and legislative branches of state and local government have acted as if it were, and too often the judicial system has failed to make the case for sufficient resources.

**Not for revenue**

The use of courts as local revenue-producing agencies is an abuse of the judicial process. It has long been recognized as unconstitutional for a judge's income to be dependent on the outcome of cases. But a similar result often occurs when the budget of a court is set in relation to the fines the court imposes or when a county or city comes to rely on whatever surplus is produced. The quality of the local courts should not depend on their severity. For that matter, the quality of local roads should not either.

Judicial fees, user charges applied to various procedures of the system, should be charged to offset, in part, the expense of operating the system, but should not be so high as to preclude access to the court's services. Fees should apply uniformly statewide and should be waived for indigent parties. All fees should be deposited with the general fund.

Judicial fines, penalties applied by the courts, should be set by the General Assembly as part of the state criminal and traffic codes and other laws. Fines for the violation of municipal ordinances could be set by state law or by municipal charter or ordinance when there is no overriding state interest.

Fines for violation of state law should be deposited in the general fund. Fines for violation of local-government ordinances could be deposited in the general fund of the local government.

**Lower Barriers**

An orientation to "customer service" within the judicial system would do much to increase public trust and understanding.

Modern business management has a new pet phrase every few years, but the constant theme is to focus on the needs of customers. In the long run, the business that accomplishes that will also do well by its employees, managers and shareholders.

Much of the public believes that the judicial system does not consider the public to be its customers. The system dispenses, inefficiently and slowly, certain services and remedies that have evolved by custom and often in the interests of the system's own participants. The public, it often seems from the outside, can "take it or leave it."

Whether the governing principle is called customer service, market orientation or total quality management, the judicial system must operate with the public as its primary client. This takes in a sweeping range of actions, from manners in a clerk's office to comprehensible jury instructions from the bench.

It also means that courts must seriously consider measurements of "customer satisfaction" as well as legal score-keeping and productivity. In service organizations, which is what courts are, both customer satisfaction and, say, rates of reversal on appeal are worthy measures. Controversial decisions do not have to meet approval from 51 percent of the public. But if 51 percent feel ill-treated as jurors or are bewildered about how to find a simple record, then those problems cannot be simply written off as part of the system.

**Crime survivors**

Victims of crime should be regarded as a special constituency of the judicial system. Nothing reflects the system's failings in serving the public more than the widespread dissatisfaction with treatment of victims. They land in the criminal justice system because of outside circumstances forcibly imposed upon them. Most enter the system reluctantly, out of a civic and personal duty to justice. Not neatly housed in any department or division, crime survivors have no independent standing within the system. Often they are regarded as merely witnesses in the process, or worse, simply bystanders.

For all the current talk of victims' rights, in truth they have far more duties than rights. Too often they are treated like a patient whipsawed between a doctor and an insurance company. There are procedural changes that could improve matters, especially in notification about plea bargaining and parole eligibility. A stronger administrative arm at the district court level could set a place for responsibility.

Improvement also depends on a change in attitude, though. Those inside the system must care more than they do now about those outside the system, and they must be held accountable when their actions do not reflect that care. Nowhere is that more important than in the treatment of crime victims.

Anything short of this special attention runs two risks: first, that the growing voice of frustrated victims will continue to undermine the broader public confidence in the judicial system, and second, that the voice will create misdirected legislative reactions that will impinge upon the judicial system without meeting the victims' real needs.

**Perception of bias**

Judicial personnel, including those in authority, should reflect the diversity of the state's population. Much progress has been made in recent years, and as long as women and minorities are under-represented within the legal profession, they are not likely to be fully represented in the judicial portion of it.

Still, when only 5 percent of trial judges are minorities, and only 5 percent of General Sessions judges are women, then minorities and women can see clearly that the courts are not led by persons like them. The judicial system's ideals of equality before the law are sometimes also betrayed by the personal biases of those to whom its administration is entrusted. Race, national origin, religion, gender, age, disability, financial means and geographic location are factors that can impair access to justice. Some manifestations of this are personal, but some are structural. For instance, the relative lack of diversity within the judiciary undermines both the public's perception of fairness and the ability of the courts to empathize with people from under-represented groups.

The criminal justice system, in particular, is pervasively affected by perceptions of race and class, with disturbing effects on which behaviors are criminalized and how severely individuals are punished. The commission has not dealt in depth with this issue, knowing that the Supreme Court has established a separate commission to deal specifically with it. We do not wish to understate the problem, though, and we encourage all efforts to address it.

Specifically, we urge that multicultural diversity be taken into account in personnel selection, be a part of the training for all judicial personnel and play a role in all subsequent performance evaluations. The system should closely monitor its own outcomes for patterns indicating bias.

**Easier access**

The many obstacles to public access of the judicial system should be reduced. Individuals with communicative disabilities, limited English-language proficiency or alien cultural background face enormous barriers in working through the judicial system. Even well-educated, socially and culturally competent citizens can be alienated by a legal system with its own arcane language and subculture.

The procedures, the rules and even the words are almost unintelligible to the uninitiated, and they almost seem designed to exclude. For those whose life circumstances are particularly challenging, the barriers are all but absolute.

In the criminal system, where victims and witnesses usually lack the guidance of private counsel, the inherently stressful process is filled with fear of the unknown and the seemingly arbitrary.

For persons with significant physical or mental impairment, the system can be quite literally inaccessible. Even those without physical limits can face practical obstacles from the system's demand that the public obtain justice in certain locations, during certain hours, under circumstances convenient primarily to those already within the system.

There are ways to mitigate these problems. We recommend that all forms and written communications to the public by the legal system should be at the sixth-grade level of reading proficiency.

Self-help assistance should be available at numerous public sites throughout the community. Such assistance should include written materials, interactive electronic media as described earlier in our discussion of technology and help from court personnel.

Reasonable accommodation should be made for those with special needs. Court facilities should be physically accessible. More importantly, they should become, to the extent possible, irrelevant. It should be possible for the public to do much of its business with the legal system from home or other convenient public locations. Again, new technology should be of some help in this regard, if the judicial system is willing to adopt it.

Affordable legal representation is especially critical for those who are unable by impairment to defend their own interests.

**Affordable justice**

Full litigation is the most expensive form of dispute resolution. Economic barriers can be most effectively reduced by turning to other forms, but changes in the traditional courts are important too. Attorneys' fees and other expenses place justice beyond the means of most low- and middle-income citizens and many small businesses. Indeed, such costs are a serious deterrent even to the affluent.

In addition to the direct costs, litigation involves substantial additional burdens, from lost wages and child-care expense to the reduced productivity of individuals and organizations.

The discovery process has become the most notoriously expensive segment of dispute resolution, and much of the public has come to believe its duration depends far more on a litigant's resources than on the merits of the case.

Alternative dispute resolution formats should be adapted to the needs of all members of the public.

Publicly supported legal services should be available on a sliding fee scale, reflecting ability to pay. The present system offers free legal service to only a fraction of the poor who are in need, but it offers nothing at all to those who have incomes above formal poverty lines, but who cannot possibly afford to pay an attorney at prevailing rates.

Judicial administrators should be accountable for compliance with laws designed to prevent fees and other costs from posing a barrier to the judicial system, by deferring payment by those unable to advance such fees before litigation. Those laws are now applied inconsistently across the state and are sometimes simply ignored.

Victims must often pay for justice in the form of lost wages and other costs of attending court and assisting the prosecution. They should be treated as "customers," assisted through the judicial process, and when possible compensated through restitution for related expenses.

**Bail bond problems**

Major reforms should address the injustices of bail bonds. Justice is literally for sale through the commercial bail bond system, which explicitly conditions access to freedom on a person's financial status. The system's perverse effects are long-standing.

♦ It invites corruption. The financial leverage of bail bondsmen seeking preferential treatment offers constant lure for sheriff's personnel.

♦ It is often used to keep persons in jail over minor matters, ones that are actually more civil than criminal. In that sense, our jails have become modern-day debtors' prisons.

♦ Under the current system, some persons take up jail space solely because they cannot make a $250 bail bond, not because they are any sort of risk to society and regardless of the high public cost in building and maintaining the jails.

♦ It also produces a financial trap. The money spent on a bond might force the defendant to rely on the public defender rather than a private attorney. Or, where local practice prohibits bonded defendants from using the public defender, the system leads them to stay in jail precisely so they can then afford an attorney.

♦ Sometimes persons remain in jail solely because it requires the "expert" bondsman to lead them through the legal maze to freedom.
♦ The bail bond system skims the cream off the jail population, like a health insurer who takes only healthy customers who can afford the insurance. This comes at the expense of justice to those of lesser means.

♦ At its worst, the system is the reverse of that pattern, and even more perverse. Bonds are written for defendants who are bad risks, in part because they might abscond, but more likely because they might commit new offenses while on bail. Bail bondsmen develop ongoing business relationships with career criminals. Those offenders may be dependable clients for the bondsman, but remain a threat to society. The commercial interest of the bondsman then supercedes what should be the judge's responsibility to determine risk.

**Bail bond reform**
The bond system has a dual purpose: to protect the public and to assure appearance in court. The present commercial system subverts the first purpose and is almost irrelevant to the second. Efforts to tinker with the system have failed. On balance, the commission believes the judicial system would be better served by its own bonding system. That system is currently almost unused, but it is easy to see how it might be used more fully, especially if some of the commission's structural and support changes were implemented.

The courts would have to make a few additional adjustments to provide a bonding service. The system, for instance, should inform persons about their options for release and notify them of court dates and other obligations. Those are manageable requirements; other states fund them fully through court fees.

If it is not feasible to end the current system entirely, at the very least the following changes should occur.

♦ The judicial system should screen out the vast number of unfounded warrants before they are ever served. Many of the defendants who provide a large and low-risk pool for bail bonds would then remain in their own homes.

♦ The judicial system should presume release for any misdemeanor unless good cause is shown to the contrary. There is a fear that this would lead to fewer arrests. That risk could

be allayed by better use of citation-and-release procedures that avoid the bail decision altogether.

♦ The judicial system should make better judgments about the real risk of releasing various defendants. An extensive pre-trial release system would then allow many persons to go free on their own recognizance.

Together, those changes might alter the present bail-bond system enough to create further changes, perhaps including the system's own demise. For years, the bail bond system has been treated as the judicial system's tawdry embarrassment, to be talked about only within the judicial family. Neither basic justice nor overcrowded jails have forced the issue. It is time for those changes to begin.

The present civil justice system is top-heavy. It is overburdened with cases that proceed, or act as if they are going to proceed, all the way to full, traditional resolution by a contest between courtroom adversaries.

That model has brought with it all sorts of encumbrances. Civil justice often fails to distinguish between practices that are time honored and those that are merely old. The customarily passive role of officials within the system has allowed these other faults to calcify on the system.

Too often and to too many people, the pursuit of justice bogs down in the mire of the legal system. Some of that problem is built into the two goals of the system.

First, all legitimate claims have a right to receive full and fair consideration in a court of law. As part of that process, all rights of the Constitution and Bill of Rights should be guarded assiduously.

Second, claims should be resolved efficiently, in a manner that lends itself to the least adversarial setting.

Quite obviously, the two goals are not easily compatible. The first goal has traditionally held sway over the second, sometimes almost to the exclusion of the second. The result has often diminished the public sense of justice.

**Reducing claims**

The most effective way of resolving these differences is to acknowledge that while every claim may have a right to be heard in court, not every claim needs to be heard in court. In later chapters we describe other places and procedures for dispute resolution. If the judicial system is to succeed, more disputes will have to be settled by those other means.

Nevertheless, courts will continue to play an important role. Some issues require a public imprimatur on their resolution. Some disputes cannot rest on precedent, for they involve changes in technology, social mores or the law itself. Some cases contribute to the normative function of the law, adding interpretation that will be guidance in other instances.

So it is important that civil justice within the courts functions better, even if more civil justice takes place outside the courts.

### Reducing delay

Delay is a form of economic obstruction, and the system should not be used to ration justice according to patience. A passive and inefficient judicial system tolerates, and at times even encourages, substantial delays. Time becomes a weapon in the hands of those whose financial advantage or other circumstances enable them simply to outlast their adversaries. As with direct economic barriers, this failing favors the strong and injures the weak. Parties that have been wronged settle for poor quality of justice, simply because they cannot wait on the remedies dispensed belatedly by the system.

Some delays impose daily consequences. Lagging disposition of cases involving the support, custody or protection of children, for instance, exacts its heaviest toll on the children themselves.

### Case management

Judicial personnel must assume responsibility for the active management of cases. At present, there are more than 250 courts exercising some form of civil jurisdiction in the state of Tennessee, not even counting municipal courts. Most of them operate as separate entities, taking on the characteristics of the presiding judge, with no uniform standards for case management. Management styles vary from passive to aggressive, with more judges in the former category. In many courts, cases are not moved toward final disposition, or set for trial, until a specific request is made by an attorney or litigant. Some cases sit for years with no action.

Time standards should be an important part of the courts' evaluation procedures, and judges or jurisdictions falling beyond a normal range should be held accountable. The normal range should be considerably shorter than present practice. This will require substantially more active case management than is usually the practice now. New technology should make that redirection of effort easier as time goes on.

### Case review

Summary dismissal powers should be available, to be used when it is clear at the outset that there is no merit to the case. A judge normally does not dismiss a case now until one of the parties has submitted a formal motion, even when the case is deficient on its face. Summary review and dismissal power would save the object of meritless lawsuits the time and expense of having to respond and request dismissal. Even some plaintiffs would benefit from early notice that no legal claim could be pursued.

Summary dismissal powers are useful not just because they might be invoked, but also because they bring the judge into early consideration of each case. Likewise, it is often clear to an assigned judge that quick resolution without additional costs could be achieved early on. Formal settlement conferences and other mediative procedures should be used promptly in such instances.

Continuances have become too routine. We recommend that the Supreme Court establish a more restricted policy for granting continuances. Continuances should not be granted unless sufficient grounds exist, and should never be granted merely by the consent of the attorneys. No practice sends a stronger signal to other parties in the justice system that the system is designed for the convenience of attorneys. In fact, convenience of the attorneys should not be sufficient grounds for granting a continuance. Good cause, as outlined in the policy, should be shown in every instance.

### Limited discovery

Abuses of the discovery process are a major area of public complaint. There are ways to make it simpler and more restrained without sacrificing just outcomes.

Discovery is designed to streamline a lawsuit, providing pertinent information to both parties that will narrow the issues, put both parties on equal footing, and speed up the judicial process. Too often, its goals have been turned on their heads. Discovery is now used to complicate the issues, fish for information that will broaden the dispute, put one side (the poorer one) at a disadvantage to the other, and delay the case. Both plaintiffs and defendants can use discovery to impede resolution rather than facilitate it.

Discovery should be limited to only that amount of information necessary for a just determination of the original claims. Appropriate safeguards should insure that privacy beyond the issues of the case is protected and that true discovery is appropriately motivated. Initial pleadings should include mutual discovery-sufficient information to define the issue in dispute and provide a framework for rulings about additional discovery. The court should then specifically set out the limits of further discovery.

Ready access and review by the court should be available throughout the discovery process, and the court should resolve disagreements over discovery before they produce unmediated hostility between litigants or their representatives.

Under a judge's supervision, the case manager should be able to impose sanctions for any obvious abuse of the process. Appeal of the discovery orders and sanctions should be limited to one direct appeal to the sitting judge, with further sanctions available for frivolous appeals. Discovery motions should be scheduled and decided quickly. The case manager should refer motions that resolve a conflict or a portion of a conflict as soon as possible for disposition by a judge.

### Expert witnesses

Expert testimony is also subject to abuse. At times there are too many expert witnesses, and their expertise is either too small or too biased. Their contribution to justice should not depend on the resources of a litigant. Too often, in fact, expert witnesses are lined up on opposing sides like so many hired guns. The practice undermines justice in the particular case, but it also undermines public confidence in the general process.

Stronger case management can limit these abuses. The case manager should determine at the earliest possible time how many expert witnesses are appropriate, considering the subject and complexity of the particular case.

A witness's expertise, however, does not depend on locality, and the present restrictions should be removed. If the expert doctor is in Atlanta, interactive video could make it easier for him to appear in a Nashville courtroom than in a Marietta one. His availability should not be limited by either a state line or a plane ticket.

In certain complex matters, the expertise best resides in the jury box rather than the witness stand. When appropriate, jury panels should consist of qualified experts in such technical fields as accounting, business dissolutions and construction.

In fact, we recommend that the judicial system remain open to expanding the list of such areas in the future when both parties agree to do so. Developments in technology make it likely that a higher and higher proportion of cases will involve constant reference to technical matters that might baffle the average jury and perhaps even the average judge. Greater use of specialized

jury panels might also stave off the tendency to create specialized courts, with their extra administrative requirements.

If efforts to resolve more issues outside the courtroom are successful, broadening expert juries might not be necessary. If the efforts fall short, specialized juries might at least offer some relief.

**Jury support**

Only the jury provides the reassurance of neutral justice rendered by peers, a reassurance that shores up public faith in the judicial system. For that reason, juries themselves need support and consideration.

Juries remain imperfect means of deciding disputes. So do all the other means. In fact, the jury has become a strongly American institution. Most of the rest of the world does not have them at all, and where they do exist, as in Great Britain, their use is more limited. Their strength here may rest on populist suspicion: Jury decisions that the public considers baffling are better for the system as a whole than bench decisions that appear corrupt. Unfortunately, that is often the perceived choice in the public mind, but the very existence of juries helps to mitigate the cynicism. More positively, they are an institution that does assure ordinary citizens of a stake and even a direct role in public life. They may reduce the very skepticism that gives them such widespread support.

**Jury membership**

Beyond the philosophical grounds, though, there is much about juries that can be improved, for the sake of both the judicial system and the public jury members. In the present system, prospective jury members face an uncertain lottery. Some may wait for a tedious few hours, only to be dismissed. Others may find themselves with a prolonged obligation. Those who do serve often find themselves in uncomfortable quarters, with token compensation, and treated as outsiders.

Not surprisingly, jury duty has become jury avoidance. Entire occupations believe it important that they not be asked to fulfill this basic civic service. Selection and service should be modernized so that persons called upon to do their civic duty in jury service could serve the shortest time period consistent with the needs of justice. Ordinarily, citizens called to jury service should be able to count on a certain number of trials or days as maximum commitments.

Jury membership should not be skewed towards those who find it convenient. Automatic exemptions for certain categories of persons should be abolished. Peremptory challenges should be substantially reduced. Too often peremptory challenges are justified because the judge has not been stringent in reviewing challenges for cause. The more that the judge takes an aggressive role in determining appropriate challenges for cause, the less there will be a need for peremptory ones.

The examination of prospective jurors should be simplified and shortened. Pre-trial questionnaires could shorten courtroom time. The privacy of jurors should be protected in areas that are not relevant to jury service.

Consistent with our recommendations for a more consolidated trial court structure, jury service should be administered in a unified fashion, through the district judicial administrator. Jury pools should be drawn from the full judicial district. Jury terms should be short.

Above all, juries should be included in the judicial system's re-orientation to the public. Jury duty normally involves some sacrifice by citizens, and that sacrifice should not be compounded by inadequate facilities, interminable waits, incomprehensible directions or haughty attitudes from judicial personnel.

Jury service is an important public window on the judicial system, and the view should enhance public confidence rather than diminish it.

**Jury size**

A twelve-person verdict is not the only form of proper justice. Under the best of circumstances, courts should give leeway to other forms by mutual agreement of the litigants. Agreement is not always possible though.

The commission recommends that the standard jury for civil cases be six persons. By agreement, there might be up to twelve members, or there might be fewer than six, a likelihood when expert juries are used. Experience elsewhere does not suggest any notable change in outcomes by reducing the standard civil jury from twelve to six, and out of consideration for jurors the lesser number should therefore be sufficient.

Criminal cases create other considerations, though. The twelve-person jury provides a greater sense of anonymous security for the individual juror, making it easier for the juror either to vote for the state or to hold out for the defendant, in both cases with less fear of personal reprisal. The commission recommends that the twelve-person jury remain the standard in criminal cases, again allowing for smaller juries by mutual agreement.

In addition to smaller juries, litigants should also have choices among non-jury trial forms. One example is the traditional judge with no jury, but there should also be opportunity for various modes of arbitration and even an inquisitorial setting, in which the judge questions the parties, with or without attorneys, and makes decisions based on that process.

There has been some sentiment for less-than-unanimous verdicts in civil cases. While that would address the problem of renegade jurors, we are not certain that problem is a burdensome one. Some consideration of lowering the unanimous threshold might be appropriate in the future. But if other aspects of change were implemented first, including broad alternative dispute resolution, the issue might appear to be even less frequent than it is now. Again, though, agreement of parties who desire a sure resolution should be sufficient for allowing a less-than-unanimous verdict.

The starting point of many studies of courts in the past several decades is that they lack the resources to deal adequately with all the cases confronting them. This commission believes, instead, that there are too many cases. We are not speaking only of the rise of apparently frivolous cases, although we find the anecdotes just as appalling as the general public does. We mean instead a broader burden on the judicial system.

Today's judicial system is held accountable for every sort of social failure that passes through its halls. The fact is, though, that the system has little or no control over most of those problems. This is not the proper forum for a debate on what is a cause and what is an effect. But even a short list of the social ills that lead cases into the court system reveals just how ill-equipped the system is.

Economic stress, educational shortcomings, bad parenting, sociopathic children, sex and violence in media, more divorce, less religion, weaker ethics, drugs, guns, gangs-the courts are constantly expected to do something about these problems but cannot.

In the commercial world, the legal system is too often the first resort rather than the last. When disputes arise, the first call goes to an attorney; informal resolution by a third party is usually a fluke. In addition, there are unrealistic expectations of what the judicial system can accomplish. Citizens bring complex problems, but hope for a simple edict. They carry unattainable demands for perfect justice and equity. They search for compensation for the unfairnesses of the world. Those are overwhelming, sometimes intractable, problems. There are ways, however, for the judicial system of the future to address them.

**Non-judicial forums**

Much of the present courts' business should be moved out of the traditional courtroom. Today's system deals with a multitude of cases that are not necessarily appropriate for the courtroom. Working from a win-lose model, courts find themselves ill-suited for social problems and mis-skilled for administrative ones.

At their heart, many cases involve issues of social or individual welfare, such as divorce, custody, health and elderly matters, including estates. They are often routine, one-sided or uncontested. At best, keeping them in the traditional court setting wastes the court's resources. More often, it may actually interfere with the smoothest resolution of the problems at hand.

Still other cases are matters of public health. They may show up as criminal behavior, but their root is in addictions. Some crack users might steal if they were cold sober, but many steal precisely because they are feeding their crack habit. While the state has an interest in preventing the behavior, little in the traditional legal system has much effect on the base problem.

There remains an important role for the adversarial, truth-seeking procedure. Some matters require it out of complexity or importance, and the body of law will not evolve without the progression of formally decided cases.

But defining that role merely emphasizes the need to move many issues out of the judicial setting.

**Administrative forums**

Many actions that are now judicial should be administrative instead. On the criminal side, administrative forums should be used to dispose of cases involving traffic violations and other routine matters, essentially regulatory, that do not require judicial attention. That might include enforcement of money judgments, violation of fish-and-game-laws, truck-weight violations and motor-vehicle sticker violations.

It might also include any number of fields for which there are standard fines when the person cited does not wish to contest the charge, and it is easily conceivable that the number of those fields might grow. For instance, some of the matters now dealt with in courts devoted to environmental regulation might become as routine as traffic matters. The right to judicial review can be maintained in these instances, but a judge's training and time are not necessary for the basic collection of fines.

Likewise, on the civil side uncontested actions such as name changes, adoptions, simple divorces and probate matters do not require the level of supervision that a trial judge brings to them.

**Alternative resolution**

Civil issues present the greatest opportunity for non-trial resolution. The judicial system should include a wide array of methods for alternative dispute resolution. Elsewhere in this report, we have discussed some of the judicial systems' most commonly perceived failings: abuse of discovery, delay, excessive cost and a "win-at-all-costs" mentality among some litigants and some attorneys. Alternative dispute resolution, invoked as early as possible in the process, can alleviate these problems.

In June 1994, the Supreme Court received the recommendations of its Commission on Alternative Dispute Resolution (ADR). We reaffirm much of the important work done by the ADR commission, and for the most part we incorporate it by reference here as part of our own conclusions. Substantive exceptions are noted.

Specifically, we recommend the use of arbitration, mediation, mini-trials, case evaluations, summary jury trials and settlement conferences. The goal is to go to peace before going to war.

In all domestic-relations disputes and all complex civil litigation, unless the court determines there are exceptional circumstances, mediation should be required before litigants can obtain a trial date. This recommendation extends the suggestions of the earlier ADR commission from the permissive to the mandatory.

Mediators may be attorneys and/or mental health professionals and/or members of other relevant disciplines. The court may also appoint qualified third-party mediators such as clergy, professionals or others with special skills and abilities to serve as mediators in specific disputes. If no agreement is reached during mediation, the mediators' fees should be assessed as part of the costs of the case. If the trial judge determines that any party has failed to mediate in good faith, the mediators' fees and fees for opposing counsel may be awarded. This also varies from the ADR Commission report.


**Plea bargaining**

Alternative dispute resolution is a term used on civil matters. In fact, it applies to criminal plea bargaining as well. Plea bargaining involves the settlement of a case before trial. Both sides accept something less than the maximum possible outcome for the sake of avoiding the rigor and uncertainty of a full trial. By those standards, plea bargaining is alternative dispute resolution. By some estimates, more than 90 percent of criminal cases are settled by plea bargaining. Clearly, the judicial system would collapse if even a third of those cases went to trial.

The term plea bargaining has come to be a public epithet, shorthand for much that is wrong with the judicial system. In fact, there would be far more wrong if plea bargaining did not play the role it does today. From the perspective of the defendant, the prospects of less expense, less emotional drain, and more certain outcome seem to outweigh the often distant chance of acquittal.

That gives some leverage to defendants, but not much. The real power in such cases rests in the office of the prosecutor. The prosecutor's primary constraint at this time is jail and prison capacity, which forces a rationing of incarceration, even for those who choose the trial route. All this dismays the public. Its sense of justice-in this case, justice defined as retribution-is offended by settling for less than the maximum. The worse the crime, the greater the dismay.

### Honest dealings

There are ways to mitigate the dismay. First, outrage is fueled by outrage among victims. The more that the court system can bring victims into the negotiating process, the more the outrage will be doused. We do not promote victims as parties of full standing in these deliberations. The case is between the defendant and the state, and three-way negotiations are too uncertain. But the practice should be closer to that model than to the exclusion of the victim.

When a victim learns of a plea bargain by reading the newspaper, the judicial system has lost a predisposed supporter. When victims are fully informed of details and reasoning behind a plea bargain, they can often lead public understanding.

Second, a more honest approach in sentencing would remove some of the gamesmanship and some of the public distaste. Courts often do this at the lowest level of traffic tickets now: $10 if you pay the fine, $30 if found guilty in court. In essence, this would create two sentencing grids rather than one. The clear proportion and the clear choice would make the plea-bargaining procedure more understandable and more acceptable.

### Narrow ADR

The judicial system should encourage alternative dispute resolution both inside its own system and in other settings. Alternative dispute resolution is not an entirely new idea. In 1682, for instance, the colonial Quaker William Penn proposed the appointment of three "peacemakers" in each precinct; their "arbitrations" were to be as "valid as the judgments of the Courts of Justice." Some histories of American law even refer to the "persistent dream" of doing without lawyers altogether.

Today, ADR has both narrow and broad senses. The efforts we propose to move more cases out of the courtroom and into mediation, arbitration and the like would go some distance in improving matters for both the parties in a dispute and the judicial system.

Once a case has become a case, however, a substantial amount of legal formality is necessarily attached to it. Requirements of due process bring some. Traditions and public expectations of the judicial system bring more. Court-supervised mediation, for instance, logically implies that the courts will at least certify the procedural rules and ethical limits and will provide some review of competence.

Even within the legal system, it's worth emphasizing, redirecting cases away from the courtroom would be a substantial change, and we don't underestimate the innate resistance.

### Broad ADR

The broader notion of ADR means solving problems before they become legal cases. It is fine, for instance, to require court-supervised mediation in divorce cases. But the judicial system also has an interest in encouraging counseling before a marital problem becomes a legal action.

The issue is a broad, cultural one; complex commerce and anonymous urban life make mutual accommodation more difficult than it once may have been. A declining sense of community and authority is well beyond the scope of this commission. Still, litigation merely reflects other shortcomings in our institutions, the same way war is the failure of diplomacy.

We cannot review here all the ways in which civil and personal diplomacy might be improved. Some, such as the model programs teaching ways to negotiate and compromise

disputes now being used in some public schools, are of direct interest to the legal system, and judicial leaders might play important roles in their support.

Whenever possible, the judicial system should encourage or actively assist efforts that resolve problems before they become litigation, or even before they are taken to lawyers for assistance. That notion is a far broader one than redirecting cases within the judicial system itself.

Courts should be a last resort, and those who sit in the courts should say so, clearly and often. Judicial leadership that champions non-legal solutions to problems is a vision just as important to the common good as any movement within the judicial system itself.

**New Forums**

Divisions of district courts devoted to family law should put special emphasis on alternative means of confronting problems. All portions of the judicial system should regard themselves as problem-solvers, but the portion that fits that description most directly is the one that deals with citizens personal lives.

It is not impossible; indeed, it is not even rare for the problems of one family to show up in three different courts within a short period of time. Domestic relations, domestic violence, child support, criminal actions, drug abuse and juvenile problems are treated as separate issues, even though no one in the system believes that they are. In that context, we come back to the recommendation made earlier that there be a separate division of the unified district courts devoted to the many aspects of family life that intersect with the law.

In some cases, that division would provide review authority for some of the non-adversarial actions we listed earlier: uncontested cases of adoption, divorce, custody, and the like. Other subjects are extensions of that category, in which judicial oversight is more direct, but without requiring a pro-and-con setting. Guardianships, declarations of incompetency, matters of health/ethics, perhaps even estates might fall into this category.

**Family mediation**

No division of district court would make greater use of mediation than the family law division. Many of the issues that enter the court as contested matters should be resolved well short of the courtroom.

Additional areas for direct involvement would be family matters that are closer to the adversarial court model, but that could benefit from involvement of other agencies. Child abuse and neglect, orders of protection, contested custody and child support are in this category. Beyond that, the court would also include many of the issues now covered in juvenile courts.

Disruptive and unruly behavior could be treated for what it is. In fact, in such a setting it would be unwise to retain jurisdiction over youths when they are considered genuinely criminal.

For actions that might lead to incarceration in a youth correctional facility, a young person should be transferred to a criminal division of district court. There, the youth could be tried under the rules now governing youth offenders, ensuring due process, but not fully certified as an adult unless circumstances warrant.

**External collaboration**

Family divisions should bring related cases together and collaborate with related social-service institutions. There are limits on that concept, and it will have to follow other changes. A judge cannot refer a defendant to drug treatment where none is available.

This is not simply a matter of more social services, although there are clearly areas in which more are needed. And it is surely not a matter of just government social services. And while it is easy to be pessimistic about future resources, there are some encouraging signs. For instance, many local United Ways and private foundations are moving into a stronger emphasis on coordination and collaboration among the agencies they fund. The judicial system should be part of that linkage.

This requires a different attitude than has often been present, although juvenile courts have sometimes shown leanings toward it. A judge in family division, and the other judicial

personnel in that area, will sometimes have to resolve disputes in traditional ways. But they will also have the chance to emphasize the courts role as a problem solver.

Win-lose frameworks carry substantial costs even in commercial disputes, but within families the costs can be permanent and inflicted on children. Family law divisions should be looking for ways to help families, not to pick winners and losers within them.

Judges are not social workers, but judges can invoke social workers more than may happen now. The same concept applies to all sorts of external support, and consolidating the many aspects of family law in one division would make that coordination possible.

**Internal coordination**

Whatever the structure of the judicial system, technology should be used to enhance coordination of related cases and collaboration with community resources. The vision of moving many cases out of the traditional court resolution still requires linkage to the courts, of course. The court has a natural interest in the progress of a defendant's drug rehabilitation program. For the first time in modern, urbanized times, the technology for that kind of coordination will be possible.

Likewise within the court system itself. Whether there is a formal family division of district court or not, it will be possible to achieve much of the information flow that is now so frustratingly absent. Child-support cases that now manifest themselves in up to three court settings at once could be focused rather than dispersed. Families at risk could be spotted through data base management rather than merely added to it when their problems become severe enough. Children of convicted criminals could be targeted for help rather than ignored until they follow their parents career.

All this would require sophisticated case management, but the technology for that can be accomplished in the foreseeable future. That is just one reason court technology should be compatible not just within the judicial system, but externally as well.

**Diversion elsewhere**

Some judicial forums may do best if they divert cases away from the judicial system. Experiments with so-called drug courts in this state and elsewhere show promising support for a court that directs problems to real problem solvers, such as drug rehabilitation programs, rather than pretending to resolve problems, such as by imposing prison sentences.

Every judge knows that resolving a case is not the same as resolving a problem, and that the courts are ill-suited to resolve many problems. There have to be adequate, accountable resources at the other end. Sleeping through drivers education classes doesn't make for safer drivers.

But we believe the judicial system should remain open to the creation of more such diversions. If courts are meant to solve problems, yet are unable to do so themselves, they should at least look for ways that someone else might solve them.

**Other alternatives**

From time to time in its deliberations, the commission has approached the idea of neighborhood justice centers. They remain a vision that is more unfocused than we would like, but that quality may be appropriate to the nature of them. We imagine something more basic than the old justice of the peace courts or other small-claims venues. Those are still judicial offices,

despite their limits. They are subject to being used against the very people they are meant to assist. Landlords and repossessors, for instance, become experts at turning them to their advantage.

There are strong benefits in a centralized system of courts. Uniform rules and the guidance of precedent are high among them. But a vertically organized judicial system needs a horizontally organized structure of alternatives to complement it. That alternative structure should offer dispute resolution that is not bound up so much in rules and statutes, but in pragmatism and community.

Whether the alternative is found in a church, among respected elders, through extended families, or in newly created institutions (similar, say, to some new ventures in neighborhood health clinics), the key elements would be flexibility and individuality, precisely the weak spots of the traditional and codified justice system.

We find some hope for such ventures in the many new experiments being tried at neighborhood and other community levels. Community-based dispute resolution could become the primary dispute resolution, with the judicial system as its supplement. This would reinforce the notion that courts should be a last resort, not the first one.

**Crime Time**

Nothing in the judicial system produces more public criticism than criminal justice. Light sentences, plea bargains, recidivism, violent juveniles, and a general sense of declining public safety blend together in a litany of complaints. The courts are held responsible, but very often this is like blaming baseball catchers for wild pitches. However, the courts' traditional role-sitting passively as neutral dispensers of cases that are put before them-can't do much to improve either the pitching or the catching.

A criminal justice case often begins 25 years earlier, with parental drug abuse or inadequate prenatal care. It proceeds to dysfunctional parenting, community and school support systems that fail, and misdirected interventions. Eventually, social disruption turns to crime, and the young person enters juvenile court, which takes a stab at changing a life that many of the court's own personnel consider hopeless. Not much later, after a term in juvenile detention, the young person graduates to adult, felony crime. Sooner or later, an arrest occurs, and the person becomes a full-fledged case in criminal court. It is almost certainly too late for a one-stop turnaround.

A turnaround is especially unlikely in a court functioning primarily to process cases and ration limited prison facilities.

To begin, therefore, let us think of the criminal justice system as both a long system over time and a broad system at any given point. Traditionally, reform has focused on one entry point, either one place on the time line or one aspect of a complex situation. Single-point focuses, though, are not the way to solve systemic problems. Too many problems compound for one "solution" to work alone; too many parts are hooked onto one another.

**Basic justice**

The current concern over crime presents an opportunity to go back to very basic questions. How do we establish a shared moral sense? What causes virtue? How do we define deviancy? What do we mean by justice?

Those are questions not just for philosophers, but for legislators and for judges and indeed for every citizen. A society has some basic sense of what makes for good character. In this country, the Golden Rule, derived from a multitude of cultural traditions, is probably the most fundamental base.

Laws and governmental institutions serve to reinforce such character, but they do not create it. Good character comes first from family and community, but both of those are weaker institutions than they once were. Affluence, technology, mobility, urbanization, consumerism, media-all these and more undermine the structures that used to weave the moral fabric.

The burden on government and law is to reinforce communities and families that contribute to the development of good character, self-reliance, respect for others, and respect for self. That burden has become heavier, but the knowledge of what works well has not increased apace. And many of the traditional institutions of government and law have not adjusted their roles or their attitudes to the heavier burdens.

That applies to the judicial system as well. We have addressed some of those broader themes earlier, and we consider them again in the next chapter. But there are some specific changes that the judicial system can consider in the areas that affect criminal justice.

**Sure punishment**

Punishments should be certain, swift, final and fitting the crime. In simpler times, this was referred to as the hot-stove rule. Touch the stove, and you would be burned. It would happen quickly, and then be over. The longer the touch, the worse the burn. The biggest shortcoming in this model today is the small likelihood of arrest for many crimes. An adept burglar can go a long time before being caught. Improvements in catching criminals would do far more to deter crime than anything the courts can offer, but that subject is beyond this commission's reach.
For the burglar who does get caught, though, an adept lawyer can maintain freedom for a long time.

Oddly enough, looking just at those who are indeed arrested, the hot-stove criteria are most often met in offenses that go through plea bargaining. It seems strange to say so, but there are higher odds of certain, swift, and final punishment in plea bargaining than in the adversarial courtroom.

The courtroom might offer the possibility of greater penalty, fitting the crime, for those found guilty, but even that is no sure thing. On three out of the four hot-stove criteria, plea bargaining is "better" justice than taking every case to trial would be.
All of which brings us back to many of the same conclusions we have encountered in earlier chapters and in other areas of the law.

Delay does deny justice. Strong case management is most important in criminal law, because lapsed time comes at the expense of either injustice to an innocent defendant or disservice to an aggrieved victim.

Mandatory grand juries are a significant source of delay in many jurisdictions now. Three screenings for a case to proceed to criminal trial (by magistrate, General Sessions Court and grand jury) build in delay, but the problem is most significant when the grand jury meets infrequently.

Criminal prosecution should be initiated by either warrant, information or grand jury proceeding. Criminal prosecution by the indictment process of the grand jury should be available in publicly sensitive or politically charged cases but not constitutionally required. A single judicial hearing to establish cause would be sufficient in most purposes.

**Honest punishment**

Sentencing should present the issues of justice honestly. The punishment should match the crime. It is a simple statement, but it draws public derision today. It is scorned largely because the actual punishment does not match the stated one.

They do not match because the resources for punishment are immensely short of the public notion of appropriate punishment. Put another way, though, the public is unwilling to pay for the justice it demands.

Few public officials like to deal openly with this issue, and we can't blame them. No one wins re-election on a platform of reducing statutory sentences for the sake of consistency.
The result, though, is a general hypocrisy that takes it toll most directly on confidence in the judicial system, which has to administer the sentencing charade that others impose upon it.
Underlying the debate is the fundamental argument over the purposes of incarceration and the sense of justice, all of which are heavily influenced by individual perspective. Four months might be a reasonable sentence for breaking-and-entering, unless it's your house that has been entered.

Nevertheless, truth in sentencing is vital to public respect for the criminal justice system. In addition, public debate over state resources will be distorted as long as nominal sentences do not reflect reality. How can the public or the legislature make honest choices between prisons and community corrections, let alone between all corrections and, say, all education, if there is a basic dishonesty about what is being done and what could affordably be done?

Perhaps the greatest failing of the present system is on the low end of sentences. It is simply galling to the public sense of justice when a two-year sentence actually allows a person to serve no time at all.

## At the minimum

We recommend that a mandatory minimum and maximum sentence be imposed for each crime. To accomplish this effort, minimum sentence guidelines would need to be identified and imposed. A sentence could be imposed between the minimum and the maximum, but no one would serve less than the stated minimum. In most cases, at least under current prison crowding, the minimum sentence would then become the standard release time.

Such a system will only work if the minimums are set honestly, though, and that will require facing up to the fact that for some, and perhaps many, minor crimes the minimum would be zero. In cases in which something beyond the minimum was imposed, traditional program and behavior credits could reduce the release date, but not to any time shorter than the minimum sentence. For disciplinary purposes, time could be added to the minimum sentence date.

The state currently employs a sentencing guideline schedule, or grid, for various categories of offenses. The grid, however, makes no distinctions between plea bargains and fully adjudicated cases, thus increasing the pressure toward reduced charges in plea bargaining. We recommend a more honest approach, with a second grid for negotiated sentences, which would allow for a reduced time rather than a reduced crime. Once incarcerated, each inmate should have to earn access to privileges. Certain recreational programs, TV, telephones, and visitation should be made contingent upon affirmative efforts, not just traditional "good behavior," and those efforts specifically include general and vocational education.

While rehabilitation programs are important, research should be conducted and a system should be established to identify those inmates who are most likely to benefit from a rehabilitation program and allow for program placement of those individuals first.

## Creative punishment

Alternatives to incarceration should be expanded and flexible. Options should include a program involving work crew activity during the day and home monitoring during the night. This would serve to reduce the number of individuals incarcerated and reduce cost.

Advancements in technology, about which we can only speculate, will also provide the next generation with better ways to deal with sentencing issues. Prisons without walls and implants for monitoring the location of certain types of offenders are both possible and probable in the future.

Judges should have greater leeway for creative sentencing. If punishment is more directly linked to the victim, the community, or the circumstances of the crime, it will be more effective. It will take more judicial latitude to make those linkages in sentencing.
Each inmate should have a restitution plan. However, all the positive benefits promised for restitution, including redress to victims, holding offenders accountable, and reducing recidivism,

depend upon the successful completion of orders. To ensure this, a programmatic approach to restitution which assigns responsibility for coordination and quality control to one person is recommended.

We recognize the difficulty of administering substance abuse programs. Much of their success depends on personal motivation, and prison is not the likeliest spot for that. Still, addictions are the direct cause of an enormous share of crime, and successful efforts to break that link would do far more to reduce recidivism than longer sentences or any of the other automatic answers.

As long as substance-abuse programs remain meager, inside and outside the institution, the criminal justice system will not be dealing with proximate cause. And as long as that is true, it can expect to see the same people come back again and again.

### Options for youths

Options should be available to younger individuals in need of social structures that would help instill a sense of responsibility. Individuals between the ages of 17 and 24 have few options open to them unless they have either prepared early to enter a particular technical field or are ready to go on to college. Neither of these options is particularly relevant for the vast majority of those who wind up instead in the criminal justice system. Without access to social structure, avenues or purpose in traditional organizations, they tend to look for it in antisocial ways. The judicial system does not have direct power to provide options, but unless some of them are available, the judicial system cannot succeed.

In addition, judges need more options in dealing with offenders. Alternatives to incarceration, half-way houses, day-treatment centers, home monitoring and community-service work must be provided.

### Effective prevention

Communities and the state should focus on programs that have demonstrable positive effects. As a rule, the earlier a program affects a child's life, the more leverage it has in making a difference. We point specifically, for instance, to parenting education, Head Start, Success by Six, and conflict-resolution programs.

Communities themselves should be rewarded for developing programs that aid in the ultimate prevention of crime. This could be accomplished through grants that would be contingent upon the successful outcome of the program.

The many links between child abuse, neglect, domestic violence, poverty, incompetent training, and future involvement with the criminal justice system cannot be denied. A serious analysis of laws governing abused children and adoption should be conducted. We believe it would support removing abused children from homes earlier and making adoption laws less restrictive.

Early identification of at-risk families and children is essential. In many cases, this can begin on day one, when birth-related circumstances may send clear signals. Similarly, children and families of incarcerated individuals deserve special attention as at-risk groups. Non-intervention can almost guarantee mirror-image problems in the future.

There is currently a national debate on revising welfare laws that fail to promote self-reliance and responsibility. We recognize the difficulty of crafting legislation that a) aids those temporarily in need of assistance, b) turns the persistently dependent back toward the

workaday world, but c) does not harm the children of those who might be turned. Still, a correction is clearly needed.

### Prison limits

Correctional resources should be allocated rationally, not by accident. In the broader view, the basic issue is a discrepancy between the public appetite for corrections and the public willingness to provide the resources.

Prosecutors and judges must fit charges and sentences within state guidelines, but the broader context is one of limited prison space. The decisions are local ones, but the resources are state ones. Under current circumstances, there is no way that local decision-makers can do what they think is "right," because there simply will not be enough prison space to accommodate their decisions.

Sentences, not surprisingly, may vary substantially among jurisdictions. To even things out, adjustments are often made during the parole process. To the public, all this appears often as randomness, and worse, inequity. The problem is deeper than this, however.

### Broader limits

Corrections is more than state prison space. It includes community corrections, probation and any of the more imaginative alternatives to incarceration that are being tried today, from technology-based home arrest to mandatory substance-abuse programs.

Resources for those programs vary widely, adding substantially to the issue of inequity in corrections. The new structure of the judicial system that we recommend would help in this regard. A broader judicial district would reduce the present variations.

Likewise, better data from a modern, computerized judicial information system would offer comparisons that could illuminate variations and steer toward equity. Even with those improvements, though, planning for the rational allocation of corrections resources would remain far short of what it should be.

To begin that kind of planning, money for prisons and money for alternative corrections should not be regarded as two separate issues. Beyond that, there should be an ongoing discussion of the proper priorities within the broadest definition of corrections. This necessarily means more discussion than has been customary among the judicial, legislative and executive branches.

If local judges make decisions about who goes to prison and who gets drug treatment, but the state budget process determines how many prison beds and treatment programs there will be, only a random shot of luck could make supply and demand match up.

Equity and rationality will require a new collaboration on this issue. The judicial system has traditionally had little voice in the matter of correctional resources. But new forms of resources and new demands on the old ones call for a new kind of discussion between those who provide the resources and those who distribute them.

**New Directions**

We have suggested many changes in the previous pages, and in sheer volume they constitute the bulk of this report. Some of them are changes that should have happened already. We hope our added voice helps push them along.

Some of the proposals concern pulling the judicial system up to a changing world. Structures and practices that made sense under different conditions often need adjustment under new ones. None of these proposals, however, stand alone. All trace to fundamental issues about the judicial system.

More importantly, merely modernizing the present system will not be sufficient. An efficient version of today's judicial system will remain for most people hopelessly expensive and ill-suited to their real needs.

Now, therefore, we take a few steps back to review those basic themes. As a vision of alternatives, they are more important than the details about this statute or that structure anyhow, and they are a fitting way to emphasize the basic points on which members of the commission agree.

## Public accountability

The Tennessee judicial system is a public institution. It should therefore serve the public. In too many ways, it fails to do so now. Too often it treats the public as outsiders. Too often its manners and mores serve its bishops rather than its laymen. Not in all ways, of course. The system also includes hundreds of dedicated persons in official positions, with thousands more in the bar and affiliated roles. Members of the commission have frequently been impressed by the intelligence, concern and diligence of those who have appeared before us.

Frequently, in fact, it is precisely those most talented members of the judicial system who are so insightful about the system's faults and who urge us most articulately to move boldly in improving upon it.

It is not always individuals who are failing, although some fall far short of their professions' lofty principles. Just as often, it is the system's own structure, rules, habits, workload and economics that undermine its role as a public institution.

We have made various recommendations about those subjects, but the most effective way to re-orient the judicial system to the public it serves is through public accountability. Occasional elections are not enough. There must be numerous, overlapping forms of evaluation and responsibility. If the judicial system is to serve the public, it must report to the public.

## Solving problems

If the judicial system is to serve the public, its purpose must go beyond merely clearing its own docket. It must play a part in actually solving the problems that arrive before it. The courts' role has traditionally been regarded as a "zealously passive" one, dispensing justice as individual cases present themselves at the courthouse.

The judicial system cannot solve every problem, of course, and many of the problems will not be solved in any final sense. But if it continues to deal with dysfunctional families by addressing one member's case, it is treating one arm while the spine is broken. If it continues to preside over commercial disputes at a timing and depth determined by the wealthier party, it is presenting itself as checkbook justice. And if it sends the addict through one more round of prison time, it is merely warehousing a problem for future distribution.

Encouraging settlement discussions should be the least of a court's active role. It will take assertive leadership to actually solve problems.

**Alternative means**

If the judicial system is to serve the public by solving problems, the measure of success will have to change. An effective system will have fewer verdicts, not more.

The right to a trial doesn't mean a trial is the right choice. Some changes in procedures can make for more efficient judicial management, but real strides will mean resolving cases sooner and by means other than trial.

The current subject along those lines throughout the nation's legal system is alternative dispute resolution, but that phrase has taken on a narrow meaning, as if determined by a few model statutes on mediated commercial disputes.

In its broader sense, the phrase has enormous implications. It means that every court is a last resort. Full trials should be last-chance surgery, not primary care.

**Broad collaboration**

If the judicial system is to help solve problems by many means, it will have to reach out far more than in the past. Judicial systems often take great pride in their solemn isolation and formal hierarchy. These are qualities that economics and technology are rendering obsolete in most other institutions.

The movement in both public and private organizations is toward horizontal structures and collaborations. Teamwork, lateral communication and shared responsibility are replacing the strictly vertical ladder of the past.

For the sake of both resources and effectiveness, the judicial system must change its nature. Judicial ethics and the tradition of authority have often led judges to be institutions unto themselves. Ethics and authority are important values in the public regard for justice, but not if they come to be regarded as the wizard's curtain.

The courts will have to have more "dotted-line" connections to institutions within the community, from the mediators' association to the 12-step programs.

**New education**

If the judicial system is to solve problems, it will need support. Education about the judicial system should begin early, but not just in the civics tradition. It is tempting to propose that much of the effort towards education about the law fall on the public schools, but schools are already burdened with external curriculum demands. In addition, specific knowledge of court structure is not the key issue.

Far more promising are school-based programs about values and conflict resolution, the important underpinnings of the judicial system. The best of these incorporate both formal instruction and school structures that put the lessons to work.

The judicial system must do more than applaud such efforts from the side. If there is any area in which community involvement should be permitted, indeed encouraged, it is in educational programs that teach mediation, peaceful resolution of disputes and peer assistance.

Respect for the law will flow naturally enough if those lessons are learned, and the judicial system could make a substantial contribution in teaching them.

### New roles

If the judicial system is to solve problems, the role of the judge and other personnel, including attorneys, will have to change. It will have to change within the judicial system, and we have dealt at some length with case management, diversions and accountability.

It will also have to change within the mind's expectations. The finest of judges believe sincerely that they can best solve problems by ruling between two adversarial parties. For many years that has been sufficient.

But if the public looks to the judicial system as a walk-in clinic, the passive role is no longer adequate. There are too many cases, and too many more effective ways to resolve them, for the new judicial caseload to be laid on the old judicial model. The system has largely tried that approach so far, and the consequences have degraded both the full trial process and the resolution of other cases.

The old model has attracted persons willing to take on the boxer's mentality for trial attorneys in each corner and the referee's mentality for the judge in the middle. At the end of 12 rounds, the referee declares a winner and the fighters shake hands.

It is an enormous shift to think of the referee asking the fighters if there isn't some other way this can be settled, and guiding them off to the side to avoid the fight. It requires different skills and attitudes from the referee, and it requires different goals among the fighters. The change won't happen by Law Day next year.

There are signs that it is happening, though, and maybe because the present system is exacting such a price. But a full transformation will also have to include the way judges and lawyers are trained in both the skills and culture of the law. There are signs of change there too.

A separate report on education of lawyers, prepared as an adjunct study by the deans of Tennessee's four law schools and four past or present members of the Tennessee Board of Law Examiners, is included as an appendix to the full commission report.

### New leadership

The courts, and the people who lead them, must be leaders in the community, not distant from it. At the very least, judicial leaders should be free to represent the interests of their own institutions. Leading judges, for instance, should be free to comment on legislative proposals that impact the courts. If three-strikes-and-you're-out means both unjust sentences for some defendants and full trials for every third-time offender, then judges ought to be able to say so as more than a meek voice in the back of the room.

Conflict-of-interest rules should recognize benefits as well as costs, and should allow for relations with the community that benefit the court. Too often, judges are bound by a caution that inhibits their role as leading citizens of their community. Only the most non-controversial subjects are considered fit for their participation. This is particularly ironic when leadership in community institutions has been offered as evidence of their suitability for a judgeship in the first place.

Substantial fund-raising and partisan politics are still areas of obvious problems for a judge's image of impartiality. But when a judge hesitates to join Kiwanis because each member is expected to sell fruitcakes at Christmas, the limits are perhaps too stringent. And when a juvenile court judge declines to serve on the board of the Boys Club, then both the court and the board are deprived of perspectives that are essential to each other.

We would recommend new language to allow reasonable community involvement. We think this would be particularly applicable to family law judges, who deal with truly community-based problems, and to presiding judges, part of whose role should be to lead their courts within their communities.

There was a time when common corruption might have warranted the strictest prohibitions. That is not the case now, and the isolation of the courts may be counter-productive to their success.

**In Context**

The trends we note and the suggestions we make for the judicial system do not exist in isolation. They mirror trends and changes occurring in many institutions. Some of the changes are driven by a market system, shaped strongly by economics and technology. The market has limits as a model, but to ignore its lessons is to ignore the direction of immense forces, and that would be far more dangerous to the judicial system than the substantial changes we recommend. Among the parallel trends we note are these:

Hierarchical authority is in decline. Organizational charts are flatter; the mystique attached to top positions is fading. Collaboration across traditional dividing lines is on the increase.

Institutions are measuring outcomes rather than volume. In medicine, the focus is on wellness, rather than the amount of disease that is treated. In education, it is on learning and mastery, rather than teaching and grade levels.

♦ Preventative efforts get new emphasis. New health-care plans shift resources to primary care and lifestyle change. Education and social programs shift resources to early childhood.

♦ New technology offers enormous increases in the ability to collect and process data.

♦ That new information creates increased accountability for effectiveness and outcomes. The sheer existence of the data can change behavioral patterns.

♦ At the same time, and in part because information is better, more flexibility and more responsibility for operations can be pushed farther down organizational lines. Operating units can find the right means if they know the outcomes for which they will be held accountable.

♦ Strong administration will enhance professional work rather than diminish its stature. Hospital administrators and school business managers allow doctors and educators to attend to their primary missions.

There are echoes of those themes throughout our own view of the Tennessee judicial system.

The specific recommendations of this report attempt to move in concert with those trends. Wishing the trends away won't work. Neither will changes that run counter to the broader forces. Moving forward, the judicial system, like all institutions, must find ways to adapt to the changing world, mitigating the trends that detract from justice and taking advantage of those that work in its favor. Nostalgia is not a strategy for the future. Those trends represent the general context of our work. There is a more specific context as well.

**Other studies**

The Commission's study of the future of Tennessee's judicial system parallels similar studies in numerous other states. There are many differences among them, and by design we did not begin with any one of them as a particular model.

Some of the studies are more academically based. While some of our Commission members are academics, we did not approach our work like a formal research project. Some of the studies are based more heavily on the work of demographers and futurists. While those fields informed and sometimes fascinated us, they were not the driving force in our study. Instead, we tried throughout to approach the subject from our perspective as citizens.

Our goal has been to lend whatever varied perspectives we bring individually and to reason through the goals of a judicial system for the future. Along the way we have considered the shortcomings of the present system, the ways in which a changing world will impact the system over time, and the internal changes that would best prepare the system for the decades to come.

As we noted in the first chapter, our report is meant as only a first step in a continuing discussion. Even if every word here were inviolate (which is not the case), what we offer is only a rough constitution for the future, not a code. The undecided details are many.
In fact, while our time frame has been the next 30 years, it would not surprise us to see a similar commission revisit the topic 10 years from now. By then the targets will have shifted enough to take another fresh look.

**Other models**

Many of the commission's conclusions are similar to models developed in other states and in national studies of judicial futures. Readers who have followed the subject elsewhere will recognize the multi-door courthouse, the technology-based future, and the judicial-leadership model.

Under the concept of a multi-door courthouse come numerous alternatives to the traditional courtroom process, including mediation and similar resolution techniques, and collaboration with social service agencies. The model often includes an ombudsman, or triage officer, directing persons entering the system to the most effective forum for solving the problem that brings them there.

The foundation of a technology-based future is self-explanatory, except that it emphasizes the need to embrace new technology and use it in creative ways. This is a fairly radical departure for judicial systems, whose rituals and content are based on precedent.

The judicial leadership model includes everything from proactive case management to asserting the system's standing as a co-equal branch of government. Again, the departure is from past and present models that emphasize passive and neutral reaction to cases arising from below. Each of these models has elements that produce second thoughts.

The multi-door courthouse produces one quick reaction: It's hard enough to manage a single-door courthouse.

Broadening the scope of judicial activity to include identifying and treating the causes of disputes (broadening the scope to solve problems, as the draft vision statement puts it) takes the judicial system well beyond its present bounds. Under present paradigms it may have neither the wisdom nor the will to take on the broader task. Setting the model as a combination of advising and adjudicating presents some clear conflicts, setting judicial activism against judicial restraint. Those difficulties are huge if the black-robed judge remains the only focal point of the model, but that structure could change.

It is changing rapidly in the medical world, where white-coated doctors are no longer the domineering figures they once were. Hospitals now include expanded roles for nurse

practitioners, social workers, nutritionists, administrators and even preventive-medicine specialists. Most important, more medical practice is being moved outside the hospital setting. The point, remarkably enough, is that doctors should therefore be able to spend more of their time in actual doctoring, and the same lesson may apply to judges as well.

If the courts aim to take full advantage of community-based resources as solutions, then there quickly arises an issue of arbitrariness in the referral process. As the legal history of juvenile courts attests, informality can lead directly to claims concerning due process and reasonable doubt, and the intended flexibility becomes lost.

We believe these difficulties can be overcome with time. As courts develop the structure and technology to broaden their view, they will more easily narrow the portion of problems headed for the traditional courtroom. The administrative and assisting functions of a family court should not have to meet the strictest standards of the rules of procedure. Divorce actions that would benefit most from helpful mediation should not be forced into husband vs. wife (or even worse, lawyer vs. lawyer) procedure.

Technology has costs as well. Our vision makes it seem a benign change, but in many ways technology can make the world seem a colder place. The choice is sometimes between the friendly bank teller and the ATM machine.

Judicial leadership has its pitfalls too. If leading judges speak up in legislative matters, their public standing may be dragged down to the political level. If they take a stronger hand in managing cases that go to adjudication, they risk new charges of error and bias.

## Difficult change

In other words, the models, and our versions of them, are not simple. No doubt there would be substantial costs involved in some of the changes, particularly in implementation. There would also be substantial savings as well, though. Mediation costs less than litigation. Computerized information costs less than manual filing.

Getting to the new models would be difficult as well. Let us acknowledge that what we propose would bring substantial dislocations. Some roles would change. Some jobs would disappear, even as others were created.

We don't take these dislocations lightly. The best part about the future, though, is that it comes just one day at a time. There are ways to schedule change, to plan for it, and to soften its impact. That shouldn't be used as an excuse for inaction. Some of what we propose as a plan for the future should have been done 10 years ago. But what we propose is an evolution-rapid, perhaps, but not cataclysmic. It won't be easy. Change rarely is.

## Necessary change

Nevertheless, we submit our report with a deep confidence in the future. A more troubled world is delivering more of its troubles to the judicial system, and clearly not because a courtroom is the best place for dealing with them. This is a burden, but it is also an opportunity. Within the judicial system there are people of great talent and energy. Those troubles may have come to just the right place.

But the place needs to change if it is to deal with those troubles. It must reorient its duties and broaden its vision. It must be more efficient and more accountable. It must open access to itself and reach out to other resources.

We believe the judicial system is capable of such change. We also believe that the change it initiates is the change that will succeed best. The system is most likely to fail if it does not change, for that will attract myriad misdirected reactions from elsewhere.

We have done our best to present a vision of a judicial system that serves the public. As members of that public, we earnestly hope for a system that realizes that vision.

**Report of the Working Group
on the
Education of Lawyers and Admission to the Bar in Tennessee**

Legal education is a lifelong process. The training of lawyers takes place on a continuum that begins before law school and extends on indefinitely throughout a lawyer's professional career.
In the judicial system of the future as envisioned by the Commission on the Future of the Tennessee Judicial System, lawyers will continue to play a vital part. To function effectively in their role in representing clients in legal disputes, they will need not only a broad range of knowledge and skills, but a particular mindset. The system of the future will require lawyers who are both disposed and trained:

♦ to attend conscientiously to their client's interests from the beginning to the end of the relationship, with sensitivity to all of the human factors involved;

♦ to resolve every dispute by the least combative and least expensive means available, and

♦ when trial is indicated, to try the case skillfully and wisely, at the least possible cost to all concerned (in human as well as financial terms).

Educating lawyers for the judicial system of the future in Tennessee poses a significant challenge for law schools and the organized bar. To some extent, meeting that challenge will be a matter of capitalizing on changes that are already taking place. But more will be required.

**Changes now under way**
The traditional three-year law school curriculum emphasized knowledge about the law and the legal system (including legal philosophy) and several fundamental skills: legal analysis and reasoning, legal research, and oral and written communication in certain very specific contexts. The traditional modes of instruction were (and are) classroom dialogue, lecture and hypothetical problem-solving.
The examination that new law graduates were required to take to gain admission to the practice of law ("admission to the bar") tested for the knowledge and skills emphasized in the traditional law school curriculum. Opportunities for post-admission "continuing legal education" for lawyers were available, but lawyers were not required to avail themselves of them.
Over the course of the last two decades, the curriculum at many law schools has been substantially transformed. Some of the changes anticipate the requirements of the judicial system of the future as envisioned in the Commission's report.
Courses have been instituted in interviewing and counseling, negotiation, alternative dispute resolution, pretrial litigation (the conduct of lawsuits from their inception to the eve of trial), and trial practice. Often these courses are taught by means of sophisticated simulations in which students assume roles as lawyers and judges. In many instances the teachers are in fact accomplished trial lawyers and judges.

A basic course in the ethics of the profession is required of all law students, generally in the second year. To emphasize the importance of ethical considerations, some law schools introduce them pervasively in first-year courses and in special programs for first-year students.

All four Tennessee law schools now offer clinical courses in which students in their third year of law school observe and assist in the work of state or federal judges, or (with the permission of the Tennessee Supreme Court) represent clients under the close supervision of an attorney who is sometimes also a member of the faculty.

At points on the legal education continuum subsequent to law school, other important developments have recently taken place in Tennessee:

♦ Chapters of the American Inns of Court have been established in Memphis, Nashville and Knoxville. Patterned on the British model, the Inns of Court bring together judges, expert and novice trial attorneys, law professors and law students, to facilitate the transmission of wisdom and knowledge about the profession.

♦ All new admittees to the bar in Tennessee must take and pass the Multistate Professional Responsibility Examination, which tests for detailed knowledge of the profession's ethical canons.

♦ It is now a condition of maintaining a law license in Tennessee that every lawyer take 15 hours of continuing legal education annually, including three hours devoted specifically to ethics and professionalism.

**New directions**

The judicial system envisioned by the Commission will impose new standards on lawyers in several areas in particular: the interpersonal aspects of lawyering; skill in resolving legal disputes by negotiation and other means short of trial; and the wise and efficient conduct of lawsuits.

The key to meeting the challenge of preparing lawyers to function effectively in the system of the future will be collaboration between law schools and the practicing bar along the whole continuum. Such collaboration could take many forms. These in particular seem to us to be worth pursuing:

♦ Increased exposure for law students to the client's perspective on the law, the legal system and lawyers. Good clinical work, in which students represent clients in actual disputes under the careful supervision of experienced attorneys, is a proven vehicle for this, but other alternatives should be carefully investigated.

♦ Development of a code of good practice for clerking relationships, encouraging lawyers to provide the students they employ with experiences that will help the students grasp what the practice of law really entails.

♦ Integration of negotiation and alternative dispute resolution into the core law school curriculum. Requiring that all students take courses in these areas would be one means of accomplishing that, but only one. There is no apparent reason why negotiation, mediation

and other forms of settlement could not be woven into the basic framework of the curriculum as trials and appeals are now.

♦ Training for law students and new lawyers in trial skills beyond the basics. For example, many novice attorneys are familiar with tools in the trial lawyer's kit, such as the forms of discovery in civil cases, but have no real conception of how to use them sparingly and economically.

♦ Access for law students and new lawyers to instruction in the mechanics, and particularly the economics, of law practice. Many mistakes lawyers make in their relationships with clients stem from economic pressures that result in part from lack of knowledge as to how to run a law practice in a businesslike way.

♦ Continuing discussion between the law schools and the Board of Law Examiners concerning what to test for on the bar examination. Students' course choices in law school are heavily influenced by what is "on the bar." If skills are important, testing for those skills on the bar exam will send an important message.

♦ Serious, high-grade, mandatory continuing legal education for new lawyers, emphasizing essential skills and knowledge that cannot be effectively conveyed in three years of law school.

♦ Programs at every level that sustain and rekindle the idealism many lawyers-in-training bring when they embark on the study of law.

We offer these suggestions not as items on a fixed agenda, but as areas for joint exploration by law schools and the organized bar, as the judicial system in Tennessee evolves toward the fulfillment of its potential as a just, fair and humane system for all.

## Commission Members

**Chairperson**

John Seigenthaler          Chair and Founder of The Freedom Forum First
                           Amendment Center at Vanderbilt University
                           Nashville

In addition to his work with The Freedom Forum First Amendment Center, Seigenthaler appears weekly on Freedom Speaks, a public affairs television program shown on 120 PBS stations nationwide. His weekly book review program, A Word on Words, is distributed by the Southern Public Television Network. He is Chair Emeritus of The Tennessean, Nashville's morning newspaper, where he worked for 43 years first as a reporter, then editor and publisher and finally CEO. He was founding editorial director of USA Today. He was president of the American Society of Newspaper Editors in 1988-89. He left journalism briefly in the 1960's as Administrative Assistant to U. S. Attorney General Robert F. Kennedy. He was educated at

Peabody College and Harvard University, where he was a Nieman Fellow, and taught Public Policy/Communications at Duke University during the 1980 academic year.

**<u>Members</u>**

**Kathryn H. Anderson, Ph.D.**　　Associate Professor-Department of Economics and Business Administration, Vanderbilt University Nashville

Anderson is an Associate Professor of Economics and Senior Fellow in the Institute for Public Policy Studies at Vanderbilt University. She received a Ph.D. in economics from North Carolina State University followed by two years of post-doctoral work in economic demography at Yale University.

**Martha S. L. Black, Esq.**　　Kizer and Black, Attorneys Maryville

Black has been a partner in the firm of Kizer and Black, Attorneys, of Maryville, Tennessee, since June of 1981. Prior to going into private practice, she was on the faculty of the University of Tennessee College of Law in Knoxville as an Assistant Professor of Law, from 1973 to 1976, and as a tenured Associate Professor of Law, from 1976 to 1981. A native of Maryville, she is a 1967 graduate of Mount Holyoke College and graduated first in her class at the University of Tennessee College of Law in 1973.

**Cynthia Rawls Bond**　　President-Golden Circle Life Insurance Company　Brownsville

Prior to beginning her career at Golden Circle Life Insurance Company, Bond received a Bachelor of Arts degree from Fisk University in Nashville and a Master of Arts degree from New York University in New York City. She is the NAACP Life Membership Chairperson and has served on the board of directors of the National Insurance Association, the Brownsville Bank, the Lane College Trustee Board, and the Resource Development Center. She is a former member of the State Board of Education. Bond is a recipient of the Tennessee Black Caucus of State Legislators' Avon N. Williams. Jr. Living Legend Award.

**G. Gordon Bonnyman, Jr.**　　Attorney-Tennessee Justice Center Nashville

As staff attorney and then managing attorney at the Legal Aid Society of Middle Tennessee, Bonnyman has represented low income and elderly clients in a broad array of civil cases before all levels of state and federal courts, including the U.S. Supreme Court. He is widely published and is quoted on health policy and criminal justice matters in major American print media and on radio and television networks in the U.S., Europe, and Japan. He is the recipient of numerous awards for his work in legal, government, and civic organizations.

**Donald W. Bouldin, Ph.D.**  Professor of Electrical and Computer Engineering, University of Tennessee, Knoxville

Bouldin has been a Professor of Electrical Engineering at the University of Tennessee in Knoxville for the past 21 years. He has received awards for outstanding teaching at the university and for meritorious service to the IEEE Computer Society, including the TAB Pioneer Award for his participation in CompuSat-88, a tutorial video conference that was broadcast to more than 6000 engineers in North America. He serves as the Editor-in-Chief of the IEEE Transactions on VLSI Systems and has authored more than 120 technical publications.

**Susan W. Bowen**  President and CEO-Champion Awards, Inc.,Memphis

In addition to serving as President and CEO of Champion Awards, Inc. since 1970, Bowen has been actively involved in business, government, education, and Memphis civic organizations. Among others past activities, she was a delegate to the White House Conference on Small Business in 1986, a member on the Legislative Committee on Education from 1987-1990, and chaired Leadership Memphis from 1993-1994. Currently she is a board member for Christian Brothers University, a member of the Economic Club of Memphis, and a member of the Military Affairs Council.

**Christine J. Bradley**  (Former Commissioner of Correction) Chief of Staff to Mayor Phil Bredesen, Nashville

Bradley has held numerous leadership positions throughout her career in which she is known for incorporating innovative management techniques into a public forum. She is well known for her contributions in the field of education, mental health, and criminal justice. As one of the first female correctional commissioners in the nation, she was the recipient of the American Correctional Association's CEO award for leading Tennessee as the first state in the nation to full accreditation status.

**Melvin T. Burgess, Sr.**    (Former Director of Police Services
                             for the Memphis Police Department),
                             Retired,        Memphis

Burgess, a 33-year veteran of the Memphis Police department, is a graduate of Booker T. Washington High School. He attended Grambling University and later enlisted in the Air Force. He received a Bachelors degree in police administration from Memphis State University.

**Charles W. Burson**    Tennessee Attorney General,
                         Nashville

Burson has served the state of Tennessee as Attorney General since 1988. He is the Immediate Past President of the National Association of Attorneys General and was the 1993 recipient of the Wyman Award, given annually to the Attorney General who has done the most to enhance the Office of Attorney General and promote the goals of the National Association. Prior to graduating from Harvard Law School in 1970, he received a B.A. with honors in Political Science from the University of Michigan and an M.A. from Cambridge in 1968.

**Lew Conner**    Attorney-Boult, Cummings, Conners
                  & Berry Nashville

Included in Woodward/White "Best Lawyers in America" from 1987 to the present, Conner has been a trial lawyer for 33 years and served as a judge on the Tennessee Court of Appeals from 1980-84. In addition to serving as a lecturer at Vanderbilt School of Law, he has been a Director of the American Arbitration Association since 1990 and chair of its Tennessee Large Complex Case Panel since 1992. He chaired the Tennessee Correction Overcrowding Commission in 1985-86.

**Andrea Conte**    President-*You Have the Power . . .*
                    *Know How to Use It, Inc.*, Nashville

A well-known victims' rights advocate since 1988, Conte is actively involved with victims' rights issues and is the founder of *You have the Power . . . Know How to Use It, Inc.*, an organization dedicated to community education, empowerment, and advocacy regarding crime and justice issues. She worked many years in the health care field prior to becoming owner/operator of a retail business. She is currently on the Boards of The Tennessee Performing Arts Center, St. Thomas Hospital, and Fisk University.

**Robert L. Crossley**    Attorney-Long, Ragsdale & Waters,
                          Knoxville

Crossley has practiced law in Knoxville for more than 40 years. During two and one-half years of that time, he served as Director of Law for the City of Knoxville and was briefly its mayor by appointment of the City Council. During all of his career, he has been a member of the American Bar Association, the Tennessee Bar Association and the Knoxville Bar Association, of which latter organization he was president in 1975. He is a fellow in the Tennessee Bar Association.

**Frank F. Drowota, III**    Justice-Tennessee Supreme Court, Nashville

Drowota has been a member of the Tennessee Supreme Court since 1980, serving as Chief Justice From February 1989 to September 1990. After receiving a J.D. from Vanderbilt University in 1965, he practiced law until becoming a trial court judge, followed by a seat on the Tennessee Court of Appeals. He retired as Commanding Officer of a local naval reserve unit after 27 years of military service.

**Thomas F. Frist, Jr., M.D.**   Vice-Chairman of the Board Columbia/HCA Healthcare Corporation, Nashville

Frist assumed his current position in April 1995, with the merger of Columbia/HCA and HealthTrust, Inc. He received a B.A. from Vanderbilt University and his M.D. from Washington University School of Medicine in St. Louis. In 1968, he founded Hospital Corporation of America (HCA) in Nashville with his father, Thomas F. Frist, Sr., M.D., and the late Jack C. Massey. He was President and Chief Executive Officer when HCA merged with Columbia and he became Chairman of the Board of Columbia/HCA.

**J. Kenneth Glass**    President-Tennessee Banking Group, First Tennessee Bank National Association, Memphis

Prior to joining the First Tennessee Bank National Association in Memphis as a corporate controller in 1974, Glass was a C.P.A. with Arthur Anderson and Company. He attended Harding University on a football scholarship and received a B.A. in 1968, graduating Cum Laude. He most recently attended the Harvard Business School Advanced Management Program in 1990.

**Michael A. Grant, J.D.**   G&C Motivational Consultants, Nashville

Grant is a motivational consultant and speaker. He received his bachelors degree from St.

Case 3:22-cv-00439    Document 33-3    Filed 08/22/22    Page 66 of 88 PageID #: 1014

Ambrose University in Davenport, Iowa; studied public administration at the University of Missouri (masters program); and received a J.D. degree from Howard University in Washington, D.C. Upon graduation, he accepted a post in the Department of Political Science at Morgan State University in Baltimore, Maryland. He is the author of Beyond Blame, a book on motivation published by Smithson-Berry Publications.

**Monice Moore Hagler**        City Attorney, Memphis

As City Attorney for the city of Memphis, Hagler is responsible for providing legal opinions and legal representation to the city administration, the city council, and the various city boards and commissions, as well as defending and resolving all claims and lawsuits filed against the city. She has served in this position since July 1990, and has served on the staff of the City Attorney's office since 1986. She earned an M.S. in social work administration from the University of Tennessee and a J.D. from Memphis State University School of Law.

**John A. Jones**  Editor-in-Chief-Johnson City Press and President, Press Holding Corp., Johnson City

In addition to his responsibilities at the Johnson City Press and Press Holding Corp., Jones is on the Board of Directors of Suntrust Bank of Upper East Tennessee, serves as chair of the Tennessee Alcoholic Beverage Commission, and is a member of numerous professional, educational, and civic organizations. He is also Past President of the Tennessee Associated Press Managing Editors, former chair of the Tennessee Wildlife Resources Commission, and former chair of the Johnson City Chapter of the American Red Cross.

**Joe Lancaster**  CEO Emeritus-Tennessee Farmers Insurance Companies,  Columbia

In 1994, Lancaster retired from Tennessee Farmers Insurance Companies (the Farm Bureau group) after forty-three years of service, remaining as CEO Emeritus and a part-time consultant for the companies. In addition to holding numerous leadership roles in the industry, he is a member of the Tennessee Higher Education Commission, the Blue Cross and Blue Shield of Tennessee Board of Trustees, the Board of Trustees of Maury Regional Hospital, a director of the First Farmers and Merchants National Bank of Columbia, and past president of the Middle Tennessee Council of the Boy Scouts of America.

**Lemuel Lewis**  President-WTVF-Channel 5, Nashville

No information available

**John J. Maddux, Jr.**  Circuit Court Judge-13th Judicial District, Cookeville

In 1992, the Tennessee Supreme Court appointed Maddux as chair of the Court Executive Team, which is responsible for assisting and advising the Commission on the Future of the Tennessee Judicial System. He has served as Circuit Court Judge for the seven-county Thirteenth Judicial District since his election in 1984. He is president of the Tennessee Trial Judges' Association, immediate past vice-president of the Tennessee Judicial Conference, and a member of the Tennessee Civil Pattern Jury Instruction Committee, where he serves as chair of the subcommittees on Clarity and Comparative Fault. He is an adjunct professor of business law at Tennessee Technological University and author of a textbook titled Tennessee Government.

**Judith P. Medearis**  Circuit Court Clerk-Hamilton County, Chattanooga

Medearis served as Deputy Clerk and Chief Deputy Clerk to the Hamilton County Circuit Court before being elected as Circuit Court Clerk in 1978. She is a Certified Public Administrator from the 1989 charter class of the University of Tennessee Institute for Public Service, Center for Government Training. She received Certified Public Official certification from the Nation Association of County Recorders and Clerks in 1992. She is a member of the Board of Directors of the State Court Clerks Association of Tennessee, the County Officials Association of Tennessee, and the National Association of County Recorders and Clerks. She also serves on the Tennessee Advisory Commission on Intergovernmental Relations.

**James G. Neeley**        President-Tennessee AFL-CIO Labor Council,
                           Nashville

Prior to his election as President of the Tennessee AFL-CIO Labor Council in 1979, Neeley served as Tennessee Commissioner of Labor. He is the founder and Chairman of the Board of the Center for Labor-Management Relations. He is the founder and member of the Board of Directors of the Tennessee Safety Congress, chair of the State Council on Vocational Education, and holds membership in numerous business, government, and civic organizations.

**Paul Neely**        Publisher-The Chattanooga Times, Chattanooga

Neely has been Publisher of The Chattanooga Times since 1992, having previously worked as that paper's managing editor. Prior to that he was a reporter and editor in Riverside, California; Louisville, Kentucky; and St. Petersburg, Florida. He is Vice-Chair of the Chattanooga Area Chamber of Commerce and a Trustee of Williams College, the Hunter Museum of American Art, and the Tennessee Aquarium. He received a B.A. from Williams College and an M.S. in journalism and an M.B.A. from Columbia University.

**Clayburn L. Peeples**        District Attorney General-28th
                               Judicial District, Trenton

Peeples is the District Attorney General for the 28th Judicial District in rural West Tennessee, having been a prosecutor since 1977. Prior to that, he served three years as an Assistant Professor of Criminal Justice at the University of Tennessee at Martin and, before that, was a Captain in the Judge Advocate General's Corps of the United States Army. He holds both a B.S. and a J.D. degree from the University of Tennessee.

**Bill Purcell**        House of Representatives, Nashville

Purcell is House Majority Leader for the Tennessee General Assembly, having first been elected to the House in 1986 and now serving his fifth term. During his years as majority leader, he has sponsored and passed legislation undertaking major reforms in Tennessee's schools, courtrooms, industrial plants and board rooms, hospitals, and voting booths. In the last session of the

legislature he turned his attention to reforms in the criminal justice system. By profession an attorney, Purcell received his law degree from Vanderbilt University.

**M. Lee Smith**          Founder and Publisher-M. Lee Smith Publishers & Printers,          Nashville

In 1975, Smith founded M. Lee Smith Publishers & Printers LLC, which publishes three directories, more than 90 newsletters-most of them state-specific legal newsletters and many of them jointly with law firms-and The Tennessee Journal, a newsletter on Tennessee government and politics. Additionally, he serves as political analyst on Nashville's WTVF-TV. Smith received his undergraduate and law degrees from Vanderbilt University. Prior to starting his publishing company, he worked on the staffs of U.S. Senator Howard Baker and Governor Winfield Dunn.

**William B. Stokely, III**          Chairman and President-The Stokely Company, Knoxville

Stokely, former CEO of Stokely Van-Camp, Inc., of Indianapolis, Indiana, is currently Chairman and President of The Stokely Company of Knoxville. He directs the venture capital activities of a wide variety of companies including restaurants, a hotel, and wildemess lodges in the Great Smoky Mountains and Big South Fork. He is also Chairman of the Board of the Greater Knoxville Sports Corporation. Stokely serves as National Chairman of the University of Tennessee's 21st Century Campaign and is President of the William B. Stokely, Jr. Foundation.

**Gary R. Wade**          Judge-Court of Criminal Appeals, Knoxville

Wade has served on the Tennessee Court of Criminal Appeals since 1987. After receiving a B.S. from the University of Tennessee in 1970 and a J.D. from the University of Tennessee College of Law in 1973, he went into the private practice of law. Additionally, he served as the City Attorney for the city of Pigeon Forge (1973-87), the Mayor of Sevierville (1977-87), and Chairman of the Board of Sevier Title, Inc. (1975-1988).

**A. C. Wharton, Jr.**   Chief Public Defender, Memphis

In addition to his position as Chief Public Defender for Shelby County, Wharton is also a partner in the firm of Wharton & Wharton & Associates as well as an Adjunct Professor of Law at the University of Mississippi in Oxford. He received a B.S. with Distinction in Political Science from Tennessee State University in 1966 and a J.D. from the University of Mississippi in 1971. He sat as a Special Justice on the Tennessee Supreme Court in 1980. He is a member of the Tennessee Higher Education Commission, the Board of Directors of the Methodist Hospital System, the Board of Directors of NationsBank of Memphis, and several university boards and commissions.

**Jane W. Wheatcraft**            Criminal Court Judge-18th Judicial
                                  District, Gallatin

Wheatcraft was elected to the position of Criminal Court Judge for the Eighteenth Judicial District (Sumner County) in September 1994. She had previously served as a General Sessions Judge in Sumner County since October 1985. She is a member of the Tennessee and Sumner County Bar Associations, the Board of Trustees for Volunteer State Community College, and the United Way Board for Sumner County;.She was the 1995 recipient of the Leadership Sumner Award. She received a J.D. degree from the Nashville School of Law in 1977.

**John S. Wilder**               Lieutenant Governor, Nashville

Wilder was first elected Lieutenant Governor and Speaker of the Senate of the State of Tennessee in 1971 and is currently serving his 13th consecutive two-year term. He presides over all sessions of the Senate, appoints all committees and committee officers, is Vice-Chairman of the State Building Commission, Co-Chairman of the Joint Legislative Services Committee, member of the Tennessee Industrial and Agricultural Development Commission and the University of Tennessee Space Institute Support Council. He is an ex officio member of the Tennessee Mental Health Board.

**Richard S. Wirtz**            Dean and Professor of
                                Law-University of Tennessee
                                College of Law, Knoxville

Wirtz joined the faculty of the University of Tennessee College of Law in 1974 and has served as Dean since 1992. He received a B.A., magna cum laude, from Amherst College in 1961, an M.P.A. from the Woodrow Wilson School of Public and International Affairs at Princeton University in 1963, and a J.D. from Stanford Law School in 1970. He is widely published and active in professional and civic organizations, including service as Vice-Chair of the American Bar Association Section on Legal Education and Admissions to the Bar, Curriculum Committee.

**Court Executive Team**

**Judge John J. Maddux, Jr.**(Chair)
**Justice Frank F. Drowota, III**
**Judge Gary R. Wade**

These three members of the Court Executive Team are also  Commission members. Their biographical information may be found in the Commission Members listing.

Case 3:22-cv-00439    Document 33-3    Filed 08/22/22    Page 71 of 88 PageID #: 1019

**Cornelia A. Clark**   Circuit Court Judge-21st Judicial District, Franklin

Clark is a Circuit Judge in the 21st Judicial District. She is also an instructor at Vanderbilt University Law School, where she received her law degree. She chairs the Judicial Evaluation Commission and is a member of the Tennessee Judicial Conference Executive Committee, The Supreme Court Advisory Commission on the Rules of Civil Procedure and Evidence, and the Uniform Probate Code Commission. She is a Fellow of the Tennessee and American Bar Foundations.

**Joseph S. (Steve) Daniel**   Circuit Court Judge-16th Judicial District, Murfreesboro

Daniel has served as Circuit Judge in the 16th Judicial District for fifteen years. His judicial experience includes being the past President of the Tennessee Judicial Conference, as well as having served in various leadership positions with the Conference and the Tennessee Trial Judges Association. He is a member of the faculty of the National Judicial College, an adjunct faculty member at Middle Tennessee State University, a Tennessee Bar Foundation Fellow, and serves in various other civic organizations.

**Charles E. Ferrell**   Director-Administrative Office of the Courts, Nashville

Ferrell has served as the Administrative Director of the Tennessee Courts since 1992. Prior to assuming his current position, he was a Vice-President of the National Center for State Courts in Williamsburg, Virginia. Ferrell is the former Administrative Director of the Courts in Oklahoma (1982-87) and began a career in court administration in 1978 with the Supreme Court of North Carolina. He is a member of the Conference of State Court Administrators, National Association of Court Managers, and serves as a member of the National Center for State Courts, Court Technology Advisory Committee.

**C. Creed McGinley**   Circuit Court Judge-24th Judicial District, Savannah

After receiving a B.S. from the University of Tennessee at Knoxville in 1973 and a J.D. from Memphis University Law School in 1976, McGinley was in private practice from 1976 to 1982 and served as Assistant District Attorney General from 1982 to 1988. He has served as Circuit Court Judge for the 24th Judicial District since 1988, hearing both civil and criminal cases of unlimited jurisdiction. He currently serves on the Education Committee and A.D.R. Committee of the Tennessee Judicial Conference as well as serving on the Supreme Court's Commission on Gender Fairness.

**Personal appearances before the commission**

Titles and affiliations listed are those of the contributors at the time of their participation with the Commission.

Adams, Betty
> Commissioner for the Department of Youth Development, Nashville (keynote speaker 06/17/94)

Alissandratos, D. J.
> Chancellor, 30th Judicial District, Memphis (panel discussion 01/27/95)

Anderson, Dr. Kathryn
> Associate Professor of Economics and Director, Graduate Program in Economic Development

Armstrong, Jr., Walter P.
> attorney, Armstrong, Allen, Prewitt, Gentry, Johnston & Holmes, Memphis (panel discussion 10/13/94)

Baer, Margaret D.

Bell, Phil
> Executive Producer at News Channel 5 in Nashville (cameras in the courtroom presentation 08/12/94)

Bennett, Andrew F.
> General Sessions and Juvenile Court Judge, Bradley County, Cleveland (appeared at public hearing 05/18/95)

Bracy, Lance
> Chief Disciplinary Counsel for the Board of Professional Responsibility of the Supreme Court of Tennessee, Nashville (presentation 08/13/94)

Bradley, Christine
> Former Commissioner for the Department of Corrections. Chief of Staff to the Mayor

Brandt, Robert S.
> Chancellor, 20th Judicial District, Davidson County, Nashville (addressed the Commission 01/08/94)

Branstetter, Cecil D.
> attorney, Branstetter, Kilgore, Stranch & Jennings, Nashville (panel discussion 10/01/93)

Brewer, Reed
 Clerk and Master, Henry County, Paris (appeared at public hearing 05/18/95)

Brian, Lisa
 court reporter (impromptu presentation 07/21/95)

Brothers, Thomas W.
 Circuit Court Judge, 20th Judicial District, Nashville (panel discussion 01/27/95)

Clark, Connie
 Circuit Court Judge, 21st Judicial District

Coates, Christopher
  Municipal Court Judge, Smyrna (appeared at public hearing 05/18/95)

Conner, Lew
  attorney, Boult, Cummings, Conners & Berry

Cornfield, Daniel B., Ph.D.
  Professor of Sociology, Vanderbilt University, Nashville (presentation 02/12/94)

Cropp, J. Wayne
  attorney, Grant, Konvalinka & Grubbs, Chattanooga (presentation 02/12/94)

Cunningham, Sheila Jordan
  Presiding Judge of the Tennessee Court of the Judiciary, Memphis (presentation 08/13/94)

Daniel, Steve
  Circuit Court Judge, 16th Judicial District

Dator, James A., Ph.D.
  Professor, University of Hawaii; head of the Alternative Futures Option, Department of Political Science, University of Hawaii; Director of the Hawaii Research Center for Futures Studies, Social Science Research Institute, University of Hawaii (facilitator for visioning retreat 04/08-09/94)

Daughtrey, Martha Craig
  Judge, U.S. 6th Circuit Court of Appeals, Nashville (keynote speaker 02/11/94)

Day, John A.
  attorney, Branham & Day, P.C., Nashville (panel discussion 10/13/94)

Dean, Karl
  District Public Defender, 20th Judicial District, Nashville (panel discussion 05/19/95)

Dickson, Roger
  attorney, Miller & Martin, Chattanooga (citizen invited to address the Commission 01/08/94)

Easley, Marc
  police officer and victim of violent crime, Chattanooga (citizen invited to address the Commission 01/08/94)

Easley, Rebecca
  victim's rights advocate (appeared at public hearing 05/18/95)

Everett, Jr., James R.
Probate Court Judge, 20th Judicial District, Nashville (appeared at public hearing 05/18/95)

Ferrell, Charles E.
Director, Administrative Office of the Courts

Fels, Charles
attorney, Ritchie, Fels, & Dillard, P.C., Knoxville (citizen invited to address the Commission 01/08/94)

Fisher, Doug
attorney, Howell & Fisher, Nashville (presentation 02/11/94)

Folk, Jody
Director of Victim Witness Services, 20th Judicial District, Davidson County, Nashville (citizen invited to address the Commission 01/08/94)

Fox, Carla
attorney, Booker & Associates, Nashville (panel discussion 10/13/94)

Frist, Jr., Dr. Thomas
Vice-Chairman of the Board, Columbia/HCA Healthcare Corp.

Gilbert, Harris
President, Tennessee Bar Association, Nashville (appeared at public hearing 05/18/95)

Goddard, Houston
Judge, Tennessee Court of Appeals, Eastern Division, Knoxville (appeared at public hearing 05/18/95)

Gordon, Tam
Press Secretary for Mayor Phil Bredesen, Nashville (moderator for panel discussion 03/03/95)

Grubbs, Shelby R.
attorney, Grant, Konvalinka & Grubbs, Chattanooga (keynote speaker 02/12/94)

Harper, Barbara Anne
Reverend, Episcopal Diocese of East Tennessee, Chairperson of Violence in Society, Lenoir City (appeared at public hearing 05/18/95)

**Harrington, Penny**
General Sessions Judge, Davidson County, Nashville (appeared at public hearing 05/18/95)

**Harwell, Jr. Aubrey B.**
attorney, Neal & Harwell, Nashville (keynote speaker 12/02/94)

**Haynes, Barbara N.**
Circuit Court Judge, 20th Judicial District, Davidson County, Nashville (addressed the Commission 01/08/94 and addressed members touring the Davidson County Courthouse 01/18/96)

**Holter, Mary Lu**
IBM industry consultant on justice recognized worldwide as an expert on court automation and integrated justice systems (presentation 06/18/94)

**Horton, Robert**
The Organized Victims of Violent Crime, Madison (citizen invited to address the Commission 01/08/94)

**Jarvis, Gail Stone**
General Sessions Judge, Knox County, Knoxville (panel discussion 12/01/94)

**Johnson, Torry**
District Attorney General, 20th Judicial District, Nashville (addressed members touring the Davidson County Courthouse 01/18/96)

**Kerns, David, Ph.D.**
Director of the Management of Technology Program, Vanderbilt University, Nashville (presentation 02/12/94)

**King, John**
Tennessee Association of Bail Agents (address 01/18/96)

**King, Nancy**
Associate Professor of Law, Vanderbilt University, Nashville (keynote speaker 12/02/94)

**Knowles, John C.**
attorney, Dodson, Parker, Shipley & Behm, Sparta (panel discussion 10/13/94)

**Koch, Jr., William C.**
Judge, Tennessee Court of Appeals, Middle Division, Nashville (appeared at public hearing 05/18/95)

Kuivenhoven, Steve
Children's Rights Council (appeared at public hearing 05/18/95)

Lee, Robert E.
General Sessions and Juvenile Court Judge, Giles County, Pulaski (appeared at public hearing 05/18/95)

Loggins, Kirk
reporter, The Tennessean, Nashville (panel discussion 10/01/93)

Loughry, David
General Sessions and Juvenile Court Judge, Rutherford County, Murfreesboro (panel discussion 03/03/95)

Maddux, Jr., John J.
Circuit Court Judge, 13th Judicial District

Mays, Kathy,
Director of Judicial Planning for the Supreme Court of Virginia (address 10/02/93)

McCutchen, Pat
Executive Secretary of the Tennessee District Attorneys General Conference, Nashville (appeared at public hearing 05/18/95)

McNeil, Dorothy
Treasurer, Commission Against Senseless Killings, Memphis (citizen invited to address the Commission 01/08/94)

McQueen, Mary Campbell
State Court Administrator for Washington State (speaker 01/28/95)

Meece, Valerie J.
Captain, Youth Services Division, Metro Nashville Police Department, Nashville (panel discussion 10/01/93)

Merritt, Gilbert S.
Chief Judge, U.S. Court of Appeals, 6th Circuit, Nashville (speaker 09/21/95)

Moore, Jr., Thomas L.
General Session Judge, Weakley County, Dresden (panel discussion 12/01/94)

Mull, Pam
Circuit Court Clerk, Bradley County, Cleveland (appeared at public hearing 05/18/95)

Nailling, Jr., Sam C.
> Juvenile Court Judge, Obion County, Union City (panel discussion 03/03/95)

Neal, James
> attorney, Neal & Harwell, Nashville (presentation 02/11/94)

Nichols, Jo Ann
> Families & Friends of Murdered Victims (appeared at public hearing 05/18/95)

Nichols, Randall E.
> Attorney General, 6th Judicial District, Knox County, Knoxville (panel discussion 10/01/93)

Nuckolls, Marion D.
> Clerk and Master, Hardeman County, Bolivar (panel discussion 01/27/95)

Ortwein, Bill
> Tennessee Association of Bail Agents (address 01/18/96)

Palermo, Rose
> attorney, Cheatham & Palermo, Nashville (panel discussion 10/01/93)

Peeples, Clayburn
> District Attorney General, 28th Judicial District

Perkins, Russell N.
> District Public Defender, 16th Judicial District, Murfreesboro (appeared at public hearing 05/18/95 and panel discussion 05/19/95)

Prentice, George
> Court Administrator, Davidson County (addressed members touring the Davidson County Courthouse 01/18/96)

Pritchartt, Van
> editor, The Collierville Herald, Collierville (citizen invited to address the Commission 01/08/94)

Purcell, Bill
> House Majority Leader, District 52

Ray, Gayle
> Sheriff, Davidson County, Nashville (appeared at public hearing 05/18/95)

Raybin, David
    attorney, Hollins, Wagster & Yarbrough, P.C., Nashville (presentation 01/07/94 and panel discussion 05/19/95)

Reed, Barbara Tucker
    Remove Intoxicated Drivers (RID) in Tennessee, Oak Ridge (appeared at public hearing 05/18/95)

Riley, Elizabeth
    Tennessee Victims' Coalition (appeared at public hearing 05/18/95)

Robinson, Muriel
    Circuit Court Judge, 20th Judicial District, Nashville (panel discussion 03/03/95)

Ruben, Leon
    General Sessions Judge, Davidson County, Nashville (panel discussion 12/01/94)

Runyon, Marvin
    Chief Executive Officer and Postmaster General of the United States Postal Service (panel discussion 05/18/95)

Sanford, Valerius
    attorney, Gullett, Sanford, Robinson and Martin, Nashville (presentation 10/02/93)

Shearon, Lorrie
    Director, Tennessee Judicial Council, Nashville (presentation 02/11/94)

Shipley, Marietta M.
    Circuit Court Judge, 20th Judicial District, Nashville (presentation 10/14/94)

Short, Ann
    attorney, Law Office of Herbert S. Moncier, Knoxville (panel discussion 05/19/95)

Slate, II, William K.
    President of the American Arbitration Association (speaker 10/14/94)

Small, C. Neal
    Chancellor, 30th Judicial District, Memphis (appeared at public hearing 05/18/95)

Sykes, Libby
    Executive Director of the Tennessee Sentencing Commission, Nashville (presentation 01/07/94)

Thompson, Sam A.
   General Sessions Judge, Shelby County, Memphis (panel discussion 12/01/94)

Tomlin, Jr., Hewitt P.
   Judge, Tennessee Court of Appeals, Western Division, Jackson (appeared at public hearing 05/18/95)

Vital, Patricia Best
   Chair of the Chattanooga Bar Association Task Force on the Future of the Tennessee Judicial System, Chattanooga (appeared at public hearing 05/18/95)

Wharton, A.C.
   Chief Public Defender

Williams, William H.
   Senior Judge, 30th Judicial District, Shelby County Drug Court, Memphis (panel discussion 10/01/93)

Wiltshire, Susan Ford
   professor, Chair of the Department of Classical Studies and Professor of Classics at Vanderbilt University, Nashville (presentation 10/02/93)

Wiseman, Thomas A. Jr.
   U.S. District Judge for the Middle District of Tennessee, Nashville (presentation 10/02/93)

Wohlford, Paul R.
   Juvenile Court Judge, Bristol (panel discussion 03/03/95)

Wyatt, Jeff
   survivor of a victim of violent crime, Nashville (citizen invited to address the Commission 01/08/94)

Written statements  distributed to the commission

   Titles and affiliations listed are those of the contributors at the time of their participation with the Commission.

Adams, Tom
   (electronic bulletin board 07/17/94 re:  negative image of justice system)

Adamson, Whit
   Executive Vice President, Tennessee Association of Broadcasters, Nashville (letter 12/22/93 re:  cameras in the courtroom)

Case 3:22-cv-00439    Document 33-3    Filed 08/22/22    Page 81 of 88 PageID #: 1029

Anderson, Michael A.
attorney, Gearhiser, Peters & Horton, Chattanooga (letter 03/02/94 re: domestic relations cases)

Archer, Joan E.
Executive Director, Tennessee Council of Juvenile and Family Court Judges, Nashville (letter 09/19/95 with Resolution of the Tennessee Council of Juvenile and Family Court Judges)

Bennett, Jr., Andrew F.
General Sessions and Juvenile Court Judge, Bradley County, Cleveland (letter 01/05/95 re: General Sessions Court)

Blackburn, W. Gary
attorney, Blackburn, Slobey, Freeman & Happell, P.C., Nashville (letter 12/05/05 re: permitting jurors to pose questions to witnesses)

Boatwright, Charlotte, B.,Ph.D.,
Convener, The Domestic Violence Coalition of Greater Chattanooga, Chattanooga (letter 05/16/95 re: domestic violence)

Boyd, Mary O.
attorney, Nashville (letter 01/25/94 re: family law court)

Bradley, Brenda
Altamonte Springs, Florida (letter 03/03/94 re: juvenile court and child support)

Briggs, S. Lee
(electronic bulletin board 07/16/94 re: plea bargaining)

Burch, Robert E.
Circuit Court Judge, 23rd Judicial District, Charlotte (electronic bulletin board 07/15/94 re: jury instructions)

Byers, John K.
Senior Judge, Eastern Section, Knoxville (letter 01/09/96 re: consolidation of intermediate appellate courts)

Campbell, A. W.
retired minister, Greeneville (letter 12/22/93 re: mandatory sentencing)

Childers, Robert L.
Circuit Court Judge, 30th Judicial District, Memphis (letter 05/15/95 re: method of selecting trial court judges)

Coats, Christopher D.
City Judge, Smyrna (letter 03/08/93 re:  municipal courts)

Cody, Paula Jo
survivor of a victim of violent crime, Memphis (letter 05/14/95 re:  failure of the system)

Crawford, Roger
Lawrenceburg (letter 01/06/94 re: "punishment should be in keeping with the crime")

Crider, Tom W.
District Public Defender, 28th Judicial District, Trenton (letter 01/09/95 re: indigent defense)

Dean, George
(electronic bulletin board 07/19/94 reply to Jim Garrett's comments re:  on-line access to public documents, reply to Bud Williams comments re:  attorney conduct, and reply to Mary McCall's comments re:  cost of litigation; and 07/22-23/94 replies to Jim Garrett's comments re:  on-line access to public documents)

Falkenberry, Bernice T.
citizen, Chattanooga (letter 11/24/95 re:  divorce in family court)

Farmer, David R.
Judge, Court of Appeals, Western Section, Jackson (letter 09/19/94 re:  rendering decisions on a timely basis and letter 05/12/95 re:  consolidation of intermediate appellate courts)

Galbreath, Charles
Judge, Retired, Court of Criminal Appeals, Nashville (letter 07/05/94 re:  election of pro tempore judge by attorneys)

Garrett, Jim
(electronic bulletin board 07/17/94 reply to Ray Walker's comments re:  access to public records, and 07/20/94 reply to George Dean's comments re:  on-line access to information)

Grubbs, Shelby R.
attorney, Grant, Konvalinka & Grubbs, Chattanooga (letter 02/17/94 re: court-annexed A.D.R.)

Hammontree, Clara Sue
Coordinator, Greenback RID (Remove Intoxicated Drivers) and East Tennessee Victim's Rights Task Force, Greenback (letter 05/06/95 re: protecting law-abiding citizens)

Harring, Roger
(electronic bulletin board 07/17/94 re: sentencing, and 07/19/94 reply to K. L. Thurston's comments re: sentencing)

Harwell, Jr., Aubrey E.
attorney, Neal & Harwell, Nashville (letter 01/16/95 re: article on jury science)

Hunter, Hamilton T.
The Society for Preservation of Family Relationships and the East Tennessee Council on Children and Youth, Custodial Issues Committee, Knoxville (letter 07/07/95 re: family courts)

Ingram, Kenneth F.
Associate Justice, Supreme Court of Alabama (letter 05/16/95 re: Alabama appellate courts structure)

Isenbert, Janice I.
LCSW, Mediation and Conflict Resolution Services, P.C., Memphis (letter 07/26/95 re: mediator qualifications)

Jackson, Barbara N.
mother of a victim of crime, Lenoir City (letter 05/15/95 re: failure of the system)

Jenkins, Alan K.
Roan Mountain (letter 12/26/93 re: system for collecting debts owed to defendants)

Johnson, Brenda
(electronic bulletin board 07/20/94 reply to K. L. Thurston's comments re: rehabilitation)

Johnson, Herchel D. Clarksville
(letter 01/04/94 re: district attorneys)

Johnson, Leslie
(electronic bulletin board 07/15/94 re: makeup of Commission membership)

Johnson, Steve
(electronic bulletin board 07/25/94 re: traffic violations)

Jones, Michael C.
> Program Director, Davidson County Community Corrections Program (letter 02/28/95 re:  community corrections)

Jones, Porter
> (electronic bulletin board 07/20/94 re:  alternative punishment)

Jones, Steven H.
> General Sessions and Juvenile Court Judge, Sullivan County, Kingsport (letter 05/16/95 re:  General Sessions Court)

Kaye, Judith S.
> Chief Judge of the State of New York (letter 12/22/94 re:  children's centers in state courts)

Keasling, Gail
> survivor of a victim of violent crime, Millington (letter 05/10/95 re:  juvenile justice system)

Kendall, Robert G.
> Circuit Court Clerk, Obion County, Union City (letter 05/12/95 re:  collecting state taxes)

Kent, Morton J.
> Vencap Investment Corporation, Chattanooga (letter 12/28/93 re:  legal ethics)

Koch, Jr., William C.
> Judge, Court of Appeals, Nashville (letters 07/31/95 and 02/20/96 re: consolidation of intermediate appellate courts)

Kuzenski, John
> (electronic bulletin board 07/16/94 re:  juvenile justice, prisons, policing, and social reform)

Lanier, Robert A.
> Circuit Court Judge, 30th Judicial District, Memphis (letter 02/01/96 re: comments on preliminary recommendations)

Martin, Jimmy P.
> Selmer (letter 08/08/95 re:  inequities in the system)

McCall, Mary
> (electronic bulletin board 07/19/94 re:  cost of litigation)

Meredith, Jennings B.
General Sessions Judge, Anderson County, Clinton (letters 02/06/95 and 05/12/95 re: several issues for consideration)

Miller, Barbara Ann
New Johnsonville (letter 08/16/95 re: problems with the system)

Miller, Larry W.
Antioch (letter 01/03/94 re: need for an informational booklet about the system)

Nelson, Gary
(electronic bulletin board 07/15/94 re: obsolete laws and pretrial release)

Partin, Steve
Claim Superintendent, State Farm Mutual Automobile Insurance Company, Brentwood (letter to Lew Conner 10/05/95 re: alternative dispute resolution)

Pierce, Douglas R.
attorney, King & Ballow, Nashville (letter 02/16/94 re: cameras in the courtroom)

Pratt, Greg
(electronic bulletin board 07/18/94 re: plea bargaining)

Rochelle, Major
Waverly (undated letter re: problems with the system)

Roebuck, Michael C.
Director, Southeast Tennessee Legal Services, Chattanooga (letter 03/19/95 re: written record of proceedings)

Rogers, Mrs. Newell
Chattanooga (letter 02/10/94 re: small claims court)

Rogerson, William I.
President, Knox County Mothers Against Drunk Driving (MADD) Chapter & Public Policy Liaison, MADD Tennessee, Knoxville (letter 05/16/95 re: several suggestions for improvement)

Russell, Ken
(electronic bulletin board 07/15/94 re: information access)

Shadden, Marie C.
M.P.A., Executive Director, Tennessee State Office, Mothers Against Drunk Driving (MADD) (letter 01/10/94 re: suggestions for improvement)

Shearron, Kenneth
(electronic bulletin board 07/16/94 re: money in the court systems)

Shine, D. Bruce
attorney, Shine & Mason, Kingsport (letter 05/17/95 re: consolidation of intermediate appellate courts)

Spillers, Sr., Harold L.
Madison (letter 12/22/93 re: plea bargaining)

Steagall, Nancy Rose
Culleoka (letter 01/08/94 re: domestic relations)

Swiggart, James M.
Circuit Court Judge, retired (undated comments re: suggestions for improvement)

Swinney, Pat
Director, The Juvenile Court of Anderson County (letter 03/21/95 re: local juvenile courts)

Taylor, George Cleveland
Cockerill Bend Special Needs Facility, Nashville (letter 12/22/93 re: recidivism)

Tennessee Commission
Recommendations Regarding Juvenile Courts (07/95) on Children and Youth

Thomas, III, W. Neil
attorney, Shumacker and Thompson, Chattanooga (letter 07/03/95 re: suggestions for preparing the Commission's recommendations)

Thurston, K. L.
(electronic bulletin board 07/18/94 reply to Ray Walker's comments re: video transcripts and reply to Roger Harring's comments re: sentencing, 07/19/94 reply to Roger Harring's comments re: alternative sentencing, and 07/26/94 reply to Ray Walker's comments re: court reporter transcripts and reply to Brenda Johnson's comments re: rehabilitation)

Trotter, Don
President, Tennessee Municipal League, Clarksville (letter 05/11/95 re: consolidation of intermediate appellate courts)

Van Hook, Joseph H.
Oliver Springs City Judge, Oliver Springs (letter 06/22/95 re: general sessions jurisdiction for municipal courts)

Vredeveld, Ruth B.
Chattanooga (letter 01/05/94 re: several recommendations)

Walker, Ray
(electronic bulletin board 07/17/94 re: court reporter transcripts and reply to Robert Burch's comments re: jury instructions, and 07/19/94 reply to K.L. Thurston's comments re: videotaping of trials)

Williams, Bud
(electronic bulletin board 07/18/94 re: lawyers)

Williams, William H.
Senior Judge, 30th Judicial District, Memphis (letter 05/16/95 re: consolidation of intermediate appellate courts)

Witcher, Ken
General Sessions Judge, Macon County, Lafayette (letter dated 05/09/95 re: general sessions court)

Witherspoon, Wendell
South Central Correctional Center, Clifton (undated letter re: district attorney)