# Exhibit 1

# McCALEB

# vs.

# LONG

# MICHELLE LONG

# October 25, 2023



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073| tn.scheduling@lexitaslegal.com

IN THE UNITED STATES DISTRICT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

DAN MCCALEB, Executive Editor of
THE CENTER SQUARE,

                Plaintiff,

vs.                          Case No. 3:22-cv-00439

MICHELLE LONG, in her official
capacity as DIRECTOR of the
TENNESSEE ADMINISTRATIVE OFFICE
OF THE COURTS,

                Defendant.

_____



        Deposition of:

        MICHELLE LONG

        Taken on behalf of the Plaintiff
        October 25, 2023
        Commencing at 9:04 a.m. CST




_____

                Lexitas Legal
           Jenny Checuga, LCR, RPR
              555 Marriott Drive
          Nashville, Tennessee 37214
                (615)595-0073

Lexitas TENNESSEE
(615)595-0073

A P P E A R A N C E S

For the Plaintiff:

MR. M.E. BUCK DOUGHERTY III
Attorney at Law
Liberty Justice Center
440 North Wells Street, Suite 200
Chicago, IL 60654
(423)326-7548
bdougherty@libertyjusticecenter.org


For the Defendant:

MR. MICHAEL M. STAHL
Assistant Attorney General
Office of the Attorney General & Reporter
PO Box 20207
Nashville, TN 37202-0207
(615)741-3491
michael.stahl@ag.tn.gov


For the Deponent, Rachel Harmon:

MR. JOHN COKE
Attorney at Law
Administrative Office of the Courts
511 Union Street, Suite 100
Nashville, TN 37219

Lexitas TENNESSEE
(615)595-0073

                              I  N  D  E  X

                                                              Page
   0Examination
   By Mr. Dougherty                                             5

   Examination
   By Mr. Stahl                                                154

   Further Examination
   By Mr. Dougherty                                            157



                    E   X   H   I   B   I   T   S

                          (None marked.)

S T I P U L A T I O N S

The deposition of MICHELLE LONG was taken by counsel for the Plaintiff, at the offices of 500 Charlotte Avenue, Nashville, Tennessee, on October 25, 2023, by Notice for all purposes under the Federal Rules of Civil Procedure.

All formalities as to caption, notice, statement of appearance, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing, and that said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding herein.

It is agreed that JENNIFER CHECUGA, LCR, RPR, and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are not waived.

Lexitas TENNESSEE
(615)595-0073

                    *   *   *

                 MICHELLE LONG,

was called as a witness, and having first been

duly sworn, testified as follows:


                   EXAMINATION

QUESTIONS BY MR. DOUGHERTY:

Q.    Good morning.

A.    Good morning.

Q.    My name is Buck Dougherty, I'm an

attorney with Liberty Justice Center and I

represent the Plaintiff in this lawsuit, Dan

McCaleb.  He's the executive editor of the

Center Square.  And we'll go ahead and get

started with some introduction and kind of

ground rules and we'll talk a little bit about

that.

       Have you ever had your deposition taken

before today?

A.    Only once.

Q.    And when was that?

A.    Over ten years ago.

Q.    Was that -- do you recall, was it a

particular lawsuit that you were involved in

or --

Lexitas TENNESSEE
(615)595-0073

A.    It was not -- I believe I was deposed as a fact witness in a lawsuit involving hospitals when I was working at the Tennessee Hospital Association.

Q.    And was that lawsuit filed in a Tennessee state court?

A.    I think it was federal.

Q.    Tennessee federal court?

A.    Yes.

Q.    Would that have been Middle District of Tennessee?

A.    Yes.

Q.    Yes.

Q.    Okay.  So you perhaps may recall, you know, I'll ask a question, it's important -- I know when people communicate we nod our heads and give cues, it's important that you give audible verbal statements so our court reporter can pick that up on the transcript, and I'll try to be as clear as possible with my questions.

If you don't understand any question at any time, feel free to ask me to restate it, okay?

A.    Yes.

Q.    And also, we can take a break at any

Lexitas TENNESSEE
(615)595-0073

point.  If you want to go for an hour and take a break or two hours, that's up to you, the only stipulation is if I've got a question that I've asked and it's on the table, I would ask that you answer that question then before we take a break.

A.    Yes, of course.

Q.    Okay.  So do you understand that you're under oath today?

A.    I do.

Q.    And are you prepared to answer the questions that I ask of you truthfully?

A.    Yes.

Q.    Are you represented by counsel?

A.    Yes.

Q.    And what is his name?

A.    Michael Stahl.

Q.    Michael Stahl.

        MR. DOUGHERTY:  And there's another person here, want go ahead and introduce yourself?

        MR. COKE:  John Coke, general counsel at the Tennessee Administrative Office.

        MR. DOUGHERTY:  I don't know if I asked you this, Mr. Coke, are you going to be

*Lexitas TENNESSEE*
*(615)595-0073*

entering a notice of appearance in this lawsuit?

MR. COKE:  No, I will not.

MR. DOUGHERTY:  Okay.

BY MR. DOUGHERTY:

Q.    Did you take any kind of medication or are you on any kind of treatment that would hinder your ability to give truthful and honest answers today?

A.    No.

Q.    Okay.  So you kind of understand kind of our ground rules today?

A.    Yes, sir.

Q.    Okay.  Please state your full name for the record.

A.    Michelle Evette Jones long.

Q.    And where have you lived during the last five years?

A.    Nashville, Tennessee.

Q.    Where do you work?

A.    The Tennessee Administrative Office of the Courts.

Q.    And what is your position?

A.    I am the director.

Q.    Do you go by director or is it

administrative director or executive director; which title is it?

A. In the statute it is director or I'm also referred to as the chief administrative officer in the statute.

Q. But you refer to yourself as director?

A. Correct.

Q. Okay. When did you start that position?

A. As director, February of 2022.

Q. Do you remember the specific day; would that have been February 1, 2022?

A. I believe that is correct.

Q. And explain that director position; did someone appoint you to that position?

A. I was appointed by the Tennessee Supreme Court, correct.

Q. And you worked there since February 1st of 2022?

A. Correct.

Q. What did you do prior to your appointment as director?

A. I was deputy director.

Q. And what was the time period in which you were deputy director?

A. I began in October of 2019 as deputy

CAPITAL - TENNESSEE
(615)595-0073

director.

Q. Prior to that, where did you work?

A. Prior to that I worked for the Tennessee Department of Health.

Q. Do you recall the time period in which you were with the Tennessee Department of Health?

A. Seven to eight years. I think it's closer to seven years.

Q. Okay. And what was your position with the Tennessee Department of Health?

A. I was assistant commissioner for licensure and regulation.

Q. Is that for hospital licensure?

A. All hospitals, all healthcare facilities, healthcare practitioners, yes.

Q. Was the assistant commissioner, is that an elected or an appointed position?

A. Appointed.

Q. Who appointed you to that position?

A. The commissioner of the Department of Health.

Q. Do you recall that person's name?

A. John Dreyzehner.

Q. How do you spell the last name?

*LEXITAS - NASHVILLE, TENNESSEE*
*(615)595-0073*

A.   D-R-E-Y-Z-E-H-N-E-R.  I'll have to look at it.

Q.   Is he still working in state government?

A.   No, he's not.

Q.   Okay.  So that's a good window.  Anything before -- I'm sure you had work before then, but what did you do prior to the Tennessee Department of Health?

A.   Prior to the Tennessee Department of Health, I worked as senior vice president and legal counsel for the Tennessee Hospital Association.

Q.   Is that a private or a state position?

A.   Private.

Q.   Is that a nonprofit?

A.   Yes.

Q.   Is that nonprofit still in existence?

A.   Yes.

Q.   And where are they located?

A.   They are now located in Maryland Farms in Brentwood, Tennessee.

Q.   Where were they located when you worked there?

A.   Over -- near the fairgrounds.  I can't recall the name of the street.

Capital TENNESSEE
(615)595-0073

Q.    Is that here in Nashville?

A.    Here in Nashville.

Q.    Okay.  All right, let's -- so you're a practicing attorney; is that correct?

A.    That's correct.

Q.    And where was your undergraduate degree, the school and the year?

A.    Northwestern University in Evanston, Illinois, and I graduated in 1990.

Q.    Chicago, our office is based in Chicago.

      And your law school?

A.    University of Tennessee, Knoxville.

Q.    And what year was your JD?

A.    1994.

Q.    Do you have any other postsecondary graduate degrees or anything?

A.    No, sir.

Q.    Okay.  What was the date of your first bar admission?  The year, excuse me.

A.    1994.

Q.    And was that Tennessee?

A.    Yes.

Q.    Are you admitted or barred in any other states?

A.    Yes.

Q. Where are those states?

A. Alabama and DC.

Q. And then do you have, I assume, federal court admissions?

A. I did. I don't maintain them, but yes.

Q. At one point?

A. Yes.

Q. Would that have been the United States Supreme Court; do you recall?

A. I believe it was when I was working in Alabama, so it would have been not the United States Supreme Court, but the 9th Circuit. Seems there was a case --

Q. The 9th Circuit Court of Appeals?

A. Yes. Yes.

Q. Okay.

A. Alabama's 9th Circuit.

Q. So you're not talking about the 9th Circuit Court of Appeals in federal court.

A. I am. I think I am.

Q. Okay. The 9th Circuit that sits in San Francisco, the federal court?

A. Then no, I'm not, I've got the circuit wrong, I apologize.

Q. Would it be the 11th Circuit Court of

Appeals?

A.   The 11th.

Q.   Would that be in Atlanta?

A.   Yes.

Q.   That's all right, we're not in federal law.

So it looks like you had a very lengthy experience with your legal career, you've held a lot of state positions.  Is it fair to say you were not in litigation?

A.   I started off in litigation, but I did not stay in litigation.  So most of my career is not litigation.

Q.   At least the last ten years or so it's been primarily in state --

A.   That's correct.

Q.   -- organizations?

A.   That's correct.

Q.   I appreciate your responsiveness.  Just to help her out, just let me finish the question and I'll try to do the same before you answer.  I know -- even though you're anticipating your answer, we'll make sure we help our court reporter out.

A.   Okay.

Capital REPORTING TENNESSEE
(615)595-0073

Q. Have you ever been formally disciplined by any state bar, licensing authority?

A. No.

Q. Have you ever been convicted of a crime?

A. No.

Q. Other than this lawsuit, McCaleb versus Long, have you ever been a party to a lawsuit before?

A. No.

Q. So the deposition you gave, the Tennessee Hospital -- the one you mentioned about ten years ago, you weren't actually a party to that lawsuit?

A. That's correct.

Q. Do you recall who the parties were?

A. I do not.

Q. Okay. Do you recall how that lawsuit concluded?

A. I do not.

Q. All right. As director -- for purposes of this deposition, I'm going to refer to your office either as the AOC or the TAOC; is that okay? Do you understand what -- we can do that today?

A. Yes, sir.

Capital TENNESSEE
(615)595-0073

Q. And I know that you all refer to it as the AOC?

A. We do.

Q. And you're aware that there is a federal AOC as well, right?

A. Yes.

Q. So that's -- just for simplicity purposes, I'll refer to it today as either the AOC or the Tennessee AOC?

A. Okay.

Q. If I'm going to refer to the Federal AOC, I'll make a specific reference to it.

A. Okay.

Q. Okay. Who is your supervisor as director of the AOC?

A. Chief Justice Holly Kirby.

Q. And how long has Chief Justice Kirby been your supervisor?

A. Since September 1st.

Q. Of this year?

A. Of this year.

Q. And who was your supervisor prior to Chief Justice Kirby?

A. Chief Justice Roger Page.

Q. And is it your understanding that the

Capitaw TENNESSEE
(615)595-0073

chief justice of the Tennessee Supreme Court is always the director's supervisor?

A.    That is my understanding.

Q.    And do you have periodic evaluations on your performance with the chief justice?

A.    I would say I have weekly evaluations with the chief justice, but nothing formal.

Q.    What -- explain those; tell me about those weekly evaluations.

A.    So we have a standing meeting -- I have a standing meeting with the chief justice every Friday.

Q.    And what do those standing meetings every Friday, what at the do they consist of?

A.    Updates on activities at the AOC and then mostly awareness, I call it situational awareness.

Q.    What kind of updates?  Are you talking about court updates?

A.    No, administrative.

Q.    What are some of those administrative updates that come up in your discussions?

A.    So -- okay, so particularly right now we're in the process of budget discussions and so we would talk about the budget priorities

*Capital Court TENNESSEE*
*(615)595-0073*

for the -- for the Court, for the AOC, those become our priorities.

Q. And does that -- do you also in these weekly meetings and updates discuss any boards or commissions, any administrative issues that are coming up in any of those?

A. I cannot recall anything recently relative to a board -- I take that back.

So we recently did salary increases at the AOC across the Judicial Department, and so yes, we talked about boards and commissions salary increases.

Q. Are boards and commissions, do they receive a state salary?

A. Some do.

Q. Which ones do you recall that receive a state salary?

A. So the CLE, the Continuing Legal Education Commission. The Board of Professional Responsibility has state employees. TLAP, Tennessee Lawyers Assistance Program has state employees. And I am -- did I say the Board of Professional Responsibility, Commission on Legal Education, I think those are the three --

CAPITOL COURT REPORTING, NASHVILLE, TENNESSEE
(615)595-0073

Q. And TLAP.

A. -- that have state employees.

Q. What does TLAP stand for?

A. Tennessee Lawyers Assistance Program.

Q. Okay. And the CLE, that's the group or the division that monitors attorneys' CLEs every year?

A. Continuing legal education, correct. Board of Law Examiners, that's the one I'm forgetting.

Q. So do you make recommendations in terms of salary increases for AOC employees or how does that process work?

A. For AOC employees, yes.

Q. But the CLE, does that come under the AOC Department?

A. No, it has its own director. Each of those boards have their own director.

Q. Well, help me, I'm just trying to understand.

Why would you be involved in salary discussions in budget; does that come under your budget, the CLE?

A. It actually does not, but in order to implement salary increases, we have to

Lexitas – TENNESSEE
(615)595-0073

implement them at the AOC.

Q.    Explain that.

A.    So our fiscal director manages their budget as well.

Q.    I see.  Well, depending on what CLE or the Board of Professional Responsibility gets in terms of funding, does that affect your office, the AOC?

A.    I'm sorry, I don't understand that question.

Q.    Sure.  I'm just trying to understand the interconnectedness.

How does the salary increases or decreases, adjustments, let's say, in another -- either CLE -- the boards that you listed, CLE, the Board of Professional Responsibility, TLAP or the Law Examiners, how does budgetary issues with respect to those four entities affect the Administrative Office of the Courts and AOC employees?

A.    So I would say that it doesn't impact AOC employees, except that our fiscal director and our HR director are the ones responsible for literally keying the salary adjustments.

Q.    So your participation in those

discussions is more just kind of ancillary; is it fair to say?

A.    I think that's fair.

Q.    Does the -- is it the fiscal director?

A.    Correct.

Q.    What is that person's name?

A.    Dalton Hensley.

Q.    And does Dalton Hensley come under your supervision?

A.    Yes.

Q.    Does the AOC office, do you get involved in the salary adjustments with the judges, state court judges, appellate judges?

A.    So their salary adjustments are pursuant to statute, so they get a COLA every year.  In order for that to show up in their paychecks, we literally key the information into a system that pays them.

Q.    So your office -- the AOC is just like the name says, your office provides administrative support?

A.    That's correct.

Q.    What is COLA; what does that stand for?

A.    Cost of living adjustment.

Q.    That's COLA?

A. Yes.

Q. Is that a state of Tennessee term or is that a federal term or just a widely used term?

A. I think it's a widely used term.

Q. Okay. What is your understanding of the purpose, function and role of your position as director of AOC?

A. To provide support to the Tennessee Supreme Court for the administration of effective, efficient court processes for the administration of justice in Tennessee.

Q. So is it just support to the Tennessee Supreme Court?

A. Yes.

Q. You don't provide support to any other of the courts?

A. I would say we -- the AOC operates at the direction of the Tennessee Supreme Court and the Tennessee Supreme Court has authority for the entire court system. So all of those other courts are included.

Q. Any responsibility for efficient administration of courts regarding litigants who come into courts?

A. We do have programs that ensure access to

*Capital* — TENNESSEE
*(615)595-0073*

justice for litigants, you know, where English is not the first language. So we do court interpreter programs. We certify court interpreters so that courts have that -- a certification for legal interpretation available in the courts.

Q. And we'll talk about access to justice in a moment.

Do you also -- as part of your duties, are you required to submit a budget each year?

A. Yes.

Q. And I think you just said something about the process. Is that -- when do you usually typically do that, submit a budget?

A. We have submitted our budget request. I don't recall the due date, but it has been submitted. We'll have our first hearing in November.

Q. Is that a public hearing or is that before the General Assembly? When you say hearing, what do you mean?

A. It's with the Department of Finance and Administration. So the statute requires us to present our budget to F&A first.

Q. What statute are you referring to?

Capital REPORTING, TENNESSEE
(615)595-0073

A.    Couldn't tell you the you citation off the top of my head.

Q.    Is it part of the statute that outlines the director's duties?

A.    Yes.

Q.    When do you typically start getting involved with that budgetary process that you're required by statute to submit?

A.    It almost begins at the conclusion of a legislative session, but I would say formally some time in the fall.  But we're gathering information the entire time.

Q.    Were you responsible for submitting the budget to the governor in 2022?

A.    No, my predecessor submitted the budget in 2022.

Q.    And do you know when that would have been submitted -- and I'm referring to the AOC portion -- to the governor?  And then as I understand it, the governor then submits it to the General Assembly; is that how it works?

A.    So departments and agencies submit their budget to the Department of Finance and Administration and then the Department of Finance and Administration makes

recommendations to the governor for his budget.

Q.    And who was your predecessor?

A.    Deborah Tate.

Q.    And do you know why she submitted the budget in 2022?

A.    It would have been in the normal course of business.  It would have been submitted in the fall of 2021 and then processed through the next steps in the legislature in 2022.

Q.    And that was before you took your role as director in February of 2022; is that correct?

A.    That's correct.

Q.    So you were Ms. Tate's deputy director; is that right?

A.    That's correct.

Q.    Is the AOC office responsible for reimbursement payments to any individuals serving on boards and commissions?

A.    Yes.

Q.    And tell me about that.

A.    So expense claims are submitted to our Division for Fiscal Services.  They then review them for appropriateness and then they get submitted to F&A for processing or payment.

Q.    And what is F&A?

A.    Finance and Administration, I apologize.

Q.    What do you mean by -- I think I know what you mean, but I want you to explain it -- by appropriateness when reimbursement expenses are submitted?

A.    So we just check to make sure that it is an eligible expense.

Q.    Is there some type of formal guideline that you have that you follow?

A.    So we do have guidelines for travel reimbursement.  For example, the day of travel for per diems would not be full day for the per diem, you get a percentage of the day.  So we look for things like that to audit the expenses.

Q.    Are those guidelines internal AOC policies or is that by statute?

A.    We do have an internal policy, but it mimics the state policy.

Q.    It's a state policy or a state statute?

A.    I believe it is a policy.

Q.    Okay.  Who implements state policies?

A.    For that purpose, it would be the Department of Finance and Administration.

Q.    F&A?

A.    Correct.

Q.    But that's not the AOC's F&A, correct?

A.    Well, it's not our Division of Fiscal
Services, correct.

Q.    I just want to understand, the AOC's
fiscal director is Dalton Hensley?

A.    That's correct.

Q.    When you say "F&A," you're referring to a
centralized different Department of Finance and
Administration?

A.    Yes.

Q.    Within the whole state?

A.    Yes.

Q.    Okay.  Are you responsible or your
office, the AOC, for overseeing reimbursement
requests from members of the Advisory
Commission on the rules of practice and
procedure?

A.    Could you repeat that?  I am sorry.

Q.    Yeah.  Is the AOC responsible for
overseeing reimbursement requests from the
members of the Advisory Commission on the rules
of practice and procedure?

A.    To the extent that they are eligible for
reimbursement for expenses, then yes.

Lexitas — TENNESSEE
(615)595-0073

Q. It comes to your office, right?

A. That is correct.

Q. Do you keep records of those reimbursement requests?

A. I do not.

Q. Does your office keep records?

A. Yes.

Q. And how far back does that -- do those records go?

A. I do not know.

Q. But someone in your office would know?

A. Yes.

Q. As director of the AOC, do you survey and study the operation of the state court system?

A. Yes.

Q. Explain how you do that. What does that look like?

A. So I can give you a specific example relative to -- since I've been director. Technology and the processes relative to E-filing for state courts. So we have been in the process of surveying what each and every court offers in term of E-filing.

Q. How do you survey?

A. Well, we went out and met with court

clerks and judges across the state in all three grand divisions, we kind of created teams that went east and west and we all kind of looked at middle to see what the state of E-filing was in as many courts as we could cover.

Q. Does the AOC office keep records of these surveys?

A. I have my notes.

Q. Okay. What does that mean, your notes?

A. So in the process of meeting with court clerks to understand what their systems looked like, I took notes to make sure we could compare from county to county what was happening.

Q. Who do you share those notes within the AOC or the court system?

A. I have not shared my notes.

Q. You have not shared your notes?

A. No.

Q. You still have your notes?

A. Yes.

Q. Are those at your office?

A. Yes.

Q. Okay. Do they get inputted into the electronic system or computer system or

CAPITAL REPORTERS, INC. MIDDLE TENNESSEE
(615)595-0073

anything like that?

A. No.

Q. Do you share your notes with the justices on the Supreme Court?

A. Are you asking me if I shared the physical paper that my --

Q. Either. When I say "share your notes," either discussed your notes with someone in the AOC or the court system or physically shared your notes with someone?

A. I have discussed.

Q. Okay. Let's do that then. Who have you discussed -- within the AOC, let's start with the AOC first. What individuals have you discussed based on your survey and based on your notes?

A. I have discussed what I learned with our director for information technology services. I have --

Q. What's the person's name?

A. Brandon Bowers.

Q. Okay.

A. Members of his team, Amanda Hughes. I have discussed the takeaways from that physical survey of courts with our appellate court

clerk, Jim Hivner. I discussed the takeaways with Chief Justice Roger Page. Maybe that's -- maybe that's all.

Q. And what was -- if you can summarize, what was the takeaway?

A. The takeaway was that there was no uniformity across our courts. There were some impediments to E-filing that we needed to overcome. Those were the major takeaways.

Q. And has there been a process of next steps to -- strike that question.

From the takeaways, did you make a recommendation to anyone based on your survey?

A. Yes.

Q. Who did you make recommendations to?

A. Chief Justice Roger Page.

Q. Were those discussed verbally with him or did you make your recommendations in writing?

A. Verbally.

Q. Do you recall when that was?

A. Probably the end of the calendar year in 2022.

Q. The end of 2022?

A. Correct.

Q. December of 2022, approximately?

CAPITAS - TENNESSEE
(615)595-0073

A. Yes.

Q. So what were your verbal recommendations?

A. Recommendations were that our case -- the state's case management system was inhibiting courts from being able to as rapidly deploy E-filing as we may have desired and that we needed to work with our vendor to make sure they were actively improving their system such that it was not limiting courts from being able to E-file.

Q. When you say "vendor," are you talking about some outside technology vendor?

A. That's correct.

Q. What's the name of the vendor?

A. Local Government.

Q. That's the name of the vendor?

A. That is the name of the vendor, Local Government Corporation located in Columbia, Tennessee.

Q. Okay. Is that a vendor that the AOC office has contracted with previously?

A. Yes.

Q. Did Chief Justice Paige implement your verbal recommendations?

MR. COKE: Object --

Capital Court Reporters
TENNESSEE
(615)595-0073

MR. STAHL: Object to the form.

THE WITNESS: Did he implement -- I'm sorry, say it again.

BY MR. DOUGHERTY:

Q. Yeah, I want to make sure I understand.

You said you gave verbal recommendation to see Chief Justice Paige in the end of 2022 in December; is that right?

A. That's right.

Q. And it was regarding the vendor, the Local Government Corporation, regarding the technology in your survey; is that accurate?

A. That's right, that is accurate.

Q. So what were your verbal recommendations to Chief Justice Page?

A. So first and foremost was to address our case management system, which is that vendor.

Q. Right.

A. And so yes, that was accepted.

Q. What do you mean by "accepted"?

A. We are in the process currently of expanding -- okay, so from that recommendation, what we learned -- the court has engaged in a technology oversight review for the court. Out of that, we expect to do competitive bids for

Lexitas - TENNESSEE
(615)595-0073

an overall system to provide uniform case management, E-filing across the state. So it's broadened our view of what is needed to move the state forward.

Q. Previously I used the word "implement," you said "accepted," so does that mean that Chief Justice Page with respect to this first verbal recommendation, the vendor, that he accepted your recommendations?

MR. STAHL: Object to the form.

THE WITNESS: So yes, he accepted the recommendations and takeaway from our survey, yes.

BY MR. DOUGHERTY:

Q. How does he display that he's accepting one of your recommendations?

A. By first creating a Technology Oversight Committee and designating one of the chief justices to head up that work.

Q. And when was that --

A. One of the justices.

Q. When was that technology committee created, if you can recall?

A. I would say the spring of this year, of 2023.

Q. Okay.

A. I think that's right.

Q. So were there any other verbal recommendations, other than the vendor, that you made to Chief Justice Page?

A. No, because most everything hinges on the case management system.

Q. Now, is the case management system that you're talking about, is that different from like the YouTube channels and livestreaming?

A. Yes.

Q. Okay. Let's talk a little bit about the YouTube channels and livestreaming, okay?

A. (Nodding head.)

Q. Did that issue come up in your survey that you've talked about where you went to each grand division?

A. No.

Q. What is your understanding of the two YouTube channels and the livestreaming that the AOC does?

A. What is my understanding?

Q. Explain what your office -- or let me start real quick.

Does your office involve providing

livestream services to court proceedings?

A.    Yes.

Q.    Does your office provide livestreaming to various meetings of boards and commissions to the public?

A.    I don't know about boards and commissions.

Q.    Well, do you -- is it your responsibility -- or whose responsibility is it on the AOC website to kind of oversee that website?

A.    Our communications director, Barbara Peck.

Q.    Are you aware that of a preliminary injunction that was entered in this case?

A.    Am I aware of it?

Q.    Yes.

A.    Yes.

Q.    And what is your understanding of that preliminary injunction with respect to what the AOC office was required to do?

A.    We were required to offer in person or virtual access to the rules -- Advisory Commission on rules.

Q.    And so when was the first time you saw

Lexitas -- TENNESSEE
(615)595-0073

that preliminary injunction?

A.    Sometime in March of this year.

Q.    And who provided that preliminary injunction to you?

A.    Probably our legal counsel, John Coke.

Q.    Who did you speak with within the AOC or the court system about the preliminary injunction?

A.    I would have only had conversation with John Coke to make me aware of the order and I don't recall having any other conversations about it.

Q.    Did -- as part of the preliminary injunction -- so you just said the virtual. When you say "virtual," does that mean livestreaming?

A.    Yes.

Q.    Is that something that you made sure took place after the preliminary injunction in terms of livestreaming or virtual so the public could view the meeting virtually?

A.    So I have to say March was a difficult month for me, I had a significant loss of a family member that month.  So I do know that the intention was certainly to comply with the

CAPITAL COURT REPORTING, LLC — NASHVILLE, TENNESSEE
(615)595-0073

order, but I took no steps myself.  I relied on my team to make sure we were in compliance with the court order.

Q.    Sorry to hear about that, but -- I just want to make sure, we're talking about March of 2023, this year, right?

A.    Yes.

Q.    Okay.  Were you out of the office on leave a period of that time?

A.    Yes.

Q.    How long were you out?

A.    So I know -- probably two weeks.  I think two weeks.

Q.    Do you recall when that might have been in March?

A.    So March 9th -- a week following March 9th, I returned to work the next week, and then I think maybe a week after March 26th.

Q.    And if we need to take a break, we've been going --

A.    No, I'm fine.

Q.    Okay, that's fine if we need to, we've been going about 45 minutes.

So you were out for a couple weeks there in March and so you said you relied on your

CAPITAL REPORTING, TENNESSEE
(615)595-0073

team to assist with compliance with the preliminary injunction; is that right?

A. That's right.

Q. Who was part of your team then?

A. So Deputy Director Rachel Harmon was serving in my absence, and then basically every division director at the AOC was making sure that things continued seamlessly during my absence.

Q. Just how many different divisions are there within the AOC?

A. Six.

Q. And can you name those six divisions?

A. Yes. So there's our Fiscal Services Division; Communications and Judicial Resources Division; Access, Innovation and Collaboration; Information Technology Services Division; Legal Services and Judicial Development. And I'm forgetting one. Executive. I'm forgetting somebody.

Q. And it's not a quiz, I'm just -- is that -- let me ask you this: Are those divisions required by statute?

A. No.

Q. So who makes the determination on

creating or disbanding divisions; is that the AOC director?

A.   Yes.

Q.   Have you ever created or implemented one of these divisions or were they already in place when you got there?

A.   They were in place when I got there.

Q.   Okay.  Do you appoint the directors of the various divisions?

A.   Yes.

Q.   So you did -- when you took over in February of 2022 you appointed new division directors?

A.   Yes.

Q.   How did you do that?  Do you -- do you hire from within the AOC or do you put out bids or how does that process work?

A.   Well, so the only director I have hired was director for legal services and we did publish notice and did about three rounds of interviews for that.  We had an internal candidate who was John Coke for that position, and he was the successful candidate.

Q.   So you hired Mr. Coke?

A.   Yes, I did.

Lexitas – TENNESSEE
(615)595-0073

Q.   Okay.

A.   He was already employed at the AOC, but yes, elevated him.

Q.   I see.  And you mentioned Deputy Director Harmon, we'll talk a little bit about her. You're aware that she gave a deposition in this case?

A.   Yes.

Q.   Kind of skipped over -- when we were talking about technology, I kind of want to circle back do that, the livestreaming and the virtual what you were talking about.

        When I say what is your understanding of the livestreaming and the virtual YouTube channels, number one, is that something that your office oversees?

A.   Yes.

Q.   And so when the preliminary injunction, and I appreciate you sharing that information, you were out, your team is helping you, who made the decision -- because as you said, I think the preliminary injunction said you either have to have in-person public observing or observing by livestreaming.

        Who made the decision to go livestreaming

to comply with the injunction?

A.    I don't know.

Q.    Well, was that you or did you delegate that to someone?

A.    I would have only directed compliance with the order, the how would have been someone else on the team.  I did not.

Q.    How did you delegate or direct compliance?  Did you do that through an e-mail or verbal communication?

A.    It would have been verbal and understood that we had a court order.  And so when that was communicated to me, of course we're going to comply with that court order.

Q.    Do you know if you sent an e-mail?

A.    I did not send an e-mail.

Q.    Do you know if anyone sent an e-mail internally?

A.    I do not know.

Q.    Did you communicate with the justices about this preliminary injunction?

A.    I think it came up in communication, again, situational awareness that we had received the order, but that would have been the extent of it, just to update them.

Q. When did you first become aware of this lawsuit?

A. Soon after I became director.

Q. Would that have been around the time it was filed in June of 2022?

A. Well, I thought June of 2022 was -- let me...

I thought June of 2022 was the amended complaint in this matter.

Q. They were filed in the same month, I believe.

A. Okay.

Q. And that's -- I'm not so much worried about dates, I assume you became aware of it when it was filed?

A. Yes.

Q. Okay. Or shortly thereafter.

When you got it, did you issue any type of litigation hold notice to your AOC Department and your team?

A. That was done by our legal counsel at the time.

Q. So there was a litigation hold sent out, as far as you're aware?

A. Yes.

Q. Did you see that litigation hold?

A. I don't recall.

Q. Who would have been the counsel that would have --

A. Rachel Harmon.

Q. Was she serving in a dual role?

A. Yes.

Q. She was your director and then she was transitioning out of her role as general counsel; is that right?

A. Yes, we were in the process of hiring at that time.

Q. Was that litigation hold letter shared with the justices?

A. I don't know.

Q. Did you discuss with the justices holding any kind of information that they may have that might be relevant to this lawsuit?

A. I did not.

Q. Do you know if Deputy Director Harmon did?

A. I do not know.

Q. As part of your role as director at the AOC, do you provide legal advice to any of the justices on the Supreme Court?

Capital Court TENNESSEE
(615)595-0073

A.    I do not.

Q.    Have you ever delegated to any of your employees that they provide legal advice to the justices?

A.    No, I would not ne in that position of delegating that.  I'm not hired for legal advice.

Q.    Right.  Explain that.  What do you mean by that?

A.    Well, my role is not one of legal advice and counsel to the courts.

Q.    Is Deputy Director Harmon's role legal advice to the courts?

A.    I think she does provide legal advice and support to the courts, yes.

Q.    And in what --

A.    Or did as general counsel.

Q.    I'm sorry, I didn't mean to interrupt.

      Does she provide legal advice to the courts in her role as deputy director?

      MR. STAHL:  Object to the form.

      THE WITNESS:  No, I don't believe so.

BY MR. DOUGHERTY:

Q.    Did she provide legal advice to any of the justices in her role as deputy director?

MR. STAHL: Object to the form.

THE WITNESS: Can you repeat that?

BY MR. DOUGHERTY:

Q. Yeah. Does Deputy Director Harmon provide legal advice to any of the Tennessee Supreme Court justices in her role as deputy director?

A. I don't believe so.

Q. Okay. As -- you kind of referenced the statute a moment ago that you would agree that there -- a lot of your duties and responsibilities are created by statute; you would agree with that?

A. I agree.

Q. And it's a very long list?

A. It is.

Q. How do you go about when you took over the position, fulfilling your obligation as director to make sure all those things that are listed in the statute that you take care of; how do you do that?

A. Well, through the organizational structure that we have, and the division directors are responsible for various parts of what's listed there in the statute, and then

those other duties are as assigned by the Court.

Q.   And you were serving as deputy, so you had some experience and you kind of knew what you were getting into, I guess, right?

A.   Yes.

Q.   I was just wondering if there's any -- for lack of a better word, is there any kind of handbook or any kind of training that you went to or continuously go through as director to be able to fulfill your obligation?

A.   The training is on the job and it is every day.  So no, there's no handbook.

Q.   There's no handbook, okay.  I was just wondering.  So there's no way to take what's in that statute and put it into practice when you're starting your position?

A.   So I will say as deputy director, I was tasked to review all of the statutes pertaining to the Court and the AOC for the duties and responsibilities.  So yes, we did engage in an effort to inventory everything that the statute required us to do to make sure that it was being handled somewhere in the AOC.

Q.   And is that in your electronic system

Capital TENNESSEE
(615)595-0073

somewhere or your hand -- I mean is it somewhere that would be available?

A.    I do have that, yes.

Q.    Okay.  And what do you call that?

A.    Just called it AOC duties and responsibilities.

Q.    Okay.  Do you still -- are you active with your legal status in Tennessee?

A.    I maintain active status, yes.

Q.    So you have to take 15 hours of CLE credits every year; is that right?

A.    Yes.

Q.    And do you take any additional type of training or education for your role as director of the AOC?

A.    It doesn't qualify for continuing legal education, but I participate with my counterparts in other states in what is the State Court Administrator Conference.

Q.    Yeah, that's kind of what I'm talking about.  So what do you call that other organization?

A.    I think it's COSCA, and I think it stands for Center -- Council on State Court Administrators, I think.  COSCA, yeah, COSCA.

CAPITOL COURT REPORTING, TENNESSEE
(615)595-0073

Q.    COSCA, okay.

Where is that organization; does it have a headquarters?

A.    No, the head -- it's an arm of the National Center of State Courts.

Q.    How frequently do you go to conferences or training or however you refer to it; is that an annual or is it monthly?

A.    As I can.  So I try to attend the annual meeting and the mid-year meeting.  So far, I've only been in the job a year and a half, almost, I have attended two conferences.

Q.    And where were they held; do you recall?

A.    One was in Chicago and one was in Alabama.

Q.    Where in Alabama?

A.    Point Clear.

Q.    Good place.

A.    Beautiful place.

Q.    That hotel right there on the water?

A.    Yes.

Q.    All right.  What types of topics do you all discuss at the COSCA meetings that you've been to so far?

A.    Whatever the challenges are facing state

courts. And so we've had topics on judicial security, definitely topics on E-filing and modernizing court systems. I guess I entered kind of post pandemic, so there was lots of education and learning around things that had been developed during the pandemic to ensure access to courts, and so there was a lot of discussion in some of those first meetings around what we learned could be done to ensure open courts.

Q. And did -- to ensure open courts, is that also -- did other topics come into play about open meetings that the AOC offices oversee?

A. So, no, it was more about the quick deployment of resources, like Zoom and the soft video conferencing ability for judges to conduct business remotely from the court house.

Q. So would you say in your estimation that since the pandemic, there's -- most AOC offices around the country are doing a lot more with technology and Zoom and livestreaming?

A. Yes.

Q. And do you feel that the Tennessee AOC office is keeping up with the technological advances with respect to livestreaming and Zoom

and all the technology that's out there?

A. Yes.

Q. Have you -- in your role as director of AOC, have you ever studied any of the federal AOC practices with respect to having open meetings?

A. I have not.

Q. Were you aware that there is a Federal Advisory Committee that's very similar to the Tennessee Advisory Commission on rules and practice?

A. Only from reviewing the pleadings in this matter.

Q. Were you aware of that federal analog before this lawsuit?

A. No.

Q. Since this lawsuit was failed, have you ever viewed any of the federal analog meetings on YouTube or wherever they have them that's open to the public?

A. No.

Q. Okay. Have you ever talked with anyone in the Federal AOC office about how they do that in terms of having their meetings open to the public?

Capitas TENNESSEE
(615)595-0073

A. No.

Q. Have you ever spoken to any of the justices on the Supreme Court about the federal meetings that are open to the public?

A. No.

Q. Have you ever spoken to anyone in the AOC office about the federal meetings like the Advisory Commission that are open to the public?

A. No.

Q. Do you know of any other -- in your COSCA group meetings, has that discussion ever come up where they've got like an equivalent Advisory Commission like Tennessee, any discussion about having their meetings open to the public?

A. No.

Q. Are there certain states -- well, strike that.

This COSCA group, do you have -- are you like on an e-mail list or how do you get informed? Is it an annual registration? What does that look like?

A. So there is an annual registration to participate. There's a Listserv and an e-mail

group among us.

Q. Have you ever had any -- are there any of the other states that you reach out to that are part of that COSCA group that you've established a relationship with?

A. Do you mind repeating?

Q. Yeah. So as I understand it, this COSCA group, they have other similar Michelle Longs in like Arkansas or Florida, Michigan, wherever. Do you have a special relationship with any of your counterparts in any of these other states?

A. I have formed relationships with other AOC directors, yes.

Q. Do you recall who those are? And I don't mean everybody, I just mean people that -- if you had to pick up the phone and call someone who is -- let's see what they're doing, is there anybody that sticks out to you that you would reach out to?

A. So David Slayton is one person I have reached out to. He's no longer there. But E-filing and vendors that other states have used for E-filing, I have had conversation with other state court administrators on that topic,

yes.

Q.    Mr. Slate [sic], what state was he in or with the AOC?

A.    Well, he was at the National Center for State Courts, but I think he's now in California.

Q.    Okay.

A.    And then I cannot remember her name, it's escaping me right now, but I did have the opportunity to speak with another state that was engaging in an RFP for court system case management and E-filing, and her name escapes me right now.

Q.    So the National Center for State Courts and COSCA, have they ever reached out to the Feds about the PACER system?  Why can Tennessee courts not use the PACER system?

A.    Why can we not use the PACER system?

Q.    Maybe I'm assuming something.

      Can the Tennessee courts use the PACER system?

A.    Well, first of all, the PACER system is being revamped right now, so they're in no better shape than we are, but PACER was not designed for the reporting and the data

collection that we ultimately want, it was purely an E-failing system.

Q. Let's talk about that. What is it that you as Tennessee AOC director want? You don't just want a place where attorneys can file lawsuits online, what do you mean by collecting and reporting; what do you mean?

A. So it's a continuum in my view. It starts with E-filing, that's where cases enter the door.

Q. Right.

A. We want to capture that information in a robust uniform way in our case management system and then have all of that information report to a data repository or warehouse where we can then produce reliable reports.

Q. And so is it -- what do you call that? It's not just E-filing, what do you call that what you're explaining?

A. We have been calling it an enterprise court information system.

Q. And if you had this court information system as you explained it, would that better assist you in fulfilling your statutory duties as AOC director?

*CAPITAL TENNESSEE*
*(615)595-0073*

A.   Yes.

Q.   Who have you shared this information with on this enterprise system within the AOC or the justices?

A.   So definitely with the Technology Oversight Committee, which is headed by Justice Sarah Campbell; our appellate court clerk, Jim Hivner; my IT director, Brandon Bowers.

Q.   Now, Mr. Hivner is on the Advisory Commission for the rules of practice and procedure; is that right?

A.   Yes.

Q.   Has he ever expressed any or shared information with you about how technology could help the Advisory Commission?

A.   No.

Q.   Have you ever discussed with him how technology could better assist the Advisory Commission?

A.   No.

Q.   Do you know if anyone in your office spoke with Mr. Hivner on technology and after the preliminary injunction was entered?

A.   I don't know.

Q.   Did your team, when the preliminary

injunction was entered, also communicate with anyone on the Advisory Commission about the injunction?

A.    I don't know.

Q.    Does the Advisory Commission on the rules of practice and procedure provide meeting dates to the AOC office?

A.    I don't -- I don't know.

Q.    Do any boards and commissions, other than the Advisory Commission, provide meeting dates to the AOC office?

A.    So I -- I know the Access to Justice Commission does.  I don't know other than that.

Q.    I'm about to get into the Access to Justice.  It's like ten after, I've got a fairly long line of questioning on it.  It's whatever you all want to do.

MR. STAHL:  Do you want to stretch your legs before we go for another hour?

THE WITNESS:  Sure.

MR. STAHL:  Why don't we come back at 10:20.

(Short break.)

BY MR. DOUGHERTY:

Q.    So we're back on the record, Ms. Long.

We talked a little bit about the Advisory
Commission on the rules of practice and
procedure this morning, haven't we?

A.    Yes.

Q.    Okay.  And that body was created by
TCA 16-3-601.  So I want to talk some more
about it and I'll just refer to it as the
Advisory Commission if that's okay?

A.    Yes.

Q.    I know in the pleadings in the briefing
there are -- lots of different names were used,
but we'll refer to it as the Advisory
Commission.

      When did you first become aware of the
Advisory Commission either in your role as
deputy director or director or were you aware
of it before then?

A.    I first became aware of it with a Supreme
Court order assigning court liaisons to the
various boards and commissions.

Q.    Was that when you were deputy director or
as director?

A.    I think it's deputy director.

Q.    And do you recall that particular order,
when that might have been?

CAPITAL CITY COURT REPORTING, TENNESSEE
(615)595-0073

A. I do not.

Q. And who was the signed, of the order that you're referencing, who was that individual that was in the order -- named in the order?

A. Justice Sharon Lee for the Advisory Commission.

Q. Did you work with Justice Lee at some point?

A. Yes, she was a member of the Supreme Court.

Q. Right. Okay, I just -- she was chief justice at one point, too, was she not?

A. She was.

Q. Was she chief justice when you were deputy director?

A. No.

Q. Okay. Who was the chief justice when you were deputy director?

A. Justice Bivins, Jeff Bivins.

Q. And then when you were director first, the chief justice was Roger Page; is that right?

A. Yes.

Q. And in September Chief Justice Kirby took that position?

A. Yes.

Q. Okay. Justice Lee retired I think end of August; is that right?

A. Yes.

Q. But she was also -- Justice Lee was on the Advisory Commission, correct?

A. Yes.

Q. Was she on the Advisory Commission when you were deputy director?

A. Yes.

Q. Was she on the Advisory Commission when you were director?

A. Yes.

Q. Tell me about your conversations with Justice Lee regarding the Advisory Commission.

A. I never had any.

Q. Okay. So you just saw that order and it referenced her that she was the liaison for the Advisory Commission?

A. Yes.

Q. All right. What is your understanding of the function of the Advisory Commission?

A. To recommend rule changes for practice and procedure for the various courts, criminal, civil, juvenile, appellate court, and rules of

Lexitas - TENNESSEE
(615)595-0073

evidence.

Q. And the AOC provides administrative support to the Advisory Commission; is that right?

A. Yes.

Q. Does the AOC have one of its employees that serves as a liaison to the Advisory Commission?

A. Yes.

Q. And who is that?

A. Michelle Consiglio-Young.

Q. Was Michelle Consiglio-Young the liaison to the Advisory Commission when you were deputy director?

A. Yes.

Q. Is Michelle Consiglio-Young still the liaison since you've been the director of the AOC?

A. Yes.

Q. Do you communicate with Michelle Consiglio-Young with respect to her role as liaison to the Advisory Commission?

A. No, I've not had any -- no.

Q. When would you have a need to communicate with her about her role on the Advisory

Commission?

A.    If there was a conflict for scheduling a meeting in a particular location.  Like sometimes we'll get double-booked at the AOC, so she might come to me to resolve a conflict for meeting location.  Beyond that, I can't really think of a need.

Q.    What do you mean by getting double-booked at the AOC for meeting locations?

A.    So we only have a few conference rooms. So if there was a need to use the conference room for a meeting and there was something else scheduled at the same time --

Q.    So you mean --

A.    -- she might engage me to resolve a conflict.

Q.    So you mean if the Advisory Commission had a meeting scheduled at the AOC and it conflicted with another meeting, you would communicate with Ms. Michelle Consiglio-Young?

A.    Yes.

Q.    Okay.  Where is records -- where are records kept of these meetings where this double booking might come to your attention?

A.    Oh, I don't know that there are records

kept.

Q.   Well, how do you know that double-booking presents itself; how do you become aware of that?

A.   So it would be the liaison saying we need to -- or the commission, the board, whatever wants -- needs to meet at a particular time and the conference room is booked.  So we have an electronic system that schedules the conference rooms, and so if there was a need to move someone or rearrange such that we could utilize another area, that might come to me.

Q.   What's the electronic system that schedules the conference room; what is that called?  Does it have a name?

A.   I think it's in our GroupWise calendering system.

Q.   When you say "GroupWise," are you talking about the group, the AOC itself in general?

A.   No, that would be the name of our e-mail system.

Q.   Okay.  What's the Group Wide calendar system?

A.   GroupWise.  GroupWise.

Q.   GroupWise, I'm sorry.

A.    It's a product.

Q.    How many individuals within the AOC have the GroupWise calendar system?

A.    We all do.

Q.    How many employees do you have, just under your supervision?

A.    87 at the AOC.

Q.    87?

A.    Yes.

Q.    So the only way you would know about potential double-booking of conference rooms would be if one of the liaisons came to you and said we've got a problem?

A.    Yes.

Q.    And so does that mean that the liaison is kind of keeping track of the dates when meetings are going to be held for whatever commission they serve?

A.    Yes.

Q.    Do you have periodic meetings with the liaisons that are assigned to specific boards and commissions?

A.    No.

Q.    So you don't have any kind of communication with your liaisons?

A.    So I do meet with -- the liaisons are the same people, so it's the same as our directors in the division or other -- so I meet with the directors regularly, I meet with them every Monday.

Q.    Right, I understand.  When I say "liaison," I am not saying -- I think -- and you correct me if I'm wrong, my understanding is a liaison is not someone -- that's not like an official position, they're going to have another role and then they are -- they are going to also serve as a liaison; is that how that works?

A.    Yes.

Q.    Okay.  So when I say "do you meet with your liaisons," let me rephrase it.

When you're meeting with your team, do you ever discuss with them their role as liaisons on their boards and commissions that they serve?

A.    I've never had occasion to discuss their role.

Q.    What about situational things that come up?

A.    So it would necessarily come up if there

Lexitas - TENNESSEE
(615)595-0073

was a meeting coming up, yes, that would be discussed at one of our Monday meetings.

Q. So a meeting would be brought to your attention about one of the boards and commissions; is that right?

A. Yes.

Q. What other types of topics would come up? I'm talking about liaisons on commissions.

A. Oh. Just situational awareness, if a meeting is scheduled. I cannot think of an example of anything else that's come up.

Q. Did you ever -- Justice Lee, was she ever involved in these Monday meetings regarding her role as the liaison to the Advisory Commission?

A. No.

Q. Is there a reason for that?

A. Those Monday meetings are just for me and my division directors.

Q. Is Michelle Consiglio-Young a division director?

A. Yes.

Q. What does she direct, what division?

A. I think that's the division I neglected to list, it's intergovernmental affairs, she's the director for that division.

Q. Is that one of the six?

A. Yes.

Q. Did she have a different title at some point prior to becoming the director of intergovernmental affairs, another role at the AOC, I should say?

A. I don't know.

Q. Okay. Was she there at the AOC as an employee when you started working as the deputy director?

A. Yes.

Q. Was she the director of intergovernmental affairs when you started as deputy director?

A. Yes.

Q. Okay. Do you recall any specific communication with Michelle Consiglio-Young about double-booking of Advisory Commission meetings?

A. No.

Q. Let me ask you another question about this GroupWise calendar system.

You're aware that there is a calendar facing the public on the AOC website?

A. Yes.

Q. Is that a different -- is that calendar

that the public can view, is that different than the GroupWise calendar system?

A. I don't know what feeds the public facing calendar, so I don't know if I know the answer to your question.

Q. You know what I'm talking about, though, right?

A. I do know what you're talking about.

Q. Who would know about the public facing calendar system within the AOC?

A. I think it's our communications director, Barbara Peck.

Q. Who would know about the GroupWise calendar system? Would Ms. Peck also have that information or would that be someone else?

A. I think Barbara Peck is a good place to gather information with regard to what's on the group calendar, because I do think she's responsible for posting information to that group calendar in GroupWise.

Q. Who comes up with the dates, the meeting dates for the Advisory Commission?

A. I do not know.

Q. Did you know that they meet quarterly typically?

Lexitas — TENNESSEE
(615)595-0073

A. I didn't -- I'm not aware of the cadence of their meetings. I know the statute just says from time to time, but I don't know what that cadence has been.

Q. At all, even after the pleadings have been filed in this case?

A. I know what the pleadings say and it says quarterly.

Q. Do you know if Deputy Director Harmon testified under oath in a declaration that they meet quarterly?

A. I don't recall.

Q. Did you review her declarations before they were filed?

A. Before they were filed, yes.

Q. You reviewed both of those declarations that she filed in this case?

A. Yes. Yes.

Q. How did you review those? Did you review those with her in the same room with General Kleinfelter?

A. No.

Q. Did Deputy Director Harmon send you a draft? I'm just curious as to how you reviewed those before they were filed?

A.    I believe I saw drafts.

Q.    So assuming that the cadence is quarterly for the Advisory Commission, were you aware that they've typically been meeting on the second Friday of March, June, September and December?

A.    I was not aware.

Q.    Okay.  Now, you talked about double-booking, and that's double-booking with respect to in-person meetings that use a conference room at the AOC; is that right?

A.    That's right.

Q.    Is there ever any double-booking when any various commissions are livestreamed to the public?

A.    So we have limited resources for the livestreaming functions of the Court. That's -- if there have been conflicts, they would be resolved by Barbara Peck, she's responsible for the livestreaming.

Q.    Is there a budgetary item within your budget for livestreaming?

A.    Not as a line item, no.

Q.    Is there a budgetary item for administrative support to the Advisory

CAPITAL REPORTERS — TENNESSEE
(615)595-0073

Commission on the rules of practice and procedure?

A. No.

Q. Is there a budgetary item for administrative support for any board or commission?

A. No, it's just part of our job and so it's part of the AOC budget.

Q. Okay. So there's no designation in any of the budget from -- I'm speaking of the AOC, the court portion, with respect to boards and commissions?

A. Not the advisory board for rules or any other advisory boards. There are those four that are revenue generating and have their own budget, so BLE, CLE, TLAP and BPR.

Q. So those four are considered boards or commissions?

A. They are.

Q. Is there a heading on your website at the AOC where it has boards and commissions?

A. Yes.

Q. Would it be fair to say that there's probably approximately 15 that are listed there on your AOC website?

*Lexitas – TENNESSEE*
*(615)595-0073*

A.    I know there's several.

Q.    When's the last time that you've reviewed the AOC website from a public facing standpoint?

A.    Yesterday.

Q.    And what did you review when you went on the website?

A.    I was looking at our calendar and then the current -- well, we're in the process of changing our website, and so I was comparing what's there now to what we plan to have on our new website.  So I was in the process of communicating with Barbara Peck about some changes.

Q.    Was that -- you reviewed the website yesterday in your role as director or was any of that review also because you were about to give a deposition today?

A.    It was in my role as director, but I certainly was cognizant of what I saw there related to the Advisory Commission rules.

Q.    How else did you prepare for this deposition?

A.    I reviewed the pleadings and the most recent package of rules from June.

*Capital - TENNESSEE*
*(615)595-0073*

Q. Now, when -- we'll talk about that in a second.

The package of rules, is that the complete package that's submitted to the General Assembly?

A. So what I saw was what was posted by the appellate court clerk for comment.

Q. Would that be like on Lexis or Westlaw?

A. Yes.

Q. That's also on the AOC website, is it not?

A. I haven't seen it on the website.

Q. If the Supreme Court says -- issues an order that something should be posted publicly, would the -- would that be posted on the AOC website?

A. Yes.

Q. Is that one of the functions that your office does is to post orders on the AOC website?

A. Yes.

Q. Is the Tennessee Supreme Court website part of the AOC website?

A. The Tennessee Supreme Court website?

Q. Let me rephrase it. If I wanted to go

Lexitas — TENNESSEE
(615)595-0073

look at the Tennessee Supreme Court, would that be on the AOC website?

A.    Yes.

Q.    Does the Tennessee Supreme Court have a separate website apart from the AOC website?

A.    Not that I'm aware of.

Q.    Okay.  So when you looked at the calendar yesterday -- was there a reason that you -- the AOC is changing its website?

A.    It's just time to update.

Q.    And why is that?

A.    It's not as user friendly as we would like.

Q.    Is it user friendly with respect to public meeting notices?

A.    There's a calendar and you can see what's posted on the calendar, so yes.

Q.    What part of the website is not user friendly?

A.    So it's not user friendly from our standpoint in terms of how it captures content. When you search for things -- for example, when you look at the public calendar, you cannot search -- you have to go month by month by month, you can't skip to a different year, so

Capital TENNESSEE
(615)595-0073

it's just not easy to navigate.

Q.    Is it user friendly to the public?

A.    If the public knows no different, then yes, it's user friendly, they can access the information.  I just believe we can improve and make it easier to access and navigate our website.

Q.    Easier for whom, the public or for AOC employees?

A.    Both.

Q.    So then improvement to the AOC website would also assist the public?

A.    Yes.

Q.    Did you review on that public facing part of the website any public meeting notices?

A.    I saw some listed, I did not review them.

Q.    Did you see any public meeting notices for the Advisory Commission?

A.    I did not.

Q.    Have you ever seen any public meeting notices on the AOC website for the Advisory Commission?

A.    I saw the June notice on the calendar.

Q.    Was that the June 2023?

A.    Yes.

Q. Do you know when that June 2023 public meeting notice was placed on the AOC website calendar?

A. I do not.

Q. Does the AOC have an -- either a formal or an informal way as to when if puts up public meeting notices so many days in advance of an actual meeting?

A. I don't know.

Q. So let's say at the beginning of -- what is the fiscal year for the AOC?

A. July 1st to June 30th.

Q. So let's say July 1st, is there ever a situation where the AOC has the indication that for the next meetings over the next 12 months will take place on a certain month by any of the boards or commissions, does that process ever happen?

A. I haven't seen that. I have not seen that.

Q. You have not seen that, but you don't know if that happens or not?

A. Right, I don't know if it happens or not.

Q. Well, let's say a board or a commission like the Advisory Commission was going to have

Lexitas TENNESSEE
(615)595-0073

a public meeting, how many days of advance notice would the AOC put out to the public to let them know?

A.    I think I answered that, I don't know if we have a policy.

Q.    What do you think is a fair amount of notice to the public?

A.    I would say 30 days is pretty standard notice.

Q.    Are you aware that the -- do you know who the ADR Commission is?

A.    Yes.

Q.    What's your involvement with the ADR Commission?

A.    I'm not involved.

Q.    Do you know if they have their meetings that are livestreamed to the public; do you know if they have any meetings like that?

A.    I don't know.

Q.    Have you ever seen any public meeting notices on the AOC website involving the ADR Commission, public meetings?

A.    I believe I did when I was looking yesterday.

Q.    How many of those notices did you see?

Capital — TENNESSEE
(615)595-0073

A. I recall one.

Q. And when was the meeting supposed to take place, or had it already taken place?

A. I believe it had already taken place.

Q. Do you know if the AOC has ever hosted meetings for the Advisory Commission in its Nashville office?

A. I do not know.

Q. Have you ever seen any public meeting notices on the AOC website showing that there had been a public meeting?

A. So I saw the June notice, but that's the only one I've seen.

Q. Okay, let's talk about the June notice.

What do you recall -- what do you remember about the June notice that you saw? Was it in person or was it livestreamed?

A. Oh, I didn't -- I didn't review it for the details.

Q. Who put that notice out?

A. I don't know.

Q. Who do you think would be the AOC employee that would be responsible? Would that be the liaison, Michelle Consiglio-Young?

A. In terms of putting it on the calendar on

our website, it's probably our communications director.

Q.   Who would be the point person to give that information to the communications director, would that be the liaison like Michelle Consiglio-Young?

A.   Quite possibly.

Q.   Could there be anybody else but the liaison that would have that information?

A.   I suppose the chairman could provide that information or the court liaison could provide that information.

Q.   Yeah, and could the justices themselves provide that information?

          MR. STAHL:  Object to the form.

          THE WITNESS:  Well, there would just be one justice who's the court liaison.

BY MR. DOUGHERTY:

Q.   But is it your understanding that the Advisory Commission serves the Tennessee Supreme Court?

A.   Serves the...

          So it serves a function to support the Tennessee Supreme Court for recommendations for rules, rule changes relative to procedure and

Capital REPORTERS TENNESSEE
(615)595-0073

practice.

Q.    I would agree with that, court rules --
they make rule recommendations to the Tennessee
Supreme Court; you agree with that?

A.    Yes.

Q.    They don't make rule recommendations to
the Tennessee General Sessions Court, right?

A.    Right.

Q.    They don't make rule recommendations to
the Tennessee Chancery Court; is that correct?

A.    That's correct.

Q.    They don't make rule recommendations to
the Tennessee Circuit Courts, right?

A.    That's correct.

Q.    And they don't make rule recommendations
to the Tennessee Court of Criminal Appeals,
right?

A.    That's correct.

Q.    They don't make rule recommendations to
the Tennessee Court of Appeals, correct?

A.    That's correct.

Q.    They make rule recommendations to the
Tennessee Supreme Court, right?

A.    That's correct.

Q.    So would the justices on the Tennessee

*Lexitas* TENNESSEE
(615)595-0073

Supreme Court who are receiving these recommendations, would they have any information about when meetings happen?

MR. STAHL: Object to the form.

THE WITNESS: I don't know.

BY MR. DOUGHERTY:

Q. Do you know if they've ever issued orders when meetings have taken place, I'm talking about the Tennessee Supreme Court?

A. Not that I've seen.

Q. Have you ever seen an order where the Tennessee Supreme Court set a meeting that the Advisory Commission took place, similar to the one you referenced about Justice Lee being the liaison, have you ever seen any kind of order from the Tennessee Supreme Court about past meetings, when they took place?

A. I have not.

Q. Are you aware that those are on the AOC website?

A. I was not.

Q. Who -- or what individuals would be in the best position to know when past meetings took place?

A. Michelle Consiglio-Young.

CAPITAL REPORTING TENNESSEE
(615)595-0073

Q. And who would have given the information to the Tennessee Supreme Court justices, assuming they did put out an order as to when past meetings took place? Who would be that person?

MR. STAHL: Object to the form.

BY MR. DOUGHERTY:

Q. Would it be the Tennessee Supreme Court justice liaison?

A. I don't know. I don't know the answer to that.

Q. Is it your understanding that Michelle Consiglio-Young attends as a liaison Advisory Commission meetings?

A. She should.

Q. And -- okay, and why should she?

A. Just as I serve on, you know, boards and commissions as a staff liaison, it's to support the needs of that board or commission.

Q. Because that's your duty and responsibility, right?

A. That's right.

Q. Do you ever get -- when you're evaluating Michelle Consiglio-Young -- do you evaluate Michelle Consiglio-Young for job performance?

Lexitas TENNESSEE
(615)595-0073

A.    Yes.

Q.    How often do you do that?

A.    Three times a year.

Q.    And when do those evaluations take place?

A.    So there are two interims, interim reviews, I want to say every three months, and then a final evaluation.

Q.    Do you evaluate Michelle Consiglio-Young on her role as liaison to the Advisory Commission?

A.    No.

Q.    And why is that?

A.    Because those things -- we set our goals and objectives based on stretch goals, it's not those things that are part of your duties and responsibilities in the job.  So those are expected to occur.  The evaluation's based on the additional things that you do that move the needle for the AOC and the courts.

Q.    What does that mean, move the needle for the AOC and the courts; what moves the needle?

A.    So any new innovation, new ideas that are consistent with the goals that we have listed in our strategic plan, those are the things that move the needle.  For example, E-filing,

that would move the needle for the courts.

Q.   So fulfilling one's duties and obligations doesn't move the needle?

A.   That's the expectation of the job.

Q.   How do you evaluate for that?

A.   If you were not performing the duties and responsibilities of the job, you would not likely continue in the job.

Q.   And that's what I'm asking, how do you make those determinations if someone, Michelle Consiglio-Young, for example, I'm not suggesting she's not, how would you evaluate Michelle Consiglio-Young if she's not fulfilling her duties and obligations?

A.   So on the duties and responsibilities of any position in the AOC, if you fail to do those things, then we're going to get complaints, we're going to learn about it through complaints.

Q.   Who would give those complaints about Michelle Consiglio-Young, for example, on her role on the Advisory Commission?

A.   It could be --

MR. STAHL:  Object to the form.

THE WITNESS:  -- any member of the

CAPITAL REPORTING TENNESSEE
(615)595-0073

Commission.

BY MR. DOUGHERTY:

Q.    It could be any member of the Commission?

A.    Uh-huh.

Q.    Do you ever consult with the chair of the Advisory Commission when you're preparing a budget?

A.    No.

Q.    Do you ever consult with the chair of the Commission with any administrative support they might need?

A.    No.

Q.    Do you leave that responsibility up to Michelle Consiglio-Young?

A.    The Advisory Commission does not have a budget.

Q.    Right, let me -- just in a broad sense. I understand that, and you've made that clear, I apologize.

Does Michelle Consiglio-Young, is she the one that's responsible with communicating with the Advisory Commission chair on administrative support, just general administrative support?

A.    I suppose so.

Q.    Would she be the only person that would

Q. be communicating with the Advisory Commission on administrative support from the AOC?

A. Yes.

Q. You wouldn't have direct communications with the chair?

A. No.

Q. Do you know the chair of the Advisory Commission, who that is?

A. I do.

Q. And who is that?

A. Gino Bulso.

Q. And have you talked to Chairman Bulso in preparation for this deposition?

A. No.

Q. Are you aware that he gave a deposition in this case?

A. Yes.

Q. Did you talk to Chairman Bulso either prior to the preliminary injunction or after the preliminary injunction?

A. No.

Q. Do you know if Deputy Director Harmon spoke with Chairman Bulso either previous to the injunction or after the injunction?

A. I don't know.

Q. Do you know if the justices have talked to Chairman Bulso either pre or post preliminary injunction about this case?

A. I don't know.

Q. So for June 2023, you observed or you saw a public meeting notice; is that correct?

A. Yes.

Q. Do you know why that was there? Was that there because of the preliminary injunction?

A. I don't know.

Q. You weren't aware that that June meeting happened after the preliminary injunction?

A. I am aware.

Q. Let me rephrase it a different way.

Is it your understanding that the reason that the June 2023 meeting was open to the public was because of the March 2023 preliminary injunction?

MR. STAHL: Object to the form.

THE WITNESS: Yes. So that would be consistent with our intention to comply with the order.

BY MR. DOUGHERTY:

Q. And that would have been something, livestreaming the Advisory Commission meeting,

the AOC office would typically do; is that right?

A. I'm struggling with the question, I'm sorry.

Q. Sure. Assuming -- let's assume before the preliminary injunction got entered -- because you would agree when the preliminary injunction was entered, Advisory Commission meetings had to be open; would you agree with that?

A. After the preliminary injunction, yes.

Q. Okay. Let's say meetings at some point before the preliminary injunction, let's say there was a meeting that was open to the public and it was going to be livestreamed to the public, is that something that the AOC office would assist the Advisory Commission in making that happen?

A. Yes.

Q. Okay. And would the AOC office put out a public meeting notice that it was going to be livestreamed, assuming the meeting was going to be open prior to the preliminary injunction?

MR. STAHL: Object to the form.

THE WITNESS: If you're -- so if

Capital CitY TENNESSEE
(615)595-0073

you're going to livestream the meeting, it's for the public's ability to observe.

BY MR. DOUGHERTY:

Q.   Right, the AOC --

A.   So I would assume that yes, we would post that.

Q.   That's going to be the AOC?

A.   That's going to be the AOC.

Q.   That's what you do?  That's what your office does, I should say?

A.   We post what's on the public notice calendar, yes.

Q.   Okay.  Have you ever observed an Advisory Commission meeting either in person or by livestreaming?

A.   I have not.

Q.   Did you observe -- or were you aware that the June 2023 meeting is on the Tennessee YouTube channel?

A.   I was not aware.

Q.   So you didn't observe that June 2023 meeting that was livestreamed when it was taking place; is that right?

A.   I did not.

Q.   And you haven't watched it on the

Tennessee YouTube channel?

A.    I have not.

Q.    Okay.  Do you know if anyone, like Deputy Harmon, if anyone from your office, if they ever commented that they saw the Advisory Commission meeting on the YouTube channel?

A.    No one has commented to me.

Q.    Have you spoken to the justices about the Advisory Commission in June that was -- that's on the YouTube channel?

A.    No.

Q.    Okay.  So what is your understanding about the Advisory Commission and the rule recommendations and how those rule recommendations get transmitted to the Supreme Court, which then get transmitted to the General Assembly and then at some point they're -- they become law or they become rules; what is your understanding of that process?

A.    So my understanding is basically what you just said, that the rules package gets put out for public comment.  At some point it then is transmitted to the General Assembly and has to be passed by both houses before becoming

Capital Court TENNESSEE
(615)595-0073

official and then they get published.

Q.    Now, the public comment period, is that something that happens at some point after the meetings and the recommendations get formulated?

A.    Yes.

Q.    Okay.  Have you ever attended one of those General Assembly hearings where the rules package is being discussed?

A.    I have not.

Q.    Do you know if Michelle Consiglio-Young has ever attended one of those General Assembly hearings on the rules package at any point?

A.    I am sure she has.  I cannot think of a specific example, but I know that's part of her role.  She and her team, that's part of their role.

Q.    Okay.  Do you communicate with the justices about the rules package?

A.    No.

Q.    Do you ever communicate with the justices about the administrative support that the Advisory Commission might need?

A.    No.

Q.    Did you communicate with Barbara Peck,

your communications director, after the preliminary injunction was entered?

A. I did not.

Q. Do you know if someone else on your team communicated with Barbara Peck after the preliminary injunction was entered?

A. I don't know.

Q. Did you know that the June meeting was livestreamed to the public?

A. Yes.

Q. When did you first become aware of that?

A. Likely in the pleadings, something I reviewed for today.

Q. You don't remember any conversation you had with Ms. Peck or anyone in your AOC team about the livestreaming of the Advisory Commission?

A. I do not recall, no.

Q. Do you know how meetings are livestreamed?

A. So I know she has explained it to me, but I could not say that I know how they're livestreamed, no.

Q. Well, for example, is Ms. Peck or somebody that works with her on her team, do

they physically go in to a room with a camera or is it something on a computer where they're --

A.    I don't know.

Q.    You don't know how that works?

A.    No.

Q.    She would be the one that knows how that works?

A.    Yes.

Q.    Is the AOC and the Tennessee courts, are they livestreaming court sessions more frequently post pandemic?

A.    Yes.

Q.    Is the AOC and Tennessee courts livestreaming meetings publicly post pandemic more so than they were pre pandemic?

A.    I am unaware.

Q.    You don't have those discussions with budgetary issues that might come up?

A.    Only for the court sessions.

Q.    Does it cost more money for the courts to be livestreamed?

A.    We've had some investment in equipment to enable the courtrooms to livestream, so yes.

Q.    How does that process work on

CAPITAL COURT REPORTING, LLC
(615)595-0073

livestreaming something in the courts?

A.    I don't know.

Q.    Is there an additional investment of employees with this increased capacity to livestream court sessions?

A.    We have not added any employees to be able to do that.

Q.    So would you say it's more of a financial burden on the AOC to livestream court sessions?

A.    I would not call it a burden, I would say yes, we have invested in equipment to make sure that we can, but I would not call it a burden.

Q.    Okay.  Other than the public meeting notice that you saw the other day on the June 2023 Advisory Commission meeting, have you ever seen any other public meeting notices of the Advisory Commission on your website, either in your role as deputy or director?

A.    I have not, but I cannot say I've ever looked for them.

Q.    Have you ever seen any public meeting notices in your role as deputy or director of any public meeting notice for any board or commission?

A.    Yes.

Capital CITY TENNESSEE
(615)595-0073

Q. And who might that be, which one?

A. The Trial Vacancy Commission.

Q. The trial what?

A. Trial vacancy.

Q. And what is that commission?

A. So it is the body that vets candidates for judicial vacancies at the trial court level for the governor, they send names, three names to the governor of recommendation to fill vacancies.

Q. And do you recall when you observed that and what that might have been?

A. We've had several here recently, so -- I can't recall.

Q. Did you ever serve as chief of staff for the Tennessee governor before?

A. Chief of staff? No.

Q. Did you ever serve in any capacity for a former governor of Tennessee?

A. Yes.

Q. Who was that and what was your role?

A. I served as Governor Don Sundquist's deputy legal counsel and legal counsel.

Q. And what was your -- what were your functions with governor Sundquist in those

Lexitas - TENNESSEE
(615)595-0073

roles?

A.   So at the time we were combining -- creating the Department of Labor and Workforce Development, so I drafted the legislation for that.  We were also engaged in bringing school reform to the state of Tennessee, so I drafted the charter school legislation for the governor.  I also was engaged in extraditions, probation parole, clemency actions, the very first execution in decades, and then generally kind of supported our legislative liaisons.

Q.   So what years were you in that role with Governor Sundquist?  Doesn't have to be the exact date, I'm just curious of the years.  I don't recall, I can look it up when he was in office.  I mean, was it his entire term or terms?

A.   No, it was the second term.

Q.   We're about the same age, so I don't remember.  Was that mid '90s?

A.   It would be late '90s and then early 2000s.

Q.   I think the charter school statute was 2002, is that -- you said you drafted that or assisted with it?

A.   I drafted the first one.  It was unsuccessful, I think it took us two years to get something.

Q.   That would have been in early 2000, okay. About 20, 25 years ago you would say roughly you were with Governor Sundquist?

A.   Yeah.

Q.   I know we're in 2023.

A.   Yeah.

Q.   So in 2022, do you know if the Advisory Commission held any meetings?

A.   In 2023?

Q.   2022 first.

A.   2022, I don't know.

Q.   You started in February 2022, right?

A.   Yes.

Q.   Do you know if there were any meetings in 2022 of the Advisory Commission?

A.   I don't know.

Q.   You never communicated with Michelle Consiglio-Young about that?

A.   No.

Q.   If there were reimbursements from 2022, would those be somewhere in your AOC files?

A.   They would be, yes, with our fiscal

*Capital Court Reporters of TENNESSEE*
*(615)595-0073*

director.

Q.    Tell me -- you may have given me that person's name.

A.    Dalton Hensley.

Q.    Yeah, okay, I got it.

      Dalton is a male?

A.    Yes.

Q.    What about 2023, do you know if the Advisory Commission met in 2023?

A.    I only know of the June meeting.

Q.    Now, are you aware that the Advisory Commission meeting -- and the June meeting you would agree was the post preliminary injunction?

A.    Yes.

Q.    Were you aware that there was supposed to be an Advisory Commission meeting in September of 2023?

A.    Yes.

Q.    And what is your understanding -- first of all, did that meeting take place in September of 2023?

A.    No.

Q.    And tell me your understanding as to why it did not.

Lexitas TENNESSEE
(615)595-0073

A.     It did not get properly noticed or we became aware that it was not properly noticed and so it was rescheduled.

Q.     And when did you become aware, your office, that it was not properly noticed?

A.     I am 99 percent sure that that would have come from legal counsel at the AOC --

Q.     Is that --

A.     -- making me aware that there was a problem.

Q.     -- Mr. Coke?

A.     Yes.

Q.     Was the meeting supposed to be on September 8, 2023?

A.     I don't remember the date, I just know it was September.

Q.     And what is your understanding -- you said it got -- I don't want to put words in your mouth.

Did it get cancelled, the September, or did it get postponed?

A.     Postponed is probably the better word.

Q.     And what is your understanding, when did it get postponed to, what date?

A.     To December.  So it is scheduled for

December.

Q. Wasn't there already though a December quarterly meeting they were supposed to have?

A. I don't know.

Q. How many meetings -- how many meetings is the Advisory Commission having in 2023 calendar year?

A. I don't know.

Q. So you don't know if this December is -- if it was already scheduled anyway or if it's the postponed meeting, you're not sure about that?

A. I don't know.

Q. Who would know about that if it's -- if it was already on the schedule or if it's the one that got postponed from September?

A. Michelle Consiglio-Young.

Q. Anyone else besides Michelle Consiglio-Young?

A. John Coke.

Q. Anyone else?

A. Rachel Harmon.

Q. Okay, anyone else? Would the Supreme Court liaison?

A. Probably.

Lexitas TENNESSEE
(615)595-0073

Q.   Would Chairman Bulso, would he know?

MR. STAHL:  Object to the form.

THE WITNESS:  If the meeting got --
if the September meeting was cancelled or
postponed, sure, yes, he should know.

BY MR. DOUGHERTY:

Q.   Okay.  And so what's your understanding
of the reason that it was postponed?  Is it
because there was going to be a violation of
the injunction and therefore they didn't have
it; is that a fair assessment?

MR. STAHL:  Object to the form,
misstates testimony.

THE WITNESS:  What I believe -- I
believe what I was made aware of is that it had
not been properly noticed.

BY MR. DOUGHERTY:

Q.   What do you mean by not properly noticed?
That's what I'm trying to understand.

A.   There was nothing on our public facing
calendar to let the public know that that
meeting was scheduled.

Q.   Did the injunction require the AOC to
properly notice the public?

MR. STAHL:  Object to the form.

THE WITNESS: So the injunction would require us to either have it in person or livestream it and so I'm going to assume neither was capable of happening for that September meeting.

BY MR. DOUGHERTY:

Q. Does the injunction also require the AOC to give proper notice to the public as to when it's going to be?

A. Yes.

Q. What do you consider proper notice to the public in advance of a meeting? I think you said 30 days; is that your testimony?

A. I will stick to that answer, I think that's standard.

Q. Do you know if the injunction requires a certain amount of notice or not?

A. I don't recall.

Q. Okay. Have you spoken to Michelle Consiglio-Young while she has been out on maternity leave?

A. Yes.

Q. Have you spoken to her specifically about the Advisory Commission?

A. No.

Lexitas    TENNESSEE
(615)595-0073

Q. So have you spoken to her about her functions as liaison to the Advisory Commission?

A. No.

Q. What -- have you spoken to her about AOC business?

A. Yes, strategic planning and the final assessments of her team members on their goals. So we do pay for performance, so she would be responsible for evaluating her team members. So we've talked about that. We've talked about revisions we've made to the strategic plan for this next calendar performance cycle, and other than that we've just talked about the baby.

Q. So -- and I'm just referring to AOC business, I'm not asking you anything about your personal conversations with her.

What is pay -- you said pay for performance?

A. Correct.

Q. What is that?

A. So we do an incentive program tied to those goals that I talked about earlier. Each person has an individual performance plan and we assess performance based on the goals and

Veritas TENNESSEE
(615)595-0073

objectives in those individual plans. And then we rank the outcomes and reward employees for their performance.

Q. Whose responsibility was it to properly notice the Advisory Commission meeting in September?

MR. STAHL: Object to the form.

THE WITNESS: I don't know.

BY MR. DOUGHERTY:

Q. Was it Michelle Consiglio-Young?

A. I don't know.

Q. Who is on her team?

A. So she oversees Charley Baldwin who is legislative liaison. She also oversees our court improvement program. I think that's everyone on her team.

Q. So Charley Baldwin, I only heard one person's name.

A. Well, Stacy Lynch is the director, if you will, I may get the titles wrong, for the court improvement program. And I believe she has a staff of -- oh, I forgot one other person, Stephanie Ethridge who is over our safe baby courts. And then there are probably three or four people that report through them.

Q.   Okay.  Do you think whether or not Advisory Commission meetings are open or closed to the public is important to improve the administrative -- administration of justice in the Tennessee courts?

A.   You're asking my opinion?

Q.   Yes.

A.   Okay.  So the process, as I know it, has the opportunity for the public to comment.  So if the goal of whether they're open or closed is to ensure that the public has the opportunity to comment, I think that is already part of the process.

Q.   Yeah, and that's not my question.  I didn't ask about commenting, I didn't suggest that the purpose was about public commenting.

I said, do you think Advisory Commission meetings that are closed to the public, closed meetings, does that improve the administration of justice?

A.   I think there are times when in order to have candid discussion of a matter, there is a need to have that discussion be closed.  In terms of the public's ability to know and understand what comes out of that discussion, I

LEXITAS TENNESSEE
(615)595-0073

believe that is already part of this process.

So I don't have an opinion one way or the other whether they should be open or closed, I just look at the outcomes. And so I believe that there is already process in place for the outcomes for the public that promote the administration of justice.

Q. And so are meetings -- is it your understanding that Advisory Commission meetings are open or closed?

A. For this particular commission, I understand the history has been that at one point they were open and at one point they were closed.

Q. And at what point is it your understanding on the history were they open?

A. It predates me. I want to say maybe 2017, 2018, but I am not certain.

Q. What is your understanding of history wise when they became closed?

A. I don't know why they became closed.

Q. I didn't say "why," I said what is your understanding of the process of getting closed and why they became closed?

A. I don't know.

Lexitas TENNESSEE
(615)595-0073

Q.   Who would know that?  Would the justices know that?

          MR. STAHL:  Object to the form.

          THE WITNESS:  Any -- whoever was involved at the time.

BY MR. DOUGHERTY:

Q.   So I guess is it fair to say if they were open, Advisory Commission meetings at some point in the past -- I think you said they were at some point, right?

A.   (Nodding head.)

Q.   If they were open, do you think they were open to try to improve the administration of justice?

          MR. STAHL:  Object to the form.

          THE WITNESS:  I don't know if there was the intentionality around that or not, I don't know.

BY MR. DOUGHERTY:

Q.   Why do you think they would have been open previously?

A.   I don't -- I don't know.

Q.   Is there someone that you're aware of who decided not to keep the meetings open any longer?

A.    I'm sorry, it predates me, I don't know.

Q.    Well, you talked about the history, I'm just trying to understand, how did you have the knowledge to be able to know that historically at some point meetings of the Advisory Commission were open?

A.    In the context of preparing for this deposition, I learned that at one point they were open.

Q.    And who did you learn that from?

A.    Likely legal counsel, John Coke.

Q.    And did you review any information that would have -- evidence that they were open at some point?

A.    No.

Q.    Do you know -- have you ever reviewed any information as to a reason they might have been open in the past at some point?

A.    No.

Q.    So is it possible that open Advisory Commission meetings could improve the administration of justice?

MR. STAHL:  Object to the form.

THE WITNESS:  I've never attended an Advisory Commission meeting for rules, but I

would say, again, that there may be a need to have candid discussion among the lawyers and judges that are part of that body. And so that may be problematic in an open forum. And so as long as the results of that discussion are made available to the public, in my opinion, that is sufficient.

BY MR. DOUGHERTY:

Q. As long as -- you're saying the public comment period comes sometime after the meeting happens, that that's sufficient is what you're saying?

MR. STAHL: Object to the form, misstates testimony.

BY MR. DOUGHERTY:

Q. Well, then you tell me what your testimony is when you talk about public comment. I'm just trying to understand it. Because I understood you to say before that the public comment period happens after the meetings; is that right?

A. I think that is the way it is set up today, yes.

Q. Okay. And you think that's sufficient to improve the administration of justice?

TENNESSEE
(615)595-0073

MR. STAHL:  Object to the form.

THE WITNESS:  I don't think it hinders the administration of justice.

BY MR. DOUGHERTY:

Q.   Well, you would agree that part of your responsibility and duties are to improve the administration of justice as director of AOC, right?

A.   Yes.

Q.   Statute requires you to survey and try to come up with ideas of how to do that, right?

A.   Yes.

Q.   So is it possible that open meetings to the public on court rulemaking is to improve the administration of justice?

MR. COKE:  Object to the form.

MR. STAHL:  Object to the form.

THE WITNESS:  Is it possible.  I would still lean toward the need to have candid open dialogue about rule changes and that may not happen in a public forum to the level of candor needed to improve the administration of justice.

BY MR. DOUGHERTY:

Q.   Does transparency on rulemaking meetings

improve the administration of justice?

MR. STAHL: Object to the form.

THE WITNESS: I don't believe it's not transparent.

BY MR. DOUGHERTY:

Q. And so you think closed meetings are transparent?

MR. STAHL: Object to the form.

THE WITNESS: So I am saying the need for candid conversation improves the administration of justice. The outcomes of that candid conversation are transparent to the public, that also improves the administration of justice. And the ability to take in comment and information from the public improves the administration of justice.

BY MR. DOUGHERTY:

Q. Would open meetings improve the rulemaking process?

A. It is open when it gets to the legislative process.

Q. No, it's not, it's a meeting?

MR. STAHL: Object to the form, argumentative.

///

*Veritas* TENNESSEE
(615)595-0073

BY MR. DOUGHERTY:

Q. It's a meeting. Are meetings today open prior to the preliminary injunction?

MR. STAHL: I'm going to allow this one last question, then I'm going to ask to take a break.

THE WITNESS: Are meetings open prior --

BY MR. DOUGHERTY:

Q. We're talking about Advisory Commission meetings. Were they open --

A. My understanding is they have not been open.

Q. Okay.

MR. STAHL: We're going to take a break. That was a question. Thank you. Take a five-minute break.

MR. DOUGHERTY: Just make it 11:35.

MR. STAHL: Okay.

(Short break.)

BY MR. DOUGHERTY:

Q. Okay, we'll go back on the record.

Ms. Long, what is your understanding of the preliminary injunction in March; why was it issued by the court?

Lexitas TENNESSEE
(615)595-0073

A. To ensure that the Advisory Commission on rules was open to the public.

Q. When you say the advisory -- you talking about meetings?

A. Meetings.

Q. So was it your understanding that prior to the injunction they were closed --

A. Yes.

Q. -- meetings, right?

A. Yes.

Q. Okay. Do you know if they talk about -- let's go back.

What -- is the Advisory Commission made up of -- what do they make rule recommendations on? Are there certain courts, certain procedures, are you aware of that?

MR. STAHL: Object to the form.

THE WITNESS: So I did -- I think I answered earlier that they make recommendations on the rules of practice and procedure for various courts and for the rules of evidence.

BY MR. DOUGHERTY:

Q. Yeah, so it's the rules of evidence is one; is that your understanding?

A. Yes.

Q. And is also the rules of civil procedure one of the rule recommendations they make?

A. Yes.

Q. And the rules of criminal procedure?

A. Yes.

Q. Rules of juvenile procedure?

A. Yes.

Q. And is the last one, the fifth one, the rules of appellate procedure?

A. Yes.

Q. When we talk about court rules of practice, that's what they're actually doing?

A. Yes.

Q. Were you aware that the federal analog has very similar rules in certain courts?

A. No.

Q. Have you read the pleadings about the federal analog and what they do?

A. Yes.

Q. What does Michelle Consiglio-Young, Intergovernmental -- what is her title --

A. Affairs.

Q. What does that mean?

A. So she is our liaison to the other branches of government and so she does -- she

works very closely with the legislature and then other departments. And so for court improvement programs, she's working with Children's Services. For safe baby courts, she's working with Human Services and Children's Services as well. So it's that place that connects with other departments and agencies across the state.

Q. So is it fair to say then when you say "intergovernmental" or what she does, some of her work touches on the executive branch and the legislative branch and the judicial branch?

A. Yes.

Q. Is that a relatively new position or has that always kind of been there with the AOC?

A. I think it's always -- well, since I've been at the AOC it's been there.

Q. Okay. Do you know how long she served on the Advisory Commission as the AOC liaison?

A. I do not know.

Q. Is the Advisory Commission listed somewhere on the AOC website?

A. It is.

Q. And are there names of the people who are on that commission on that particular website?

Lexitas TENNESSEE
(615)595-0073

A.    Yes.

Q.    I think all of the -- we talked earlier about the boards and commissions section of the AOC website; do you recall that?

A.    Yes.

Q.    And I haven't looked last week, but I think it is fair to say that most members who serve on these various commissions and boards are listed there on the AOC website?

A.    Yes.

Q.    Who puts that information together?

A.    So who serves is decided in most places by the Court and they will often times put down a court order for membership and then that gets accumulated at the AOC.  I don't know who physically puts it on the website.

Q.    Well, is the responsibility of liaison for that particular board or commission to make sure those names are on the website or is that your communications group?

A.    I don't know.

Q.    Okay.  Do you all have like a flow chart at the AOC because you have a lot of different divisions?  I am just trying to understand how, you know, delegation of duties and obligations

*Veritas* TENNESSEE
(615)595-0073

are carried out when you've got kind of these various six divisions, what -- and you don't have to tell me everything, I am just trying to understand the hierarchy and how everybody communicates with one another.

A.    So you won't find flow charts.  What you will find is trust in liaisons that work with these various boards and commissions to carry out the functions that they always carried out. We are in the process of trying to document some of those processes and procedures, I call it eliminating single points of failure, because if something happens to Michelle Consiglio-Young, someone else needs to be able to pick up where she left off.  So it's not written down now, but we're working toward writing some of those practices and procedures down.

Q.    Are you aware of a commission that was established several years ago that put together several reports on aspirations for the Tennessee judicial system in the year 2030?

A.    I'm not.

Q.    Are you aware that that commission's final report is on the AOC website?

LEXITAS TENNESSEE
(615)595-0073

A.   So I believe I saw a report -- I don't think that's what -- I thought it was more around diversity.  I don't know if we're talking about the same report or not, though.

Q.   So as I understand it, I believe it might even be in the pleadings at some point or motions, I'm not sure, but I just wanted to know if you were aware that -- I want to say it was the mid '90s, there was a commission in Tennessee by various members, private attorneys, judges, you weren't aware of that?  I know that was several years ago.

A.   If you're talking about -- I'm calling it a diversity report.  I have seen that one, but I don't know if we're talking about the same thing.

Q.   What I am referring to, and I don't know the exact name, but I think it was Vision, Tennessee Courts 2030.  I believe the year was 2030.  You don't recall that?

A.   I don't.

Q.   And you haven't seen that 2030 -- I am just -- it may not be exactly, but you don't recall seeing that 2030 report on the AOC website?

Lexitas TENNESSEE
(615)595-0073

A.    No.

Q.    I don't recall who the person -- the person who served in your role, the director of the AOC was, but do you ever get together or have communications with previous AOC directors that predated you?  Even going back mid '90s or the '80s?

A.    So two of them are friends.  So I do have conversation with two previous directors.

Q.    Who are those?

A.    Debbie Tate and Bill Young.

Q.    And Ms. Tate was your -- you were deputy to her, right?

A.    Yes.

Q.    Does she still serve in some capacity with the AOC?

A.    We have her on a temporary assignment right now, so yes.

Q.    Is that like a limited contract for certain period of time?

A.    Yes.

Q.    120-day contract?

A.    I think so, yes.

Q.    Bill Young, who is Bill Young?

A.    Bill Young was I believe Ms. Tate's

Lexitas TENNESSEE
(615)595-0073

predecessor in the role.

Q.    How long did Ms. Tate serve as AOC director, if you can recall?

A.    I think it was seven years.

Q.    And then how about Mr. Young, how long was he -- do you know?  If you don't, that's fine.

A.    I don't know.

Q.    Is he still living?

A.    Yes.

Q.    Does he work for the AOC?

A.    No.

Q.    Is he retired?

A.    Not that I'm aware of.

Q.    Okay.  Is he an attorney?

A.    Yes, he is.  I think he's working for the Ethics Commission.

Q.    So is that a Tennessee government paid position?

A.    Yes.

Q.    Bill Young?

A.    Yes.

Q.    He is an attorney?

A.    Yes.

Q.    Is Ms. Tate an attorney?

A.    Yes.

Q.    And is there requirement that the executive director of the AOC has to be an attorney?

A.    Not in statute.

Q.    Have most of them, besides Ms. Tate and Mr. Young and yourself, have most previous AOC directors been attorneys?

A.    To my knowledge, yes.

Q.    Are you aware of how the Federal AOC is set up with respect to the relationship with the chief justices of the US Supreme Court?

A.    No.

Q.    So if I told you that the AOC in the federal court does not serve at the pleasure of the chief justice, Chief Justice Roberts, and is a separate entity, you wouldn't have any information on that or knowledge?

A.    No.

Q.    Are you aware of anyone or any report that has ever suggested or recommended that the AOC director and office should be separate from the Tennessee Supreme Court?

A.    No.

Q.    You've never seen a report or heard about

any recommendations on that?

A.     I think there's some opinion out there that it should be led by more than just the Supreme Court, in other words a group of judges representing all levels of the court system, but I've never seen a report, I've never seen anything in writing in that regard.

Q.     What opinion are you referring to?

A.     I think there's been some discussion over time about the AOC being responsible, if you will, to more than just the Supreme Court.

Q.     So is it your understanding that the AOC is just responsible for the Tennessee Supreme Court?

A.     No, it is not my understanding.

Q.     Well, then why does that -- why is that opinion or idea out there?

A.     I don't know.

Q.     Who -- when you say opinion, is it like an Tennessee attorney general opinion; what do you mean?

A.     No, no.  I just mean over the course of time, there have been comments that I'm aware of that trial judges don't get -- don't perceive that they are heard when it comes to

LEXITAS TENNESSEE
(615)595-0073

how the AOC operates. The statute clearly says that the AOC director serves at the pleasure of the Tennessee Supreme Court. The realty is the Tennessee Supreme Court is responsible for the entire court system. So the Tennessee Supreme Court, vis-a-vis the AOC director, is responsive to all levels of court. But we don't control perception.

Q. What is your opinion on that, do you think they -- that maybe the statute requiring your position to serve, as you say, the pleasure of the chief justice and the justices, is that a good thing or a bad thing?

A. It's a thing.

Q. Right.

A. I think that in terms of --

Q. I'm not trying to --

A. -- to get something done, having five bosses is very different from having some larger group of bosses, if you will.

Q. I'm not trying to get you in trouble with your bosses, I'm just -- I'm just talking about -- I mean, because you would agree that you are responsible for the administration of justice and some of these kind of broad

concepts; would you agree with that?

A.   Absolutely.

Q.   So having five bosses, is that more difficult to carry out your duties?  Or what do you mean by having five bosses?  Explain that. I am just trying to understand.  I don't want to put words in your mouth, I don't want you to talk bad about -- I'm just trying to understand philosophically what your opinion is.

A.   Well, the AOC is the administrative arm of the Tennessee Supreme Court.  The Tennessee Supreme Court has five justices.

Q.   Right.  Do you think if would be a better situation if your office, the AOC, was completely separate from the Tennessee Supreme Court and that you made all those decisions?

A.   No.

Q.   Okay.  And if the Feds do it that way, and I don't know if they do it exactly that way, but would that be something you wouldn't agree or think would be a great thing or you don't know right now?

A.   I don't know.  I don't think it would be because I think our Tennessee Supreme Court is very intentional about hearing and making sure

LEXITAS TENNESSEE
(615)595-0073

they are responsive to all courts.

I mean, we have programs across the AOC that address juvenile courts, general sessions courts, trial courts. So there -- the processes are in place to make sure all courts are represented in what the Tennessee Supreme Court then directs.

Q. Do you think the people on the inside, attorneys, all of us at this table, justices and judges think that the Tennessee judicial system is a good thing or --

MR. STAHL: Object to the form.

BY MR. DOUGHERTY:

Q. -- or doing the best it can?

A. The Tennessee judicial system?

Q. Yeah. Well, the courts, what you have to do, what you have to do. Do you think the Tennessee courts are perceived by the members of the bar and the judiciary as being a pretty good system?

A. Yes.

Q. Do you think the public perceives the Tennessee judicial system as a pretty good system?

MR. STAHL: Object to the form.

LEXITAS TENNESSEE
(615)595-0073

THE WITNESS:  The public is kind of broad.  I think it depends on your interaction with the courts.  So you could have a negative interaction and I suppose your perception would not be positive.  I think generally, when I talk about what I do, I don't hear negative things about the Tennessee judicial system.

BY MR. DOUGHERTY:

Q.    Do you think there's an access to justice crisis in the state of Tennessee?

A.    Crisis, no.

Q.    Do you think there's an access to justice problem in the state of Tennessee?

A.    I think we are intentional with programs to make sure that the reach of the Tennessee courts is as broad as it can be from where we work at the AOC, and then we work very closely with all of those legal aid societies out there that do provide the reach and access.  So I believe that's a very positive thing for the state of Tennessee.

Q.    Are there a lot of pro se litigants in the state of Tennessee?

A.    I don't know.

Q.    That's not something that you keep track

LexitasⓇ TENNESSEE
(615)595-0073

of, record wise?

A. I don't keep track of that, no.

Q. You're not required to do that under the statute?

A. No.

Q. Are you aware of the compensation system for attorneys in Tennessee for indigent representation?

A. Yes.

Q. Is it good or is it bad compared to other states?

MR. STAHL: Object to the form.

THE WITNESS: So compared to other states, we compensate lawyers for their representation at the lowest level of any other state.

BY MR. DOUGHERTY:

Q. So Tennessee's the worst state, right?

MR. STAHL: Object to the form.

THE WITNESS: We compensate at a rate lower than any other state.

BY MR. DOUGHERTY:

Q. The worst state in terms of compensation, I should have clarified that.

A. The lowest.

Q.   Well, is it better to get less money or more money?

MR. STAHL:  Object to the form, asked and answered.

THE WITNESS:  Better to get -- so I don't view it from the standpoint of the attorney compensation whether or not that is good or bad, I view it from the standpoint of are we providing representation.  And so representation continues, despite paying the lowest rate in the country.

BY MR. DOUGHERTY:

Q.   Did Chief Justice Kirby think it was bad enough to issue some comments recently about how she wanted to improve the compensation system?

A.   So we are currently in the process of advocating to improve the compensation for attorneys, yes.

Q.   Did Chief Justice Kirby release some public comments recently?

A.   Yes, she did.

Q.   Were those on the AOC website?

A.   Yes, they are.

Q.   How is -- is the AOC, part of that

EXHIBIT TENNESSEE
(615)595-0073

advocacy, as you called it, about trying to increase compensation?

A.    Yes.

Q.    How -- what does that advocacy look like? What does your office have to do?

A.    So the entire fund for indigent representation is appropriated money by the General Assembly.  So if there is to be an increase in attorney compensation rates, it will have to come from additional appropriation of moneys.

Q.    So does that mean, when you say "advocacy," trying to get more money appropriated?  You don't have to pass a law, right?

A.    No.

Q.    Who does the advocacy besides the AOC office?

A.    I'm sure on this topic there will be many groups advocating.  I think the TBA will definitely be at the table on behalf of attorneys.  You might see the PDs office, some of the legal aid societies.  I'm sure there's a wide swath of people that would agree.

Q.    Is low compensation that we're talking

y
Case 3:22-cv-00439    Document 121    Filed 11/05/24    Page 131 of 182 PageID #: 1452
LEXITAS TENNESSEE
(615)595-0073

about, does that make the access to justice issue better or worse?

MR. STAHL: Object to the form.

THE WITNESS: Better or worse. I think we could be -- I don't think it has to date, but I think if we don't address it, we could be in a position where access to justice is in jeopardy.

BY MR. DOUGHERTY:

Q. So appreciate you sharing the advocacy, is there any kind of written materials that your office has on this -- what you have to do to increase the funding to get -- to compensate, is there anything out there physically written?

A. So it is one of our budget requests. And so we have provided information to the Department of Finance and Administration in writing that we will be making an ask to increase the rates.

Q. Are the justices themselves advocating on this issue? I mentioned Justice Kirby, but are they doing any advocacy along with the AOC?

MR. STAHL: Object to the form.

THE WITNESS: So before it appears in

our budget request, the Court would have to agree with that. And so they have. I don't know about individual advocacy on their parts.

BY MR. DOUGHERTY:

Q. How do you know they agreed with the increase of compensation?

A. We present our budget proposals to the Court in advance.

Q. When you say "we," you're talking about the AOC?

A. I'm talking about me.

Q. You?

A. Uh-huh.

Q. So when you're doing a budget -- I know you said that's kind of a year-long process, kind of, right?

A. Uh-huh.

Q. You're putting numbers together, you go to the justices first or at some point before that gets submitted to the governor?

A. That's right, I need approval.

Q. Okay. So we're just talking about the compensation for attorneys right now, what the article was recently that Justice Kirby spoke about.

What's the increase -- or proposed increase for attorney compensation on a percentage basis?

A. Well, it's $30 increase in the compensation rate. So from $50 an hour to 80.

Q. And so currently it's $50 an hour, is that for criminal or explain that -- or is that just court appointed? What does that mean?

MR. COKE: Object to the form.

THE WITNESS: That's court appointed counsel.

BY MR. DOUGHERTY:

Q. In state courts in Tennessee?

A. Yes.

Q. So is that by statute or is that just how it's been, the $50?

A. It's by rule, supreme court rule, Rule 13.

Q. That's Rule 13?

A. Yes.

Q. When was that rule promulgated?

A. I don't know.

Q. And so this compensation of $50 an hour, is that civil or criminal?

A. Both.

*Lexitas — TENNESSEE*
*(615)595-0073*

Q.  Oh, it is, okay.

How does that on a criminal side?  Isn't the public defender's office -- don't they serve that role or -- I don't understand that part of it.

MR. COKE:  Object to form.

THE WITNESS:  So the public defender's office does take -- undertake the representation.  However, the indigent -- my understanding, the indigent representation fund for adult defense applied when the public defender's office had a conflict on a matter, and so private counsel could be engaged.

BY MR. DOUGHERTY:

Q.  I see.  So the increase in it, assuming it goes through, does that require a rule change of Supreme Court Rule 13?

A.  Yes.

Q.  Who makes that change?  Do the Supreme Court justices make that change?

A.  Yes.

Q.  Supreme Court rules are not part of the Advisory Commission, are they?

A.  I don't believe so, no.

Q.  Is there any commission or board outside

Case 3:22-cv-00439   Document 121-4   Filed 11/01/23   Page 135 of 182 PageID #: 1456

Lexitas TENNESSEE
(615)595-0073

of the justices themselves that make changes to supreme court rules?

A.    So they will -- no, there's no entity, no.

Q.    Do they do that at like certain period, cadence of the year, or is that ongoing; how does that work?

A.    I think it's ongoing and they will be put out for public comment.

Q.    So they also put out public comment, but as far as you know the Supreme Court rules are not part of the Advisory Commission meeting rule recommendations; is that right?

A.    That's right.

Q.    Okay.  So assuming that the rate increases from $50 an hour to compensate an attorney representing indigent people to 80, where does that -- where would that put Tennessee?

MR. COKE:  Object to form.

THE WITNESS:  It puts us kind of square in the middle of other states that do indigent representation in this way.

BY MR. DOUGHERTY:

Q.    How many states do indigent

Case 3:22-cv-00439    Document 121    Filed 11/08/23    Page 136 of 182 PageID #: 1347

representation like Tennessee?

A.    I don't know.

Q.    Approximately?

A.    I don't know.

Q.    Do you ever discuss indigent representation in your -- is it the COSCA group, that organization, does that ever come up?

A.    We have not.

Q.    What about access to justice issues in general, does that ever come up in your state meeting association?

A.    So, yes.  Interpreters has come up in the COSCA group.  I'm trying to remember.  I think just interpreters and language access has been an issue.

Q.    What about litigants having to represent themselves or being pro se, does that pro se litigation ever come up?

A.    Not that I recall.

Q.    Is part of the goal of increasing compensation for indigent representation so that we will have fewer pro se litigants?

          MR. STAHL:  Object to the form.

          THE WITNESS:  I don't -- I don't know

that that is a goal.

BY MR. DOUGHERTY:

Q.   Would it be fair to say that if attorneys are going to be paid more to represent people who can't afford payment, then you're going to have less indigent -- excuse me, you're going to have less pro se litigants in courts?

MR. STAHL:  Object to the form.

MR. COKE:  Object to the form.

THE WITNESS:  Yeah, I don't know the reasons why people choose to go pro se, so I can't necessarily say that I know the answer to that.

BY MR. DOUGHERTY:

Q.   Is one of the reasons that people choose to go pro se because they don't have enough money to pay for a lawyer?

A.   I suppose it could be one reason.

Q.   Isn't that the main reason?

MR. STAHL:  Object to the form.

THE WITNESS:  I don't know that to be the main reason.

BY MR. DOUGHERTY:

Q.   You don't know that to be the main reason?

A.    (Shaking head.)

Q.    Have you ever had this discussion specifically with Justice Kirby?

A.    No.

Q.    Were there any justices that opposed the rate increase from $50 an hour to 80?

MR. COKE:  Object to the form.

THE WITNESS:  No.

BY MR. DOUGHERTY:

Q.    Are any of the justices opposed to having Advisory Commission meetings open to the public?

MR. STAHL:  Object to the form.

THE WITNESS:  I -- I don't know.

BY MR. DOUGHERTY:

Q.    Has anyone said anything to you about that -- their objection to having open meetings?

A.    No.

Q.    Do you personally object to having Advisory Commission meetings open to the public?

A.    Do I object?  I don't know that it matters.  They are open now pursuant to court order.  So no, I don't object.

LEXITAS TENNESSEE
(615)595-0073

Q. Has that ever been a discussion within the AOC office about whether or not Advisory Commission meetings should be open or closed?

A. I have not had such a discussion.

Q. You don't know anyone's opinion? Like, for example, you don't know if Director Harmon thinks it's a good idea or bad idea?

A. I don't know her opinion.

Q. Do you know Chairman Bulso's opinion whether he thinks it's a good idea or bad idea?

A. I do not know.

Q. Do you think if Chairman Bulso thought it was a bad idea to have meetings open, would he tell you as the AOC director?

MR. STAHL: Object to the form.

THE WITNESS: He's more likely to talk with the staff liaison. I don't interact with the commission or the chairman.

BY MR. DOUGHERTY:

Q. So that would be -- you think he would tell Michelle Consiglio-Young?

A. Possibly.

Q. Would he tell any of the justices on the Supreme Court?

MR. STAHL: Object to the form.

THE WITNESS:  I don't know.

BY MR. DOUGHERTY:

Q.    You don't think he would tell -- you don't know.

A.    I don't know.

Q.    Do you ever have any input with the justices when they appoint members to the Advisory Commission?

A.    Do I -- say the first, do I?

Q.    Yeah, do -- you would agree that the Tennessee Supreme Court justices appoint members to serve on the Advisory Commission, correct?

A.    Yes.

Q.    Do you as the AOC director have any input with the justices before they appoint someone?

A.    No.

Q.    Does anyone in your office at the AOC have any input on that process?

MR. STAHL:  Object to the form.

THE WITNESS:  The only input that our office would have would be based on the terms of the currently serving members and whether or not they are eligible for reappointment.

///

Veritas TENNESSEE
(615)595-0073

BY MR. DOUGHERTY:

Q.   And that eligibility is by statute, right?

A.   Yes.

Q.   So you don't -- your office doesn't weigh in and say I think you all should appoint John Smith as a member to the Advisory Commission, is that right?

A.   That is correct.  Or I don't.

Q.   And I'm talking about -- when I say "you," I'm talking about your office, the AOC. Who would be the person that would get involved in that?

A.   I don't know if, for instance, Michelle Consiglio-Young would have the opportunity to weigh in on appointments or not.  I know on the boards and commissions that I serve as liaison, I do not.

Q.   What boards and commissions do you serve as liaison?

A.   So I serve on the Building Commission.

Q.   The building?

A.   Yes.

Q.   Okay.

A.   I serve on the Technology Oversight

Veritas Court Reporting, TENNESSEE
(615)595-0073

Committee.  I cannot recall if I am on the Access to Justice Commission or not by name, but I attend sometimes their meetings.  I think that's all.

Q.    The Building Commission, do they hold regular meetings?

A.    They do.

Q.    Do you all meet together in one physical location or is it through Zoom or Webinar?

A.    It's been Zoom.

Q.    Has that been since the pandemic?

A.    I don't -- I started in October like right before, I don't recall a meeting -- well, I wasn't director before then, so I don't know what it was before the pandemic.

Q.    Are your Building meetings open to the public?

A.    I don't -- I don't think I've ever seen a public notice.  They're really about maintenance of the building, like landscaping, plumbing issues.

Q.    Right.  How about the Tech Oversight, how many times a year typically do they meet?

A.    So it's brand new and so it has met maybe three times.

Q. When you say "three times," you're talking about in calendar year 2023?

A. Yes.

Q. Where do you all meet and how do you all meet?

A. It's been via Zoom.

Q. And are any of those meetings been open to the public?

A. Not to my knowledge.

Q. How would you know if a meeting that you were serving on would be open to the public?

A. If public was a part of the meeting. I attend, so if there were members of the public outside of, you know, those who are on the committee was in attendance, then I would know that it was open.

Q. I understand that if they were physically in the same room. So my question is how would you -- if you're sitting in a room and it's being Zoomed out to the public, would you know? Would there be a camera in the room? How would you understand that that meeting was going out to the public?

A. We're all joining from our own locations.

Q. Sure.

LEXITAS TENNESSEE
(615)595-0073

A.   And there's no livestreaming, if that's your question.

Q.   That's what I'm trying to figure out. How do you know -- not sitting on the side of the public, you're in the room or your meetings are being livestreamed, how do you as a participant know that the public -- that this meeting is being livestreamed to the public?

A.   I guess I don't know.

Q.   So assuming a chair didn't say, hey members, this meeting's going to be livestreamed -- if they told you, you would know at that point, right?

A.   Right.

Q.   Would you also know if you saw a public meeting notice on the AOC website that it was being livestreamed?

A.   Yes.

Q.   Okay.  Any other way that you would know?

A.   No.

Q.   Okay.  So one of the other aspirational goals -- are you required as the director to come up with ways to expedite litigation?

A.   Yes.

Q.   How does that -- what does that look

Lexitas TENNESSEE
(615)595-0073

like?  What things have you done in your role to expedite litigation?

A.    I would say the entire in Korean (phonetic) study of E-filing in the state is one of those.

Q.    The E-filing?

A.    Yes.

Q.    Any other ways of expediting litigation?

A.    No.  We collect statistical data that would inform the Court of where there may be overloaded dockets and then the Court has some tools available to it to address that.

Q.    So when you see expedited litigation, you think that relates more towards particular court dockets?

A.    Yes.

Q.    Are there some court dockets that are slower to work through a case than other dockets or courts?

A.    So I think there are places where population growth has caused the courts to be more heavily burdened than in the past.  And so the 19th Judicial District comes to mind, they've just got more filings -- filings than they -- over the course of time.

Lexitas TENNESSEE
(615)595-0073

Q. So what's the 19th Judicial District?

A. So that's Montgomery County.

Q. And what's the major city in Montgomery County?

A. Clarksville.

Q. Okay. Is that because there has been an increase in population?

A. That's what I would argue.

Q. Well, when you're setting up your processes to expedite litigation and collecting all this information, how do you do that? If you have a district that has a lot more filings, how does that work? What do you do?

A. To address it or get the information?

Q. Well, I don't know. I'm just trying to understand, is it just your job to collect the information and statistics or is it your job --

A. It is my job to collect the information.

Q. Once you collect the information, is it your job to come up with a fix or that's not your job?

A. So I'm -- it's not my job. I support the Court with the information that it needs to make decisions.

Q. Okay. And who would be making a decision

let's say on information you collect from Montgomery -- you said Montgomery County?

A.    Uh-huh.

Q.    Who would make decisions on what to do with that information that you're collecting, would that be the justices?

MR. STAHL:  Object to the form.

THE WITNESS:  Yes.  So one of the things that resulted from the collection of information on filings and the growth over time was the request for new judicial positions.  So that is something once the Court decides that that is needed, then we would advocate for new judicial positions through the legislature.

BY MR. DOUGHERTY:

Q.    And has that happened once the information you collected and shared with the justices?

A.    Yes.

Q.    Okay.  So you would think it's fair to say that a big part of the director position is collecting a lot of these statistics and information and sharing it with justices, right?

A.    Yes.

Q.    Do you remember filing an answer in this lawsuit?

A.    Yes.

Q.    Who helped prepare that answer for you?

A.    Rachel Harmon and the Offices of the Attorney General.

Q.    Anyone else assist you with that?

A.    No.

Q.    Was Ms. Harmon representing you at any point during this lawsuit?

A.    She has not represented me, no.

Q.    And you reviewed that answer before it was filed?

A.    Yes.

Q.    Along with your attorneys?

A.    Yes.

Q.    I will segue a little bit away from the Advisory Commission and talk about the Tennessee Judicial Conference Committees, which is a part of this lawsuit, you'll recall.

A.    Okay.

Q.    For simplicity purposes, I'm going to try to keep it simple and not say Advocacy Commission, just say TJC committees, if that's okay.

A.    Okay.

Q.    What is your understanding of the TJC committees?

A.    They are committees of the Judicial Conference.  We support them in the same way we do other committees, just administrative support.  So there's a staff member assigned to -- I don't want to -- I'm not certain that it's all, but most.

Q.    Right.  And is your -- what is your office responsible for?  I mean, your office is responsible for providing education for judges; is that right?

A.    Yes.

Q.    Is your office responsible for providing any kind of education to the Advisory Commission?

A.    No.

Q.    Okay.  But you would agree that judges do serve on the Advisory Commission?

A.    Yes.

Q.    And non-judges serve on the Advisory Commission?

A.    Yes.

Q.    Okay.  But with the TJC committees, are

*Veritas* TENNESSEE
(615)595-0073

there any non-judges that serve on any of those committees that you're aware of?

A.    There's a Bench Bar Committee, so there would be non-judges on that committee, but I'm not sure about others.

Q.    Yeah, and that's -- what's -- what's your understanding of what that means, "bench bar," what does that typically mean?

A.    It's for joint programming, education programming.

Q.    But --

A.    Between the bar associations and the Court.

Q.    For simplicity purposes, does bench bar mean you have some judges that are on a group and then some non-judges, attorneys, who are in the group?

A.    Yes.

Q.    And the Advisory Commission is a Bench Bar Committee -- Commission, right?

A.    In the generic sense of the term, sure.

Q.    Yeah.  Do you participate or serve on any of these TJC committees?

A.    I participate in the Executive Committee, which I think I actually serve on that

committee.  I participate with the Court Security Committee, the Weighted Caseload Committee, Trust and Confidence Committee.  I think those are the only ones I've been involved in.

Q.    Are you required by statute to be on any of those committees?

A.    No.

Q.    Okay.  Who makes the selection as to whether or not you're going to be on a committee or a commission, who makes that determination?

A.    I don't know.  I inherited all of that.

Q.    Have you ever asked Ms. Tate?

A.    No.

Q.    Do the justices make that decision?

A.    I don't think so.

Q.    Who would be making the decision?

A.    I think most likely the head of the TJC, the president of the TJC.

Q.    Who is that a chief justice of the Supreme Court?

A.    No.

Q.    Who is the head of the TJC?

A.    Currently it is Valerie Smith.

Q. Okay. Is that position elected or whatever by the people that are -- by the members?

A. By the membership.

Q. Okay. So since you've been director, how many of these various TJC meetings have you been to?

A. I would say four or five. Because most of them meet during a conference and so I will pop in.

Q. Okay.

A. Or I'm asked to join just to provide information.

Q. Does your office also help gain speakers for CLE for the judges?

A. Yes.

Q. Okay. Is that something that you're involved in or someone else in your office is involved in?

A. Someone else in my office.

Q. Is that Deputy Director Harmon?

A. I would say it's John Crawford, but I wouldn't doubt that he consults her. He's not an attorney, so I would not doubt that he would consult Deputy Harmon.

LEXITAS TENNESSEE
(615)595-0073

Q. Do you know how Mr. Crawford makes the decisions to choose certain speakers for education?

A. I don't think he chooses them, I think he might recommend to the Education Committee. There's an Education Committee for TJC.

Q. Do any of those committees of the TJC, do they make rule recommendations, court rule recommendations like the Advisory Commission?

A. No.

Q. Okay. And do you know if any of their meetings are open or closed to the public?

A. I don't know.

Q. When you say you pop in, is that -- when you say conference, are you talking about like a TBA conference that happens to be taking place at the same time as the TJC committee meetings? What do you mean by that, you pop in?

A. So I attend all of the conferences for our judicial trial courts -- State Judges Conference, the General Sessions Conference, the Municipal Judge Conference, I'll be going to that here shortly. So I'm an attendant. So if their committees are meeting, then I'll join

Veritas Legal TENNESSEE
(615)595-0073

them.

Q.   Okay.  Do you know if any of those conference meetings that the judges have had, have they ever been open to the public?

A.   Not that I'm aware of.  Those conferences are their Judicial Education Conference, so I don't believe they're open to the public.

Q.   Okay.  Is it your intention to provide -- well, are you going to provide any expert testimony in this case or be designated as an expert witness?

A.   I don't believe so.

Q.   Okay.  Do you know if Deputy Director Harmon would be doing that?

A.   I don't know.

Q.   Okay.  Do you know if any of the Tennessee Supreme Court justices will be doing that?

A.   I don't know.

Q.   Okay.

         MR. DOUGHERTY:  I'll pass the witness, Mike.

///

///

///

Lexitas   TENNESSEE
(615)595-0073

EXAMINATION

QUESTIONS BY MR. STAHL:

Q.     Just a few questions, Director Long.

       Do you personally as director of the AOC control any of the conduct related to any committee meetings that happen at the AOC?

A.     No.

Q.     Would you be able to tell a chairperson of any committee how or what to do during their meetings?

A.     No.  Our interaction with the chairs is limited to implementing what they desire.  That's our interaction with the chairs.

Q.     Has any member of your office, as far as you know, ever told a committee or a commission when or where to hold its meeting?

A.     No.

Q.     Are the commissions that are listed on the AOC website either statutorily or otherwise required to hold their meetings at the AOC?

A.     At the AOC?

Q.     (Nodding head.)

A.     I don't know the answer to that.

Q.     Okay.  You're a -- your statement earlier regarding counsel's question about public

Lexitas TENNESSEE
(615)595-0073

notices, you had mentioned 30 days was a time frame that you thought was reasonable to post a public notice if a meeting was going to be public; is that right?

A.    Well, I said I felt like that was pretty standard.  I don't know if that's reasonable.

Q.    Why would you feel like that's a standard time frame?

A.    I can only draw on my experiences with the Department of Health, and I know that our notices for boards that were meeting in the Department of Health was published in advance and it was about a 30-day notice.

Q.    Would the AOC, as far as you know, publish a public notice without permission of the committee or chairperson?

A.    No.

Q.    Who -- the information contained within a public notice, the public notices that you've seen, what kind of information is included in a public notice that you've seen?

A.    So date and time for a meeting.  I've seen -- I believe I've seen some with proposed agenda or an agenda for the meeting.  That's what I recall.

Lexitas TENNESSEE
(615)595-0073

Q. Okay. Would the AOC in any capacity control the information on public notice concerning the date and time of the meeting?

A. No.

Q. Would the AOC have the ability or in any way control the proposed agenda of the meeting?

A. No.

Q. So the information you've seen on public notices must come from someone outside the AOC?

A. Yes.

Q. And can you describe the AOC's role in publishing the notice after it gets that information?

A. So this is where I'm not sure who handles what, but I know more than likely the staff liaison for whatever body we're talking about would get that information, when is the next meeting, what's the time, date, proposed agenda, and then provide that most likely to our communications team that then posts to our website.

Q. Do you have any reason to believe that anybody within that process would change or alter that information?

A. Absolutely not.

*Veritas* MIDDLE TENNESSEE
(615)595-0073

Q.   Do you think anybody within that process has the authority to change or alter that information?

A.   No.

MR. STAHL:  That's all I have.

FURTHER EXAMINATION

QUESTIONS BY MR. DOUGHERTY:

Q.   On that line of questioning, on those public meeting notices that you've seen, is there an AOC contact person listed?

A.   I didn't make note of that.

Q.   Would there be an AOC contact person listed with e-mail and phone number if the public has a question?

A.   I don't know.  There could be.

Q.   Who would the public call if they had a question about a public meeting notice that the AOC put out?

A.   This is speculative, but I would say Barbara Peck or our web master.

Q.   They would call someone at the AOC, right?

A.   Yes.

Q.   Does the first amendment require the

Lexitas   TENNESSEE
(615)595-0073

Advisory Commission meetings to be open to the public?

MR. STAHL: Object to the form, legal conclusion.

THE WITNESS: I know that's what's argued in this case. I don't know.

BY MR. DOUGHERTY:

Q. You don't know?

A. I don't know.

MR. DOUGHERTY: I have nothing further.

MR. STAHL: Great. Do you want to review the transcript or do you want to waive signature?

MR. COKE: I'd like to review.

THE WITNESS: Okay, we'd like to review.

THE REPORTER: Did you want to order this?

MR. DOUGHERTY: Yes.

MR. STAHL: Yes, we want a copy of it.

FURTHER DEPONENT SAITH NOT

(At 12:30 p.m. CST.)

**E R R A T A   P A G E**

I, MICHELLE LONG, having read the foregoing deposition, Pages 1 through 158, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

PAGE    LINE      SHOULD HAVE BEEN

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____

_____   _____     _____


_____
MICHELLE LONG


_____
Notary Public

My Commission Expires: _____

*Lexitas TENNESSEE*
*(615)595-0073*

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF SUMNER

I, JENNY CHECUGA, Licensed Court Reporter, with offices in Nashville, Tennessee, and Registered Professional Reporter, hereby certify that I reported the foregoing deposition of MICHELLE LONG by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me.

I further certify that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

JENNY CHECUGA, LCR, RPR
Lexitas Legal
Licensed Court Reporter (TN)
Notary Public State of Tennessee

My Notary Commission Expires:  5/18/2027
LCR #690 - Expires:  6/30/2024

**$**

**$30** 132:4

**$50** 132:5,6,16,23 134:16 137:6

**1**

**1** 9:11

**10:20** 57:22

**11:35** 112:18

**11th** 13:25 14:2

**12** 76:15

**120-day** 119:22

**12:30** 158:24

**13** 132:18,19 133:17

**15** 48:10 71:24

**16-3-601** 58:6

**1990** 12:9

**1994** 12:14,20

**19th** 144:23 145:1

**1st** 9:17 16:19 76:12,13

**2**

**20** 97:5

**2000** 97:4

**2000s** 96:22

**2002** 96:24

**2017** 106:18

**2018** 106:18

**2019** 9:25

**2021** 25:8

**2022** 9:9,11,18 24:14,16 25:5,9, 11 31:22,23,25 33:7 40:12 43:5,6, 8 97:10,13,14,15, 18,23

**2023** 34:25 38:6 75:24 76:1 87:5, 16,17 89:18,21 94:15 97:8,12 98:8,9,18,22 99:14 100:6 142:2

**2030** 117:22 118:19,20,22,24

**25** 97:5

**26th** 38:18

**3**

**30** 77:8 102:13 155:1

**30-day** 155:13

**30th** 76:12

**4**

**45** 38:23

**8**

**8** 99:14

**80** 132:5 134:17 137:6

**80s** 119:7

**87** 64:7,8

**9**

**90s** 96:20,21 118:9 119:6

**99** 99:6

**9th** 13:12,14,17, 18,21 38:16,17

**A**

**ability** 8:8 50:16 89:2 105:24 111:14 156:5

**absence** 39:6,9

**Absolutely** 124:2 156:25

**accepted** 33:19, 20 34:6,9,11

**accepting** 34:15

**access** 22:25 23:7 36:23 39:16 50:7 57:12,14 75:4,6 126:9,12, 19 130:1,7 135:10,15 141:2

**accumulated** 116:15

**accurate** 33:12, 13

**actions** 96:9

**active** 48:7,9

**actively** 32:8

**activities** 17:15

**actual** 76:8

**added** 94:6

**additional** 48:13 83:18 94:3 129:10

**address** 33:16 125:3 130:6 144:12 145:14

**adjustment** 21:24

**adjustments** 20:14,24 21:12,14

**administration** 22:9,11,23 23:23 24:24,25 26:1,24 27:10 105:4,19 106:7 107:13 108:22 109:25 110:3,7,15,22 111:1,11,13,16 123:24 130:18

**administrative** 7:23 8:21 9:1,4 17:20,21 18:5 20:19 21:21 61:2 70:25 71:5 85:10, 22,23 86:2 91:22 105:4 124:10 148:6

**Administrator** 48:19

**administrators** 48:25 53:25

**admission** 12:19

**admissions** 13:4

**admitted** 12:23

**ADR** 77:11,13,21

**adult** 133:11

**advance** 76:7 77:1 102:12 131:8 155:12

**advances** 50:25

**advice** 44:24 45:3,7,10,13,14, 19,24 46:5

**advisory** 27:16, 22 36:23 51:9,10 52:8,14 56:9,15, 18 57:2,5,10 58:1, 8,12,15 59:5 60:6, 8,11,15,19,22 61:3,7,13,22,25 62:17 66:14 67:17 68:22 70:3,25 71:13,14 72:21 75:18,21 76:25 78:6 79:20 81:13 82:13 83:9 84:22 85:6,15,22 86:1,7 87:25 88:8,17 89:13 90:5,9,13 91:23 92:16 94:15,17 97:10,18 98:9,11,17 100:6 102:24 103:2 104:5 105:2,17 106:9 107:8 108:5,20,25 112:10 113:1,3,13 115:19,21 133:23 134:12 137:11,21 138:2 139:8,12 140:7 147:18 148:16,20,22 149:19 152:9 158:1

**advocacy** 129:1, 4,13,17 130:10,23 131:3 147:23

**advocate** 146:13

**advocating**

128:18 129:20 130:21

**affairs** 66:24 67:5, 13 114:22

**affect** 20:7,19

**afford** 136:5

**age** 96:19

**agencies** 24:22 115:8

**agenda** 155:24 156:6,19

**agree** 46:10,13,14 80:2,4 88:7,9 98:13 110:5 123:23 124:1,21 129:24 131:2 139:10 148:19

**agreed** 131:5

**ahead** 5:14 7:20

**aid** 126:18 129:23

**Alabama** 13:2,11 49:15,16

**Alabama's** 13:17

**alter** 156:24 157:2

**Amanda** 30:23

**amended** 43:8

**amendment** 157:25

**amount** 77:6 102:17

**analog** 51:14,18 114:14,18

**ancillary** 21:1

**annual** 49:8,9 52:22,24

**answers** 8:9

**anticipating** 14:23

**anyone's** 138:5

**AOC** 15:22 16:2,5, 9,11,15 17:15 18:1,10 19:12,14, 15 20:1,8,20,21 21:11,19 22:7,17

24:18 25:16 26:16 27:15,20 28:13 29:6,16 30:9,13, 14 32:20 35:21 36:10,21 37:6 39:7,11 40:2,16 41:2 43:19 44:24 47:20,24 48:5,15 50:13,19,23 51:4, 5,23 52:6 53:14 54:3 55:4,25 56:3 57:7,11 61:2,6,18 62:4,9,18 63:19 64:2,7 67:6,8,23 68:10 70:11 71:8, 10,21,25 72:3 73:10,15,19,23 74:2,5,9 75:8,11, 21 76:2,5,11,14 77:2,21 78:5,10, 22 81:19 83:19,21 84:16 86:2 88:1, 16,20 89:4,7,8 92:15 93:10,14 94:9 97:24 99:7 101:23 102:7 103:5,15 110:7 115:15,17,19,22 116:4,9,15,23 117:25 118:24 119:4,5,16 120:2, 11 121:3,7,10,14, 22 122:10,12 123:1,2,6 124:10, 14 125:2 126:17 128:23,25 129:17 130:23 131:10 138:2,14 139:15, 18 140:11 143:16 154:4,6,19,20,21 155:14 156:1,5,9 157:11,13,19,22

**AOC's** 27:2,5 156:11

**apologize** 13:24 26:1 85:19

**Appeals** 13:14,19 14:1 80:16,20

**appearance** 8:1

**appears** 130:25

**appellate** 21:13 30:25 56:7 60:25 73:7 114:9

**applied** 133:11

**appoint** 9:14 40:8 139:7,11,16 140:6

**appointed** 9:15 10:18,19,20 40:12 132:8,10

**appointment** 9:20

**appointments** 140:16

**appropriated** 129:7,14

**appropriateness** 25:23 26:4

**appropriation** 129:10

**approval** 131:21

**approximately** 31:25 71:24 135:3

**area** 63:12

**argue** 145:8

**argued** 158:6

**argumentative** 111:24

**Arkansas** 53:9

**arm** 49:4 124:10

**article** 131:24

**aspirational** 143:21

**aspirations** 117:21

**Assembly** 23:20 24:21 73:5 90:17, 24 91:8,12 129:8

**assess** 103:25

**assessment** 101:11

**assessments** 103:8

**assigned** 47:1 64:21 148:7

**assigning** 58:19

**assignment**

119:17

**assist** 39:1 55:24 56:18 75:12 88:17 147:7

**Assistance** 18:21 19:4

**assistant** 10:12, 17

**assisted** 96:25

**association** 6:4 11:12 135:12

**associations** 149:12

**assume** 13:3 43:14 88:5 89:5 102:3

**assuming** 54:19 70:2 82:3 88:5,22 133:15 134:15 143:10

**Atlanta** 14:3

**attend** 49:9 141:3 142:13 152:20

**attendance** 142:15

**attendant** 152:24

**attended** 49:12 91:7,12 108:24

**attends** 82:13

**attention** 62:24 66:4

**attorney** 5:11 12:4 120:15,23,25 121:4 122:20 128:7 129:9 132:2 134:17 147:6 151:24

**attorneys** 55:5 118:11 121:8 125:9 127:7 128:19 129:22 131:23 136:3 147:15 149:16

**attorneys'** 19:6

**audible** 6:17

audit 26:14

August 60:3

authority 15:2
22:19 157:2

aware 16:4 36:14,
16 37:10 41:6
43:1,14,24 51:8,
14 58:14,16,18
63:3 67:22 69:1
70:3,7 74:6 77:10
81:19 86:15
87:11,13 89:17,20
92:11 98:11,16
99:2,4,9 101:15
107:23 113:16
114:14 117:19,24
118:8,11 120:14
121:10,20 122:23
127:6 149:2 153:5

awareness
17:16,17 42:23
66:9

---

**B**

baby 103:14
104:23 115:4

back 18:8 28:8
41:11 57:21,25
112:22 113:12
119:6

bad 123:13 124:8
127:10 128:8,13
138:7,10,13

Baldwin 104:13,
17

bar 12:19 15:2
125:19 149:3,7,
12,14,20

Barbara 36:12
68:12,16 70:19
72:13 91:25 92:5
157:21

barred 12:23

based 12:10
30:15 31:13
83:14,17 103:25
139:22

basically 39:6

90:21

basis 132:3

Beautiful 49:19

began 9:25

beginning 76:10

begins 24:9

behalf 129:21

bench 149:3,7,14,
19

bids 33:25 40:16

big 146:21

Bill 119:11,24,25
120:21

bit 5:16 35:12 41:5
58:1 147:17

Bivins 59:19

BLE 71:16

board 18:8,19,23
19:9 20:6,16 63:6
71:5,13 76:24
82:19 94:23
116:18 133:25

boards 18:4,11,
13 19:18 20:15
25:18 36:4,6 57:9
58:20 64:21 65:19
66:4 71:11,14,17,
21 76:17 82:17
116:3,8 117:8
140:17,19 155:11

body 58:5 95:6
109:3 156:16

booked 63:8

booking 62:24

bosses 123:19,
20,22 124:3,5

Bowers 30:21
56:8

BPR 71:16

branch 115:11,12

branches 114:25

brand 141:24

Brandon 30:21

56:8

break 6:25 7:2,6
38:19 57:23
112:6,16,17,20

Brentwood 11:21

briefing 58:10

bringing 96:5

broad 85:17
123:25 126:2,16

broadened 34:3

brought 66:3

Buck 5:10

budget 17:24,25
19:22,23 20:4
23:10,14,15,24
24:14,15,23 25:1,
5 70:22 71:8,10,
16 85:7,16 130:16
131:1,7,14

budgetary 20:17
24:7 70:21,24
71:4 93:19

building 140:21,
22 141:5,16,20

Bulso 86:11,12,
18,23 87:2 101:1
138:12

Bulso's 138:9

burden 94:9,10,
12

burdened 144:22

business 25:7
50:17 103:6,16

---

**C**

cadence 69:1,4
70:2 134:6

calendar 31:21
63:22 64:3 67:21,
22,25 68:2,4,10,
14,18,20 72:8
74:7,16,17,23
75:23 76:3 78:25
89:12 100:6
101:21 103:13
142:2

calendering
63:16

California 54:6

call 17:16 48:4,21
53:17 55:17,18
94:10,12 117:11
157:17,22

called 5:3 48:5
63:15 129:1

calling 55:20
118:13

camera 93:1
142:21

Campbell 56:7

cancelled 99:20
101:4

candid 105:22
109:2 110:19
111:10,12

candidate 40:22,
23

candidates 95:6

candor 110:22

capable 102:4

capacity 94:4
95:18 119:15
156:1

capture 55:12

captures 74:21

care 46:20

career 14:8,12

carried 117:1,9

carry 117:8 124:4

case 13:13 32:3,4
33:17 34:1 35:7,8
36:15 41:7 54:11
55:13 69:6,17
86:16 87:3 144:18
153:10 158:6

Caseload 150:2

cases 55:9

caused 144:21

Center 5:11,14
48:24 49:5 54:4,

Lexitas     TENNESSEE     Court Center
(615)595-0073

14

centralized 27:9

certification 23:5

certify 23:3

chair 85:5,9,22
86:5,7 143:10

chairman 79:10
86:12,18,23 87:2
101:1 138:9,12,18

chairperson
154:8 155:16

chairs 154:11,13

challenges 49:25

Chancery 80:10

change 133:17,
19,20 156:23
157:2

changing 72:10
74:9

channel 89:19
90:1,6,10

channels 35:10,
13,20 41:15

Charley 104:13,
17

chart 116:22

charter 96:7,23

charts 117:6

check 26:6

Chicago 12:10
49:14

chief 9:4 16:16,
17,23,24 17:1,5,7,
11 31:2,16 32:23
33:7,15 34:7,18
35:5 59:11,14,17,
21,24 95:15,17
121:12,16 123:12
128:13,20 150:21

Children's 115:4,
6

choose 136:11,15
152:2

chooses 152:4

circle 41:11

circuit 13:12,14,
17,19,21,23,25
80:13

citation 24:1

city 145:3

civil 60:25 114:1
132:24

claims 25:21

clarified 127:24

Clarksville 145:5

CLE 18:18 19:5,
15,23 20:5,15,16
48:10 71:16
151:15

clear 6:19 49:17
85:18

clemency 96:9

clerk 31:1 56:7
73:7

clerks 29:1,11

CLES 19:6

closed 105:2,10,
18,23 106:3,10,
14,20,21,23,24
111:6 113:7 138:3
152:12

closely 115:1
126:17

closer 10:9

cognizant 72:20

Coke 7:22,25 8:3
32:25 37:5,10
40:22,24 99:11
100:20 108:11
110:16 132:9
133:6 134:20
136:9 137:7
158:15

COLA 21:15,23,
25

Collaboration
39:16

collect 144:9
145:16,18,19

146:1

collected 146:17

collecting 55:6
145:10 146:5,22

collection 55:1
146:9

Columbia 32:18

combining 96:2

comment 73:7
90:23 91:2 105:9,
12 109:10,18,20
111:14 134:9,10

commented
90:5,7

commenting
105:15,16

comments
122:23 128:14,21

commission
18:19,24 27:17,22
36:24 51:10 52:8,
14 56:10,15,19
57:2,5,10,13 58:2,
8,13,15 59:6 60:6,
8,11,15,19,22
61:3,8,13,22 62:1,
17 63:6 64:18
66:14 67:17 68:22
70:3 71:1,6 72:21
75:18,22 76:24,25
77:11,14,22 78:6
79:20 81:13
82:14,19 83:10
84:22 85:1,3,6,10,
15,22 86:1,8
87:25 88:8,17
89:14 90:6,9,13
91:23 92:17
94:15,17,24 95:2,
5 97:11,18 98:9,
12,17 100:6
102:24 103:3
104:5 105:2,17
106:9,11 107:8
108:6,21,25
112:10 113:1,13
115:19,21,25
116:18 117:19
118:9 120:17
133:23,25 134:12
137:11,21 138:3,

18 139:8,12
140:7,21 141:2,5
147:18,24 148:17,
20,23 149:19,20
150:11 152:9
154:15 158:1

commission's
117:24

commissioner
10:12,17,21

commissions
18:5,11,13 25:18
36:4,7 57:9 58:20
64:22 65:19 66:5,
8 70:14 71:12,18,
21 76:17 82:18
116:3,8 117:8
140:17,19 154:18

committee 34:18,
22 51:9 56:6
141:1 142:15
149:3,4,20,24
150:1,2,3,11
152:5,6,17 154:6,
9,15 155:16

committees
147:19,24 148:3,
4,6,25 149:2,23
150:7 152:7,25

communicate
6:15 42:20 57:1
61:20,24 62:20
91:18,21,25

communicated
42:13 92:5 97:20

communicates
117:5

communicating
72:13 85:21 86:1

communication
42:10,22 64:25
67:16

communications
36:12 39:15 68:11
79:1,4 86:4 92:1
116:20 119:5
156:20

compare 29:13

compared
127:10,13

LEXITAS TENNESSEE Court Reporting
(615)595-0073

**comparing** 72:10

**compensate** 127:14,20 130:14 134:16

**compensation** 127:6,23 128:7, 15,18 129:2,9,25 131:6,23 132:2,5, 23 135:22

**competitive** 33:25

**complaint** 43:9

**complaints** 84:18,19,20

**complete** 73:4

**completely** 124:15

**compliance** 38:2 39:1 42:5,9

**comply** 37:25 42:1,14 87:21

**computer** 29:25 93:2

**concepts** 124:1

**concluded** 15:18

**conclusion** 24:9 158:4

**conduct** 50:17 154:5

**conference** 48:19 62:10,11 63:8,9,14 64:11 70:11 147:19 148:5 151:9 152:15,16,22,23 153:3,6

**conferences** 49:6,12 152:20 153:5

**conferencing** 50:16

**Confidence** 150:3

**conflict** 62:2,5,16 133:12

**conflicted** 62:19

**conflicts** 70:18

**connects** 115:7

**considered** 71:17

**Consiglio-young** 61:11,12,16,21 62:20 66:19 67:16 78:24 79:6 81:25 82:13,24,25 83:8 84:11,13,21 85:14,20 91:11 97:21 100:17,19 102:20 104:10 114:20 117:14 138:21 140:15

**consist** 17:14

**consistent** 83:23 87:21

**consult** 85:5,9 151:25

**consults** 151:23

**contact** 157:11,13

**contained** 155:18

**content** 74:21

**context** 108:7

**continue** 84:8

**continued** 39:8

**continues** 128:10

**continuing** 18:18 19:8 48:16

**continuously** 47:10

**continuum** 55:8

**contract** 119:19, 22

**contracted** 32:21

**control** 123:8 154:5 156:2,6

**conversation** 37:9 53:24 92:14 111:10,12 119:9

**conversations** 37:11 60:14

103:17

**convicted** 15:4

**copy** 158:21

**Corporation** 32:18 33:11

**correct** 9:7,12,16, 19 12:4,5 14:16, 18 15:14 19:8 21:5,22 25:11,12, 15 27:1,2,4,7 28:2 31:24 32:13 60:6 65:8 80:10,11,14, 18,20,21,24 87:6 103:20 139:13 140:9

**COSCA** 48:23,25 49:1,23 52:11,20 53:4,7 54:15 135:6,14

**cost** 21:24 93:21

**Council** 48:24

**counsel** 7:14,22 11:11 37:5 43:21 44:3,10 45:11,17 95:23 99:7 108:11 132:11 133:13

**counsel's** 154:25

**counterparts** 48:18 53:11

**country** 50:20 128:11

**county** 29:13 145:2,4 146:2

**couple** 38:24

**court** 6:6,8,17 9:16 13:4,9,12,14, 19,22,25 14:24 17:1,19 18:1 21:13 22:9,10,13, 18,19,20 23:2,3 28:14,23,25 29:10,16 30:4,9, 25 33:23,24 36:1 37:7 38:3 42:12, 14 44:25 46:6 47:2,20 48:19,24 50:3,17 52:3 53:25 54:11 55:21,22 56:7

58:19 59:10 60:25 70:17 71:11 73:7, 13,22,24 74:1,4 79:11,17,21,24 80:2,4,7,10,16,20, 23 81:1,9,12,16 82:2,8 90:16 93:11,20 94:5,9 95:7 100:24 104:15,20 110:14 112:25 114:11 115:2 116:13,14 121:12,15,23 122:4,5,11,14 123:3,4,5,6,7 124:11,12,16,24 125:7 131:1,8 132:8,10,17 133:17,20,22 134:2,11 137:24 138:24 139:11 144:10,11,15,17 145:23 146:12 149:13 150:1,22 152:8 153:17

**courtrooms** 93:24

**courts** 8:22 20:19 22:16,21,23,24 23:4,6 28:21 29:5 30:25 31:7 32:5,9 45:11,13,15,20 49:5 50:1,7,10,11 54:5,14,17,20 60:24 80:13 83:19,21 84:1 93:10,14,21 94:1 104:24 105:5 113:15,21 114:15 115:4 118:19 125:1,3,4,5,16,18 126:3,16 132:13 136:7 144:19,21 152:21

**cover** 29:5

**Crawford** 151:22 152:1

**created** 29:2 34:23 40:4 46:12 58:5

**creating** 34:17 40:1 96:3

TENNESSEE comparing...reading (615)595-0073

credits 48:11

crime 15:4

criminal 60:24 80:16 114:4 132:7,24 133:2

crisis 126:10,11

CST 158:24

cues 6:16

curious 69:24 96:14

current 72:9

cycle 103:13

## D

D-R-E-Y-Z-E-H-N-E-R 11:1

Dalton 21:7,8 27:6 98:4,6

Dan 5:12

data 54:25 55:15 144:9

date 12:18 23:16 96:14 99:15,24 130:6 155:22 156:3,18

dates 43:14 57:6, 10 64:16 68:21,22

David 53:21

day 9:10 26:11,12, 13 47:13 94:14

days 76:7 77:1,8 102:13 155:1

DC 13:2

Debbie 119:11

Deborah 25:3

decades 96:10

December 31:25 33:8 70:6 99:25 100:1,2,9

decided 107:24 116:12

decides 146:12

decision 41:21,25 145:25 150:16,18

decisions 124:16 145:24 146:4 152:2

declaration 69:10

declarations 69:13,16

decreases 20:14

defender's 133:3, 8,12

defense 133:11

degree 12:6

degrees 12:16

delegate 42:3,8

delegated 45:2

delegating 45:6

delegation 116:25

Department 10:4, 6,11,21 11:8,9 18:10 19:16 23:22 24:23,24 26:24 27:9 43:20 96:3 130:18 155:10,12

departments 24:22 115:2,7

depending 20:5

depends 126:2

deploy 32:5

deployment 50:15

DEPONENT 158:23

deposed 6:1

deposition 5:18 15:10,21 41:6 72:18,23 86:13,15 108:8

deputy 9:22,24,25 25:13 39:5 41:4 44:20 45:12,20,25 46:4,6 47:3,18 58:16,21,23

59:15,18 60:9 61:13 67:9,13 69:9,23 86:22 90:3 94:18,22 95:23 119:12 151:21,25 153:13

describe 156:11

designated 153:10

designating 34:18

designation 71:9

designed 54:25

desire 154:12

desired 32:6

details 78:19

determination 39:25 150:12

determinations 84:10

developed 50:6

Development 39:18 96:4

dialogue 110:20

diem 26:13

diems 26:12

difficult 37:22 124:4

direct 42:8 66:22 86:4

directed 42:5

direction 22:18

director 8:24,25 9:1,3,6,9,13,21, 22,24 10:1 15:20 16:14 19:17,18 20:3,22,23 21:4 22:7 25:11,13 27:6 28:13,19 30:18 36:12 39:5, 7 40:2,18,19 41:4 43:3 44:8,20,23 45:12,20,25 46:4, 7,19 47:10,18 48:14 51:3 55:4, 25 56:8 58:16,21,

22,23 59:15,18,20 60:9,12 61:14,17 66:20,25 67:4,10, 12,13 68:11 69:9, 23 72:16,19 79:2, 5 86:22 92:1 94:18,22 98:1 104:19 110:7 119:3 120:3 121:3,22 123:2,6 138:6,14 139:15 141:14 143:22 146:21 151:5,21 153:13 154:3,4

director's 17:2 24:4

directors 40:8,13 46:24 53:14 65:2, 4 66:18 119:5,9 121:8

directs 125:7

disbanding 40:1

disciplined 15:1

discuss 18:4 44:16 49:23 65:18,21 135:5

discussed 30:8, 11,13,15,17,24 31:1,17 56:17 66:2 91:9

discussion 50:8 52:12,15 105:22, 23,25 109:2,5 122:9 137:2 138:1,4

discussions 17:22,24 19:22 21:1 93:18

display 34:15

district 6:10 144:23 145:1,12

diversity 118:3, 14

division 19:6 25:22 27:3 35:17 39:7,15,16,17 40:12 46:23 65:3 66:18,19,22,23,25

divisions 29:2

39:10,13,23 40:1,5,9 116:24 117:2

**dockets** 144:11,15,17,19

**document** 117:10

**Don** 95:22

**door** 55:10

**double** 62:24

**double-booked** 62:4,8

**double-booking** 63:2 64:11 67:17 70:9,13

**doubt** 151:23,24

**Dougherty** 5:7,10 7:19,24 8:4,5 33:4 34:14 45:23 46:3 57:24 79:18 81:6 82:7 85:2 87:23 89:3 101:6,17 102:6 104:9 107:6,19 109:8,15 110:4,24 111:5,17 112:1,9,18,21 113:22 125:13 126:8 127:17,22 128:12 130:9 131:4 132:12 133:14 134:24 136:2,14,23 137:9,15 138:19 139:2 140:1 146:15 153:21 157:8 158:7,10,20

**draft** 69:24

**drafted** 96:4,6,24 97:1

**drafts** 70:1

**draw** 155:9

**Dreyzehner** 10:24

**dual** 44:6

**due** 23:16

**duly** 5:4

**duties** 23:9 24:4 46:11 47:1,20 48:5 55:24 83:15

84:2,6,14,15 110:6 116:25 124:4

**duty** 82:20

---

**E**

---

**E-FAILING** 55:2

**E-FILE** 32:10

**E-FILING** 28:21,23 29:4 31:8 32:6 34:2 50:2 53:23,24 54:12 55:9,18 83:25 144:4,6

**e-mail** 42:9,15,16,17 52:21,25 63:20 157:14

**earlier** 103:23 113:19 116:2 154:24

**early** 96:21 97:4

**easier** 75:6,8

**east** 29:3

**easy** 75:1

**editor** 5:13

**education** 18:19,24 19:8 48:14,17 50:5 148:12,16 149:9 152:3,5,6 153:6

**effective** 22:10

**efficient** 22:10,22

**effort** 47:22

**elected** 10:18 151:1

**electronic** 29:25 47:25 63:9,13

**elevated** 41:3

**eligibility** 140:2

**eligible** 26:7 27:24 139:24

**eliminating** 117:12

**employed** 41:2

**employee** 67:9 78:23

**employees** 18:21,22 19:2,12,14 20:20,22 45:3 61:6 64:5 75:9 94:4,6 104:2

**enable** 93:24

**end** 31:21,23 33:7 60:2

**engage** 47:21 62:15

**engaged** 33:23 96:5,8 133:13

**engaging** 54:11

**English** 23:1

**ensure** 22:25 50:6,9,11 105:11 113:1

**enter** 55:9

**entered** 36:15 50:3 56:23 57:1 88:6,8 92:2,6

**entering** 8:1

**enterprise** 55:20 56:3

**entire** 22:20 24:12 96:16 123:5 129:6 144:3

**entities** 20:18

**entity** 121:17 134:3

**equipment** 93:23 94:11

**equivalent** 52:13

**escapes** 54:12

**escaping** 54:9

**established** 53:5 117:20

**estimation** 50:18

**Ethics** 120:17

**Ethridge** 104:23

**evaluate** 82:24 83:8 84:5,12

**evaluating** 82:23 103:10

**evaluation** 83:7

**evaluation's** 83:17

**evaluations** 17:4,6,9 83:4

**Evanston** 12:8

**Evette** 8:16

**evidence** 61:1 108:13 113:21,23

**exact** 96:14 118:18

**EXAMINATION** 5:6 154:1 157:7

**Examiners** 19:9 20:17

**excuse** 12:19 136:6

**execution** 96:10

**executive** 5:13 9:1 39:19 115:11 121:3 149:24

**existence** 11:17

**expanding** 33:22

**expect** 33:25

**expectation** 84:4

**expected** 83:17

**expedite** 143:23 144:2 145:10

**expedited** 144:13

**expediting** 144:8

**expense** 25:21 26:7

**expenses** 26:4,15 27:25

**experience** 14:8 47:4

**experiences** 155:9

**expert** 153:9,11

**explain** 9:13 17:8 20:2 26:3 28:16

35:23 45:8 124:5 132:7

**explained** 55:23 92:21

**explaining** 55:19

**expressed** 56:13

**extent** 27:24 42:25

**extraditions** 96:8

---

**F**

---

**F&a** 23:24 25:24, 25 26:25 27:2,8

**facilities** 10:15

**facing** 49:25 67:23 68:3,9 72:3 75:14 101:20

**fact** 6:2

**fail** 84:16

**failed** 51:17

**failure** 117:12

**fair** 14:9 21:2,3 71:23 77:6 101:11 107:7 115:9 116:7 136:3 146:20

**fairgrounds** 11:24

**fairly** 57:16

**fall** 24:11 25:8

**family** 37:24

**Farms** 11:20

**February** 9:9,11, 17 25:11 40:12 97:15

**federal** 6:7,8 13:3, 19,22 14:5 16:4, 11 22:3 51:4,8,14, 18,23 52:3,7 114:14,18 121:10, 15

**Feds** 54:16 124:18

**feeds** 68:3

**feel** 6:22 50:23 155:7

**felt** 155:5

**fewer** 135:23

**figure** 143:3

**file** 55:5

**filed** 6:5 43:5,10, 15 69:6,14,15,17, 25 147:13

**files** 97:24

**filing** 147:1

**filings** 144:24 145:13 146:10

**fill** 95:9

**final** 83:7 103:7 117:25

**Finance** 23:22 24:23,25 26:1,24 27:9 130:18

**financial** 94:8

**find** 117:6,7

**fine** 38:21,22 120:7

**finish** 14:20

**fiscal** 20:3,22 21:4 25:22 27:3,6 39:14 76:11 97:25

**five-minute** 112:17

**fix** 145:20

**Florida** 53:9

**flow** 116:22 117:6

**follow** 26:9

**foremost** 33:16

**forgetting** 19:10 39:19

**forgot** 104:22

**form** 33:1 34:10 45:21 46:1 79:15 81:4 82:6 84:24 87:19 88:24 101:2,12,25 104:7 107:3,15 108:23

109:13 110:1,16, 17 111:2,8,23 113:17 125:12,25 127:12,19 128:3 130:3,24 132:9 133:6 134:20 135:24 136:8,9,20 137:7,13 138:15, 25 139:20 146:7 158:3

**formal** 17:7 26:8 76:5

**formally** 15:1 24:10

**formed** 53:13

**formulated** 91:5

**forum** 109:4 110:21

**forward** 34:4

**frame** 155:2,8

**Francisco** 13:22

**free** 6:22

**frequently** 49:6 93:12

**Friday** 17:12,14 70:5

**friendly** 74:12,14, 19,20 75:2,4

**friends** 119:8

**fulfill** 47:11

**fulfilling** 46:18 55:24 84:2,14

**full** 8:14 26:12

**function** 22:6 60:22 79:23

**functions** 70:17 73:18 95:25 103:2 117:9

**fund** 129:6 133:10

**funding** 20:7 130:13

---

**G**

---

**gain** 151:14

**gather** 68:17

**gathering** 24:11

**gave** 15:10 33:6 41:6 86:15

**general** 7:22 23:20 24:21 44:9 45:17 63:19 69:20 73:5 80:7 85:23 90:17,24 91:8,12 122:20 125:3 129:8 135:11 147:6 152:22

**generally** 96:10 126:5

**generating** 71:15

**generic** 149:21

**Gino** 86:11

**give** 6:16 8:8 28:18 72:18 79:3 84:20 102:8

**goal** 105:10 135:21 136:1

**goals** 83:13,14,23 103:8,23,25 143:22

**good** 5:8,9 11:5 49:18 68:16 123:13 125:11,20, 23 127:10 128:8 138:7,10

**government** 11:3 32:15,18 33:11 114:25 120:18

**governor** 24:14, 19,20 25:1 95:8,9, 16,19,22,25 96:8, 13 97:6 131:20

**graduate** 12:16

**graduated** 12:9

**grand** 29:2 35:17

**great** 124:21 158:12

**ground** 5:16 8:12

**group** 19:5 52:12, 20 53:1,4,8 63:19, 22 68:18,20

116:20 122:4 123:20 135:7,14 149:15,17

**groups** 129:20

**Groupwise** 63:16,18,24,25 64:3 67:21 68:2, 13,20

**growth** 144:21 146:10

**guess** 47:5 50:3 107:7 143:9

**guideline** 26:8

**guidelines** 26:10, 16

---

**H**

---

**half** 49:11

**hand** 48:1

**handbook** 47:9, 13,14

**handled** 47:24

**handles** 156:14

**happen** 76:18 81:3 88:18 110:21 154:6

**happened** 87:12 146:16

**happening** 29:14 102:4

**Harmon** 39:5 41:5 44:5,20 46:4 69:9, 23 86:22 90:4 100:22 138:6 147:5,9 151:21,25 153:14

**Harmon's** 45:12

**head** 24:2 34:19 35:14 49:4 107:11 137:1 150:19,24 154:22

**headed** 56:6

**heading** 71:20

**headquarters** 49:3

**heads** 6:15

**Health** 10:4,7,11, 22 11:8,10 155:10,12

**healthcare** 10:15, 16

**hear** 38:4 126:6

**heard** 104:17 121:25 122:25

**hearing** 23:17,19, 21 124:25

**hearings** 91:8,13

**heavily** 144:22

**held** 14:8 49:13 64:17 97:11

**helped** 147:4

**helping** 41:20

**Hensley** 21:7,8 27:6 98:4

**hey** 143:10

**hierarchy** 117:4

**hinder** 8:8

**hinders** 110:3

**hinges** 35:6

**hire** 40:16

**hired** 40:18,24 45:6

**hiring** 44:11

**historically** 108:4

**history** 106:12, 16,19 108:2

**Hivner** 31:1 56:8, 9,22

**hold** 43:19,23 44:1,13 141:5 154:16,20

**holding** 44:16

**Holly** 16:16

**honest** 8:8

**hospital** 6:3 10:14 11:11 15:11

**hospitals** 6:2 10:15

**hosted** 78:5

**hotel** 49:20

**hour** 7:1 57:19 132:5,6,23 134:16 137:6

**hours** 7:2 48:10

**house** 50:17

**houses** 90:25

**HR** 20:23

**Hughes** 30:23

**Human** 115:5

---

**I**

---

**idea** 122:17 138:7, 10,13

**ideas** 83:22 110:11

**Illinois** 12:9

**impact** 20:21

**impediments** 31:8

**implement** 19:25 20:1 32:23 33:2 34:5

**implemented** 40:4

**implementing** 154:12

**implements** 26:22

**important** 6:14, 16 105:3

**improve** 75:5 105:3,19 107:13 108:21 109:25 110:6,14,22 111:1,18 128:15, 18

**improvement** 75:11 104:15,21 115:3

**improves** 111:10, 13,15

**improving** 32:8

**in-person** 41:23 70:10

**incentive** 103:22

**included** 22:21 155:20

**increase** 129:2,9 130:13,20 131:6 132:1,2,4 133:15 137:6 145:7

**increased** 94:4

**increases** 18:9, 12 19:12,25 20:13 134:16

**increasing** 135:21

**indication** 76:14

**indigent** 127:7 129:6 133:9,10 134:17,23,25 135:5,22 136:6

**individual** 59:3 103:24 104:1 131:3

**individuals** 25:17 30:14 64:2 81:22

**inform** 144:10

**informal** 76:6

**information** 21:17 24:12 30:18 39:17 41:19 44:17 55:12,14,21,22 56:2,14 68:15,17, 19 75:5 79:4,9,11, 12,14 81:3 82:1 108:12,17 111:15 116:11 121:18 130:17 145:11,14, 17,18,19,23 146:1,5,10,17,23 151:13 155:18,20 156:2,8,13,17,24 157:3

**informed** 52:22

**inherited** 150:13

inhibiting 32:4

injunction 36:15,
20 37:1,4,8,14,19
39:2 41:18,22
42:1,21 56:23
57:1,3 86:19,20,
24 87:3,9,12,18
88:6,8,11,13,23
92:2,6 98:14
101:10,23 102:1,
7,16 112:3,24
113:7

innovation 39:16
83:22

input 139:6,15,19,
21

inputted 29:24

inside 125:8

instance 140:14

intention 37:25
87:21 153:8

intentional
124:25 126:14

intentionality
107:17

interact 138:17

interaction
126:2,4 154:11,13

interconnectedn
ess 20:12

intergovernment
al 66:24 67:5,12
114:21 115:10

interim 83:5

interims 83:5

internal 26:16,18
40:21

internally 42:18

interpretation
23:5

interpreter 23:3

interpreters 23:4
135:13,15

interrupt 45:18

interviews 40:21

introduce 7:20

introduction
5:15

inventory 47:22

invested 94:11

investment 93:23
94:3

involve 35:25

involved 5:24
19:21 21:11 24:7
66:13 77:15 107:5
140:12 150:5
151:18,19

involvement
77:13

involving 6:2
77:21

issue 35:15 43:18
128:14 130:2,22
135:16

issued 81:7
112:25

issues 18:5 20:18
73:13 93:19
135:10 141:21

item 70:21,23,24
71:4

---

**J**

JD 12:13

Jeff 59:19

jeopardy 130:8

Jim 31:1 56:7

job 47:12 49:11
71:7 82:25 83:16
84:4,7,8 145:16,
17,18,20,21,22

John 7:22 10:24
37:5,10 40:22
100:20 108:11
140:6 151:22

join 151:12 152:25

joining 142:24

joint 149:9

Jones 8:16

Judge 152:23

judges 21:12,13
29:1 50:16 109:3
118:11 122:4,24
125:10 148:12,19
149:15 151:15
152:21 153:3

judicial 18:10
39:15,18 50:1
95:7 115:12
117:22 125:10,15,
23 126:7 144:23
145:1 146:11,14
147:19 148:4
152:21 153:6

judiciary 125:19

July 76:12,13

June 43:5,6,8
70:5 72:25 75:23,
24 76:1,12 78:12,
14,16 87:5,11,16
89:18,21 90:9
92:8 94:15 98:10,
12

justice 5:11
16:16,17,23,24
17:1,5,7,11 22:11
23:1,7 31:2,16
32:23 33:7,15
34:7 35:5 56:6
57:12,15 59:5,7,
12,14,17,19,21,24
60:2,5,15 66:12
79:17 81:14 82:9
105:4,20 106:7
107:14 108:22
109:25 110:3,7,
15,23 111:1,11,
14,16 121:16
123:12,25 126:9,
12 128:13,20
130:1,7,22 131:24
135:10 137:3
141:2 150:21

justices 30:3
34:19,21 42:20
44:14,16,25 45:4,
25 46:6 52:3 56:4
79:13 80:25 82:2
87:1 90:8 91:19,

21 107:1 121:12
123:12 124:12
125:9 130:21
131:19 133:20
134:1 137:5,10
138:23 139:7,11,
16 146:6,18,23
150:16 153:17

juvenile 60:25
114:6 125:3

---

**K**

keeping 50:24
64:16

key 21:17

keying 20:24

kind 5:15 8:6,7,11
17:18 21:1 29:2,3
36:10 41:9,10
44:17 46:9 47:4,8,
9 48:20 50:4
64:16,24 81:15
96:11 115:15
117:1 123:25
126:1 130:11
131:15,16 134:21
148:16 155:20

Kirby 16:16,17,23
59:24 128:13,20
130:22 131:24
137:3

Kleinfelter 69:21

knew 47:4

knowledge 108:4
121:9,18 142:9

Knoxville 12:12

Korean 144:3

---

**L**

Labor 96:3

lack 47:8

landscaping
141:20

language 23:2
135:15

TENNESSEE Public Service Commission
(615)595-0073

larger 123:20

late 96:21

law 12:11 14:6 19:9 20:17 90:18 129:14

lawsuit 5:12,24 6:2,5 8:2 15:6,7, 13,17 43:2 44:18 51:15,17 147:2, 10,20

lawsuits 55:6

lawyer 136:17

lawyers 18:21 19:4 109:2 127:14

lean 110:19

learn 84:18 108:10

learned 30:17 33:23 50:9 108:8

learning 50:5

leave 38:9 85:13 102:21

led 122:3

Lee 59:5,7 60:2,5, 15 66:12 81:14

left 117:15

legal 11:11 14:8 18:18,24 19:8 23:5 37:5 39:17 40:19 43:21 44:24 45:3,6,10,12,14, 19,24 46:5 48:8, 16 95:23 99:7 108:11 126:18 129:23 158:3

legislation 96:4,7

legislative 24:10 96:11 104:14 111:21 115:12

legislature 25:9 115:1 146:14

legs 57:19

lengthy 14:7

letter 44:13

level 95:7 110:21 127:15

levels 122:5 123:7

Lexis 73:8

liaison 60:18 61:7,12,17,22 63:5 64:15 65:7,9, 12 66:14 78:24 79:5,9,11,17 81:15 82:9,13,18 83:9 100:24 103:2 104:14 114:24 115:19 116:17 138:17 140:17,20 156:16

liaisons 58:19 64:12,21,25 65:1, 16,19 66:8 96:11 117:7

Liberty 5:11

licensing 15:2

licensure 10:13, 14

limited 70:16 119:19 154:12

limiting 32:9

list 46:15 52:21 66:24

listed 20:15 46:20,25 71:24 75:16 83:23 115:21 116:9 154:18 157:11,14

Listserv 52:25

literally 20:24 21:17

litigants 22:23 23:1 126:22 135:17,23 136:7

litigation 14:10, 11,12,13 43:19,23 44:1,13 135:19 143:23 144:2,8,13 145:10

lived 8:17

livestream 36:1 89:1 93:24 94:5,9

102:3

livestreamed 70:14 77:17 78:17 88:15,22 89:22 92:9,20,23 93:22 143:6,8,12,17

livestreaming 35:10,13,20 36:3 37:16,20 41:11, 14,24,25 50:21,25 70:17,20,22 87:25 89:15 92:16 93:11,15 94:1 143:1

living 21:24 120:9

Local 32:15,17 33:11

located 11:19,20, 22 32:18

location 62:3,6 141:9

locations 62:9 142:24

long 5:2 8:16 15:7 16:17 38:11 46:15 57:16,25 109:5,9 112:23 115:18 120:2,5 154:3

longer 53:22 107:25

Longs 53:8

looked 29:3,11 74:7 94:20 116:6

loss 37:23

lot 14:9 46:11 50:7,20 116:23 126:22 145:12 146:22

lots 50:4 58:11

low 129:25

lower 127:21

lowest 127:15,25 128:11

Lynch 104:19

---

**M**

made 35:5 37:18 41:21,25 85:18 101:15 103:12 109:5 113:13 124:16

main 136:19,22, 24

maintain 13:5 48:9

maintenance 141:20

major 31:9 145:3

make 14:23 16:12 19:11 26:6 29:12 31:12,15,18 32:7 33:5 37:10 38:2,5 46:19 47:23 75:6 80:3,6,9,12,15,19, 22 84:10 94:11 112:18 113:14,19 114:2 116:18 125:5 126:15 130:1 133:20 134:1 145:24 146:4 150:16 152:8 157:12

makes 24:25 39:25 133:19 150:9,11 152:1

making 39:7 88:17 99:9 124:25 130:19 145:25 150:18

male 98:6

management 32:4 33:17 34:2 35:7,8 54:12 55:13

manages 20:3

March 37:2,22 38:5,15,16,17,18, 25 70:5 87:17 112:24

Maryland 11:20

master 157:21

**materials** 130:11

**maternity** 102:21

**matter** 43:9 51:13 105:22 133:12

**matters** 137:24

**Mccaleb** 5:13 15:6

**means** 149:7

**medication** 8:6

**meet** 63:7 65:1,3, 4,15 68:24 69:11 141:8,23 142:4,5 151:9

**meeting** 17:10,11 29:10 37:21 49:10 57:6,10 62:3,6,9, 12,18,19 65:17 66:1,3,10 68:21 70:4 74:15 75:15, 17,20 76:2,7,8 77:1,20 78:2,9,11 81:12 87:6,11,16, 25 88:14,21,22 89:1,14,18,22 90:6 92:8 94:13, 15,16,21,23 98:10,12,17,21 99:13 100:3,11 101:3,4,22 102:5, 12 104:5 108:25 109:10 111:22 112:2 134:12 135:12 141:13 142:10,12,22 143:8,16 152:25 154:16 155:3,11, 22,24 156:3,6,18 157:10,18

**meeting's** 143:11

**meetings** 17:13 18:4 36:4 49:23 50:8,13 51:6,18, 24 52:4,7,12,15 62:23 64:17,20 66:2,13,17 67:18 69:2 70:10 76:15 77:16,18,22 78:6 81:3,8,17,23 82:4, 14 88:9,12 91:4 92:19 93:15 97:11,17 100:5

105:2,18,19 106:8,9 107:8,24 108:5,21 109:21 110:13,25 111:6, 18 112:2,7,11 113:4,5,9 137:11, 18,21 138:3,13 141:3,6,16 142:7 143:5 151:6 152:12,18 153:3 154:6,10,20 158:1

**member** 37:24 59:9 84:25 85:3 140:7 148:7 154:14

**members** 27:16, 22 30:23 103:8,10 116:7 118:10 125:18 139:7,12, 23 142:13 143:11 151:3

**membership** 116:14 151:4

**mentioned** 15:11 41:4 130:22 155:1

**met** 28:25 98:9 141:24

**Michael** 7:17,18

**Michelle** 5:2 8:16 53:8 61:11,12,16, 20 62:20 66:19 67:16 78:24 79:6 81:25 82:12,24,25 83:8 84:10,13,21 85:14,20 91:11 97:20 100:17,18 102:19 104:10 114:20 117:13 138:21 140:14

**Michigan** 53:9

**mid** 96:20 118:9 119:6

**mid-year** 49:10

**middle** 6:10 29:4 134:22

**Mike** 153:22

**mimics** 26:19

**mind** 53:6 144:23

**minutes** 38:23

**misstates** 101:13 109:14

**modernizing** 50:3

**moment** 23:8 46:10

**Monday** 65:5 66:2,13,17

**money** 93:21 128:1,2 129:7,13 136:17

**moneys** 129:11

**monitors** 19:6

**Montgomery** 145:2,3 146:2

**month** 37:23,24 43:10 74:24,25 76:16

**monthly** 49:8

**months** 76:15 83:6

**morning** 5:8,9 58:3

**motions** 118:7

**mouth** 99:19 124:7

**move** 34:3 63:10 83:18,20,25 84:1, 3

**moves** 83:21

**Municipal** 152:23

---
**N**
---

**named** 59:4

**names** 58:11 95:8 115:24 116:19

**Nashville** 8:19 12:1,2 78:7

**National** 49:5 54:4,14

**navigate** 75:1,6

**ne** 45:5

**necessarily** 65:25 136:12

**needed** 31:8 32:7 34:3 110:22 146:13

**needle** 83:19,20, 21,25 84:1,3

**negative** 126:3,6

**neglected** 66:23

**nod** 6:15

**nodding** 35:14 107:11 154:22

**non-judges** 148:22 149:1,4,16

**nonprofit** 11:15, 17

**normal** 25:6

**Northwestern** 12:8

**note** 157:12

**notes** 29:8,9,12, 15,17,18,20 30:3, 7,8,10,16

**notice** 8:1 40:20 43:19 75:23 76:2 77:2,7,9 78:12,14, 16,20 87:6 88:21 89:11 94:14,23 101:24 102:8,11, 17 104:5 141:19 143:16 155:3,13, 15,19,21 156:2,12 157:18

**noticed** 99:1,2,5 101:16,18

**notices** 74:15 75:15,17,21 76:7 77:21,25 78:10 94:16,22 155:1, 11,19 156:9 157:10

**November** 23:18

**number** 41:15 157:14

**numbers** 131:18

Lexitas TENNESSEE materials numbers
(615)595-0073

## O

**oath** 7:9 69:10

**object** 32:25 33:1 34:10 45:21 46:1 79:15 81:4 82:6 84:24 87:19 88:24 101:2,12,25 104:7 107:3,15 108:23 109:13 110:1,16, 17 111:2,8,23 113:17 125:12,25 127:12,19 128:3 130:3,24 132:9 133:6 134:20 135:24 136:8,9,20 137:7,13,20,23,25 138:15,25 139:20 146:7 158:3

**objection** 137:17

**objectives** 83:14 104:1

**obligation** 46:18 47:11

**obligations** 84:3, 14 116:25

**observe** 89:2,17, 21

**observed** 87:5 89:13 95:11

**observing** 41:23, 24

**occasion** 65:21

**occur** 83:17

**October** 9:25 141:12

**offer** 36:22

**offers** 28:23

**office** 7:23 8:21 12:10 15:22 20:8, 19 21:11,19,20 25:16 27:15 28:1, 6,11 29:6,22 32:21 35:23,25 36:3,21 38:8 41:16 50:24 51:23 52:7 56:21 57:7, 11 73:19 78:7

88:1,16,20 89:10 90:4 96:16 99:5 121:22 124:14 129:5,18,22 130:12 133:3,8,12 138:2 139:18,22 140:5,11 148:11, 15 151:14,18,20 154:14

**officer** 9:4

**offices** 50:13,19 147:5

**official** 65:10 91:1

**one's** 84:2

**ongoing** 134:6,8

**online** 55:6

**open** 50:10,11,13 51:5,20,24 52:4,8, 15 87:16 88:9,14, 23 105:2,10 106:3,10,13,16 107:8,12,13,21,24 108:6,9,13,18,20 109:4 110:13,20 111:18,20 112:2, 7,11,13 113:2 137:11,17,21,24 138:3,13 141:16 142:7,11,16 152:12 153:4,7 158:1

**operates** 22:17 123:1

**operation** 28:14

**opinion** 105:6 106:2 109:6 122:2,8,17,19,20 123:9 124:9 138:5,8,9

**opportunity** 54:10 105:9,12 140:15

**opposed** 137:5, 10

**order** 19:24 21:16 37:10 38:1,3 42:6, 12,14,24 58:19,24 59:2,4 60:17 73:14 81:11,15 82:3 87:22 105:21

116:14 137:25 158:18

**orders** 73:19 81:7

**organization** 48:22 49:2 135:7

**organizational** 46:22

**organizations** 14:17

**outcomes** 104:2 106:4,6 111:11

**outlines** 24:3

**overcome** 31:9

**overloaded** 144:11

**oversee** 36:10 50:13

**overseeing** 27:15,21

**oversees** 41:16 104:13,14

**oversight** 33:24 34:17 56:6 140:25 141:22

## P

**p.m.** 158:24

**PACER** 54:16,17, 18,20,22,24

**package** 72:25 73:3,4 90:22 91:9, 13,19

**paid** 120:18 136:4

**Paige** 32:23 33:7

**pandemic** 50:4,6, 19 93:12,15,16 141:11,15

**paper** 30:6

**parole** 96:9

**part** 23:9 24:3 37:13 39:4 44:23 53:4 71:7,8 73:23 74:18 75:14 83:15 91:15,16 105:13

106:1 109:3 110:5 128:25 133:5,22 134:12 135:21 142:12 146:21 147:20

**participant** 143:7

**participate** 48:17 52:25 149:22,24 150:1

**participation** 20:25

**parties** 15:15

**parts** 46:24 131:3

**party** 15:7,12

**pass** 129:14 153:21

**passed** 90:25

**past** 81:16,23 82:4 107:9 108:18 144:22

**pay** 103:9,18 136:17

**paychecks** 21:16

**paying** 128:10

**payment** 25:24 136:5

**payments** 25:17

**pays** 21:18

**PDS** 129:22

**Peck** 36:13 68:12, 14,16 70:19 72:13 91:25 92:5,15,24 157:21

**people** 6:15 53:16 65:2 104:25 115:24 125:8 129:24 134:17 136:4,11,15 151:2

**perceive** 122:25

**perceived** 125:18

**perceives** 125:22

**percent** 99:6

**percentage** 26:13 132:3

perception 123:8 126:4

performance 17:5 82:25 103:9, 13,19,24,25 104:3

performing 84:6

period 9:23 10:5 38:9 91:2 109:10, 20 119:20 134:5

periodic 17:4 64:20

permission 155:15

person 7:20 36:22 53:21 78:17 79:3 82:5 85:25 89:14 102:2 103:24 104:22 119:2,3 140:12 157:11,13

person's 10:23 21:6 30:20 98:3 104:18

personal 103:17

personally 137:20 154:4

pertaining 47:19

philosophically 124:9

phone 53:17 157:14

phonetic 144:4

physical 30:6,24 141:8

physically 30:9 93:1 116:16 130:15 142:17

pick 6:18 53:17 117:15

place 37:19 40:6,7 49:18,19 55:5 68:16 76:16 78:3, 4 81:8,13,17,24 82:4 83:4 89:23 98:21 106:5 115:7 125:5 152:17

places 116:12 144:20

Plaintiff 5:12

plan 72:11 83:24 103:12,24

planning 103:7

plans 104:1

play 50:12

pleadings 51:12 58:10 69:5,7 72:24 92:12 114:17 118:6

pleasure 121:15 123:2,12

plumbing 141:21

point 7:1 13:6 49:17 59:8,12 67:4 79:3 88:12 90:17,23 91:3,13 106:13,15 107:9, 10 108:5,8,14,18 118:6 131:19 143:13 147:10

points 117:12

policies 26:17,22

policy 26:18,19, 20,21 77:5

pop 151:10 152:14,18

population 144:21 145:7

portion 24:19 71:11

position 8:23 9:8, 13,14 10:10,18,20 11:13 22:6 40:22 45:5 46:18 47:17 59:25 65:10 81:23 84:16 115:14 120:19 123:11 130:7 146:21 151:1

positions 14:9 146:11,14

positive 126:5,20

possibly 79:7

138:22

post 50:4 73:19 87:2 89:5,11 93:12,15 98:13 155:2

posted 73:6,14,15 74:17

posting 68:19

postponed 99:21,22,24 100:11,16 101:5,8

posts 156:20

postsecondary 12:15

potential 64:11

practice 27:17,23 47:16 51:11 56:10 57:6 58:2 60:23 71:1 80:1 113:20 114:12

practices 51:5 117:17

practicing 12:4

practitioners 10:16

pre 87:2 93:16

predated 119:6

predates 106:17 108:1

predecessor 24:15 25:2 120:1

preliminary 36:14,20 37:1,3,7, 13,19 39:2 41:18, 22 42:21 56:23,25 86:19,20 87:3,9, 12,18 88:6,7,11, 13,23 92:2,6 98:13 112:3,24

preparation 86:13

prepare 72:22 147:4

prepared 7:11

preparing 85:6 108:7

present 23:24 131:7

presents 63:3

president 11:10 150:20

pretty 77:8 125:19,23 155:5

previous 86:23 119:5,9 121:7

previously 32:21 34:5 107:21

primarily 14:15

prior 9:20 10:2,3 11:7,9 16:22 67:4 86:19 88:23 112:3,8 113:6

priorities 17:25 18:2

private 11:13,14 118:10 133:13

pro 126:22 135:18,23 136:7, 11,16

probation 96:9

problem 64:13 99:10 126:13

problematic 109:4

procedure 27:18, 23 56:11 57:6 58:3 60:24 71:2 79:25 113:20 114:1,4,6,9

procedures 113:16 117:11,17

proceedings 36:1

process 17:24 19:13 23:13 24:7 28:22 29:10 31:10 33:21 40:17 44:11 72:9,12 76:17 90:20 93:25 105:8,13 106:1,5, 23 111:19,21 117:10 128:17 131:15 139:19

TENNESSEE COURT REPORTING
(615)595-0073

156:23 157:1

**processed** 25:8

**processes** 22:10 28:20 117:11 125:5 145:10

**processing** 25:24

**produce** 55:16

**product** 64:1

**Professional** 18:20,23 20:6,16

**program** 18:22 19:4 103:22 104:15,21

**programming** 149:9,10

**programs** 22:25 23:3 115:3 125:2 126:14

**promote** 106:6

**promulgated** 132:21

**proper** 102:8,11

**properly** 99:1,2,5 101:16,18,24 104:4

**proposals** 131:7

**proposed** 132:1 155:23 156:6,18

**provide** 22:8,15 34:1 36:3 44:24 45:3,14,19,24 46:5 57:6,10 79:10,11,14 126:19 151:12 153:8,9 156:19

**provided** 37:3 130:17

**providing** 35:25 128:9 148:12,15

**public** 23:19 36:5 37:20 41:23 51:20,25 52:4,9, 16 67:23 68:1,3,9 70:15 72:3 74:15, 23 75:2,3,8,12,14,

15,17,20 76:1,6 77:1,2,7,17,20,22 78:9,11 87:6,17 88:14,16,21 89:11 90:23 91:2 92:9 94:13,16,21,23 101:20,21,24 102:8,12 105:3,9, 11,16,18 106:6 109:6,9,17,20 110:14,21 111:13, 15 113:2 125:22 126:1 128:21 133:3,7,11 134:9, 10 137:12,22 141:17,19 142:8, 11,12,13,20,23 143:5,7,8,15 152:12 153:4,7 154:25 155:3,4, 15,19,21 156:2,8 157:10,15,17,18 158:2

**public's** 89:2 105:24

**publicly** 73:14 93:15

**publish** 40:20 155:15

**published** 91:1 155:12

**publishing** 156:12

**purely** 55:2

**purpose** 22:6 26:23 105:16

**purposes** 15:20 16:8 147:22 149:14

**pursuant** 21:14 137:24

**put** 40:16 47:16 77:2 78:20 82:3 88:20 90:22 99:18 116:13 117:20 124:7 134:8,10,18 157:19

**puts** 76:6 116:11, 16 134:21

**putting** 78:25

131:18

---

### Q

**qualify** 48:16

**quarterly** 68:24 69:8,11 70:2 100:3

**question** 6:14,21 7:3,5 14:21 20:10 31:11 67:20 68:5 88:3 105:14 112:5,16 142:18 143:2 154:25 157:15,18

**questioning** 57:16 157:9

**questions** 5:7 6:20 7:12 154:2,3 157:8

**quick** 35:24 50:14

**quiz** 39:21

---

### R

**Rachel** 39:5 44:5 100:22 147:5

**rank** 104:2

**rapidly** 32:5

**rate** 127:20 128:11 132:5 134:15 137:6

**rates** 129:9 130:20

**reach** 53:3,20 126:15,19

**reached** 53:22 54:15

**read** 114:17

**real** 35:24

**realty** 123:3

**reappointment** 139:24

**rearrange** 63:11

**reason** 66:16 74:8

87:15 101:8 108:17 136:18,19, 22,25 156:22

**reasonable** 155:2,6

**reasons** 136:11, 15

**recall** 5:23 6:13 10:5,23 11:25 13:9 15:15,17 18:7,16 23:16 31:20 34:23 37:11 38:14 44:2 49:13 53:15 58:24 67:15 69:12 78:1,15 92:18 95:11,14 96:15 102:18 116:4 118:20,24 119:2 120:3 135:20 141:1,13 147:20 155:25

**receive** 18:14,16

**received** 42:24

**receiving** 81:1

**recent** 72:25

**recently** 18:7,9 95:13 128:14,21 131:24

**recommend** 60:23 152:5

**recommendation** 31:13 33:6,22 34:8 95:9

**recommendation s** 19:11 25:1 31:15, 18 32:2,3,24 33:14 34:9,12,16 35:4 79:24 80:3,6, 9,12,15,19,22 81:2 90:14,15 91:4 113:14,19 114:2 122:1 134:13 152:8,9

**recommended** 121:21

**record** 8:15 57:25 112:22 127:1

**records** 28:3,6,9 29:6 62:22,23,25

Case 3:22-cv-00439 Document 61-4 Filed 11/08/22 Page 177 of 182 PageID #: 1598

**refer** 9:6 15:21 16:1,8,11 49:7 58:7,12

**reference** 16:12

**referenced** 46:9 60:18 81:14

**referencing** 59:3

**referred** 9:4

**referring** 23:25 24:18 27:8 103:15 118:17 122:8

**reform** 96:6

**regard** 68:17 122:7

**registration** 52:22,24

**regular** 141:6

**regularly** 65:4

**regulation** 10:13

**reimbursement** 25:17 26:4,11 27:15,21,25 28:4

**reimbursements** 97:23

**related** 72:21 154:5

**relates** 144:14

**relationship** 53:5,10 121:11

**relationships** 53:13

**relative** 18:8 28:19,20 79:25

**release** 128:20

**relevant** 44:18

**reliable** 55:16

**relied** 38:1,25

**remember** 9:10 54:8 78:16 92:14 96:20 99:15 135:14 147:1

**remotely** 50:17

**repeat** 27:19 46:2

**repeating** 53:6

**rephrase** 65:16 73:25 87:14

**report** 55:15 104:25 117:25 118:1,4,14,24 121:20,25 122:6

**reporter** 6:17 14:24 158:18

**reporting** 54:25 55:7

**reports** 55:16 117:21

**repository** 55:15

**represent** 5:12 135:17 136:4

**representation** 127:8,15 128:9,10 129:7 133:9,10 134:23 135:1,6,22

**represented** 7:14 125:6 147:11

**representing** 122:5 134:17 147:9

**request** 23:15 131:1 146:11

**requests** 27:16, 21 28:4 130:16

**require** 101:23 102:2,7 133:16 157:25

**required** 23:10 24:8 36:21,22 39:23 47:23 127:3 143:22 150:6 154:20

**requirement** 121:2

**requires** 23:23 102:16 110:10

**requiring** 123:10

**rescheduled** 99:3

**resolve** 62:5,15

**resolved** 70:19

**resources** 39:15 50:15 70:16

**respect** 20:18 34:7 36:20 50:25 51:5 61:21 70:10 71:11 74:14 121:11

**responsibilities** 46:12 47:21 48:6 83:16 84:7,15

**responsibility** 18:20,23 20:6,16 22:22 36:9 82:21 85:13 104:4 110:6 116:17

**responsible** 20:23 24:13 25:16 27:14,20 46:24 68:19 70:20 78:23 85:21 103:10 122:10,13 123:4, 24 148:11,12,15

**responsive** 123:7 125:1

**responsiveness** 14:19

**restate** 6:22

**resulted** 146:9

**results** 109:5

**retired** 60:2 120:13

**returned** 38:17

**revamped** 54:23

**revenue** 71:15

**review** 25:22 33:24 47:19 69:13,19 72:6,17 75:14,16 78:18 108:12 158:13,15, 17

**reviewed** 69:16, 24 72:2,15,24 92:13 108:16 147:12

**reviewing** 51:12

**reviews** 83:6

**revisions** 103:12

**reward** 104:2

**RFP** 54:11

**Roberts** 121:16

**robust** 55:13

**Roger** 16:24 31:2, 16 59:21

**role** 22:6 25:10 44:6,9,23 45:10, 12,20,25 46:6 48:14 51:3 58:15 61:21,25 65:11, 18,22 66:14 67:5 72:16,19 83:9 84:22 91:16,17 94:18,22 95:21 96:12 119:3 120:1 133:4 144:1 156:11

**roles** 96:1

**room** 62:12 63:8, 14 69:20 70:11 93:1 142:18,19,21 143:5

**rooms** 62:10 63:10 64:11

**roughly** 97:5

**rounds** 40:20

**rule** 60:23 79:25 80:3,6,9,12,15,19, 22 90:13,14 110:20 113:14 114:2 132:17,19, 21 133:16,17 134:13 152:8

**rulemaking** 110:14,25 111:19

**rules** 5:16 8:12 27:17,22 36:23,24 51:10 56:10 57:5 58:2 60:25 71:1, 13 72:21,25 73:3 79:25 80:2 90:19, 22 91:8,13,19 108:25 113:2,20, 21,23 114:1,4,6,9, 11,15 133:22

134:2,11

## S

**safe** 104:23 115:4

**SAITH** 158:23

**salary** 18:9,12,14,
17 19:12,21,25
20:13,24 21:12,14

**San** 13:21

**Sarah** 56:7

**schedule** 100:15

**scheduled** 62:13,
18 66:10 99:25
100:10 101:22

**schedules** 63:9,
14

**scheduling** 62:2

**school** 12:7,11
96:5,7,23

**seamlessly** 39:8

**search** 74:22,24

**section** 116:3

**security** 50:2
150:2

**segue** 147:17

**selection** 150:9

**send** 42:16 69:23
95:8

**senior** 11:10

**sense** 85:17
149:21

**separate** 74:5
121:17,22 124:15

**September** 16:19
59:24 70:5 98:17,
22 99:14,16,20
100:16 101:4
102:5 104:6

**serve** 64:18
65:12,20 82:17
95:15,18 116:8
119:15 120:2
121:15 123:11
133:4 139:12

**served** 95:22
115:18 119:3

**serves** 61:7
79:20,22,23
116:12 123:2

**services** 25:22
27:4 30:18 36:1
39:14,17,18 40:19
115:4,5,6

**serving** 25:18
39:6 44:6 47:3
139:23 142:11

**session** 24:10

**sessions** 80:7
93:11,20 94:5,9
125:3 152:22

**set** 81:12 83:13
109:22 121:11

**setting** 145:9

**shaking** 137:1

**shape** 54:24

**share** 29:15 30:3,
7

**shared** 29:17,18
30:5,9 44:13 56:2,
13 146:17

**sharing** 41:19
130:10 146:23

**Sharon** 59:5

**short** 57:23
112:20

**shortly** 43:17
152:24

**show** 21:16

**showing** 78:10

**sic** 54:2

**side** 133:2 143:4

**signature** 158:14

**signed** 59:2

**significant** 37:23

**similar** 51:9 53:8
81:13 114:15

**simple** 147:23

**simplicity** 16:7
147:22 149:14

**single** 117:12

**sir** 8:13 12:17
15:25

**sits** 13:21

**sitting** 142:19
143:4

**situation** 76:14
124:14

**situational** 17:16
42:23 65:23 66:9

**skip** 74:25

**skipped** 41:9

**Slate** 54:2

**Slayton** 53:21

**slower** 144:18

**Smith** 140:7
150:25

**societies** 126:18
129:23

**soft** 50:15

**speak** 37:6 54:10

**speakers** 151:14
152:2

**speaking** 71:10

**special** 53:10

**specific** 9:10
16:12 28:18 64:21
67:15 91:15

**specifically**
102:23 137:3

**speculative**
157:20

**spell** 10:25

**spoke** 56:22
86:23 131:24

**spoken** 52:2,6
90:8 102:19,23
103:1,5

**spring** 34:24

**square** 5:14
134:22

**Stacy** 104:19

**staff** 82:18 95:15,
17 104:22 138:17
148:7 156:15

**Stahl** 7:17,18 33:1
34:10 45:21 46:1
57:18,21 79:15
81:4 82:6 84:24
87:19 88:24
101:2,12,25 104:7
107:3,15 108:23
109:13 110:1,17
111:2,8,23 112:4,
15,19 113:17
125:12,25 127:12,
19 128:3 130:3,24
135:24 136:8,20
137:13 138:15,25
139:20 146:7
154:2 157:5
158:3,12,21

**stand** 19:3 21:23

**standard** 77:8
102:15 155:6,7

**standing** 17:10,
11,13

**standpoint** 72:4
74:21 128:6,8

**stands** 48:23

**start** 9:8 24:6
30:13 35:24

**started** 5:15
14:11 67:9,13
97:15 141:12

**starting** 47:17

**starts** 55:9

**state** 6:6 8:14
11:3,13 14:9,15
15:2 18:14,17,20,
22 19:2 21:13
22:2 26:19,20,22
27:12 28:14,21
29:1,4 34:2,4
48:19,24 49:5,25
53:25 54:2,5,10,
14 96:6 115:8

126:10,13,21,23
127:16,18,21,23
132:13 135:11
144:4 152:21

**state's** 32:4

**statement** 154:24

**statements** 6:17

**states** 12:24 13:1,
8,12 48:18 52:18
53:3,12,23
127:11,14 134:22,
25

**statistical** 144:9

**statistics** 145:17
146:22

**status** 48:8,9

**statute** 9:3,5
21:15 23:23,25
24:3,8 26:17,20
39:23 46:10,12,
20,25 47:16,22
69:2 96:23 110:10
121:5 123:1,10
127:4 132:15
140:2 150:6

**statutes** 47:19

**statutorily**
154:19

**statutory** 55:24

**stay** 14:12

**Stephanie** 104:23

**steps** 25:9 31:11
38:1

**stick** 102:14

**sticks** 53:19

**stipulation** 7:3

**strategic** 83:24
103:7,12

**street** 11:25

**stretch** 57:18
83:14

**strike** 31:11 52:18

**structure** 46:23

**struggling** 88:3

**studied** 51:4

**study** 28:14 144:4

**submit** 23:10,14
24:8,22

**submits** 24:20

**submitted** 23:15,
17 24:15,18 25:4,
7,21,24 26:5 73:4
131:20

**submitting** 24:13

**successful** 40:23

**sufficient** 109:7,
11,24

**suggest** 105:15

**suggested**
121:21

**suggesting**
84:12

**summarize** 31:4

**Sundquist** 95:25
96:13 97:6

**Sundquist's**
95:22

**supervision** 21:9
64:6

**supervisor**
16:14,18,22 17:2

**support** 21:21
22:8,12,15 45:15
61:3 70:25 71:5
79:23 82:18
85:10,23 86:2
91:22 145:22
148:5,7

**supported** 96:11

**suppose** 79:10
85:24 126:4
136:18

**supposed** 78:2
98:16 99:13 100:3

**supreme** 9:15
13:9,12 17:1 22:9,
13,18,19 30:4
44:25 46:6 52:3
58:18 59:9 73:13,
22,24 74:1,4

79:21,24 80:4,23
81:1,9,12,16 82:2,
8 90:15 100:23
121:12,23 122:4,
11,13 123:3,4,5
124:11,12,15,24
125:6 132:17
133:17,19,22
134:2,11 138:24
139:11 150:22
153:17

**survey** 28:13,24
30:15,25 31:13
33:12 34:12 35:15
110:10

**surveying** 28:22

**surveys** 29:7

**swath** 129:24

**sworn** 5:4

**system** 21:17
22:20 28:14
29:16,25 30:9
32:4,8 33:17 34:1
35:7,8 37:7 47:25
54:11,16,17,18,
21,22 55:2,14,21,
23 56:3 63:9,13,
17,21,23 64:3
67:21 68:2,10,14
117:22 122:5
123:5 125:11,15,
20,23,24 126:7
127:6 128:16

**systems** 29:11
50:3

---

**T**

---

**table** 7:4 125:9
129:21

**takeaway** 31:5,6
34:12

**takeaways** 30:24
31:1,9,12

**taking** 89:23
152:16

**talk** 5:16 17:25
23:7 35:12 41:5
55:3 58:6 73:1
78:14 86:18

109:17 113:11
114:11 124:8
126:6 138:17
147:18

**talked** 18:11
35:16 51:22 58:1
70:8 86:12 87:1
103:11,14,23
108:2 116:2

**talking** 13:18
17:18 32:11 35:9
38:5 41:10,12
48:20 63:18 66:8
68:6,8 81:8
112:10 113:3
118:4,13,15
123:22 129:25
131:9,11,22
140:10,11 142:2
152:15 156:16

**TAOC** 15:22

**tasked** 47:19

**Tate** 25:3 119:11,
12 120:2,25 121:6
150:14

**Tate's** 25:13
119:25

**TBA** 129:20
152:16

**TCA** 58:6

**team** 30:23 38:2
39:1,4 41:20 42:7
43:20 56:25 65:17
91:16 92:4,15,25
103:8,10 104:12,
16 156:20

**teams** 29:2

**Tech** 141:22

**technological**
50:24

**technology**
28:20 30:18 32:12
33:12,24 34:17,22
39:17 41:10 50:21
51:1 56:5,14,18,
22 140:25

**temporary**
119:17

TENNESSEE state of the art temporary i15
(615)595-0073

ten 5:22 14:14 15:11 57:15

Tennessee 6:3,5, 8,11 7:23 8:19,21 9:15 10:3,6,11 11:7,9,11,21 12:12,21 15:10 16:9 17:1 18:21 19:4 22:2,8,11,12, 18,19 32:19 46:5 48:8 50:23 51:10 52:14 54:16,20 55:4 73:22,24 74:1,4 79:20,24 80:3,7,10,13,16, 20,23,25 81:9,12, 16 82:2,8 89:18 90:1 93:10,14 95:16,19 96:6 105:5 117:22 118:10,19 120:18 121:23 122:13,20 123:3,4,5 124:11, 15,24 125:6,10, 15,18,23 126:7, 10,13,15,21,23 127:7 132:13 134:19 135:1 139:11 147:19 153:17

Tennessee's 127:18

term 22:2,3,4 28:23 96:16,18 149:21

terms 19:11 20:7 37:19 51:24 74:21 78:25 96:17 105:24 123:16 127:23 139:22

testified 5:4 69:10

testimony 101:13 102:13 109:14,17 153:10

thing 118:16 123:13,14 124:21 125:11 126:20

things 26:14 39:8 46:19 50:5 65:23 74:22 83:13,15, 18,24 84:17 126:7

144:1 146:9

thinks 138:7,10

thought 43:6,8 118:2 138:12 155:2

tied 103:22

time 6:22 9:23 10:5 24:11,12 36:25 38:9 43:4, 22 44:12 62:13 63:7 69:3 72:2 74:10 96:2 107:5 119:20 122:10,23 144:25 146:10 152:17 155:1,8,22 156:3,18

times 83:3 105:21 116:13 141:23,25 142:1

title 9:2 67:3 114:21

titles 104:20

TJC 147:24 148:2, 25 149:23 150:19, 20,24 151:6 152:6,7,17

TLAP 18:21 19:1, 3 20:17 71:16

today 5:19 7:9 8:9,12 15:24 16:8 72:18 92:13 109:23 112:2

told 121:14 143:12 154:15

tools 144:12

top 24:2

topic 53:25 129:19

topics 49:22 50:1, 2,12 66:7

touches 115:11

track 64:16 126:25 127:2

training 47:9,12 48:14 49:7

transcript 6:18

158:13

transitioning 44:9

transmitted 90:15,16,24

transparency 110:25

transparent 111:4,7,12

travel 26:10,11

treatment 8:7

trial 95:2,3,4,7 122:24 125:4 152:21

trouble 123:21

trust 117:7 150:3

truthful 8:8

truthfully 7:12

type 26:8 43:18 48:13

types 49:22 66:7

typically 23:14 24:6 68:25 70:4 88:1 141:23 149:8

——————

**U**

——————

Uh-huh 85:4 131:13,17 146:3

ultimately 55:1

unaware 93:17

undergraduate 12:6

understand 6:21 7:8 8:11 15:23 19:20 20:9,11 24:20 27:5 29:11 33:5 53:7 65:6 85:18 101:19 105:25 106:12 108:3 109:18 116:24 117:4 118:5 124:6,8 133:4 142:17,22 145:16

understanding 16:25 17:3 22:5 35:19,22 36:19 41:13 60:21 65:8 79:19 82:12 87:15 90:12,19,21 98:20,24 99:17,23 101:7 106:9,16, 19,23 112:12,23 113:6,24 122:12, 15 133:10 148:2 149:7

understood 42:11 109:19

undertake 133:8

uniform 34:1 55:13

uniformity 31:7

United 13:8,11

University 12:8, 12

unsuccessful 97:2

update 42:25 74:10

updates 17:15, 18,19,22 18:4

user 74:12,14,18, 20 75:2,4

utilize 63:11

——————

**V**

——————

vacancies 95:7, 10

vacancy 95:2,4

Valerie 150:25

vendor 32:7,11, 12,14,16,17,20 33:10,17 34:8 35:4

vendors 53:23

verbal 6:17 32:2, 24 33:6,14 34:8 35:3 42:10,11

verbally 31:17,19

**versus** 15:6

**vets** 95:6

**vice** 11:10

**video** 50:16

**view** 34:3 37:21 55:8 68:1 128:6,8

**viewed** 51:18

**violation** 101:9

**virtual** 36:23 37:14,15,20 41:12,14

**virtually** 37:21

**vis-a-vis** 123:6

**Vision** 118:18

### W

**waive** 158:13

**wanted** 73:25 118:7 128:15

**warehouse** 55:15

**watched** 89:25

**water** 49:20

**ways** 143:23 144:8

**web** 157:21

**Webinar** 141:9

**website** 36:10,11 67:23 71:20,25 72:3,7,10,12,15 73:10,12,16,20, 22,23,24 74:2,5,9, 18 75:7,11,15,21 76:2 77:21 78:10 79:1 81:20 94:17 115:22,25 116:4, 9,16,19 117:25 118:25 128:23 143:16 154:19 156:21

**week** 38:16,17,18 116:6

**weekly** 17:6,9 18:4

**weeks** 38:12,13, 24

**weigh** 140:5,16

**Weighted** 150:2

**west** 29:3

**Westlaw** 73:8

**When's** 72:2

**wide** 63:22 129:24

**widely** 22:3,4

**window** 11:5

**wise** 106:20 127:1

**wondering** 47:7, 15

**word** 34:5 47:8 99:22

**words** 99:18 122:4 124:7

**work** 8:20 10:2 11:6 19:13 32:7 34:19 38:17 40:17 59:7 93:25 115:11 117:7 120:11 126:17 134:7 144:18 145:13

**worked** 9:17 10:3 11:10,22

**Workforce** 96:3

**working** 6:3 11:3 13:10 67:9 115:3, 5 117:16 120:16

**works** 24:21 65:13 92:25 93:5, 8 115:1

**worried** 43:13

**worse** 130:2,4

**worst** 127:18,23

**writing** 31:18 117:17 122:7 130:19

**written** 117:16 130:11,15

**wrong** 13:24 65:8 104:20

### Y

**year** 12:7,13,19 16:20,21 19:7 21:15 23:10 31:21 34:24 37:2 38:6 48:11 49:11 74:25 76:11 83:3 100:7 117:22 118:19 134:6 141:23 142:2

**year-long** 131:15

**years** 5:22 8:18 10:8,9 14:14 15:12 96:12,14 97:2,5 117:20 118:12 120:4

**yesterday** 72:5, 16 74:8 77:24

**Young** 119:11,24, 25 120:5,21 121:7

**Youtube** 35:10, 13,20 41:14 51:19 89:19 90:1,6,10

### Z

**Zoom** 50:15,21,25 141:9,10 142:6

**Zoomed** 142:20

*LEXITAS* **TENNESSEE**
*(615)595-0073*