IN THE UNITED STATES DISTRICT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DAN McCALEB, Executive Editor of THE CENTER SQUARE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:22-cv-00439 |
| | ) | Judge Richardson |
| MICHELLE LONG, in her official capacity as DIRECTOR of the TENNESSEE ADMINISTRATIVE OFFICE OF THE COURTS, | ) ) ) ) ) | Magistrate Judge Frensley |
| Defendant. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Michelle Long, in her official capacity as Director of the Tennessee Administrative Office of the Courts, has moved for summary judgment on the claims alleged by Plaintiff, Dan McCaleb. Defendant submits this memorandum of law in support of her motion. There is no genuine dispute as to any material fact and for the reasons discussed below, Defendant is entitled to judgment as a matter of law on Plaintiff's claims.

Plaintiff cannot establish that he has a First Amendment right of access to the meetings of the Tennessee Advisory Commission on the Rules of Practice & Procedure ("Advisory Commission") and to committee meetings of the Tennessee Judicial Conference ("Judicial Conference"). Plaintiff's claims rely on the "experience and logic" test set out in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), but this test does not apply to meetings of judicial commissions and judicial conferences. Even if it did, application of the test would weigh

against finding a constitutional right of access to meetings of the Advisory Commission and Judicial Conference.

## BACKGROUND

### A. The Advisory Commission

The Tennessee General Assembly created the Advisory Commission, "whose members shall be appointed by the supreme court and whose duty shall be to advise the supreme court from time to time respecting the rules of practice and procedure." Tenn. Code Ann. § 16-3-601(a). The purpose of the Advisory Commission is to discuss rule proposals and make recommendations of possible changes to the Supreme Court. (Ex. 1 ("Consiglio-Young Dep."), at 53-54.) The Tennessee Administrative Office of the Courts ("AOC") provides administrative support to the Advisory Commission. (Consiglio-Young Dep., at 20-21.)

A proposed rule recommendation can come from a number of sources: a member of the Advisory Commission; a legislator; a judge; an attorney; and even a member of the public. (Consiglio-Young Dep., at 68; Ex. 2 ("Wiseman Dep."), at 29.) After considering a proposed rule change, the Advisory Commission votes on the proposal. If approved, the AOC's liaison to the Advisory Commission sends the recommendation to the Tennessee Supreme Court. (Ex. 3 ("Bulso Dep."), at 32; Consiglio-Young Dep., at 55-56.) The Tennessee Supreme Court then decides whether to move forward on a rule proposal, including making its own revisions to the proposed rule; the Supreme Court can make any such changes without consulting the Advisory Commission. (Consiglio-Young Dep., at 56-57, 61; Wiseman Dep., at 31-32, 53.) After deciding on a proposed rule, the Supreme Court will publicize it for public comment for at least 60 days. (Consiglio-Young Dep., at 56-57.) Once the comment period ends, the Supreme Court takes the comments into consideration before filing an order of proposed rules that are then transmitted to the General

Assembly. (*Id.* at 57-58.) The proposed rules do not go into effect unless affirmatively approved by the General Assembly. (Wiseman Dep., at 53.)

Advisory Commission members understand their meetings to be closed to the public. (Wiseman Dep., at 66; Bulso Dep., at 27, 29, 78.) Closed meetings operate in the Advisory Commission's best interest to provide for honest and frank discussions among its members. (Bulso Dep., at 78-79.) Discussions among Advisory Commission members on proposed rule changes can involve sensitive information, and confidential meetings allow members a certain level of candor that would be diminished if the meetings were open to the public. (Wiseman Dep., at 48, 67; Ex. 4 ("Long Dep."), at 111; Ex. 7 ("Wiseman Declaration and Report"), at 4-6.)

### B. The Judicial Conference

The General Assembly also created the Judicial Conference, "whose membership shall consist of all judges of courts of records whose salary is paid in whole or in part out of the state treasury, including retired judges." Tenn. Code Ann. § 17-3-101(a). The Judicial Conference is required to "meet annually for the consideration of any and all matters pertaining to the discharge of the official duties and obligations of its several members, to the end that there shall be a more prompt and efficient administration of justice in the courts of this state." Tenn. Code Ann. § 17-3-104(a). The AOC provides administrative support to the Judicial Conference. (Long Dep., at 148.) As part of that support, the AOC provides educational sessions to the Judicial Conference. (Ex. 6 ("Harmon Dep."), at 118.) The Judicial Conference meets three times a year, and all three meetings involve judicial education. (*Id.* at 118, 121.) Unlike the Advisory Commission, the Judicial Conference does not make recommendations for changes to the rules of practice and procedure. (*Id.* at 128.) The Judicial Conference's meetings are closed to the public. (*Id.* at 136.)

C.  **Plaintiff's lawsuit.**

Plaintiff, an Illinois resident, serves as Executive Editor of The Center Square news organization. (Ex. 5 ("McCaleb Dep."), at 9, 19.) At some point, Plaintiff saw a policy statement from Defendant regarding the closure of the Judicial Conference to the public because of security and safety concerns for its members. (*Id.* at 12-13.) In searching the AOC website, Plaintiff became suspicious as to why Advisory Commission meetings were not publicly noticed. (*Id.* at 14-15.) During his search, Plaintiff learned that the federal rules advisory committee had open meetings. (*Id.* at 16-17.) Plaintiff's search for Advisory Commission notices began and ended with searching the website; he did not attempt to contact a member of the AOC to find public notices. (*Id.* at 18, 36.)

Plaintiff filed suit against the Defendant on June 13, 2022, under 42 U.S.C. § 1983. (D.E. 1 at PageID# 1.) Plaintiff filed an amended complaint on June 30, 2022. (D.E. 19 at PageID# 131.) Plaintiff's claims alleged a violation of his First Amendment right of access to the meetings of the Advisory Commission and the Judicial Conference. (*Id.* at PageID## 144-48, ¶¶ 71-93.)

This Court granted in part Plaintiff's motion for a preliminary injunction on March 22, 2023. (D.E. 40 at PageID## 1102-04.) The Court enjoined Defendant from holding future meetings of the Advisory Commission without providing the public with access by either livestreaming or in-person attendance, unless circumstances justified closure. (D.E. 40 at PageID# 1103.) The parties have engaged in discovery, which is now closed pursuant to the Court's most recent scheduling order, and Defendant's motion for summary judgment is now properly before the Court.

## STANDARD OF REVIEW

Summary judgment is appropriate when a party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, the non-moving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). The non-moving party "must do more than show that there is some metaphysical doubt as to the material facts;" rather, it must "present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment." *Id.* A fact is "material" if it might affect the outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a reasonable juror could not return a verdict for the non-movant, the Court should grant summary judgment. *Id.* at 251-52.

## ARGUMENT

**Plaintiff Has No Constitutional Right to Attend the Meetings of the Advisory Commission or Judicial Conference.**

Plaintiff cannot establish that he has a First Amendment right of access to meetings of the Advisory Commission or the Judicial Conference. *First*, while Plaintiff's claims rely on the "experience and logic" test set out in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980),[1] this test does not apply to meetings of judicial commissions or judicial conferences. *Second*, application of the *Richmond Newspapers* test would in any event weigh *against* finding a constitutional right of access to meetings of the Advisory Commission and Judicial Conference.

---

[1] (D.E. 1, PageID## 145-46.) *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986).

### A. The Supreme Court's decision in *Houchins v. KQED, Inc.*—not *Richmond Newspapers*—governs Plaintiff's claims.

The First Amendment, as applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I; *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749-50 n.1 (1976). By its terms, the First Amendment "bars a state from 'abridging' oral expression (the freedom of 'speech') or written expression (the freedom of the 'press')." *Lichtenstein v. Hargett*, 83 F.4th 575, 582 (6th Cir. 2023). From these provisions, the Supreme Court has determined that "news gathering" also qualifies for First Amendment protection, allowing persons "to seek news from any source by means within the law." *Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972). Further, the Sixth Circuit "has recognized a general First Amendment right to gather information in public settings." *Hils v. Davis*, 52 F.4th 997, 1002 (6th Cir. 2022).

The right to gather information, however, "does not require others to give it away or require governments to open up all ongoing proceedings to the public." *Id.* "Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality opinion); *see id.* at 16 ("The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government, nor do they guarantee the press any basic right of access superior to that of the public generally.") (Stewart, J., concurring). Nor does the Constitution "impose[] upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834 (1974). The public and press can be constitutionally excluded, for example, from accessing grand-jury proceedings, attending the Supreme Court's

6

Case 3:22-cv-00439    Document 72    Filed 12/15/23    Page 6 of 18 PageID #: 1937

conferences, attending the meetings of official bodies gathered in executive session, attending the meetings of private organizations, accessing the scenes of a crime or disaster, travelling to foreign countries to gather news, and illegally entering the White House. *Branzburg*, 408 U.S. at 684-85; *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965).

In evaluating a First Amendment right-of-access claim, *Houchins* "sets the baseline principle." *Phillips v. DeWine*, 841 F.3d 405, 418 (6th Cir. 2016). As the Constitution "is neither a Freedom of Information Act nor an Official Secrets Act," *Houchins*, 438 U.S. at 14, "the First Amendment right to gather information from the government usually extends as far as the government has opened its doors to the public and press," *Hils*, 52 F.4th at 1003. And unless "the political branches decree otherwise, as they are free to do," the media has no "special right of access" to government information that is "different from or greater than that accorded the public generally." *Houchins*, 438 U.S. at 15-16; *see also Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999) (citing *Houchins* to conclude that "California could decide not to give out arrestee information at all without violating the First Amendment").

Under *Houchins*, then, Plaintiff's right of access to meetings of the Advisory Commission and the Judicial Conference depends on whether the State of Tennessee "has opened its doors to the public and press" to allow attendance. *Hils*, 52 F.4th at 1003. It has not—the State has closed the meetings of the Advisory Commission and the Judicial Conference to both the press and public. (Wiseman Dep., at 66; Bulso Dep., at 27, 29, 78; Harmon Dep., at 136.); *see Houchins*, 438 U.S. at 15-16. Plaintiff therefore has no right of access to the Advisory Commission and Judicial Conference meetings, and his claims fail as a matter of law.

There is a "modest exception" to *Houchins*' baseline rule, *Hils*, 52 F.4th at 1002, but that exception does not apply here. Starting with *Richmond Newspapers*, "the Supreme Court has

recognized a right of access to certain criminal proceedings and the documents filed in those proceedings." *Phillips*, 841 F.3d at 418. *Richmond Newspapers* used an "experience and logic" test to determine whether "a qualified First Amendment right of public access attaches." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986) ("*Press-Enterprise II*"). Application of this "experience and logic" test, however, has been limited to adjudicatory, or quasi-adjudicatory, proceedings. *See Hils*, 52 F.4th at 1002-03 (noting that the right to access government information applies in "limited settings").

In *Richmond Newspapers* itself, for example, the Supreme Court concluded that the press and public have a qualified First Amendment right to access criminal trials. 448 U.S. at 580; *see Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 609-11 (1982). In *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"), the Court applied the test to voir dire examination of potential jurors in criminal proceedings. 464 U.S. at 503, 510-13. And in *Press-Enterprise II*, the test was applied to a preliminary hearing in a criminal prosecution. 478 U.S. at 10-13.

The Sixth Circuit has found this right of access to apply also to civil trials, plea agreements, and deportation proceedings, and while such proceedings are not all criminal, they are adjudicatory or quasi-adjudicatory in nature. *See Phillips*, 841 F.3d at 418; *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 694-710 (6th Cir. 2002). The Sixth Circuit has also applied the *Richmond Newspapers* test to determine whether there was a right of access to university disciplinary proceedings. *Phillips*, 841 F.3d at 418; *see United States v. Miami Univ.*, 294 F.3d 797, 821-24 (6th Cir. 2002) (no First Amendment right to access university disciplinary proceedings). But again, a university disciplinary proceeding is at least *quasi*-adjudicatory. *See Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585 (E.D. Va. 2018) (university disciplinary hearing run by an adjudicator).

8

Meetings of the Advisory Commission and the Judicial Conference are not adjudicatory or quasi-adjudicatory. (Consiglio-Young Dep., at 53-54; Harmon Dep., at 128.) Consequently, the *Richmond Newspapers* test has no application in this context. Indeed, applying that test to non-adjudicatory or non-quasi-adjudicatory proceedings would "represent a significant—and unwarranted—expansion of the right of access under the First Amendment as developed by the Supreme Court and [the Sixth Circuit's] prior decisions" and "disregard the general applicability of *Houchins*." *Phillips*, 841 F.3d at 419-20; *see also Ctr. for Nat'l Security Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 935 (D.C. Cir. 2003) ("[T]o the extent the Supreme Court has addressed the constitutional right of access to information outside the criminal trial context, the Court has applied the general rule of *Houchins*, not *Richmond Newspapers*.").

Defendant acknowledges, as this Court previously observed (D.E. 39, PageID# 1096), that the Sixth Circuit stated in *In re Search of Fair Fin.*, 692 F.3d 424 (6th Cir. 2012), that courts have applied the "experience and logic" test "in a wide variety of other contexts." 692 F.3d at 429. But four years later, in *Philips v. DeWine*, 841 F.3d 405, the Sixth Circuit disavowed that statement, noting that that *Fair Fin.*'s "pronouncement was dicta." 841 F.3d at 418. Furthermore, while *Fair Fin.* ultimately relied on a Third Circuit decision for the proposition that the test applies to "municipal planning meetings," 629 F.3d at 429,[2] that decision, too, has since been disavowed. In *N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002), the Third Circuit concluded that the cited language in *Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180-81 (3d Cir. 1999), was both "misleading" and "dicta," because the issue in that case was whether a citizen had a right to videotape the township's planning commission meeting—not whether the

---

[2] *In re Search of Fair Fin.* cited *Detroit Free Press*, 303 F.3d at 695, which, in turn, relied on the Third Circuit's decision in *Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180-81 (3d Cir. 1999).

9

citizen had a right of access to the meeting since "the *access* [was] guaranteed by state law." *N. Jersey Media Grp., Inc.*, 308 F.3d at 214; *see also Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 546 & n.6 (D. Vt. 2014) (noting that "the Third Circuit later observed that its conclusion that there was a 'constitutional right of access to the Planning Commission meeting' was dicta and refused to follow it").

Defendant also acknowledges that the Sixth Circuit's decision in *Detroit Free Press* questioned *Houchins*' validity. *Detroit Free Press*, 303 F.3d at 694-95. However, the Sixth Circuit has since "treated *Houchins* as good law . . . which, of course, it is, having never been overruled by the Supreme Court." *Phillips*, 841 F.3d at 418. And the Supreme Court itself relied on *Houchins* three years before *Detroit Free Press* was decided. *See United Reporting Publ'g Corp.*, 528 U.S. at 40. Moreover, even after *Detroit Free Press*, both the Supreme Court and the Sixth Circuit have continued to rely on *Houchins*' general rule. *See McBurney v. Young*, 569 U.S. 221, 232 (2013); *Hils*, 52 F.4th at 1003; *Phillips*, 841 F.3d at 418-20. All of this compels the conclusion that *Houchins*—not *Richmond Newspapers*—controls here. And under *Houchins*, Plaintiff cannot establish that he has a First Amendment right of access to the meetings of the Advisory Commission or the Judicial Conference.

### B. Plaintiff's claims fail under the *Richmond Newspapers* test.

Even if the *Richmond Newspapers* "experience and logic" test were applied, though, Plaintiff's claims would still fail. Under the "experience" prong, a court considers "whether the place and process ha[s] historically been open to the press and general public." *Press-Enterprise II*, 478 U.S. at 8. For the "logic" prong, courts consider "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* If the qualified right of access attaches, it can be overcome only "by an overriding interest based on findings that closure

is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510.

Plaintiff cannot satisfy either prong. He cannot show an "unbroken, uncontradicted history" of public access to meetings of the Advisory Commission or Judicial Conference. *Richmond Newspapers*, 448 U.S. at 573. Nor can he show that public access would play a "significant positive role" in such meetings.

1. **Plaintiff cannot satisfy the "experience" prong of the test.**

Plaintiff cannot point to any specific facts showing that Advisory Commission or Judicial Conference meetings "have historically been open to the press and general public." *Press-Enterprise II*, 478 U.S. at 8; *see Chao*, 285 F.3d at 424. Historically, there was no common-law right to attend government meetings. *See Cyr*, 60 F. Supp. 3d at 545-46 (concluding that there was no First Amendment right of access to a school board meeting); *Soc'y of Prof. Journalists v. Sec'y of Labor*, 616 F. Supp. 569, 572 (D. Utah 1985) (determining that the public had "no common-law right to attend meetings of government bodies"); *Abood v. League of Women Voters*, 743 P.2d 333, 340 (Alaska 1987) (noting that "the legislative bodies of Colonial America" carried on "the tradition of the English Parliament" to "hold legislative debate in secret and to prohibit publication of legislative proceedings"); *Mayhew v. Wilder*, 46 S.W.3d 760, 777 (Tenn. Ct. App. 2001) (finding that the historical record showed that public access "to local legislative bodies required state action to secure it"); *see also Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1171 (3d Cir. 1986) (holding that "decisions as to how much governmental information must be disclosed in order to make democracy work historically have been regarded as political decisions to be made by the people and their elected representatives"); *cf. Richmond Newspapers*, 448 U.S.

at 564-73 (tracing the origins of criminal trials in the United States to a point "beyond reliable historical records").

Furthermore, as recently as 2018, among the 35 States with court-rule advisory committees, "[a]t least twenty-one states either d[id] not typically open their meetings to the public or d[id] not routinely give notice to the public of upcoming meetings." Zachary D. Clopton, *Making State Civil Procedure*, 104 Cornell L. Rev. 1, 35 (2018); *see also id.* at 64, Appendix Table B (noting that rules advisory commission meetings in Alabama, Alaska, Delaware, Hawaii, Indiana, Massachusetts, Mississippi, New Jersey, Pennsylvania, South Carolina, and Virginia "are not open to the public"). In short, different state sovereigns have made different policy decisions about whether to open advisory-commission meetings to the public. There is no consensus on the openness of these meetings to trigger a constitutional dictate forbidding their closure.

Plaintiff has alleged that the *federal* rules advisory committee is the "quintessential equivalent" to the Advisory Commission and that the federal committee's open meetings satisfies the experience test. (D.E. 19, PageID## 145-46, ¶¶ 79-83.) And this Court previously concluded that Plaintiff was likely to succeed in establishing a right of access to Advisory Commission meetings because he was likely to succeed in establishing a right of access to federal rules advisory committee meetings. (D.E. 39, PageID# 1099.) But reliance on the federal practice is misplaced, for three reasons.

*First* and foremost, "the 'experience' test . . . does not look to the particular practice of any one jurisdiction, but instead 'to the experience in that type or kind of hearing throughout the United States.'" *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150-51 (1993) (quoting *Rivera-Puig v. Garcia-Rosario*, 983 F.2d 311, 323 (1st Cir. 1992) (emphasis omitted)). For example, in *Press Enterprise II*, the Supreme Court found an "established and widespread tradition of open

preliminary hearings *among the States*." *Id.* (emphasis added). As noted above, no such tradition exists in the context of rules advisory commission meetings. (*Supra*, at 11-12.)

*Second*, the federal meetings were not always open. Congress opened the meetings of the federal advisory committee by statute in 1988. *See* 28 U.S.C. § 2073(c)(1). Previously, however, that committee "worked out of the public eye" for its "first fifty years of federal rulemaking." Richard D. Freer, *The Continuing Gloom About Federal Judicial Rulemaking*, 107 Nw. U. L. Rev. 447, 460 (2013); *see also* Linda S. Mullenix, *Hope Over Experience: Mandatory Informal Discovery and the Politics of Rulemaking*, 69 N.C.L. Rev. 795, 830-33 (1991) (noting the criticisms of the federal rule committee's "closed nature of the rulemaking process" prior to Congress opening the meetings by statute). It was not until the passage of the Judicial Improvements and Access to Justice Act that the federal courts' advisory committees were obligated to be open to the public. PL 100-702 (Nov. 19, 1988).

So, not only can Plaintiff not demonstrate an unbroken history of public access to court-rule advisory-commission meetings throughout the United States, but the federal committee Plaintiff says is the "quintessential equivalent" to the Advisory Commission *also* has a checkered past of open and closed meetings. Without a "near uniform practice of state and federal" open meetings at court rules advisory commission meetings to rely on, Plaintiff fails the "experience" test. *See Press-Enterprise II*, 478 U.S. at 10-11.

*Third* and finally, relying on federal policy dictated by Congress to impose federal *constitutional* mandates on the States would be fraught with federalism peril. The United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. In other words, the Tenth Amendment provides that "what is not conferred, is

withheld, and belongs to the state authorities." *New York v. United States*, 505 U.S. 144, 156 (1992) (interior quotation marks omitted). Thus, "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *Id*. at 166.

Usually, federalism concerns arise when Congress has specifically commanded the States to obey certain federal acts and the question becomes whether Congress was authorized to do so under the Constitution. *Id*. at 160. And even then, federal courts have sometimes found that Congress lacked such intrusive authority. *See*, *e.g.*, *id.* at 176, 188; *United States v. Morrison*, 529 U.S. 598, 613 (2000); *United States v. Lopez*, 514 U.S. 549, 567-68 (1995).

But here, Plaintiff's position gives rise to an even greater federalism concern. He is essentially claiming that States must follow the *policy* choice enacted by the Congress *for the federal government*, when Congress itself did not command that the States follow suit. Plaintiff expressly relies on the federal statute, 28 U.S.C. § 2073(c)(1), (D.E. 19, PageID## 137-41, 146-47), but that statute applies only to United States courts—not State courts. For this reason as well, then, this Cout should decline to rely on federal practice in determining whether Plaintiff can satisfy the "experience" prong of the *Richmond Newspapers* test. And Plaintiff has *no* evidence to indicate that such a tradition exists for meetings akin to Judicial Conference meetings held for educational purposes. Plaintiff fails to satisfy the "experience" prong.

    **2. Plaintiff cannot satisfy the "logic" prong of the test.**

      **a. Advisory Commission meetings do not satisfy the "logic" prong.**

Nor can Plaintiff point to any specific facts showing that "public access plays a significant positive role in the functioning of" Advisory Commission meetings. *Press-Enterprise II*, 478 U.S. at 9. As an initial matter, court rules of procedure "are based on the assumption that litigation is normally conducted by lawyers." *McNeil v. United States*, 508 U.S. 106, 113 (1993). Open

meetings of the Advisory Commission would serve no purpose for the majority of the public at large.

Further, the rules-adoption procedure already includes an opportunity for public comment (Consiglio-Young Dep., at 56-58), and access to the Advisory Commission meetings would not give the public any additional rights to comment on rule proposals. Once the Advisory Commission submits its proposed rule revisions, the Tennessee Supreme Court can accept the proposals or provide its own revisions before publishing them for public comment. (Wiseman Dep., at 53.) And once the rule proposals are submitted to the General Assembly, they do not become effective unless approved by Tennesseans' representatives in the legislature. (*Id*.); *see* Tenn. Const. art. 2, § 3 (providing that the General Assembly's authority is "dependent on the people"). Thus, the public already possesses the right to participation under *both* the public-comment period *and* the legislative-phase of the rules process. (Long Dep., at 105.) Providing public access to the Advisory Commission meetings would simply not result in a "particularly significant positive role" in the functioning of the process. *Press-Enterprise II*, 478 U.S. at 11; (Long Dep., at 105).

Additionally, there are significant policy reasons why Advisory Commission meetings should be closed. "[H]aving confidential meetings brings a certain level of candor to the meeting that is—is diminished by having meetings be public." (Wiseman Dep., at 48.) "[T]here are times when in order to have candid discussion of a matter, there is a need to have that discussion be closed." (Long Dep, at 105.) Just as appellate judges, for example, value private, candid discussion before reaching a decision, and just as high executives rely on candid discussion with their advisors before making a decision, so too can Advisory Commission members properly rely on closed meetings to foster "frank and candid" discussions. (Wiseman Declaration and Report at

15

4-6; *see also* Wiseman Dep., at 48, 67; Long Dep., at 111; Bulso Dep., at 78-79); *Branzburg*, 408 U.S. at 684-85; *Zemel*, 381 U.S. at 16-17. "Freedom to brainstorm and to raise and deliberate bad ideas is often a key component to identifying and honing good ideas." (Wiseman Declaration and Report, at 5.) Based on the undisputed material facts, Plaintiff cannot demonstrate the "logic" prong as to Advisory Commission meetings.

### b. Judicial Conference meetings do not satisfy the "logic" prong.

Nor does logic dictate that Judicial Conference meetings be open to the public. The Conference's purpose is to provide education to Tennessee's current and retired judiciary; it does not make court-rule recommendations. (Harmon Dep., at 121, 128.) Plaintiff cannot demonstrate that public attendance at the Judicial Conference would play any positive role, let alone a "particularly significant" one, regarding education sessions for Tennessee's judiciary. *See Press-Enterprise II*, 478 U.S. at 11.

For all these reasons, even if the *Richmond Newspapers* test applies, Plaintiff cannot establish that he has a First Amendment right of access to meetings of the Advisory Commission or Judicial Conference.

# CONCLUSION

For the reasons stated, the Court should grant Defendant's motion for summary judgment and vacate the preliminary injunction.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

s/ Andrew C. Coulam
ANDREW C. COULAM
Deputy Attorney General
Public Interest Division
P.O. Box 20207
Nashville, Tennessee 37202
615-741-1868
andrew.coulam@ag.tn.gov
B.P.R. No. 30731


s/ Michael Stahl
MICHAEL M. STAHL
Senior Assistant Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207
615-253-5463
michael.stahl@ag.tn.gov
B.P.R. No. 032381

s/ Robert W. Wilson
ROBERT W. WILSON
Senior Assistant Attorney General
40 South Main Street, Suite 1014
Memphis, Tennessee 38103
901-543-9031
robert.wilson@ag.tn.gov
B.P.R. No. 34492

*Counsel for Defendant Michelle Long*
*in her official capacity as Director of the*
*Tennessee Administrative Office of the Courts*

**CERTIFICATE OF SERVICE**

      I, Robert W. Wilson, counsel for Defendant Michelle Long, hereby certify that a copy of the foregoing memorandum of law, is being served electronically via the Court's ECF/ECM service on December 15, 2023, upon the following:

| | |
|---|---|
| M.E. Buck Dougherty, III (a/k/a Buck Dougherty) bdougherty@libertyjusticecenter.org *Counsel for Plaintiff Dan McCaleb* | James J. McQuaid jmcquaid@libertyjusticecenter.org *Counsel for Plaintiff Dan McCaleb* |
| Michael Matthew Stahl Michael.Stahl@ag.tn.gov *Counsel for Defendant Michelle Long* | Andrew Craig Coulam Andrew.Coulam@ag.tn.gov *Counsel for Defendant Michelle Long* |
| Donna L. Green Donna.Green@ag.tn.gov *Counsel for the Tennessee Supreme Court* | |

                                                  s/ Robert W. Wilson
                                                  Robert W. Wilson
                                                  Senior Assistant Attorney General
                                                *Counsel for Defendant Michelle Long*