# EXHIBIT 1

1          IN THE UNITED STATES DISTRICT FOR
           THE MIDDLE DISTRICT OF TENNESSEE
2               NASHVILLE DIVISION

3
_____

DAN MCCALEB, Executive Editor
4 of THE CENTER SQUARE,

5        Plaintiff,

6 vs.                 Case No. 3:22-cv-00439

7 MICHELLE LONG, in her official
  capacity as DIRECTOR of the
8 TENNESSEE ADMINISTRATIVE OFFICE
  OF THE COURTS,
9
        Defendant.
10
_____

11

12

13

14

15      Deposition of:

16      MICHELLE CONSIGLIO-YOUNG

17      Taken on behalf of the Plaintiff
        November 16, 2023
18
      Commencing at 9:24 a.m. CST
19

20

21

22

23
_____

24             Lexitas Legal
       Michelle Cessna, LCR, RPR
25           (615)595-0073

```
 1

 2

 3              A  P  P  E  A  R  A  N  C  E  S

 4

 5

    For the Plaintiff:
 6
            MR. M. E. BUCK DOUGHERTY, III
 7          Attorney at Law
            Liberty Justice Center
 8          440 N. Wells Street, Suite 200
            Chicago, IL 60654
 9          (312)637-2280
            bdougherty@libertyjusticecenter.org
10

11

12
    For the Defendant:
13
            MR. MICHAEL M. STAHL
14          Attorney at Law
            Office of the Attorney General
15          PO Box 20207
            Nashville, TN 37202-0207
16          (615)741-3491
            michael.stahl@ag.tn.gov
17

18

19
    For the Administrative Office of the Courts:
20
            MR. JOHN COKE
21          Attorney at Law
            Administrative Office of the Courts
22          511 Union Street, Suite 600
            Nashville, TN 37219
23          john.coke@tncourts.gov

24

25
```

*LexitasTENNESSEE*
*(615)595-0073*

```
 1

 2

 3

 4                      I  N  D  E  X
                                                    Page
 5    Examination
      By Mr. Dougherty                                  5
 6
      Examination
 7    By Mr. Stahl                                     73

 8    Examination
      By Mr. Dougherty                                 81
 9

10

11

12                E  X  H  I  B  I  T  S

13

14                   (None offered.)

15

16

17

18

19

20

21

22

23

24

25
```

```
1          S T I P U L A T I O N S

2

3

4          The deposition of MICHELLE CONSIGLIO-YOUNG

5   was taken by counsel for the Plaintiff, at the

6   offices of 500 Charlotte Avenue, Nashville,

7   Tennessee, on November 16, 2023, for all purposes

8   under the Tennessee Rules of Civil Procedure.

9          All formalities as to caption, notice,

10  statement of appearance, et cetera, are waived.  All

11  objections, except as to the form of the questions,

12  are reserved to the hearing, and that said deposition

13  may be read and used in evidence in said cause of

14  action in any trial thereon or any proceeding herein.

15          It is agreed that MICHELLE CESSNA, LCR, RPR,

16  and Court Reporter for the State of Tennessee, may

17  swear the witness, and that the reading and signing

18  of the completed deposition by the witness are

19  waived.

20

21

22

23

24

25
```

LexitasLegal.com/Premier   TENNESSEE   Lexitas
(615)595-0073

```
 1                    *   *   *

 2             MICHELLE CONSIGLIO-YOUNG,

 3   was called as a witness, and having first been

 4   duly sworn, testified as follows:

 5

 6                 EXAMINATION

 7   QUESTIONS BY MR. DOUGHERTY:

 8   Q.    Good morning.

 9   A.    Good morning.

10   Q.    Can you please state your name for the

11   record?

12   A.    Sure, my name is Michelle

13   Consiglio-Young.

14   Q.    And have you ever had your deposition

15   taken before today?

16   A.    No.

17   Q.    Okay.  And do you understand that you're

18   under oath?

19   A.    Yes, sir.

20   Q.    Okay.  And you're prepared to answer the

21   questions that I ask of you today?

22   A.    Yes, sir.

23   Q.    Are you represented by counsel?

24   A.    I am represented by the Attorney

25   General's Office and our general counsel.
```

1    Q.    Okay.  And I know that we have Mr. Stahl.

2    If you want to share his name on the record.

3    A.    Oh, John Coke, our general counsel for

4    the Administrative Office of the Courts.

5    Q.    Thank you.  And I probably should have

6    mentioned that, you know, it's really important

7    when you're giving a deposition that we -- we

8    all get in habits, I do it myself, where we nod

9    or give nonverbal kind of nodding our heads, so

10   it's important that we give verbal statements

11   so she can pick up everything.  Okay?

12   A.    I understand.

13   Q.    And, you know, any time you need to take

14   a break, we can do that.  I don't anticipate

15   this going, you know, all day, probably not.

16   Half a day at the most.  But if you do need a

17   break, we can take it at any time.  The only

18   stipulation or caveat I would have is if I've

19   already asked a question that you go ahead and

20   answer it first before we take a break --

21   A.    Sure.

22   Q.    -- okay?

23   A.    That's fine.

24   Q.    All right.  Where do you work?

25   A.    I work at the Administrative Office of

```
 1    the Courts.

 2    Q.    And what is your position at the AOC?

 3    A.    I am a division director of the

 4    Intergovernmental Affairs Division within the

 5    Administrative Office of the Courts.

 6    Q.    And can you explain a little bit about

 7    the Intergovernmental Affairs Division, what do

 8    they do?

 9    A.    Sure.  I oversee several programs within

10    my division.  One being legislative affairs for

11    the Administrative Office of the Courts.

12    Another being juvenile matters within the

13    Administrative Office of the Courts.  We have

14    the three judge panel system within our

15    division and also the Court Approvement Program

16    is also within my division, which deals with

17    juvenile matters.

18    Q.    Okay.  When did you start your position

19    with the AOC?

20    A.    I came to the AOC January of 2015.

21    Q.    And what was your title or role in

22    January of 2015?

23    A.    It was assistant general counsel and

24    legislative liaison.

25    Q.    And then so did you get promoted or have
```

1   a different position after that?

2   A.    Yes.  I kind of gone up the -- the ranks,

3   but yes, I got promoted -- gosh, what year was

4   that?  2018?  2019?  2019, I believe.

5   Q.    So what was your new position in 2019

6   with the AOC?

7   A.    The director of the Intergovernmental

8   Affairs Division, which was newly created in

9   2019.

10  Q.    So that's your current position?

11  A.    Correct.

12  Q.    So you've been in that role approximately

13  four years?

14  A.    Yes.

15  Q.    And you said that's a new position, so

16  you're the first director of governmental

17  affairs?

18  A.    Yes.

19  Q.    Okay.  And when you were assistant

20  general counsel from 2015 to 2019, who was the

21  general counsel at that point?

22  A.    When I first started it was David Haines.

23  And then shortly thereafter Rachel Harmon

24  joined the AOC and became it -- the general

25  counsel.

1    Q.    And now Ms. Harmon is the deputy
2    director; is that right?
3    A.    Correct.
4    Q.    Who do you report directly to?
5    A.    I report directly to Director Michelle
6    Long.
7    Q.    And do you have employees under you that
8    report directly to you?
9    A.    Yes.
10   Q.    I mean, you don't have to give all their
11   names unless there are only a couple.  How many
12   -- how many roughly do you have --
13   A.    I have 11 total.  But I have 3
14   supervisors that report directly to me, and
15   it's -- there are 8 that report to their
16   various supervisors.
17   Q.    What are the three supervisors' names?
18   A.    Charlie Baldwin, Stacy Lynch, and
19   Stephanie Etheridge.
20   Q.    Okay.  So you don't report directly to
21   Deputy Director Harmon and she doesn't report
22   to you, correct?
23   A.    Correct, I do not report to her directly.
24   Q.    Before you came to the AOC in 2015, what
25   type of work did you do before then?

```
 1   A.    I worked at the Attorney General's
 2   Office.
 3   Q.    In what capacity?
 4   A.    I was an assistant attorney general in
 5   the criminal division.
 6   Q.    How long were you in that role?
 7   A.    I was in that role two years.
 8   Q.    So that takes us back to, like -- about
 9   ten years to 2013, I guess?
10   A.    Correct.
11   Q.    Were you in private practice or did you
12   do anything before your position with the
13   Attorney General's Office?
14   A.    Before that I clerked for the Court of
15   Criminal Appeals for Judge Robert Wedemeyer.
16   Q.    Okay.
17   A.    And I had started that directly after law
18   school, so...
19   Q.    Well, let's go ahead and get into your
20   education.  That's a good segue.
21         So where is your undergraduate degree
22   from and what year?
23   A.    I graduated from Boston University in
24   2005.
25   Q.    And then how about your JD?
```

1    A.    I graduated from University of Tennessee
2    College of Law in 2011.
3    Q.    Okay.  And what was the date of your
4    first Bar admission?
5    A.    November 2011.
6    Q.    And that -- that's in Tennessee?
7    A.    Correct.
8    Q.    Are you admitted to any other state Bars?
9    A.    No.
10   Q.    How about any other court admissions that
11   you might hold?
12   A.    No.  Just Tennessee.
13   Q.    Okay.  Have you ever been formally
14   disciplined by the Tennessee State Bar
15   licensing authority?
16   A.    No.
17   Q.    And have you ever been convicted of a
18   crime?
19   A.    No.
20   Q.    Have you ever been a party to a lawsuit
21   before?
22   A.    No.
23   Q.    Okay.  You told us a little bit about
24   your position as intergovernmental affairs.
25   Can you kind of go into a little more detail,

*Lexitas* TENNESSEE
(615)595-0073

1    kind of what you do and how that relates to

2    your role on the Advisory Commission?

3    A.    Sure.  You know, I oversee the

4    legislative process for the court system, which

5    is mainly the role that correlates with the --

6    the Advisory Commission and why I'm the staff

7    attorney/liaison for the AOC.  And that is

8    because the rules package must go through the

9    legislative process to be approved.  So it just

10   made sense within our office when liaisons were

11   changing to just add me to that so that I would

12   be aware of what was going on through the Rules

13   Commission and could carry that through the

14   legislative process which is required by

15   statute.

16   Q.    So do you also report to anyone over in

17   the legislative branch?

18   A.    No.

19   Q.    Okay.  You're there and you're -- as I

20   understand it, and correct me if I'm wrong,

21   you're there to kind of facilitate the Advisory

22   Commission and its rules package with the

23   legislative body; is that right?

24   A.    That's correct.

25   Q.    And what does that look like -- and we'll

```
 1   talk about meetings in a second.  But what does

 2   that look like on a day-to-day basis?  Do you

 3   have to have -- do you go to sessions, to

 4   legislative session?  Do you have to testify?

 5   What does that look like?

 6   A.    When legislature's in session, I do

 7   attend daily on behalf of the court system to

 8   various committee meetings, meetings with

 9   legislators as requested and testimony as

10   requested within the Legislative Committee

11   meetings.

12   Q.    Do they ever request testimony from you?

13   A.    Yes.

14   Q.    And have you given testimony before the

15   legislative body?

16   A.    Yes, on a number of different topics.  It

17   just varies depending on what's before the

18   Committee and what is of interest to the

19   legislators in that particular meeting.

20   Q.    Is that -- are those transcripts

21   available with the Tennessee legislative body

22   somewhere?

23   A.    Everything is filed online.  They have a

24   pretty extensive record of all of the

25   Legislative Committees that occur within a
```

LEXITAS TENNESSEE
(615)595-0073

1    legislative session.

2    Q.    Do you recall when the last time you gave

3    any testimony before the legislature?

4    A.    It was this past legislative session,

5    which was in January.  And that -- I guess the

6    last time was fairly close to the end of

7    session, which was in April of this past year.

8    Q.    Is the legislative session -- what is it,

9    January through what?

10   A.    Typically it's through April or May.  It

11   just depends on when they -- how much business

12   they have and when they want to adjourn.  This

13   past year ended in April.

14   Q.    The testimony that you gave in April, was

15   that related to the Advisory Commission?

16   A.    No.

17   Q.    What was that related to?

18   A.    It was related to legislation that we

19   sponsored, but -- that was filed within the

20   legislature, but it was not related to the

21   Rules Commission.

22   Q.    When you say "we," are you referring to

23   the AOC?

24   A.    Yes, I'm sorry, the AOC.

25   Q.    What type of legislation does the AOC

Lexitas TENNESSEE
(615)595-0073

1    sponsor?

2    A.    We -- it varies.  There are various

3    topics.  A lot of times it has to do with

4    various procedures perhaps within the AOC.  The

5    legislation that was the most talked about this

6    past year was adding new judges, so we do file

7    legislation requesting new judge positions when

8    we deem that necessary.  And that was the topic

9    that I had testified on in April.

10   Q.    And is that kind of in an advocacy role

11   that you're advocating on behalf of the AOC

12   that we need -- the AOC needs new judges and

13   therefore you're making that request; is that

14   how that works?

15   A.    That's correct.

16   Q.    Do you recall when the last time you gave

17   testimony to the legislature about the Advisory

18   Commission?

19   A.    No.  I -- I have not given testimony

20   about the Advisory Commission in my recent

21   memory.

22   Q.    Do you know if any members of the

23   Advisory Commission have ever given testimony

24   before the legislature?

25   A.    Typically it's the chair of the Advisory

*Lexitas* TENNESSEE
(615)595-0073

1    Commission that will testify if requested;
2    however, that request does not -- I don't
3    believe in the past couple of legislative
4    sessions that they've requested any testimony
5    from any member of the Advisory Commission.
6    Q.    And we'll come back, as I said, a little
7    bit in a moment about -- we'll go more in depth
8    about the Advisory Commission.
9          When did you first hear about the lawsuit
10   that -- the reason you're here today to
11   testify?
12   A.    I don't recall the exact date, but it was
13   after it had been filed and when the Attorney
14   General's Office had notified our general
15   counsel about it.  Our general counsel had
16   notified me and others within our office.
17   Q.    So who would that have been?  Would that
18   --
19   A.    John Coke.
20   Q.    Okay.  So you think that was fairly close
21   in time after the lawsuit was filed?
22   A.    Yes.
23   Q.    When -- do you recall -- or let me ask:
24   Are you aware that there's a preliminary
25   injunction that was issued in this case?

```
 1   A.    Yes.
 2   Q.    When did you first become aware of the
 3   preliminary injunction?
 4   A.    I became aware when it was filed after --
 5   when the AG's Office had sent it to notify our
 6   office.
 7   Q.    Did Director Long notify you of the
 8   preliminary injunction?
 9   A.    No.  General Counsel John Coke did.
10   Q.    And what was your understanding of the
11   preliminary injunction at that point?
12   A.    At that point it was that basically we
13   needed to have a -- a public option for the
14   next commission meeting that would occur, that
15   we need to either make that available via
16   livestream or in person.
17   Q.    And by "public option" you mean public
18   access, right?
19   A.    Correct.
20   Q.    Have you ever seen a copy of the
21   preliminary injunction?
22   A.    Yes.
23   Q.    And was that when you were first notified
24   of it when you got a copy?
25   A.    Yes.
```

Lexitas TENNESSEE
(615)595-0073

```
 1    Q.    Who provided you a copy of the
 2    preliminary injunction?
 3    A.    I believe that was our General Counsel
 4    John Coke.
 5    Q.    What was your understanding of the
 6    preliminary injunction in terms of who it
 7    applied to?
 8    A.    My understanding is that it would apply
 9    to the Commission as a whole, as well as our
10    office and the parties to the -- to the
11    lawsuit.
12    Q.    Director Long, would it apply to Director
13    Long?
14    A.    Yes.
15    Q.    So you would agree then it was a fairly
16    broad preliminary injunction in terms of who it
17    applied to?
18              MR. STAHL:  Object to the form.
19              THE WITNESS:  Could you restate that?
20    BY MR. DOUGHERTY:
21    Q.    Yeah.  I think you said, and I don't want
22    to put words in your mouth, that -- you said --
23    well, let me just ask you this way:  The
24    preliminary injunction applied to the members
25    of the Commission, right?
```

1    A.    Yes.

2    Q.    Did the preliminary injunction apply to

3    Director Long?

4              MR. STAHL:  Object to the form.

5              THE WITNESS:  I'm not sure if it

6    applies to her directly or it just with her

7    connection as far as her role as the director

8    of the Administrative Office of the Courts and

9    how it's -- our Advisor Commission is overseen.

10   BY MR. DOUGHERTY:

11   Q.    Did the preliminary --

12   A.    -- in our office.

13   Q.    I'm sorry, go ahead.

14   A.    Just within our office.

15   Q.    Did the preliminary injunction apply to

16   AOC employees?

17             MR. STAHL:  Object to the form.

18             THE WITNESS:  As an employee of the

19   AOC, we would follow the preliminary injunction

20   requirements.

21   BY MR. DOUGHERTY:

22   Q.    Did the preliminary injunction apply to

23   the Tennessee Supreme Court justices?

24             MR. STAHL:  Object to the form.

25             THE WITNESS:  I'm -- I'm not sure.

*Lexitas* TENNESSEE
(615)595-0073

```
 1   BY MR. DOUGHERTY:

 2   Q.    Did the Tennessee preliminary -- excuse

 3   me, let me strike that question.

 4         Did the preliminary injunction apply to

 5   Director Long's attorneys?

 6   A.    As far as the Attorney General's Office

 7   that who represents her, is that?

 8   Q.    Just in general, just attorneys?

 9   A.    I'm not sure if I can answer that.

10   Q.    Okay.  When's the last time you've read

11   that preliminary injunction?

12   A.    I -- I did review it this week.

13   Q.    What other materials did you review in

14   preparation for this deposition?

15   A.    Just the preliminary injunction and the

16   original filing of -- of the lawsuit.

17   Q.    Did you review the first amended

18   complaint?

19   A.    Yes, uh-huh.

20   Q.    Okay.  All right.  Are you familiar --

21   let's go ahead and deal with the Advisory

22   Commission.

23         Are you familiar with the Advisory

24   Commission on the rules of practice and

25   procedure created by TCA 16-3-601?
```

*Lexitas TENNESSEE*
(615)595-0073

```
 1    A.    Yes, sir.

 2    Q.    And are commission members typically

 3    listed on the AOC website?

 4    A.    Yes.

 5    Q.    Describe your role with the Advisory

 6    Commission.

 7    A.    Sure.  My role is the AOC liaison to the

 8    Advisory Commission.  It's -- primarily it's

 9    logistical responsibilities.  Like I had said

10    earlier, mostly so that there is a staff member

11    of the AOC that is aware of the commission that

12    can assist them in just various scheduling

13    needs or other types of needs for the

14    Commission, as well as making sure that that --

15    the ultimate rules package gets filed and is

16    sought -- seen through the legislative process.

17    Q.    Are you considered a member of the

18    Advisory Commission?

19    A.    No.

20    Q.    So explain -- and you kind of talked

21    about it -- what does a liaison do to the

22    Advisory Commission?  Which is what you are,

23    right?

24    A.    Yes, yes.  Because the Advisory

25    Commission is attached to the Commission of the
```

Lexitas  TENNESSEE
(615)595-0073

1    Administrative Office of the Courts for the

2    logistical needs and is appointed by the

3    Tennessee Supreme Court, the liaison role just

4    ensures that their work is -- that they are

5    able to do their work as far as having meeting

6    space and just other, you know, requests from

7    the Commission to be supportive of the chair

8    and the reporter and just to be in

9    communication with them throughout the rules

10   package process and then ultimately to take

11   that and make sure it gets approved through the

12   legislature.

13   Q.    Do logistical needs include providing

14   public access to any meetings?

15   A.    It -- it includes what is required or

16   what's needed for the Commission.

17   Q.    If meetings were to be open, let's say

18   for example, would a logistical need that you

19   would provide in making sure that the public is

20   notified of a meeting?

21   A.    I would be sure that that -- that the --

22   whoever within our office that would need to be

23   involved with that, that that would occur, yes.

24   Q.    So it would occur through the AOC, right?

25   A.    Yes.

1    Q.    And you used the term "logistical needs."

2    Is that kind of like -- is it fair to say

3    that's kind of the administrative support?

4    A.    Yes, that's what I was going to say,

5    logistical administrative can be

6    interchangeable.

7    Q.    Okay.  What is your understanding --

8    let's back up.

9          How long have you served as a liaison to

10   the Advisory Commission?

11   A.    I was trying to think back on that and

12   it -- it was either sometime in 2016 or 2017

13   that I became the liaison for the -- the AOC

14   with the Advisory Commission.

15   Q.    And you started with the AOC in 2015?

16   A.    Uh-huh.

17   Q.    Do you recall --

18   A.    Yes.  Sorry, I didn't mean to --

19   Q.    No, no, you're fine.

20         Do you recall who the -- when you joined

21   in 2015, do you recall who the liaison at that

22   time was for the AOC -- excuse me, for the

23   Advisory Commission?

24   A.    Yes, her name is Jeana Hendrix, and she

25   was Assistant General Counsel with the AOC at

1    the time.

2    Q.    Do you recall when you joined in 2015

3    when Jeana Hendrix was the liaison, do you know

4    if any Advisory Commission meetings were open

5    to the public?

6    A.    I don't recall specifically, but there

7    were open meetings at that time, I believe.

8    But I wasn't involved then, so I couldn't say

9    definitively.

10   Q.    So when you joined, you recall that there

11   were open Advisory Commission meetings?

12   A.    Yes.

13   Q.    And explain, how do you recall that?

14   What do you recall about those open meetings?

15   A.    I don't recall specifics, it's -- I just

16   recall my involvement as far as when the rules

17   package was completed that I would then take

18   it, you know, to the legislator -- to the

19   legislature for that approval process.  So I

20   would sit in on meetings here and there just to

21   have an understanding of the particular rules

22   package for that year.

23   Q.    So even before you became a liaison to

24   the Advisory Commission you sat in on Advisory

25   Commission meetings?

```
1    A.    Yes.

2    Q.    What years were -- were those?

3    A.    2015, 2016.

4    Q.    Were -- and you say they were open to the

5    public.  Were they open to the public via

6    livestreaming or in person, how did that work?

7    A.    I don't recall specifically which method,

8    because I was not the liaison at the time.

9    Q.    Well, I mean, do you recall people from

10   the public sitting around a conference room?

11   I'm just trying to understand, do you recall

12   anything like that?

13   A.    I'm sorry, I just don't remember.

14   Q.    Assuming that the -- well, you say those

15   meetings were open to the public, right?

16   A.    As far as I can recall, there were -- was

17   an open option for the meetings.

18   Q.    Do you ever recall seeing a public

19   meeting notice in advance of one of those

20   meetings that you attended?

21   A.    I do recall some being on our website,

22   but I couldn't tell you specifically which

23   meeting.

24   Q.    Sure.  Would -- would Jeana Hendrix be

25   the AOC person responsible for generating that
```

LexitasᵀᴹTENNESSEE
(615)595-0073

1    public meeting notice at that point?

2    A.    I do not know if she specifically was the

3    one responsible or if there was another person

4    in the office at the time.  I just couldn't

5    tell you definitively.

6    Q.    But definitively it would have been some

7    AOC employee, right?

8    A.    I believe it would have, but because it

9    wasn't me at the time, I -- I can't tell you

10   for sure.

11   Q.    Was it announced at the meetings that you

12   were at that were open to the public that it

13   was open to the public?  I mean, was there some

14   kind of communication on the record, do you

15   recall?

16   A.    I don't recall, I'm sorry.

17   Q.    Okay.  Who was the chief justice in --

18   during this time period that you recall these

19   open meetings, do you know?  Do you recall who

20   the chief justice was?

21   A.    Justice Lee was the chief justice when I

22   had started the AOC.  And she was the chief

23   justice for the first year, so that was there.

24   I don't know if that answers your question.

25   Q.    Okay.  Did you recall who the chair was

Lexitas TENNESSEE
(615)595-0073

```
 1    at that point during those first years of your
 2    AOC employment?
 3    A.    I'm sorry, I just don't remember off the
 4    top of my head.
 5    Q.    So when you became the liaison, did
 6    Ms. Hendrix move on to something else?  What
 7    did she do?
 8    A.    There was just a shift within our office
 9    of various roles and duties.  And at the time
10    I -- because I had taken on the legislative
11    roles that there was just a -- a change made to
12    put me in that liaison role and move her to
13    other roles.  But I couldn't say specifically
14    what her roles were at that time.
15    Q.    So let's fast forward a little bit.  You
16    go on the Advisory Commission.  What year was
17    that again, please?
18    A.    It was either 2016 or 2017.  I'm sorry I
19    don't remember exactly.
20    Q.    When you started in -- as the liaison on
21    behalf of the AOC for the Advisory Commission,
22    were meetings open at this point to the public?
23    A.    Yes.
24    Q.    Were you responsible for putting out any
25    advanced public meeting notices?
```

Lexitas TENNESSEE
(615)595-0073

1    A.   It varied because of the various
2    different people who worked in our office at
3    the time.  However, I did notify the
4    communications division or if there was another
5    -- I think it had been a paralegal at the time
6    that had posted notices before.  It just kind
7    of varied based on the people at the office and
8    what roles they were in, but I -- I would -- I
9    do recall requesting, you know, the notice to
10   be put on our website prior to meeting, yes.
11   Q.   You did that as a liaison?
12   A.   I would -- I told -- I would be sure to
13   relay that information to those in our office
14   who would post that information.
15   Q.   And would -- who was the director of the
16   AOC at that point?
17   A.   It was Deborah Taylor Tate.
18   Q.   And did you report directly to Ms. Tate?
19   A.   At that time I reported to our general
20   counsel, who then was Rachel Harmon.  And then
21   that was my direct -- my direct report was to
22   her, so...
23   Q.   So who assigned you to make sure that
24   public meeting notices got posted?  Was that
25   Harmon or someone else?

```
1    A.    It -- it was our General Counsel Rachel
2    Harmon that made the changes of who would be
3    the liaison to the Commission.
4    Q.    Do you recall in those public meeting
5    notices that was posted then was there ever a
6    name of the AOC employee that was provided for
7    the public to contact?
8    A.    In the public meeting notices, them
9    specifically I cannot recall that; however, on
10   our website we do have and have consistently
11   had the AOC liaison name on the commission page
12   on our website.
13   Q.    On the commission page of members?
14   A.    Yes.
15   Q.    Okay.  In terms of public meeting
16   notices, if one went out, let's say, five or
17   ten years ago, would it still be on the AOC
18   website?
19   A.    That is more of an IT question.  But if
20   it -- if there were records kept of it, then
21   yes, there would be a -- a record of the ones
22   that were posted.
23   Q.    Do you know how the Commission is
24   appointed, the members?
25   A.    I do.  I know that they are appointed by
```

1 the Tennessee Supreme Court.

2 Q. And are there attorneys in private

3 practice that are members of the Advisory

4 Commission?

5 A. Yes.

6 Q. Are there government attorneys that are

7 members of the Advisory Commission?

8 A. Yes.

9 Q. Are there law school faculty

10 attorneys/attorneys that are members of the

11 Advisory Commission?

12 A. Currently not members, but there --

13 there's a reporter.

14 Q. What is the reporter's role on the

15 Advisory Commission?

16 A. The reporter keeps the official records

17 of the Advisory Commission's business.

18 Q. And so, you as the liaison, try to help

19 me distinguish your role from the reporter's

20 role.

21 A. It -- I do not keep the minutes or the --

22 any record of what occurs in those meetings,

23 that is up to the reporter.  That's within the

24 reporter's role.

25 My role is -- compared to the reporter is

1   purely administrative.  Just to be sure that

2   the reporter has any information as far as

3   meeting space or Zoom links, access to the

4   meeting for the members just to be sure that

5   that reporter has the information that they

6   need.

7   Q.    Are there minutes -- are they ever posted

8   publicly from the meetings?

9   A.    Not to my knowledge.

10  Q.    Where are they kept?

11  A.    They are housed within the Tennessee

12  Supreme Court building and they are -- there's

13  electronic records.  And I'm not sure if there

14  are paper records still or not, but that was

15  something that has -- a duty that's been within

16  the Tennessee Supreme Court building with the

17  Appellate Court clerk's office, I believe.

18  Q.    When you say there are electronic records

19  of minutes of the Advisory Commission, what do

20  you mean?

21  A.    Just the meeting records which would be

22  their agendas, minutes, any attachments any

23  proposals from the members.  Those would be

24  included in the -- in the records that -- for

25  each Commission meeting.

LEXITAS TENNESSEE
(615)595-0073

```
 1    Q.    Have minutes been kept for every meeting
 2    since you've been liaison?
 3    A.    Yes.
 4    Q.    Is that a requirement in the statute or
 5    is that just practice?
 6    A.    I cannot recall if that is a statutory
 7    requirement, but it has been the practice.
 8    Q.    Okay.  So even prior to you being a
 9    liaison, the meetings that you did attend, did
10    you observe someone keeping minutes?
11    A.    Yes, the -- there has always been a
12    reporter of the Advisory Commission keeping
13    minutes and other documentation.
14    Q.    How is the reporter selected?
15    A.    The reporter is selected by the Tennessee
16    Supreme Court.
17    Q.    Do the members -- like for example, let's
18    say there's a meeting, do they look back at the
19    proposed minutes and then approve them or how
20    does that work?  How do the minutes get
21    approved?
22    A.    The Commission approves the minutes from
23    the prior meeting at wherever their current
24    meeting is.  So if they meet in June, they are
25    approving the minutes of the March meeting.
```

*LexitasTENNESSEE*
*(615)595-0073*

1    Q.    Okay.  Are there members of the judiciary
2    that are on the Commission?
3    A.    They are not members, voting members, but
4    they are liaisons for their particular court.
5    Q.    What's a voting member?
6    A.    They are not voting members.
7    Q.    I understand.  I'm just saying what is a
8    voting member?
9    A.    Oh, a voting member is the official
10   members appointed by the Tennessee Supreme
11   Court pursuant to their ability via statute to
12   do that.
13   Q.    When the Tennessee Supreme Court appoints
14   someone, do they -- in an order, for example,
15   do they say that they're a member or do they
16   say that they're a voting member?
17   A.    I don't recall.  I would have to look at
18   one of their orders to -- to say that
19   specifically.  I'm not sure.
20   Q.    Does the statute make a distinction
21   between a member of the Advisory Commission and
22   a voting member?
23   A.    I -- I do not know.
24   Q.    And does the statute provide for the term
25   of those members that are appointed?  Are you

1    aware of how that works?

2    A.    I would need to brush up on the statute

3    language exactly, I can't recall.

4    Q.    Okay.  And so, does the Advisory

5    Commission have regular meetings?

6    A.    Yes.

7    Q.    And during your experience as liaison,

8    what's been the typical cadence of meetings

9    each year?

10   A.    It's quarterly.

11   Q.    And was it quarterly in 2015 and 2016

12   prior to you becoming liaison?

13   A.    As far as I can recall, yes.

14   Q.    What -- and you say quarterly.  Can you

15   explain what that means?

16   A.    Sure.  At least recently and I do believe

17   prior, say the Commission has a meeting, for

18   example, March, June, September and December

19   each year.

20   Q.    And as the -- do you know how long that's

21   been in practice, that March, June, September,

22   December cadence?

23   A.    It has varied slightly over the years.

24   Sometimes it will be February rather than March

25   and sometimes it will be May rather than June,

```
 1    depending on the members' availability

 2    sometimes.

 3          But as far as I can recall back to 2017,

 4    2016, it was in that March, June, September

 5    vicinity.  But like I said, it may be February,

 6    May.  You know, just kind of depending.

 7    Q.    In 2022 did the Advisory Commission meet

 8    in March?

 9    A.    As far as I recall, yes.  However, I

10    would need to look to make sure that wasn't a

11    meeting that, you know, got cancelled or that

12    they didn't have.

13    Q.    Did the Advisory Commission -- let's ask

14    it a different way.

15          Did they have quarterly meetings in the

16    calendar year 2022?

17    A.    Yes.

18    Q.    Did you attend all four of those 2022

19    meetings?

20    A.    I believe I did.  But to confirm, I would

21    have to look at my calendar to be sure I didn't

22    miss one.  But I believe I was at all four of

23    those.  I'm typically at the meetings unless

24    I'm scheduled out of town or there's another

25    conflict.  But I do try to make those priority.
```

```
1    Q.    And to the best of your recollection, in

2    2022 were the four meetings in March, June,

3    September and December?

4    A.    Yes.

5    Q.    And were the dates in 2022, was it the

6    second Friday in March, June, September and

7    December when they met?

8    A.    Those were the dates -- that second

9    Friday of the month was the date set by the

10   chair.  And unless there was some conflict,

11   those would have been the dates that they met.

12   Q.    So that -- you recall that would have

13   been the case in 2022?

14   A.    Yes.

15   Q.    And was the chair in 2022 Mr. Bulso?

16   A.    Yes, Gina Bulso.

17   Q.    And in 2023, which is the year we're in

18   --

19   A.    Uh-huh.

20   Q.    -- had there been quarterly meetings of

21   the Advisory Commission?

22   A.    There were -- I do know there was a March

23   and a June meeting.  And then I was out on

24   maternity leave starting August.

25   Q.    Did you attend the March 2023 Advisory
```

1  Commission meeting?

2  A.    Yes.

3  Q.    And was it open or closed to the public?

4  A.    It was closed.

5  Q.    And then the -- did you attend the

6  June 2023 Advisory Commission meeting?

7  A.    Yes.

8  Q.    Was it open or closed to the public?

9  A.    It was open.

10  Q.    Why was it open?

11  A.    It was open due to the preliminary

12  injunction order.

13  Q.    And do you recall seeing a public meeting

14  notice in advance of that June meeting?

15  A.    There was a public meeting notice that

16  posted on our website, the AOC website.

17  Q.    Is that public meeting notice still to

18  the best of your recollection posted?

19  A.    I believe it should still be there, yes.

20  Q.    Is that -- did that public meeting

21  notice, is that something that you kind of

22  oversaw or how did that take place?

23  A.    I did inform our communications division

24  to post -- to one, create the link for the

25  livestreaming for that meeting, as well as

1    posted on the website.

2    Q.    Were any of the 2022 quarterly meetings

3    open to the public?

4    A.    They were not.

5    Q.    Okay.  And when did you go on maternity

6    leave?

7    A.    It was August 21st of this year.

8    Q.    So was there a September Advisory

9    Commission meeting of 2023?

10   A.    I believe there was one scheduled, but I

11   was not -- I was on leave when it was scheduled

12   to occur.

13   Q.    Do you know if that meeting occurred or

14   not?

15   A.    I believe it did not occur.

16   Q.    And do you know why it didn't occur?

17   A.    I don't.

18   Q.    Did anyone inform you that -- that it

19   didn't occur because they weren't able to get

20   out a public meeting notice in time?

21   A.    No.

22   Q.    Okay.  You've not had any discussion with

23   anyone at the AOC about that?

24   A.    No, I have not.

25   Q.    How about have you had any discussion

LexitasTENNESSEE
(615)595-0073

1    with any of the Advisory Commission members
2    about that?
3    A.    No.
4    Q.    Is there -- are you aware of another
5    meeting in 2023 besides March and June?  Is
6    there one upcoming that you're aware of?
7    A.    There is a December meeting upcoming.  I
8    believe it's December 8th.
9    Q.    And does that follow that second Friday
10   cadence, quarterly cadence?
11   A.    Yes.
12   Q.    Is there a public meeting notice of the
13   December upcoming meeting on the AOC website?
14   A.    Yes, I believe that it has been posted.
15   Q.    Have you seen that or you just heard
16   that?  How do you know?
17   A.    I did check it because I will be back
18   from maternity leave for that meeting, and so I
19   wanted to check to see if there was one up --
20   if it had been put on the website, and it is on
21   there.
22   Q.    Did you actually oversee that while you
23   were on maternity leave or did you just check
24   it just to make sure?
25   A.    I did not facilitate that -- the creation

1    of that, but I was aware that it had happened

2    and I checked it to be sure it was posted.

3    Q.    Do you know who facilitated that public

4    meeting notice at the AOC office?

5    A.    It was both our General Counsel John Coke

6    and Charlie Baldwin, who has assumed my role

7    essentially while I've been out on leave.

8    Q.    Let's kind of backtrack a little bit.

9         So I think you said 2015 to 2016 you sat

10   in on some meetings?

11   A.    Uh-huh.

12   Q.    And the -- your recollection, they were

13   open to the public?

14   A.    Yes.

15   Q.    At what point did those Advisory

16   Commission meetings become closed to the

17   public?

18   A.    I believe it was 2018.

19   Q.    I'm sorry?

20   A.    2018.  It was after I had taken over as

21   liaison.  There was -- meetings were open to

22   the public, as far as I can recall.  And there

23   was a meeting that we had that there was a

24   member of the public who had attended in person

25   who was there and became unruly and combative

1   with the Commission.  And after that, the --

2   the Tennessee Supreme Court took the matter up

3   for discussion and then the meetings were

4   closed after that incident.

5   Q.   And what -- where was this particular

6   meeting in 2018?

7   A.   I wish I could recall the exact date.  I

8   do believe it was 2018 and the meeting was at

9   the Administrative Office of the Courts, it was

10  in our conference room.  And members of the

11  public would come periodically, sometimes we

12  didn't have any and sometimes some would

13  request to come.

14       And that particular meeting there was a

15  member of the public who attended, and he was

16  interested in a topic that was being discussed

17  by the Commission.  And during that discussion,

18  he was speaking kind of out of term, you know,

19  without being called on or outside of the

20  public comment period that was allowed and

21  essentially became very assertive with the

22  members and -- and the meeting was stopped and

23  he was asked to leave.

24  Q.   Do you recall how many members of the

25  public were at that particular meeting in 2018?

```
1    A.    I believe it was just that gentleman and
2    his son.
3    Q.    Do you recall his name?
4    A.    I don't.  I'm sorry.
5    Q.    When you say "combative," do you mean --
6    what do you mean?  Was it verbal combativeness
7    --
8    A.    Yes.
9    Q.    -- or physical?
10   A.    It was verbal.  He did leave his chair --
11   or, you know, get up from his chair while he
12   was having this discussion, which kind of
13   escalated the -- the tone that was going on in
14   there in his interaction with the members.  So
15   it -- yeah, it just became more of an
16   aggressive action on his part.  Clearly he was
17   upset with a topic that was being discussed.
18   Q.    Do you recall the topic?
19   A.    No.
20   Q.    Do you recall who the chair was at that
21   time at that meeting?
22   A.    I believe the chair was Allen Wade then.
23   Q.    Is Mr. Wade currently a member on the
24   Advisory Commission?
25   A.    Yes.
```

```
1    Q.    Were there four quarterly meetings in

2    2018?

3    A.    Yes.  As far as I remember there were.

4    Q.    And you were at this meeting in 2018?

5    A.    I was at that meeting, yes.

6    Q.    Who was the chief justice of the Supreme

7    Court at that time in 2018?

8    A.    It was Justice Jeff Bivins at that time.

9    Q.    So did the Chairman Wade ask this person

10   that was being verbal -- verbally combative to

11   leave?  Did he -- did the person leave?

12   A.    I don't recall who exactly asked him to

13   leave; however, he was asked to leave.  We did

14   have to have several people help escort him

15   out.  And I can't remember if security was

16   called at that meeting or not.  I -- I do

17   believe that building security was made aware.

18   Q.    Do you recall if any formal charges,

19   criminal charges were brought against this

20   person?

21   A.    I -- I do not believe that there were

22   formal criminal charges.

23   Q.    So the person that was verbally combative

24   was never prosecuted to the best of your

25   recollection?
```

```
 1    A.    Correct, I do not believe that he was.
 2    Q.    And so, I guess, was there a member of
 3    the Tennessee Supreme Court that was attending
 4    that particular meeting?
 5    A.    Yes.
 6    Q.    And who was that?
 7    A.    It was Justice Holly Kirby.
 8    Q.    So Justice Kirby was the Supreme Court
 9    liaison on the Commission in 2018?
10    A.    She was.
11    Q.    Justice Kirby is now the Chief Justice of
12    the Supreme Court?
13    A.    Yes, she is.
14    Q.    So you said something about the -- the
15    justices at that point, they made the call,
16    they made the decision to close meetings.
17    Explain what -- explain what happened after
18    that.
19    A.    After the meeting where the person got
20    combative -- and Justice Kirby was in
21    attendance in that meeting, so she had seen it
22    firsthand, the -- as far as I am aware, she
23    took that matter back to the Supreme Court for
24    discussion, and we at the AOC were told that
25    the meetings would no longer be open after
```

Lexitas TENNESSEE
(615)595-0073

```
1    that.  And that was really my interaction with
2    that.  They were -- I was informed that they
3    would be closed.
4    Q.    How were you told?  How were the members
5    of the Commission told that from now on they
6    were going to be closed, the meetings?
7    A.    I don't recall exactly.  I do know that
8    if our General Counsel Rachel Harmon at the
9    time had told me that there was no need to put
10   public notice out because they were going to be
11   closed the next meeting after that incident.
12   And I cannot recall if Justice Kirby told the
13   members directly or if a member of our office
14   told them that we -- that they would be closed.
15   I just don't remember exactly.
16   Q.    But that decision would have come from
17   either the justices or the AOC office to the
18   Advisory Commission?
19   A.    One of the two, yes, would have told
20   either the Commission as a whole or the chair
21   and the chair would have relayed that to the
22   Commission.
23   Q.    So the Chair, Mr. Wade, didn't make that
24   decision?
25   A.    No.
```

```
 1   Q.    Did -- was it reported, do you recall,
 2   that meetings were going to be closed and
 3   formally in the minutes?
 4   A.    I do not recall.  I would have to look
 5   back at the minutes to see if they were -- if
 6   there was any mention.
 7   Q.    Where are the minutes kept?
 8   A.    Like I had said earlier, they're housed
 9   within the Tennessee Supreme Court building
10   overseen by the Appellate Court Clerk's Office,
11   so there is -- whether they're electronic or
12   paper filed.
13   Q.    And the clerk is James Hivner, I believe,
14   right?
15   A.    Yes.
16   Q.    And Mr. Hivner is a member of the
17   Advisory Commission?
18   A.    Yes.  I just couldn't recall if he was a
19   voting member or not voting member.  He is on
20   the Commission.
21   Q.    Did they have a distinction between
22   voting members and members when you first
23   became liaison?
24   A.    I'm not sure if there was a formal
25   distinction, but the judge liaisons are members
```

Lexitas TENNESSEE
(615)595-0073

1    but they don't -- they don't have a vote.  So
2    sometimes the terminology "member," "voting
3    member" would be used just to distinguish,
4    okay, we're having votes and the voting members
5    would be the ones participating; however,
6    the -- like for example, the judicial members
7    are members of the court -- of the Commission,
8    they just don't vote on the matters that they
9    are -- that's presented within that commission.
10   Q.    I -- I may not -- you may have answered
11   the question, I'm just not quite clear.  Do you
12   know definitively when this voting member
13   versus member, when that became part of the
14   culture of the Advisory Commission?
15   A.    No.  I wouldn't say that there is a
16   culture of that, it's more just a -- the
17   Commission looks toward the judicial members
18   just for insight into various proposals or just
19   kind of on-the-ground experience within the
20   courtroom.
21   Q.    Okay.  That distinction is not made on
22   the AOC website, though, it list members,
23   right?
24   A.    It lists members, and I believe it lists
25   the -- I know it lists the judge members, but I

1  believe it says for that the court, the various

2  courts that they're members -- that they

3  represent on the Commission.

4  Q.    Does it say courts or does it just say

5  judicial liaisons?

6  A.    It may just say judicial liaisons, but I

7  believe their titles have what their judge --

8  which court they're on.

9  Q.    Does it make a distinction on the AOC

10  website between voting members and members?

11  And if you don't know, that's okay.

12  A.    I should know, but I do not recall.

13  Q.    Did you create the list of members that

14  are on -- that's on the website?

15  A.    No.

16  Q.    Did someone that you oversee or supervise

17  create that document?

18  A.    There is an employee within our office

19  that maintains and creates all the rosters for

20  the various court commissions; however, that

21  person -- I do not oversee that person.

22  Q.    So up until that point of 2018 when the

23  one individual became verbally combative, had

24  there been any other problems with the Advisory

25  Commission meetings being open to the public

```
 1   that you saw?

 2   A.    Not that I experienced, no.

 3   Q.    Was there any discussion at that point in

 4   2018 when that incident happened about having

 5   the public not physically be present but to

 6   view it by any type of livestreaming?

 7   A.    I was not privy to those discussions or

 8   involvement of them.

 9   Q.    Was the Advisory Commission doing

10   livestreaming in 2018?

11   A.    I do not believe so.  We did have option

12   for members to join virtually if needed;

13   however, majority of the people then would

14   come -- would travel to the AOC office here in

15   Nashville and majority were in person.

16   Q.    So those meetings where everybody got

17   together at the AOC office --

18   A.    Uh-huh.

19   Q.    -- was that in 2017?

20   A.    Yes.

21   Q.    2015?

22   A.    As far as I can recall.

23   Q.    2016?

24   A.    That was the norm prior to 2020.

25   Q.    Okay.  That -- I was going to go into
```

LexitasTENNESSEE
(615)595-0073

```
 1   that.
 2   A.    Uh-huh.
 3   Q.    So it -- did that coincide with COVID
 4   when the Advisory Commission meetings then went
 5   by virtual?
 6   A.    Yes, when all the COVID restrictions
 7   occurred and we were still having meetings,
 8   they were a hundred percent virtual because of
 9   what had occurred in 2020.  But that was when
10   it shifted to a hundred percent virtual.  Prior
11   to that, they were in person.
12   Q.    So now from COVID on, the Advisory
13   Commission itself, they meet virtually, right?
14   A.    It has continued to be virtual since the
15   2020 meetings, yes.
16   Q.    Was there ever discussion about let's go
17   back to open meetings virtually since we
18   wouldn't have a problem with someone
19   interrupting?
20   A.    There were not any discussions prior to
21   this lawsuit within the Commission that I
22   recall.
23   Q.    That issue never came up?
24   A.    It just didn't come up, correct.
25   Q.    If we need to take a break --
```

```
 1    A.    No I'm okay.
 2              (WHEREUPON, an off-the-record
 3    discussion was held.)
 4    BY MR. DOUGHERTY:
 5    Q.    How is that livestreaming working with
 6    Advisory Commission meetings kind of post
 7    COVID?
 8    A.    Livestreaming or the virtual meetings
 9    with the members?
10    Q.    Why don't you -- I'm using the term.  Why
11    don't you tell me what do you understand by
12    virtual meetings?  What does that mean?
13    A.    So since 2020 we've had meetings via
14    Zoom.  So our office would generate the Zoom
15    link and send it to the members.  The Zoom link
16    typically had not been something that's been
17    given out other than to the members.
18    Q.    Right.
19    A.    And that's all that was generated was the
20    Zoom link sent out to the members.  Post the
21    preliminary injunction, we did generate a
22    livestreaming link for this past June -- at
23    least when I -- before I went on leave it was
24    for the June meeting, which was the meeting --
25    the only meeting it would apply to post the
```

1    preliminary injunction based on the timing,

2    so...

3    Q.    So to the best of your knowledge, post

4    preliminary injunction, there's only been one

5    meeting that's been open to the public by

6    livestreaming and that was in June?

7    A.    Correct.

8    Q.    And public meeting notice to the best of

9    your recollection has already been posted in

10   advance of the December meeting; is that right?

11   A.    Yes.

12   Q.    And so, that will be the second post

13   preliminary injunction meeting that will be

14   open to the public?

15   A.    Yes.

16   Q.    And you will be in attendance at the

17   December one?

18   A.    That is the plan.

19   Q.    In terms of your office, the AOC and what

20   you do with providing administrative support,

21   was there any additional labor or work or cost

22   associated with providing the Zoom link to the

23   public for the June meeting?

24   A.    The livestreaming link --

25   Q.    Yes.

Lexitas TENNESSEE
(615)595-0073

1  A.    -- to the public?  As far as cost, no.
2  We did need to enlist a member of our
3  communications division to create that because
4  the way that the livestreaming is set up is
5  outside of my division or the Advisory
6  Commission, so the communications division
7  within our office sets all that up.  And I --
8  one of the employees there I had contacted to
9  create a livestreaming link for it.
10  Q.    To the best of your recollection,
11  providing that livestreaming link to the
12  public, did that -- is that going to cost the
13  AOC more funds than if they did not provide
14  livestreaming to the public?
15  A.    To my knowledge, no.  However, it does
16  require the use of a communications division
17  employee that was previously not involved with
18  the commission meetings.
19  Q.    So that -- and you do that as the -- in
20  your role as the liaison?
21  A.    I do communicate with the communications
22  department -- division employee.
23  Q.    Okay.  What goes on in the Advisory
24  Commission meeting?  What's the purpose of the
25  Advisory Commission?

```
1   A.    The purpose is to discuss rule -- court

2   rule proposals and/or needs and make

3   recommendations of possible changes to the

4   court.

5   Q.    Do they -- does the Advisory Commission

6   discuss and make potential rule recommendations

7   regarding the criminal rules and procedure in

8   Tennessee?

9   A.    Yes.  If that is a topic that comes up

10  and is requested or -- by a member of the

11  public or another member of the government or

12  member of the Commission, they would discuss

13  the rules of criminal procedure and make

14  recommendations as to changes if there are any

15  to the Court.

16  Q.    What about proposed recommendations to

17  the civil rules of procedure, does that come

18  up?

19  A.    Yes.

20  Q.    What about the rules of appellate

21  procedure?

22  A.    Yes.

23  Q.    What about the rules of evidence?

24  A.    Yes.

25  Q.    And what about the juvenile rules of
```

1    procedure?

2    A.    Yes, occasionally.

3    Q.    So is it fair to say that those are the

4    five categories of proposed rules that the

5    Advisory Commission discusses?

6    A.    Yes, those are the five.

7    Q.    Are there any more other than those five?

8    A.    No.

9    Q.    Okay.  Let's -- walk me through, in

10   general, how this happens in terms of the

11   proposed rules -- and my understanding, and you

12   can tell us, at some point there's a -- there's

13   a public comment period and then at some point

14   there's -- but you've referred to the rules

15   package?

16   A.    Uh-huh.

17   Q.    And at some point the legislature votes

18   on it.  So can you just kind of roughly explain

19   that process?

20   A.    Sure.  It typically goes for a calendar

21   year, so there is -- the June meeting would be

22   the last meeting that rules -- proposed rules

23   would be sent to the Supreme Court for

24   consideration.  So from the September meetings

25   to the June meetings would be your -- your year

1   of what would be considered in a rules package

2   for -- that would be sent to the Supreme Court.

3   Q.    And that's because the Tennessee

4   government cycle is July through June; is that

5   the reason?

6   A.    It probably was based on that at some

7   point, but it does also coincide with being

8   able to have public comment and then having a

9   rules package for January enough time to be --

10  for the consideration in there.  So that is --

11  for the rules I think may be more the reason

12  why it goes -- the September meeting would be

13  the start of the new package and June would be

14  the end.

15  Q.    So and that's because the general

16  assembly comes in January, right?

17  A.    Correct.

18  Q.    Okay.  Go ahead, I didn't mean to

19  interrupt.

20  A.    No, no problem.

21        So once the rule -- Advisory Commission

22  has settled on proposals, they -- that is

23  compiled, is sent to the attorneys for the

24  Supreme Court, who are also liaisons on the --

25  on the Commission, they will make sure that

Lexitas TENNESSEE
(615)595-0073

1    everything is cohesive and together.  They send

2    that to the Supreme Court for consideration as

3    far as the recommendations.

4         The Supreme Court will take the

5    recommendations and they may add or subtract or

6    whatnot, but they will then put out those

7    recommendations for public comment.  And

8    there's always a public comment period that --

9    it varies, but it's -- typically it's not less

10   than 60 days.  There's always a comment period

11   for the public.

12        And then the Supreme Court gets those

13   comments back.  They take all that into

14   consideration, and they file an order of

15   proposed rules for that -- we call it the rules

16   package.  I mean, that may not -- it's not more

17   of an internal term, it's not an official term.

18   But they issue the order of the proposed rules

19   that -- based on the recommendations and public

20   comment.

21        And then I take certified copies of those

22   orders plus the proposed amendments to the

23   rules, I file them with the -- on behalf of the

24   Supreme Court, but I file them with the clerks

25   at the House and the Senate that -- which is

1    required by statute to do so.  And you have to

2    do it from when they gavel in -- between when

3    they gavel in and January 31st.  So typically

4    is a couple weeks that you can file them.  And

5    then those certified copies of the orders and

6    the amendments are considered via rule

7    resolution, which is -- which I make sure is

8    written up and filed by the legislature.

9    Q.    And you -- you've answered exactly like I

10   asked you to, which was general.  I just now

11   want to kind of go back and unpack that just a

12   little bit.

13   A.    Uh-huh.

14   Q.    So the June meeting, as I understand it,

15   you've said that's kind of the last of the term

16   of the Advisory Commission meetings; is that

17   right?

18   A.    Yes.

19   Q.    And that's when the final proposed rule

20   recommendations to the extent there are any --

21   A.    Right.

22   Q.    -- that's when they're made?

23   A.    Yes.

24   Q.    How are they made in June?  Does the

25   Advisory Commission have like a list?  Do you

1    write it?  Does a reporter write it?  How does
2    that work?
3    A.    It -- it's really ongoing.  So there may
4    be rules that they approved to recommend to the
5    Court in the September prior.  So it -- and
6    those will not come up again in June, it's just
7    they're -- they are -- the reporter kind of
8    keeps a record -- well, keeps a record of what
9    officially is recommended by the Commission.
10   That's all compiled by the reporter in
11   conjunction with the Supreme Court liaisons.
12   And it's really between them of how the form --
13   the format of how that gets to the Court.
14   Q.    So and then do you all send that -- when
15   I saw "you all," does the Advisory Commission,
16   either the reporter or you or the chair, does
17   that get transmitted to the justices in June?
18   A.    It's -- the reporter puts it together as
19   far as I know or, like I said, works with the
20   Supreme Court liaison, the Supreme Court
21   attorneys or the liaisons, and they determine
22   how it gets relayed to the Court.
23   Q.    And then the Supreme Court around
24   September through maybe November, that's when
25   the public comment period is?

1    A.    It varies every year, but typically, yes,

2    it would be -- they -- they typically take it

3    into consideration from that June meeting

4    through August.  And then in the past it's been

5    some where between September and November that

6    they'll put out the rules for comment.

7    Q.    So there's a lag period between June and

8    then whenever they start the public comment

9    period?

10   A.    It's a review period for the Court.

11   That's the time that they take to review the

12   recommendations.

13   Q.    So it is a -- there is a lag period

14   between that time?

15   A.    And you can call it that, but I don't

16   know that it's necessarily a lag period.  It's

17   just part of the process.

18   Q.    Well, the Supreme Court is not -- doesn't

19   send out public comment notices in June, right?

20   A.    No.

21   Q.    And you said typically that public

22   comment period lasts, you said, 60 days?

23   A.    It's 60 days minimum.  I've not ever seen

24   it less than that.

25   Q.    Is that -- do you know if that's by

1    statute or just custom in practice?

2    A.    I can't recall if it's statute or within

3    the rules themselves, but it's definitely

4    practice within the Court.

5    Q.    So let's say this September to November,

6    roughly, comment period, when comments come

7    back about the proposed rules, what does the

8    Supreme Court do?  Do they send it back to the

9    Advisory Commission or do they act on it?  How

10   does that work?

11   A.    I mean, I can't speak definitively for

12   the Court.  I can just say that sometimes

13   they -- I mean, they take the recommendations

14   or comments by the public into consideration.

15   They have in the past sent rules back to the

16   Commission, and they've also made changes

17   themselves to the recommendations for

18   consideration by the legislature.  It just

19   varies.

20   Q.    Without consulting the Advisory

21   Commission?

22   A.    Correct.

23   Q.    And so, after the public comment period,

24   is it Tennessee Supreme Court or is it you that

25   then takes the rules package to the general

1    assembly?

2    A.    I facilitate it on behalf of the Supreme

3    Court.  So I essentially represent their

4    requirement to do so.  I will be the one to

5    physically bring it over and file and make sure

6    it goes through the process.  But it is a

7    requirement that the Court -- the Supreme Court

8    does that, but I'm their --

9    Q.    And when you say "requirement," you mean

10   a statutory requirement?

11   A.    Yes.

12   Q.    So when you -- when do you typically

13   submit the rules package to the general

14   assembly?  Is that around January when they --

15   A.    It's almost always in January.

16   Q.    Right, when they begin their term?

17   A.    Correct.

18   Q.    So once you get the rules package to the

19   general assembly in January, is there anything

20   else that you do?

21   A.    I will -- I file the -- the orders and

22   the certified copies with the clerks, and then

23   I draft the res -- rule resolutions for

24   whichever resolution -- whichever rules that

25   are being proposed to be amended.  And I will

```
1    send those rule resolution drafts to the member
2    of the legislature who will sponsor those
3    resolutions.  And it varies kind of year to
4    year, but typically it's the chair of the
5    Judiciary Committee that I would go through and
6    then they -- they take those drafts from there
7    and consult with their legislative legal
8    services attorneys for official drafting.
9    Q.    So you typically submit the rules package
10   to the chair on the Judicial Committee?
11   A.    It's a rule resolution --
12   Q.    Okay.
13   A.    -- that must be filed.  It's -- the way
14   that the legislature approves the rules is via
15   --
16   Q.    I see.
17   A.    -- resolution.  So they have to have that
18   drafted and then filed officially within the
19   rule -- resolution filing process so that it's
20   in the -- in the system to -- to be acted upon.
21   Q.    So is it fair to say the rules
22   resolution, that's just more of a summary of
23   the entire rules package?
24   A.    It -- there is a separate resolution for
25   every category of court rule that is being
```

1    amended.

2    Q.    And you typically do provide the

3    Judiciary Committee chair with the rules

4    resolution?

5    A.    Yes, it's typically the -- either the

6    Senate judiciary chair or the House, civil or

7    criminal, it -- obviously criminal rules will

8    go through the Criminal Justice Committee --

9    Q.    Oh, okay.

10   A.    -- civil rules will go through the Civil

11   Justice Committee.  So I just facilitate to

12   make sure whichever particular rule package

13   amendments we have that they go to the correct

14   judiciary chair in the House.

15   Q.    Is there a committee for every -- all

16   five different proposed rules; criminal, civil,

17   appellate, evidence and juvenile?

18   A.    There are -- the way the legislature is

19   currently set up, there are just two -- there's

20   a Criminal and a Civil Judiciary Committee.

21   And the clerk of the House and the clerk of the

22   Senate determine which committee the rules

23   get -- rule resolutions get sent to.

24         However, we know just from past

25   experience, obviously, civil ones will go to

```
 1    civil and criminal would go to the Criminal
 2    Committee.  So we just be sure to talk to those
 3    chairs prior so that they're aware of the rule
 4    resolutions.
 5    Q.    How long does that process take from
 6    January through -- does that take through March
 7    or April?  What does that look like for you?
 8    A.    It just depends on when the legislature
 9    schedules the rule resolutions to be heard.
10    They are scheduled to be heard in the
11    committees, and so it's really just dependent
12    on the chair of the committee and when they
13    want to schedule it.  So we could hear them in
14    January or we could hear them closer to the end
15    of session.  It just depends on preference of
16    the chair.
17              THE REPORTER:  And could we take a
18    quick restroom break?
19              MR. DOUGHERTY:  Sure.
20              (Short break.)
21    BY MR. DOUGHERTY:
22    Q.    We're back on the record.
23          Are you aware of Federal Advisory
24    Committee meetings that are similar to the
25    Tennessee Advisory Commission?
```

```
 1    A.    I can't say that I'm very familiar with

 2    them.

 3    Q.    Have you become familiar with the Federal

 4    Advisory Committees from this lawsuit?

 5    A.    Only what's referenced in the lawsuit.  I

 6    have not looked it up separately.

 7    Q.    And that's never something the Federal

 8    Advisory Committee that's ever come up in

 9    Advisory Commission meetings?

10    A.    Not that I recall.

11    Q.    Do you go to conferences in your position

12    with the AOC to other either state AOC

13    conferences or federal AOC conferences?

14    A.    I go to the AOC's judicial conferences,

15    yes.

16    Q.    Is that -- is that a state -- on the

17    state or what is that?

18    A.    On the state level.  There are various

19    conferences for the different levels of judges,

20    and I attend those.

21    Q.    How often do those usually take place?

22    A.    It varies per judicial conference, but

23    it's either two or three times a year.

24    Q.    You talking about the Tennessee judicial

25    conference?
```

Lexitas   TENNESSEE
(615)595-0073

```
1    A.    Yes.
2    Q.    And so, are you saying that other state
3    AOC offices and employees come together at
4    these conferences?
5    A.    What do you mean other state?
6    Q.    Well, I guess what I'm trying to ask is:
7    Do you have an opportunity as the Tennessee AOC
8    departmental government liaison, are there
9    other states that have equivalent jobs that
10   you're able to communicate with to see what
11   they do?
12   A.    I do not know.  And no, typically we do
13   not confirm with other state AOCs.
14   Q.    Do you have any interaction with the
15   federal AOC?
16   A.    No.
17   Q.    Does the Advisory Commission members, do
18   they have opportunities to do conferences with
19   other either state judicial conferences or
20   federal advisory?
21   A.    Not that I'm aware of.
22   Q.    Okay.  Do you personally take a role in
23   making rule recommendations or is your role
24   just to provide administrative support to the
25   Advisory Commission?
```

*Lexitas TENNESSEE*
(615)595-0073

```
1   A.     I do not make rule recommendations, it's
2   purely administrative.
3   Q.     And you may have said, but how does that
4   happen?  Let's say a rule comes and someone
5   wants to change Rule 12 of Civil Procedure, do
6   the members debate it, talk about it, does
7   someone write a paper about it?  What does that
8   look like?
9   A.     It varies on how it comes up.  It can
10  come up via a member or a request from a
11  legislator or another member of the public.  It
12  really varies.  But the Commission will
13  typically add it to the agenda for the -- for
14  the next meeting, whatever meeting would be in
15  closest proximity to that request.  And the
16  Commission members discuss it and decide if it
17  warrants further discussion or reference to a
18  subcommittee within the Commission or -- or
19  they just don't want -- don't deem it necessary
20  to discuss further.
21  Q.     How would a member of the public make a
22  suggestion to get on the agenda of the Advisory
23  Commission?
24  A.     They could do that in various ways by
25  either e-mailing the AOC.  They could e-mail
```

*Lexitas* TENNESSEE
(615)595-0073

1    the contact, you know, me or another person via

2    the names on the website or they could reach

3    out directly to the reporter or the chair.  It

4    just depends on -- and it's varied in the past.

5    We have had requests from members of the public

6    before for discussion of items.

7    Q.    Do members of the public know they have

8    that option?  I mean, is that something that

9    the AOC regularly broadcasts to the public?

10   A.    Other than the public access to the page

11   on the website, I don't know that there's

12   anything specific.

13   Q.    Has there ever been anything on the AOC

14   website that announces to the public that if

15   they want to make a suggestion proposed rule

16   change, they could do so?

17   A.    I don't know if that's ever been

18   something that's been on our website.  I can't

19   say that it was or wasn't.

20   Q.    So it's not something that affirmatively

21   the AOC reaches out to the public, it just kind

22   of comes up occasionally?

23   A.    The page is open to the public.  And so

24   if a member of the public had a question,

25   they're always free to reach out to contacts

1    provided on that page.

2    Q.    And is your contact provided on the page?

3    A.    Yes.

4    Q.    Okay.  That's pre injunction?

5    A.    Correct.

6    Q.    What about reimbursements of Advisory

7    Commission members, is that something that you

8    provide administrative support for for

9    expenses?

10   A.    I have in the past; however, recently I

11   don't recall anyone requesting a reimbursement

12   for mileage or anything like that because our

13   meetings happen virtual.

14   Q.    And that's been going on pre preliminary

15   injunction?

16   A.    Correct.

17   Q.    Do you recall getting the litigation hold

18   letter when this lawsuit was filed by either

19   Director Long or someone within the AOC?

20   A.    I don't remember exactly if I received a

21   litigation hold letter or if it was just our

22   director and I was just informed of the pending

23   litigation.

24   Q.    And so, was it your understanding that

25   all records and e-mails and everything was

```
 1    supposed to be preserved now that there was
 2    litigation?
 3    A.    Yes.
 4    Q.    To the best of your recollection and
 5    knowledge that has it actually taken place,
 6    everything's been preserved?
 7    A.    As far as I know, yes.
 8    Q.    Did you participate personally in -- with
 9    Director Long or in her answer that was filed
10    in this lawsuit?
11    A.    No.
12    Q.    Have you ever seen her answer that was
13    filed in this lawsuit?
14    A.    I do believe I saw it after it was filed,
15    but I don't recall exactly.
16    Q.    Do you recall seeing Director Harmon's
17    two declarations that were filed early when the
18    lawsuit was filed?
19    A.    I do believe I saw them, but I don't
20    recall the details.
21    Q.    Did you assist in preparing those
22    declarations --
23    A.    No.
24    Q.    -- for Ms. Harmon?
25          And you said no?
```

Lexitas TENNESSEE
(615)595-0073

```
 1    A.    Correct, no.
 2    Q.    Do you provide -- in your role with the
 3    AOC, do you provide legal advice to the
 4    justices of the Supreme Court?
 5    A.    In various capacities I have in the past
 6    on various topics.
 7    Q.    But what are those topics and capacities?
 8    A.    It -- majority is with legislative
 9    topics.
10    Q.    Related to the Advisory Commission rules
11    package?
12    A.    No.  Just other legislative duties that I
13    provide.
14    Q.    Could you give me an example?  Is there
15    something you could give me an example?
16    A.    Sure.  Just the legislation that is
17    either filed, proposed statutory amendment that
18    may affect court process and I will talk to the
19    Court about that.  And there are lots of times
20    it's legal in nature but not related to the
21    Advisory Commission, just other proposals that
22    get filed by members of legislature.
23    Q.    So that's more in your capacity as
24    intergovernmental affairs director?
25    A.    That's correct.
```

```
 1   Q.   Do you know if deputy Harmon provides

 2   legal advice to the justices of the Supreme

 3   Court?

 4   A.   I believe she does, yes.

 5   Q.   Do you know in what capacity?

 6            MR. STAHL:  Object to the form.

 7            THE WITNESS:  No.

 8   BY MR. DOUGHERTY:

 9   Q.   Do you know if Director Long provides

10   legal advice to the justices?

11   A.   I can't -- I can't answer that

12   definitively.

13   Q.   So you don't know; is that right?

14   A.   I don't know.

15            MR. DOUGHERTY:  I think I'll pass the

16   witness, Mike.

17            MR. STAHL:  Okay.

18

19                   EXAMINATION

20   QUESTIONS BY MR. STAHL:

21   Q.   Ms. Young, just a few questions.

22        Prior to the closing of the meetings and

23   the virtual meetings that occurred when COVID

24   started in 2020, I think you mentioned that

25   most of the meetings occurred in person and
```

Lexitas   TENNESSEE
(615)595-0073

```
 1    they occurred in a conference room at the AOC
 2    offices; is that right?
 3    A.    That's correct.
 4    Q.    How big is that conference room?
 5    A.    I'm not good with measurement.  I would
 6    say there's a -- it's fairly large.  There's a
 7    large conference table that seats roughly 20 or
 8    so.  It can probably -- I do believe it can
 9    accommodate about 50 people com -- maybe not so
10    comfortably, but that could be in there.
11    Q.    And how many members of the Committee and
12    other people like yourself from the AOC are
13    typically present at or were typically present
14    when the meetings were held in person?
15    A.    We would have roughly ten members of the
16    Commission.  Probably more than that before --
17    before COVID we had good attendance.  I would
18    say majority of the members would be in
19    attendance.
20          And then as far as members of the AOC, it
21    would -- myself, possibly a member of our tech
22    division to just handle any technology needs in
23    there.  But that would be it, typically.  There
24    weren't a lot of members of the AO -- other
25    employees of the AOC that would attend.
```

1    Q.    Okay.  In your experience prior to 2020

2    when the meetings went virtual and they were

3    still in person and you mentioned that there

4    was the one incident with the member of the

5    public who had come in, how did that member of

6    the public come into the AOC offices?  Is there

7    a security area that they need to request

8    permission to come through in order to go to

9    the offices or are members of the public just

10   able to walk in?

11   A.    No, the -- that member of the public did

12   have to check in in our -- the security kiosk

13   that's in the lobby of our building.  We --

14   sometimes we would know if a member of the

15   public was going to attend because they would

16   reach out prior and request to attend so we

17   could give the information to the security

18   desk, but sometimes they'd just show up.  And

19   so they would say, we're here for commission

20   meeting, we would basically verify that, allow

21   them to come up and then they would go through

22   our second -- our own security -- our own doors

23   to our -- to the AOC and they would be allowed

24   into the meeting.

25   Q.    Okay.  When the meetings were in person

*Lexitas* **TENNESSEE**
(615)595-0073

1    and when you attended, were they always held in

2    the same conference room or were they held in

3    different rooms?

4    A.    Always the same conference room.

5    Q.    Is that the biggest conference room

6    that's available?

7    A.    Yes.

8    Q.    You mentioned a member of the IT

9    department for the AOC sometimes being at these

10   meetings to facilitate IT needs.  I'm wondering

11   in your -- in the AOC's role as administrative

12   support for the Advisory Commission meeting, if

13   a member was to show up in person prior to

14   2020, were they given a computer?  Were they

15   expected to provide their own?  Would they be

16   provided with writing supplies if they wanted

17   to take notes?  What did that look like?

18   A.    Just the member of the public that --

19   Q.    No, a member of the Committee.

20   A.    Oh, anybody.  They would typically bring

21   their own if they kept information on a

22   computer or whatnot, but the AOC would

23   typically provide copies of the agenda and any

24   documents that would be considered in that

25   meeting as requested.  I would typically have

```
 1    copies available, but members, in my
 2    experience, usually brought either on a
 3    computer they would just keep electronic
 4    documents of how they kept up with it or they
 5    would bring their own that they already printed
 6    out and reviewed prior to the meeting.
 7    Q.    Okay.  Now that the meetings are virtual,
 8    does the AOC provide any computers or hardware,
 9    tech support to facilitate those meetings?
10    A.    To facilitate the meetings we'll provide
11    the links and whatnot.  But as far as any
12    hardware to anybody, no, we don't provide that.
13    Q.    Okay.  You mentioned that the -- that
14    there's a portion of the Rules Committee
15    process where there is a public comment period.
16    I think you mentioned that you've never seen it
17    to where that comment period was less than
18    60 days but it could be more; is that right?
19    A.    Yes, in my experience it has been
20    60 days.  It could be more.  I won't say it's
21    never been less than 60 days, but in my
22    experience it's been 60 days.  That's been the
23    minimum.
24    Q.    Are you aware of any public comment that
25    has found its way to the Supreme Court during
```

1    that public comment period on any Rules

2    Committee recommendations?

3                MR. DOUGHERTY:  Object to the form.

4                THE WITNESS:  Yes, there have been

5    public comments.

6    BY MR. STAHL:

7    Q.    How were those comments provided to the

8    Supreme Court during that period as far as, you

9    know?

10   A.    They are -- there is a form that you can

11   fill out on the AOC -- the Court website as far

12   as the -- when that public comment notice goes

13   out, there is an ability to file a -- a

14   comment.  And that is also within that

15   Appellate Court clerk's office, but there is a

16   form on the website that you can enter your

17   comments or, I believe, you can upload a

18   document as well if you already have comments

19   pre -- you know, written on a Word document or

20   whatnot.  But then the Appellate Court clerk's

21   office compiles those.

22   Q.    Okay.  Since your -- you've taken up this

23   role as liaison for the rules Advisory

24   Commission, has a member of the public ever

25   contacted you about attending a meeting?

Lexitas    TENNESSEE
(615)595-0073

```
1    A.    Yes.   I mean, prior to 2020 there have --
2    there were members of the public that
3    required -- that requested to attend.   I don't
4    know I can give you a specific example, but it
5    has happened.
6    Q.    Since 2020 has any member of the public
7    contacted you about attending a meeting?
8    A.    No.
9    Q.    Do you make any decisions about rules
10   Advisory Commission, policies or actions of the
11   Committee?
12   A.    No.
13   Q.    Have you ever witnessed the Committee
14   requesting someone come and speak to them in
15   any capacity?
16   A.    Yes.   I've witnessed a legislator asking
17   to come and address the Committee, the
18   Commission.   That has happened in the past.
19   Q.    You also mentioned that there are
20   subcommittees as part of the Rules Commission;
21   is that right?
22   A.    Correct.
23   Q.    Are they standing committees or are they
24   committees as necessary?
25   A.    They have been standing committees;
```

*Lexitas* TENNESSEE
(615)595-0073

1    however, it is up to the chair whether or not

2    to dissolve a committee or create one as

3    needed.  Create a new one.

4    Q.   Do you know what the standing committees

5    are -- subcommittees, I'm sorry?

6    A.   I can't recall all of them, but they

7    basically breakdown into categories.  So there

8    is civil, criminal, appellate, evidence.  I

9    don't believe there's a juvenile one at the

10   moment.

11   Q.   Have you witnessed any meetings between

12   the members of those subcommittees?

13   A.   No, I have not attended any of those

14   subcommittee meetings.

15   Q.   Do members of the subcommittee meet at

16   the AOC offices as far as you know?

17   A.   Since subcommittees were created, to my

18   knowledge, they have all been virtual meetings.

19   Q.   Since they've been created have any of

20   those subcommittees requested AOC technical

21   support to conduct those virtual meetings?

22   A.   I do not know.

23           MR. STAHL:  I think that's all I've

24   got.

25   ///

Lexitas   TENNESSEE
(615)595-0073

```
                         EXAMINATION
BY MR. DOUGHERTY:
Q.    Brief follow-up.
      Does providing livestreaming access of
Advisory Commission meetings to the public
elevate any crowding problems from in-person
attendance?
A.    It could.  It just depends, I suppose.
But livestreaming would eliminate the need of
someone attending in person.
Q.    I mean, if there's a small conference
room and you can only fit 60 people in, for
example, of the public, it would be better if
you had unlimited amount of people, which they
could do that through livestreaming, right?
            MR. STAHL:  Object to the form.
            THE WITNESS:  The livestreaming does
give that option.
BY MR. DOUGHERTY:
Q.    Okay.
            MR. DOUGHERTY:  That's all I've got.
            MR. STAHL:  Great.  Okay.
            THE REPORTER:  Do you want to order
this?
            MR. DOUGHERTY:  Yeah.
```

```
 1              THE REPORTER:  Do you want it regular
 2    delivery or sooner?
 3              MR. DOUGHERTY:  Can I get it before?
 4              (WHEREUPON, an off-the-record
 5    discussion was held.)
 6              MR. DOUGHERTY:  What about Tuesday or
 7    Wednesday, the 27th or 28th?
 8              THE REPORTER:  Yeah.
 9              MR. STAHL:  Yeah, we'll take a copy.
10    Same order.  And she's going to waive
11    signature.  Thank you.
12              FURTHER DEPONENT SAITH NOT
13      (Proceeding concluded at 11:16 a.m. CST)
14
15
16
17
18
19
20
21
22
23
24
25
```

*Lexitas* TENNESSEE
(615)595-0073

```
 1                    REPORTER'S CERTIFICATE

 2

 3    STATE OF TENNESSEE

 4    COUNTY OF SUMNER

 5            I, MICHELLE CESSNA, Licensed Court Reporter,

 6    with offices in Nashville, Tennessee, hereby certify

 7    that I reported the foregoing deposition of MICHELLE

 8    CONSIGLIO-YOUNG by machine shorthand to the best of

 9    my skills and abilities, and thereafter the same was

10    reduced to typewritten form by me.

11            I further certify that I am not related to

12    any of the parties named herein, nor their counsel,

13    and have no interest, financial or otherwise, in the

14    outcome of the proceedings.

15            I further certify that in order for this
      document to be considered a true and correct copy, it
16    must bear my original signature and that any
      unauthorized reproduction in whole or in part and/or
17    transfer of this document is not authorized, will not
      be considered authentic, and will be in violation of
18    Tennessee Code Annotated 39-14-104, Theft of
      Services.
19

20

21

22

23    MICHELLE CESSNA, LCR, RPR
      Lexitas Legal
24    Licensed Court Reporter (TN)
      Notary Public State of Tennessee
25
      LCR #864 - Expires:  6/30/2024
```

Lexitas - TENNESSEE
(615)595-0073

**1**

**11** 9:13

**11:16** 82:13

**12** 68:5

**16-3-601** 20:25

**2**

**20** 74:7

**2005** 10:24

**2011** 11:2,5

**2013** 10:9

**2015** 7:20,22 8:20
9:24 23:15,21
24:2 25:3 34:11
40:9 49:21

**2016** 23:12 25:3
27:18 34:11 35:4
40:9 49:23

**2017** 23:12 27:18
35:3 49:19

**2018** 8:4 40:18,20
41:6,8,25 43:2,4,7
44:9 48:22 49:4,
10

**2019** 8:4,5,9,20

**2020** 49:24 50:9,
15 51:13 73:24
75:1 76:14 79:1,6

**2022** 35:7,16,18
36:2,5,13,15 38:2

**2023** 36:17,25
37:6 38:9 39:5

**21st** 38:7

**27th** 82:7

**28th** 82:7

**3**

**3** 9:13

**31st** 58:3

**5**

**50** 74:9

**6**

**60** 57:10 60:22,23
77:18,20,21,22
81:12

**8**

**8** 9:15

**8th** 39:8

**A**

**a.m.** 82:13

**ability** 33:11
78:13

**access** 17:18
22:14 31:3 69:10
81:4

**accommodate**
74:9

**act** 61:9

**acted** 63:20

**action** 42:16

**actions** 79:10

**add** 12:11 57:5
68:13

**adding** 15:6

**additional** 52:21

**address** 79:17

**adjourn** 14:12

**administrative**
6:4,25 7:5,11,13
19:8 22:1 23:3,5
31:1 41:9 52:20
67:24 68:2 70:8
76:11

**admission** 11:4

**admissions**
11:10

**admitted** 11:8

**advance** 25:19
37:14 52:10

**advanced** 27:25

**advice** 72:3 73:2,
10

**Advisor** 19:9

**advisory** 12:2,6,
21 14:15 15:17,
20,23,25 16:5,8
20:21,23 21:5,8,
18,22,24 23:10,
14,23 24:4,11,24
27:16,21 30:3,7,
11,15,17 31:19
32:12 33:21 34:4
35:7,13 36:21,25
37:6 38:8 39:1
40:15 42:24 45:18
46:17 47:14 48:24
49:9 50:4,12 51:6
53:5,23,25 54:5
55:5 56:21 58:16,
25 59:15 61:9,20
65:23,25 66:4,8,9
67:17,20,25 68:22
70:6 72:10,21
76:12 78:23 79:10
81:5

**advocacy** 15:10

**advocating** 15:11

**affairs** 7:4,7,10
8:8,17 11:24
72:24

**affect** 72:18

**affirmatively**
69:20

**AG's** 17:5

**agenda** 68:13,22
76:23

**agendas** 31:22

**aggressive** 42:16

**agree** 18:15

**ahead** 6:19 10:19
19:13 20:21 56:18

**Allen** 42:22

**admitted** 11:8

**advance** 25:19

**allowed** 41:20
75:23

**amended** 20:17
62:25 64:1

**amendment**
72:17

**amendments**
57:22 58:6 64:13

**amount** 81:14

**and/or** 54:2

**announced**
26:11

**announces** 69:14

**answers** 26:24

**anticipate** 6:14

**AO** 74:24

**AOC** 7:2,19,20
8:6,24 9:24 12:7
14:23,24,25 15:4,
11,12 19:16,19
21:3,7,11 22:24
23:13,15,22,25
25:25 26:7,22
27:2,21 28:16
29:6,11,17 37:16
38:23 39:13 40:4
44:24 45:17 47:22
48:9 49:14,17
52:19 53:13
66:12,13 67:3,7,
15 68:25 69:9,13,
21 70:19 72:3
74:1,12,20,25
75:6,23 76:9,22
77:8 78:11 80:16,
20

**AOC's** 66:14
76:11

**AOCS** 67:13

**Appeals** 10:15

**appellate** 31:17
46:10 54:20 64:17
78:15,20 80:8

**applied** 18:7,17,
24

**applies** 19:6

apply 18:8,12
19:2,15,22 20:4
51:25

appointed 22:2
29:24,25 33:10,25

appoints 33:13

approval 24:19

approve 32:19

approved 12:9
22:11 32:21 59:4

Approvement
7:15

approves 32:22
63:14

approving 32:25

approximately
8:12

April 14:7,10,13,
14 15:9 65:7

area 75:7

assembly 56:16
62:1,14,19

assertive 41:21

assigned 28:23

assist 21:12
71:21

assistant 7:23
8:19 10:4 23:25

assumed 40:6

Assuming 25:14

attached 21:25

attachments
31:22

attend 13:7 32:9
35:18 36:25 37:5
66:20 74:25
75:15,16 79:3

attendance 44:21
52:16 74:17,19
81:7

attended 25:20
40:24 41:15 76:1
80:13

attending 44:3
78:25 79:7 81:10

attorney 5:24
10:1,4,13 16:13
20:6

attorney/liaison
12:7

attorneys 20:5,8
30:2,6 56:23
59:21 63:8

attorneys/
attorneys 30:10

August 36:24
38:7 60:4

authority 11:15

availability 35:1

aware 12:12
16:24 17:2,4
21:11 34:1 39:4,6
40:1 43:17 44:22
65:3,23 67:21
77:24

---

**B**

back 10:8 16:6
23:8,11 32:18
35:3 39:17 44:23
46:5 50:17 57:13
58:11 61:7,8,15
65:22

backtrack 40:8

Baldwin 9:18
40:6

Bar 11:4,14

Bars 11:8

based 28:7 52:1
56:6 57:19

basically 17:12
75:20 80:7

basis 13:2

begin 62:16

behalf 13:7 15:11
27:21 57:23 62:2

big 74:4

biggest 76:5

bit 7:6 11:23 16:7
27:15 40:8 58:12

Bivins 43:8

body 12:23 13:15,
21

Boston 10:23

branch 12:17

break 6:14,17,20
50:25 65:18,20

breakdown 80:7

bring 62:5 76:20
77:5

broad 18:16

broadcasts 69:9

brought 43:19
77:2

brush 34:2

building 31:12,16
43:17 46:9 75:13

Bulso 36:15,16

business 14:11
30:17

---

**C**

cadence 34:8,22
39:10

calendar 35:16,
21 55:20

call 44:15 57:15
60:15

called 5:3 41:19
43:16

cancelled 35:11

capacities 72:5,7

capacity 10:3
72:23 73:5 79:15

carry 12:13

case 16:25 36:13

categories 55:4
80:7

category 63:25

caveat 6:18

certified 57:21
58:5 62:22

chair 15:25 22:7
26:25 36:10,15
42:10,11,20,22
45:20,21,23 59:16
63:4,10 64:3,6,14
65:12,16 69:3
80:1

Chairman 43:9

chairs 65:3

change 27:11
68:5 69:16

changing 12:11

charges 43:18,
19,22

Charlie 9:18 40:6

check 39:17,19,
23 75:12

checked 40:2

chief 26:17,20,21,
22 43:6 44:11

civil 54:17 64:6,
10,16,20,25 65:1
68:5 80:8

clear 47:11

clerk 46:13 64:21

clerk's 31:17
46:10 78:15,20

clerked 10:14

clerks 57:24
62:22

close 14:6 16:20
44:16

closed 37:3,4,8
40:16 41:4 45:3,6,
11,14 46:2

closer 65:14

closest 68:15

closing 73:22

cohesive 57:1

coincide 50:3 56:7

Coke 6:3 16:19 17:9 18:4 40:5

College 11:2

combative 40:25 42:5 43:10,23 44:20 48:23

combativeness 42:6

comfortably 74:10

comment 41:20 55:13 56:8 57:7,8, 10,20 59:25 60:6, 8,19,22 61:6,23 77:15,17,24 78:1, 12,14

comments 57:13 61:6,14 78:5,7,17, 18

commission 12:2,6,13,22 14:15,21 15:18, 20,23 16:1,5,8 17:14 18:9,25 19:9 20:22,24 21:2,6,8,11,14,18, 22,25 22:7,16 23:10,14,23 24:4, 11,24,25 27:16,21 29:3,11,13,23 30:4,7,11,15 31:19,25 32:12,22 33:2,21 34:5,17 35:7,13 36:21 37:1,6 38:9 39:1 40:16 41:1,17 42:24 44:9 45:5, 18,20,22 46:17,20 47:7,9,14,17 48:3, 25 49:9 50:4,13, 21 51:6 53:6,18, 24,25 54:5,12 55:5 56:21,25 58:16,25 59:9,15 61:9,16,21 65:25 66:9 67:17,25 68:12,16,18,23 70:7 72:10,21 74:16 75:19 76:12 78:24 79:10,18,20

81:5

Commission's 30:17

commissions 48:20

committee 13:8, 10,18 63:5,10 64:3,8,11,15,20, 22 65:2,12,24 66:8 74:11 76:19 77:14 78:2 79:11, 13,17 80:2

committees 13:25 65:11 66:4 79:23,24,25 80:4

communicate 53:21 67:10

communication 22:9 26:14

communications 28:4 37:23 53:3,6, 16,21

compared 30:25

compiled 56:23 59:10

compiles 78:21

complaint 20:18

completed 24:17

computer 76:14, 22 77:3

computers 77:8

concluded 82:13

conduct 80:21

conference 25:10 41:10 66:22,25 74:1,4,7 76:2,4,5 81:11

conferences 66:11,13,14,19 67:4,18,19

confirm 35:20 67:13

conflict 35:25 36:10

conjunction

59:11

connection 19:7

consideration 55:24 56:10 57:2, 14 60:3 61:14,18

considered 21:17 56:1 58:6 76:24

Consiglio-young 5:2,13

consistently 29:10

consult 63:7

consulting 61:20

contact 29:7 69:1 70:2

contacted 53:8 78:25 79:7

contacts 69:25

continued 50:14

convicted 11:17

copies 57:21 58:5 62:22 76:23 77:1

copy 17:20,24 18:1 82:9

correct 8:11 9:3, 22,23 10:10 11:7 12:20,24 15:15 17:19 44:1 50:24 52:7 56:17 61:22 62:17 64:13 70:5, 16 72:1,25 74:3 79:22

correlates 12:5

cost 52:21 53:1,12

counsel 5:23,25 6:3 7:23 8:20,21, 25 16:15 17:9 18:3 23:25 28:20 29:1 40:5 45:8

couple 9:11 16:3 58:4

court 7:15 10:14 11:10 12:4 13:7 19:23 22:3 30:1 31:12,16,17 32:16

33:4,11,13 41:2 43:7 44:3,8,12,23 46:9,10 47:7 48:1, 8,20 54:1,4,15 55:23 56:2,24 57:2,4,12,24 59:5, 11,13,20,22,23 60:10,18 61:4,8, 12,24 62:3,7 63:25 72:4,18,19 73:3 77:25 78:8, 11,15,20

courtroom 47:20

courts 6:4 7:1,5, 11,13 19:8 22:1 41:9 48:2,4

COVID 50:3,6,12 51:7 73:23 74:17

create 37:24 48:13,17 53:3,9 80:2,3

created 8:8 20:25 80:17,19

creates 48:19

creation 39:25

crime 11:18

criminal 10:5,15 43:19,22 54:7,13 64:7,8,16,20 65:1 80:8

crowding 81:6

CST 82:13

culture 47:14,16

current 8:10 32:23

custom 61:1

cycle 56:4

---

**D**

daily 13:7

date 11:3 16:12 36:9 41:7

dates 36:5,8,11

David 8:22

day 6:15,16

day-to-day 13:2

days 57:10 60:22, 23 77:18,20,21,22

deal 20:21

deals 7:16

debate 68:6

Deborah 28:17

December 34:18, 22 36:3,7 39:7,8, 13 52:10,17

decide 68:16

decision 44:16 45:16,24

decisions 79:9

declarations 71:17,22

deem 15:8 68:19

definitively 24:9 26:5,6 47:12 61:11 73:12

degree 10:21

delivery 82:2

department 53:22 76:9

departmental 67:8

dependent 65:11

depending 13:17 35:1,6

depends 14:11 65:8,15 69:4 81:8

DEPONENT 82:12

deposition 5:14 6:7 20:14

depth 16:7

deputy 9:1,21 73:1

Describe 21:5

desk 75:18

detail 11:25

details 71:20

determine 59:21 64:22

direct 28:21

directly 9:4,5,8, 14,20,23 10:17 19:6 28:18 45:13 69:3

director 7:3 8:7, 16 9:2,5,21 17:7 18:12 19:3,7 20:5 28:15 70:19,22 71:9,16 72:24 73:9

disciplined 11:14

discuss 54:1,6,12 68:16,20

discussed 41:16 42:17

discusses 55:5

discussion 38:22,25 41:3,17 42:12 44:24 49:3 50:16 51:3 68:17 69:6 82:5

discussions 49:7 50:20

dissolve 80:2

distinction 33:20 46:21,25 47:21 48:9

distinguish 30:19 47:3

division 7:3,4,7, 10,15,16 8:8 10:5 28:4 37:23 53:3,5, 6,16,22 74:22

document 48:17 78:18,19

documentation 32:13

documents 76:24 77:4

doors 75:22

DOUGHERTY 5:7 18:20 19:10,

21 20:1 51:4 65:19,21 73:8,15 78:3 81:2,19,21, 25 82:3,6

draft 62:23

drafted 63:18

drafting 63:8

drafts 63:1,6

due 37:11

duly 5:4

duties 27:9 72:12

duty 31:15

_____

**E**

_____

e-mail 68:25

e-mailing 68:25

e-mails 70:25

earlier 21:10 46:8

early 71:17

education 10:20

electronic 31:13, 18 46:11 77:3

elevate 81:6

eliminate 81:9

employee 19:18 26:7 29:6 48:18 53:17,22

employees 9:7 19:16 53:8 67:3 74:25

employment 27:2

end 14:6 56:14 65:14

ended 14:13

enlist 53:2

ensures 22:4

enter 78:16

entire 63:23

equivalent 67:9

escalated 42:13

escort 43:14

essentially 40:7 41:21 62:3

Etheridge 9:19

everything's 71:6

evidence 54:23 64:17 80:8

exact 16:12 41:7

EXAMINATION 5:6 73:19 81:1

excuse 20:2 23:22

expected 76:15

expenses 70:9

experience 34:7 47:19 64:25 75:1 77:2,19,22

experienced 49:2

explain 7:6 21:20 24:13 34:15 44:17 55:18

extensive 13:24

extent 58:20

_____

**F**

_____

facilitate 12:21 39:25 62:2 64:11 76:10 77:9,10

facilitated 40:3

faculty 30:9

fair 23:2 55:3 63:21

fairly 14:6 16:20 18:15 74:6

familiar 20:20,23 66:1,3

fast 27:15

February 34:24 35:5

*Lexitas Tennessee Court Reporting*
*(615)595-0073*

**federal** 65:23
66:3,7,13 67:15,
20

**file** 15:6 57:14,23,
24 58:4 62:5,21
78:13

**filed** 13:23 14:19
16:13,21 17:4
21:15 46:12 58:8
63:13,18 70:18
71:9,13,14,17,18
72:17,22

**filing** 20:16 63:19

**fill** 78:11

**final** 58:19

**fine** 6:23 23:19

**firsthand** 44:22

**fit** 81:12

**follow** 19:19 39:9

**follow-up** 81:3

**form** 18:18 19:4,
17,24 59:12 73:6
78:3,10,16 81:16

**formal** 43:18,22
46:24

**formally** 11:13
46:3

**format** 59:13

**forward** 27:15

**found** 77:25

**free** 69:25

**Friday** 36:6,9 39:9

**funds** 53:13

---

**G**

**gave** 14:2,14
15:16

**gavel** 58:2,3

**general** 5:25 6:3
7:23 8:20,21,24
10:4 16:14,15
17:9 18:3 20:8
23:25 28:19 29:1
40:5 45:8 55:10

56:15 58:10 61:25
62:13,19

**General's** 5:25
10:1,13 16:14
20:6

**generate** 51:14,
21

**generated** 51:19

**generating** 25:25

**gentleman** 42:1

**Gina** 36:16

**give** 6:9,10 9:10
72:14,15 75:17
79:4 81:18

**giving** 6:7

**good** 5:8,9 10:20
74:5,17

**gosh** 8:3

**government** 30:6
54:11 56:4 67:8

**governmental**
8:16

**graduated** 10:23
11:1

**Great** 81:22

**guess** 10:9 14:5
44:2 67:6

---

**H**

**habits** 6:8

**Haines** 8:22

**Half** 6:16

**handle** 74:22

**happen** 68:4
70:13

**happened** 40:1
44:17 49:4 79:5,
18

**hardware** 77:8,12

**Harmon** 8:23 9:1,
21 28:20,25 29:2
45:8 71:24 73:1

**Harmon's** 71:16

**head** 27:4

**heads** 6:9

**hear** 16:9 65:13,
14

**heard** 39:15 65:9,
10

**held** 51:3 74:14
76:1,2 82:5

**Hendrix** 23:24
24:3 25:24 27:6

**Hivner** 46:13,16

**hold** 11:11 70:17,
21

**Holly** 44:7

**House** 57:25 64:6,
14,21

**housed** 31:11
46:8

**hundred** 50:8,10

---

**I**

**important** 6:6,10

**in-person** 81:6

**incident** 41:4
45:11 49:4 75:4

**include** 22:13

**included** 31:24

**includes** 22:15

**individual** 48:23

**inform** 37:23
38:18

**information**
28:13,14 31:2,5
75:17 76:21

**informed** 45:2
70:22

**injunction** 16:25
17:3,8,11,21 18:2,
6,16,24 19:2,15,
19,22 20:4,11,15
37:12 51:21 52:1,
4,13 70:4,15

**insight** 47:18

**interaction** 42:14
45:1 67:14

**interchangeable**
23:6

**interest** 13:18

**interested** 41:16

**intergovernment
al** 7:4,7 8:7 11:24
72:24

**internal** 57:17

**interrupt** 56:19

**interrupting**
50:19

**involved** 22:23
24:8 53:17

**involvement**
24:16 49:8

**issue** 50:23 57:18

**issued** 16:25

**items** 69:6

---

**J**

**James** 46:13

**January** 7:20,22
14:5,9 56:9,16
58:3 62:14,15,19
65:6,14

**JD** 10:25

**Jeana** 23:24 24:3
25:24

**Jeff** 43:8

**jobs** 67:9

**John** 6:3 16:19
17:9 18:4 40:5

**join** 49:12

**joined** 8:24 23:20
24:2,10

**judge** 7:14 10:15
15:7 46:25 47:25
48:7

**judges** 15:6,12

66:19

**judicial** 47:6,17
48:5,6 63:10
66:14,22,24 67:19

**judiciary** 33:1
63:5 64:3,6,14,20

**July** 56:4

**June** 32:24 34:18,
21,25 35:4 36:2,6,
23 37:6,14 39:5
51:22,24 52:6,23
55:21,25 56:4,13
58:14,24 59:6,17
60:3,7,19

**justice** 26:17,20,
21,23 43:6,8 44:7,
8,11,20 45:12
64:8,11

**justices** 19:23
44:15 45:17 59:17
72:4 73:2,10

**juvenile** 7:12,17
54:25 64:17 80:9

---

**K**

---

**keeping** 32:10,12

**kind** 6:9 8:2 11:25
12:1,21 15:10
21:20 23:2,3
26:14 28:6 35:6
37:21 40:8 41:18
42:12 47:19 51:6
55:18 58:11,15
59:7 63:3 69:21

**kiosk** 75:12

**Kirby** 44:7,8,11,20
45:12

**knowledge** 31:9
52:3 53:15 71:5
80:18

---

**L**

---

**labor** 52:21

**lag** 60:7,13,16

**language** 34:3

**large** 74:6,7

**lasts** 60:22

**law** 10:17 11:2
30:9

**lawsuit** 11:20
16:9,21 18:11
20:16 50:21 66:4,
5 70:18 71:10,13,
18

**leave** 36:24 38:6,
11 39:18,23 40:7
41:23 42:10
43:11,13 51:23

**Lee** 26:21

**legal** 63:7 72:3,20
73:2,10

**legislation** 14:18,
25 15:5,7 72:16

**legislative** 7:10,
24 12:4,9,14,17,
23 13:4,10,15,21,
25 14:1,4,8 16:3
21:16 27:10 63:7
72:8,12

**legislator** 24:18
68:11 79:16

**legislators** 13:9,
19

**legislature** 14:3,
20 15:17,24 22:12
24:19 55:17 58:8
61:18 63:2,14
64:18 65:8 72:22

**legislature's**
13:6

**letter** 70:18,21

**level** 66:18

**levels** 66:19

**liaison** 7:24 21:7,
21 22:3 23:9,13,
21 24:3,23 25:8
27:5,12,20 28:11
29:3,11 30:18
32:2,9 34:7,12
40:21 44:9 46:23
53:20 59:20 67:8
78:23

**liaisons** 12:10
33:4 46:25 48:5,6
56:24 59:11,21

**licensing** 11:15

**link** 37:24 51:15,
20,22 52:22,24
53:9,11

**links** 31:3 77:11

**list** 47:22 48:13
58:25

**listed** 21:3

**lists** 47:24,25

**litigation** 70:17,
21,23 71:2

**livestream** 17:16

**livestreaming**
25:6 37:25 49:6,
10 51:5,8,22 52:6,
24 53:4,9,11,14
81:4,9,15,17

**lobby** 75:13

**logistical** 21:9
22:2,13,18 23:1,5

**long** 9:6 10:6 17:7
18:12,13 19:3
23:9 34:20 65:5
70:19 71:9 73:9

**Long's** 20:5

**longer** 44:25

**looked** 66:6

**lot** 15:3 74:24

**lots** 72:19

**Lynch** 9:18

---

**M**

---

**made** 12:10 27:11
29:2 43:17 44:15,
16 47:21 58:22,24
61:16

**maintains** 48:19

**majority** 49:13,15
72:8 74:18

**make** 17:15 22:11
28:23 33:20

**35:10,25** 39:24
45:23 48:9 54:2,6,
13 56:25 58:7
62:5 64:12 68:1,
21 69:15 79:9

**making** 15:13
21:14 22:19 67:23

**March** 32:25
34:18,21,24 35:4,
8 36:2,6,22,25
39:5 65:6

**materials** 20:13

**maternity** 36:24
38:5 39:18,23

**matter** 41:2 44:23

**matters** 7:12,17
47:8

**means** 34:15

**measurement**
74:5

**meet** 32:24 35:7
50:13 80:15

**meeting** 13:19
17:14 22:5,20
25:19,23 26:1
27:25 28:10,24
29:4,8,15 31:3,4,
21,25 32:1,18,23,
24,25 34:17 35:11
36:23 37:1,6,13,
14,15,17,20,25
38:9,13,20 39:5,7,
12,13,18 40:4,23
41:6,8,14,22,25
42:21 43:4,5,16
44:4,19,21 45:11
51:24,25 52:5,8,
10,13,23 53:24
55:21,22 56:12
58:14 60:3 68:14
75:20,24 76:12,25
77:6 78:25 79:7

**meetings** 13:1,8,
11 22:14,17 24:4,
7,11,14,20,25
25:15,17,20
26:11,19 27:22
30:22 31:8 32:9
34:5,8 35:15,19,
23 36:2,20 38:2
40:10,16,21 41:3

43:1 44:16,25
45:6 46:2 48:25
49:16 50:4,7,15,
17 51:6,8,12,13
53:18 55:24,25
58:16 65:24 66:9
70:13 73:22,23,25
74:14 75:2,25
76:10 77:7,9,10
80:11,14,18,21
81:5

**member** 16:5
21:10,17 33:5,8,9,
15,16,21,22 40:24
41:15 42:23 44:2
45:13 46:16,19
47:2,3,12,13 53:2
54:10,11,12 63:1
68:10,11,21 69:24
74:21 75:4,5,11,
14 76:8,13,18,19
78:24 79:6

**members** 15:22
18:24 21:2 29:13,
24 30:3,7,10,12
31:4,23 32:17
33:1,3,6,10,25
39:1 41:10,22,24
42:14 45:4,13
46:22,25 47:4,6,7,
17,22,24,25 48:2,
10,13 49:12 51:9,
15,17,20 67:17
68:6,16 69:5,7
70:7 72:22 74:11,
15,18,20,24 75:9
77:1 79:2 80:12,
15

**members'** 35:1

**memory** 15:21

**mention** 46:6

**mentioned** 6:6
73:24 75:3 76:8
77:13,16 79:19

**met** 36:7,11

**method** 25:7

**Michelle** 5:2,12
9:5

**Mike** 73:16

**mileage** 70:12

**minimum** 60:23
77:23

**minutes** 30:21
31:7,19,22 32:1,
10,13,19,20,22,25
46:3,5,7

**moment** 16:7
80:10

**month** 36:9

**morning** 5:8,9

**mouth** 18:22

**move** 27:6,12

---

**N**

**names** 9:11,17
69:2

**Nashville** 49:15

**nature** 72:20

**necessarily**
60:16

**needed** 17:13
22:16 49:12 80:3

**newly** 8:8

**nod** 6:8

**nodding** 6:9

**nonverbal** 6:9

**norm** 49:24

**notes** 76:17

**notice** 25:19 26:1
28:9 37:14,15,17,
21 38:20 39:12
40:4 45:10 52:8
78:12

**notices** 27:25
28:6,24 29:5,8,16
60:19

**notified** 16:14,16
17:23 22:20

**notify** 17:5,7 28:3

**November** 11:5
59:24 60:5 61:5

**number** 13:16

---

**O**

**oath** 5:18

**Object** 18:18
19:4,17,24 73:6
78:3 81:16

**observe** 32:10

**occasionally**
55:2 69:22

**occur** 13:25 17:14
22:23,24 38:12,
15,16,19

**occurred** 38:13
50:7,9 73:23,25
74:1

**occurs** 30:22

**off-the-record**
51:2 82:4

**office** 5:25 6:4,25
7:5,11,13 10:2,13
12:10 16:14,16
17:5,6 18:10 19:8,
12,14 20:6 22:1,
22 26:4 27:8 28:2,
7,13 31:17 40:4
41:9 45:13,17
46:10 48:18
49:14,17 51:14
52:19 53:7 78:15,
21

**offices** 67:3 74:2
75:6,9 80:16

**official** 30:16 33:9
57:17 63:8

**officially** 59:9
63:18

**on-the-ground**
47:19

**ongoing** 59:3

**online** 13:23

**open** 22:17 24:4,
7,11,14 25:4,5,15,
17 26:12,13,19
27:22 37:3,8,9,10,
11 38:3 40:13,21
44:25 48:25 50:17
52:5,14 69:23

**opportunities**
67:18

**opportunity** 67:7

**option** 17:13,17
25:17 49:11 69:8
81:18

**order** 33:14 37:12
57:14,18 75:8
81:23 82:10

**orders** 33:18
57:22 58:5 62:21

**original** 20:16

**oversaw** 37:22

**oversee** 7:9 12:3
39:22 48:16,21

**overseen** 19:9
46:10

---

**P**

**package** 12:8,22
21:15 22:10
24:17,22 55:15
56:1,9,13 57:16
61:25 62:13,18
63:9,23 64:12
72:11

**panel** 7:14

**paper** 31:14 46:12
68:7

**paralegal** 28:5

**part** 42:16 47:13
60:17 79:20

**participate** 71:8

**participating**
47:5

**parties** 18:10

**party** 11:20

**pass** 73:15

**past** 14:4,7,13
15:6 16:3 51:22
60:4 61:15 64:24
69:4 70:10 72:5
79:18

**pending** 70:22

**people** 25:9 28:2, 7 43:14 49:13 74:9,12 81:12,14

**percent** 50:8,10

**period** 26:18 41:20 55:13 57:8, 10 59:25 60:7,9, 10,13,16,22 61:6, 23 77:15,17 78:1, 8

**periodically** 41:11

**permission** 75:8

**person** 17:16 25:6,25 26:3 40:24 43:9,11,20, 23 44:19 48:21 49:15 50:11 69:1 73:25 74:14 75:3, 25 76:13 81:10

**personally** 67:22 71:8

**physical** 42:9

**physically** 49:5 62:5

**pick** 6:11

**place** 37:22 66:21 71:5

**plan** 52:18

**point** 8:21 17:11, 12 26:1 27:1,22 28:16 40:15 44:15 48:22 49:3 55:12, 13,17 56:7

**policies** 79:10

**portion** 77:14

**position** 7:2,18 8:1,5,10,15 10:12 11:24 66:11

**positions** 15:7

**possibly** 74:21

**post** 28:14 37:24 51:6,20,25 52:3, 12

**posted** 28:6,24 29:5,22 31:7

37:16,18 38:1 39:14 40:2 52:9

**potential** 54:6

**practice** 10:11 20:24 30:3 32:5,7 34:21 61:1,4

**pre** 70:4,14 78:19

**preference** 65:15

**preliminary** 16:24 17:3,8,11, 21 18:2,6,16,24 19:2,11,15,19,22 20:2,4,11,15 37:11 51:21 52:1, 4,13 70:14

**preparation** 20:14

**prepared** 5:20

**preparing** 71:21

**present** 49:5 74:13

**presented** 47:9

**preserved** 71:1,6

**pretty** 13:24

**previously** 53:17

**primarily** 21:8

**printed** 77:5

**prior** 28:10 32:8, 23 34:12,17 49:24 50:10,20 59:5 65:3 73:22 75:1, 16 76:13 77:6 79:1

**priority** 35:25

**private** 10:11 30:2

**privy** 49:7

**problem** 50:18 56:20

**problems** 48:24 81:6

**procedure** 20:25 54:7,13,17,21 55:1 68:5

**procedures** 15:4

**proceeding** 82:13

**process** 12:4,9, 14 21:16 22:10 24:19 55:19 60:17 62:6 63:19 65:5 72:18 77:15

**Program** 7:15

**programs** 7:9

**promoted** 7:25 8:3

**proposals** 31:23 47:18 54:2 56:22 72:21

**proposed** 32:19 54:16 55:4,11,22 57:15,18,22 58:19 61:7 62:25 64:16 69:15 72:17

**prosecuted** 43:24

**provide** 22:19 33:24 53:13 64:2 67:24 70:8 72:2,3, 13 76:15,23 77:8, 10,12

**provided** 18:1 29:6 70:1,2 76:16 78:7

**providing** 22:13 52:20,22 53:11 81:4

**proximity** 68:15

**public** 17:13,17 22:14,19 24:5 25:5,10,15,18 26:1,12,13 27:22, 25 28:24 29:4,7,8, 15 37:3,8,13,15, 17,20 38:3,20 39:12 40:3,13,17, 22,24 41:11,15, 20,25 45:10 48:25 49:5 52:5,8,14,23 53:1,12,14 54:11 55:13 56:8 57:7,8, 11,19 59:25 60:8, 19,21 61:14,23 68:11,21 69:5,7,9, 10,14,21,23,24

75:5,6,9,11,15 76:18 77:15,24 78:1,5,12,24 79:2, 6 81:5,13

**publicly** 31:8

**purely** 31:1 68:2

**purpose** 53:24 54:1

**pursuant** 33:11

**put** 18:22 27:12 28:10 39:20 45:9 57:6 60:6

**puts** 59:18

**putting** 27:24

---

### Q

**quarterly** 34:10, 11,14 35:15 36:20 38:2 39:10 43:1

**question** 6:19 20:3 26:24 29:19 47:11 69:24

**questions** 5:7,21 73:20,21

**quick** 65:18

---

### R

**Rachel** 8:23 28:20 29:1 45:8

**ranks** 8:2

**reach** 69:2,25 75:16

**reaches** 69:21

**read** 20:10

**reason** 16:10 56:5,11

**recall** 14:2 15:16 16:12,23 23:17, 20,21 24:2,6,10, 13,14,15,16 25:7, 9,11,16,18,21 26:15,16,18,19,25 28:9 29:4,9 32:6 33:17 34:3,13

35:3,9 36:12
37:13 40:22 41:7,
24 42:3,18,20
43:12,18 45:7,12
46:1,4,18 48:12
49:22 50:22 61:2
66:10 70:11,17
71:15,16,20 80:6

**received** 70:20

**recent** 15:20

**recently** 34:16
70:10

**recollection** 36:1
37:18 40:12 43:25
52:9 53:10 71:4

**recommend** 59:4

**recommendation
s** 54:3,6,14,16
57:3,5,7,19 58:20
60:12 61:13,17
67:23 68:1 78:2

**recommended**
59:9

**record** 5:11 6:2
13:24 26:14 29:21
30:22 59:8 65:22

**records** 29:20
30:16 31:13,14,
18,21,24 70:25

**reference** 68:17

**referenced** 66:5

**referred** 55:14

**referring** 14:22

**regular** 34:5 82:1

**regularly** 69:9

**reimbursement**
70:11

**reimbursements**
70:6

**related** 14:15,17,
18,20 72:10,20

**relates** 12:1

**relay** 28:13

**relayed** 45:21
59:22

**remember** 25:13
27:3,19 43:3,15
45:15 70:20

**report** 9:4,5,8,14,
15,20,21,23 12:16
28:18,21

**reported** 28:19
46:1

**reporter** 22:8
30:13,16,23,25
31:2,5 32:12,14,
15 59:1,7,10,16,
18 65:17 69:3
81:23 82:1,8

**reporter's** 30:14,
19,24

**represent** 48:3
62:3

**represented**
5:23,24

**represents** 20:7

**request** 13:12
15:13 16:2 41:13
68:10,15 75:7,16

**requested** 13:9,
10 16:1,4 54:10
76:25 79:3 80:20

**requesting** 15:7
28:9 70:11 79:14

**requests** 22:6
69:5

**require** 53:16

**required** 12:14
22:15 58:1 79:3

**requirement**
32:4,7 62:4,7,9,10

**requirements**
19:20

**res** 62:23

**resolution** 58:7
62:24 63:1,11,17,
19,22,24 64:4

**resolutions**
62:23 63:3 64:23
65:4,9

**responsibilities**

21:9

**responsible**
25:25 26:3 27:24

**restate** 18:19

**restrictions** 50:6

**restroom** 65:18

**review** 20:12,13,
17 60:10,11

**reviewed** 77:6

**Robert** 10:15

**role** 7:21 8:12
10:6,7 12:2,5
15:10 19:7 21:5,7
22:3 27:12 30:14,
19,20,24,25 40:6
53:20 67:22,23
72:2 76:11 78:23

**roles** 27:9,11,13,
14 28:8

**room** 25:10 41:10
74:1,4 76:2,4,5
81:12

**rooms** 76:3

**rosters** 48:19

**roughly** 9:12
55:18 61:6 74:7,
15

**rule** 54:1,2,6
56:21 58:6,19
62:23 63:1,11,19,
25 64:12,23 65:3,
9 67:23 68:1,4,5
69:15

**rules** 12:8,12,22
14:21 20:24 21:15
22:9 24:16,21
54:7,13,17,20,23,
25 55:4,11,14,22
56:1,9,11 57:15,
18,23 59:4 60:6
61:3,7,15,25
62:13,18,24 63:9,
14,21,23 64:3,7,
10,16,22 72:10
77:14 78:1,23
79:9,20

**S**

**SAITH** 82:12

**sat** 24:24 40:9

**schedule** 65:13

**scheduled** 35:24
38:10,11 65:10

**schedules** 65:9

**scheduling** 21:12

**school** 10:18 30:9

**seats** 74:7

**security** 43:15,17
75:7,12,17,22

**segue** 10:20

**selected** 32:14,15

**Senate** 57:25
64:6,22

**send** 51:15 57:1
59:14 60:19 61:8
63:1

**sense** 12:10

**separate** 63:24

**separately** 66:6

**September**
34:18,21 35:4
36:3,6 38:8 55:24
56:12 59:5,24
60:5 61:5

**served** 23:9

**services** 63:8

**session** 13:4,6
14:1,4,7,8 65:15

**sessions** 13:3
16:4

**set** 36:9 53:4
64:19

**sets** 53:7

**settled** 56:22

**share** 6:2

**shift** 27:8

**shifted** 50:10

**short** 65:20

**shortly** 8:23

**show** 75:18 76:13

**signature** 82:11

**similar** 65:24

**sir** 5:19,22 21:1

**sit** 24:20

**sitting** 25:10

**slightly** 34:23

**small** 81:11

**son** 42:2

**sooner** 82:2

**sought** 21:16

**space** 22:6 31:3

**speak** 61:11
79:14

**speaking** 41:18

**specific** 69:12
79:4

**specifically** 24:6
25:7,22 26:2
27:13 29:9 33:19

**specifics** 24:15

**sponsor** 15:1
63:2

**sponsored** 14:19

**Stacy** 9:18

**staff** 12:6 21:10

**Stahl** 6:1 18:18
19:4,17,24 73:6,
17,20 78:6 80:23
81:16,22 82:9

**standing** 79:23,
25 80:4

**start** 7:18 56:13
60:8

**started** 8:22
10:17 23:15 26:22
27:20 73:24

**starting** 36:24

**state** 5:10 11:8,14
66:12,16,17,18

67:2,5,13,19

**statements** 6:10

**states** 67:9

**statute** 12:15 32:4
33:11,20,24 34:2
58:1 61:1,2

**statutory** 32:6
62:10 72:17

**Stephanie** 9:19

**stipulation** 6:18

**stopped** 41:22

**strike** 20:3

**subcommittee**
68:18 80:14,15

**subcommittees**
79:20 80:5,12,17,
20

**submit** 62:13 63:9

**subtract** 57:5

**suggestion**
68:22 69:15

**summary** 63:22

**supervise** 48:16

**supervisors**
9:14,16

**supervisors'**
9:17

**supplies** 76:16

**support** 23:3
52:20 67:24 70:8
76:12 77:9 80:21

**supportive** 22:7

**suppose** 81:8

**supposed** 71:1

**Supreme** 19:23
22:3 30:1 31:12,
16 32:16 33:10,13
41:2 43:6 44:3,8,
12,23 46:9 55:23
56:2,24 57:2,4,12,
24 59:11,20,23
60:18 61:8,24
62:2,7 72:4 73:2
77:25 78:8

**sworn** 5:4

**system** 7:14 12:4
13:7 63:20

---

**T**

**table** 74:7

**takes** 10:8 61:25

**talk** 13:1 65:2 68:6
72:18

**talked** 15:5 21:20

**talking** 66:24

**Tate** 28:17,18

**Taylor** 28:17

**TCA** 20:25

**tech** 74:21 77:9

**technical** 80:20

**technology**
74:22

**ten** 10:9 29:17
74:15

**Tennessee** 11:1,
6,12,14 13:21
19:23 20:2 22:3
30:1 31:11,16
32:15 33:10,13
41:2 44:3 46:9
54:8 56:3 61:24
65:25 66:24 67:7

**term** 23:1 33:24
41:18 51:10 57:17
58:15 62:16

**terminology** 47:2

**terms** 18:6,16
29:15 52:19 55:10

**testified** 5:4 15:9

**testify** 13:4 16:1,
11

**testimony** 13:9,
12,14 14:3,14
15:17,19,23 16:4

**time** 6:13,17 14:2,
6 15:16 16:21
20:10 23:22 24:1,
7 25:8 26:4,9,18

27:9,14 28:3,5,19
38:20 42:21 43:7,
8 45:9 56:9 60:11,
14

**times** 15:3 66:23
72:19

**timing** 52:1

**title** 7:21

**titles** 48:7

**today** 5:15,21
16:10

**told** 11:23 28:12
44:24 45:4,5,9,12,
14,19

**tone** 42:13

**top** 27:4

**topic** 15:8 41:16
42:17,18 54:9

**topics** 13:16 15:3
72:6,7,9

**total** 9:13

**town** 35:24

**transcripts** 13:20

**transmitted**
59:17

**travel** 49:14

**Tuesday** 82:6

**type** 9:25 14:25
49:6

**types** 21:13

**typical** 34:8

**typically** 14:10
15:25 21:2 35:23
51:16 55:20 57:9
58:3 60:1,2,21
62:12 63:4,9 64:2,
5 67:12 68:13
74:13,23 76:20,
23,25

---

**U**

**uh-huh** 20:19
23:16 36:19 40:11
49:18 50:2 55:16

58:13

**ultimate** 21:15

**ultimately** 22:10

**undergraduate** 10:21

**understand** 5:17 6:12 12:20 25:11 33:7 51:11 58:14

**understanding** 17:10 18:5,8 23:7 24:21 55:11 70:24

**University** 10:23 11:1

**unlimited** 81:14

**unpack** 58:11

**unruly** 40:25

**upcoming** 39:6,7, 13

**upload** 78:17

**upset** 42:17

---

**V**

**varied** 28:1,7 34:23 69:4

**varies** 13:17 15:2 57:9 60:1 61:19 63:3 66:22 68:9, 12

**verbal** 6:10 42:6, 10 43:10

**verbally** 43:10,23 48:23

**verify** 75:20

**versus** 47:13

**vicinity** 35:5

**view** 49:6

**virtual** 50:5,8,10, 14 51:8,12 70:13 73:23 75:2 77:7 80:18,21

**virtually** 49:12 50:13,17

**vote** 47:1,8

---

**votes** 47:4 55:17

**voting** 33:3,5,6,8, 9,16,22 46:19,22 47:2,4,12 48:10

---

**W**

**Wade** 42:22,23 43:9 45:23

**waive** 82:10

**walk** 55:9 75:10

**wanted** 39:19 76:16

**warrants** 68:17

**ways** 68:24

**website** 21:3 25:21 28:10 29:10,12,18 37:16 38:1 39:13,20 47:22 48:10,14 69:2,11,14,18 78:11,16

**Wedemeyer** 10:15

**Wednesday** 82:7

**week** 20:12

**weeks** 58:4

**whatnot** 57:6 76:22 77:11 78:20

**When's** 20:10

**whichever** 62:24 64:12

**witnessed** 79:13, 16 80:11

**wondering** 76:10

**Word** 78:19

**words** 18:22

**work** 6:24,25 9:25 22:4,5 25:6 32:20 52:21 59:2 61:10

**worked** 10:1 28:2

**working** 51:5

**works** 15:14 34:1 59:19

---

**write** 59:1 68:7

**writing** 76:16

**written** 58:8 78:19

**wrong** 12:20

---

**Y**

**year** 8:3 10:22 14:7,13 15:6 24:22 26:23 27:16 34:9,19 35:16 36:17 38:7 55:21, 25 60:1 63:3,4 66:23

**years** 8:13 10:7,9 25:2 27:1 29:17 34:23

**Young** 73:21

---

**Z**

**Zoom** 31:3 51:14, 15,20 52:22

*Lexitas TENNESSEE Court Reporting*
*(615)595-0073*