# EXHIBIT 2

```
 1          IN THE UNITED STATES DISTRICT FOR        09:02:56
            THE MIDDLE DISTRICT OF TENNESSEE
 2                 NASHVILLE DIVISION

 3   _____

     DAN MCCALEB, Executive Editor
 4   of THE CENTER SQUARE,

 5           Plaintiff,

 6   vs.                        Case No. 3:22-cv-00439

 7   MICHELLE LONG, in her official
     capacity as DIRECTOR of the
 8   TENNESSEE ADMINISTRATIVE OFFICE
     OF THE COURTS,
 9
             Defendant.
10   _____

11

12

13

14

15        Videoconference Deposition of:

16        THOMAS LANG WISEMAN

17        Taken on behalf of the Plaintiff
          November 21, 2023
18
          Commencing at 9:05 a.m. CST
19

20

21

22

23   _____

24            Lexitas Legal
         Michelle Cessna, LCR, RPR
25            (615)595-0073
```

```
 1

 2

 3              A  P  P  E  A  R  A  N  C  E  S

 4

 5

        For the Plaintiff:
 6
                MR. M. E. BUCK DOUGHERTY, III
 7              MR. JAMES MCQUAID
                Attorneys at Law
 8              Liberty Justice Center
                440 N. Wells Street, Suite 200
 9              Chicago, IL 60654
                (312)637-2280
10              bdougherty@libertyjusticecenter.org
                jmcquaid@libertyjusticecenter.org
11

12

13
        For the Defendant:
14
                MR. MICHAEL M. STAHL
15              Attorney at Law
                Office of the Attorney General
16              PO Box 20207
                Nashville, TN 37202-0207
17              (615)741-3491
                michael.stahl@ag.tn.gov
18

19
        Also Present:
20
                MS. BRIDGET CONLAN
21

22

23

24

25
```

*Lexitas* *TENNESSEE*
(615)595-0073

```
1                          I   N   D   E   X

2                                                        Page
   Examination
3  By Mr. Dougherty                                       5

4  Examination
   By Mr. Stahl                                          66
5
   Examination
6  By Mr. Dougherty                                      69

7

8

9               E   X   H   I   B   I   T   S

10                                                       Page

11 Exhibit No. 2                                         17
        Expert report
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              S T I P U L A T I O N S

2

3

4            The deposition of THOMAS LANG WISEMAN was

5    taken by counsel for the Plaintiff, whereupon all

6    parties participated via videoconference on November

7    21, 2023, for all purposes under the Tennessee Rules

8    of Civil Procedure.

9            All formalities as to caption, notice,

10   statement of appearance, et cetera, are waived.  All

11   objections, except as to the form of the questions,

12   are reserved to the hearing, and that said deposition

13   may be read and used in evidence in said cause of

14   action in any trial thereon or any proceeding herein.

15           It is agreed that MICHELLE CESSNA, LCR, RPR,

16   and Court Reporter for the State of Tennessee, may

17   swear the witness, and that the reading and signing

18   of the completed deposition by the witness are not

19   waived.

20

21

22

23

24

25
```

*Lexitas - TENNESSEE*
*(615)595-0073*

```
 1              *   *   *

 2              THOMAS LANG WISEMAN,

 3   was called as a witness, and having first been

 4   duly sworn, testified as follows:

 5

 6              EXAMINATION

 7   QUESTIONS BY MR. DOUGHERTY:

 8   Q.    Good morning, Mr. Wiseman.

 9   A.    Hey, how are you?

10   Q.    I'm fine, thank you.  And I guess

11   everyone but Mr. Wiseman and I, I guess,

12   probably should -- could mute it.

13        But, I guess, could you please state your

14   name for the record?

15   A.    My full name is Thomas Lang Wiseman.

16   Q.    And Mr. Wiseman, have you ever had your

17   deposition taken before today?

18   A.    I have.

19   Q.    And can you tell me in what context and

20   what cases, if you can recall?

21   A.    So it's one -- it was one occasion in

22   connection with a construction lending dispute

23   that involved what is now First Horizon Bank

24   and one of its lending customers.  I worked on

25   the case as a very young associate during my
```

1     first two or three years of practice.  We -- it

2     was a workout situation.  We worked with the

3     borrower to kind of maximize the value of the

4     construction contracts in order to pay down the

5     loan.  Apparently, a dispute occurred later on

6     because there was some deficiencies and issues

7     came up about his cooperative -- his level of

8     cooperation, the bank's level of cooperation.

9     So I gave a deposition a number of years later

10    just about my interactions with him, limited as

11    they were.  I don't really remember the

12    specifics of it other than it was based on the

13    work I did as a young lawyer.

14    Q.    And you weren't actually involved as a

15    party in that case, you were an attorney?

16    A.    I was an attorney, yeah.

17    Q.    Have you ever been a party to a lawsuit

18    before and not in your role as an attorney?

19    A.    Yes, I -- I was involved in a divorce

20    action in 2007.

21    Q.    Okay.  And so, that was -- was that in

22    State court in Tennessee?

23    A.    State court in Tennessee and it was

24    resolved by agreement.

25    Q.    Okay, what county was that in?

```
1    A.    Shelby County.
2    Q.    Okay.  Are you represented by counsel
3    here today, Mr. Wiseman?
4    A.    I am not.
5    Q.    Okay.  And do you have any medical
6    condition or anything that would prevent you
7    from your ability to give honest and truthful
8    answers today?
9    A.    No.
10   Q.    Okay.  And --
11   A.    Although I will say, I'm always amused by
12   that question because if someone were -- I'm
13   not sure they could answer the question, but
14   no.
15   Q.    That's a good point, we'll take it.
16         So you -- I'm sure you probably conducted
17   depositions yourself and, you know, this is not
18   a marathon.  If at any point today -- it's a
19   little bit different when we're doing it
20   remotely, but if at any time you need a break,
21   certainly feel free and we'll take a break.
22   A.    Will do.
23   Q.    Yeah, the only stipulation is if I've got
24   a question on the table, I would just ask that
25   you answer that particular question first
```

1    before we take the break.  Okay?

2    A.    Sounds good.

3    Q.    All right.  I know you've already --

4    you've been sworn in on that long remote oath,

5    but do you have any written materials that you

6    brought to the deposition today?

7    A.    I brought my bag just because I didn't

8    want to leave it in the car, but it doesn't

9    have any case materials or anything.  It's just

10   my bag with my pens and my computer and that

11   sort of thing.

12   Q.    Okay.  And we're going to talk about your

13   expert report in a second.  We're going to

14   enter that into the record, and that's going to

15   be -- I'll go ahead and tell you that's going

16   to be the only exhibit we'll be discussing

17   today.  Okay?

18   A.    Okay.

19   Q.    How did you prepare for this deposition?

20   A.    I just went back and reviewed the

21   materials that were referenced in my report

22   that I prepared that -- the only thing in

23   addition to that was I scanned through the

24   deposition of Michelle Long, which I don't

25   think was available when I -- at the time I

LexiTas  TENNESSEE
(615)595-0073

```
 1   prepared my report.

 2   Q.    And I know your report we'll talk about

 3   in a second has a lot of your background.  I

 4   just want to go ahead and get some of the

 5   background discussed and get it out of the way.

 6         What is your current position?

 7   A.    Say again?

 8   Q.    What is your current work position?

 9   A.    I'm an attorney at Baker Donelson.

10   Q.    And when did you start at Baker Donelson

11   in your current role?

12   A.    So I started in my current role in

13   January of '22.

14   Q.    And prior to that, what were you doing?

15   A.    I worked as a deputy chief counsel to a

16   governor.

17   Q.    You have your legal credentials in your

18   bio.  When -- what was the date of your first

19   Bar admission?

20   A.    I was admitted to the Bar in 1997.  I

21   don't remember the exact month.  It was -- I

22   want to say it was February or March of '97.

23   Q.    And other than the state of Tennessee,

24   are you licensed to practice law in any other

25   states?
```

1    A.    No.

2    Q.    Mr. Wiseman?

3    A.    I think one of us froze up there for a

4    second.  I am not licensed in any state but

5    Tennessee.

6    Q.    Okay.  Have you ever been formally

7    disciplined by a Bar licensing authority?

8    A.    I have not.

9    Q.    Have you ever been convicted of a crime?

10   A.    I have not.

11   Q.    Now, tell me a little bit about your law

12   practice with Baker Donelson and your

13   particular practice areas, please.

14   A.    It's a -- it's a fairly healthy mix of

15   things ranging from kind of traditional

16   litigation work, commercial and otherwise this

17   seems to be these days for whatever reason

18   heavy in trust and estates type litigation.

19   And then I also do a healthy amount of kind of

20   regulatory work that would be kind of state

21   facing, help people navigate kind of state

22   government issues that come up from time to

23   time.  And then also assist people in the

24   economic development states who are, you know,

25   coming into the state trying to figure out how

Lexitas TENNESSEE
(615)595-0073

1    to -- how to do business in Tennessee.
2    Q.    Does your experience in your law practice
3    include constitutional law under the United
4    States Constitution?
5    A.    I wouldn't say that I hold myself out at
6    handling constitutional questions, but
7    obviously, you know, constitutional issues come
8    up in a variety of ways in different cases.
9    So, I mean, certainly to the extent
10   constitutional questions come up, yes.
11   Q.    Do you have any experience in your law
12   practice with the First Amendment?
13   A.    I don't -- I don't think any direct
14   experience in my current law practice with the
15   First Amendment, no.
16   Q.    Have you ever tried a case that involved
17   the First Amendment?
18   A.    I don't -- I don't believe so.
19   Q.    In your work with -- your past work with
20   government officials, have you ever had to
21   advise an official -- a government official
22   about what it means legally under the First
23   Amendment to have a compelling governmental
24   interest that is narrowly tailored?
25   A.    I don't know that when you're in a

*Lexitas* **TENNESSEE**
(615)595-0073

1    political space you use legal speak to advise

2    nonlawyer clients, but -- so I don't know that

3    I've ever used that particular phrase.  But

4    certainly during the course of my time in the

5    governor's office, First Amendment related

6    issues come up from time to time.

7    Q.    In your experience, what is your

8    understanding of what it -- what a compelling

9    governmental interest means under the First

10   Amendment?

11   A.    What does a compelling governmental

12   interest mean under the First Amendment?  I

13   think my sense is that, you know, the First

14   Amendment is a fundamental right and certainly

15   is held to the highest of scrutiny and that it

16   would require a very important governmental

17   interest in order to curve whatever First

18   Amendment right might be at issue.

19   Q.    And you just kind of referenced this, the

20   scrutiny, during that experience that you've

21   had advising governmental officials, have you

22   ever had to delve into a situation on applying

23   strict scrutiny and what that means under the

24   First Amendment?

25   A.    Again, you know, when you're advising

1    clients, I don't know that -- I'm not sure I

2    probably ever used that particular phrase.

3    Certainly it comes up in discussion amongst

4    your colleagues, but, I mean, we would have

5    issues come up from time to time dealing with,

6    you know, public records, open meetings and

7    other issues related to the First Amendment

8    issues that -- that people would raise or ask

9    questions about or make demands about.

10   Q.    Do you personally know AOC Director

11   Michelle Long?

12   A.    I know Michelle.  I've served on a panel

13   with her before, but I would not say that we're

14   friends or anything -- I mean, we're

15   acquaintances, and I know who she is, yes.

16   Q.    What particular panel was that?

17   A.    We served on Governor Haslam's judicial

18   panel together for a brief period of time.

19   Q.    And that's the only contact that you've

20   had with Ms. -- excuse me, Director Long,

21   professionally?

22   A.    I think we may have talked on the phone

23   at one point when I was in the Governor's

24   office, but I don't recall the nature of the

25   call.  It may have just been to congratulate

1    her when she took a position, but I don't
2    recall.  I know I spoke to her at some point
3    for some reason, but I don't recall the nature
4    of it.
5    Q.    What about do you personally know AOC
6    Deputy Director Rachel Harmon?
7    A.    Yeah, I would say it's the same, I -- I
8    know her professionally through coordinating --
9    well, in the Governor's office coordinating
10   judicial selection issues.
11   Q.    What about current AOC employee Michelle
12   Consiglio-Young, do you know her personally?
13   A.    It would be the same answer, I've had
14   interaction with her professionally.
15   Q.    Any opportunity that you've ever had --
16   and I don't mean casually at Bar events, but
17   have you ever worked with or advises any of the
18   current or past justices of the Tennessee
19   Supreme Court?
20   A.    Just in my time only a -- on the advisory
21   commissioner rules.
22   Q.    And so, you had an opportunity when you
23   -- and we'll talk about the Advisory Commission
24   in a minute.  You had an opportunity to
25   interact with some of those justices?

```
1    A.   Well, the -- I mean, the justice at the

2    time was Holly Kirby who was the liaison, so it

3    would have been her.

4    Q.   Okay.  But by being the liaison, Justice

5    Kirby actually attended meetings when you

6    served on the Advisory Commission?

7    A.   Yes.

8    Q.   Okay.  All right, I'm going to go ahead

9    and we'll talk about your disclosure and your

10   report.  It should be in the chat there if

11   you're able to pull that up or perhaps I don't

12   know if Mike is there with you, but the court

13   reporter can maybe help you navigate the -- the

14   exhibit.

15   A.   I'm looking at the chat, but I'm not

16   seeing anything.

17   Q.   So if you click on the chat, it should

18   open up a box and to the right there should be

19   a PDF.

20   A.   I'm not seeing anything.  It's allowing

21   me to type a message, but I'm not seeing any

22   messages.

23        MS. CONLAN:  I'll send it again.  It

24   might be because you joined after I sent it.

25   ///
```

```
 1   BY MR. DOUGHERTY:

 2   Q.    All right, are you able to pull that

 3   document up, Mr. Wiseman?

 4   A.    Yeah, it's asking me to download it.  Let

 5   me -- let me try to save it to the desktop and

 6   see if it will...

 7   Q.    Yeah, however -- whatever works for you

 8   just so you're able to refer to it.

 9   A.    Yeah, it looks like I'm going to pull it

10   up here.

11   Q.    Okay.

12   A.    So is there a question pending?  I've got

13   it open.

14   Q.    As long as you've got it open now, we can

15   talk about it.

16   A.    Okay.

17   Q.    So look at that document and is that your

18   signature on the -- the last page?  And do you

19   recognize that document?

20   A.    Yes, that is my signature and I'm

21   scanning through the document.  I mean,

22   obviously, I haven't read it word for word, but

23   it looks like the document.

24   Q.    And that would be your expert disclosure

25   and report?
```

```
1    A.    Yes.

2    Q.    For purposes of your deposition, we're

3    going to mark this as Exhibit 2.  I understand

4    that it says Exhibit 1, but just because where

5    it comes in the nature of this lawsuit we're

6    going to mark it as Exhibit 2 and enter this as

7    Exhibit 2 as part of your transcript.  Okay?

8    A.    Okay.

9          (WHEREUPON, a document was marked as

10   Exhibit No. 2.)

11   BY MR. DOUGHERTY:

12   Q.    Were you -- when you signed this

13   declaration, were you physically in the United

14   States when you signed it?

15   A.    Yes.

16   Q.    Do you recall what city and state you

17   were in when you signed the declaration?

18   A.    I was sitting in my office in Nashville.

19   Q.    Okay.  And did you prepare this

20   declaration and report or did you receive

21   assistance?

22   A.    I prepared it.  I mean, I had discussions

23   with Mr. Stahl and Mr. Coulam, but this is my

24   work.

25   Q.    Do you have multiple drafts of this
```

```
1   report or is this the only draft?
2   A.    I -- it depends on what you refer to as a
3   draft.  I mean, I had -- I had a working
4   document that I worked on over the course of --
5   of several days.
6   Q.    What I mean --
7   A.    I'm --
8   Q.    I'm sorry, go ahead.
9   A.    I would -- I would say it was a
10  continuous working document that -- I wouldn't
11  say I -- it was something I prepared and said,
12  hey, this is a finished draft.  It was a
13  working draft throughout its entirety until I
14  finished it.
15  Q.    Do you have any e-mails back and forth
16  with Mr. Stahl about this report and the draft
17  that you put together?
18  A.    Yes.
19  Q.    Can you please preserve those e-mailed?
20  A.    Okay.
21  Q.    How many do you think you have of e-mails
22  back and forth regarding this report with
23  Mr. Stahl?
24  A.    Maybe two or three.  I don't -- it was
25  just a handful.  It was not an -- I don't
```

```
 1    recall an exact number, but a handful.
 2    Q.    Okay.  We'll go through it in general,
 3    this report, and we'll go through it in detail.
 4    A.    Okay.
 5    Q.    And what is your experience with the
 6    Advisory Commission on the rules of procedure
 7    and practice created by TCA 16-3-601?
 8    A.    I was appointed I believe it was in 2015
 9    initially.  Don't hold me to that.  I think I
10    went back and figured that out and had that in
11    the -- in my report.  I trust that it's in
12    there somewhere in that general time frame.
13    And worked on the -- on the Commission for
14    maybe two or three years.  At one point was
15    asked and agreed to serve as vice chair and
16    then ultimately resigned my position once I
17    agreed to accept the governor's appointment to
18    serve as deputy chief counsel to the governor.
19    Q.    And we're going to talk today about the
20    Advisory Commission.  We're also going to talk
21    about what I'll refer to as Federal Analogue to
22    the Advisory Commission.  When I ask you a
23    question about the Advisory Commission, I'm
24    going to try to just say Advisory Commission
25    and that will be the Tennessee Commission.  And
```

```
 1    then when I talk about the Federal Analogue,
 2    I'll try to designate that.
 3          But at any point today, Mr. Wiseman, if
 4    you don't understand which commission or
 5    committee I'm asking you about, please let me
 6    know.  Okay?
 7    A.    Sure, okay.
 8    Q.    What is the purpose of the Tennessee
 9    Advisory Commission?
10    A.    Just to advise the Supreme Court on the
11    rules of practice and procedure.
12    Q.    And aren't there basically five different
13    types of rules and practices that the Advisory
14    Commission makes recommendations on?
15    A.    I don't know that I've ever stopped and
16    counted them up.  I mean, the main topics of
17    conversation are always the civil rules and
18    criminal rules and rules of evidence.  I don't
19    think if I -- as I sit here today I can tell
20    you exactly what the -- what the full pan of
21    play of rules were.
22    Q.    Well, we'll just go through it.
23          Does the Advisory Commission make
24    recommendations regarding the Tennessee Rules
25    of Criminal Procedure?
```

```
1    A.     Yes.
2    Q.     Does the Advisory Commission make
3    recommendations regarding the Tennessee Rules
4    of Civil Procedure?
5    A.     Yes.  Let me amend my response.  That was
6    the practice at the time I was on it.  I don't
7    know that I can speak to what occurs today.  I
8    assume that it's the same.
9    Q.     Okay.  Does the Advisory Commission make
10   recommendations regarding the Tennessee Rules
11   of Appellate Procedure?
12   A.     Yes, as I recall.
13   Q.     Does the Advisory Commission make
14   recommendations regarding the Tennessee Rules
15   of Evidence?
16   A.     Yes.
17   Q.     And does the Advisory Commission make
18   recommendations regarding the usual Rules of
19   Procedure?
20   A.     You know, I think that's the case.  I --
21   I'm racking my brain to remember whether that
22   actually occurred.  I should say the Advisory
23   Commission has the ability or opportunity to
24   make recommendation.  I don't know that it
25   always occurs, but yes.
```

1    Q.    Okay.  And during your time on the
2    Advisory Commission, how often did the
3    Commission meet?  What was the cadence?
4    A.    I want to say it was quarterly.
5    Q.    Do you have any experience or knowledge
6    with the Federal Analogue to the Advisory
7    Commission, the Federal Rulemaking Committees
8    created by 28 USC 2073?
9    A.    Is your question whether I have any
10   experience with it?
11   Q.    Or knowledge.
12   A.    I mean, I have knowledge of it.  I've
13   never been on the Commission -- the Federal
14   Commission or had experience dealing with it.
15   Q.    What is your knowledge of the -- the
16   Federal Committees that make rules of practice
17   and procedure?
18   A.    Just, you know, general knowledge that a
19   lawyer would have in terms of understanding the
20   rules, understanding the -- you know, the
21   competence to the rules, where they originate
22   from.  And then, you know, reviewing the code
23   to understand at a broad level how -- how the
24   process works.
25   Q.    Have you ever had a case during your law

1    practice that involved the Federal Committee

2    created by 28 USC 2073?

3    A.    Not sure I understand the question.

4    Q.    Sure.

5         In your role as a practicing attorney,

6    has the Federal Advisory Committees, has that

7    ever been part of any lawsuit that you've

8    litigated?

9    A.    I've never been involved in a case -- let

10   me back up.  I'm not sure I understand your

11   question, so I want to answer specifically to

12   make sure I'm getting what you're saying.

13   Q.    Okay.

14   A.    I obviously had lots of cases that

15   involve federal practice and rules of civil

16   practice and procedure and evidence and

17   whatnot.  I feel certain, although I can't

18   quote you a case where an issue would have come

19   up, where we -- where I or we at my firm would

20   have argued or made argument based on the

21   Advisory Commission comments.  But I don't know

22   that I've ever had an issue that raised the --

23   how the -- how the Advisory Commission at the

24   federal level would have operated or -- if

25   that's -- so I'm not sure what your question

```
 1   is, but I have to answer it like that.
 2   Q.    Yeah, I understand.  Let me clarify that
 3   some for you if I can.
 4         Have you ever had any experience with the
 5   federal rulemaking process that is, you know,
 6   related to the statute 28 USC 2073?
 7   A.    No.  Other than to argue the rules that
 8   would have been their work product.
 9   Q.    What is your understanding of the Federal
10   Rulemaking Committees, what is -- what is their
11   purpose?
12   A.    I don't know that I'm -- I don't know
13   that I can answer what -- what they might
14   consider their purpose to be.  But, I mean,
15   the -- I think the code says what it says.  The
16   notion is to have a process in place to make
17   recommendations and advise judiciary on the
18   rules.
19   Q.    Okay.  When were you first made aware of
20   this lawsuit, McCaleb versus Long?
21   A.    Oh, two months ago.  Maybe a month and a
22   half, two months.
23   Q.    And how were you made aware of -- about
24   this lawsuit?
25   A.    Mr. Stahl called and told me about the
```

```
 1    lawsuit, kind of the general issues.  We talked
 2    about the issues and they asked -- or he asked
 3    if they -- would I have any interest in perhaps
 4    serving as an expert.
 5    Q.    Are you aware that there's currently a
 6    preliminary injunction that is in place?
 7    A.    Yes.
 8    Q.    And did you have an opportunity before
 9    you prepared your expert report to read that
10    memorandum opinion?
11    A.    Yes.
12    Q.    And did you also have an opportunity -- I
13    think there was a separate actual order and
14    preliminary injunction -- were you able to read
15    that?
16    A.    I'm sorry?
17    Q.    I think there was a separate order
18    related to the memorandum opinion about the
19    preliminary injunction.  Were you able to read
20    that document?
21    A.    I read the pleadings.  I don't have a
22    specific recollection of reading the order, but
23    I -- I feel confident that -- that I read the
24    order.
25    Q.    Okay.
```

LEXITAS TENNESSEE
(615)595-0073

```
1   A.    Along with the memorandum of opinion.

2   Q.    Okay.  Did you recall who -- what

3   individuals the preliminary injunction applies

4   to?

5   A.    As I sit here today, I assume that it

6   applies to the AOC as party to the case, but I

7   don't -- I need to look at the order again.

8   Q.    Okay.  Are there members of the judiciary

9   that serve on the Advisory Commission?

10  A.    You said are there members of the

11  judiciary?

12  Q.    Yes.

13  A.    I don't recall as I sit here.  I looked

14  at the roster of folks who are on the

15  Commission at one point, and I seem to recall

16  there were members of the judiciary.  There

17  were at the time I served.  Certainly not -- I

18  believe there to be today, but I -- I can't

19  quote you any.

20  Q.    Are there private attorneys, what I'll

21  refer to as members of the Bar, who serve on

22  the Advisory Commission?

23  A.    Yes.

24  Q.    Who makes appointments to the Advisory

25  Commission?
```

LEXITAS - TENNESSEE
(615)595-0073

```
1    A.    The Supreme Court.

2    Q.    And is that by statute?

3    A.    Yes.

4    Q.    Now, tell me again the years that you

5    served on the Advisory Commission.

6    A.    I would -- in order to be specific I

7    would refer you to the information that I put

8    in my report as I -- I've said we'd go back

9    and -- and look at that, but I believe it was

10   2015 until late 2018.

11   Q.    Okay.  And do you recall -- during 2018

12   before you resigned, do you recall actually

13   participating in all four quarterly meetings

14   that years in 2018?

15   A.    I don't have a specific recollection but

16   it would have been unusual for me to miss

17   something.

18   Q.    I just didn't know if you resigned

19   midstream before all the committees had

20   actually -- I mean, excuse me, all the meetings

21   had taken place.  That's kind of why I was

22   asking that about 2018.

23         Do you recall what point in 2018 you

24   resigned?  Was that at the end of the year?

25   A.    It would have been certainly after the
```

Lexitas MIDDLE TENNESSEE
(615)595-0073

```
 1    gubernatorial election, which would have
 2    occurred in November.  I believe all the
 3    meetings would have been completed by then, but
 4    I'm not a hundred percent certain about that.
 5    Q.    During your service on the Advisory
 6    Commission, were any of those quarterly
 7    meetings open to the public?
 8    A.    I don't recall a single meeting being
 9    open to the public.
10    Q.    I'm sorry?
11    A.    I do not recall a single meeting during
12    my tenure on the Advisory Commission being open
13    to the public.
14    Q.    Did the Advisory Commission meet back
15    then physically in one room, in one conference
16    room at the AOC office in Nashville?
17    A.    There were multiple locations throughout
18    the state and then the locations would
19    conference in by video together.
20    Q.    Where were those locations?
21    A.    I think it would have been various -- my
22    recollection was it was almost always a group
23    of people in Nashville.  Certainly there were a
24    group of people in Memphis where I would have
25    been located.  I think there were sometimes
```

1  people in Knoxville and then the Tri-Cities and

2  maybe in Chattanooga depending on who was in

3  attendance and who was on the commission at

4  that time.

5  Q.    In 2018 do you recall going to the AOC

6  office in Nashville during any in-person

7  quarterly meeting?

8  A.    I do not have a recollection of going to

9  Nashville for a meeting.

10  Q.    Okay.  And so, can you describe the

11  process of the Advisory Commission and how it

12  makes rule recommendations to the Supreme

13  Court?

14  A.    Well, the commission would meet, as I

15  said, quarterly.  There would be -- there would

16  sometimes be proposals or suggestions made by

17  folks who perhaps were not on the commission.

18  Might be a judge or a lawyer or a member of the

19  public or whomever would submit a request or a

20  memo or letter to the Advisory Commission as an

21  IVF for a potential rule change or amendment.

22      Certainly there would be suggestions that

23  would come from the members of the Commission

24  to take a look at certain things based on

25  experiences that -- that the members may have

had.  Or there may be issues that would be
raised by the Supreme Court liaison as matters
that the Court was interested in taking part to
look at.

It was really just kind of a large mix of
things.  And then the Commission would -- would
discuss those items from time to time to the
extent there was, you know, broad agreement to
study the issue, to look at an issue.  There
might be a -- you know, a -- a committee of
people assigned to look at a particular issue
and to, you know, kind of work on a draft of
some change or amendment.  And then that, you
know, process would just repeat itself and it
would come before the Commission for further
discussion or refinement.

That's -- you know, and then to the
extent there was even broader consensus about a
particular amendment, then it would be
submitted on behalf of the Commission to the
Court for their review.  My recollection is
they would have -- the Court would have their
general review process where they made
decisions about potential amendments or rules.
And I believe it would have been in September

1    maybe.

2          And then it would kind of go -- go to the

3    Court and it was, you know, up to them at that

4    point whether or not they agreed with any of

5    the ideas or recommendations, whether they

6    disagreed with them, whether they wanted to

7    tweak them, whether they wanted to come up with

8    their own proposals or rules.  But at that

9    point it was -- you know, it was out of our

10   hands.  It was certainly everyone understood it

11   was totally the discretion of the Court to do

12   as they please.  And the -- our role was to

13   kind of -- kind of work on IBS and submit them

14   for whatever they were worth, if anything.

15   Q.    Right.  And kind of picking up on what

16   you're talking about, as I understand that --

17   and please describe what your understanding is

18   and was -- once these rule recommendations are

19   made, there's kind of after the fact there's

20   a -- there's a period where the Supreme Court

21   puts out a kind of public notice and comment

22   period that takes place after the meetings.

23   Can you describe that process?

24   A.    Well, you know, as I said, the Court

25   would take, you know, the work the Commission

Lexitas    TENNESSEE
(615)595-0073

1  decide how they wanted to move forward.  And

2  then it was their work product that would be

3  put out for public comment.  Ultimately that

4  would be, you know, their decision.  It was not

5  a situation where they would put out for public

6  comment all of the work the Commission and seek

7  comment, but rather what the Court felt was

8  prudent in its discretion to move forward with.

9       So certainly there would be, for example,

10  items that would be submitted by the Commission

11  the Supreme Court would decline to pursue and

12  that would not be part of the public comment

13  process.

14  Q.    Was Justice Kirby the Supreme Court

15  liaison during your entire service on the

16  Advisory Commission?

17  A.    I believe she was.  I'm fairly confident

18  in that.  It -- maybe at the margins, maybe it

19  wasn't, but I'm fairly certain it was -- that

20  she was the liaison the entire time.

21  Q.    So based on what you put in your report

22  of your service period from 2015 to 2018 that

23  would be four years, by my math.  So if there

24  are quarterly meetings, did you -- do you

25  recall attending 16 Advisory Commission

1  meetings during your service?

2  A.    Like I said, I don't -- I don't have a

3  specific recollection or way to count whether I

4  attended every single meeting.  But I -- I took

5  the work very seriously and it would have been

6  unusual for me to miss a meeting.

7      I -- I seem to recall that I may have

8  missed one meeting, maybe a summer meeting

9  because I had a vacation planned.  I don't know

10  why I have that thought in my head, but I -- it

11  would have been very unusual for me to miss a

12  meeting.

13      I -- I've had very high regard for -- for

14  Justice Kirby, in particular, just because I --

15  you know, I've known her for a long time and

16  would have frankly felt it would have been rude

17  to her not to attend and I took the work

18  seriously.

19  Q.    Sure.  And I understand and I can

20  appreciate that.

21      And just for the record, Justice Kirby

22  became the Chief Justice of the Tennessee

23  Supreme Court, I believe, September 1st of this

24  year; is that your understanding?

25  A.    I know she's is chief justice.  I

1    wouldn't profess to know the exact date.

2    Q.    Okay, fair enough.

3          In your service on the Advisory

4    Commission, was there ever any discussion about

5    whether meetings should be open or closed to

6    the public?

7    A.    Not that I recall.

8    Q.    During your service on the Advisory

9    Commission, was there ever any discussion about

10   what the Federal Analogue -- the Federal

11   Advisory Committees were doing?

12   A.    Not that I recall.

13   Q.    Were you aware --

14   A.    Let me -- let me back up.

15   Q.    Yeah, sure.

16   A.    There was -- I do not recall discussion

17   of what the Federal Commission was doing in

18   terms of its operations.  We would often have

19   discussions about comparisons between state and

20   federal rules and whether or not, you know, we

21   should follow suit on some Federal rule change

22   or have a discussion about the merits.  That's

23   between the substance of rules, but not about

24   the operation of the Federal Commission itself.

25   Q.    Was there ever any discussion that the

1    Federal Advisory Committees, their meetings

2    were open to the public?

3    A.    No.

4    Q.    Were you aware back then when you were

5    serving on the Tennessee Advisory Commission

6    that the Federal Advisory Commission meetings

7    were open to the public?

8    A.    I don't know that -- I mean, I -- I

9    suppose I -- I knew that, but it wasn't

10   something I had conscious thought or

11   deliberation about.

12   Q.    So when you saw this lawsuit and first

13   became aware of this lawsuit a couple of months

14   ago, did -- was it your understanding then a

15   couple of months ago that you knew that the

16   Federal meetings were open to the public?

17   A.    I'm not sure I -- you're saying did I

18   know that before I found out about this lawsuit

19   or in connection with finding out about the

20   lawsuit?

21   Q.    Both.  I'm just trying to understand when

22   you first became aware consciously that the

23   Federal meetings were open to the public?

24   A.    I -- I -- I knew that the Federal

25   meetings were open to the public because I knew

1    that unlike the Tennessee statutory scheme, the

2    Federal statutory scheme is much more detailed

3    and prescriptive about the role or work of that

4    commission, so yes, I was aware of that.

5    Q.    And we'll talk a little bit about that

6    comparison in a moment based on your report.

7          Do you think the Tennessee Advisory

8    Commission meetings that are closed to the

9    public, in fact, serves the needs of the civil

10   litigants in the state court system?

11              MR. STAHL:  Object to the form.

12              THE WITNESS:  Yes.

13   BY MR. DOUGHERTY:

14   Q.    And why is that?

15   A.    I mean, the Advisory Commissions work --

16   serve the needs of the litigants.  And the idea

17   is to -- is to -- is for continuous improvement

18   and work on the rules and to advise the Court.

19   Q.    You're aware that there are a lot of,

20   say, litigants that go through the court system

21   in the state of Tennessee, aren't you?

22              MR. STAHL:  Object to the form.

23              THE WITNESS:  I would say as a

24   practicing lawyer I know there are lots of

25   litigants in the courts, yes.

```
 1    BY MR. DOUGHERTY:
 2    Q.    Do you think it would help those pro se
 3    litigants if they could see and observe the
 4    rulemaking process before they actually set
 5    foot in a court?
 6              MR. STAHL:  Object to the form.
 7              THE WITNESS:  I think it's impossible
 8    to answer that question in a -- in a broad
 9    sense.  I ask that every single element -- I
10    think you could certainly make an argument that
11    in certain circumstances it might be helpful
12    for people to -- to watch a debate.  I don't
13    think it would meaningfully help a litigant in
14    their -- in their work to litigate their case,
15    if that's what you're asking.
16    BY MR. DOUGHERTY:
17    Q.    Well, would you agree that the First
18    Amendment attaches to the actual trial of a
19    criminal case, meaning that it must be open to
20    the public?
21    A.    I think that absent compelling reasons
22    that, yes, criminal trials are open to the
23    public.
24    Q.    And also the -- the voir dire process,
25    interviewing potential jurors, that process is
```

*Lexitas* TENNESSEE
(615)595-0073

1    also open to the public; is that your

2    understanding?

3    A.    I think with respect -- again, absent

4    compelling circumstances, I think the voir dire

5    process to the extent is oral and open court is

6    open to the public.  I mean, there are

7    certain -- certain issues and avenues where,

8    you know, jury information and perhaps

9    questionnaires may or may not be open to the

10   public and depending on what you mean by that.

11   Q.    Yeah, and I agree with you that when I

12   say -- I understand when you're trying to say

13   that it's subject to certain situations.

14        You would agree that there's a qualified

15   First Amendment right of access to criminal

16   trials, would you not?

17   A.    Say that again?  You broke up a little

18   bit.

19   Q.    Yeah.  Do you agree that there is a

20   qualified First Amendment right of access to

21   criminal trials?

22   A.    I think I would agree with that.

23   Q.    I'm sorry, you said you would agree?

24   A.    I agree with that.

25   Q.    And that in order to overcome that First

1    Amendment right, the government must show a

2    compelling interest that is narrowly tailored.

3    Do you agree with that?

4            MR. STAHL:  Object to the form.

5            THE WITNESS:  I think that any

6    litigant could avail themselves of potential

7    compelling interest to overcome the presumption

8    that a criminal trial would be open.

9    BY MR. DOUGHERTY:

10   Q.    Are you aware of an incident in 2018

11   where a member of the public became verbally

12   combative with questions during a Tennessee

13   Advisory Commission that was open to the

14   public?

15   A.    I'm not.

16   Q.    You're not aware of that?

17   A.    I do not recall that.

18   Q.    Do you recall Michelle Consiglio-Young

19   serving as the AOC liaison in 2018?

20   A.    I do not.

21   Q.    Do you -- I think we discussed this

22   earlier.  Do you -- do you know Michelle

23   Consiglio-Young?

24   A.    I know her professionally.

25   Q.    And tell me about that professional

```
 1    relationship.  How do you know her?
 2    A.    During my time in the Governor's office,
 3    as you know, the Governor has the
 4    constitutional duty to appoint judges when
 5    there are vacancies.  And that process is
 6    coordinated through the AOC, and my memory is
 7    that Michelle and/or Rachel Harmon were kind of
 8    points of contact for that process.
 9    Q.    Are you aware that the justices of the
10    Tennessee Supreme Court made a decision to
11    close meetings after this 2018 incident?
12              MR. STAHL:  Object to the form.
13              THE WITNESS:  I'm not aware of that
14    to -- as I stated earlier, I -- I'm not aware
15    that the meetings that I attended were open to
16    the public.
17    BY MR. DOUGHERTY:
18    Q.    Okay.
19    A.    To say that they were closed would
20    presume that they were open, and I'm not -- I'm
21    not aware of that.
22    Q.    Did you observe the June 2023 Advisory
23    Commission meeting that was open to the public
24    and livestreamed pursuant to the preliminary
25    injunction?
```

Lexitas TENNESSEE
(615)595-0073

```
1    A.    No.
2    Q.    You didn't have an opportunity to see
3    that?
4    A.    No.
5    Q.    Have you spoken to anyone on the current
6    Advisory Commission as to what their thoughts
7    were about the June 2023 meeting being open?
8    A.    No.
9    Q.    Did we -- did we freeze up?
10   A.    I can hear you.  My answer was no.
11   Q.    Okay.  I think maybe I saw you but you
12   weren't moving.
13         Okay.  And have you ever observed the
14   federal meetings that are open to the public
15   either in person or by livestreaming?
16   A.    No.
17   Q.    All right.  I want to kind of go through
18   some of the specific paragraphs of your opinion
19   in your report.  It's been marked as Exhibit 2
20   to your deposition.
21         Paragraph 6, Pages 4 through 5 of your
22   report, you state that you served as the lawyer
23   for the Governor of Tennessee; is that correct?
24   A.    Yes.
25   Q.    Are you claiming that there is some sort
```

1  of privilege that attaches to Advisory

2  Commission meetings?

3             MR. STAHL:  Object to the form.

4             THE WITNESS:  I don't know that I

5  would go that -- that far.  That certainly was

6  not my charge, and I -- I don't profess to be a

7  lawyer making legal arguments in the case.  I

8  noted that the deliberative process privilege

9  is something I routinely dealt with in the

10  Governor's office.  I know that there's --

11  there's also a deliberative process privilege

12  with respect to legislative branch in that my

13  understanding is that there is a similar

14  privilege that extends likewise to the judicial

15  branch and that certainly the Advisory

16  Commission would implicate that, but I'm not

17  prepared to cite you a case or anything like

18  that to my discretion.

19  BY MR. DOUGHERTY:

20  Q.    Why would the Advisory Commission

21  implicate -- excuse me, scratch that.  Scratch

22  that question.

23        Why would the deliberative process

24  privilege implicate meetings that consist of

25  members of the private Bar and members of the

1    judiciary?

2              MR. STAHL:  Object to the form.

3              THE WITNESS:  Again, I -- I'm not a

4    lawyer on the case, so I'll defer to the

5    lawyers who are -- who are defending the case.

6    But deliberative process privilege is a concept

7    that deals with the type of advice being given,

8    not necessarily by the person giving it.

9              So the Governor's deliberative

10   process privilege, for example, runs to advice

11   that he might take from a private citizen as

12   opposed to a paid member of the staff.  And

13   again, the issue is about the type of advice

14   and the candor of that the principle requires

15   to make good decisions, not necessarily on who

16   is providing that advice.

17   BY MR. DOUGHERTY:

18   Q.   If Advisory Commission meetings were open

19   to the public, would the deliberative process

20   privilege be destroyed?

21             MR. STAHL:  Object to the form.

22             THE WITNESS:  Well, I -- I think,

23   again, I'm not prepared to argue that there

24   is -- a deliberative process privilege does

25   apply.  I will defer to the lawyers on that and

1  would certainly require more research on my

2  part.  I think the concepts and the principles

3  that give rise to the deliberative process

4  privilege in this particular context involving

5  the Advisory Commission would be diminished

6  certainly.

7  BY MR. DOUGHERTY:

8  Q.    In Paragraph 9 you say that there are

9  other boards and commissions in Tennessee that

10  are open to the public.  Why is the Advisory

11  Commission not open to the public?  What makes

12  it different?

13  A.    Well, you've got a couple questions baked

14  in there.  Why is the Advisory Commission not

15  open to the public?  Number one, it is

16  currently pursuant to the injunction.  I think

17  to the extent that it was not or is not, the

18  reason is that the Supreme Court decided that

19  it would be closed.

20  Q.    What's your understanding that the

21  Supreme Court made that decision and not the

22  Advisory Commission members to close meetings?

23  A.    You know, I don't know the answer to

24  that, but the Advisory Commission operates in

25  service to the Supreme Court and -- and so as a

```
1    practical matter, the Advisory Commission works
2    at the pleasure of the Court, and I -- I would
3    not think that the Advisory Commission would
4    make a -- would make a decision that would be
5    inconsistent with the Court's wishes.
6    Q.    You ever recall during your service on
7    the Commission a vote coming up as to whether
8    or not the members thought that meetings should
9    be open or closed?
10   A.    No, I think as I said earlier, it was an
11   issue that -- that I -- I have no recollection
12   that it ever came up.
13   Q.    In Paragraph 10 of your report, I want to
14   talk a little bit about that.
15   A.    Okay.
16   Q.    Is it your understanding that Advisory
17   Commission meetings are equivalent to judicial
18   deliberations of the Tennessee Supreme Court?
19   A.    Well, it think it depends on what you
20   mean by deliberation.  I mean, there are
21   obviously many types of judicial deliberations.
22   But certainly the Court has the authority and
23   power over rules of practice and procedure.
24   It's an inherent power of the Court.  That is
25   one of the most core powers that the Court has.
```

Lexitas TENNESSEE
(615)595-0073

1        And to the extent that the Court hears

2   advice, seeks advice, listens to advice, and

3   yes, that would be a core part of the judicial

4   power.  That is a part of their deliberations.

5   By definition, the justices are the ones who

6   get together each year to make decisions about

7   the rules and what -- what amendments they may

8   want to make or not want to make or what -- you

9   know, how they want to move forward with

10  respect to the rules.

11  Q.    But would you agree that any

12  deliberations that occur in meetings are

13  different than the Tennessee Supreme Court

14  deliberations on an actual case?  You would

15  agree with that, right?

16  A.    I'm not sure I understand the question.

17  Say that again.

18  Q.    Yeah.  Are Advisory Commission meeting

19  deliberations different from Tennessee Supreme

20  Court deliberations of an actual case before

21  the Court?

22  A.    Sure.

23  Q.    Okay.

24  A.    And one involves only justices.

25  Q.    I'm sorry?

```
 1    A.    I said the one involves only justices.
 2    Q.    And -- and it also involves a particular
 3    case versus a rulemaking process like members
 4    on the Commission engage in, right?
 5    A.    I think -- sure.  I mean, I would suppose
 6    that judicial deliberations of a case having
 7    not been in them deal with just that case.
 8    Q.    And you understand from this lawsuit from
 9    reading the pleadings that Dan McCaleb is not
10    trying to get access to deliberations of the
11    Tennessee Supreme Court justices on a
12    particular case?  You do understand that,
13    right?
14              MR. STAHL:  Object to the form.
15              THE WITNESS:  I understand that that
16    is not the relief he is seeking, but I do not
17    agree that that might not be the implication of
18    his arguments in what he is seeking.
19    BY MR. DOUGHERTY:
20    Q.    Do you think the public would have more
21    confidence and trust in the Tennessee court
22    system if Advisory Commission meetings were
23    open to the public?
24              MR. STAHL:  Object to the form.
25              THE WITNESS:  I can't speak for what
```

LexitasTENNESSEE
(615)595-0073

1    the public would -- would believe or not

2    believe.  I can speak to what I believe.

3    BY MR. DOUGHERTY:

4    Q.    Well, you're here providing an expert

5    opinion, so don't you think what the public

6    thinks and believes is important to this case?

7    A.    I think with respect to what the public

8    thinks may have some bearing, but I don't -- I

9    don't believe that the public listening in to a

10   meeting has a -- a -- a meaningful impact on --

11   on the process or the public's understanding of

12   the process.

13   Q.    You think the Advisory Commission would

14   make better court rule recommendations if

15   meetings were open to the public?

16   A.    I do not.

17   Q.    And why is that?

18   A.    I think having confidential meetings

19   brings a certain level of candor to the meeting

20   that is -- is diminished by having meetings be

21   public.

22   Q.    And why have the Federal Advisory

23   Committees been so successful with their

24   rulemaking when their meetings are open to the

25   public?

```
 1              MR. STAHL:  Object to the form.

 2              THE WITNESS:  I can't -- ask me the

 3    question again.  I want to make sure I

 4    understand the question.

 5    BY MR. DOUGHERTY:

 6    Q.    Yeah.  Why does the Federal Advisory

 7    Committees open its meetings to the public when

 8    you say that open meetings of the Tennessee

 9    Commission would be detrimental to the process?

10              MR. STAHL:  Object to the form.

11              THE WITNESS:  Well, I think the why

12    you would have to go ask the legislators in

13    congress who passed the statute requiring it as

14    to why.

15              Again, I think there are different

16    policy choices to be made.  And I think there

17    could be debate or even disagreement over one

18    option versus the other.  I'm -- I'm perfectly

19    open to the idea that there is a debate to be

20    had there, but it's a policy choice and the

21    federal system made that policy choice.

22    BY MR. DOUGHERTY:

23    Q.    Do you think Tennessee's Advisory

24    Commission process is superior to the Federal

25    Advisory Committee rulemaking process?
```

Lexitas  TENNESSEE
(615)595-0073

1    A.    I don't know that there's any objective

2    way to determine whether it's superior or not.

3    You know, obviously when you're making

4    judgments about the success of a particular

5    body, you're weighing that against outcomes

6    that did not occur by virtue of the fact that

7    you -- you can't know how something would have

8    turned out had the rules been differently.

9         But I think, again, there are

10   different -- there are different policy choices

11   to be made in this space.  There are some

12   benefits and detriments to -- that attach to

13   both of those choices.  But in my experience,

14   the admission -- the Advisory Commission

15   process in Tennessee has worked well, and so I

16   don't have any -- I don't have any problems

17   with it.  And frankly, I think it's -- it's

18   probably better than the federal system, in my

19   judgment.

20   Q.    What other Tennessee State boards and

21   commissions other than the Advisory Commission

22   work just fine with their meetings being open

23   to the public?

24   A.    Say the question again.

25   Q.    Yeah.  Other Tennessee State boards and

1    commissions other than the Advisory Commission

2    work fine despite, you know, the public has

3    open access, they're open.  Why are they okay

4    and the Advisory Commission is not?

5    A.    Well, I think you need to ask the Supreme

6    Court that.  Again, it's a policy choice, and I

7    think there are obviously differences in the

8    various commissions.  I'm not in position to

9    tell you whether those -- those other

10   commissions work -- to your words, work fine or

11   not.  I suspect that the Supreme Court must be

12   satisfied with them the way that they operate

13   if they continue to operate that way, but it's

14   ultimately up to the Court to decide.

15   Q.    Are you familiar with the ADR Commission

16   in Tennessee?

17   A.    Vaguely.  Just by virtue and fact that

18   I'm listed as a mediator and turn in my

19   paperwork every couple years.

20   Q.    What do you mean?  Explain that.

21   A.    I'm listed as a mediator, Rule 31

22   mediator, so you have to submit your -- not

23   sure -- your renewal of your -- your listing

24   every couple years to the ADR Commission.

25   Q.    Were you aware that the ADR is made up of

```
 1    members of the judiciary as well as private
 2    attorneys?
 3    A.    Some vague recollection of that, but
 4    I'm -- I'm not an expert on the -- on the ADR
 5    Commission.
 6    Q.    And were you aware that the ADR
 7    Commission meetings are open to the public?
 8    A.    I don't know that that was a working
 9    understanding that I had until I -- I think I
10    saw that in a pleading or something in
11    connection with this case.
12    Q.    Any --
13    A.    I have no independent -- I have no
14    independent knowledge of that.
15    Q.    I'm sorry, I didn't mean to interrupt.
16    A.    No, I'm sorry, I think I interrupted you.
17    Q.    On Page 6, Paragraph 14 of your report
18    you say that the federal rulemaking process
19    brings into effect and doesn't have
20    congressional oversight like Tennessee's
21    process.  Explain -- explain how you arrived at
22    that opinion.
23    A.    I'm going to ask you to reframe the
24    question.  I'm not sure your question
25    accurately reflects what my opinion is, but I
```

1  want to make sure I heard you correctly.

2  Q.    Well, I want to understand from Paragraph

3  14 in this springing into effect -- I think

4  springing into effect are your words.  Can you

5  explain what you mean by the federal rulemaking

6  process springing into effect?

7  A.    I think -- I think the word I used was

8  automatically goes into effect.  But the

9  obvious difference between the Tennessee and

10  the federal rules is that there are different

11  default rules involved.  The work of the

12  Commission in Tennessee then goes to the

13  Supreme Court who exercises complete discretion

14  over how to move forward.  They then go to the

15  public comment system.  They publish those

16  rules for public comment.  Those rules do not

17  go into effect unless and until the general

18  assembly affirmatively approves those rules.

19        There is a -- a process.  It goes before

20  the committees in the House and Senate for

21  approval and is voted on by the General

22  Assembly.  And in fact, when I was in the

23  Governor's office, on one occasion the General

24  Assembly in the rush of trying to get done with

25  his work neglected to -- to approve those

rules.  And so we had to call an extraordinary

session under the Tennessee Constitution to

have them come back in in order -- among other

things to approve those rules.

The federal system's just the opposite.

The federal system the work the commission by

and through the Court, those rules do

automatically go into effect without any

further action of congress.

Q.    Were you aware that 28 USC 2074(a)

requires the US Supreme Court to transmit a

proposed rule to Congress no later than May 1st

of the year in which is the rules to go into

effect?

A.    I know they transmit the rules to

Congress.  I -- I couldn't tell you the date as

we sit here today, but I don't -- I don't have

quibble with that.

Q.    And are you aware that 28 USC 2074(a)

also requires that a proposed rule not take

effect until December 1st of that year?

A.    Yes.

Q.    And doesn't 28 USC 2074(b) require

Congress to vote on every proposed rule before

it becomes effective?

```
 1    A.    I don't -- if you could flash up the --
 2    I'm not prepared to quote subsections of the
 3    Rules.  My understanding is that Congress has
 4    the option to vote up or down but their
 5    affirmative approval is not required for a rule
 6    that's proposed by the US Supreme Court to go
 7    into effect.
 8    Q.    Well, you cited it, 28 USC 2074(a)6
 9    [phonetic], Paragraph 14 of your complaint.  So
10    I'm working off of what you cited.
11    A.    Okay, but this is not a memory contest.
12    If we want to look at it, we can.
13    Q.    Well, were you -- don't you understand
14    that the Federal Rules Enabling Act operates
15    just like Tennessee's where a rule doesn't go
16    into effect until Congress votes for it to go
17    into effect?
18            MR. STAHL:  Object to the form,
19    argumentative.
20            THE WITNESS:  That's not my
21    understanding.
22    BY MR. DOUGHERTY:
23    Q.    Okay.  In Paragraph 11 in your opinion
24    section, you state that no serious argument can
25    be made that the public has a right of access
```

1  to meetings.  Do you see that in Paragraph 11?

2  A.    I see Paragraph 11.

3  Q.    Okay.  Was Judge Richardson's memorandum

4  opinion and preliminary injunction a serious

5  argument?

6           MR. STAHL:  Object to the form.

7           THE WITNESS:  I think what I argued

8  is that no serious argument might be advanced.

9  For example, an absent allegation of

10 malfeasance or other wrongdoing the public

11 would have a right to access the deliberations,

12 communications or confidential exchanges

13 between a judge and her law clerk or staff or

14 between a governor and her executive team or

15 between a legislator and her staff.  Period.

16 That was --

17 BY MR. DOUGHERTY:

18 Q.    Did that --

19 A.    That was what the no serious argument

20 might be advanced.  My argument was that under

21 the circumstances, the Advisory Commission is

22 functioning different.  There is no case law

23 specifically on that issue that I'm aware of,

24 so to argue my analogy that it is no different

25 is not the same thing as saying there is no

1    serious argument for that.

2    Q.    But I believe you already said that the

3    meetings are different than an actual case and

4    deliberations of a judge, right?

5    A.    What I said is that factually yes, there

6    is a distinction between deliberations amongst

7    judges.  I do not believe there is any

8    functional equiv -- or any functional

9    difference insofar as the law should be

10   concerned.

11   Q.    When you apply Richmond Newspapers

12   experience test -- and you discussed this in

13   your report -- is it your understanding that

14   Courts are to look to a similar proceeding and

15   not the exact same proceeding that is being

16   challenged?

17   A.    I'm not sure I understand the question.

18   Q.    Yeah.  What is your understanding of the

19   Richmond Newspapers experience test?

20   A.    I think the Court says to look around at

21   the various experiences in similar situations.

22   Q.    Exactly.  And to determine if there's

23   been a long history of a similar meeting or, I

24   suppose, to look at the exact meeting or

25   proceeding that's being challenged, right?

```
 1    A.    I mean, I don't know that I agree with

 2    that.  I mean, the Court was deciding the case

 3    before it and that dealt with criminal trials.

 4    Q.    But the Court in Richmond Newspapers

 5    looked at the common law heritage of criminal

 6    trials being open to the public, right?

 7    A.    Yes, with respect to criminal trials.

 8    Q.    Were you aware that the Federal Analogue

 9    to the Advisory Commission makes rule

10    recommendations on the Federal Rules of Civil

11    Procedure?

12    A.    Yes.

13    Q.    Were you aware that the Federal Analogue

14    to the Advisory Commission make rule

15    recommendations on the Federal Rules of

16    Criminal Procedure?

17    A.    Yes.

18    Q.    Were you aware that the Federal Analogue,

19    the Advisory Commission make rule

20    recommendations on the Federal Rules of

21    Evidence?

22    A.    Yes.

23    Q.    Were you aware that the Federal Analogue

24    to the Advisory Commission makes rule

25    recommendations on the Federal Rules of
```

1    Appellate Procedure?

2    A.    Yes, I think that would be the case.

3    Q.    It's -- we've been going about an hour

4    and 15 minutes.  I mean, we can take a break or

5    keep going.  It's your call.

6    A.    I'm good.

7    Q.    Okay.  Did you know that these federal

8    rule recommendations are recommended to the

9    United States Supreme Court?

10   A.    Yes.

11   Q.    And the United States Supreme Court then

12   transmits those proposed rules to Congress for

13   a vote?

14   A.    Yes.  Well, they transmit them to

15   Congress.

16   Q.    Does Congress not vote on them?

17   A.    I think they can or can't.

18   Q.    What -- what statutory provision allows

19   them to either vote or not vote?

20   A.    I think the way the statute reads is that

21   they go into effect unless Congress takes

22   action otherwise.  They can certainly affirm

23   them, I suppose, if they choose.

24   Q.    Doesn't that sound similar to the

25   rulemaking process?  I mean, with the Advisory

1    Commission?

2    A.    Of course not.

3    Q.    And why is that?

4    A.    Well, there's a critical difference

5    between the Supreme Court exercising authority

6    which may or may not require approval or a

7    check from a legislative branch as in the

8    federal system versus the state system where

9    there is a requirement for affirmative approval

10   by the legislature before rules can go into

11   effect.

12   Q.    What methodology did you use in Paragraph

13   14 arriving at your opinion that the rulemaking

14   process of the Tennessee Advisory Commission is

15   meaningful -- meaningfully different than the

16   federal related process?

17   A.    What was my process?

18   Q.    What methodology did you use in arriving

19   at that opinion in Paragraph 14 that

20   Tennessee's process was meaningfully different

21   than the federal process?

22   A.    Like I said, conclusion I drew from

23   reading both the statute at the federal level

24   and understanding how the state system works.

25   It's meaningfully different in terms of the

1  public's representatives and/or their
2  opportunities to address ultimately whether or
3  not a rule is going to take effect or not.
4  Q.   You would agree that this case involves
5  First Amendment and specifically the First
6  Amendment right of access, correct?
7  A.   I think I understand, yes, that is what
8  the Plaintiff is claiming.
9  Q.   Since you have no experience in the First
10  Amendment, do you think you're qualified to
11  render an expert opinion in this case?
12  A.   Well, I think my opinions are related to
13  the experience that I have in connection with
14  how certain committees and commissions work, my
15  experience particularly on this Advisory
16  Commission.  But to the extent you're asking
17  whether I have the expertise to tell the judge
18  what the law is, I would agree with you, I
19  don't think any expert should be dictating or
20  telling the judge what the law is.  That is up
21  to the lawyers and the judge.  I certainly have
22  an opinion about it, but it's ultimately the
23  judge's call.
24  Q.   And your opinion is based on your service
25  on the Advisory Commission and reviewing the

1    statutes and the pleadings and the case law
2    involved in this case, right?
3    A.    And my service on other boards and
4    commissions and my -- my service in state
5    government and having an understanding of the
6    different nuances of how those particular
7    things work as differentiating between one
8    another.
9    Q.    Your service on the other committees and
10   commissions in Tennessee, are any of those
11   meetings open to the public?
12   A.    I think certainly we have to go through
13   and list them, but the boards and commissions
14   that I've served on where -- where there's a --
15   you know, a judicatory responsibility or
16   situations where decisions are made that have
17   some binding effect, then yes, those would
18   be -- would be open meetings subject to the
19   normal qualifications that you have for open
20   meetings in connection with -- you know, you
21   may have privilege meetings to discuss legal
22   matters and those sorts of things.
23   Q.    Do you recall, Mr. Wiseman, during your
24   service on the Advisory Commission if AOC had a
25   liaison that attended meetings?

Lexitas TENNESSEE
(615)595-0073

1    A.    I don't recall that since I was in

2    Memphis and not at the Nashville office.  It

3    wouldn't have been something I -- it wouldn't

4    be somebody sitting at the table with me, so I

5    don't dispute that there was a liaison who was

6    involved in the meetings, but I -- I don't have

7    a recollection of it.

8    Q.    During the preparation of your opinion

9    and report, did you ever review the AOC website

10   and past public meeting notices?

11   A.    Now, I went to the website and tried to

12   look at some of that information, but the

13   website was not very helpful and I didn't make

14   it very far, to be quite candid.  So I did not

15   spend a lot of time looking at that.

16   Q.    Did you come across any public meeting

17   notices of past Advisory Commission meetings

18   that were open to the public?

19   A.    You know, I found a few indicating when

20   the date of a meeting would be.  I'm not sure I

21   would accept the characterization of them as

22   public meeting notices, but rather notices of

23   when a meeting might occur.

24   Q.    Why else would the AOC issue a public

25   meeting notice to the public about an upcoming

1    meeting unless they were inviting the public?

2    A.    Again --

3              MR. STAHL:  Object to the form.

4              THE WITNESS:  Again, I'm not sure I

5    would accept the characterization of public

6    meeting notice.  But it might issue a notice of

7    when a meeting was going to occur for a couple

8    different reasons.  One is to alert the

9    commission members as to when a meeting would

10   occur.  And secondly to alert the public as to

11   the time frame of when they might want to

12   submit a proposal to the Commission.  We used

13   to receive proposals on a regular basis.

14   Q.    Well, would the AOC be in a better

15   position to talk about their public meeting

16   notices than you then, I guess, is what you're

17   saying?

18   A.    I -- I would -- I would defer to the AOC

19   as to why they would have issued a notice.

20   Q.    Did you notice on the website or were you

21   able to see the upcoming public meeting notice

22   for the December meeting of 2023?

23   A.    I'm -- I'm sure I would have seen the

24   notice of the meeting, but I don't have a

25   specific recollection of it.

Lexitas   TENNESSEE
(615)595-0073

```
1    Q.    Do you have a specific recollection of
2    seeing the June 2023 meeting, public meeting
3    notice?
4    A.    I -- I think I did see that, but I don't
5    have a ready recollection of it in my -- in my
6    mind as I sit here today.
7    Q.    And that June 2023 meeting, is it your
8    understanding that that was the first meeting
9    that was open to the public post preliminary
10   injunction?
11   A.    I believe that to be the case only
12   because I think I read it somewhere in a -- in
13   a pleading or perhaps Mr. Bart's [sp] report.
14   I don't recall why I have that in my head,
15   but -- but I do believe that to be the case.
16         MR. DOUGHERTY:  Mike, I'll go ahead
17   and pass the witness.
18         MR. STAHL:  Okay.
19         Michelle, can you hear me?  I muted
20   my computer to reduce some of the feedback so
21   we didn't have both speakers going at the same
22   time.  Can you hear me?
23         THE REPORTER:  Yeah, I can hear you.
24   ///
25   ///
```

```
                    EXAMINATION
QUESTIONS BY MR. STAHL:
Q.    Mr. Wiseman, I only have a few questions.
You served on the Rules Committee previously;
is that right?
A.    On the Rules Commission, yes.
Q.    And while you were serving on the
Commission, you believe those meetings to be
closed; is that right?
A.    I -- I always understood and assumed that
they were closed.
Q.    If you were asked to participate as a
member of the Commission today knowing that the
meetings are now open to the public pursuant to
the preliminary injunction, would that affect
your willingness to serve on the Committee?
A.    Perhaps.  I -- I probably out of a sense
of duty would agree, but it would certainly
give me a little pause.
Q.    Why?
A.    Having been in the public eye, so to
speak, having been in state service, you always
have to think twice about putting yourself out
there for -- for matters like that.  And -- and
certainly that's something you would think
```

Lexitas TENNESSEE
(615)595-0073

1    about.  I'm more used to it than others, I

2    suspect.  There might -- others may have a more

3    strident opinion in that regard, but yeah, it

4    would -- it would -- it would affect my

5    calculus, yes.

6    Q.    If you had accepted the opportunity to

7    serve on the Committee again and the member --

8    and members of the public were at the meeting,

9    would that in any way affect your -- your

10   openness, your candor or your willingness to

11   discuss issues?

12   A.    I think it's certainly dependent on what

13   issues are raised.  So as a general rule I

14   would say yes, certainly, you know, during my

15   time on the Commission, you know, issues

16   would -- would come up that were sensitive.

17   Some would be -- you know, my definition if

18   you're amending a rule, you're taking an issue

19   with someone's prior work and/or someone's

20   ruling with respect to prior work that needs

21   --- require some clarification.  And so it can

22   be sensitive at times.

23         And so yes, I -- I think it would affect

24   the openness by which you might -- might

25   discuss certain things.

1    Q.    And you've mentioned that even when the

2    meetings were closed, there were times that you

3    had received comments from the public that you

4    discussed or considered in those meetings; is

5    that right?

6    A.    I don't -- I don't know that I would have

7    received -- that we would have received

8    comments.  We from time to time would receive

9    rule proposals or, you know, memos from

10   attorneys or judges suggesting that we'll take

11   a look at a certain item because of some

12   experience that they had in a case.  I'm -- I'm

13   loathed to try to categorize or quantify the

14   number of times that that happened, but it

15   would happen.

16   Q.    If -- if the meetings were closed, did

17   you ever consider not taking in those proposed

18   rule changes from the public or consider

19   declining something that the public had

20   submitted to the Committee only because the

21   meetings were closed?

22   A.    I mean --

23            MR. DOUGHERTY:  Object to the form.

24            THE WITNESS:  If I'm understanding

25   your question, I think every proposal that came

1   in we took very seriously and considered.

2   BY MR. STAHL:

3   Q.    Despite your belief that the meetings

4   were closed to the public?

5           MR. DOUGHERTY:  Object to the form.

6           THE WITNESS:  You know, it's hard to

7   answer that question because I -- I've never

8   assumed otherwise.  It was just something that

9   wasn't an issue as to whether they were open or

10  closed, I just always assumed that they were

11  closed and believed them to have been closed.

12  And so, it kind of fell in the category of it

13  is what it is.  We consider everything very

14  seriously that would have -- that would have

15  been submitted to us.

16  Q.    Okay.

17          MR. STAHL:  That's all I have, Buck.

18

19              EXAMINATION

20  QUESTIONS BY MR. DOUGHERTY:

21  Q.    I just have a couple more, Mr. Wiseman.

22        Did you ever feel -- did you ever feel

23  that during your attendance at meetings when

24  you were on the Advisory Commission that you

25  could not be candid with your views and how you

1    expressed them?

2    A.    No, I mean, you -- certainly whenever

3    you're in a public group, you -- you want to

4    measure your words and be thoughtful.  But I --

5    I don't know that I can think of an occasion

6    where I was not candid with my advice.

7    Q.    So you feel that the way the meetings

8    were conducted during your service that you

9    could generate whatever ideas you felt were

10   best in advancing the process?

11   A.    Again, within -- within reason.  I mean,

12   certainly you always want to be thoughtful and,

13   you know, be thoughtful in your words, but I --

14   I did not feel inhibited in any way.

15             MR. DOUGHERTY:  Thank you,

16   Mr. Wiseman.  I have nothing further.  I

17   appreciate your time taking your time out of

18   your professional career to -- to chat with us

19   this morning.

20             THE WITNESS:  I appreciate it.  Have

21   a happy Thanksgiving, everybody.

22             (WHEREUPON, an off-the-record

23   discussion was held.)

24             MR. DOUGHERTY:  I would like to go

25   ahead and get an expedited rush transcript on

```
1    that electronically.
2              THE REPORTER:  When do you need it?
3              (WHEREUPON, an off-the-record
4    discussion was held.)
5              MR. DOUGHERTY:  Next week would be
6    great.
7              MR. STAHL:  Same order, as soon as
8    you can.  I know the witness would like to read
9    and sign.
10             FURTHER DEPONENT SAITH NOT
11      (Proceeding concluded at 10:31 a.m. CST)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*Lexitas TENNESSEE*
*(615)595-0073*

```
 1                    REPORTER'S CERTIFICATE

 2

 3   STATE OF TENNESSEE

 4   COUNTY OF SUMNER

 5          I, MICHELLE CESSNA, Licensed Court Reporter,

 6   with offices in Nashville, Tennessee, hereby certify

 7   that I reported the foregoing deposition of THOMAS

 8   LANG WISEMAN by machine shorthand to the best of my

 9   skills and abilities, and thereafter the same was

10   reduced to typewritten form by me.

11          I further certify that I am not related to

12   any of the parties named herein, nor their counsel,

13   and have no interest, financial or otherwise, in the

14   outcome of the proceedings.

15          I further certify that in order for this
     document to be considered a true and correct copy, it
16   must bear my original signature and that any
     unauthorized reproduction in whole or in part and/or
17   transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
18   Tennessee Code Annotated 39-14-104, Theft of
     Services.
19

20

21

22

23   MICHELLE CESSNA, LCR, RPR
     Lexitas Legal
24   Licensed Court Reporter (TN)
     Notary Public State of Tennessee
25
     LCR #864 - Expires:  6/30/2024
```

Lexitas TENNESSEE
(615)595-0073

1
            E R R A T A   P A G E
2
        I, THOMAS LANG WISEMAN, having read the
3    foregoing deposition, Pages 1 through 71, do hereby
     certify said testimony is a true and accurate
4    transcript, with the following changes (if any):

5    PAGE   LINE                    SHOULD HAVE BEEN

6    _____ _____    _____

7    _____ _____    _____

8    _____ _____    _____

9    _____ _____    _____

10   _____ _____    _____

11   _____ _____    _____

12   _____ _____    _____

13   _____ _____    _____

14   _____ _____    _____

15   _____ _____    _____

16   _____ _____    _____

17   _____ _____    _____

18

19

20                    _____

21                              THOMAS LANG WISEMAN

22   _____
     Notary Public
23
     My Commission Expires: _____
24

25

LEXITAS TENNESSEE
(615)595-0073

**Exhibits**

**Ex 02 -**
**Lang Wiseman**
3:11 17:3,6,7,10
41:19

---

**1**

**1** 17:4
**10** 45:13
**10:31** 71:11
**11** 55:23 56:1,2
**14** 52:17 53:3 55:9
60:13,19
**15** 59:4
**16** 32:25
**16-3-601** 19:7
**1997** 9:20
**1st** 33:23 54:12,21

---

**2**

**2** 17:3,6,7,10 41:19
**2007** 6:20
**2015** 19:8 27:10
32:22
**2018** 27:10,11,14,
22,23 29:5 32:22
39:10,19 40:11
**2023** 40:22 41:7
64:22 65:2,7
**2073** 22:8 23:2
24:6
**2074(a)** 54:10,19
**2074(a)6** 55:8
**2074(b)** 54:23
**22** 9:13
**28** 22:8 23:2 24:6
54:10,19,23 55:8

---

**3**

**31** 51:21

---

**4**

**4** 41:21

---

**5**

**5** 41:21

---

**6**

**6** 41:21 52:17

---

**9**

**9** 44:8
**97** 9:22

---

**A**

**a.m.** 71:11
**ability** 7:7 21:23
**absent** 37:21 38:3
56:9
**accept** 19:17
63:21 64:5
**accepted** 67:6
**access** 38:15,20
47:10 51:3 55:25
56:11 61:6
**accurately** 52:25
**acquaintances**
13:15
**Act** 55:14
**action** 6:20 54:9
59:22
**actual** 25:13
37:18 46:14,20
57:3
**addition** 8:23
**address** 61:2

**admission** 9:19
50:14
**admitted** 9:20
**ADR** 51:15,24,25
52:4,6
**advanced** 56:8,
20
**advancing** 70:10
**advice** 43:7,10,
13,16 46:2 70:6
**advise** 11:21 12:1
20:10 24:17 36:18
**advises** 14:17
**advising** 12:21,25
**advisory** 14:20,
23 15:6 19:6,20,
22,23,24 20:9,13,
23 21:2,9,13,17,
22 22:2,6 23:6,21,
23 26:9,22,24
27:5 28:5,12,14
29:11,20 32:16,25
34:3,8,11 35:1,5,6
36:7,15 39:13
40:22 41:6 42:1,
15,20 43:18 44:5,
10,14,22,24 45:1,
3,16 46:18 47:22
48:13,22 49:6,23,
25 50:14,21 51:1,
4 56:21 58:9,14,
19,24 59:25 60:14
61:15,25 62:24
63:17 69:24
**affect** 66:15 67:4,
9,23
**affirm** 59:22
**affirmative** 55:5
60:9
**affirmatively**
53:18
**agree** 37:17
38:11,14,19,22,
23,24 39:3 46:11,
15 47:17 58:1
61:4,18 66:18
**agreed** 19:15,17
31:4

**agreement** 6:24
30:8
**ahead** 8:15 9:4
15:8 18:8 65:16
70:25
**alert** 64:8,10
**allegation** 56:9
**allowing** 15:20
**amend** 21:5
**amending** 67:18
**amendment**
11:12,15,17,23
12:5,10,12,14,18,
24 13:7 29:21
30:13,19 37:18
38:15,20 39:1
61:5,6,10
**amendments**
30:24 46:7
**amount** 10:19
**amused** 7:11
**Analogue** 19:21
20:1 22:6 34:10
58:8,13,18,23
**analogy** 56:24
**and/or** 40:7 61:1
67:19
**answers** 7:8
**AOC** 13:10 14:5,
11 26:6 28:16
29:5 39:19 40:6
62:24 63:9,24
64:14,18
**Apparently** 6:5
**Appellate** 21:11
59:1
**applies** 26:3,6
**apply** 43:25 57:11
**applying** 12:22
**appoint** 40:4
**appointed** 19:8
**appointment**
19:17

**appointments** 26:24

**approval** 53:21 55:5 60:6,9

**approve** 53:25 54:4

**approves** 53:18

**areas** 10:13

**argue** 24:7 43:23 56:24

**argued** 23:20 56:7

**argument** 23:20 37:10 55:24 56:5, 8,19,20 57:1

**argumentative** 55:19

**arguments** 42:7 47:18

**arrived** 52:21

**arriving** 60:13,18

**assembly** 53:18, 22,24

**assigned** 30:11

**assist** 10:23

**assistance** 17:21

**associate** 5:25

**assume** 21:8 26:5

**assumed** 66:10 69:8,10

**attach** 50:12

**attaches** 37:18 42:1

**attend** 33:17

**attendance** 29:3 69:23

**attended** 15:5 33:4 40:15 62:25

**attending** 32:25

**attorney** 6:15,16, 18 9:9 23:5

**attorneys** 26:20 52:2 68:10

**authority** 10:7 45:22 60:5

**automatically** 53:8 54:8

**avail** 39:6

**avenues** 38:7

**aware** 24:19,23 25:5 34:13 35:4, 13,22 36:4,19 39:10,16 40:9,13, 14,21 51:25 52:6 54:10,19 56:23 58:8,13,18,23

---

**B**

**back** 8:20 18:15, 22 19:10 23:10 27:8 28:14 34:14 35:4 54:3

**background** 9:3, 5

**bag** 8:7,10

**baked** 44:13

**Baker** 9:9,10 10:12

**Bank** 5:23

**bank's** 6:8

**Bar** 9:19,20 10:7 14:16 26:21 42:25

**Bart's** 65:13

**based** 6:12 23:20 29:24 32:21 36:6 61:24

**basically** 20:12

**basis** 64:13

**bearing** 48:8

**behalf** 30:20

**belief** 69:3

**believed** 69:11

**believes** 48:6

**benefits** 50:12

**binding** 62:17

**bio** 9:18

**bit** 7:19 10:11 36:5 38:18 45:14

**boards** 44:9 50:20,25 62:3,13

**body** 50:5

**borrower** 6:3

**box** 15:18

**brain** 21:21

**branch** 42:12,15 60:7

**break** 7:20,21 8:1 59:4

**brings** 48:19 52:19

**broad** 22:23 30:8 37:8

**broader** 30:18

**broke** 38:17

**brought** 8:6,7

**Buck** 69:17

**business** 11:1

---

**C**

**cadence** 22:3

**calculus** 67:5

**call** 13:25 54:1 59:5 61:23

**called** 5:3 24:25

**candid** 63:14 69:25 70:6

**candor** 43:14 48:19 67:10

**car** 8:8

**career** 70:18

**case** 5:25 6:15 8:9 11:16 21:20 22:25 23:9,18 26:6 37:14,19 42:7,17 43:4,5 46:14,20 47:3,6,7,12 48:6 52:11 56:22 57:3 58:2 59:2 61:4,11

62:1,2 65:11,15 68:12

**cases** 5:20 11:8 23:14

**casually** 14:16

**categorize** 68:13

**category** 69:12

**chair** 19:15

**challenged** 57:16,25

**change** 29:21 30:13 34:21

**characterization** 63:21 64:5

**charge** 42:6

**chat** 15:10,15,17 70:18

**Chattanooga** 29:2

**check** 60:7

**chief** 9:15 19:18 33:22,25

**choice** 49:20,21 51:6

**choices** 49:16 50:10,13

**choose** 59:23

**circumstances** 37:11 38:4 56:21

**cite** 42:17

**cited** 55:8,10

**citizen** 43:11

**city** 17:16

**civil** 20:17 21:4 23:15 36:9 58:10

**claiming** 41:25 61:8

**clarification** 67:21

**clarify** 24:2

**clerk** 56:13

**click** 15:17

**clients** 12:2 13:1

**close** 40:11 44:22

**closed** 34:5 36:8 40:19 44:19 45:9 66:9,11 68:2,16, 21 69:4,10,11

**code** 22:22 24:15

**colleagues** 13:4

**combative** 39:12

**comment** 31:21 32:3,6,7,12 53:15, 16

**comments** 23:21 68:3,8

**commercial** 10:16

**commission** 14:23 15:6 19:6, 13,20,22,23,24,25 20:4,9,14,23 21:2, 9,13,17,23 22:2,3, 7,13,14 23:21,23 26:9,15,22,25 27:5 28:6,12,14 29:3,11,14,17,20, 23 30:6,15,20 31:25 32:6,10,16, 25 34:4,9,17,24 35:5,6 36:4,8 39:13 40:23 41:6 42:2,16,20 43:18 44:5,11,14,22,24 45:1,3,7,17 46:18 47:4,22 48:13 49:9,24 50:14,21 51:1,4,15,24 52:5, 7 53:12 54:6 56:21 58:9,14,19, 24 60:1,14 61:16, 25 62:24 63:17 64:9,12 66:6,8,13 67:15 69:24

**commissioner** 14:21

**commissions** 36:15 44:9 50:21 51:1,8,10 61:14 62:4,10,13

**committee** 20:5 23:1 30:10 49:25

66:4,16 67:7 68:20

**committees** 22:7, 16 23:6 24:10 27:19 34:11 35:1 48:23 49:7 53:20 61:14 62:9

**common** 58:5

**communications** 56:12

**comparison** 36:6

**comparisons** 34:19

**compelling** 11:23 12:8,11 37:21 38:4 39:2,7

**competence** 22:21

**complaint** 55:9

**complete** 53:13

**completed** 28:3

**computer** 8:10 65:20

**concept** 43:6

**concepts** 44:2

**concerned** 57:10

**concluded** 71:11

**conclusion** 60:22

**condition** 7:6

**conducted** 7:16 70:8

**conference** 28:15,19

**confidence** 47:21

**confident** 25:23 32:17

**confidential** 48:18 56:12

**congratulate** 13:25

**congress** 49:13 54:9,12,16,24 55:3,16 59:12,15, 16,21

**congressional** 52:20

**CONLAN** 15:23

**connection** 5:22 35:19 52:11 61:13 62:20

**conscious** 35:10

**consciously** 35:22

**consensus** 30:18

**considered** 68:4 69:1

**Consiglio-young** 14:12 39:18,23

**consist** 42:24

**Constitution** 11:4 54:2

**constitutional** 11:3,6,7,10 40:4

**construction** 5:22 6:4

**contact** 13:19 40:8

**contest** 55:11

**context** 5:19 44:4

**continue** 51:13

**continuous** 18:10 36:17

**contracts** 6:4

**conversation** 20:17

**convicted** 10:9

**cooperation** 6:8

**cooperative** 6:7

**coordinated** 40:6

**coordinating** 14:8,9

**core** 45:25 46:3

**correct** 41:23 61:6

**correctly** 53:1

**Coulam** 17:23

**counsel** 7:2 9:15 19:18

**count** 33:3

**counted** 20:16

**county** 6:25 7:1

**couple** 35:13,15 44:13 51:19,24 64:7 69:21

**court** 6:22,23 14:19 15:12 20:10 27:1 29:13 30:2,3, 21,22 31:3,11,20, 24 32:7,11,14 33:23 36:10,18,20 37:5 38:5 40:10 44:18,21,25 45:2, 18,22,24,25 46:1, 13,20,21 47:11,21 48:14 51:6,11,14 53:13 54:7,11 55:6 57:20 58:2,4 59:9,11 60:5

**Court's** 45:5

**courts** 36:25 57:14

**created** 19:7 22:8 23:2

**credentials** 9:17

**crime** 10:9

**criminal** 20:18,25 37:19,22 38:15,21 39:8 58:3,5,7,16

**critical** 60:4

**CST** 71:11

**current** 9:6,8,11, 12 11:14 14:11,18 41:5

**curve** 12:17

**customers** 5:24

———

**D**

**Dan** 47:9

**date** 9:18 34:1 54:16 63:20

**days** 10:17 18:5

deal 47:7

dealing 13:5
22:14

deals 43:7

dealt 42:9 58:3

debate 37:12
49:17,19

December 54:21
64:22

decide 32:1 51:14

decided 44:18

deciding 58:2

decision 32:4
40:10 44:21 45:4

decisions 30:24
43:15 46:6 62:16

declaration
17:13,17,20

decline 32:11

declining 68:19

default 53:11

defending 43:5

defer 43:4,25
64:18

deficiencies 6:6

definition 46:5
67:17

deliberation
35:11 45:20

deliberations
45:18,21 46:4,12,
14,19,20 47:6,10
56:11 57:4,6

deliberative 42:8,
11,23 43:6,9,19,
24 44:3

delve 12:22

demands 13:9

dependent 67:12

depending 29:2
38:10

depends 18:2
45:19

DEPONENT
71:10

deposition 5:17
6:9 8:6,19,24 17:2
41:20

depositions 7:17

deputy 9:15 14:6
19:18

describe 29:10
31:17,23

designate 20:2

desktop 16:5

destroyed 43:20

detail 19:3

detailed 36:2

determine 50:2
57:22

detrimental 49:9

detriments 50:12

development
10:24

dictating 61:19

difference 53:9
57:9 60:4

differences 51:7

differentiating
62:7

differently 50:8

diminished 44:5
48:20

dire 37:24 38:4

direct 11:13

Director 13:10,20
14:6

disagreed 31:6

disagreement
49:17

disciplined 10:7

disclosure 15:9
16:24

discretion 31:11
32:8 42:18 53:13

discuss 30:7
62:21 67:11,25

discussed 9:5
39:21 57:12 68:4

discussing 8:16

discussion 13:3
30:16 34:4,9,16,
22,25 70:23 71:4

discussions
17:22 34:19

dispute 5:22 6:5
63:5

distinction 57:6

divorce 6:19

document 16:3,
17,19,21,23 17:9
18:4,10 25:20

Donelson 9:9,10
10:12

DOUGHERTY
5:7 16:1 17:11
36:13 37:1,16
39:9 40:17 42:19
43:17 44:7 47:19
48:3 49:5,22
55:22 56:17 65:16
68:23 69:5,20
70:15,24 71:5

download 16:4

draft 18:1,3,12,13,
16 30:12

drafts 17:25

drew 60:22

duly 5:4

duty 40:4 66:18

E

e-mailed 18:19

e-mails 18:15,21

earlier 39:22
40:14 45:10

economic 10:24

effect 52:19 53:3,
4,6,8,17 54:8,14,

21 55:7,16,17
59:21 60:11 61:3
62:17

effective 54:25

election 28:1

electronically
71:1

element 37:9

employee 14:11

Enabling 55:14

end 27:24

engage 47:4

enter 8:14 17:6

entire 32:15,20

entirety 18:13

equiv 57:8

equivalent 45:17

estates 10:18

events 14:16

evidence 20:18
21:15 23:16 58:21

exact 9:21 19:1
34:1 57:15,24

EXAMINATION
5:6 66:1 69:19

exchanges 56:12

excuse 13:20
27:20 42:21

executive 56:14

exercises 53:13

exercising 60:5

exhibit 8:16 15:14
17:3,4,6,7,10
41:19

expedited 70:25

experience 11:2,
11,14 12:7,20
19:5 22:5,10,14
24:4 50:13 57:12,
19 61:9,13,15
68:12

experiences

expert 8:13 16:24
25:4,9 48:4 52:4
61:11,19

expertise 61:17

explain 51:20
52:21 53:5

expressed 70:1

extends 42:14

extent 11:9 30:8,
18 38:5 44:17
46:1 61:16

extraordinary
54:1

eye 66:21

---

**F**

---

facing 10:21

fact 31:19 36:9
50:6 51:17 53:22

factually 57:5

fair 34:2

fairly 10:14 32:17,
19

familiar 51:15

February 9:22

federal 19:21 20:1
22:6,7,13,16 23:1,
6,15,24 24:5,9
34:10,17,20,21,24
35:1,6,16,23,24
36:2 41:14 48:22
49:6,21,24 50:18
52:18 53:5,10
54:5,6 55:14 58:8,
10,13,15,18,20,
23,25 59:7 60:8,
16,21,23

feedback 65:20

feel 7:21 23:17
25:23 69:22 70:7,
14

fell 69:12

felt 32:7 33:16
70:9

figure 10:25

figured 19:10

finding 35:19

fine 5:10 50:22
51:2,10

finished 18:12,14

firm 23:19

flash 55:1

folks 26:14 29:17

follow 34:21

foot 37:5

form 36:11,22
37:6 39:4 40:12
42:3 43:2,21
47:14,24 49:1,10
55:18 56:6 64:3
68:23 69:5

formally 10:6

forward 32:1,8
46:9 53:14

found 35:18 63:19

frame 19:12 64:11

frankly 33:16
50:17

free 7:21

freeze 41:9

friends 13:14

froze 10:3

full 5:15 20:20

functional 57:8

functioning
56:22

fundamental
12:14

---

**G**

---

gave 6:9

general 19:2,12
22:18 25:1 30:23
53:17,21,23 67:13

generate 70:9

give 7:7 44:3
66:19

giving 43:8

good 5:8 7:15 8:2
43:15 59:6

government
10:22 11:20,21
39:1 62:5

governmental
11:23 12:9,11,16,
21

governor 9:16
13:17 19:18 40:3
41:23 56:14

governor's 12:5
13:23 14:9 19:17
40:2 42:10 43:9
53:23

great 71:6

group 28:22,24
70:3

gubernatorial
28:1

guess 5:10,11,13
64:16

---

**H**

---

half 24:22

handful 18:25
19:1

handling 11:6

hands 31:10

happen 68:15

happened 68:14

happy 70:21

hard 69:6

Harmon 14:6 40:7

Haslam's 13:17

head 33:10 65:14

healthy 10:14,19

hear 41:10 65:19,
22,23

heard 53:1

hears 46:1

heavy 10:18

held 12:15 70:23
71:4

helpful 37:11
63:13

heritage 58:5

hey 5:9 18:12

high 33:13

highest 12:15

history 57:23

hold 11:5 19:9

Holly 15:2

honest 7:7

Horizon 5:23

hour 59:3

House 53:20

hundred 28:4

---

**I**

---

IBS 31:13

idea 36:16 49:19

ideas 31:5 70:9

impact 48:10

implicate 42:16,
21,24

implication 47:17

important 12:16
48:6

impossible 37:7

improvement
36:17

in-person 29:6

incident 39:10
40:11

include 11:3

inconsistent
45:5

Lexitas TENNESSEE Reporting
(615)595-0073

**independent** 52:13,14

**indicating** 63:19

**individuals** 26:3

**information** 27:7 38:8 63:12

**inherent** 45:24

**inhibited** 70:14

**initially** 19:9

**injunction** 25:6, 14,19 26:3 40:25 44:16 56:4 65:10 66:15

**interact** 14:25

**interaction** 14:14

**interactions** 6:10

**interest** 11:24 12:9,12,17 25:3 39:2,7

**interested** 30:3

**interrupt** 52:15

**interrupted** 52:16

**interviewing** 37:25

**inviting** 64:1

**involve** 23:15

**involved** 5:23 6:14,19 11:16 23:1,9 53:11 62:2 63:6

**involves** 46:24 47:1,2 61:4

**involving** 44:4

**issue** 12:18 23:18, 22 30:9,11 43:13 45:11 56:23 63:24 64:6 67:18 69:9

**issued** 64:19

**issues** 6:6 10:22 11:7 12:6 13:5,7,8 14:10 25:1,2 30:1 38:7 67:11,13,15

**item** 68:11

**items** 30:7 32:10

**IVF** 29:21

**J**

**January** 9:13

**joined** 15:24

**judge** 29:18 56:3, 13 57:4 61:17,20, 21

**judge's** 61:23

**judges** 40:4 57:7 68:10

**judgment** 50:19

**judgments** 50:4

**judicatory** 62:15

**judicial** 13:17 14:10 42:14 45:17,21 46:3 47:6

**judiciary** 24:17 26:8,11,16 43:1 52:1

**June** 40:22 41:7 65:2,7

**jurors** 37:25

**jury** 38:8

**justice** 15:1,4 32:14 33:14,21, 22,25

**justices** 14:18,25 40:9 46:5,24 47:1, 11

**K**

**kind** 6:3 10:15,19, 20,21 12:19 25:1 27:21 30:5,12 31:2,13,15,19,21 40:7 41:17 69:12

**Kirby** 15:2,5 32:14 33:14,21

**knew** 35:9,15,24, 25

**knowing** 66:13

**knowledge** 22:5, 11,12,15,18 52:14

**Knoxville** 29:1

**L**

**Lang** 5:2,15

**large** 30:5

**late** 27:10

**law** 9:24 10:11 11:2,3,11,14 22:25 56:13,22 57:9 58:5 61:18, 20 62:1

**lawsuit** 6:17 17:5 23:7 24:20,24 25:1 35:12,13,18, 20 47:8

**lawyer** 6:13 22:19 29:18 36:24 41:22 42:7 43:4

**lawyers** 43:5,25 61:21

**leave** 8:8

**legal** 9:17 12:1 42:7 62:21

**legally** 11:22

**legislative** 42:12 60:7

**legislator** 56:15

**legislators** 49:12

**legislature** 60:10

**lending** 5:22,24

**letter** 29:20

**level** 6:7,8 22:23 23:24 48:19 60:23

**liaison** 15:2,4 30:2 32:15,20 39:19 62:25 63:5

**licensed** 9:24 10:4

**licensing** 10:7

**likewise** 42:14

**limited** 6:10

**list** 62:13

**listed** 51:18,21

**listening** 48:9

**listens** 46:2

**listing** 51:23

**litigant** 37:13 39:6

**litigants** 36:10, 16,20,25 37:3

**litigate** 37:14

**litigated** 23:8

**litigation** 10:16, 18

**livestreamed** 40:24

**livestreaming** 41:15

**loan** 6:5

**loathed** 68:13

**located** 28:25

**locations** 28:17, 18,20

**long** 8:4,24 13:11, 20 16:14 24:20 33:15 57:23

**looked** 26:13 58:5

**lot** 9:3 36:19 63:15

**lots** 23:14 36:24

**M**

**made** 23:20 24:19,23 29:16 30:23 31:19 40:10 44:21 49:16,21 50:11 51:25 55:25 62:16

**main** 20:16

**make** 13:9 20:23 21:2,9,13,17,24 22:16 23:12 24:16 37:10 43:15 45:4 46:6,8 48:14 49:3 53:1 58:14,19

**makes** 20:14 26:24 29:12 44:11 58:9,24

**making** 42:7 50:3

**malfeasance** 56:10

**marathon** 7:18

**March** 9:22

**margins** 32:18

**mark** 17:3,6

**marked** 17:9 41:19

**materials** 8:5,9, 21

**math** 32:23

**matter** 45:1

**matters** 30:2 62:22 66:24

**maximize** 6:3

**Mccaleb** 24:20 47:9

**meaning** 37:19

**meaningful** 48:10 60:15

**meaningfully** 37:13 60:15,20,25

**means** 11:22 12:9,23

**measure** 70:4

**mediator** 51:18, 21,22

**medical** 7:5

**meet** 22:3 28:14 29:14

**meeting** 28:8,11 29:7,9 33:4,6,8,12 40:23 41:7 46:18 48:10,19 57:23,24 63:10,16,20,22, 23,25 64:1,6,7,9, 15,21,22,24 65:2, 7,8 67:8

**meetings** 13:6 15:5 27:13,20 28:3,7 31:22 32:24 33:1 34:5 35:1,6,16,23,25 36:8 40:11,15 41:14 42:2,24 43:18 44:22 45:8, 17 46:12 47:22 48:15,18,20,24 49:7,8 50:22 52:7 56:1 57:3 62:11, 18,20,21,25 63:6, 17 66:8,14 68:2,4, 16,21 69:3,23 70:7

**member** 29:18 39:11 43:12 66:13 67:7

**members** 26:8, 10,16,21 29:23,25 42:25 44:22 45:8 47:3 52:1 64:9 67:8

**memo** 29:20

**memorandum** 25:10,18 26:1 56:3

**memory** 40:6 55:11

**memos** 68:9

**Memphis** 28:24 63:2

**mentioned** 68:1

**merits** 34:22

**message** 15:21

**messages** 15:22

**methodology** 60:12,18

**Michelle** 8:24 13:11,12 14:11 39:18,22 40:7 65:19

**midstream** 27:19

**Mike** 15:12 65:16

**mind** 65:6

**minute** 14:24

**minutes** 59:4

**missed** 33:8

**mix** 10:14 30:5

**moment** 36:6

**month** 9:21 24:21

**months** 24:21,22 35:13,15

**morning** 5:8 70:19

**move** 32:1,8 46:9 53:14

**moving** 41:12

**multiple** 17:25 28:17

**mute** 5:12

**muted** 65:19

**N**

**narrowly** 11:24 39:2

**Nashville** 17:18 28:16,23 29:6,9 63:2

**nature** 13:24 14:3 17:5

**navigate** 10:21 15:13

**necessarily** 43:8, 15

**neglected** 53:25

**Newspapers** 57:11,19 58:4

**nonlawyer** 12:2

**normal** 62:19

**noted** 42:8

**notice** 31:21 63:25 64:6,19,20, 21,24 65:3

**notices** 63:10,17, 22 64:16

**notion** 24:16

**November** 28:2

**nuances** 62:6

**number** 6:9 19:1 44:15 68:14

**O**

**oath** 8:4

**Object** 36:11,22 37:6 39:4 40:12 42:3 43:2,21 47:14,24 49:1,10 55:18 56:6 64:3 68:23 69:5

**objective** 50:1

**observe** 37:3 40:22

**observed** 41:13

**obvious** 53:9

**occasion** 5:21 53:23 70:5

**occur** 46:12 50:6 63:23 64:7,10

**occurred** 6:5 21:22 28:2

**occurs** 21:7,25

**off-the-record** 70:22 71:3

**office** 12:5 13:24 14:9 17:18 28:16 29:6 40:2 42:10 53:23 63:2

**official** 11:21

**officials** 11:20 12:21

**open** 13:6 15:18 16:13,14 28:7,9, 12 34:5 35:2,7,16, 23,25 37:19,22 38:1,5,6,9 39:8,13 40:15,20,23 41:7, 14 43:18 44:10, 11,15 45:9 47:23 48:15,24 49:7,8, 19 50:22 51:3 52:7 58:6 62:11, 18,19 63:18 65:9 66:14 69:9

openness 67:10, 24

operate 51:12,13

operated 23:24

operates 44:24 55:14

operation 34:24

operations 34:18

opinion 25:10,18 26:1 41:18 48:5 52:22,25 55:23 56:4 60:13,19 61:11,22,24 63:8 67:3

opinions 61:12

opportunities 61:2

opportunity 14:15,22,24 21:23 25:8,12 41:2 67:6

opposed 43:12

opposite 54:5

option 49:18 55:4

oral 38:5

order 6:4 12:17 25:13,17,22,24 26:7 27:6 38:25 54:3 71:7

originate 22:21

outcomes 50:5

overcome 38:25 39:7

oversight 52:20

**P**

Pages 41:21

paid 43:12

pan 20:20

panel 13:12,16,18

paperwork 51:19

Paragraph 41:21 44:8 45:13 52:17 53:2 55:9,23 56:1,

2 60:12,19

paragraphs 41:18

part 17:7 23:7 30:3 32:12 44:2 46:3,4

participate 66:12

participating 27:13

party 6:15,17 26:6

pass 65:17

passed 49:13

past 11:19 14:18 63:10,17

pause 66:19

pay 6:4

PDF 15:19

pending 16:12

pens 8:10

people 10:21,23 13:8 28:23,24 29:1 30:11 37:12

percent 28:4

perfectly 49:18

period 13:18 31:20,22 32:22 56:15

person 41:15 43:8

personally 13:10 14:5,12

phone 13:22

phonetic 55:9

phrase 12:3 13:2

physically 17:13 28:15

picking 31:15

place 24:16 25:6 27:21 31:22

Plaintiff 61:8

planned 33:9

play 20:21

pleading 52:10 65:13

pleadings 25:21 47:9 62:1

pleasure 45:2

point 7:15,18 13:23 14:2 19:14 20:3 26:15 27:23 31:4,9

points 40:8

policy 49:16,20, 21 50:10 51:6

political 12:1

position 9:6,8 14:1 19:16 51:8 64:15

post 65:9

potential 29:21 30:24 37:25 39:6

power 45:23,24 46:4

powers 45:25

practical 45:1

practice 6:1 9:24 10:12,13 11:2,12, 14 19:7 20:11 21:6 22:16 23:1, 15,16 45:23

practices 20:13

practicing 23:5 36:24

preliminary 25:6, 14,19 26:3 40:24 56:4 65:9 66:15

preparation 63:8

prepare 8:19 17:19

prepared 8:22 9:1 17:22 18:11 25:9 42:17 43:23 55:2

prescriptive 36:3

preserve 18:19

presume 40:20

presumption 39:7

prevent 7:6

previously 66:4

principle 43:14

principles 44:2

prior 9:14 67:19, 20

private 26:20 42:25 43:11 52:1

privilege 42:1,8, 11,14,24 43:6,10, 20,24 44:4 62:21

pro 37:2

problems 50:16

procedure 19:6 20:11,25 21:4,11, 19 22:17 23:16 45:23 58:11,16 59:1

proceeding 57:14,15,25 71:11

process 22:24 24:5,16 29:11 30:14,23 31:23 32:13 37:4,24,25 38:5 40:5,8 42:8, 11,23 43:6,10,19, 24 44:3 47:3 48:11,12 49:9,24, 25 50:15 52:18,21 53:6,19 59:25 60:14,16,17,20,21 70:10

product 24:8 32:2

profess 34:1 42:6

professional 39:25 70:18

professionally 13:21 14:8,14 39:24

proposal 64:12 68:25

proposals 29:16 31:8 64:13 68:9

proposed 54:12,

20,24 55:6 59:12 68:17

**providing** 43:16 48:4

**provision** 59:18

**prudent** 32:8

**public** 13:6 28:7, 9,13 29:19 31:21 32:3,5,12 34:6 35:2,7,16,23,25 36:9 37:20,23 38:1,6,10 39:11, 14 40:16,23 41:14 43:19 44:10,11,15 47:20,23 48:1,5,7, 9,15,21,25 49:7 50:23 51:2 52:7 53:15,16 55:25 56:10 58:6 62:11 63:10,16,18,22, 24,25 64:1,5,10, 15,21 65:2,9 66:14,21 67:8 68:3,18,19 69:4 70:3

**public's** 48:11 61:1

**publish** 53:15

**pull** 15:11 16:2,9

**purpose** 20:8 24:11,14

**purposes** 17:2

**pursuant** 40:24 44:16 66:14

**pursue** 32:11

**put** 18:17 27:7 32:3,5,21

**puts** 31:21

**putting** 66:23

---

**Q**

**qualifications** 62:19

**qualified** 38:14, 20 61:10

**quantify** 68:13

**quarterly** 22:4 27:13 28:6 29:7, 15 32:24

**question** 7:12,13, 24,25 16:12 19:23 22:9 23:3,11,25 37:8 42:22 46:16 49:3,4 50:24 52:24 57:17 68:25 69:7

**questionnaires** 38:9

**questions** 5:7 11:6,10 13:9 39:12 44:13 66:2, 3 69:20

**quibble** 54:18

**quote** 23:18 26:19 55:2

---

**R**

**Rachel** 14:6 40:7

**racking** 21:21

**raise** 13:8

**raised** 23:22 30:2 67:13

**ranging** 10:15

**read** 16:22 25:9, 14,19,21,23 65:12 71:8

**reading** 25:22 47:9 60:23

**reads** 59:20

**ready** 65:5

**reason** 10:17 14:3 44:18 70:11

**reasons** 37:21 64:8

**recall** 5:20 13:24 14:2,3 17:16 19:1 21:12 26:2,13,15 27:11,12,23 28:8, 11 29:5 32:25 33:7 34:7,12,16 39:17,18 45:6 62:23 63:1 65:14

**receive** 17:20 64:13 68:8

**received** 68:3,7

**recognize** 16:19

**recollection** 25:22 27:15 28:22 29:8 30:21 33:3 45:11 52:3 63:7 64:25 65:1,5

**recommendation** 21:24

**recommendations** 20:14,24 21:3,10, 14,18 24:17 29:12 31:5,18 48:14 58:10,15,20,25 59:8

**recommended** 59:8

**record** 5:14 8:14 33:21

**records** 13:6

**reduce** 65:20

**refer** 16:8 18:2 19:21 26:21 27:7

**referenced** 8:21 12:19

**refinement** 30:16

**reflects** 52:25

**reframe** 52:23

**regard** 33:13 67:3

**regular** 64:13

**regulatory** 10:20

**related** 12:5 13:7 24:6 25:18 60:16 61:12

**relationship** 40:1

**relief** 47:16

**remember** 6:11 9:21 21:21

**remote** 8:4

**remotely** 7:20

**render** 61:11

**renewal** 51:23

**repeat** 30:14

**report** 8:13,21 9:1,2 15:10 16:25 17:20 18:1,16,22 19:3,11 25:9 27:8 32:21 36:6 41:19, 22 45:13 52:17 57:13 63:9 65:13

**reporter** 15:13 65:23 71:2

**representatives** 61:1

**represented** 7:2

**request** 29:19

**require** 12:16 44:1 54:23 60:6 67:21

**required** 55:5

**requirement** 60:9

**requires** 43:14 54:11,20

**requiring** 49:13

**research** 44:1

**resigned** 19:16 27:12,18,24

**resolved** 6:24

**respect** 38:3 42:12 46:10 48:7 58:7 67:20

**response** 21:5

**responsibility** 62:15

**review** 30:21,23 63:9

**reviewed** 8:20

**reviewing** 22:22 61:25

**Richardson's** 56:3

**Richmond** 57:11, 19 58:4

**rise** 44:3

**role** 6:18 9:11,12 23:5 31:12 36:3

**room** 28:15,16

**roster** 26:14

**routinely** 42:9

**rude** 33:16

**rule** 29:12,21 31:18 34:21 48:14 51:21 54:12,20,24 55:5,15 58:9,14, 19,24 59:8 61:3 67:13,18 68:9,18

**rulemaking** 22:7 24:5,10 37:4 47:3 48:24 49:25 52:18 53:5 59:25 60:13

**rules** 14:21 19:6 20:11,13,17,18, 21,24 21:3,10,14, 18 22:16,20,21 23:15 24:7,18 30:24 31:8 34:20, 23 36:18 45:23 46:7,10 50:8 53:10,11,16,18 54:1,4,7,13,15 55:3,14 58:10,15, 20,25 59:12 60:10 66:4,6

**ruling** 67:20

**runs** 43:10

**rush** 53:24 70:25

---

**S**

**SAITH** 71:10

**satisfied** 51:12

**save** 16:5

**scanned** 8:23

**scanning** 16:21

**scheme** 36:1,2

**scratch** 42:21

**scrutiny** 12:15, 20,23

**section** 55:24

**seek** 32:6

**seeking** 47:16,18

**seeks** 46:2

**selection** 14:10

**Senate** 53:20

**send** 15:23

**sense** 12:13 37:9 66:17

**sensitive** 67:16, 22

**separate** 25:13, 17

**September** 30:25 33:23

**serve** 19:15,18 26:9,21 36:16 66:16 67:7

**served** 13:12,17 15:6 26:17 27:5 41:22 62:14 66:4

**serves** 36:9

**service** 28:5 32:15,22 33:1 34:3,8 44:25 45:6 61:24 62:3,4,9,24 66:22 70:8

**serving** 25:4 35:5 39:19 66:7

**session** 54:2

**set** 37:4

**Shelby** 7:1

**show** 39:1

**sign** 71:9

**signature** 16:18, 20

**signed** 17:12,14, 17

**similar** 42:13 57:14,21,23 59:24

**single** 28:8,11 33:4 37:9

**sit** 20:19 26:5,13 54:17 65:6

**sitting** 17:18 63:4

**situation** 6:2 12:22 32:5

**situations** 38:13 57:21 62:16

**someone's** 67:19

**sort** 8:11 41:25

**sorts** 62:22

**sound** 59:24

**Sounds** 8:2

**sp** 65:13

**space** 12:1 50:11

**speak** 12:1 21:7 47:25 48:2 66:22

**speakers** 65:21

**specific** 25:22 27:6,15 33:3 41:18 64:25 65:1

**specifically** 23:11 56:23 61:5

**specifics** 6:12

**spend** 63:15

**spoke** 14:2

**spoken** 41:5

**springing** 53:3,4, 6

**staff** 43:12 56:13, 15

**Stahl** 17:23 18:16, 23 24:25 36:11,22 37:6 39:4 40:12 42:3 43:2,21 47:14,24 49:1,10 55:18 56:6 64:3 65:18 66:2 69:2, 17 71:7

**start** 9:10

**started** 9:12

**state** 5:13 6:22,23 9:23 10:4,20,21, 25 17:16 28:18 34:19 36:10,21 41:22 50:20,25 55:24 60:8,24

62:4 66:22

**stated** 40:14

**states** 9:25 10:24 11:4 17:14 59:9, 11

**statute** 24:6 27:2 49:13 59:20 60:23

**statutes** 62:1

**statutory** 36:1,2 59:18

**stipulation** 7:23

**stopped** 20:15

**strict** 12:23

**strident** 67:3

**study** 30:9

**subject** 38:13 62:18

**submit** 29:19 31:13 51:22 64:12

**submitted** 30:20 32:10 68:20 69:15

**subsections** 55:2

**substance** 34:23

**success** 50:4

**successful** 48:23

**suggesting** 68:10

**suggestions** 29:16,22

**suit** 34:21

**summer** 33:8

**superior** 49:24 50:2

**suppose** 35:9 47:5 57:24 59:23

**Supreme** 14:19 20:10 27:1 29:12 30:2 31:20 32:11, 14 33:23 40:10 44:18,21,25 45:18 46:13,19 47:11 51:5,11 53:13 54:11 55:6 59:9,

11 60:5

**suspect** 51:11 67:2

**sworn** 5:4 8:4

**system** 36:10,20 47:22 49:21 50:18 53:15 54:6 60:8, 24

**system's** 54:5

---

**T**

**table** 7:24 63:4

**tailored** 11:24 39:2

**takes** 31:22 59:21

**taking** 30:3 67:18 68:17 70:17

**talk** 8:12 9:2 14:23 15:9 16:15 19:19, 20 20:1 36:5 45:14 64:15

**talked** 13:22 25:1

**talking** 31:16

**TCA** 19:7

**team** 56:14

**telling** 61:20

**Tennessee** 6:22, 23 9:23 10:5 11:1 14:18 19:25 20:8, 24 21:3,10,14 33:22 35:5 36:1,7, 21 39:12 40:10 41:23 44:9 45:18 46:13,19 47:11,21 49:8 50:15,20,25 51:16 53:9,12 54:2 60:14 62:10

**Tennessee's** 49:23 52:20 55:15 60:20

**tenure** 28:12

**terms** 22:19 34:18 60:25

**test** 57:12,19

**testified** 5:4

**Thanksgiving** 70:21

**thing** 8:11,22 56:25

**things** 10:15 29:24 30:6 54:4 62:7,22 67:25

**thinks** 48:6,8

**Thomas** 5:2,15

**thought** 33:10 35:10 45:8

**thoughtful** 70:4, 12,13

**thoughts** 41:6

**time** 7:20 8:25 10:22,23 12:4,6 13:5,18 14:20 15:2 19:12 21:6 22:1 26:17 29:4 30:7 32:20 33:15 40:2 63:15 64:11 65:22 67:15 68:8 70:17

**times** 67:22 68:2, 14

**today** 5:17 7:3,8, 18 8:6,17 19:19 20:3,19 21:7 26:5, 18 54:17 65:6 66:13

**told** 24:25

**topics** 20:16

**totally** 31:11

**traditional** 10:15

**transcript** 17:7 70:25

**transmit** 54:11,15 59:14

**transmits** 59:12

**Tri-cities** 29:1

**trial** 37:18 39:8

**trials** 37:22 38:16, 21 58:3,6,7

**trust** 10:18 19:11 47:21

**truthful** 7:7

**turn** 51:18

**turned** 50:8

**tweak** 31:7

**type** 10:18 15:21 43:7,13

**types** 20:13 45:21

---

**U**

**ultimately** 19:16 32:3 51:14 61:2, 22

**understand** 17:3 20:4 22:23 23:3, 10 24:2 31:16 33:19 35:21 38:12 46:16 47:8,12,15 49:4 53:2 55:13 57:17 61:7

**understanding** 12:8 22:19,20 24:9 31:17 33:24 35:14 38:2 42:13 44:20 45:16 48:11 52:9 55:3,21 57:13,18 60:24 62:5 65:8 68:24

**understood** 31:10 66:10

**United** 11:3 17:13 59:9,11

**unlike** 36:1

**unusual** 27:16 33:6,11

**upcoming** 63:25 64:21

**USC** 22:8 23:2 24:6 54:10,19,23 55:8

**usual** 21:18

---

**V**

**vacancies** 40:5

**vacation** 33:9

**vague** 52:3

**Vaguely** 51:17

**variety** 11:8

**verbally** 39:11

**versus** 24:20 47:3 49:18 60:8

**vice** 19:15

**video** 28:19

**views** 69:25

**virtue** 50:6 51:17

**voir** 37:24 38:4

**vote** 45:7 54:24 55:4 59:13,16,19

**voted** 53:21

**votes** 55:16

---

**W**

**wanted** 31:6,7 32:1

**watch** 37:12

**ways** 11:8

**website** 63:9,11, 13 64:20

**week** 71:5

**weighing** 50:5

**whatnot** 23:17

**whomever** 29:19

**willingness** 66:16 67:10

**Wiseman** 5:2,8, 11,15,16 7:3 10:2 16:3 20:3 62:23 66:3 69:21 70:16

**wishes** 45:5

**word** 16:22 53:7

**words** 51:10 53:4 70:4,13

**work** 6:13 9:8 10:16,20 11:19 17:24 24:8 30:12

*Lexitas Filed TENNESSEE Reporters Work Product*
*(615)595-0073*

31:13,25 32:2,6
33:5,17 36:3,15,
18 37:14 50:22
51:2,10 53:11,25
54:6 61:14 62:7
67:19,20

**worked** 5:24 6:2
9:15 14:17 18:4
19:13 50:15

**working** 18:3,10,
13 52:8 55:10

**workout** 6:2

**works** 16:7 22:24
45:1 60:24

**worth** 31:14

**written** 8:5

**wrongdoing**
56:10

---

Y

---

**year** 27:24 33:24
46:6 54:13,21

**years** 6:1,9 19:14
27:4,14 32:23
51:19,24

**young** 5:25 6:13

Lexitas TENNESSEE worked - young 113
(615)595-0073

# E R R A T A   P A G E

I, THOMAS LANG WISEMAN, having read the foregoing deposition, Pages 1 through 71, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

| PAGE | LINE | SHOULD HAVE BEEN |
|------|------|------------------|
| 9 | 15 | Should read "deputy *and* chief counsel to the governor" |
| 10 | 16 | "this" should be "there" |
| 10 | 24 | "states" should be "space" |
| 12 | 17 | "curve" should be "curb" |
| 14 | 21 | Should read "commission *on the* rules." |
| 19 | 18 | Should read "deputy *and* chief counsel to the governor |
| 20 | 20-21 | "pan of play" should be "panoply" |
| 29 | 21 | "IVF" should be "idea" |
| 30 | 3 | "part to" should be "a hard" |
| 31 | 13 | "IBS" should be "ideas" |
| 37 | 9 | The phrase "I ask that every single element" is obviously erroneous, but I cannot decipher from the context what the accurate phrase might have been. |
| 42 | 18 | The phrase "to my discretion" is obviously erroneous, but I cannot decipher from the context what the accurate phrase might have been. |

(continued on next page)

_____

THOMAS LANG WISEMAN

_____
Notary Public

My Commission Expires: _____

# E R R A T A   P A G E

I, THOMAS LANG WISEMAN, having read the
foregoing deposition, Pages 1 through 71, do hereby
certify said testimony is a true and accurate
transcript, with the following changes (if any):

| PAGE | LINE | SHOULD HAVE BEEN |
|------|------|------------------|
| 50 | 14 | "admission" should be "commssion" |
| 54 | 6 | Should read "work *of* the commission" |
| 56 | 8-9 | Should read "might be advanced, for example, absent an" |
| 56 | 19-22 | Should read "That was what the "no serious argument might be advanced" comment was about. My then further argument was that under the circumstances, the Advisory Commission should functionally be no different. |
| 56 | 24 | "my" should be "by" |
| 62 | 15 | "a" should be "an" |
| 67 | 17 | "my" should be "by" |

_____
THOMAS LANG WISEMAN

_____
Notary Public

My Commission Expires: 5|9|26

TAMMY L. RUTLEDGE
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY