# EXHIBIT 3

```
1              IN THE UNITED STATES DISTRICT FOR
              THE MIDDLE DISTRICT OF TENNESSEE
2                   NASHVILLE DIVISION
  _____
3
  DAN McCALEB, Executive
4 Editor of
  THE CENTER SQUARE,
5
                              Case No. 3:22-cv-00439
6 Plaintiff,
                              Judge Richardson
7 vs.
                              Magistrate Judge
8 MICHELLE LONG, in her       Frensley
  official capacity as
9 DIRECTOR of the
  TENNESSEE ADMINISTRATIVE
10 OFFICE OF THE COURTS,

11
  Defendant.
12
  _____
13

14

15

16

17
                   Deposition of:
18
                   GINO BULSO
19
                   Taken on behalf of the Plaintiff
20                 October 9, 2023

21

22
  _____
23

24         Saba McKinley, LCR, RPR, CRI

25
```

*Lexitas* **TENNESSEE**
*(615)595-0073*

```
                    A P P E A R A N C E S


For the Plaintiff:

                    M. E. BUCK DOUGHERTY III
                    Attorney at Law
                    LIBERTY JUSTICE CENTER
                    440 N. Wells Street
                    Suite 200
                    Chicago, Illinois 60654
                    423.326.7548
                    Bdougherty@ljc.org


For the Defendant:

                    MICHAEL M. STAHL
                    Senior Assistant Attorney General
                    OFFICE OF THE ATTORNEY
                    GENERAL & REPORTER
                    Federal Habeas Corpus Division
                    P.O. Box 20207
                    Nashville, Tennessee 37202
                    615.253.5463
                    Michael.stahl@ag.tn.gov



Also Present:
                    For Witness Bulso
                    ASHLEY CARTER
                    Attorney at Law
                    Senior Assistant Attorney General
                    STATE OF TENNESSEE
                    ATTORNEY GENERAL
                    315 Deaderick Street
                    Nashville, Tennessee 37243
                    615.741.7932
```

*LEXITAS TENNESSEE*
*(615)595-0073*

1  APPEARANCES CONTINUED:

2
                        For Witness Bulso
3                       CAROLYN U. SMITH
                        Deputy Attorney General
4                       Education and Employment Division
                        315 Deaderick Street
5                       Nashville, Tennessee 37243
                        615.532.2578
6                       Carolyn.Smith@ag.tn.gov

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2                    I  N  D  E  X

3                                                    Page

4   Examination
    By Mr. Dougherty                                  6
5   By Mr. Stahl                                      77
    By Mr. Dougherty                                  79
6   By Mr. Stahl                                      81

7

8

9

10            E   X   H   I   B   I   T   S

11

12

                      (None marked)
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2          S  T  I  P  U  L  A  T  I  O  N  S

 3

 4          The deposition of GINO BULSO was taken by counsel

 5    for the Plaintiff, by Notice, at the John Sevier State

 6    Office Building, 500 Dr. Martin Luther King, Jr.

 7    Boulevard, Nashville, Tennessee, on October 9, 2023, for

 8    all purposes under the Federal Rules of Civil Procedure.

 9          All formalities as to caption, notice, statement

10    of appearance, et cetera, are waived.  All objections,

11    except as to the form of the question, are reserved for

12    the hearing, and that said deposition may be read and

13    used in evidence in said cause of action in any trial

14    thereon or any proceeding herein.

15          It is agreed that SABA MC KINLEY, LCR, RPR, CRI,

16    may swear the witness, and that the reading and signing

17    of the completed deposition by the witness are waived.

18

19

20

21

22

23

24

25
```

```
1                          *   *   *

2                       GINO BULSO,

3    was called as a witness, and after having been first

4    duly sworn, testified as follows:

5

6                       EXAMINATION

7    QUESTIONS BY MR. DOUGHERTY:

8        Q    Good morning, Mr. Bulso.

9        A    Good morning.

10       Q    Have you ever had your deposition taken before

11   today?

12       A    Yes.

13       Q    When was that?

14       A    Several times.

15       Q    Can you recall those times and in what -- what

16   the reason was?

17       A    Sure.  I believe I gave several depositions in

18   litigation with a adverse party named Ken Nelson, who

19   was a defendant in a fraudulent transfer case that I

20   filed.  He filed some type of an action against me, and

21   I think there were one or two depositions in that case.

22       Q    And that litigation that was filed by

23   Mr. Nelson, that was against you in your capacity as an

24   attorney?

25       A    Yes and no.  I was an attorney.  He sued me as
```

```
 1   a party, claiming some type of malicious prosecution.

 2       Q    Okay.

 3       A    And it was a deposition that was given, I

 4   think, here in Nashville.  At some point, the case was

 5   dismissed and refiled in Wisconsin.  Before that case

 6   was dismissed, I may have testified again.  And then

 7   there was another action brought by parties from

 8   San Francisco in which I was deposed.

 9           MR. DOUGHERTY:  I tell you what.  Let's go off

10   the record for a second.

11

12           (Discussion off the record)

13

14   BY MR. DOUGHERTY:

15       Q    Mr. Bulso, I appreciate that.  I should have

16   probably clarified.

17           You're an attorney; is that correct?

18       A    Yes.

19       Q    When I asked that question, I was referring to

20   you specifically being part of a deposition, giving your

21   deposition.

22           Did you understand that correctly?

23       A    Yes.

24       Q    Okay.  I'll try to clarify that next time.

25           Do you understand, Mr. Bulso, that you are
```

1    under oath here today?

2        A    Yes.

3        Q    Are you prepared to answer the questions that I

4    ask of you today?

5        A    To the best of my ability.

6        Q    Okay.  Have you taken any medications before

7    your deposition today that could affect your ability to

8    give honest and truthful answers?

9        A    No.

10       Q    Will you inform me if you do not understand a

11   question had that I ask of you today?

12       A    Yes.

13       Q    I will try to clarify that to the best of my

14   ability.

15            And then, I know you're an experienced

16   attorney, it's my understanding.  So any time you need

17   to take a break, feel free and we can.

18       A    All right.

19       Q    Then just a couple other points.

20            Obviously, in giving depositions, it's very

21   important to give audible, verbal responses.

22            Do you understand that?

23       A    Yes.

24       Q    I know quite frequently, as a matter of habit,

25   we all kind of nod our heads.  It's important, for the

```
 1    court reporter, for you to give audible and verbal
 2    answers.
 3          Okay?
 4    A    Understood.
 5    Q    You understand the procedures we've outlined
 6    here today for conducting your deposition?
 7    A    Could you ask that again?
 8    Q    Sure.  Do you understand the procedures we've
 9    gone over for conducting your deposition today?
10    A    I presume they're in accordance with the
11    Federal Rules of Civil Procedure.
12    Q    That's correct.  I meant kind of general
13    guidelines; if you need a break, those simple kind of
14    common sense things.
15          Do you understand that?
16    A    I do.
17    Q    Can you please state your full name for the
18    record?
19    A    Eugene Nicholas Bulso, Jr.
20    Q    You go by Gino; is that correct?
21    A    Correct.
22    Q    Okay.  How old are you and what is your date of
23    birth?
24    A    61.  December 25, 1961.
25    Q    Where do you live, Mr. Bulso?
```

```
 1    A    Brentwood, Tennessee.

 2    Q    How long have you lived there?

 3    A    28 years.

 4    Q    Okay.  Where do you work?

 5    A    I work at Bulso PLC.  155 Franklin Road, Suite

 6  400, Brentwood, Tennessee.

 7    Q    You're an attorney; is that correct?

 8    A    Yes.

 9    Q    Are there any other attorneys in practice with

10  you at your firm?

11    A    Yes.

12    Q    How many other attorneys are in practice with

13  you?

14    A    Three.

15    Q    What are their names?

16    A    Paul Krog, Nicholas Bulso, and Niko Tsiouvaras.

17    Q    The other Nicholas Bulso, that a relative?

18    A    Yes.

19    Q    Is he your son?

20    A    Exactly.

21    Q    Okay.  Does he go by "Junior" or "the third" or

22  anything like that?

23    A    He goes by Nicholas.

24    Q    Okay.  What other law firms have you been

25  associated with prior to your current firm?
```

LEXITAS TENNESSEE
(615)595-0073

1    A    Boult Cummings Conners & Berry, and Leader
2    Bulso & Nolan PLC.
3    Q    Can you give me the approximate years when you
4    were with Boult Cummings?
5    A    1986 to May 2008.
6    Q    And the other firm that you gave, what was that
7    name again?
8    A    Leader Bulso & Nolan.
9    Q    Approximately what years were you associated
10   with that firm?
11   A    2008 to 2020.
12   Q    How long again have you been associated with
13   your current firm, Bulso PLC?
14   A    Since its formation in about May of 2020.
15   Q    Where did you go to undergraduate school?
16   A    Cornell college.
17   Q    What year did you graduate from Cornell?
18   A    1983.
19   Q    What school -- what law school did you attend
20   and graduate from?
21   A    Emory.
22   Q    In Atlanta?
23   A    Yes.
24   Q    What was your graduation year?
25   A    1986.

Lexitas     TENNESSEE
(615)595-0073

```
 1    Q    How many state bar licenses do you currently
 2  carry?
 3    A    One.
 4    Q    And what is that?
 5    A    Tennessee.
 6    Q    Do you recall the year of your first admission?
 7    A    Yes.
 8    Q    What is that?
 9    A    1986.
10    Q    Are you admitted to any other courts besides
11  the state of Tennessee courts?
12    A    Yes.
13    Q    What are those?
14    A    In the federal system, the U.S. Supreme Court,
15  the U.S. Court of Appeals for the 6th Circuit, U.S.
16  Court of Appeals for the 5th Circuit, U.S. Court of
17  Appeals for the 4th circuit.
18         The Middle District of Tennessee.  The Eastern
19  District of Tennessee, the Western District of
20  Tennessee, the Eastern District of Arkansas, the
21  Southern District of Texas, the Eastern District of
22  Wisconsin.
23         And those are the ones that I can recall right
24  now.
25    Q    You did a better job that I did.  I typically
```

```
1    have to look at my plaques on the wall to figure that
2    out.
3          Have you ever been formally disciplined by a
4    state bar licensing authority?
5    A    No.
6    Q    Have you ever been disciplined by a court that
7    you're admitted in?
8    A    I have not.
9    Q    Have you ever been convicted of a crime?
10   A    I have not.
11   Q    Other than the Ken Nelson matter that you
12   described, have you ever been sued before?
13   A    In the San Francisco matter that I mentioned
14   earlier.
15   Q    Is that the Ken Nelson matter?
16   A    That's a different case.
17   Q    Okay.  Let's try -- I just want to get this for
18   the record.
19   A    Sure.
20   Q    Can you tell me the name of the litigation and
21   what court in what you refer to as Ken Nelson
22   litigation?
23   A    That was Nelson vs. Bulso, originally filed in
24   the Davidson County Chancery Court and later filed in
25   the Eastern District of Wisconsin.
```

LEXITAS TENNESSEE
(615)595-0073

1     Q    Do you happen to recall the case number or
2  anything like that?

3     A    I do not.

4     Q    Do you recall the year when that was filed?

5     A    I do not.

6     Q    How did that litigation conclude?

7     A    It was dismissed.

8     Q    You were a defendant in that case?

9     A    Correct.

10    Q    That was a civil matter?

11    A    Yes.

12    Q    You refer to something -- the San Francisco
13  litigation; is that correct?

14    A    Right.  There was an action, San Francisco
15  Residence club versus Leader Bulso & Nolan PLC.  I
16  believe I was individually named in that case as well.

17    Q    When was that lawsuit filed?

18    A    Sometime around 2014 or '15.

19    Q    Did that conclude, that case conclude?

20    A    It was dismissed on summary judgment.

21    Q    What court was that in?

22    A    Ultimately, it was in the Northern District of
23  Alabama.

24    Q    You say "ultimately."  Was it in another court
25  before it got transferred?

1    A    Yes.

2    Q    What court was that?

3    A    As I recall, it was originally filed in state
4 court in Marin County, California.  It was removed to
5 the Northern District of California, Federal District
6 Court, and then transferred to Alabama.

7    Q    Okay.  Are you represented by counsel today?

8    A    Yes.

9    Q    Who represents you?

10    A    Ashley Carter.

11    Q    Ms. Carter's here today, correct?

12    A    Yes.

13    Q    How did you learn of your deposition today,
14 that it was going to be taken today?

15    A    I was advised by counsel.

16    Q    Okay.  As a nonparty to this lawsuit, you're
17 entitled, under federal statute, to receive a daily fee
18 for your attendance plus mileage reimbursement.  I
19 believe I may have sent an email either -- last week to
20 the other -- Mr. Stahl's group, who represents Director
21 Long.

22        Where should I send your check for your
23 appearance today and your mileage fee, number one?  Who
24 should I send that to?

25    A    You can send that to me at the firm.

```
 1          MR. DOUGHERTY:  Is that okay, Ms. Carter?

 2          MS. CARTER:  Yes.

 3   BY MR. DOUGHERTY:

 4      Q    You've already given -- can you go ahead and

 5   give me that address once again?

 6      A    Sure.  It's Bulso PLC.  155 Franklin Road,

 7   Suite 400, Brentwood, Tennessee 37027.

 8      Q    And then, should I calculate your mileage

 9   reimbursement from your office to this office and then

10   back to be able to send you a check?

11      A    That would be fine.

12      Q    Okay.

13      A    It should be -- it will be nine miles either

14   way.

15      Q    Okay.  Great.

16          All right.  Mr. Bulso, are you familiar with

17   the Advisory Commission on the Rules of Practice and

18   Procedure that was created by Tennessee Code annotated

19   16-3-601?

20      A    Yes.

21      Q    What is that?

22      A    It's a commission that the General Assembly

23   created to advise the Supreme Court on rules of practice

24   and procedure.

25      Q    When you say "the Supreme Court," you're
```

1   referring to Tennessee Supreme Court; is that right?

2      A   Yes.

3      Q   Are the members of that commission typically

4   listed on the Tennessee Administrative Office of the

5   Courts' website?

6          MS. CARTER:  Can I just make a clarification

7   for the record --

8          MR. DOUGHERTY:  Yes.

9          MS. CARTER:  -- as we're going into this?

10         So I just want to clarify that you've noticed

11  him in his individual capacity.  That's -- to the extent

12  he knows, he's welcome to testify to it, but I just want

13  to make sure that it's clear on the record that he's not

14  testifying for the commission in the deposition today.

15         MR. DOUGHERTY:  I think that's correct.  I

16  think the reason for Mr. Bulso's testimony is in his,

17  which we'll get into, his capacity as chair of the

18  Advisory Commission.

19         MS. CARTER:  Right.  But he's not here to

20  testify on behalf of the commission as its chair.  He's

21  here to testify as an individual.

22         So I just want to make certain that as we go

23  through, he's providing whatever knowledge he has to you

24  just for clarification purposes.

25         MR. DOUGHERTY:  Okay.

1  BY MR. DOUGHERTY:

2      Q    Can you describe the commission?

3      A    A commission is a group of attorneys and judges

4  appointed by the Tennessee Supreme Court pursuant to

5  16-3-601 to assist it in modifying Rules of Civil and

6  Criminal Procedure.

7      Q    We'll get to those different committees in a

8  moment.

9           So I think you said this already, but there are

10  members of the judiciary that serve on the commission?

11      A    In an ex officio capacity, yes.

12      Q    What does that mean?

13      A    It means they're nonvoting members.

14      Q    But they're on the actual Advisory Commission,

15  the judicial members?

16      A    I'm not sure exactly how to answer that.  I

17  know that the statute gives the Supreme Court the

18  authority to appoint members to the commission.  I know

19  that we've got attorneys who vote on proposals that come

20  before the commission, and that we have judges who are

21  involved in the meetings but who do not actually vote.

22           When you say that they're members of the

23  commission, I'm not exactly sure I can answer that

24  specifically.

25      Q    Have you ever gone to the AOC website and seen

1 the names that were listed for the Advisory Commission

2 on that website?

3     A   Yes.

4     Q   Does it list names of judicial members?

5     A   I don't know.

6     Q   I've actually viewed it this morning.  I will

7 give you some names, and you can tell me if they are

8 members of the judiciary.

9        Okay?

10     A   Sure.

11     Q   So it list you as the chair, Gino Bulso, and

12 that's correct?

13     A   It is.

14     Q   How long have you been the chair for the

15 Advisory Commission?

16     A   The last two years.

17     Q   Do you recall the year or the day that you were

18 appointed to the commission as chair?

19     A   Not the specific date, no.

20     Q   Would it have been 2020 or after that?

21     A   It was either in 2020 or 2021.

22     Q   In your current appointment as chair of the

23 Advisory Commission, how long is the term?

24     A   My understanding is it's one year.

25     Q   Did you serve as chair in 2022?

LEXITAS TENNESSEE
(615)595-0073

1    A    Yes.

2    Q    Was that for the full year?

3    A    Yes.

4    Q    Did you serve as chair in 2021?

5    A    At least for part of the year, I believe so.

6    Q    You were appointed, you think, halfway or part

7    of the way through 2021; is that your testimony?

8    A    No.  My testimony is that I was appointed, I

9    believe, either in 2020 or 2021.  I don't recall

10   specifically which year it was.

11   Q    Okay.  Are you -- is it your understanding

12   you're to chair the full year in 2023?

13   A    My understanding is that I'm to be chair so

14   long as the Supreme Court wants me to be.  And at some

15   point, if they decide to fill that role with some other

16   person, then obviously they'll issue an order doing

17   that.

18        But I serve at the pleasure of the Supreme

19   Court as chair.

20   Q    So earlier you testified that your term was one

21   year.  By that you mean, as I understand it from what

22   you just said, it's a rolling one year until you're

23   notified that you're no longer chair?

24   A    I'm not sure I'd say it quite that way.

25   Q    I'm just trying to understand.  I just wanted

1    to clarify that point.

2        A    Sure.  I was appointed by the Supreme Court to

3    be chair of the Advisory Commission, and then at least

4    once or possibly twice since I was initially appointed,

5    the Supreme Court liaison has asked me to continue in

6    that role.  And I've agreed to do so.

7        Q    How does the Supreme Court communicate with you

8    about that?

9        A    Principally through the liaison.

10       Q    Do they -- do any of the members of the Supreme

11   Court communicate with you by email regarding your role

12   as chair?

13       A    I do not believe I've ever exchanged an email

14   with anyone on the Supreme Court about that, no.

15       Q    And you never exchanged email with Director

16   Michelle Long of the Tennessee AOC about your --

17   regarding your role as chair?

18       A    Not that I recall.

19       Q    We'll get to the other members.  It's my

20   understanding that there are some AOC staff members that

21   serve on the commission; is that correct?

22       A    I do not believe that it is.

23       Q    Okay.  Then let's unpack that.

24            Can you explain that?

25       A    I don't believe there's anyone at the AOC who

```
 1   is actually on the commission.
 2       Q    Okay.  So my understanding, from looking at the
 3   website this morning, it lists AOC staff contact
 4   Michelle Consiglio-Young.
 5            Do you know her?
 6       A    Yes.
 7       Q    Does she attend Advisory Commission meetings?
 8       A    Yes.
 9       Q    What is her role on the Advisory Commission, or
10   what is her role when she does attend the meetings?
11       A    Her role is that of a facilitator.
12       Q    Okay.  Can you explain what that means?
13       A    Sure.  Our meetings are conducted remotely, and
14   so there is a Zoom link that is hosted for the meeting,
15   and Michelle typically is in charge of hosting the
16   remote connection.  So she'll circulate a link to the
17   reporter for the commission, who will then circulate it
18   to the other commission members.
19            And then Michelle will be virtually online
20   throughout the meeting to manage the connection.
21       Q    Does Ms. Young -- is it fair to say she
22   provides administrative support to the Advisory
23   Commission?
24       A    Yes.
25       Q    Now, when you said that -- we'll get in, a
```

1    little bit later, to meetings being open to the public.
2    But when you said that your meetings are remote, what
3    did you mean by that?
4        A    What I meant was that currently, when we
5    conduct meetings of the Advisory Commission, that the
6    members of the commission are not in the same place.
7    Rather, they're meeting through a Internet connection.
8        Q    When did the remote meetings of the Advisory
9    Commission, when did that begin?
10        A    Well, as long as I've been on the commission,
11    at least some portion of the meeting has been remote.
12        Q    Would that have been in 2020?
13        A    Can you clarify?
14        Q    Did the remote Advisory Commission meetings
15    begin in 2020?
16        A    No.
17        Q    Did they begin in 2021?
18        A    No.
19        Q    Did they begin in 2022?
20        A    No.
21        Q    Did they begin in 2023?
22        A    No.
23        Q    Okay.  I'm just trying to understand.  When did
24    the remote meetings start, when you all were in
25    different places having your meeting?

LEXITAS TENNESSEE
(615)595-0073

1    A    Well, as I stated a moment ago, for as long as
2  I've been on the commission, at least some portion of
3  the meeting has been remote.
4    Q    Okay.  Were you on the commission in any other
5  capacity prior to your serving as chair?
6    A    Yes.
7    Q    Tell us what -- when that was and what was your
8  role.
9    A    I was initially appointed as a member of the
10  commission, I believe, in 2016.
11    Q    So, in 2016, you were not the chair; is that
12  correct?
13    A    That is correct.
14    Q    How many years do you recall serving prior to
15  being appointed chair?
16    A    I would estimate four to five years.
17    Q    When you started in 2016 with your initial
18  appointment to the Advisory Commission, is it your
19  testimony that you all held meetings remotely?
20    A    In part, yes.
21    Q    Okay.  Were there some times where you met
22  physically, in person?
23    A    What I mean by "in part" is that the way the
24  meetings were conducted were through videoconference.
25  So we have a room of commission members in Nashville who

```
 1   would be joined by videoconference with other members
 2   who were meeting together in the same room in Memphis,
 3   and a third group of members meeting in Knoxville.  And
 4   also there sometimes were members who participated by
 5   telephone.
 6           So that was a hybrid of having some members in
 7   person; yet, meeting, in part, being conducted remotely
 8   through videoconference.
 9       Q   In 2016, when you met -- did your group meet
10   here in the Nashville area?
11       A   Yes.
12       Q   What office did you meet at?
13       A   At the AOC.
14       Q   The Tennessee AOC office?
15       A   Yes.
16       Q   That was in 2016?
17       A   Yes.
18       Q   Do you recall who the chair was of the Advisory
19   Commission when you were first appointed?
20       A   I do.
21       Q   Who was that?
22       A   Jim Doran.
23               (Stenographer interrupts for
24               clarification.)
25           THE WITNESS:  D-O-R-A-N.
```

BY MR. DOUGHERTY:

Q   Is Mr. Doran still on the commission?

A   No.

Q   When he was chair, was he -- what did he do --
strike that question.

When he was chair, was he a private attorney or
was he a judge?

A   He was an attorney.

Q   Was he in private practice in the Nashville
area?

A   Yes.

Q   Do you know if he is still practicing law in
Tennessee?

A   I believe so, yes.

Q   Do you know what firm he's with?

A   I believe I do.

Q   Can you name it, please?

A   I believe he's with what is now Holland &
Knight.

Q   Who was the executive director of the Tennessee
AOC in 2016, when you were first appointed?

A   I do not remember.

Q   Was it Michelle Long?

A   I do not believe it was, no.

Q   Do you know the current deputy director, Rachel

Lexitas    TENNESSEE
(615)595-0073

```
1   Harmon, of the Tennessee AOC?

2       A   I know of her.

3       Q   Does she ever participate in you all's meetings

4   currently?

5       A   I do not recall Rachel ever being in one of our

6   meetings.

7       Q   Do you recall if she was working with the AOC

8   in 2016, when you were first appointed?

9       A   I do not.

10      Q   You do not recall, or you do not know?

11      A   I do not recall.

12      Q   When you were first appointed in 2016, were any

13  of those meetings ever open to the public?

14      A   I'm not sure.

15      Q   Do you ever -- you don't ever recall the

16  Advisory Commission discussing whether the meeting

17  should or should not be open to the public?

18      A   Correct.

19      Q   Do you ever recall seeing a public meeting

20  notice for any of those meetings beginning in 2016?

21      A   I do not recall seeing such a notice.

22      Q   Was there someone on the Tennessee AOC staff

23  that provided administrative support during these

24  meetings for you?

25      A   Yes.
```

*Lexitas TENNESSEE*
*(615)595-0073*

1    Q    Who was that?

2    A    Michelle Consiglio.

3    Q    So she's currently providing administrative

4    support.  I think that's your testimony, correct?

5    A    I believe she's currently on maternity leave.

6    But when she's not on maternity leave, yes, she is.

7    Q    I think you're right.  She'll be back in

8    November, is my understanding.

9         It's also your testimony when you joined the

10   Advisory Commission in 2016, Ms. Young was there

11   participating in your meetings?

12   A    I believe so.  I believe she was participating

13   then in the same respect that she participates now.

14   Q    And that would be providing administrative

15   support?

16   A    Yes.

17   Q    From 2016 through 2022, during your time

18   serving on the commission, were any of those meetings

19   ever open to the public?

20   A    I'm not sure.

21   Q    How would you know if they were open to the

22   public?

23   A    I mean, if someone had told me, I presume that

24   I would know.

25   Q    If there were a public meeting notice still

1    posted on the Tennessee AOC website that says there's a

2    meeting that's open to the public, would you think that

3    that meeting probably was open to the public?

4        A    I'm not sure.

5        Q    Let me rephrase it.

6            Were there any members of the public that

7    physically came in to any of the offices that you

8    observed during these meetings?

9        A    I do not recall that happening.

10       Q    Do you ever recall seeing some type of video

11   setup that allowed the meetings to be broadcast to the

12   public from 2016 to 2022?

13       A    I do not recall that.

14       Q    We'll go through some more names later.  I want

15   to go kind of back -- more names of the current

16   commission members.

17           Okay?

18       A    Sure.

19       Q    Are there different subcommittees of the

20   Tennessee Advisory Commission?

21       A    No.

22       Q    Can you give me a summary of what the

23   commission does in terms of the various court rules that

24   it reviews potential rules?

25       A    Sure.  In summary, there will be proposals made

by members of the commission or by other attorneys or
judges across Tennessee, or by others, to modify an
existing rule of evidence, appellate procedure, civil
procedure, criminal procedure, or juvenile procedure.

And then we will, at a Advisory Commission
meeting, typically assign the proposal to one of our
standing committees.  And then the committee will
discuss the proposal amongst itself and then report at
the next Advisory Commission meeting as to what their
recommendation would be with regard to the proposal.

We will then, at some point, vote on whether to
adopt a rule change, and if so, that is prepared by the
AOC and presented to the Supreme Court.

Q   Is there a committee to make recommendations
for the Criminal Rules of Tennessee Procedure?

A   We have a committee on the Rules of Criminal
Procedure.  I'm not sure that I would characterize that
what that committee does is recommendations.  They will
investigate a proposed rule change and then report at a
Advisory Commission meeting.  And then one or more
members of that committee may make a motion to adopt a
rule change, at which point it's debated by the entire
commission.

Q   Does the Tennessee Advisory Commission make
rule recommendations on the Criminal Rules of Procedure?

```
 1        MS. CARTER:  I'm sorry.  Can you just repeat
 2   that last question?
 3        MR. DOUGHERTY:  Sure.
 4   BY MR. DOUGHERTY:
 5   Q   Does the Tennessee Advisory Commission on the
 6   Rules of Practice and Procedure make recommendations to
 7   the Tennessee Supreme Court regarding the Criminal Rules
 8   of Procedure?
 9   A   Yes.
10   Q   Does the Tennessee Advisory Commission make
11   rule recommendation to the Supreme Court regarding the
12   Civil Rules of Procedure?
13   A   We do.
14   Q   Does the Tennessee Advisory Commission make
15   rule recommendations to the Supreme Court regarding the
16   Appellate Rules of Procedure?
17   A   Yes.
18   Q   Does the Tennessee Advisory Commission make
19   rule recommendations to the Supreme Court regarding the
20   Rules of Evidence?
21   A   Yes.
22   Q   Does the Tennessee Advisory Commission make
23   rule recommendations to the Supreme Court regarding the
24   Juvenile Rules of Procedure?
25   A   We do.
```

LEXITAS TENNESSEE
(615)595-0073

1    Q   How do you communicate -- how does the Advisory
2  Commission communicate these rule recommendations to the
3  Tennessee Supreme Court?
4    A   Through the AOC.
5    Q   So once a rule recommendation is made, the
6  Advisory Commission will communicate those
7  recommendations directly to the AOC?
8    A   I wouldn't characterize it that way.
9    Q   Well, you just said that.  I just want to
10 understand it.
11      Can you explain how that process works?
12   A   Well, if there is a firm vote by a majority of
13 the members of the Advisory Commission on a proposed
14 rule change, somehow, administratively, that is prepared
15 by the AOC.  And then from that point, it's communicated
16 to the full Supreme Court.
17   Q   Does Michelle Consiglio-Young, once a vote has
18 been taken on a rule change, does she then go back to
19 the AOC, or do you, as chair, communicate with the AOC
20 as far as the rule change?
21   A   To the Supreme Court?
22   Q   To the AOC.
23   A   Well, Michelle's present at the meetings, so
24 she knows what happened.
25   Q   Yeah.  I'm just trying to understand the

1   process.

2       Let's say the commission makes a vote --

3   A   Yeah.

4   Q   -- for a rule recommendation.  Do you then, as

5   chair, get on your email and send an email to someone at

6   the AOC office?

7   A   No.

8   Q   Does -- is it your understanding that

9   Ms. Michelle Consiglio-Young, since she's present, does

10  she then go back to the AOC and communicate that to the

11  director, for example?

12  A   I don't know.

13  Q   But it's your understanding that the AOC is the

14  next point of contact who receives the rule

15  recommendations from the Advisory Commission?

16  A   I think that's fair.  I would also add that we

17  do have a reporter that's appointed by the Supreme Court

18  for the Advisory Commission, and so there likely is some

19  involvement between Michelle at the AOC and our reporter

20  on actually packaging the rule and communicating it to

21  the full Supreme Court.

22  Q   Who is the current reporter for the Tennessee

23  Advisory Commission?

24  A   Lynn Zehrt.

25  Q   How do you spell her last name?

1      A    I believe it's Z-E-R-T.

2      Q    Would her name be listed, Ms. Zehrt's name,

3  would it be listed on the website that sets out the

4  names for the Advisory Commission members?

5      A    I don't know.

6      Q    I see it.  Lynn Zehrt, would it be Z-E-H-R-T?

7      A    Yes.  I left out the H.

8      Q    And the same Lynn Zehrt that is a professor at

9  Belmont University College of Law?

10     A    She is.

11     Q    Was she, Ms. Zehrt, the reporter when you first

12 joined in 2016?

13     A    No.

14     Q    Do you recall who the reporter was then?

15     A    I do not.

16     Q    So by "reporter," does that mean an individual

17 who is taking notes?  Is that what Ms. Zehrt does?

18     A    I don't know whether she takes notes.  The

19 function of the reporter is to prepare agenda for the

20 meetings, to take minutes of the meetings, to take the

21 role at meetings.

22     Q    Is it your understanding that Ms. Zehrt would

23 take the minutes, the meeting minutes?

24     A    Yes.  She does currently.

25     Q    She also is the one who handles putting the

1 agenda together?

2  A Correct.

3  Q Who determines the agenda for each meeting?

4  A Working together, the reporter and the chair.

5  Q So you work with Ms. Zehrt to come up with an

6 agenda for the next meeting?

7  A Exactly.

8  Q In 2016, when you first joined, how frequently

9 were meetings held of the Advisory Commission?

10  A Quarterly.

11  Q Has that always been the case, quarterly

12 meetings?

13  A It's been the case ever since I've been on the

14 commission.

15  Q Who determines when those quarterly meetings

16 are going to be held?

17  A The chair.

18  Q Since you became the chair of the Advisory

19 Commission, you would make that determination, the date

20 and time when meetings are to be held; is that correct?

21  A Yes.

22  Q What is your role as chair?

23  A To conduct meetings of the Advisory Commission.

24  Q Do you, as chair, have any other communication

25 in between quarterly meetings with the other members on

```
 1   the commission?
 2            MS. CARTER:  Object to form.
 3            THE WITNESS:  From time to time, I would say
 4   so.
 5   BY MR. DOUGHERTY:
 6       Q    During these communications in between
 7   quarterly meetings, do you discuss business, Advisory
 8   Commission business with other members?
 9       A    If I understood your question correctly, yes.
10       Q    Do you have these discussions with other
11   members in between quarterly meetings by email?
12       A    On some occasions.
13       Q    Do you still keep -- do you have those emails?
14       A    I'm not sure.
15       Q    When did you first become aware of this lawsuit
16   that you're currently giving a deposition in?
17       A    Probably at some point within the last six
18   months or so.
19       Q    You only became aware of this lawsuit within
20   the last six months?
21       A    I believe that's what I said, yes.
22       Q    Has anyone from the AOC office reached out to
23   you with a litigation hold letter?
24       A    I have not receive a litigation hold letter
25   from anyone.
```

LEXITAS TENNESSEE
(615)595-0073

1      Q    When you became aware of this litigation six

2    months ago, did you discuss with the other members on

3    the Advisory Commission if they should hold on to

4    emails?

5      A    I did not.

6      Q    How did you prepare for this deposition?

7      A    Met with counsel.

8      Q    That would be Ms. Carter?

9      A    Correct.

10     Q    Have you ever served on any other boards or

11   commissions in Tennessee, other than the Advisory

12   Commission?

13     A    Yes.

14     Q    What are those other boards and commissions?

15     A    I was on the board of the directors for Pope

16   John Paul II High School, on the board of the St. Thomas

17   More Society of Middle Tennessee.

18          There are probably others that I've been on as

19   well.

20     Q    Have you ever served on any other boards or

21   commissions where the AOC office provides administrative

22   support, other than the Advisory Commission?

23     A    Not that I recall.

24     Q    Are you aware of similar meetings held by the

25   federal courts and the federal advisory committees?

1    A    No.

2    Q    You're not aware of any of those meetings and

3 what they do with regard to making federal rules?

4    A    Correct.

5    Q    You've never seen any or observed any of those

6 federal advisory committee rule-making meetings?

7    A    Correct.

8    Q    When was the first time you ever became aware

9 of those federal advisory committee meetings?

10    A    Likely sometime during law school.

11    Q    Is it your testimony you've never had that

12 discussion with your current Tennessee Advisory

13 Commission meetings regarding what the federal advisory

14 committee meetings do?

15    A    I believe that's true.

16    Q    In 2022, you were the chair of the Tennessee

17 Advisory Commission; is that right?

18    A    Yes.

19    Q    Were there quarterly meetings held during that

20 year, 2022?

21    A    Yes.

22    Q    Was there a quarterly meeting in March of 2022

23 that was held?

24    A    Well, we have to check the record, but I

25 believe so.

1    Q    Was that meeting open to the public?

2    A    I don't know.

3    Q    You wouldn't know if the public was able to

4   watch it?

5    A    Well, first, I've told you that I'm not able to

6   testify for certain that there was a meeting in March of

7   2022.  Even if there were such a meeting, I do not know

8   whether the AOC or anyone else made any provision for

9   public participation in that meeting.

10    Q    Was that March 2022 meeting held remotely among

11   the members of the Advisory Commission?

12    A    If there was such a meeting, it was held

13   remotely, yes.

14    Q    Where were you when you participated in that

15   meeting?

16    A    Well, I do not recall that there was a meeting

17   in March of 2022, even if there were, I could not,

18   sitting here, tell you where I was.

19    Q    Of the four quarterly meetings in March of

20   2022, were any of those open to the public?

21    A    I don't know.

22    Q    Did you see any of the public participating in

23   those meetings?

24    A    No.

25    Q    Was the June 2023 Advisory Commission meeting

LexitasⓇ TENNESSEE
(615)595-0073

```
1   open to the public?

2       A    Depends on what you mean by "open to the

3   public."

4       Q    Was the June 9, 2023, Advisory Commission

5   meeting livestreamed to the public?

6       A    My understanding is that it was.

7       Q    Why is that, your understanding?  How do you

8   know?

9       A    Based on discussions with Michelle.

10      Q    Is that Michelle Consiglio-Young?

11      A    Yes.

12      Q    What did she tell you about that June 9, 2023,

13  meeting?

14      A    Well, at some point, Michelle advised me,

15  perhaps the other members of the commission, that Judge

16  Richardson had issued some type of an injunction that

17  provided for livestreaming of our Advisory Commission

18  meetings.  And she wanted to make sure that the members

19  of the commission were aware that the meetings were

20  going to be livestreamed.

21      Q    Did Michelle Consiglio-Young tell you during

22  any of the quarterly meetings of 2022 that those were

23  going to be livestreamed?

24      A    I don't recall.

25      Q    Did you have a discussion with the members on
```

1    the Advisory Commission about the June 9, 2023, meeting
2    being livestreamed to the public?
3        A    No.
4        Q    When is the -- did the Advisory Commission have
5    a meeting in September of 2023?
6        A    We did not.
7        Q    Do you know why?
8        A    I believe so.
9        Q    And why is that?
10       A    My understanding is that the AOC had intended
11   to issue some type of a public notice regarding the
12   meeting.  But I think, in part, because Michelle was on
13   maternity leave, the notice was not sent out when
14   perhaps it otherwise would have been sent out.
15            And we made the decision, in light of the
16   absence of that public notice, just to move the agenda
17   items from the September 2023 meeting to the
18   December 2023 meeting.
19       Q    Was that meeting supposed to be held on
20   September 8th, 2023?
21       A    I believe that is correct.
22       Q    At the end of the June 9th, 2023, livestream
23   meeting, you said to the public that it was going to be
24   held on September 8th, 2023, correct?
25       A    I don't know.

```
 1     Q    Have you ever watched that livestreamed video?
 2     A    I have not.
 3     Q    Are you aware that the Tennessee courts have
 4   YouTube pages that you can watch the videos?
 5     A    I'm aware that one can watch oral arguments
 6   from the Supreme Court and the Court of Appeals on a
 7   YouTube channel.
 8     Q    Were you aware that people can also watch the
 9   June 9, 2023, meeting that was livestreamed to the
10   public?
11     A    I'm aware of that, yes.
12     Q    Have you ever watched that video?
13     A    I have not.
14     Q    By having that June 9, 2023, meeting
15   livestreamed to the public, did it cause you, as
16   chair -- or did it burden you in terms of how you
17   conducted the meeting?
18     A    You've got two questions in there, counsel.
19     Q    I apologize.  I will strike that.
20          Having the June 9, 2023, meeting livestreamed,
21   did that burden the meeting, from your perspective as
22   chair?
23     A    I can't say that I know exactly what you mean
24   by "burden the meeting."
25     Q    Did it cause you more stress, more problems in
```

1  terms of the way the meeting was conducted?

2      A   Having the meeting livestreamed in June 2023

3  did not cause me any stress.  It did not cause me any

4  problems.

5      Q   So is it your testimony that the meeting that

6  was livestreamed in June 2023 was very similar to other

7  meetings that you've overseen?

8      A   I have not testified to that, no.

9      Q   Well, is there any difference between the

10 June 9, 2023, meeting that was livestreamed to any other

11 meetings that you've chaired?

12     A   I'm sure there are, yes.

13     Q   Well, can you tell me what those differences

14 are?

15     A   Sure.  I mean, at some meetings, we simply

16 discuss proposed rule changes.  At other meetings, we

17 actually vote on adopting amendments or recommending the

18 adoption of amendments to the Supreme Court.

19     Q   Did the June 9, 2023, meeting, the fact that it

20 was livestreamed, did that interfere with the meeting

21 itself?

22     A   It did not.

23     Q   Have you ever discussed with other members

24 whether meetings should be open or closed to the public?

25     A   Could you repeat that?

```
 1     Q    Yeah.  Have you ever discussed with other

 2   members on the Advisory Commission whether meetings

 3   should be open or closed to the public?

 4     A    No.

 5     Q    You've never had that discussion?

 6     A    Correct.

 7     Q    Have the members themselves ever had that

 8   discussion amongst themselves?

 9          MS. CARTER:  Object to the form.

10          THE WITNESS:  I don't mow.

11   BY MR. DOUGHERTY:

12     Q    Have you ever observed anybody talking about

13   whether meetings should be open or closed the public?

14     A    Are you excluding discussions with counsel?

15     Q    I'm certainly -- not your discussions with

16   counsel.

17          I'm saying:  Have you ever observed, at any

18   point during your chairmanship, other individuals on the

19   commission discussing whether that meeting should be

20   opened or closed?

21     A    I have not, no.

22     Q    You mentioned a preliminary injunction that

23   Judge Richardson issued.  When was the first time you

24   became aware of the preliminary injunction?

25     A    I'm not sure.
```

1      Q   Do you recall when Ms. Consiglio-Young told you
2  about the preliminary injunction prior to the June 9,
3  2023, meeting?
4      A   I think, as I testified earlier, it's been at
5  least six months that I've known about it.  It could be
6  longer.
7      Q   Okay.  So when Ms. Michelle Consiglio-Young
8  first told you about the preliminary injunction, was
9  that the first time you heard about the lawsuit?
10     A   I believe so.
11     Q   As part of your legal practice, do you do any
12 first amendment work?
13     A   I do not believe I've ever handled a first
14 amendment case.
15     Q   I probably should have clarified.  Free speech,
16 first amendment work?
17         You've never handled free speech, first
18 amendment work?
19     A   I do not believe I've ever had a case involving
20 the first amendment or the right to free speech.
21     Q   What is the nature of your law practice,
22 Mr. Bulso?
23     A   Commercial litigation.
24     Q   I know that's kind of a broad area.  Can you
25 expand on that a little bit?  What are the types of

1  cases you typically get involved in?

2     A   We get involved in business disputes.  I've

3  handled cases involving commercial/residential real

4  estate, federal estate securities, franchise litigation,

5  transportation litigation, warranty fraud, Consumer

6  Protection Act, breach of contract, other types of

7  commercial disputes.

8     Q   Now, on the website that I viewed this morning

9  that list the members of the Advisory Commission, it

10 list a vice chair.  Her name is Catherine Clayton.

11        Do you know Ms. Clayton?

12    A   Yes.

13    Q   How long has she been the vice chair?

14    A   I believe Cathy has been vice chair for as long

15 as I have been chair.

16    Q   Was she also on the committee when you first

17 joined in 2016?

18    A   If by "committee" you mean commission, no.

19    Q   Correct.  So Ms. Clayton came on the Advisory

20 Commission after you had been appointed in 2016?

21    A   I believe so, yes.

22    Q   Did you make Ms. Clayton vice chair, or does

23 the Supreme Court make that appointment?

24    A   The Supreme Court makes that appointment.

25    Q   So not only -- it's my understanding -- I just

1    want to understand this.

2         The Supreme Court appoints the members to the

3    Advisory Commission, correct?

4         A   It does.

5         Q   And the Supreme Court appoints the specific

6    roles, like chair and vice chair; is that correct?

7         A   Precisely.

8         Q   Okay.  Does the Tennessee Supreme Court also

9    make the appointment on the judicial liaisons?

10        A   It does.

11        Q   Does the Tennessee Supreme Court make an

12   appointment on the Supreme Court liaison?

13        A   I believe it does.

14        Q   Do you know why there's a distinction between

15   judicial liaisons and Supreme Court liaison?

16        A   Well, it may be that "judicial liaison" refers

17   to judges who are not on the Supreme Court.  And the

18   Supreme Court liaison refers to a liaison who is.

19        Q   Makes sense.  I just was curious.  When you

20   look at the website, it makes a clear distinction.  Have

21   you ever looked at the website that lists your Advisory

22   Commission before, on the AOC website?

23        A   I have a vague recollection of having seen it

24   several years ago.

25        Q   Currently, it lists, under the judicial

```
 1  liaison, the first person is Chancellor William Cole.

 2      A   Sure.

 3      Q   And was Chancellor Cole on the Advisory

 4  Commission in 2016?

 5      A   I don't recall.

 6      Q   You don't know if he was there when you first

 7  joined or if he came later?

 8      A   I do not.

 9      Q   The -- and it lists him as a chancellor.  He's

10  a chancellor in chancery court, as you understand it?

11      A   He is.

12      Q   James Hivner.  Who is Mr. Hivner?

13      A   He's the clerk.

14      Q   Would that be the clerk of the Tennessee

15  appellate courts?

16      A   Exactly.

17      Q   Is Mr. Hivner a judge?

18      A   I do not believe so.

19      Q   Is Mr. Hivner an attorney?

20      A   I'm sure he is.

21      Q   Okay.  The next person under judicial liaison

22  category on the website is Judge Carma Dennis McGee.  Do

23  you know Judge McGee?

24      A   I do.

25      Q   What court is Judge McGee -- what court does
```

1  she oversee?

2      A    Court of Criminal Appeals.

3      Q    Do you know what county?

4      A    I'm not sure the Court of Criminal Appeals is

5  restricted to a county.

6      Q    Okay.  So she's on the Court of Criminal

7  Appeals?

8      A    Yes.

9      Q    Do you know if she's in the west, east, or

10  middle grand division?

11      A    That, I'm not sure of.

12      Q    Are appointments made by the Tennessee Supreme

13  Court Advisory Commission made based on the grand

14  divisions, east, west and middle?

15      A    I believe that is certainly a factor that the

16  Supreme Court takes into account.

17      Q    Do you know if that's a required factor in the

18  statute?

19      A    Yes.

20      Q    It's your understanding that is a required

21  factor in the statute?

22      A    No, it's not.

23      Q    It's not?

24      A    No.

25      Q    So you think the Supreme Court just makes that

LEXITAS — TENNESSEE
(615)595-0073

1  their own decision to do that, have the representatives
2  from each grand division?
3      A   I might express that a bit differently.  I
4  would say that the statute that you referred to earlier,
5  16-3-601, vests the Supreme Court with the authority to
6  appoint members to the Advisory Commission, and the
7  Supreme Court has the discretion about whom to appoint.
8          So it could, according to the statute, appoint
9  all the members from one grand division.  But in
10 practice, I believe it has appointed members from all
11 three grand divisions.
12     Q   Currently, the current members that serve on
13 the Advisory Commission of which you chair, is there a
14 equal breakdown of members between east, west and middle
15 grand divisions?
16     A   I have not looked at it statistically, but my
17 sense would be that each grand division is well
18 represented on the commission.
19     Q   The next individual under judicial liaisons is
20 Judge Camille McMullen of Memphis, Tennessee.  Do you
21 know Judge McMullen?
22     A   Yeah.
23     Q   In what court does Judge McMullen serve?
24     A   Also the Court of Criminal Appeals.
25     Q   Where?

LEXITAS TENNESSEE
(615)595-0073

```
 1      A    Court of Criminal Appeals.

 2      Q    Also the Court of Criminal Appeals?

 3      A    (No audible response from witness.)

 4      Q    But Chancellor Cole would be in the lower trial

 5 chancery court; is that right?

 6      A    Correct.  He's out in Hardeman County, McNairy

 7 County, that area.

 8      Q    The last judicial liaison listed is Judge

 9 Jennifer Smith of Nashville.  Do you know Judge Smith?

10      A    Yes.

11      Q    What court does she oversee?

12      A    She's in a trial-level court.

13      Q    Do you know if that's circuit court or general

14 sessions or chancery court?

15      A    I am not certain.

16      Q    But you think it's a trial-level court?

17      A    I do.

18      Q    And then there's one Supreme Court liaison,

19 justice, Dwight Tarwater; is that right?

20      A    That's correct.

21      Q    I believe he started his tenure as Supreme

22 Court justice on September 1, 2023; is that right?

23      A    Yes.

24      Q    So has he participated yet in any Advisory

25 Commission meetings?
```

LEXITAS TENNESSEE
(615)595-0073

1    A    No.

2    Q    That would be because the September meeting,

3  you all did not have it, right?

4    A    That is correct.

5    Q    When is the December meeting?  When is it

6  scheduled for?

7    A    It is scheduled for the second Friday of

8  December.

9    Q    Do you have a date on that?

10    A    As I'm sitting here, I do not recall the date,

11  no.

12    Q    Its looks like that might be December the 8th,

13  on my calendar.  But you said the second Friday; is that

14  your testimony?

15    A    Yes.

16    Q    Are Advisory Commission meetings typically held

17  on the second Friday of each month?

18    A    For the last -- well, no.

19        For the last few years, we have held the

20  meetings at 9:00 a.m. on the second Friday of March,

21  June, September, and December.

22    Q    Since when have you done that?

23    A    At least for the last several years.

24    Q    Since you've been there, since 2016?

25    A    No.  I wouldn't say that.

```
 1       Q    Well, can you recall when you started this
 2  March, June, September, December?  Can you recall what
 3  year that was when that began?
 4       A    That's been the case ever since I've been on
 5  the commission.
 6       Q    You've been on the commission since 2016.
 7       A    Correct.
 8       Q    So has this March, June, September, December
 9  staggering of quarterly meetings happened since 2016?
10       A    Yes.
11       Q    Since you're not having a meeting in September
12  in 2023, is the Advisory Commission communicating as to
13  what you might otherwise be doing in your meeting?  Are
14  you communicating online with each other, emailing with
15  each other?
16            MS. CARTER:  Object the form.
17            THE WITNESS:  Yeah.  I'll have to ask you to
18  rephrase the question, please.
19  BY MR. DOUGHERTY:
20       Q    Since you're not going to have quarterly
21  meetings in 2023 because there's no September meeting,
22  is Advisory Commission business being conducted in
23  another form or fashion?
24       A    Well, I disagree with the predicate of your
25  question, but the answer is no.
```

```
 1    Q    You disagree that there was no meeting in
 2  September of 2023?
 3    A    I do not disagree with that.
 4    Q    Well, what do you disagree with, the predicate
 5  of the question?
 6    A    The predicate of your question was, "Since
 7  quarterly meetings are not being held in 2023."  It's
 8  inaccurate and I disagree with it.
 9    Q    Okay.  How many meetings are going to be held
10  in 2023?
11    A    Three.
12    Q    Does three meetings in 2023 satisfy the
13  quarterly meeting standard?
14    A    Yes.
15    Q    It does?
16    A    (No audible response from witness.)
17    Q    And how is that?
18    A    Because of the nature of what a quarterly
19  meeting is.  A quarterly is a meeting that's held every
20  three months, and our meetings in 2003 (sic) have been
21  held every three months.
22         Therefore, they are quarterly meetings.
23    Q    You said "2003."  We're referring to 2023.
24    A    Exactly.
25    Q    Okay.  When did you -- when were the meetings
```

1    in 2023?

2        A    We had one in March.  We had on in June.  We'll

3    have one in December.

4        Q    From June meeting until the December meeting,

5    how many months is that?

6        A    Six.

7        Q    So then, you would agree that there haven't

8    been meetings in 2023 every three months?

9        A    I will agree that there was no September

10   quarterly meeting.

11       Q    But it's your testimony there will only be

12   three meetings in September -- excuse me -- three

13   meeting in 2023?

14       A    That is correct.

15       Q    The next would be in the second Friday in

16   December?

17       A    Yes.

18       Q    At 9:00 a.m.?

19       A    Exactly.

20       Q    That will be livestreamed to the public, right?

21       A    I don't know.

22       Q    You're waiting for Ms. Michelle Consiglio-Young

23   to tell you?

24       A    I am not waiting on anything, counsel.

25       Q    Did you receive a copy of the preliminary

LEXITAS TENNESSEE
(615)595-0073

1  injunction?

2      A    Well, let me answer it this way.

3           At some point, I went on PACER and got the
4  preliminary injunction.

5      Q    Did anyone from the Tennessee Administrative
6  Office of Courts provide you with a copy of the
7  preliminary injunction?

8      A    I do not recall.

9      Q    You don't recall if Ms. Consiglio-Young
10 provided you with a copy of the preliminary injunction?

11     A    Correct.  I do not believe that anyone at the
12 AOC provided me a copy of the preliminary injunction.
13 It's possible, but I just do not recall it.

14          MS. CARTER:  Counsel, when you have a minute,
15 if we can take five minutes for a comfort break, that
16 would be great.

17          MR. DOUGHERTY:  Yeah.  We can go ahead and do
18 that.  There's no question on the table.  That's fine.

19          It's 10:05.  When do you want to come back?

20          MS. CARTER:  I'm just going to run down to the
21 ladies' room.

22          MR. DOUGHERTY:  We can do 10 minutes or 15.  It
23 doesn't matter to me.

24          MS. CARTER:  That's fine.

25          MR. DOUGHERTY:  We will be back at 10:15.

```
 1          We'll take a break now, Mr. Bulso.
 2               (Whereupon, a recess was taken
 3               from 10:06 a.m. to 10:12 a.m.)
 4          MR. DOUGHERTY:  We're back on the record, Mr.
 5   Bulso.
 6   BY MR. DOUGHERTY:
 7      Q   What is the process, from your understanding,
 8   once the Advisory Commission transmits the rule
 9   recommendations to the AOC office?
10          What happens after that?
11      A   Well, I would not characterize it as what
12   happens as a transmission from the Advisory Commission
13   to the AOC.  That is a bit of a seamless process because
14   the AOC is in the meetings when the rule recommendations
15   are adopted.
16          And once we vote on and approve a proposed
17   change to the rules, I do not know by what process the
18   AOC notifies the Supreme Court of that.
19      Q   Understood.
20          Is it your understanding -- and I'm trying to
21   get to if the General Assembly is involved at any point
22   after the Advisory Commission's rule recommendations.
23      A   Sure.
24      Q   So is the General Assembly involved at any
25   point after the Advisory Commission makes -- votes and
```

```
 1  makes its rule recommendations?

 2      A   Yes.

 3      Q   Can you tell me what your understanding of that

 4  process is, that the General Assembly then gets involved

 5  at some point?

 6      A   Sure.  At some point, the Supreme Court will

 7  propose changes to the rules of civil or criminal

 8  procedure, and those proposals are sent to the General

 9  Assembly by way of resolutions.  And in order for any

10  rule change to go into affect, the rule change has to be

11  approved by resolution in the House and in the Senate.

12      Q   And then is that when the rule becomes final,

13  at some point?

14      A   I think the rule becomes effective once those

15  resolutions have been adopted.

16      Q   By the General Assembly?

17      A   Yes.

18      Q   Is that typically in July, maybe July 1st of

19  each year?

20      A   I believe the effective date on those

21  resolutions typically is July 1 of each year.

22      Q   Is the public ever notified at any point?  Is

23  there some type of public and notice comment period

24  after the commission makes its recommendations?

25      A   Yes.
```

1     Q    What is your understanding of that process?

2     A    That at some point, when the Supreme Court

3  decides that it is contemplating a rule change, that it

4  will put the proposed change out for public comment.

5     Q    Are you, as chair, or is the Advisory

6  Commission involved in that process with the Supreme

7  Court?

8     A    No.

9     Q    Does that happen immediately and

10 contemporaneously, when the Advisory Commission votes on

11 its recommendations?

12    A    No.

13    Q    That happens after?

14    A    Yes.

15    Q    Do you know how long after?

16    A    I do not.

17    Q    Does the public notice and comment period, is

18 that predate when the Supreme Court sends the proposed

19 rule to the general assembly?

20    A    Yes.

21    Q    Are you, as chair, or any members of the

22 Advisory Commission involved in that process with the

23 General Assembly or the public notice and comment

24 period?

25    A    Yes.

1      Q    How?

2      A    In my role as chairman of the Advisory

3 Commission, I have, in the past, appeared at meetings of

4 the Civil Justice Subcommittee to the extent testimony

5 would be necessary before the House on the proposed rule

6 changes.

7      Q    How many times have you appeared at hearings to

8 provide testimony on proposed rule changes?

9      A    At least twice.

10     Q    Do you recall when that was?

11     A    Sometime between 2020 or -- strike that.

12          Sometime likely between 2018 and today.

13     Q    How were you notified that your testimony at

14 these hearings were necessary?

15     A    Well, let me amend that question slightly,

16 'cause there have been times when I've gone and I

17 haven't actually testified.

18          What occurs is that Michelle tells me that, on

19 a particular day, a rules package will be presented to

20 the subcommittee or the full committee of the Civil

21 Justice Committee and the House, and then I will be

22 present in the event that testimony is necessary.

23          But in every instance previously, before this

24 year, I've been notified by Michelle that the package is

25 going to be submitted, and myself, either as vice chair

```
 1   or chair, would be there in case testimony were
 2   necessary.
 3       Q    When you say "Michelle," you're referring to
 4   Michelle Consiglio-Young of the AOC?
 5       A    Correct.
 6       Q    You said you were -- how long did you serve as
 7   vice chair?
 8       A    For at least a year, possibly two years.
 9       Q    Does the Advisory Commission, are they required
10   to do any kind extra training above and beyond your
11   normal CLE-required hours?
12       A    No.
13       Q    Are there ever any kind of meetings about what
14   the federal equivalent advisory committees is doing or
15   not doing?
16       A    I have never been a party to any such meeting.
17       Q    The rule recommendations that the Tennessee
18   Advisory Commission evaluates, is there ever any
19   consideration with what the federal rules -- what
20   they're doing in the federal rules?
21       A    Sure.
22       Q    Can you elaborate on that, please?
23       A    (No audible response from witness.)
24       Q    And let just ask a couple questions as a
25   lead-in.
```

1          It's my understanding that the Tennessee rules
2     can make its own rules for court procedure; is that
3     correct?
4          A    (No audible response from witness.)
5          Q    Assuming the process is -- goes through the
6     process.
7          A    Let me answer it this way.
8          Q    Sure.
9          A    I mean, in Title 16, the General Assembly has
10    vested the Tennessee Supreme Court with the authority to
11    promulgate rules for all the civil and criminal courts.
12    That's what happens in Tennessee.
13         Q    I understand that Tennessee does not have to
14    follow what the federal rules, what they do.  You would
15    agree with that?
16         A    A hundred percent.
17         Q    Is it fair to say that, historically, the
18    Tennessee rules somewhat mirror the federal rules?
19         A    In some respects.
20         Q    So would that typically be who -- your
21    commission would look to see what the federal rules are
22    doing?  That would be kind of your guide post, so to
23    speak; would you agree with that?
24         A    Not as you've stated it.  I would say that we
25    look at federal rules of civil procedure.  We look at

```
 1   other states' rules of civil procedure, and try to look
 2   at what would be the best practice for the state of
 3   Tennessee.
 4        Q   What would you say the percentage of Tennessee
 5   rules are that follow the federal rules?  Would it be,
 6   like, 90 percent of the Tennessee rules are about the
 7   same as the federal equivalent rules?  Would that be a
 8   fair number?
 9        A   I doubt it.  I think it would be lower than
10   that.
11        Q   You think it would be lower than that?  What do
12   you think it would be?
13        A   Well, we have to go rule by rule.  If you look
14   at Rule 4 on service of process, they are similar, but
15   they're not identical.  If you look at Rule 6 on timing,
16   they are similar, but they're not identical.  If you
17   look at Rule 8 on pleadings, they are similar, but
18   they're not identical.  If you look at the process under
19   Rule 12, they're similar, but they're not identical.
20           If you get to Rule 26 and you're dealing with
21   discovery of fact witnesses and expert witnesses,
22   they're similar, but not identical.  If you look at Rule
23   38 on the practice of jury selection, once again,
24   they're similar, but they're not identical.
25           So I would have a very difficult time believing
```

1    that 90 percent of our state rules are the same as what
2    we've got in the federal rules.
3        Q    When the Advisory Commission is coming up with
4    its rule recommendations, does it look to the federal
5    rules to say, "What are the feds doing?  Do we want to
6    do that or not want to do that?"
7            Is that part of your process?
8        A    We certainly have had members that propose
9    changes based on what's going on in federal courts.
10       Q    Do you know why that is?
11       A    Sure.  Because sometimes the federal rules have
12   a process or procedure that would benefit litigation in
13   Tennessee.
14       Q    Now, as part of the rules that are published,
15   once they're a adopted by the General Assembly, there's
16   usually -- as I understand it, in the rules, there's,
17   like, a comment section that says, "Advisory
18   Commission."
19           Do you know what I'm referring to?
20       A    I do.
21       Q    Is that the Advisory Commission on the Rules of
22   Practice and Procedure that you chair?
23       A    It is.
24       Q    Who publishes that?  Is that something that you
25   get involved in?  Does the AOC get involved in it?  How

1  does that get transmitted to some type of published rule

2  when you have the Advisory Commission comments?

3      A   It's something that we vote on in the Advisory

4  Commission.  If we adopt a new rule or amend an existing

5  rule, often there is a comment that explains why that

6  change was made.

7          And so what we send through the AOC to the

8  Supreme Court will be not just a proposed rule change,

9  but a proposed Advisory Commission comment.  And

10 ultimately, that will follow all the way through the

11 process and be part of the resolution, as presented to

12 the General Assembly.

13         If it's adopted, it becomes part of the

14 official rule package.

15     Q   So any time --

16         Are all proposed rule changes, do they -- do

17 they come with an Advisory Commission comment?

18     A   Many times, yes.

19     Q   But not all the time; is that your testimony?

20     A   I think that's correct, yes.

21     Q   Do you ever look at when the AOC sends out for

22 the public notice and comment period -- well, let me

23 back up.

24         Who sends that out, the public notice and

25 comment period, to the public?

1     A    I'm not sure.

2     Q    Is it on the AOC website, typically?

3     A    I don't know.

4     Q    You've never looked?

5     A    Correct.

6     Q    Do you know if the Tennessee Supreme Court and

7  the AOC, if they share the same website?

8     A    I'm not sure how to answer that, but what I can

9  tell you is that the Tennessee Administrative Office of

10 the Courts maintains the website.  And part of the

11 website reflects arguments in front of the Supreme

12 Court, opinions issued by the Supreme Court, arguments

13 before the Court of Appeals, opinions from the court of

14 Appeals.

15          So when you say, "Do they share the same

16 website," I'm not really sure.

17    Q    If I wanted to pull up the Advisory Commission

18 on the Rules of Practice and Procedure on the AOC

19 website, would I go to the AOC website?

20    A    If you wanted to do what?

21    Q    To look at the Advisory Commission names and

22 members, would I go to the AOC website?

23    A    As far as I'm aware, the names of the

24 commission members are posted on the AOC website.

25    Q    If I wanted to look up oral arguments or

*Lexitas* TENNESSEE
(615)595-0073

1  opinions from the Tennessee Supreme Court, would I go to

2  the same AOC website or would I go to a different

3  website?

4       A    The same website.

5       Q    Okay.  Do you ever get with Michelle

6  Consiglio-Young at the beginning of a calendar year to

7  map out agendas or meetings notices?  Do you do anything

8  like that at the beginning of each calendar year?

9       A    Well, I've never done what you've asked, but I

10 have met with Michelle about other things.

11      Q    Related to the Advisory Commission?

12      A    Probably.

13      Q    How often do you meet with Michelle

14 Consiglio-Young regarding the Advisory Commission?

15      A    I'd say, over the seven years that I've been on

16 the commission, maybe two or three times.

17      Q    Two or three times total?

18      A    Yes.

19      Q    Is that when she tells you about a package that

20 the General Assembly may be considering, a rules

21 package?

22      A    No.

23      Q    Okay.  What were those two or three times?

24 What were they related to?

25      A    Well, just likely how to make the commission

1  operate as efficiently as possible, whether we should

2  use the committee structure, whether we should have

3  subcommittees, who we should perhaps assign to

4  committees to make sure that they're evenly and

5  appropriately staffed.

6      Q    Okay.  I think you said -- I want to make sure

7  I understood this.

8          Did you say in your earlier testimony that you

9  serve at the pleasure of the Tennessee Supreme Court?

10     A    I did say that.

11     Q    Is that language, is that in the statute?

12     A    Yes.

13     Q    It is?

14     A    It is implicitly in 16-3-601.

15     Q    I think, as I recall, the AOC director uses

16 that language, "Serves at the pleasure of the chief

17 justice of the Supreme Court"; would that be correct?

18     A    I don't know.

19     Q    But you're saying implicitly, you, as the

20 chair -- who do you serve at the pleasure of, the

21 Supreme Court or the Chief Justice?

22     A    The Supreme Court.

23     Q    Tell me how that is implicit.  What does that

24 mean?  What do you do vis-à-vis your relationship with

25 the Supreme Court members?

1      A    Well, the statute states explicitly that it's
2    the Supreme Court who appoints the members.  So at any
3    day, the Supreme Court could decide to appoint someone
4    else.
5      Q    Okay.  So do you -- let's say through a year,
6    and you're about to have four quarterly meetings.
7      A    All right.
8      Q    Would you ever communicate with any members of
9    the Supreme Court during the course of that year about
10   potential Advisory Commission roles?
11          MS. CARTER:  Object to form.
12          THE WITNESS:  I've never done that about a
13   rule.  But, I mean, certainly I've had communications
14   with our Supreme Court liaison over times about other
15   things.
16   BY MR. DOUGHERTY:
17     Q    How do you communicate with your Supreme Court
18   liaison?  Do you do it while you're at the meeting or at
19   a later time?
20     A    By telephone, typically.
21     Q    Who was the Supreme Court liaison in 2022 from
22   the Supreme Court?
23     A    Justice Lee.
24     Q    How often did you communicate by telephone with
25   Justice Lee during the 2022 calendar year?

1    A    Likely once or twice.

2    Q    Once or twice?

3    A    (Witness nods head up and down.)

4    Q    Do you recall what the nature of those calls

5  were about?

6    A    Yes.  Questions about reappointment as chair.

7  Reappointment to the commission.

8    Q    Why would you communicate with Justice Lee

9  about that, those issues?

10    A    Because it's -- the Supreme Court appoints the

11  members of the commission.  It's the Supreme Court who

12  appoints the chair, the vice chair, the reporter, and

13  the other offices of the commission.

14    Q    Well, do you ever -- have you, in the past,

15  ever communicated with any members of the Supreme Court

16  about the Advisory Commission, other than the Supreme

17  Court liaison?

18    A    No.

19    Q    So your point of communication in the past has

20  always been with the individual who's named as the

21  Supreme Court liaison?

22    A    Correct.

23    Q    I'm not talking about communications you might

24  have at a bar function.  I'm only referring, when I talk

25  about these communications, related to the Advisory

1  Commission and your duties.

2      A    That's the way I understood your question.

3      Q    Okay.  Did Justice Lee have any information or

4  comments back to you during your one or two meetings

5  with her in 2022?

6      A    I don't believe I had any meetings with you.

7      Q    Well, I think -- my understanding, I said, "How

8  many meeting in 2022 by telephone," and I think you

9  said, "One or two."

10         Was that your testimony?

11     A    My testimony was intended to be that I spoke

12  with her by phone once or twice.  They were not

13  meetings --

14     Q    Okay.

15     A    -- in person.

16     Q    The one or two times in 2022 when you spoke by

17  phone with Justice Lee, do you recall what information

18  Justice Lee said to you or gave to you?

19     A    In general, yes.

20     Q    Okay.  What was that?

21     A    Had to do with reappointment as chairman of the

22  commission, possibly reappointment to the commission

23  itself.

24     Q    Were you calling Justice Lee, at that point, to

25  see if you were going to be reappointed, or you were

1  requesting reappointment?

2      Explain that a little bit, please.

3  A    I don't believe I called her.  Most likely, she

4  called me.

5  Q    Okay.  When she called you during those one or

6  two times, what did she say?

7  A    In words or in substance, "The Supreme Court

8  would like you to continue to serve on the commission.

9  The Supreme Court would like you to continue to serve as

10 chair."

11     Something to that effect.

12 Q    Do you recall in 2022 when that happened, those

13 one or two times?

14 A    I do not.

15 Q    I'm going to jump back to the -- what I viewed

16 on the AOC website this morning, okay, regarding the

17 Advisory Commission and the members that are listed.

18     There's another heading.  It says -- and we

19 talked about Justice Tarwater, who was just appointed to

20 the Supreme Court.  I think Justice Lee retired.

21     Is that accurate?

22 A    She did.

23 Q    There's a heading here that says, "Assigned

24 staff attorney (criminal)," and the individual is

25 Elizabeth Ryan, Supreme Court staff attorney.

*Lexisasa*  *TENNESSEE*
(615)595-0073

1        What is Ms. Ryan's role on the Advisory
2   Commission?
3      A    Let me answer it this way.
4        I don't know that she's actually on the
5   commission.  I know that Elizabeth is in our meetings,
6   along with Jeff Zager, as counsel, and they participate
7   in the meetings there.  They do not vote on proposed
8   rule changes, but they provide expertise and guidance on
9   various issues.
10     Q    Well, if someone's not on the commission, how
11  do they get to go to the meetings?  I don't understand
12  that.
13       Can you explain that?
14       MS. CARTER:  I'm going to object to the form.
15       Go ahead.
16       THE WITNESS:  My explanation is that the
17  Tennessee Supreme Court has authority to decide who the
18  members of the commission are and how the meetings
19  proceed, and that, at some level, the Supreme Court has
20  determined that having those in the position of
21  Elizabeth Ryan and Jeff Zager would be helpful to the
22  commission's business.
23       And so they have, since I can remember, been in
24  attendance at the meetings.
25  BY MR. DOUGHERTY:

```
 1      Q    How long has Ms. Ryan been in attendance at the
 2 meetings?
 3      A    For as long as I can remember.
 4      Q    What does she do?  What is your understanding
 5 of Ms. Ryan's role at these meetings?
 6      A    To lend expertise to the subject matter of the
 7 discussions.
 8      Q    Is Ms. Ryan a judge, or she a practicing
 9 attorney?  Do you know?
10      A    I do know, and she's an attorney.  She's not a
11 judge.
12      Q    Okay.  The other person, it says, "Assigned
13 staff attorney (civil), Jeff Zager."  I think you
14 mentioned his name.  You are saying Mr. Zager
15 participates in all the meetings?
16      A    He's participated in all of the meetings that I
17 can remember, yes.
18      Q    Okay.  Mr. Zager would have participated in
19 quarterly meetings in 2022?
20      A    Yes.
21      Q    Did Ms. Ryan participate in the quarterly
22 meetings in 2022?
23      A    I believe so.
24      Q    Did Mr. Zager participate in the meetings thus
25 far in 2023?
```

```
 1      A    I'm not entirely sure, but I believe so.

 2      Q    Did Ms. Ryan participate in the meetings thus

 3  far in 2023?

 4      A    I believe so.

 5      Q    Just to confirm, the reporter, Ms. Zehrt, did

 6  she participate in the meetings in 2022?

 7      A    I'm not sure.

 8      Q    Do you know when she was appointed to the

 9  Advisory Commission?

10      A    It was, I believe, either in 2022 or 2023.

11      Q    I believe, as I understand your testimony, you

12  said that the Supreme Court makes appointments of

13  members to the Advisory Commission; is that accurate?

14      A    That's what I testified to, yes.

15      Q    Do they enter any type of judicial order when

16  they make these appointments?  Are you aware?

17      A    Yes, I am aware.  Yes, they do.

18      Q    Do they make judicial orders when they appoint

19  judicial liaisons to the Advisory Commission?

20      A    I believe so.

21      Q    Do they make judicial orders when they appoint

22  and assign staff attorneys?  For example, Ms. Ryan or

23  Mr. Zager?

24      A    I'm not sure.

25      Q    Okay.  Do they make judicial orders when they
```

```
 1  appoint a reporter, like Ms. Zehrt, for example?

 2      A   I believe so.

 3      Q   Okay.  Do they make judicial orders when they

 4  appoint someone like an AOC contact, like Ms. Michelle

 5  Consiglio-Young?

 6      A   I'm not sure.

 7      Q   As far as you recall, Ms. Michelle

 8  Consiglio-Young has served at least until you have been

 9  on the commission, since 2016?

10      A   That's my memory.

11      Q   Okay.  Are all of the other people that are

12  listed on the AOC website for the Advisory Commission,

13  other than judicial liaisons, are all those individuals

14  in private practice?  Are they private attorneys?

15          MS. CARTER:  Object to the form.

16          THE WITNESS:  For the most part.

17  BY MR. DOUGHERTY:

18      Q   The only one I don't see, from what I'm seeing,

19  it says "ESQ" after pretty much everything.  What is

20  your understanding of ESQ?

21      A   It's an abbreviation for the word "esquire."

22      Q   What does that mean?  Does that mean an

23  attorney?

24      A   It's a suffix that oftentimes you'll see

25  appended to the name of an attorney.
```

1    Q    There's a Representative William Lamberth of

2    Nashville, Tennessee that does not have the "ESQ" next

3    to his name.  Who is Representative Lamberth?

4    A    He's a member of the Advisory Commission, and

5    also a member of the Tennessee House of Representatives.

6    Q    Is Representative Lamberth an attorney?  Do you

7    know?

8    A    I do know.  Yes, he is an attorney.

9    Q    He is an attorney?

10   A    (Witness nods head up and down.)

11   Q    Is he -- do you know what -- is he with a

12   particular firm that you're aware of?

13   A    He has his own firm in Sumner County.

14   Q    Andree Blumstein is listed here.  As I recall,

15   Ms. Blumstein is the current solicitor general; is that

16   right?

17   A    That is correct.

18        MR. DOUGHERTY:  I think someone else,

19   Mr. Stahl, may have some questions.

20        I'll pass the witness, Mike.

21                    EXAMINATION

22   BY MR. STAHL:

23   Q    Representative Bulso, have you ever personally

24   denied a member of the public the option of attending an

25   Advisory Commission meeting?

*Lexitas* **TENNESSEE**
(615)595-0073

```
 1       A    I have not.

 2       Q    Do commission members ever disagree about

 3   proposed rule changes?

 4       A    Yes.

 5       Q    Does the commission ever assign subcommittees

 6   to examine proposed rule changes?

 7       A    We have committees.  We have no subcommittees.

 8       Q    You mentioned earlier that you'll testify

 9   before the House or the General Assembly about proposed

10   rule changes that may have gone up through the AOC to

11   the Tennessee Supreme Court; is that right?

12       A    Yes.

13       Q    When you are at those proceedings, whether you

14   testify or not, do you know if those proceedings are

15   open to the public?

16       A    I do.

17       Q    Are they?

18       A    They are.

19       Q    Have you ever been involved in a commission

20   meeting where you noticed that members of the public

21   were present?

22       A    I do not recall such a meeting.

23       Q    As chair of the Advisory Commission, do you

24   believe that honest and frank discussions among the

25   members is in the committee's best interest?
```

1    A    Yes.

2    Q    Have you ever had a rule change that you

3 submitted through the AOC to the Tennessee Supreme Court

4 that the General Assembly denied?

5    A    By the Supreme Court?

6    Q    Uh-huh.

7    A    Yes.

8    Q    Have you ever noticed that a submitted proposed

9 rule change and the advisory comments that you said you

10 most often submit with those have been amended or

11 changed in any way before being accepted?

12    A    That has happened as well.

13         MR. STAHL:   That's all I have.

14                    EXAMINATION

15 BY MR. DOUGHERTY:

16    Q    When did these changes -- what years did that

17 occur, where the Supreme Court either denied -- well,

18 when did the Supreme Court deny a proposed rule change

19 that the Advisory Commission made?

20    A    My recollection is that that occurred with

21 regard to a proposed change regarding mandatory

22 disclosure under Rule 26.

23    Q    Do you recall what year that might have been?

24    A    No.  I could not recall the year that occurred.

25    Q    Would there be a record somewhere on the AOC

1   website or the Supreme Court orders?  Do you know?

2       A   I know that there would be a written record

3   that a rule was proposed to the Supreme Court, and that

4   the Supreme Court did not adopt it.

5       Q   Where would that be?  Would that be in your

6   typically Lexis/Westlaw search, or where would that be?

7       A   Well, it would be in a number of places.  It

8   would be a written record of what the commission

9   approved.  There'd be some writing of the communication

10  of that action to the Supreme Court, and then there

11  would be, perhaps, no further action by the Supreme

12  Court on putting that proposed rule out for public

13  comment or change.

14      Q   Do you recall what year it was when there was

15  a -- the Supreme Court rewrote the recommended rule or

16  changed it somehow?  Do you recall when that would have

17  been?

18      A   I can't recall the precise year.

19      Q   But you're saying it would -- it's your

20  understanding that there would be some type of record of

21  what the Advisory Commission recommended versus what was

22  actually enacted?

23      A   Absolutely.

24      Q   Were -- those times when the Supreme Court

25  either made a change or denied, were you ever required

```
 1   to testify before the General Assembly?

 2       A    I don't recall.

 3            MR. DOUGHERTY:  I don't think I have anything

 4   else.

 5            MR. STAHL:  I just have one more question.

 6                         EXAMINATION

 7   BY MR. STAHL:

 8       Q    Does every meeting result in a vote?

 9       A    No.

10            MR. STAHL:  That's all I have.

11            MR. DOUGHERTY:  We're on the same schedule, an

12   hour and 45 minutes for both of our first depos.

13            MS. CARTER:  You have the right to read and

14   sign, so do you want to read and sign your deposition?

15            THE WITNESS:  No, I'll waive it.

16            THE STENOGRAPHER:  Do you want a copy of the

17   transcript?

18            MR. DOUGHERTY:  Yes, I do.

19            We're off the record.

20

21                (At 10:47 a.m. Central Time,

22                proceedings concluded.)

23

24

25
```

LEXITAS TENNESSEE
(615)595-0073

```
 1                REPORTER'S CERTIFICATE

 2

 3   STATE OF TENNESSEE

 4   COUNTY OF DAVIDSON

 5        I, Saba Mc Kinley, court reporter, with offices

 6   in Clarksville, Tennessee, hereby certify that I

 7   reported the foregoing deposition of GINO BULSO by

 8   machine shorthand to the best of my skills and

 9   abilities, and thereafter the same was reduced to

10   typewritten form by me.

11        I am not related to any of the parties named

12   herein, nor related to their counsel, and have no

13   interest, financial or otherwise, in the outcome of the

14   proceedings.

15        I further certify that in order for this document
     to be considered a true and correct copy, it must bear
16   my original signature, and that any unauthorized
     reproduction in whole or in part and/or transfer of this
17   document is not authorized, will not be considered
     authentic, and will be in violation of Tennessee Code
18   Annotated 3-914-104, Theft of Services.

19

20

21

22   _____
     SABA MC KINLEY, LCR, RPR, CRI
23   Licensed Court Reporter
     Registered Professional Reporter
24   Certified Reporting Instructor

25
     LCR #843 - Expires:    6/30/2024
```

## 1

**1** 51:22 58:21

**10** 56:22

**10:05** 56:19

**10:06** 57:3

**10:12** 57:3

**10:15** 56:25

**10:47** 81:21

**12** 63:19

**15** 14:18 56:22

**155** 10:5 16:6

**16** 62:9

**16-3-601** 16:19
18:5 50:5 68:14

**1961** 9:24

**1983** 11:18

**1986** 11:5,25 12:9

**1st** 58:18

## 2

**2003** 54:20,23

**2008** 11:5,11

**2014** 14:18

**2016** 24:10,11,17
25:9,16 26:21
27:8,12,20 28:10,
17 29:12 34:12
35:8 46:17,20
48:4 52:24 53:6,9
76:9

**2018** 60:12

**2020** 11:11,14
19:20,21 20:9
23:12,15 60:11

**2021** 19:21 20:4,7,
9 23:17

**2022** 19:25 23:19
28:17 29:12
38:16,20,22 39:7,
10,17,20 40:22
69:21,25 71:5,8,

**16** 72:12 74:19,22
75:6,10

**2023** 20:12 23:21
39:25 40:4,12
41:1,5,17,18,20,
22,24 42:9,14,20
43:2,6,10,19 45:3
51:22 53:12,21
54:2,7,10,12,23
55:1,8,13 74:25
75:3,10

**25** 9:24

**26** 63:20 79:22

**28** 10:3

## 3

**37027** 16:7

**38** 63:23

## 4

**4** 63:14

**400** 10:6 16:7

**45** 81:12

**4th** 12:17

## 5

**5th** 12:16

## 6

**6** 63:15

**61** 9:24

**6th** 12:15

## 8

**8** 63:17

**8th** 41:20,24 52:12

## 9

**9** 40:4,12 41:1
42:9,14,20 43:10,

**19** 45:2

**90** 63:6 64:1

**9:00** 52:20 55:18

**9th** 41:22

## A

**a.m.** 52:20 55:18
57:3 81:21

**abbreviation**
76:21

**ability** 8:5,7,14

**absence** 41:16

**Absolutely** 80:23

**accepted** 79:11

**accordance** 9:10

**account** 49:16

**accurate** 72:21
75:13

**Act** 46:6

**action** 6:20 7:7
14:14 80:10,11

**actual** 18:14

**add** 33:16

**address** 16:5

**administrative**
17:4 22:22 27:23
28:3,14 37:21
56:5 66:9

**administratively**
32:14

**admission** 12:6

**admitted** 12:10
13:7

**adopt** 30:12,21
65:4 80:4

**adopted** 57:15
58:15 64:15 65:13

**adopting** 43:17

**adoption** 43:18

**adverse** 6:18

**advise** 16:23

**advised** 15:15
40:14

**advisory** 16:17
17:18 18:14 19:1,
15,23 21:3 22:7,9,
22 23:5,8,14
24:18 25:18 27:16
28:10 29:20 30:5,
9,20,24 31:5,10,
14,18,22 32:1,6,
13 33:15,18,23
34:4 35:9,18,23
36:7 37:3,11,22,
25 38:6,9,12,13,
17 39:11,25 40:4,
17 41:1,4 44:2
46:9,19 47:3,21
48:3 49:13 50:6,
13 51:24 52:16
53:12,22 57:8,12,
22,25 59:5,10,22
60:2 61:9,14,18
64:3,17,21 65:2,3,
9,17 66:17,21
67:11,14 69:10
70:16,25 72:17
73:1 75:9,13,19
76:12 77:4,25
78:23 79:9,19
80:21

**affect** 8:7 58:10

**agenda** 34:19
35:1,3,6 41:16

**agendas** 67:7

**agree** 55:7,9
62:15,23

**agreed** 21:6

**ahead** 16:4 56:17
73:15

**Alabama** 14:23
15:6

**all's** 27:3

**allowed** 29:11

**amend** 60:15 65:4

**amended** 79:10

**amendment**
45:12,14,16,18,20

**amendments** 43:17,18

**Andree** 77:14

**annotated** 16:18

**answers** 8:8 9:2

**AOC** 18:25 21:16, 20,25 22:3 25:13, 14 26:21 27:1,7, 22 29:1 30:13 32:4,7,15,19,22 33:6,10,13,19 36:22 37:21 39:8 41:10 47:22 56:12 57:9,13,14,18 61:4 64:25 65:7, 21 66:2,7,18,19, 22,24 67:2 68:15 72:16 76:4,12 78:10 79:3,25

**apologize** 42:19

**Appeals** 12:15, 16,17 42:6 49:2,4, 7 50:24 51:1,2 66:13,14

**appearance** 15:23

**appeared** 60:3,7

**appellate** 30:3 31:16 48:15

**appended** 76:25

**appoint** 18:18 50:6,7,8 69:3 75:18,21 76:1,4

**appointed** 18:4 19:18 20:6,8 21:2, 4 24:9,15 25:19 26:21 27:8,12 33:17 46:20 50:10 72:19 75:8

**appointment** 19:22 24:18 46:23,24 47:9,12

**appointments** 49:12 75:12,16

**appoints** 47:2,5 69:2 70:10,12

**appropriately** 68:5

**approve** 57:16

**approved** 58:11 80:9

**approximate** 11:3

**Approximately** 11:9

**area** 25:10 26:10 45:24 51:7

**arguments** 42:5 66:11,12,25

**Arkansas** 12:20

**Ashley** 15:10

**assembly** 16:22 57:21,24 58:4,9, 16 59:19,23 62:9 64:15 65:12 67:20 78:9 79:4 81:1

**assign** 30:6 68:3 75:22 78:5

**Assigned** 72:23 74:12

**assist** 18:5

**Assuming** 62:5

**Atlanta** 11:22

**attend** 11:19 22:7, 10

**attendance** 15:18 73:24 74:1

**attending** 77:24

**attorney** 6:24,25 7:17 8:16 10:7 26:6,8 48:19 72:24,25 74:9,10, 13 76:23,25 77:6, 8,9

**attorneys** 10:9,12 18:3,19 30:1 75:22 76:14

**audible** 8:21 9:1 51:3 54:16 61:23 62:4

**authority** 13:4 18:18 50:5 62:10 73:17

**aware** 36:15,19 37:1,24 38:2,8 40:19 42:3,5,8,11 44:24 66:23 75:16,17 77:12

---

**B**

**back** 16:10 28:7 29:15 32:18 33:10 56:19,25 57:4 65:23 71:4 72:15

**bar** 12:1 13:4 70:24

**based** 40:9 49:13 64:9

**began** 53:3

**begin** 23:9,15,17, 19,21

**beginning** 27:20 67:6,8

**behalf** 17:20

**believing** 63:25

**Belmont** 34:9

**benefit** 64:12

**Berry** 11:1

**birth** 9:23

**bit** 23:1 45:25 50:3 57:13 72:2

**Blumstein** 77:14, 15

**board** 37:15,16

**boards** 37:10,14, 20

**Boult** 11:1,4

**breach** 46:6

**break** 8:17 9:13 56:15 57:1

**breakdown** 50:14

**Brentwood** 10:1, 6 16:7

**broad** 45:24

**broadcast** 29:11

**brought** 7:7

**Bulso** 6:2,8 7:15, 25 9:19,25 10:5, 16,17 11:2,8,13 13:23 14:15 16:6, 16 19:11 45:22 57:1,5 77:23

**Bulso's** 17:16

**burden** 42:16,21, 24

**business** 36:7,8 46:2 53:22 73:22

---

**C**

**calculate** 16:8

**calendar** 52:13 67:6,8 69:25

**California** 15:4,5

**called** 6:3 72:3,4, 5

**calling** 71:24

**calls** 70:4

**Camille** 50:20

**capacity** 6:23 17:11,17 18:11 24:5

**Carma** 48:22

**carry** 12:2

**Carter** 15:10 16:1, 2 17:6,9,19 31:1 36:2 37:8 44:9 53:16 56:14,20,24 69:11 73:14 76:15 81:13

**Carter's** 15:11

**case** 6:19,21 7:4,5 13:16 14:1,8,16, 19 35:11,13 45:14,19 53:4 61:1

**cases** 46:1,3

**category** 48:22

**Catherine** 46:10

**Cathy** 46:14

**Central** 81:21

**chair** 17:17,20 19:11,14,18,22,25 20:4,12,13,19,23 21:3,12,17 24:5, 11,15 25:18 26:4, 6 32:19 33:5 35:4, 17,18,22,24 38:16 42:16,22 46:10, 13,14,15,22 47:6 50:13 59:5,21 60:25 61:1,7 64:22 68:20 70:6, 12 72:10 78:23

**chaired** 43:11

**chairman** 60:2 71:21

**chairmanship** 44:18

**chancellor** 48:1, 3,9,10 51:4

**chancery** 13:24 48:10 51:5,14

**change** 30:12,19, 22 32:14,18,20 57:17 58:10 59:3, 4 65:6,8 79:2,9, 18,21 80:13,25

**changed** 79:11 80:16

**channel** 42:7

**characterize** 30:17 32:8 57:11

**charge** 22:15

**check** 15:22 16:10 38:24

**chief** 68:16,21

**circuit** 12:15,16, 17 51:13

**circulate** 22:16, 17

**civil** 9:11 14:10 18:5 30:3 31:12 58:7 60:4,20 62:11,25 63:1 74:13

**claiming** 7:1

**clarification** 17:6,24 25:24

**clarified** 7:16 45:15

**clarify** 7:24 8:13 17:10 21:1 23:13

**Clayton** 46:10,11, 19,22

**CLE-REQUIRED** 61:11

**clear** 17:13 47:20

**clerk** 48:13,14

**closed** 43:24 44:3,13,20

**club** 14:15

**Code** 16:18

**Cole** 48:1,3 51:4

**college** 11:16 34:9

**comfort** 56:15

**comment** 58:23 59:4,17,23 64:17 65:5,9,17,22,25 80:13

**comments** 65:2 71:4 79:9

**commercial** 45:23 46:7

**commercial/ residential** 46:3

**commission** 16:17,22 17:3,14, 18,20 18:2,3,10, 14,18,20,23 19:1, 15,18,23 21:3,21 22:1,7,9,17,18,23 23:5,6,9,10,14 24:2,4,10,18,25 25:19 26:2 27:16 28:10,18 29:16, 20,23 30:1,5,9,20, 23,24 31:5,10,14, 18,22 32:2,6,13 33:2,15,18,23 34:4 35:9,14,19, 23 36:1,8 37:3,12, 22 38:13,17

39:11,25 40:4,15, 17,19 41:1,4 44:2, 19 46:9,18,20 47:3,22 48:4 49:13 50:6,13,18 51:25 52:16 53:5, 6,12,22 57:8,12, 25 58:24 59:6,10, 22 60:3 61:9,18 62:21 64:3,18,21 65:2,4,9,17 66:17, 21,24 67:11,14, 16,25 69:10 70:7, 11,13,16 71:1,22 72:8,17 73:2,5,10, 18 75:9,13,19 76:9,12 77:4,25 78:2,5,19,23 79:19 80:8,21

**commission's** 57:22 73:22

**commissions** 37:11,14,21

**committee** 30:7, 14,16,18,21 38:6, 9,14 46:16,18 60:20,21 68:2

**committee's** 78:25

**committees** 18:7 30:7 37:25 61:14 68:4 78:7

**common** 9:14

**communicate** 21:7,11 32:1,2,6, 19 33:10 69:8,17, 24 70:8

**communicated** 32:15 70:15

**communicating** 33:20 53:12,14

**communication** 35:24 70:19 80:9

**communications** 36:6 69:13 70:23, 25

**conclude** 14:6,19

**concluded** 81:22

**conduct** 23:5

35:23

**conducted** 22:13 24:24 25:7 42:17 43:1 53:22

**conducting** 9:6,9

**confirm** 75:5

**connection** 22:16,20 23:7

**Conners** 11:1

**consideration** 61:19

**Consiglio** 28:2

**Consiglio-young** 22:4 32:17 33:9 40:10,21 45:1,7 55:22 56:9 61:4 67:6,14 76:5,8

**Consumer** 46:5

**contact** 22:3 33:14 76:4

**contemplating** 59:3

**contemporaneo usly** 59:10

**continue** 21:5 72:8,9

**contract** 46:6

**convicted** 13:9

**copy** 55:25 56:6, 10,12 81:16

**Cornell** 11:16,17

**correct** 7:17 9:12, 20,21 10:7 14:9, 13 15:11 17:15 19:12 21:21 24:12,13 27:18 28:4 35:2,20 37:9 38:4,7 41:21,24 44:6 46:19 47:3,6 51:6,20 52:4 53:7 55:14 56:11 61:5 62:3 65:20 66:5 68:17 70:22 77:17

**correctly** 7:22 36:9

**LEXITAS TENNESSEE - General Section**
*(615)595-0073*

counsel 15:7,15
37:7 42:18 44:14,
16 55:24 56:14
73:6

county 13:24 15:4
49:3,5 51:6,7
77:13

couple 8:19 61:24

court 9:1 12:14,
15,16 13:6,21,24
14:21,24 15:2,4,6
16:23,25 17:1
18:4,17 20:14,19
21:2,5,7,11,14
29:23 30:13 31:7,
11,15,19,23 32:3,
16,21 33:17,21
42:6 43:18 46:23,
24 47:2,5,8,11,12,
15,17,18 48:10,25
49:2,4,6,13,16,25
50:5,7,23,24 51:1,
2,5,11,12,13,14,
16,18,22 57:18
58:6 59:2,7,18
62:2,10 65:8 66:6,
12,13 67:1 68:9,
17,21,22,25 69:2,
3,9,14,17,21,22
70:10,11,15,17,21
72:7,9,20,25
73:17,19 75:12
78:11 79:3,5,17,
18 80:1,3,4,10,12,
15,24

courts 12:10,11
37:25 42:3 48:15
56:6 62:11 64:9
66:10

Courts' 17:5

created 16:18,23

crime 13:9

criminal 18:6
30:4,15,16,25
31:7 49:2,4,6
50:24 51:1,2 58:7
62:11 72:24

Cummings 11:1,
4

curious 47:19

current 10:25
11:13 19:22 26:25
29:15 33:22 38:12
50:12 77:15

—————

**D**

D-O-R-A-N 25:25

daily 15:17

date 9:22 19:19
35:19 52:9,10
58:20

Davidson 13:24

day 19:17 60:19
69:3

dealing 63:20

debated 30:22

December 9:24
41:18 52:5,8,12,
21 53:2,8 55:3,4,
16

decide 20:15 69:3
73:17

decides 59:3

decision 41:15
50:1

defendant 6:19
14:8

denied 77:24
79:4,17 80:25

Dennis 48:22

deny 79:18

Depends 40:2

depos 81:12

deposed 7:8

deposition 6:10
7:3,20,21 8:7 9:6,
9 15:13 17:14
36:16 37:6 81:14

depositions
6:17,21 8:20

deputy 26:25

describe 18:2

determination

35:19

determined
73:20

determines 35:3,
15

difference 43:9

differences
43:13

differently 50:3

difficult 63:25

directly 32:7

director 15:20
21:15 26:20,25
33:11 68:15

directors 37:15

disagree 53:24
54:1,3,4,8 78:2

disciplined 13:3,
6

disclosure 79:22

discovery 63:21

discretion 50:7

discuss 30:8 36:7
37:2 43:16

discussed 43:23
44:1

discussing 27:16
44:19

discussion 7:12
38:12 40:25 44:5,
8

discussions
36:10 40:9 44:14,
15 74:7 78:24

dismissed 7:5,6
14:7,20

disputes 46:2,7

distinction 47:14,
20

District 12:18,19,
20,21 13:25 14:22
15:5

division 49:10
50:2,9,17

divisions 49:14
50:11,15

Doran 25:22 26:2

doubt 63:9

DOUGHERTY
6:7 7:9,14 16:1,3
17:8,15,25 18:1
26:1 31:3,4 36:5
44:11 53:19
56:17,22,25 57:4,
6 69:16 73:25
76:17 77:18 79:15
81:3,11,18

duly 6:4

duties 71:1

Dwight 51:19

—————

**E**

earlier 13:14
20:20 45:4 50:4
68:8 78:8

east 49:9,14 50:14

Eastern 12:18,20,
21 13:25

effect 72:11

effective 58:14,20

efficiently 68:1

elaborate 61:22

Elizabeth 72:25
73:5,21

email 15:19 21:11,
13,15 33:5 36:11

emailing 53:14

emails 36:13 37:4

Emory 11:21

enacted 80:22

end 41:22

enter 75:15

entire 30:22

entitled 15:17

equal 50:14

equivalent 61:14

63:7

**ESQ** 76:19,20
77:2

**esquire** 76:21

**estate** 46:4

**estimate** 24:16

**Eugene** 9:19

**evaluates** 61:18

**evenly** 68:4

**event** 60:22

**evidence** 30:3
31:20

**EXAMINATION**
6:6 77:21 79:14
81:6

**examine** 78:6

**exchanged**
21:13,15

**excluding** 44:14

**excuse** 55:12

**executive** 26:20

**existing** 30:3 65:4

**expand** 45:25

**experienced**
8:15

**expert** 63:21

**expertise** 73:8
74:6

**explain** 21:24
22:12 32:11 72:2
73:13

**explains** 65:5

**explanation**
73:16

**explicitly** 69:1

**express** 50:3

**extent** 17:11 60:4

**extra** 61:10

---

**F**

**facilitator** 22:11

**fact** 43:19 63:21

**factor** 49:15,17,21

**fair** 22:21 33:16
62:17 63:8

**familiar** 16:16

**fashion** 53:23

**federal** 9:11 12:14
15:5,17 37:25
38:3,6,9,13 46:4
61:14,19,20
62:14,18,21,25
63:5,7 64:2,4,9,11

**feds** 64:5

**fee** 15:17,23

**feel** 8:17

**figure** 13:1

**filed** 6:20,22
13:23,24 14:4,17
15:3

**fill** 20:15

**final** 58:12

**fine** 16:11 56:18,
24

**firm** 10:10,25
11:6,10,13 15:25
26:15 32:12
77:12,13

**firms** 10:24

**follow** 62:14 63:5
65:10

**form** 36:2 44:9
53:16,23 69:11
73:14 76:15

**formally** 13:3

**formation** 11:14

**franchise** 46:4

**Francisco** 7:8
13:13 14:12,14

**frank** 78:24

**Franklin** 10:5
16:6

**fraud** 46:5

**fraudulent** 6:19

**free** 8:17 45:15,
17,20

**frequently** 8:24
35:8

**Friday** 52:7,13,17,
20 55:15

**front** 66:11

**full** 9:17 20:2,12
32:16 33:21 60:20

**function** 34:19
70:24

---

**G**

**gave** 6:17 11:6
71:18

**general** 9:12
16:22 51:13
57:21,24 58:4,8,
16 59:19,23 62:9
64:15 65:12 67:20
71:19 77:15 78:9
79:4 81:1

**Gino** 6:2 9:20
19:11

**give** 8:8,21 9:1
11:3 16:5 19:7
29:22

**giving** 7:20 8:20
36:16

**Good** 6:8,9

**graduate** 11:17,
20

**graduation** 11:24

**grand** 49:10,13
50:2,9,11,15,17

**great** 16:15 56:16

**group** 15:20 18:3
25:3,9

**guidance** 73:8

**guide** 62:22

**guidelines** 9:13

---

**H**

**habit** 8:24

**halfway** 20:6

**handled** 45:13,17
46:3

**handles** 34:25

**happen** 14:1 59:9

**happened** 32:24
53:9 72:12 79:12

**happening** 29:9

**Hardeman** 51:6

**Harmon** 27:1

**head** 70:3 77:10

**heading** 72:18,23

**heads** 8:25

**heard** 45:9

**hearings** 60:7,14

**held** 24:19 35:9,
16,20 37:24
38:19,23 39:10,12
41:19,24 52:16,19
54:7,9,19,21

**helpful** 73:21

**High** 37:16

**historically** 62:17

**Hivner** 48:12,17,
19

**hold** 36:23,24
37:3

**Holland** 26:18

**honest** 8:8 78:24

**hosted** 22:14

**hosting** 22:15

**hour** 81:12

**hours** 61:11

**House** 58:11 60:5,
21 77:5 78:9

**hundred** 62:16

**hybrid** 25:6

---

**I**

---

**identical** 63:15, 16,18,19,22,24

**II** 37:16

**immediately** 59:9

**implicit** 68:23

**implicitly** 68:14, 19

**important** 8:21, 25

**inaccurate** 54:8

**individual** 17:11, 21 34:16 50:19 70:20 72:24

**individually** 14:16

**individuals** 44:18 76:13

**inform** 8:10

**information** 71:3, 17

**initial** 24:17

**initially** 21:4 24:9

**injunction** 40:16 44:22,24 45:2,8 56:1,4,7,10,12

**instance** 60:23

**intended** 41:10 71:11

**interest** 78:25

**interfere** 43:20

**Internet** 23:7

**interrupts** 25:23

**investigate** 30:19

**involved** 18:21 46:1,2 57:21,24 58:4 59:6,22 64:25 78:19

**involvement** 33:19

**involving** 45:19 46:3

**issue** 20:16 41:11

**issued** 40:16 44:23 66:12

**issues** 70:9 73:9

**items** 41:17

---

**J**

---

**James** 48:12

**Jeff** 73:6,21 74:13

**Jennifer** 51:9

**Jim** 25:22

**job** 12:25

**John** 37:16

**joined** 25:1 28:9 34:12 35:8 46:17 48:7

**Jr** 9:19

**judge** 26:7 40:15 44:23 48:17,22, 23,25 50:20,21,23 51:8,9 74:8,11

**judges** 18:3,20 30:2 47:17

**judgment** 14:20

**judicial** 18:15 19:4 47:9,15,16, 25 48:21 50:19 51:8 75:15,18,19, 21,25 76:3,13

**judiciary** 18:10 19:8

**July** 58:18,21

**jump** 72:15

**June** 39:25 40:4, 12 41:1,22 42:9, 14,20 43:2,6,10, 19 45:2 52:21 53:2,8 55:2,4

**Junior** 10:21

**jury** 63:23

**justice** 51:19,22

60:4,21 68:17,21 69:23,25 70:8 71:3,17,18,24 72:19,20

**juvenile** 30:4 31:24

---

**K**

---

**Ken** 6:18 13:11, 15,21

**kind** 8:25 9:12,13 29:15 45:24 61:10,13 62:22

**Knight** 26:19

**knowledge** 17:23

**Knoxville** 25:3

**Krog** 10:16

---

**L**

---

**ladies'** 56:21

**Lamberth** 77:1,3, 6

**language** 68:11, 16

**law** 10:24 11:19 26:12 34:9 38:10 45:21

**lawsuit** 14:17 15:16 36:15,19 45:9

**lead-in** 61:25

**Leader** 11:1,8 14:15

**learn** 15:13

**leave** 28:5,6 41:13

**Lee** 69:23,25 70:8 71:3,17,18,24 72:20

**left** 34:7

**legal** 45:11

**lend** 74:6

**letter** 36:23,24

**level** 73:19

**Lexis/westlaw** 80:6

**liaison** 21:5,9 47:12,15,16,18 48:1,21 51:8,18 69:14,18,21 70:17,21

**liaisons** 47:9,15 50:19 75:19 76:13

**licenses** 12:1

**licensing** 13:4

**light** 41:15

**link** 22:14,16

**list** 19:4,11 46:9, 10

**listed** 17:4 19:1 34:2,3 51:8 72:17 76:12 77:14

**lists** 22:3 47:21,25 48:9

**litigation** 6:18,22 13:20,22 14:6,13 36:23,24 37:1 45:23 46:4,5 64:12

**live** 9:25

**lived** 10:2

**livestream** 41:22

**livestreamed** 40:5,20,23 41:2 42:1,9,15,20 43:2, 6,10,20 55:20

**livestreaming** 40:17

**long** 10:2 11:12 15:21 19:14,23 20:14 21:16 23:10 24:1 26:23 46:13, 14 59:15 61:6 74:1,3

**longer** 20:23 45:6

**looked** 47:21 50:16 66:4

**lower** 51:4 63:9, 11

**Lynn** 33:24 34:6,8

---

**M**

**made** 29:25 32:5 39:8 41:15 49:12, 13 65:6 79:19 80:25

**maintains** 66:10

**majority** 32:12

**make** 17:6,13,22 30:14,21,24 31:6, 10,14,18,22 35:19 40:18 46:22,23 47:9,11 62:2 67:25 68:4,6 75:16,18,21,25 76:3

**makes** 33:2 46:24 47:19,20 49:25 57:25 58:1,24 75:12

**making** 38:3

**malicious** 7:1

**manage** 22:20

**mandatory** 79:21

**map** 67:7

**March** 38:22 39:6, 10,17,19 52:20 53:2,8 55:2

**Marin** 15:4

**maternity** 28:5,6 41:13

**matter** 8:24 13:11, 13,15 14:10 56:23 74:6

**Mcgee** 48:22,23, 25

**Mcmullen** 50:20, 21,23

**Mcnairy** 51:6

**means** 18:13 22:12

**meant** 9:12 23:4

**medications** 8:6

**meet** 25:9,12 67:13

**meeting** 22:14,20 23:7,11,25 24:3 25:2,3,7 27:16,19 28:25 29:2,3 30:6, 9,20 34:23 35:3,6 38:22 39:1,6,7,9, 10,12,15,16,25 40:5,13 41:1,5,12, 17,18,19,23 42:9, 14,17,20,21,24 43:1,2,5,10,19,20 44:19 45:3 52:2,5 53:11,13,21 54:1, 13,19 55:4,10,13 61:16 69:18 71:8 77:25 78:20,22 81:8

**meetings** 18:21 22:7,10,13 23:1,2, 5,8,14,24 24:19, 24 27:3,6,13,20, 24 28:11,18 29:8, 11 32:23 34:20,21 35:9,12,15,20,23, 25 36:7,11 37:24 38:2,6,9,13,14,19 39:19,23 40:18, 19,22 43:7,11,15, 16,24 44:2,13 51:25 52:16,20 53:9,21 54:7,9,12, 20,22,25 55:8,12 57:14 60:3 61:13 67:7 69:6 71:4,6, 13 73:5,7,11,18, 24 74:2,5,15,16, 19,22,24 75:2,6

**member** 24:9 77:4,5,24

**members** 17:3 18:10,13,15,18,22 19:4,8 21:10,19, 20 22:18 23:6 24:25 25:1,3,4,6 29:6,16 30:1,21 32:13 34:4 35:25 36:8,11 37:2 39:11 40:15,18,25 43:23 44:2,7 46:9 47:2 50:6,9,10,12, 14 59:21 64:8 66:22,24 68:25

**memory** 76:10

**Memphis** 25:2 50:20

**mentioned** 13:13 44:22 74:14 78:8

**met** 24:21 25:9 37:7 67:10

**Michelle** 21:16 22:4,15,19 26:23 28:2 32:17 33:9, 19 40:9,10,14,21 41:12 45:7 55:22 60:18,24 61:3,4 67:5,10,13 76:4,7

**Michelle's** 32:23

**middle** 12:18 37:17 49:10,14 50:14

**Mike** 77:20

**mileage** 15:18,23 16:8

**miles** 16:13

**minute** 56:14

**minutes** 34:20,23 56:15,22 81:12

**mirror** 62:18

**modify** 30:2

**modifying** 18:5

**moment** 18:8 24:1

**month** 52:17

**months** 36:18,20 37:2 45:5 54:20, 21 55:5,8

**morning** 6:8,9 19:6 22:3 46:8 72:16

**motion** 30:21

**move** 41:16

**mow** 44:10

**69:2,8 70:11,15 72:17 73:18 75:13 78:2,20,25

**memory** 76:10

**memory**

---

**N**

**named** 6:18 14:16 70:20

**names** 10:15 19:1,4,7 29:14,15 34:4 66:21,23

**Nashville** 7:4 24:25 25:10 26:9 51:9 77:2

**nature** 45:21 54:18 70:4

**Nelson** 6:18,23 13:11,15,21,23

**Nicholas** 9:19 10:16,17,23

**Niko** 10:16

**nod** 8:25

**nods** 70:3 77:10

**Nolan** 11:2,8 14:15

**nonparty** 15:16

**nonvoting** 18:13

**normal** 61:11

**Northern** 14:22 15:5

**notes** 34:17,18

**notice** 27:20,21 28:25 41:11,13,16 58:23 59:17,23 65:22,24

**noticed** 17:10 78:20 79:8

**notices** 67:7

**notified** 20:23 58:22 60:13,24

**notifies** 57:18

**November** 28:8

**number** 14:1 15:23 63:8 80:7

**Lexitas Legal TENNESSEE**
**(615)595-0073**

**O**

oath 8:1

object 36:2 44:9
53:16 69:11 73:14
76:15

observed 29:8
38:5 44:12,17

occasions 36:12

occur 79:17

occurred 79:20,
24

occurs 60:18

office 16:9 17:4
25:12,14 33:6
36:22 37:21 56:6
57:9 66:9

offices 29:7 70:13

official 65:14

officio 18:11

oftentimes 76:24

online 22:19
53:14

open 23:1 27:13,
17 28:19,21 29:2,
3 39:1,20 40:1,2
43:24 44:3,13
78:15

opened 44:20

operate 68:1

opinions 66:12,
13 67:1

option 77:24

oral 42:5 66:25

order 20:16 58:9
75:15

orders 75:18,21,
25 76:3 80:1

originally 13:23
15:3

outlined 9:5

oversee 49:1
51:11

overseen 43:7

**P**

PACER 56:3

package 60:19,24
65:14 67:19,21

packaging 33:20

pages 42:4

part 7:20 20:5,6
24:20,23 25:7
41:12 45:11 64:7,
14 65:11,13 66:10
76:16

participate 27:3
73:6 74:21,24
75:2,6

participated 25:4
39:14 51:24
74:16,18

participates
28:13 74:15

participating
28:11,12 39:22

participation
39:9

parties 7:7

party 6:18 7:1
61:16

pass 77:20

past 60:3 70:14,19

Paul 10:16 37:16

people 42:8 76:11

percent 62:16
63:6 64:1

percentage 63:4

period 58:23
59:17,24 65:22,25

person 20:16
24:22 25:7 48:1,
21 71:15 74:12

personally 77:23

perspective
42:21

phone 71:12,17

physically 24:22
29:7

place 23:6

places 23:25 80:7

plaques 13:1

PLC 10:5 11:2,13
14:15 16:6

pleadings 63:17

pleasure 20:18
68:9,16,20

point 7:4 20:15
21:1 30:11,22
32:15 33:14 36:17
40:14 44:18 56:3
57:21,25 58:5,6,
13,22 59:2 70:19
71:24

points 8:19

Pope 37:15

portion 23:11
24:2

position 73:20

possibly 21:4
61:8 71:22

post 62:22

posted 29:1 66:24

potential 29:24
69:10

practice 10:9,12
16:17,23 26:9
31:6 45:11,21
50:10 63:2,23
64:22 66:18 76:14

practicing 26:12
74:8

precise 80:18

Precisely 47:7

predate 59:18

predicate 53:24
54:4,6

preliminary
44:22,24 45:2,8
55:25 56:4,7,10,
12

prepare 34:19
37:6

prepared 8:3
30:12 32:14

present 32:23
33:9 60:22 78:21

presented 30:13
60:19 65:11

presume 9:10
28:23

pretty 76:19

previously 60:23

Principally 21:9

prior 10:25 24:5,
14 45:2

private 26:6,9
76:14

problems 42:25
43:4

procedure 9:11
16:18,24 18:6
30:3,4,15,17,25
31:6,8,12,16,24
58:8 62:2,25 63:1
64:12,22 66:18

procedures 9:5,8

proceed 73:19

proceedings
78:13,14 81:22

process 32:11
33:1 57:7,13,17
58:4 59:1,6,22
62:5,6 63:14,18
64:7,12 65:11

professor 34:8

promulgate
62:11

proposal 30:6,8,
10

proposals 18:19
29:25 58:8

propose 58:7
64:8

**proposed** 30:19
32:13 43:16 57:16
59:4,18 60:5,8
65:8,9,16 73:7
78:3,6,9 79:8,18,
21 80:3,12

**prosecution** 7:1

**Protection** 46:6

**provide** 56:6 60:8
73:8

**provided** 27:23
40:17 56:10,12

**providing** 17:23
28:3,14

**provision** 39:8

**public** 23:1 27:13,
17,19 28:19,22,25
29:2,3,6,12 39:1,
3,9,20,22 40:1,3,5
41:2,11,16,23
42:10,15 43:24
44:3,13 55:20
58:22,23 59:4,17,
23 65:22,24,25
77:24 78:15,20
80:12

**published** 64:14
65:1

**publishes** 64:24

**pull** 66:17

**purposes** 17:24

**pursuant** 18:4

**put** 59:4

**putting** 34:25
80:12

**Q**

**quarterly** 35:10,
11,15,25 36:7,11
38:19,22 39:19
40:22 53:9,20
54:7,13,18,19,22
55:10 69:6 74:19,
21

**question** 7:19
8:11 26:5 31:2
36:9 53:18,25

54:5,6 56:18
60:15 71:2 81:5

**questions** 6:7 8:3
42:18 61:24 70:6
77:19

**R**

**Rachel** 26:25 27:5

**reached** 36:22

**read** 81:13,14

**real** 46:3

**reappointed**
71:25

**reappointment**
70:6,7 71:21,22
72:1

**reason** 6:16 17:16

**recall** 6:15 12:6,
23 14:1,4 15:3
19:17 20:9 21:18
24:14 25:18 27:5,
7,10,11,15,19,21
29:9,10,13 34:14
37:23 39:16 40:24
45:1 48:5 52:10
53:1,2 56:8,9,13
60:10 68:15 70:4
71:17 72:12 76:7
77:14 78:22
79:23,24 80:14,
16,18 81:2

**receive** 15:17
36:24 55:25

**receives** 33:14

**recess** 57:2

**recollection**
47:23 79:20

**recommendation**
30:10 31:11 32:5
33:4

**recommendation
s** 30:14,18,25 31:6,
15,19,23 32:2,7
33:15 57:9,14,22
58:1,24 59:11
61:17 64:4

**recommended**
80:15,21

**recommending**
43:17

**record** 7:10,12
9:18 13:18 17:7,
13 38:24 57:4
79:25 80:2,8,20
81:19

**refer** 13:21 14:12

**referred** 50:4

**referring** 7:19
17:1 54:23 61:3
64:19 70:24

**refers** 47:16,18

**refiled** 7:5

**reflects** 66:11

**regard** 30:10 38:3
79:21

**reimbursement**
15:18 16:9

**related** 67:11,24
70:25

**relationship**
68:24

**relative** 10:17

**remember** 26:22
73:23 74:3,17

**remote** 22:16
23:2,8,11,14,24
24:3

**remotely** 22:13
24:19 25:7 39:10,
13

**removed** 15:4

**repeat** 31:1 43:25

**rephrase** 29:5
53:18

**report** 30:8,19

**reporter** 9:1
22:17 33:17,19,22
34:11,14,16,19
35:4 70:12 75:5
76:1

**recommended**
80:15,21 _(see above)_

**Representative**
77:1,3,6,23

**representatives**
50:1 77:5

**represented** 15:7
50:18

**represents** 15:9,
20

**requesting** 72:1

**required** 49:17,20
61:9 80:25

**Residence** 14:15

**resolution** 58:11
65:11

**resolutions** 58:9,
15,21

**respect** 28:13

**respects** 62:19

**response** 51:3
54:16 61:23 62:4

**responses** 8:21

**restricted** 49:5

**result** 81:8

**retired** 72:20

**reviews** 29:24

**rewrote** 80:15

**Richardson**
40:16 44:23

**Road** 10:5 16:6

**role** 20:15 21:6,
11,17 22:9,10,11
24:8 34:21 35:22
60:2 73:1 74:5

**roles** 47:6 69:10

**rolling** 20:22

**room** 24:25 25:2
56:21

**rule** 30:3,12,19,
22,25 31:11,15,
19,23 32:2,5,14,
18,20 33:4,14,20
43:16 57:8,14,22
58:1,10,12,14
59:3,19 60:5,8

61:17 63:13,14,
15,17,19,20,22
64:4 65:1,4,5,8,
14,16 69:13 73:8
78:3,6,10 79:2,9,
18,22 80:3,12,15

**rule-making** 38:6

**rules** 9:11 16:17,
23 18:5 29:23,24
30:15,16,25 31:6,
7,12,16,20,24
38:3 57:17 58:7
60:19 61:19,20
62:1,2,11,14,18,
21,25 63:1,5,6,7
64:1,2,5,11,14,16,
21 66:18 67:20

**run** 56:20

**Ryan** 72:25 73:21
74:1,8,21 75:2,22

**Ryan's** 73:1 74:5

---

**S**

**San** 7:8 13:13
14:12,14

**satisfy** 54:12

**schedule** 81:11

**scheduled** 52:6,7

**school** 11:15,19
37:16 38:10

**seamless** 57:13

**search** 80:6

**section** 64:17

**securities** 46:4

**selection** 63:23

**Senate** 58:11

**send** 15:22,24,25
16:10 33:5 65:7

**sends** 59:18
65:21,24

**sense** 9:14 47:19
50:17

**September** 41:5,
17,20,24 51:22
52:2,21 53:2,8,11,

21 54:2 55:9,12

**serve** 18:10 19:25
20:4,18 21:21
50:12,23 61:6
68:9,20 72:8,9

**served** 37:10,20
76:8

**Serves** 68:16

**service** 63:14

**serving** 24:5,14
28:18

**sessions** 51:14

**sets** 34:3

**setup** 29:11

**share** 66:7,15

**she'll** 22:16 28:7

**sic** 54:20

**sign** 81:14

**similar** 37:24 43:6
63:14,16,17,19,
22,24

**simple** 9:13

**simply** 43:15

**sitting** 39:18
52:10

**slightly** 60:15

**Smith** 51:9

**Society** 37:17

**solicitor** 77:15

**someone's** 73:10

**son** 10:19

**Southern** 12:21

**speak** 62:23

**specific** 19:19
47:5

**specifically** 7:20
18:24 20:10

**speech** 45:15,17,
20

**spell** 33:25

**spoke** 71:11,16

**St** 37:16

**staff** 21:20 22:3
27:22 72:24,25
74:13 75:22

**staffed** 68:5

**staggering** 53:9

**Stahl** 77:19,22
79:13 81:5,7,10

**Stahl's** 15:20

**standard** 54:13

**standing** 30:7

**start** 23:24

**started** 24:17
51:21 53:1

**state** 9:17 12:1,11
13:4 15:3 63:2
64:1

**stated** 24:1 62:24

**states** 69:1

**states'** 63:1

**statistically**
50:16

**statute** 15:17
18:17 49:18,21
50:4,8 68:11 69:1

**stenographer**
25:23 81:16

**stress** 42:25 43:3

**strike** 26:5 42:19
60:11

**structure** 68:2

**subcommittee**
60:4,20

**subcommittees**
29:19 68:3 78:5,7

**subject** 74:6

**submit** 79:10

**submitted** 60:25
79:3,8

**substance** 72:7

**sued** 6:25 13:12

**suffix** 76:24

**Suite** 10:5 16:7

**summary** 14:20
29:22,25

**Sumner** 77:13

**support** 22:22
27:23 28:4,15
37:22

**supposed** 41:19

**Supreme** 12:14
16:23,25 17:1
18:4,17 20:14,18
21:2,5,7,10,14
30:13 31:7,11,15,
19,23 32:3,16,21
33:17,21 42:6
43:18 46:23,24
47:2,5,8,11,12,15,
17,18 49:12,16,25
50:5,7 51:18,21
57:18 58:6 59:2,6,
18 62:10 65:8
66:6,11,12 67:1
68:9,17,21,22,25
69:2,3,9,14,17,21,
22 70:10,11,15,
16,21 72:7,9,20,
25 73:17,19 75:12
78:11 79:3,5,17,
18 80:1,3,4,10,11,
15,24

**sworn** 6:4

**system** 12:14

---

**T**

**table** 56:18

**takes** 34:18 49:16

**taking** 34:17

**talk** 70:24

**talked** 72:19

**talking** 44:12
70:23

**Tarwater** 51:19
72:19

**telephone** 25:5
69:20,24 71:8

**tells** 60:18 67:19

**Tennessee** 10:1,
6 12:5,11,18,19,
20 16:7,18 17:1,4
18:4 21:16 25:14
26:13,20 27:1,22
29:1,20 30:2,15,
24 31:5,7,10,14,
18,22 32:3 33:22
37:11,17 38:12,16
42:3 47:8,11
48:14 49:12 50:20
56:5 61:17 62:1,
10,12,13,18 63:3,
4,6 64:13 66:6,9
67:1 68:9 73:17
77:2,5 78:11 79:3

**tenure** 51:21

**term** 19:23 20:20

**terms** 29:23 42:16
43:1

**testified** 6:4 7:6
20:20 43:8 45:4
60:17 75:14

**testify** 17:12,20,
21 39:6 78:8,14
81:1

**testifying** 17:14

**testimony** 17:16
20:7,8 24:19 28:4,
9 38:11 43:5
52:14 55:11 60:4,
8,13,22 61:1
65:19 68:8 71:10,
11 75:11

**Texas** 12:21

**There'd** 80:9

**things** 9:14 67:10
69:15

**Thomas** 37:16

**time** 7:24 8:16
28:17 35:20 36:3
38:8 44:23 45:9
63:25 65:15,19
69:19 81:21

**times** 6:14,15
24:21 60:7,16
65:18 67:16,17,23
69:14 71:16 72:6,
13 80:24

**timing** 63:15

**Title** 62:9

**today** 6:11 8:1,4,
7,11 9:6,9 15:7,
11,13,14,23 17:14
60:12

**told** 28:23 39:5
45:1,8

**total** 67:17

**training** 61:10

**transcript** 81:17

**transfer** 6:19

**transferred** 14:25
15:6

**transmission**
57:12

**transmits** 57:8

**transmitted** 65:1

**transportation**
46:5

**trial** 51:4

**trial-level** 51:12,
16

**true** 38:15

**truthful** 8:8

**Tsiouvaras** 10:16

**type** 6:20 7:1
29:10 40:16 41:11
58:23 65:1 75:15
80:20

**types** 45:25 46:6

**typically** 12:25
17:3 22:15 30:6
46:1 52:16 58:18,
21 62:20 66:2
69:20 80:6

---

**U**

**U.S.** 12:14,15,16

**Uh-huh** 79:6

**ultimately** 14:22,
24 65:10

**undergraduate**
11:15

**understand** 7:22,
25 8:10,22 9:5,8,
15 20:21,25 23:23
32:10,25 47:1
48:10 62:13 64:16
73:11 75:11

**understanding**
8:16 19:24 20:11,
13 21:20 22:2
28:8 33:8,13
34:22 40:6,7
41:10 46:25 49:20
57:7,20 58:3 59:1
62:1 71:7 74:4
76:20 80:20

**understood** 9:4
36:9 57:19 68:7
71:2

**University** 34:9

**unpack** 21:23

---

**V**

**vague** 47:23

**verbal** 8:21 9:1

**versus** 14:15
80:21

**vested** 62:10

**vests** 50:5

**vice** 46:10,13,14,
22 47:6 60:25
61:7 70:12

**video** 29:10 42:1,
12

**videoconference**
24:24 25:1,8

**videos** 42:4

**viewed** 19:6 46:8
72:15

**virtually** 22:19

**vis-à-vis** 68:24

**vote** 18:19,21
30:11 32:12,17
33:2 43:17 57:16
65:3 73:7 81:8

**votes** 57:25 59:10

---

**W**

**waiting** 55:22,24

**waive** 81:15

**wall** 13:1

**wanted** 20:25
40:18 66:17,20,25

**warranty** 46:5

**watch** 39:4 42:4,
5,8

**watched** 42:1,12

**website** 17:5
18:25 19:2 22:3
29:1 34:3 46:8
47:20,21,22 48:22
66:2,7,10,11,16,
19,22,24 67:2,3,4
72:16 76:12 80:1

**week** 15:19

**west** 49:9,14
50:14

**Western** 12:19

**William** 48:1 77:1

**Wisconsin** 7:5
12:22 13:25

**witnesses** 63:21

**word** 76:21

**words** 72:7

**work** 10:4,5 35:5
45:12,16,18

**working** 27:7
35:4

**works** 32:11

**writing** 80:9

**written** 80:2,8

---

**Y**

**year** 11:17,24 12:6
14:4 19:17,24
20:2,5,10,12,21,
22 38:20 53:3

LEXITAS TENNESSEE
(615)595-0073

58:19,21 60:24
61:8 67:6,8 69:5,
9,25 79:23,24
80:14,18

**years** 10:3 11:3,9
19:16 24:14,16
47:24 52:19,23
61:8 67:15 79:16

**Young** 22:21
28:10

**Youtube** 42:4,7

---

**Z**

---

**Z-E-H-R-T** 34:6

**Z-E-R-T** 34:1

**Zager** 73:6,21
74:13,14,18,24
75:23

**Zehrt** 33:24 34:6,
8,11,17,22 35:5
75:5 76:1

**Zehrt's** 34:2

**Zoom** 22:14

*Lexitas Legal TENNESSEE Index of Years to Zoom*
*(615)595-0073*