# EXHIBIT 4

1        IN THE UNITED STATES DISTRICT FOR
         THE MIDDLE DISTRICT OF TENNESSEE
2              NASHVILLE DIVISION
_____
3

DAN MCCALEB, Executive Editor of
4   THE CENTER SQUARE,
5               Plaintiff,
6   vs.                    Case No. 3:22-cv-00439
7   MICHELLE LONG, in her official
    capacity as DIRECTOR of the
8   TENNESSEE ADMINISTRATIVE OFFICE
    OF THE COURTS,
9

                Defendant.
10  _____

11

12

13

14

15
            Deposition of:
16
            MICHELLE LONG
17
            Taken on behalf of the Plaintiff
18          October 25, 2023
            Commencing at 9:04 a.m. CST
19

20

21

22
    _____
23
                   Lexitas Legal
24          Jenny Checuga, LCR, RPR
                555 Marriott Drive
25          Nashville, Tennessee 37214
                  (615)595-0073

*Lexitas TENNESSEE*
*(615)595-0073*

```
1              A P P E A R A N C E S

2

3    For the Plaintiff:

4         MR. M.E. BUCK DOUGHERTY III
          Attorney at Law
5         Liberty Justice Center
          440 North Wells Street, Suite 200
6         Chicago, IL 60654
          (423)326-7548
7         bdougherty@libertyjusticecenter.org

8

9    For the Defendant:

10        MR. MICHAEL M. STAHL
          Assistant Attorney General
11        Office of the Attorney General & Reporter
          PO Box 20207
12        Nashville, TN 37202-0207
          (615)741-3491
13        michael.stahl@ag.tn.gov

14

15

     For the Deponent, Rachel Harmon:
16
          MR. JOHN COKE
17        Attorney at Law
          Administrative Office of the Courts
18        511 Union Street, Suite 100
          Nashville, TN 37219
19

20

21

22

23

24

25
```

*LEXITAS TENNESSEE*
*(615)595-0073*

```
 1                    I   N   D   E   X

 2                                                    Page
           0Examination
 3         By Mr. Dougherty                              5

 4         Examination
           By Mr. Stahl                                154
 5
           Further Examination
 6         By Mr. Dougherty                            157

 7

 8

 9
                    E   X   H   I   B   I   T   S
10
                        (None marked.)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              S  T  I  P  U  L  A  T  I  O  N  S

 2

 3

 4           The deposition of MICHELLE LONG was taken

 5      by counsel for the Plaintiff, at the offices of

 6      500 Charlotte Avenue, Nashville, Tennessee, on

 7      October 25, 2023, by Notice for all purposes

 8      under the Federal Rules of Civil Procedure.

 9           All formalities as to caption, notice,

10      statement of appearance, et cetera, are waived.

11      All objections, except as to the form of the

12      questions, are reserved to the hearing, and

13      that said deposition may be read and used in

14      evidence in said cause of action in any trial

15      thereon or any proceeding herein.

16           It is agreed that JENNIFER CHECUGA, LCR,

17      RPR, and Court Reporter for the State of

18      Tennessee, may swear the witness, and that the

19      reading and signing of the completed deposition

20      by the witness are not waived.

21

22

23

24

25
```

*LexiTas* TENNESSEE
(615)595-0073

```
 1                    *    *    *

 2                  MICHELLE LONG,

 3     was called as a witness, and having first been

 4     duly sworn, testified as follows:

 5

 6                    EXAMINATION

 7     QUESTIONS BY MR. DOUGHERTY:

 8     Q.    Good morning.

 9     A.    Good morning.

10     Q.    My name is Buck Dougherty, I'm an

11     attorney with Liberty Justice Center and I

12     represent the Plaintiff in this lawsuit, Dan

13     McCaleb.  He's the executive editor of the

14     Center Square.  And we'll go ahead and get

15     started with some introduction and kind of

16     ground rules and we'll talk a little bit about

17     that.

18           Have you ever had your deposition taken

19     before today?

20     A.    Only once.

21     Q.    And when was that?

22     A.    Over ten years ago.

23     Q.    Was that -- do you recall, was it a

24     particular lawsuit that you were involved in

25     or --
```

1   A.    It was not -- I believe I was deposed as

2   a fact witness in a lawsuit involving hospitals

3   when I was working at the Tennessee Hospital

4   Association.

5   Q.    And was that lawsuit filed in a Tennessee

6   state court?

7   A.    I think it was federal.

8   Q.    Tennessee federal court?

9   A.    Yes.

10  Q.    Would that have been Middle District of

11  Tennessee?

12  A.    Yes.

13  Q.    Okay.  So you perhaps may recall, you

14  know, I'll ask a question, it's important -- I

15  know when people communicate we nod our heads

16  and give cues, it's important that you give

17  audible verbal statements so our court reporter

18  can pick that up on the transcript, and I'll

19  try to be as clear as possible with my

20  questions.

21      If you don't understand any question at

22  any time, feel free to ask me to restate it,

23  okay?

24  A.    Yes.

25  Q.    And also, we can take a break at any

```
1   point.  If you want to go for an hour and take
2   a break or two hours, that's up to you, the
3   only stipulation is if I've got a question that
4   I've asked and it's on the table, I would ask
5   that you answer that question then before we
6   take a break.
7   A.    Yes, of course.
8   Q.    Okay.  So do you understand that you're
9   under oath today?
10  A.    I do.
11  Q.    And are you prepared to answer the
12  questions that I ask of you truthfully?
13  A.    Yes.
14  Q.    Are you represented by counsel?
15  A.    Yes.
16  Q.    And what is his name?
17  A.    Michael Stahl.
18  Q.    Michael Stahl.
19        MR. DOUGHERTY:  And there's another
20  person here, want go ahead and introduce
21  yourself?
22        MR. COKE:  John Coke, general counsel
23  at the Tennessee Administrative Office.
24        MR. DOUGHERTY:  I don't know if I
25  asked you this, Mr. Coke, are you going to be
```

Lexitas TENNESSEE
(615)595-0073

1    entering a notice of appearance in this

2    lawsuit?

3              MR. COKE:  No, I will not.

4              MR. DOUGHERTY:  Okay.

5    BY MR. DOUGHERTY:

6    Q.    Did you take any kind of medication or

7    are you on any kind of treatment that would

8    hinder your ability to give truthful and honest

9    answers today?

10   A.    No.

11   Q.    Okay.  So you kind of understand kind of

12   our ground rules today?

13   A.    Yes, sir.

14   Q.    Okay.  Please state your full name for

15   the record.

16   A.    Michelle Evette Jones long.

17   Q.    And where have you lived during the last

18   five years?

19   A.    Nashville, Tennessee.

20   Q.    Where do you work?

21   A.    The Tennessee Administrative Office of

22   the Courts.

23   Q.    And what is your position?

24   A.    I am the director.

25   Q.    Do you go by director or is it

Lexitas TENNESSEE
(615)595-0073

1    administrative director or executive director;
2    which title is it?
3    A.    In the statute it is director or I'm also
4    referred to as the chief administrative officer
5    in the statute.
6    Q.    But you refer to yourself as director?
7    A.    Correct.
8    Q.    Okay.  When did you start that position?
9    A.    As director, February of 2022.
10   Q.    Do you remember the specific day; would
11   that have been February 1, 2022?
12   A.    I believe that is correct.
13   Q.    And explain that director position; did
14   someone appoint you to that position?
15   A.    I was appointed by the Tennessee Supreme
16   Court, correct.
17   Q.    And you worked there since February 1st
18   of 2022?
19   A.    Correct.
20   Q.    What did you do prior to your appointment
21   as director?
22   A.    I was deputy director.
23   Q.    And what was the time period in which you
24   were deputy director?
25   A.    I began in October of 2019 as deputy

1    director.

2    Q.    Prior to that, where did you work?

3    A.    Prior to that I worked for the Tennessee

4    Department of Health.

5    Q.    Do you recall the time period in which

6    you were with the Tennessee Department of

7    Health?

8    A.    Seven to eight years.  I think it's

9    closer to seven years.

10   Q.    Okay.  And what was your position with

11   the Tennessee Department of Health?

12   A.    I was assistant commissioner for

13   licensure and regulation.

14   Q.    Is that for hospital licensure?

15   A.    All hospitals, all healthcare facilities,

16   healthcare practitioners, yes.

17   Q.    Was the assistant commissioner, is that

18   an elected or an appointed position?

19   A.    Appointed.

20   Q.    Who appointed you to that position?

21   A.    The commissioner of the Department of

22   Health.

23   Q.    Do you recall that person's name?

24   A.    John Dreyzehner.

25   Q.    How do you spell the last name?

```
 1   A.    D-R-E-Y-Z-E-H-N-E-R.  I'll have to look

 2   at it.

 3   Q.    Is he still working in state government?

 4   A.    No, he's not.

 5   Q.    Okay.  So that's a good window.  Anything

 6   before -- I'm sure you had work before then,

 7   but what did you do prior to the Tennessee

 8   Department of Health?

 9   A.    Prior to the Tennessee Department of

10   Health, I worked as senior vice president and

11   legal counsel for the Tennessee Hospital

12   Association.

13   Q.    Is that a private or a state position?

14   A.    Private.

15   Q.    Is that a nonprofit?

16   A.    Yes.

17   Q.    Is that nonprofit still in existence?

18   A.    Yes.

19   Q.    And where are they located?

20   A.    They are now located in Maryland Farms in

21   Brentwood, Tennessee.

22   Q.    Where were they located when you worked

23   there?

24   A.    Over -- near the fairgrounds.  I can't

25   recall the name of the street.
```

```
1    Q.    Is that here in Nashville?

2    A.    Here in Nashville.

3    Q.    Okay.  All right, let's -- so you're a

4    practicing attorney; is that correct?

5    A.    That's correct.

6    Q.    And where was your undergraduate degree,

7    the school and the year?

8    A.    Northwestern University in Evanston,

9    Illinois, and I graduated in 1990.

10   Q.    Chicago, our office is based in Chicago.

11         And your law school?

12   A.    University of Tennessee, Knoxville.

13   Q.    And what year was your JD?

14   A.    1994.

15   Q.    Do you have any other postsecondary

16   graduate degrees or anything?

17   A.    No, sir.

18   Q.    Okay.  What was the date of your first

19   bar admission?  The year, excuse me.

20   A.    1994.

21   Q.    And was that Tennessee?

22   A.    Yes.

23   Q.    Are you admitted or barred in any other

24   states?

25   A.    Yes.
```

TEXT IN TENNESSEE
(615)595-0073

```
 1    Q.    Where are those states?

 2    A.    Alabama and DC.

 3    Q.    And then do you have, I assume, federal

 4    court admissions?

 5    A.    I did.  I don't maintain them, but yes.

 6    Q.    At one point?

 7    A.    Yes.

 8    Q.    Would that have been the United States

 9    Supreme Court; do you recall?

10    A.    I believe it was when I was working in

11    Alabama, so it would have been not the United

12    States Supreme Court, but the 9th Circuit.

13    Seems there was a case --

14    Q.    The 9th Circuit Court of Appeals?

15    A.    Yes.  Yes.

16    Q.    Okay.

17    A.    Alabama's 9th Circuit.

18    Q.    So you're not talking about the 9th

19    Circuit Court of Appeals in federal court.

20    A.    I am.  I think I am.

21    Q.    Okay.  The 9th Circuit that sits in San

22    Francisco, the federal court?

23    A.    Then no, I'm not, I've got the circuit

24    wrong, I apologize.

25    Q.    Would it be the 11th Circuit Court of
```

*Text of* TENNESSEE
(615)595-0073

```
 1    Appeals?

 2    A.    The 11th.

 3    Q.    Would that be in Atlanta?

 4    A.    Yes.

 5    Q.    That's all right, we're not in federal

 6    law.

 7          So it looks like you had a very lengthy

 8    experience with your legal career, you've held

 9    a lot of state positions.  Is it fair to say

10    you were not in litigation?

11    A.    I started off in litigation, but I did

12    not stay in litigation.  So most of my career

13    is not litigation.

14    Q.    At least the last ten years or so it's

15    been primarily in state --

16    A.    That's correct.

17    Q.    -- organizations?

18    A.    That's correct.

19    Q.    I appreciate your responsiveness.  Just

20    to help her out, just let me finish the

21    question and I'll try to do the same before you

22    answer.  I know -- even though you're

23    anticipating your answer, we'll make sure we

24    help our court reporter out.

25    A.    Okay.
```

*Legal Court Reporting TENNESSEE*
*(615)595-0073*

```
1    Q.    Have you ever been formally disciplined
2    by any state bar, licensing authority?
3    A.    No.
4    Q.    Have you ever been convicted of a crime?
5    A.    No.
6    Q.    Other than this lawsuit, McCaleb versus
7    Long, have you ever been a party to a lawsuit
8    before?
9    A.    No.
10   Q.    So the deposition you gave, the Tennessee
11   Hospital -- the one you mentioned about ten
12   years ago, you weren't actually a party to that
13   lawsuit?
14   A.    That's correct.
15   Q.    Do you recall who the parties were?
16   A.    I do not.
17   Q.    Okay.  Do you recall how that lawsuit
18   concluded?
19   A.    I do not.
20   Q.    All right.  As director -- for purposes
21   of this deposition, I'm going to refer to your
22   office either as the AOC or the TAOC; is that
23   okay?  Do you understand what -- we can do that
24   today?
25   A.    Yes, sir.
```

1  Q.   And I know that you all refer to it as

2  the AOC?

3  A.   We do.

4  Q.   And you're aware that there is a federal

5  AOC as well, right?

6  A.   Yes.

7  Q.   So that's -- just for simplicity

8  purposes, I'll refer to it today as either the

9  AOC or the Tennessee AOC?

10 A.   Okay.

11 Q.   If I'm going to refer to the Federal AOC,

12 I'll make a specific reference to it.

13 A.   Okay.

14 Q.   Okay.  Who is your supervisor as director

15 of the AOC?

16 A.   Chief Justice Holly Kirby.

17 Q.   And how long has Chief Justice Kirby been

18 your supervisor?

19 A.   Since September 1st.

20 Q.   Of this year?

21 A.   Of this year.

22 Q.   And who was your supervisor prior to

23 Chief Justice Kirby?

24 A.   Chief Justice Roger Page.

25 Q.   And is it your understanding that the

1    chief justice of the Tennessee Supreme Court is
         2    always the director's supervisor?
         3    A.    That is my understanding.
         4    Q.    And do you have periodic evaluations on
         5    your performance with the chief justice?
         6    A.    I would say I have weekly evaluations
         7    with the chief justice, but nothing formal.
         8    Q.    What -- explain those; tell me about
         9    those weekly evaluations.
        10    A.    So we have a standing meeting -- I have a
        11    standing meeting with the chief justice every
        12    Friday.
        13    Q.    And what do those standing meetings every
        14    Friday, what at the do they consist of?
        15    A.    Updates on activities at the AOC and then
        16    mostly awareness, I call it situational
        17    awareness.
        18    Q.    What kind of updates?  Are you talking
        19    about court updates?
        20    A.    No, administrative.
        21    Q.    What are some of those administrative
        22    updates that come up in your discussions?
        23    A.    So -- okay, so particularly right now
        24    we're in the process of budget discussions and
        25    so we would talk about the budget priorities

1    for the -- for the Court, for the AOC, those

2    become our priorities.

3    Q.    And does that -- do you also in these

4    weekly meetings and updates discuss any boards

5    or commissions, any administrative issues that

6    are coming up in any of those?

7    A.    I cannot recall anything recently

8    relative to a board -- I take that back.

9         So we recently did salary increases at

10   the AOC across the Judicial Department, and so

11   yes, we talked about boards and commissions

12   salary increases.

13   Q.    Are boards and commissions, do they

14   receive a state salary?

15   A.    Some do.

16   Q.    Which ones do you recall that receive a

17   state salary?

18   A.    So the CLE, the Continuing Legal

19   Education Commission.  The Board of

20   Professional Responsibility has state

21   employees.  TLAP, Tennessee Lawyers Assistance

22   Program has state employees.  And I am -- did I

23   say the Board of Professional Responsibility,

24   Commission on Legal Education, I think those

25   are the three --

1  Q.    And TLAP.

2  A.    -- that have state employees.

3  Q.    What does TLAP stand for?

4  A.    Tennessee Lawyers Assistance Program.

5  Q.    Okay.  And the CLE, that's the group or

6  the division that monitors attorneys' CLEs

7  every year?

8  A.    Continuing legal education, correct.

9  Board of Law Examiners, that's the one I'm

10 forgetting.

11 Q.    So do you make recommendations in terms

12 of salary increases for AOC employees or how

13 does that process work?

14 A.    For AOC employees, yes.

15 Q.    But the CLE, does that come under the AOC

16 Department?

17 A.    No, it has its own director.  Each of

18 those boards have their own director.

19 Q.    Well, help me, I'm just trying to

20 understand.

21       Why would you be involved in salary

22 discussions in budget; does that come under

23 your budget, the CLE?

24 A.    It actually does not, but in order to

25 implement salary increases, we have to

1    implement them at the AOC.

2    Q.    Explain that.

3    A.    So our fiscal director manages their

4    budget as well.

5    Q.    I see.  Well, depending on what CLE or

6    the Board of Professional Responsibility gets

7    in terms of funding, does that affect your

8    office, the AOC?

9    A.    I'm sorry, I don't understand that

10   question.

11   Q.    Sure.  I'm just trying to understand the

12   interconnectedness.

13         How does the salary increases or

14   decreases, adjustments, let's say, in another

15   -- either CLE -- the boards that you listed,

16   CLE, the Board of Professional Responsibility,

17   TLAP or the Law Examiners, how does budgetary

18   issues with respect to those four entities

19   affect the Administrative Office of the Courts

20   and AOC employees?

21   A.    So I would say that it doesn't impact AOC

22   employees, except that our fiscal director and

23   our HR director are the ones responsible for

24   literally keying the salary adjustments.

25   Q.    So your participation in those

```
1    discussions is more just kind of ancillary; is
2    it fair to say?
3    A.    I think that's fair.
4    Q.    Does the -- is it the fiscal director?
5    A.    Correct.
6    Q.    What is that person's name?
7    A.    Dalton Hensley.
8    Q.    And does Dalton Hensley come under your
9    supervision?
10   A.    Yes.
11   Q.    Does the AOC office, do you get involved
12   in the salary adjustments with the judges,
13   state court judges, appellate judges?
14   A.    So their salary adjustments are pursuant
15   to statute, so they get a COLA every year.  In
16   order for that to show up in their paychecks,
17   we literally key the information into a system
18   that pays them.
19   Q.    So your office -- the AOC is just like
20   the name says, your office provides
21   administrative support?
22   A.    That's correct.
23   Q.    What is COLA; what does that stand for?
24   A.    Cost of living adjustment.
25   Q.    That's COLA?
```

TENNESSEE
(615)595-0073

```
 1    A.    Yes.
 2    Q.    Is that a state of Tennessee term or is
 3    that a federal term or just a widely used term?
 4    A.    I think it's a widely used term.
 5    Q.    Okay.  What is your understanding of the
 6    purpose, function and role of your position as
 7    director of AOC?
 8    A.    To provide support to the Tennessee
 9    Supreme Court for the administration of
10    effective, efficient court processes for the
11    administration of justice in Tennessee.
12    Q.    So is it just support to the Tennessee
13    Supreme Court?
14    A.    Yes.
15    Q.    You don't provide support to any other of
16    the courts?
17    A.    I would say we -- the AOC operates at the
18    direction of the Tennessee Supreme Court and
19    the Tennessee Supreme Court has authority for
20    the entire court system.  So all of those other
21    courts are included.
22    Q.    Any responsibility for efficient
23    administration of courts regarding litigants
24    who come into courts?
25    A.    We do have programs that ensure access to
```

LEXITAS TENNESSEE
(615)595-0073

1    justice for litigants, you know, where English

2    is not the first language.  So we do court

3    interpreter programs.  We certify court

4    interpreters so that courts have that -- a

5    certification for legal interpretation

6    available in the courts.

7    Q.    And we'll talk about access to justice in

8    a moment.

9          Do you also -- as part of your duties,

10   are you required to submit a budget each year?

11   A.    Yes.

12   Q.    And I think you just said something about

13   the process.  Is that -- when do you usually

14   typically do that, submit a budget?

15   A.    We have submitted our budget request.  I

16   don't recall the due date, but it has been

17   submitted.  We'll have our first hearing in

18   November.

19   Q.    Is that a public hearing or is that

20   before the General Assembly?  When you say

21   hearing, what do you mean?

22   A.    It's with the Department of Finance and

23   Administration.  So the statute requires us to

24   present our budget to F&A first.

25   Q.    What statute are you referring to?

Texita
TENNESSEE
(615)595-0073

```
1    A.    Couldn't tell you the you citation off

2    the top of my head.

3    Q.    Is it part of the statute that outlines

4    the director's duties?

5    A.    Yes.

6    Q.    When do you typically start getting

7    involved with that budgetary process that

8    you're required by statute to submit?

9    A.    It almost begins at the conclusion of a

10   legislative session, but I would say formally

11   some time in the fall.  But we're gathering

12   information the entire time.

13   Q.    Were you responsible for submitting the

14   budget to the governor in 2022?

15   A.    No, my predecessor submitted the budget

16   in 2022.

17   Q.    And do you know when that would have been

18   submitted -- and I'm referring to the AOC

19   portion -- to the governor?  And then as I

20   understand it, the governor then submits it to

21   the General Assembly; is that how it works?

22   A.    So departments and agencies submit their

23   budget to the Department of Finance and

24   Administration and then the Department of

25   Finance and Administration makes
```

1    recommendations to the governor for his budget.

2    Q.    And who was your predecessor?

3    A.    Deborah Tate.

4    Q.    And do you know why she submitted the

5    budget in 2022?

6    A.    It would have been in the normal course

7    of business.  It would have been submitted in

8    the fall of 2021 and then processed through the

9    next steps in the legislature in 2022.

10   Q.    And that was before you took your role as

11   director in February of 2022; is that correct?

12   A.    That's correct.

13   Q.    So you were Ms. Tate's deputy director;

14   is that right?

15   A.    That's correct.

16   Q.    Is the AOC office responsible for

17   reimbursement payments to any individuals

18   serving on boards and commissions?

19   A.    Yes.

20   Q.    And tell me about that.

21   A.    So expense claims are submitted to our

22   Division for Fiscal Services.  They then review

23   them for appropriateness and then they get

24   submitted to F&A for processing or payment.

25   Q.    And what is F&A?

Tennessee TRANSCRIPTS
(615)595-0073

```
1    A.    Finance and Administration, I apologize.

2    Q.    What do you mean by -- I think I know

3    what you mean, but I want you to explain it --

4    by appropriateness when reimbursement expenses

5    are submitted?

6    A.    So we just check to make sure that it is

7    an eligible expense.

8    Q.    Is there some type of formal guideline

9    that you have that you follow?

10   A.    So we do have guidelines for travel

11   reimbursement.  For example, the day of travel

12   for per diems would not be full day for the per

13   diem, you get a percentage of the day.  So we

14   look for things like that to audit the

15   expenses.

16   Q.    Are those guidelines internal AOC

17   policies or is that by statute?

18   A.    We do have an internal policy, but it

19   mimics the state policy.

20   Q.    It's a state policy or a state statute?

21   A.    I believe it is a policy.

22   Q.    Okay.  Who implements state policies?

23   A.    For that purpose, it would be the

24   Department of Finance and Administration.

25   Q.    F&A?
```

```
 1    A.    Correct.

 2    Q.    But that's not the AOC's F&A, correct?

 3    A.    Well, it's not our Division of Fiscal

 4    Services, correct.

 5    Q.    I just want to understand, the AOC's

 6    fiscal director is Dalton Hensley?

 7    A.    That's correct.

 8    Q.    When you say "F&A," you're referring to a

 9    centralized different Department of Finance and

10    Administration?

11    A.    Yes.

12    Q.    Within the whole state?

13    A.    Yes.

14    Q.    Okay.  Are you responsible or your

15    office, the AOC, for overseeing reimbursement

16    requests from members of the Advisory

17    Commission on the rules of practice and

18    procedure?

19    A.    Could you repeat that?  I am sorry.

20    Q.    Yeah.  Is the AOC responsible for

21    overseeing reimbursement requests from the

22    members of the Advisory Commission on the rules

23    of practice and procedure?

24    A.    To the extent that they are eligible for

25    reimbursement for expenses, then yes.
```

Text & Caption TENNESSEE
(615)595-0073

```
1   Q.    It comes to your office, right?

2   A.    That is correct.

3   Q.    Do you keep records of those

4   reimbursement requests?

5   A.    I do not.

6   Q.    Does your office keep records?

7   A.    Yes.

8   Q.    And how far back does that -- do those

9   records go?

10  A.    I do not know.

11  Q.    But someone in your office would know?

12  A.    Yes.

13  Q.    As director of the AOC, do you survey and

14  study the operation of the state court system?

15  A.    Yes.

16  Q.    Explain how you do that.  What does that

17  look like?

18  A.    So I can give you a specific example

19  relative to -- since I've been director.

20  Technology and the processes relative to

21  E-filing for state courts.  So we have been in

22  the process of surveying what each and every

23  court offers in term of E-filing.

24  Q.    How do you survey?

25  A.    Well, we went out and met with court
```

TENNESSEE
(615)595-0073

```
1   clerks and judges across the state in all three
2   grand divisions, we kind of created teams that
3   went east and west and we all kind of looked at
4   middle to see what the state of E-filing was in
5   as many courts as we could cover.
6   Q.    Does the AOC office keep records of these
7   surveys?
8   A.    I have my notes.
9   Q.    Okay.  What does that mean, your notes?
10  A.    So in the process of meeting with court
11  clerks to understand what their systems looked
12  like, I took notes to make sure we could
13  compare from county to county what was
14  happening.
15  Q.    Who do you share those notes within the
16  AOC or the court system?
17  A.    I have not shared my notes.
18  Q.    You have not shared your notes?
19  A.    No.
20  Q.    You still have your notes?
21  A.    Yes.
22  Q.    Are those at your office?
23  A.    Yes.
24  Q.    Okay.  Do they get inputted into the
25  electronic system or computer system or
```

Veritas TENNESSEE
(615)595-0073

1    anything like that?

2    A.    No.

3    Q.    Do you share your notes with the justices

4    on the Supreme Court?

5    A.    Are you asking me if I shared the

6    physical paper that my --

7    Q.    Either.  When I say "share your notes,"

8    either discussed your notes with someone in the

9    AOC or the court system or physically shared

10   your notes with someone?

11   A.    I have discussed.

12   Q.    Okay.  Let's do that then.  Who have you

13   discussed -- within the AOC, let's start with

14   the AOC first.  What individuals have you

15   discussed based on your survey and based on

16   your notes?

17   A.    I have discussed what I learned with our

18   director for information technology services.

19   I have --

20   Q.    What's the person's name?

21   A.    Brandon Bowers.

22   Q.    Okay.

23   A.    Members of his team, Amanda Hughes.  I

24   have discussed the takeaways from that physical

25   survey of courts with our appellate court

```
 1    clerk, Jim Hivner.  I discussed the takeaways
 2    with Chief Justice Roger Page.  Maybe that's --
 3    maybe that's all.
 4    Q.    And what was -- if you can summarize,
 5    what was the takeaway?
 6    A.    The takeaway was that there was no
 7    uniformity across our courts.  There were some
 8    impediments to E-filing that we needed to
 9    overcome.  Those were the major takeaways.
10    Q.    And has there been a process of next
11    steps to -- strike that question.
12          From the takeaways, did you make a
13    recommendation to anyone based on your survey?
14    A.    Yes.
15    Q.    Who did you make recommendations to?
16    A.    Chief Justice Roger Page.
17    Q.    Were those discussed verbally with him or
18    did you make your recommendations in writing?
19    A.    Verbally.
20    Q.    Do you recall when that was?
21    A.    Probably the end of the calendar year in
22    2022.
23    Q.    The end of 2022?
24    A.    Correct.
25    Q.    December of 2022, approximately?
```

TEXTA REPORTING, TENNESSEE
(615)595-0073

```
 1    A.    Yes.

 2    Q.    So what were your verbal recommendations?

 3    A.    Recommendations were that our case -- the

 4    state's case management system was inhibiting

 5    courts from being able to as rapidly deploy

 6    E-filing as we may have desired and that we

 7    needed to work with our vendor to make sure

 8    they were actively improving their system such

 9    that it was not limiting courts from being able

10    to E-file.

11    Q.    When you say "vendor," are you talking

12    about some outside technology vendor?

13    A.    That's correct.

14    Q.    What's the name of the vendor?

15    A.    Local Government.

16    Q.    That's the name of the vendor?

17    A.    That is the name of the vendor, Local

18    Government Corporation located in Columbia,

19    Tennessee.

20    Q.    Okay.  Is that a vendor that the AOC

21    office has contracted with previously?

22    A.    Yes.

23    Q.    Did Chief Justice Paige implement your

24    verbal recommendations?

25              MR. COKE:  Object --
```

```
 1              MR. STAHL:  Object to the form.

 2              THE WITNESS:  Did he implement --

 3    I'm sorry, say it again.

 4    BY MR. DOUGHERTY:

 5    Q.    Yeah, I want to make sure I understand.

 6          You said you gave verbal recommendation

 7    to see Chief Justice Paige in the end of 2022

 8    in December; is that right?

 9    A.    That's right.

10    Q.    And it was regarding the vendor, the

11    Local Government Corporation, regarding the

12    technology in your survey; is that accurate?

13    A.    That's right, that is accurate.

14    Q.    So what were your verbal recommendations

15    to Chief Justice Page?

16    A.    So first and foremost was to address our

17    case management system, which is that vendor.

18    Q.    Right.

19    A.    And so yes, that was accepted.

20    Q.    What do you mean by "accepted"?

21    A.    We are in the process currently of

22    expanding -- okay, so from that recommendation,

23    what we learned -- the court has engaged in a

24    technology oversight review for the court.  Out

25    of that, we expect to do competitive bids for
```

*Text of* **MIDDLE TENNESSEE**
*(615)595-0073*

1    an overall system to provide uniform case

2    management, E-filing across the state.  So it's

3    broadened our view of what is needed to move

4    the state forward.

5    Q.    Previously I used the word "implement,"

6    you said "accepted," so does that mean that

7    Chief Justice Page with respect to this first

8    verbal recommendation, the vendor, that he

9    accepted your recommendations?

10                MR. STAHL:  Object to the form.

11                THE WITNESS:  So yes, he accepted the

12   recommendations and takeaway from our survey,

13   yes.

14   BY MR. DOUGHERTY:

15   Q.    How does he display that he's accepting

16   one of your recommendations?

17   A.    By first creating a Technology Oversight

18   Committee and designating one of the chief

19   justices to head up that work.

20   Q.    And when was that --

21   A.    One of the justices.

22   Q.    When was that technology committee

23   created, if you can recall?

24   A.    I would say the spring of this year, of

25   2023.

1    Q.    Okay.

2    A.    I think that's right.

3    Q.    So were there any other verbal

4    recommendations, other than the vendor, that

5    you made to Chief Justice Page?

6    A.    No, because most everything hinges on the

7    case management system.

8    Q.    Now, is the case management system that

9    you're talking about, is that different from

10   like the YouTube channels and livestreaming?

11   A.    Yes.

12   Q.    Okay.  Let's talk a little bit about the

13   YouTube channels and livestreaming, okay?

14   A.    (Nodding head.)

15   Q.    Did that issue come up in your survey

16   that you've talked about where you went to each

17   grand division?

18   A.    No.

19   Q.    What is your understanding of the two

20   YouTube channels and the livestreaming that the

21   AOC does?

22   A.    What is my understanding?

23   Q.    Explain what your office -- or let me

24   start real quick.

25         Does your office involve providing

1   livestream services to court proceedings?

2   A.    Yes.

3   Q.    Does your office provide livestreaming to

4   various meetings of boards and commissions to

5   the public?

6   A.    I don't know about boards and

7   commissions.

8   Q.    Well, do you -- is it your

9   responsibility -- or whose responsibility is it

10  on the AOC website to kind of oversee that

11  website?

12  A.    Our communications director, Barbara

13  Peck.

14  Q.    Are you aware that of a preliminary

15  injunction that was entered in this case?

16  A.    Am I aware of it?

17  Q.    Yes.

18  A.    Yes.

19  Q.    And what is your understanding of that

20  preliminary injunction with respect to what the

21  AOC office was required to do?

22  A.    We were required to offer in person or

23  virtual access to the rules -- Advisory

24  Commission on rules.

25  Q.    And so when was the first time you saw

```
 1   that preliminary injunction?

 2   A.    Sometime in March of this year.

 3   Q.    And who provided that preliminary

 4   injunction to you?

 5   A.    Probably our legal counsel, John Coke.

 6   Q.    Who did you speak with within the AOC or

 7   the court system about the preliminary

 8   injunction?

 9   A.    I would have only had conversation with

10   John Coke to make me aware of the order and I

11   don't recall having any other conversations

12   about it.

13   Q.    Did -- as part of the preliminary

14   injunction -- so you just said the virtual.

15   When you say "virtual," does that mean

16   livestreaming?

17   A.    Yes.

18   Q.    Is that something that you made sure took

19   place after the preliminary injunction in terms

20   of livestreaming or virtual so the public could

21   view the meeting virtually?

22   A.    So I have to say March was a difficult

23   month for me, I had a significant loss of a

24   family member that month.  So I do know that

25   the intention was certainly to comply with the
```

Text&Table TENNESSEE
(615)595-0073

```
 1    order, but I took no steps myself.  I relied on
 2    my team to make sure we were in compliance with
 3    the court order.
 4    Q.    Sorry to hear about that, but -- I just
 5    want to make sure, we're talking about March of
 6    2023, this year, right?
 7    A.    Yes.
 8    Q.    Okay.  Were you out of the office on
 9    leave a period of that time?
10    A.    Yes.
11    Q.    How long were you out?
12    A.    So I know -- probably two weeks.  I think
13    two weeks.
14    Q.    Do you recall when that might have been
15    in March?
16    A.    So March 9th -- a week following
17    March 9th, I returned to work the next week,
18    and then I think maybe a week after March 26th.
19    Q.    And if we need to take a break, we've
20    been going --
21    A.    No, I'm fine.
22    Q.    Okay, that's fine if we need to, we've
23    been going about 45 minutes.
24          So you were out for a couple weeks there
25    in March and so you said you relied on your
```

```
 1    team to assist with compliance with the
 2    preliminary injunction; is that right?
 3    A.    That's right.
 4    Q.    Who was part of your team then?
 5    A.    So Deputy Director Rachel Harmon was
 6    serving in my absence, and then basically every
 7    division director at the AOC was making sure
 8    that things continued seamlessly during my
 9    absence.
10    Q.    Just how many different divisions are
11    there within the AOC?
12    A.    Six.
13    Q.    And can you name those six divisions?
14    A.    Yes.  So there's our Fiscal Services
15    Division; Communications and Judicial Resources
16    Division; Access, Innovation and Collaboration;
17    Information Technology Services Division; Legal
18    Services and Judicial Development.  And I'm
19    forgetting one.  Executive.  I'm forgetting
20    somebody.
21    Q.    And it's not a quiz, I'm just -- is
22    that -- let me ask you this:  Are those
23    divisions required by statute?
24    A.    No.
25    Q.    So who makes the determination on
```

*Text* **TENNESSEE**
(615)595-0073

```
1    creating or disbanding divisions; is that the

2    AOC director?

3    A.    Yes.

4    Q.    Have you ever created or implemented one

5    of these divisions or were they already in

6    place when you got there?

7    A.    They were in place when I got there.

8    Q.    Okay.  Do you appoint the directors of

9    the various divisions?

10   A.    Yes.

11   Q.    So you did -- when you took over in

12   February of 2022 you appointed new division

13   directors?

14   A.    Yes.

15   Q.    How did you do that?  Do you -- do you

16   hire from within the AOC or do you put out bids

17   or how does that process work?

18   A.    Well, so the only director I have hired

19   was director for legal services and we did

20   publish notice and did about three rounds of

21   interviews for that.  We had an internal

22   candidate who was John Coke for that position,

23   and he was the successful candidate.

24   Q.    So you hired Mr. Coke?

25   A.    Yes, I did.
```

1    Q.    Okay.

2    A.    He was already employed at the AOC, but

3    yes, elevated him.

4    Q.    I see.  And you mentioned Deputy Director

5    Harmon, we'll talk a little bit about her.

6    You're aware that she gave a deposition in this

7    case?

8    A.    Yes.

9    Q.    Kind of skipped over -- when we were

10   talking about technology, I kind of want to

11   circle back do that, the livestreaming and the

12   virtual what you were talking about.

13         When I say what is your understanding of

14   the livestreaming and the virtual YouTube

15   channels, number one, is that something that

16   your office oversees?

17   A.    Yes.

18   Q.    And so when the preliminary injunction,

19   and I appreciate you sharing that information,

20   you were out, your team is helping you, who

21   made the decision -- because as you said, I

22   think the preliminary injunction said you

23   either have to have in-person public observing

24   or observing by livestreaming.

25         Who made the decision to go livestreaming

Lexitas TENNESSEE
(615)595-0073

1   to comply with the injunction?

2   A.    I don't know.

3   Q.    Well, was that you or did you delegate

4   that to someone?

5   A.    I would have only directed compliance

6   with the order, the how would have been someone

7   else on the team.  I did not.

8   Q.    How did you delegate or direct

9   compliance?  Did you do that through an e-mail

10  or verbal communication?

11  A.    It would have been verbal and understood

12  that we had a court order.  And so when that

13  was communicated to me, of course we're going

14  to comply with that court order.

15  Q.    Do you know if you sent an e-mail?

16  A.    I did not send an e-mail.

17  Q.    Do you know if anyone sent an e-mail

18  internally?

19  A.    I do not know.

20  Q.    Did you communicate with the justices

21  about this preliminary injunction?

22  A.    I think it came up in communication,

23  again, situational awareness that we had

24  received the order, but that would have been

25  the extent of it, just to update them.

```
 1    Q.    When did you first become aware of this

 2    lawsuit?

 3    A.    Soon after I became director.

 4    Q.    Would that have been around the time it

 5    was filed in June of 2022?

 6    A.    Well, I thought June of 2022 was -- let

 7    me...

 8          I thought June of 2022 was the amended

 9    complaint in this matter.

10    Q.    They were filed in the same month, I

11    believe.

12    A.    Okay.

13    Q.    And that's -- I'm not so much worried

14    about dates, I assume you became aware of it

15    when it was filed?

16    A.    Yes.

17    Q.    Okay.  Or shortly thereafter.

18          When you got it, did you issue any type

19    of litigation hold notice to your AOC

20    Department and your team?

21    A.    That was done by our legal counsel at the

22    time.

23    Q.    So there was a litigation hold sent out,

24    as far as you're aware?

25    A.    Yes.
```

```
1    Q.    Did you see that litigation hold?

2    A.    I don't recall.

3    Q.    Who would have been the counsel that

4    would have --

5    A.    Rachel Harmon.

6    Q.    Was she serving in a dual role?

7    A.    Yes.

8    Q.    She was your director and then she was

9    transitioning out of her role as general

10   counsel; is that right?

11   A.    Yes, we were in the process of hiring at

12   that time.

13   Q.    Was that litigation hold letter shared

14   with the justices?

15   A.    I don't know.

16   Q.    Did you discuss with the justices holding

17   any kind of information that they may have that

18   might be relevant to this lawsuit?

19   A.    I did not.

20   Q.    Do you know if Deputy Director Harmon

21   did?

22   A.    I do not know.

23   Q.    As part of your role as director at the

24   AOC, do you provide legal advice to any of the

25   justices on the Supreme Court?
```

TENNESSEE
(615)595-0073

```
 1   A.    I do not.
 2   Q.    Have you ever delegated to any of your
 3   employees that they provide legal advice to the
 4   justices?
 5   A.    No, I would not ne in that position of
 6   delegating that.  I'm not hired for legal
 7   advice.
 8   Q.    Right.  Explain that.  What do you mean
 9   by that?
10   A.    Well, my role is not one of legal advice
11   and counsel to the courts.
12   Q.    Is Deputy Director Harmon's role legal
13   advice to the courts?
14   A.    I think she does provide legal advice and
15   support to the courts, yes.
16   Q.    And in what --
17   A.    Or did as general counsel.
18   Q.    I'm sorry, I didn't mean to interrupt.
19         Does she provide legal advice to the
20   courts in her role as deputy director?
21              MR. STAHL:  Object to the form.
22              THE WITNESS:  No, I don't believe so.
23   BY MR. DOUGHERTY:
24   Q.    Did she provide legal advice to any of
25   the justices in her role as deputy director?
```

*Excita* TENNESSEE
(615)595-0073

```
 1            MR. STAHL:  Object to the form.

 2            THE WITNESS:  Can you repeat that?

 3   BY MR. DOUGHERTY:

 4   Q.    Yeah.  Does Deputy Director Harmon

 5   provide legal advice to any of the Tennessee

 6   Supreme Court justices in her role as deputy

 7   director?

 8   A.    I don't believe so.

 9   Q.    Okay.  As -- you kind of referenced the

10   statute a moment ago that you would agree that

11   there -- a lot of your duties and

12   responsibilities are created by statute; you

13   would agree with that?

14   A.    I agree.

15   Q.    And it's a very long list?

16   A.    It is.

17   Q.    How do you go about when you took over

18   the position, fulfilling your obligation as

19   director to make sure all those things that are

20   listed in the statute that you take care of;

21   how do you do that?

22   A.    Well, through the organizational

23   structure that we have, and the division

24   directors are responsible for various parts of

25   what's listed there in the statute, and then
```

1    those other duties are as assigned by the
2    Court.
3    Q.    And you were serving as deputy, so you
4    had some experience and you kind of knew what
5    you were getting into, I guess, right?
6    A.    Yes.
7    Q.    I was just wondering if there's any --
8    for lack of a better word, is there any kind of
9    handbook or any kind of training that you went
10   to or continuously go through as director to be
11   able to fulfill your obligation?
12   A.    The training is on the job and it is
13   every day.  So no, there's no handbook.
14   Q.    There's no handbook, okay.  I was just
15   wondering.  So there's no way to take what's in
16   that statute and put it into practice when
17   you're starting your position?
18   A.    So I will say as deputy director, I was
19   tasked to review all of the statutes pertaining
20   to the Court and the AOC for the duties and
21   responsibilities.  So yes, we did engage in an
22   effort to inventory everything that the statute
23   required us to do to make sure that it was
24   being handled somewhere in the AOC.
25   Q.    And is that in your electronic system

TENNESSEE TEXT & TABLE
(615)595-0073

1    somewhere or your hand -- I mean is it
2    somewhere that would be available?
3    A.    I do have that, yes.
4    Q.    Okay.  And what do you call that?
5    A.    Just called it AOC duties and
6    responsibilities.
7    Q.    Okay.  Do you still -- are you active
8    with your legal status in Tennessee?
9    A.    I maintain active status, yes.
10   Q.    So you have to take 15 hours of CLE
11   credits every year; is that right?
12   A.    Yes.
13   Q.    And do you take any additional type of
14   training or education for your role as director
15   of the AOC?
16   A.    It doesn't qualify for continuing legal
17   education, but I participate with my
18   counterparts in other states in what is the
19   State Court Administrator Conference.
20   Q.    Yeah, that's kind of what I'm talking
21   about.  So what do you call that other
22   organization?
23   A.    I think it's COSCA, and I think it stands
24   for Center -- Council on State Court
25   Administrators, I think.  COSCA, yeah, COSCA.

TEXTLAR TENNESSEE
(615)595-0073

```
1    Q.    COSCA, okay.
2          Where is that organization; does it have
3    a headquarters?
4    A.    No, the head -- it's an arm of the
5    National Center of State Courts.
6    Q.    How frequently do you go to conferences
7    or training or however you refer to it; is that
8    an annual or is it monthly?
9    A.    As I can.  So I try to attend the annual
10   meeting and the mid-year meeting.  So far, I've
11   only been in the job a year and a half, almost,
12   I have attended two conferences.
13   Q.    And where were they held; do you recall?
14   A.    One was in Chicago and one was in
15   Alabama.
16   Q.    Where in Alabama?
17   A.    Point Clear.
18   Q.    Good place.
19   A.    Beautiful place.
20   Q.    That hotel right there on the water?
21   A.    Yes.
22   Q.    All right.  What types of topics do you
23   all discuss at the COSCA meetings that you've
24   been to so far?
25   A.    Whatever the challenges are facing state
```

1    courts.  And so we've had topics on judicial

2    security, definitely topics on E-filing and

3    modernizing court systems.  I guess I entered

4    kind of post pandemic, so there was lots of

5    education and learning around things that had

6    been developed during the pandemic to ensure

7    access to courts, and so there was a lot of

8    discussion in some of those first meetings

9    around what we learned could be done to ensure

10   open courts.

11   Q.    And did -- to ensure open courts, is that

12   also -- did other topics come into play about

13   open meetings that the AOC offices oversee?

14   A.    So, no, it was more about the quick

15   deployment of resources, like Zoom and the soft

16   video conferencing ability for judges to

17   conduct business remotely from the court house.

18   Q.    So would you say in your estimation that

19   since the pandemic, there's -- most AOC offices

20   around the country are doing a lot more with

21   technology and Zoom and livestreaming?

22   A.    Yes.

23   Q.    And do you feel that the Tennessee AOC

24   office is keeping up with the technological

25   advances with respect to livestreaming and Zoom

1    and all the technology that's out there?

2    A.    Yes.

3    Q.    Have you -- in your role as director of

4    AOC, have you ever studied any of the federal

5    AOC practices with respect to having open

6    meetings?

7    A.    I have not.

8    Q.    Were you aware that there is a Federal

9    Advisory Committee that's very similar to the

10   Tennessee Advisory Commission on rules and

11   practice?

12   A.    Only from reviewing the pleadings in this

13   matter.

14   Q.    Were you aware of that federal analog

15   before this lawsuit?

16   A.    No.

17   Q.    Since this lawsuit was failed, have you

18   ever viewed any of the federal analog meetings

19   on YouTube or wherever they have them that's

20   open to the public?

21   A.    No.

22   Q.    Okay.  Have you ever talked with anyone

23   in the Federal AOC office about how they do

24   that in terms of having their meetings open to

25   the public?

*Texita* TENNESSEE
(615)595-0073

```
1    A.    No.
2    Q.    Have you ever spoken to any of the
3    justices on the Supreme Court about the federal
4    meetings that are open to the public?
5    A.    No.
6    Q.    Have you ever spoken to anyone in the AOC
7    office about the federal meetings like the
8    Advisory Commission that are open to the
9    public?
10   A.    No.
11   Q.    Do you know of any other -- in your COSCA
12   group meetings, has that discussion ever come
13   up where they've got like an equivalent
14   Advisory Commission like Tennessee, any
15   discussion about having their meetings open to
16   the public?
17   A.    No.
18   Q.    Are there certain states -- well, strike
19   that.
20         This COSCA group, do you have -- are you
21   like on an e-mail list or how do you get
22   informed?  Is it an annual registration?  What
23   does that look like?
24   A.    So there is an annual registration to
25   participate.  There's a Listserv and an e-mail
```

```
1    group among us.
2    Q.    Have you ever had any -- are there any of
3    the other states that you reach out to that are
4    part of that COSCA group that you've
5    established a relationship with?
6    A.    Do you mind repeating?
7    Q.    Yeah.  So as I understand it, this COSCA
8    group, they have other similar Michelle Longs
9    in like Arkansas or Florida, Michigan,
10   wherever.  Do you have a special relationship
11   with any of your counterparts in any of these
12   other states?
13   A.    I have formed relationships with other
14   AOC directors, yes.
15   Q.    Do you recall who those are?  And I don't
16   mean everybody, I just mean people that -- if
17   you had to pick up the phone and call someone
18   who is -- let's see what they're doing, is
19   there anybody that sticks out to you that you
20   would reach out to?
21   A.    So David Slayton is one person I have
22   reached out to.  He's no longer there.  But
23   E-filing and vendors that other states have
24   used for E-filing, I have had conversation with
25   other state court administrators on that topic,
```

```
 1    yes.
 2    Q.    Mr. Slate [sic], what state was he in or
 3    with the AOC?
 4    A.    Well, he was at the National Center for
 5    State Courts, but I think he's now in
 6    California.
 7    Q.    Okay.
 8    A.    And then I cannot remember her name, it's
 9    escaping me right now, but I did have the
10    opportunity to speak with another state that
11    was engaging in an RFP for court system case
12    management and E-filing, and her name escapes
13    me right now.
14    Q.    So the National Center for State Courts
15    and COSCA, have they ever reached out to the
16    Feds about the PACER system?  Why can Tennessee
17    courts not use the PACER system?
18    A.    Why can we not use the PACER system?
19    Q.    Maybe I'm assuming something.
20          Can the Tennessee courts use the PACER
21    system?
22    A.    Well, first of all, the PACER system is
23    being revamped right now, so they're in no
24    better shape than we are, but PACER was not
25    designed for the reporting and the data
```

*Text a* TENNESSEE
(615)595-0073

1    collection that we ultimately want, it was

2    purely an E-failing system.

3    Q.    Let's talk about that.  What is it that

4    you as Tennessee AOC director want?  You don't

5    just want a place where attorneys can file

6    lawsuits online, what do you mean by collecting

7    and reporting; what do you mean?

8    A.    So it's a continuum in my view.  It

9    starts with E-filing, that's where cases enter

10   the door.

11   Q.    Right.

12   A.    We want to capture that information in a

13   robust uniform way in our case management

14   system and then have all of that information

15   report to a data repository or warehouse where

16   we can then produce reliable reports.

17   Q.    And so is it -- what do you call that?

18   It's not just E-filing, what do you call that

19   what you're explaining?

20   A.    We have been calling it an enterprise

21   court information system.

22   Q.    And if you had this court information

23   system as you explained it, would that better

24   assist you in fulfilling your statutory duties

25   as AOC director?

1  A.    Yes.

2  Q.    Who have you shared this information with

3  on this enterprise system within the AOC or the

4  justices?

5  A.    So definitely with the Technology

6  Oversight Committee, which is headed by Justice

7  Sarah Campbell; our appellate court clerk, Jim

8  Hivner; my IT director, Brandon Bowers.

9  Q.    Now, Mr. Hivner is on the Advisory

10  Commission for the rules of practice and

11  procedure; is that right?

12  A.    Yes.

13  Q.    Has he ever expressed any or shared

14  information with you about how technology could

15  help the Advisory Commission?

16  A.    No.

17  Q.    Have you ever discussed with him how

18  technology could better assist the Advisory

19  Commission?

20  A.    No.

21  Q.    Do you know if anyone in your office

22  spoke with Mr. Hivner on technology and after

23  the preliminary injunction was entered?

24  A.    I don't know.

25  Q.    Did your team, when the preliminary

1    injunction was entered, also communicate with

2    anyone on the Advisory Commission about the

3    injunction?

4    A.     I don't know.

5    Q.     Does the Advisory Commission on the rules

6    of practice and procedure provide meeting dates

7    to the AOC office?

8    A.     I don't -- I don't know.

9    Q.     Do any boards and commissions, other than

10   the Advisory Commission, provide meeting dates

11   to the AOC office?

12   A.     So I -- I know the Access to Justice

13   Commission does.  I don't know other than that.

14   Q.     I'm about to get into the Access to

15   Justice.  It's like ten after, I've got a

16   fairly long line of questioning on it.  It's

17   whatever you all want to do.

18          MR. STAHL:  Do you want to stretch

19   your legs before we go for another hour?

20          THE WITNESS:  Sure.

21          MR. STAHL:  Why don't we come back at

22   10:20.

23          (Short break.)

24   BY MR. DOUGHERTY:

25   Q.     So we're back on the record, Ms. Long.

1    We talked a little bit about the Advisory

2    Commission on the rules of practice and

3    procedure this morning, haven't we?

4    A.    Yes.

5    Q.    Okay.  And that body was created by

6    TCA 16-3-601.  So I want to talk some more

7    about it and I'll just refer to it as the

8    Advisory Commission if that's okay?

9    A.    Yes.

10   Q.    I know in the pleadings in the briefing

11   there are -- lots of different names were used,

12   but we'll refer to it as the Advisory

13   Commission.

14         When did you first become aware of the

15   Advisory Commission either in your role as

16   deputy director or director or were you aware

17   of it before then?

18   A.    I first became aware of it with a Supreme

19   Court order assigning court liaisons to the

20   various boards and commissions.

21   Q.    Was that when you were deputy director or

22   as director?

23   A.    I think it's deputy director.

24   Q.    And do you recall that particular order,

25   when that might have been?

TEXAL TENNESSEE
(615)595-0073

```
1    A.    I do not.
2    Q.    And who was the signed, of the order that
3    you're referencing, who was that individual
4    that was in the order -- named in the order?
5    A.    Justice Sharon Lee for the Advisory
6    Commission.
7    Q.    Did you work with Justice Lee at some
8    point?
9    A.    Yes, she was a member of the Supreme
10   Court.
11   Q.    Right.  Okay, I just -- she was chief
12   justice at one point, too, was she not?
13   A.    She was.
14   Q.    Was she chief justice when you were
15   deputy director?
16   A.    No.
17   Q.    Okay.  Who was the chief justice when you
18   were deputy director?
19   A.    Justice Bivins, Jeff Bivins.
20   Q.    And then when you were director first,
21   the chief justice was Roger Page; is that
22   right?
23   A.    Yes.
24   Q.    And in September Chief Justice Kirby took
25   that position?
```

Lexitas TENNESSEE
(615)595-0073

```
 1    A.    Yes.
 2    Q.    Okay.  Justice Lee retired I think end of
 3    August; is that right?
 4    A.    Yes.
 5    Q.    But she was also -- Justice Lee was on
 6    the Advisory Commission, correct?
 7    A.    Yes.
 8    Q.    Was she on the Advisory Commission when
 9    you were deputy director?
10    A.    Yes.
11    Q.    Was she on the Advisory Commission when
12    you were director?
13    A.    Yes.
14    Q.    Tell me about your conversations with
15    Justice Lee regarding the Advisory Commission.
16    A.    I never had any.
17    Q.    Okay.  So you just saw that order and it
18    referenced her that she was the liaison for the
19    Advisory Commission?
20    A.    Yes.
21    Q.    All right.  What is your understanding of
22    the function of the Advisory Commission?
23    A.    To recommend rule changes for practice
24    and procedure for the various courts, criminal,
25    civil, juvenile, appellate court, and rules of
```

*Veritext* TENNESSEE
(615)595-0073

```
 1    evidence.
 2    Q.    And the AOC provides administrative
 3    support to the Advisory Commission; is that
 4    right?
 5    A.    Yes.
 6    Q.    Does the AOC have one of its employees
 7    that serves as a liaison to the Advisory
 8    Commission?
 9    A.    Yes.
10    Q.    And who is that?
11    A.    Michelle Consiglio-Young.
12    Q.    Was Michelle Consiglio-Young the liaison
13    to the Advisory Commission when you were deputy
14    director?
15    A.    Yes.
16    Q.    Is Michelle Consiglio-Young still the
17    liaison since you've been the director of the
18    AOC?
19    A.    Yes.
20    Q.    Do you communicate with Michelle
21    Consiglio-Young with respect to her role as
22    liaison to the Advisory Commission?
23    A.    No, I've not had any -- no.
24    Q.    When would you have a need to communicate
25    with her about her role on the Advisory
```

1    Commission?

2    A.    If there was a conflict for scheduling a

3    meeting in a particular location.  Like

4    sometimes we'll get double-booked at the AOC,

5    so she might come to me to resolve a conflict

6    for meeting location.  Beyond that, I can't

7    really think of a need.

8    Q.    What do you mean by getting double-booked

9    at the AOC for meeting locations?

10   A.    So we only have a few conference rooms.

11   So if there was a need to use the conference

12   room for a meeting and there was something else

13   scheduled at the same time --

14   Q.    So you mean --

15   A.    -- she might engage me to resolve a

16   conflict.

17   Q.    So you mean if the Advisory Commission

18   had a meeting scheduled at the AOC and it

19   conflicted with another meeting, you would

20   communicate with Ms. Michelle Consiglio-Young?

21   A.    Yes.

22   Q.    Okay.  Where is records -- where are

23   records kept of these meetings where this

24   double booking might come to your attention?

25   A.    Oh, I don't know that there are records

1    kept.

2    Q.    Well, how do you know that double-booking

3    presents itself; how do you become aware of

4    that?

5    A.    So it would be the liaison saying we need

6    to -- or the commission, the board, whatever

7    wants -- needs to meet at a particular time and

8    the conference room is booked.  So we have an

9    electronic system that schedules the conference

10   rooms, and so if there was a need to move

11   someone or rearrange such that we could utilize

12   another area, that might come to me.

13   Q.    What's the electronic system that

14   schedules the conference room; what is that

15   called?  Does it have a name?

16   A.    I think it's in our GroupWise calendering

17   system.

18   Q.    When you say "GroupWise," are you talking

19   about the group, the AOC itself in general?

20   A.    No, that would be the name of our e-mail

21   system.

22   Q.    Okay.  What's the Group Wide calendar

23   system?

24   A.    GroupWise.  GroupWise.

25   Q.    GroupWise, I'm sorry.

Lexitas TENNESSEE
(615)595-0073

```
1    A.    It's a product.

2    Q.    How many individuals within the AOC have

3    the GroupWise calendar system?

4    A.    We all do.

5    Q.    How many employees do you have, just

6    under your supervision?

7    A.    87 at the AOC.

8    Q.    87?

9    A.    Yes.

10   Q.    So the only way you would know about

11   potential double-booking of conference rooms

12   would be if one of the liaisons came to you and

13   said we've got a problem?

14   A.    Yes.

15   Q.    And so does that mean that the liaison is

16   kind of keeping track of the dates when

17   meetings are going to be held for whatever

18   commission they serve?

19   A.    Yes.

20   Q.    Do you have periodic meetings with the

21   liaisons that are assigned to specific boards

22   and commissions?

23   A.    No.

24   Q.    So you don't have any kind of

25   communication with your liaisons?
```

*Text*-*tal* TENNESSEE
(615)595-0073

```
 1    A.    So I do meet with -- the liaisons are the

 2    same people, so it's the same as our directors

 3    in the division or other -- so I meet with the

 4    directors regularly, I meet with them every

 5    Monday.

 6    Q.    Right, I understand.  When I say

 7    "liaison," I am not saying -- I think -- and

 8    you correct me if I'm wrong, my understanding

 9    is a liaison is not someone -- that's not like

10    an official position, they're going to have

11    another role and then they are -- they are

12    going to also serve as a liaison; is that how

13    that works?

14    A.    Yes.

15    Q.    Okay.  So when I say "do you meet with

16    your liaisons," let me rephrase it.

17          When you're meeting with your team, do

18    you ever discuss with them their role as

19    liaisons on their boards and commissions that

20    they serve?

21    A.    I've never had occasion to discuss their

22    role.

23    Q.    What about situational things that come

24    up?

25    A.    So it would necessarily come up if there
```

1    was a meeting coming up, yes, that would be
2    discussed at one of our Monday meetings.
3    Q.    So a meeting would be brought to your
4    attention about one of the boards and
5    commissions; is that right?
6    A.    Yes.
7    Q.    What other types of topics would come up?
8    I'm talking about liaisons on commissions.
9    A.    Oh.  Just situational awareness, if a
10   meeting is scheduled.  I cannot think of an
11   example of anything else that's come up.
12   Q.    Did you ever -- Justice Lee, was she ever
13   involved in these Monday meetings regarding her
14   role as the liaison to the Advisory Commission?
15   A.    No.
16   Q.    Is there a reason for that?
17   A.    Those Monday meetings are just for me and
18   my division directors.
19   Q.    Is Michelle Consiglio-Young a division
20   director?
21   A.    Yes.
22   Q.    What does she direct, what division?
23   A.    I think that's the division I neglected
24   to list, it's intergovernmental affairs, she's
25   the director for that division.

```
1    Q.    Is that one of the six?

2    A.    Yes.

3    Q.    Did she have a different title at some

4    point prior to becoming the director of

5    intergovernmental affairs, another role at the

6    AOC, I should say?

7    A.    I don't know.

8    Q.    Okay.  Was she there at the AOC as an

9    employee when you started working as the deputy

10   director?

11   A.    Yes.

12   Q.    Was she the director of intergovernmental

13   affairs when you started as deputy director?

14   A.    Yes.

15   Q.    Okay.  Do you recall any specific

16   communication with Michelle Consiglio-Young

17   about double-booking of Advisory Commission

18   meetings?

19   A.    No.

20   Q.    Let me ask you another question about

21   this GroupWise calendar system.

22         You're aware that there is a calendar

23   facing the public on the AOC website?

24   A.    Yes.

25   Q.    Is that a different -- is that calendar
```

Texta taff TENNESSEE
(615)595-0073

1  that the public can view, is that different

2  than the GroupWise calendar system?

3  A.    I don't know what feeds the public facing

4  calendar, so I don't know if I know the answer

5  to your question.

6  Q.    You know what I'm talking about, though,

7  right?

8  A.    I do know what you're talking about.

9  Q.    Who would know about the public facing

10  calendar system within the AOC?

11  A.    I think it's our communications director,

12  Barbara Peck.

13  Q.    Who would know about the GroupWise

14  calendar system?  Would Ms. Peck also have that

15  information or would that be someone else?

16  A.    I think Barbara Peck is a good place to

17  gather information with regard to what's on the

18  group calendar, because I do think she's

19  responsible for posting information to that

20  group calendar in GroupWise.

21  Q.    Who comes up with the dates, the meeting

22  dates for the Advisory Commission?

23  A.    I do not know.

24  Q.    Did you know that they meet quarterly

25  typically?

```
1    A.    I didn't -- I'm not aware of the cadence
2    of their meetings.  I know the statute just
3    says from time to time, but I don't know what
4    that cadence has been.
5    Q.    At all, even after the pleadings have
6    been filed in this case?
7    A.    I know what the pleadings say and it says
8    quarterly.
9    Q.    Do you know if Deputy Director Harmon
10   testified under oath in a declaration that they
11   meet quarterly?
12   A.    I don't recall.
13   Q.    Did you review her declarations before
14   they were filed?
15   A.    Before they were filed, yes.
16   Q.    You reviewed both of those declarations
17   that she filed in this case?
18   A.    Yes.  Yes.
19   Q.    How did you review those?  Did you review
20   those with her in the same room with General
21   Kleinfelter?
22   A.    No.
23   Q.    Did Deputy Director Harmon send you a
24   draft?  I'm just curious as to how you reviewed
25   those before they were filed?
```

```
 1    A.     I believe I saw drafts.

 2    Q.     So assuming that the cadence is quarterly

 3    for the Advisory Commission, were you aware

 4    that they've typically been meeting on the

 5    second Friday of March, June, September and

 6    December?

 7    A.     I was not aware.

 8    Q.     Okay.  Now, you talked about

 9    double-booking, and that's double-booking with

10    respect to in-person meetings that use a

11    conference room at the AOC; is that right?

12    A.     That's right.

13    Q.     Is there ever any double-booking when any

14    various commissions are livestreamed to the

15    public?

16    A.     So we have limited resources for the

17    livestreaming functions of the Court.

18    That's -- if there have been conflicts, they

19    would be resolved by Barbara Peck, she's

20    responsible for the livestreaming.

21    Q.     Is there a budgetary item within your

22    budget for livestreaming?

23    A.     Not as a line item, no.

24    Q.     Is there a budgetary item for

25    administrative support to the Advisory
```

*Legal Tech TENNESSEE*
*(615)595-0073*

1  Commission on the rules of practice and

2  procedure?

3  A.    No.

4  Q.    Is there a budgetary item for

5  administrative support for any board or

6  commission?

7  A.    No, it's just part of our job and so it's

8  part of the AOC budget.

9  Q.    Okay.  So there's no designation in any

10  of the budget from -- I'm speaking of the AOC,

11  the court portion, with respect to boards and

12  commissions?

13  A.    Not the advisory board for rules or any

14  other advisory boards.  There are those four

15  that are revenue generating and have their own

16  budget, so BLE, CLE, TLAP and BPR.

17  Q.    So those four are considered boards or

18  commissions?

19  A.    They are.

20  Q.    Is there a heading on your website at the

21  AOC where it has boards and commissions?

22  A.    Yes.

23  Q.    Would it be fair to say that there's

24  probably approximately 15 that are listed there

25  on your AOC website?

Texta of TENNESSEE
(615)595-0073

```
 1   A.    I know there's several.
 2   Q.    When's the last time that you've reviewed
 3   the AOC website from a public facing
 4   standpoint?
 5   A.    Yesterday.
 6   Q.    And what did you review when you went on
 7   the website?
 8   A.    I was looking at our calendar and then
 9   the current -- well, we're in the process of
10   changing our website, and so I was comparing
11   what's there now to what we plan to have on our
12   new website.  So I was in the process of
13   communicating with Barbara Peck about some
14   changes.
15   Q.    Was that -- you reviewed the website
16   yesterday in your role as director or was any
17   of that review also because you were about to
18   give a deposition today?
19   A.    It was in my role as director, but I
20   certainly was cognizant of what I saw there
21   related to the Advisory Commission rules.
22   Q.    How else did you prepare for this
23   deposition?
24   A.    I reviewed the pleadings and the most
25   recent package of rules from June.
```

1    Q.    Now, when -- we'll talk about that in a
2    second.
3         The package of rules, is that the
4    complete package that's submitted to the
5    General Assembly?
6    A.    So what I saw was what was posted by the
7    appellate court clerk for comment.
8    Q.    Would that be like on Lexis or Westlaw?
9    A.    Yes.
10   Q.    That's also on the AOC website, is it
11   not?
12   A.    I haven't seen it on the website.
13   Q.    If the Supreme Court says -- issues an
14   order that something should be posted publicly,
15   would the -- would that be posted on the AOC
16   website?
17   A.    Yes.
18   Q.    Is that one of the functions that your
19   office does is to post orders on the AOC
20   website?
21   A.    Yes.
22   Q.    Is the Tennessee Supreme Court website
23   part of the AOC website?
24   A.    The Tennessee Supreme Court website?
25   Q.    Let me rephrase it.  If I wanted to go

```
1    look at the Tennessee Supreme Court, would that
2    be on the AOC website?
3    A.    Yes.
4    Q.    Does the Tennessee Supreme Court have a
5    separate website apart from the AOC website?
6    A.    Not that I'm aware of.
7    Q.    Okay.  So when you looked at the calendar
8    yesterday -- was there a reason that you -- the
9    AOC is changing its website?
10   A.    It's just time to update.
11   Q.    And why is that?
12   A.    It's not as user friendly as we would
13   like.
14   Q.    Is it user friendly with respect to
15   public meeting notices?
16   A.    There's a calendar and you can see what's
17   posted on the calendar, so yes.
18   Q.    What part of the website is not user
19   friendly?
20   A.    So it's not user friendly from our
21   standpoint in terms of how it captures content.
22   When you search for things -- for example, when
23   you look at the public calendar, you cannot
24   search -- you have to go month by month by
25   month, you can't skip to a different year, so
```

```
 1    it's just not easy to navigate.

 2    Q.    Is it user friendly to the public?

 3    A.    If the public knows no different, then

 4    yes, it's user friendly, they can access the

 5    information.  I just believe we can improve and

 6    make it easier to access and navigate our

 7    website.

 8    Q.    Easier for whom, the public or for AOC

 9    employees?

10    A.    Both.

11    Q.    So then improvement to the AOC website

12    would also assist the public?

13    A.    Yes.

14    Q.    Did you review on that public facing part

15    of the website any public meeting notices?

16    A.    I saw some listed, I did not review them.

17    Q.    Did you see any public meeting notices

18    for the Advisory Commission?

19    A.    I did not.

20    Q.    Have you ever seen any public meeting

21    notices on the AOC website for the Advisory

22    Commission?

23    A.    I saw the June notice on the calendar.

24    Q.    Was that the June 2023?

25    A.    Yes.
```

```
 1    Q.    Do you know when that June 2023 public
 2    meeting notice was placed on the AOC website
 3    calendar?
 4    A.    I do not.
 5    Q.    Does the AOC have an -- either a formal
 6    or an informal way as to when if puts up public
 7    meeting notices so many days in advance of an
 8    actual meeting?
 9    A.    I don't know.
10    Q.    So let's say at the beginning of -- what
11    is the fiscal year for the AOC?
12    A.    July 1st to June 30th.
13    Q.    So let's say July 1st, is there ever a
14    situation where the AOC has the indication that
15    for the next meetings over the next 12 months
16    will take place on a certain month by any of
17    the boards or commissions, does that process
18    ever happen?
19    A.    I haven't seen that.  I have not seen
20    that.
21    Q.    You have not seen that, but you don't
22    know if that happens or not?
23    A.    Right, I don't know if it happens or not.
24    Q.    Well, let's say a board or a commission
25    like the Advisory Commission was going to have
```

1   a public meeting, how many days of advance
2   notice would the AOC put out to the public to
3   let them know?
4   A.     I think I answered that, I don't know if
5   we have a policy.
6   Q.     What do you think is a fair amount of
7   notice to the public?
8   A.     I would say 30 days is pretty standard
9   notice.
10  Q.     Are you aware that the -- do you know who
11  the ADR Commission is?
12  A.     Yes.
13  Q.     What's your involvement with the ADR
14  Commission?
15  A.     I'm not involved.
16  Q.     Do you know if they have their meetings
17  that are livestreamed to the public; do you
18  know if they have any meetings like that?
19  A.     I don't know.
20  Q.     Have you ever seen any public meeting
21  notices on the AOC website involving the ADR
22  Commission, public meetings?
23  A.     I believe I did when I was looking
24  yesterday.
25  Q.     How many of those notices did you see?

```
 1    A.    I recall one.
 2    Q.    And when was the meeting supposed to take
 3    place, or had it already taken place?
 4    A.    I believe it had already taken place.
 5    Q.    Do you know if the AOC has ever hosted
 6    meetings for the Advisory Commission in its
 7    Nashville office?
 8    A.    I do not know.
 9    Q.    Have you ever seen any public meeting
10    notices on the AOC website showing that there
11    had been a public meeting?
12    A.    So I saw the June notice, but that's the
13    only one I've seen.
14    Q.    Okay, let's talk about the June notice.
15          What do you recall -- what do you
16    remember about the June notice that you saw?
17    Was it in person or was it livestreamed?
18    A.    Oh, I didn't -- I didn't review it for
19    the details.
20    Q.    Who put that notice out?
21    A.    I don't know.
22    Q.    Who do you think would be the AOC
23    employee that would be responsible?  Would that
24    be the liaison, Michelle Consiglio-Young?
25    A.    In terms of putting it on the calendar on
```

Text in TENNESSEE
(615)595-0073

```
 1    our website, it's probably our communications
 2    director.
 3    Q.    Who would be the point person to give
 4    that information to the communications
 5    director, would that be the liaison like
 6    Michelle Consiglio-Young?
 7    A.    Quite possibly.
 8    Q.    Could there be anybody else but the
 9    liaison that would have that information?
10    A.    I suppose the chairman could provide that
11    information or the court liaison could provide
12    that information.
13    Q.    Yeah, and could the justices themselves
14    provide that information?
15              MR. STAHL:  Object to the form.
16              THE WITNESS:  Well, there would just
17    be one justice who's the court liaison.
18    BY MR. DOUGHERTY:
19    Q.    But is it your understanding that the
20    Advisory Commission serves the Tennessee
21    Supreme Court?
22    A.    Serves the...
23          So it serves a function to support the
24    Tennessee Supreme Court for recommendations for
25    rules, rule changes relative to procedure and
```

*Alexitas* TENNESSEE
(615)595-0073

```
 1    practice.
 2    Q.    I would agree with that, court rules --
 3    they make rule recommendations to the Tennessee
 4    Supreme Court; you agree with that?
 5    A.    Yes.
 6    Q.    They don't make rule recommendations to
 7    the Tennessee General Sessions Court, right?
 8    A.    Right.
 9    Q.    They don't make rule recommendations to
10    the Tennessee Chancery Court; is that correct?
11    A.    That's correct.
12    Q.    They don't make rule recommendations to
13    the Tennessee Circuit Courts, right?
14    A.    That's correct.
15    Q.    And they don't make rule recommendations
16    to the Tennessee Court of Criminal Appeals,
17    right?
18    A.    That's correct.
19    Q.    They don't make rule recommendations to
20    the Tennessee Court of Appeals, correct?
21    A.    That's correct.
22    Q.    They make rule recommendations to the
23    Tennessee Supreme Court, right?
24    A.    That's correct.
25    Q.    So would the justices on the Tennessee
```

1  Supreme Court who are receiving these

2  recommendations, would they have any

3  information about when meetings happen?

4          MR. STAHL:  Object to the form.

5          THE WITNESS:  I don't know.

6  BY MR. DOUGHERTY:

7  Q.    Do you know if they've ever issued orders

8  when meetings have taken place, I'm talking

9  about the Tennessee Supreme Court?

10 A.    Not that I've seen.

11 Q.    Have you ever seen an order where the

12 Tennessee Supreme Court set a meeting that the

13 Advisory Commission took place, similar to the

14 one you referenced about Justice Lee being the

15 liaison, have you ever seen any kind of order

16 from the Tennessee Supreme Court about past

17 meetings, when they took place?

18 A.    I have not.

19 Q.    Are you aware that those are on the AOC

20 website?

21 A.    I was not.

22 Q.    Who -- or what individuals would be in

23 the best position to know when past meetings

24 took place?

25 A.    Michelle Consiglio-Young.

```
1    Q.    And who would have given the information

2    to the Tennessee Supreme Court justices,

3    assuming they did put out an order as to when

4    past meetings took place?  Who would be that

5    person?

6              MR. STAHL:  Object to the form.

7    BY MR. DOUGHERTY:

8    Q.    Would it be the Tennessee Supreme Court

9    justice liaison?

10   A.    I don't know.  I don't know the answer to

11   that.

12   Q.    Is it your understanding that Michelle

13   Consiglio-Young attends as a liaison Advisory

14   Commission meetings?

15   A.    She should.

16   Q.    And -- okay, and why should she?

17   A.    Just as I serve on, you know, boards and

18   commissions as a staff liaison, it's to support

19   the needs of that board or commission.

20   Q.    Because that's your duty and

21   responsibility, right?

22   A.    That's right.

23   Q.    Do you ever get -- when you're evaluating

24   Michelle Consiglio-Young -- do you evaluate

25   Michelle Consiglio-Young for job performance?
```

TENNESSEE
(615)595-0073

```
1    A.    Yes.

2    Q.    How often do you do that?

3    A.    Three times a year.

4    Q.    And when do those evaluations take place?

5    A.    So there are two interims, interim

6    reviews, I want to say every three months, and

7    then a final evaluation.

8    Q.    Do you evaluate Michelle Consiglio-Young

9    on her role as liaison to the Advisory

10   Commission?

11   A.    No.

12   Q.    And why is that?

13   A.    Because those things -- we set our goals

14   and objectives based on stretch goals, it's not

15   those things that are part of your duties and

16   responsibilities in the job.  So those are

17   expected to occur.  The evaluation's based on

18   the additional things that you do that move the

19   needle for the AOC and the courts.

20   Q.    What does that mean, move the needle for

21   the AOC and the courts; what moves the needle?

22   A.    So any new innovation, new ideas that are

23   consistent with the goals that we have listed

24   in our strategic plan, those are the things

25   that move the needle.  For example, E-filing,
```

```
1    that would move the needle for the courts.
2    Q.    So fulfilling one's duties and
3    obligations doesn't move the needle?
4    A.    That's the expectation of the job.
5    Q.    How do you evaluate for that?
6    A.    If you were not performing the duties and
7    responsibilities of the job, you would not
8    likely continue in the job.
9    Q.    And that's what I'm asking, how do you
10   make those determinations if someone, Michelle
11   Consiglio-Young, for example, I'm not
12   suggesting she's not, how would you evaluate
13   Michelle Consiglio-Young if she's not
14   fulfilling her duties and obligations?
15   A.    So on the duties and responsibilities of
16   any position in the AOC, if you fail to do
17   those things, then we're going to get
18   complaints, we're going to learn about it
19   through complaints.
20   Q.    Who would give those complaints about
21   Michelle Consiglio-Young, for example, on her
22   role on the Advisory Commission?
23   A.    It could be --
24          MR. STAHL:  Object to the form.
25          THE WITNESS:  -- any member of the
```

TEXTANN TENNESSEE
(615)595-0073

1    Commission.

2    BY MR. DOUGHERTY:

3    Q.    It could be any member of the Commission?

4    A.    Uh-huh.

5    Q.    Do you ever consult with the chair of the

6    Advisory Commission when you're preparing a

7    budget?

8    A.    No.

9    Q.    Do you ever consult with the chair of the

10   Commission with any administrative support they

11   might need?

12   A.    No.

13   Q.    Do you leave that responsibility up to

14   Michelle Consiglio-Young?

15   A.    The Advisory Commission does not have a

16   budget.

17   Q.    Right, let me -- just in a broad sense.

18   I understand that, and you've made that clear,

19   I apologize.

20        Does Michelle Consiglio-Young, is she the

21   one that's responsible with communicating with

22   the Advisory Commission chair on administrative

23   support, just general administrative support?

24   A.    I suppose so.

25   Q.    Would she be the only person that would

TENNESSEE
(615)595-0073

```
 1    be communicating with the Advisory Commission
 2    on administrative support from the AOC?
 3    A.    Yes.
 4    Q.    You wouldn't have direct communications
 5    with the chair?
 6    A.    No.
 7    Q.    Do you know the chair of the Advisory
 8    Commission, who that is?
 9    A.    I do.
10    Q.    And who is that?
11    A.    Gino Bulso.
12    Q.    And have you talked to Chairman Bulso in
13    preparation for this deposition?
14    A.    No.
15    Q.    Are you aware that he gave a deposition
16    in this case?
17    A.    Yes.
18    Q.    Did you talk to Chairman Bulso either
19    prior to the preliminary injunction or after
20    the preliminary injunction?
21    A.    No.
22    Q.    Do you know if Deputy Director Harmon
23    spoke with Chairman Bulso either previous to
24    the injunction or after the injunction?
25    A.    I don't know.
```

Textara TENNESSEE
(615)595-0073

1   Q.   Do you know if the justices have talked
2   to Chairman Bulso either pre or post
3   preliminary injunction about this case?
4   A.   I don't know.
5   Q.   So for June 2023, you observed or you saw
6   a public meeting notice; is that correct?
7   A.   Yes.
8   Q.   Do you know why that was there?  Was that
9   there because of the preliminary injunction?
10  A.   I don't know.
11  Q.   You weren't aware that that June meeting
12  happened after the preliminary injunction?
13  A.   I am aware.
14  Q.   Let me rephrase it a different way.
15       Is it your understanding that the reason
16  that the June 2023 meeting was open to the
17  public was because of the March 2023
18  preliminary injunction?
19            MR. STAHL:  Object to the form.
20            THE WITNESS:  Yes.  So that would be
21  consistent with our intention to comply with
22  the order.
23  BY MR. DOUGHERTY:
24  Q.   And that would have been something,
25  livestreaming the Advisory Commission meeting,

```
 1   the AOC office would typically do; is that
 2   right?
 3   A.    I'm struggling with the question, I'm
 4   sorry.
 5   Q.    Sure.  Assuming -- let's assume before
 6   the preliminary injunction got entered --
 7   because you would agree when the preliminary
 8   injunction was entered, Advisory Commission
 9   meetings had to be open; would you agree with
10   that?
11   A.    After the preliminary injunction, yes.
12   Q.    Okay.  Let's say meetings at some point
13   before the preliminary injunction, let's say
14   there was a meeting that was open to the public
15   and it was going to be livestreamed to the
16   public, is that something that the AOC office
17   would assist the Advisory Commission in making
18   that happen?
19   A.    Yes.
20   Q.    Okay.  And would the AOC office put out a
21   public meeting notice that it was going to be
22   livestreamed, assuming the meeting was going to
23   be open prior to the preliminary injunction?
24              MR. STAHL:  Object to the form.
25              THE WITNESS:  If you're -- so if
```

```
 1    you're going to livestream the meeting, it's
 2    for the public's ability to observe.
 3    BY MR. DOUGHERTY:
 4    Q.    Right, the AOC --
 5    A.    So I would assume that yes, we would post
 6    that.
 7    Q.    That's going to be the AOC?
 8    A.    That's going to be the AOC.
 9    Q.    That's what you do?  That's what your
10    office does, I should say?
11    A.    We post what's on the public notice
12    calendar, yes.
13    Q.    Okay.  Have you ever observed an Advisory
14    Commission meeting either in person or by
15    livestreaming?
16    A.    I have not.
17    Q.    Did you observe -- or were you aware that
18    the June 2023 meeting is on the Tennessee
19    YouTube channel?
20    A.    I was not aware.
21    Q.    So you didn't observe that June 2023
22    meeting that was livestreamed when it was
23    taking place; is that right?
24    A.    I did not.
25    Q.    And you haven't watched it on the
```

1    Tennessee YouTube channel?

2    A.    I have not.

3    Q.    Okay.  Do you know if anyone, like Deputy

4    Harmon, if anyone from your office, if they

5    ever commented that they saw the Advisory

6    Commission meeting on the YouTube channel?

7    A.    No one has commented to me.

8    Q.    Have you spoken to the justices about the

9    Advisory Commission in June that was -- that's

10   on the YouTube channel?

11   A.    No.

12   Q.    Okay.  So what is your understanding

13   about the Advisory Commission and the rule

14   recommendations and how those rule

15   recommendations get transmitted to the Supreme

16   Court, which then get transmitted to the

17   General Assembly and then at some point

18   they're -- they become law or they become

19   rules; what is your understanding of that

20   process?

21   A.    So my understanding is basically what you

22   just said, that the rules package gets put out

23   for public comment.  At some point it then is

24   transmitted to the General Assembly and has to

25   be passed by both houses before becoming

```
1    official and then they get published.
2    Q.    Now, the public comment period, is that
3    something that happens at some point after the
4    meetings and the recommendations get
5    formulated?
6    A.    Yes.
7    Q.    Okay.  Have you ever attended one of
8    those General Assembly hearings where the rules
9    package is being discussed?
10   A.    I have not.
11   Q.    Do you know if Michelle Consiglio-Young
12   has ever attended one of those General Assembly
13   hearings on the rules package at any point?
14   A.    I am sure she has.  I cannot think of a
15   specific example, but I know that's part of her
16   role.  She and her team, that's part of their
17   role.
18   Q.    Okay.  Do you communicate with the
19   justices about the rules package?
20   A.    No.
21   Q.    Do you ever communicate with the justices
22   about the administrative support that the
23   Advisory Commission might need?
24   A.    No.
25   Q.    Did you communicate with Barbara Peck,
```

```
 1    your communications director, after the
 2    preliminary injunction was entered?
 3    A.    I did not.
 4    Q.    Do you know if someone else on your team
 5    communicated with Barbara Peck after the
 6    preliminary injunction was entered?
 7    A.    I don't know.
 8    Q.    Did you know that the June meeting was
 9    livestreamed to the public?
10    A.    Yes.
11    Q.    When did you first become aware of that?
12    A.    Likely in the pleadings, something I
13    reviewed for today.
14    Q.    You don't remember any conversation you
15    had with Ms. Peck or anyone in your AOC team
16    about the livestreaming of the Advisory
17    Commission?
18    A.    I do not recall, no.
19    Q.    Do you know how meetings are
20    livestreamed?
21    A.    So I know she has explained it to me, but
22    I could not say that I know how they're
23    livestreamed, no.
24    Q.    Well, for example, is Ms. Peck or
25    somebody that works with her on her team, do
```

Text la     TENNESSEE
(615)595-0073

```
1    they physically go in to a room with a camera
2    or is it something on a computer where
3    they're --
4    A.    I don't know.
5    Q.    You don't know how that works?
6    A.    No.
7    Q.    She would be the one that knows how that
8    works?
9    A.    Yes.
10   Q.    Is the AOC and the Tennessee courts, are
11   they livestreaming court sessions more
12   frequently post pandemic?
13   A.    Yes.
14   Q.    Is the AOC and Tennessee courts
15   livestreaming meetings publicly post pandemic
16   more so than they were pre pandemic?
17   A.    I am unaware.
18   Q.    You don't have those discussions with
19   budgetary issues that might come up?
20   A.    Only for the court sessions.
21   Q.    Does it cost more money for the courts to
22   be livestreamed?
23   A.    We've had some investment in equipment to
24   enable the courtrooms to livestream, so yes.
25   Q.    How does that process work on
```

Texas TENNESSEE
(615)595-0073

1    livestreaming something in the courts?

2    A.    I don't know.

3    Q.    Is there an additional investment of

4    employees with this increased capacity to

5    livestream court sessions?

6    A.    We have not added any employees to be

7    able to do that.

8    Q.    So would you say it's more of a financial

9    burden on the AOC to livestream court sessions?

10   A.    I would not call it a burden, I would say

11   yes, we have invested in equipment to make sure

12   that we can, but I would not call it a burden.

13   Q.    Okay.  Other than the public meeting

14   notice that you saw the other day on the

15   June 2023 Advisory Commission meeting, have you

16   ever seen any other public meeting notices of

17   the Advisory Commission on your website, either

18   in your role as deputy or director?

19   A.    I have not, but I cannot say I've ever

20   looked for them.

21   Q.    Have you ever seen any public meeting

22   notices in your role as deputy or director of

23   any public meeting notice for any board or

24   commission?

25   A.    Yes.

```
1    Q.    And who might that be, which one?

2    A.    The Trial Vacancy Commission.

3    Q.    The trial what?

4    A.    Trial vacancy.

5    Q.    And what is that commission?

6    A.    So it is the body that vets candidates

7    for judicial vacancies at the trial court level

8    for the governor, they send names, three names

9    to the governor of recommendation to fill

10   vacancies.

11   Q.    And do you recall when you observed that

12   and what that might have been?

13   A.    We've had several here recently, so -- I

14   can't recall.

15   Q.    Did you ever serve as chief of staff for

16   the Tennessee governor before?

17   A.    Chief of staff?  No.

18   Q.    Did you ever serve in any capacity for a

19   former governor of Tennessee?

20   A.    Yes.

21   Q.    Who was that and what was your role?

22   A.    I served as Governor Don Sundquist's

23   deputy legal counsel and legal counsel.

24   Q.    And what was your -- what were your

25   functions with governor Sundquist in those
```

TEXT TENNESSEE
(615)595-0073

```
1    roles?
2    A.    So at the time we were combining --
3    creating the Department of Labor and Workforce
4    Development, so I drafted the legislation for
5    that.  We were also engaged in bringing school
6    reform to the state of Tennessee, so I drafted
7    the charter school legislation for the
8    governor.  I also was engaged in extraditions,
9    probation parole, clemency actions, the very
10   first execution in decades, and then generally
11   kind of supported our legislative liaisons.
12   Q.    So what years were you in that role with
13   Governor Sundquist?  Doesn't have to be the
14   exact date, I'm just curious of the years.  I
15   don't recall, I can look it up when he was in
16   office.  I mean, was it his entire term or
17   terms?
18   A.    No, it was the second term.
19   Q.    We're about the same age, so I don't
20   remember.  Was that mid '90s?
21   A.    It would be late '90s and then early
22   2000s.
23   Q.    I think the charter school statute was
24   2002, is that -- you said you drafted that or
25   assisted with it?
```

```
 1   A.    I drafted the first one.  It was

 2   unsuccessful, I think it took us two years to

 3   get something.

 4   Q.    That would have been in early 2000, okay.

 5   About 20, 25 years ago you would say roughly

 6   you were with Governor Sundquist?

 7   A.    Yeah.

 8   Q.    I know we're in 2023.

 9   A.    Yeah.

10   Q.    So in 2022, do you know if the Advisory

11   Commission held any meetings?

12   A.    In 2023?

13   Q.    2022 first.

14   A.    2022, I don't know.

15   Q.    You started in February 2022, right?

16   A.    Yes.

17   Q.    Do you know if there were any meetings in

18   2022 of the Advisory Commission?

19   A.    I don't know.

20   Q.    You never communicated with Michelle

21   Consiglio-Young about that?

22   A.    No.

23   Q.    If there were reimbursements from 2022,

24   would those be somewhere in your AOC files?

25   A.    They would be, yes, with our fiscal
```

```
 1    director.
 2    Q.    Tell me -- you may have given me that
 3    person's name.
 4    A.    Dalton Hensley.
 5    Q.    Yeah, okay, I got it.
 6          Dalton is a male?
 7    A.    Yes.
 8    Q.    What about 2023, do you know if the
 9    Advisory Commission met in 2023?
10    A.    I only know of the June meeting.
11    Q.    Now, are you aware that the Advisory
12    Commission meeting -- and the June meeting you
13    would agree was the post preliminary
14    injunction?
15    A.    Yes.
16    Q.    Were you aware that there was supposed to
17    be an Advisory Commission meeting in September
18    of 2023?
19    A.    Yes.
20    Q.    And what is your understanding -- first
21    of all, did that meeting take place in
22    September of 2023?
23    A.    No.
24    Q.    And tell me your understanding as to why
25    it did not.
```

Lexitas TENNESSEE
(615)595-0073

```
1    A.    It did not get properly noticed or we

2    became aware that it was not properly noticed

3    and so it was rescheduled.

4    Q.    And when did you become aware, your

5    office, that it was not properly noticed?

6    A.    I am 99 percent sure that that would have

7    come from legal counsel at the AOC --

8    Q.    Is that --

9    A.    -- making me aware that there was a

10   problem.

11   Q.    -- Mr. Coke?

12   A.    Yes.

13   Q.    Was the meeting supposed to be on

14   September 8, 2023?

15   A.    I don't remember the date, I just know it

16   was September.

17   Q.    And what is your understanding -- you

18   said it got -- I don't want to put words in

19   your mouth.

20         Did it get cancelled, the September, or

21   did it get postponed?

22   A.    Postponed is probably the better word.

23   Q.    And what is your understanding, when did

24   it get postponed to, what date?

25   A.    To December.  So it is scheduled for
```

Lexitas TENNESSEE
(615)595-0073

```
 1   December.
 2   Q.    Wasn't there already though a December
 3   quarterly meeting they were supposed to have?
 4   A.    I don't know.
 5   Q.    How many meetings -- how many meetings is
 6   the Advisory Commission having in 2023 calendar
 7   year?
 8   A.    I don't know.
 9   Q.    So you don't know if this December is --
10   if it was already scheduled anyway or if it's
11   the postponed meeting, you're not sure about
12   that?
13   A.    I don't know.
14   Q.    Who would know about that if it's -- if
15   it was already on the schedule or if it's the
16   one that got postponed from September?
17   A.    Michelle Consiglio-Young.
18   Q.    Anyone else besides Michelle
19   Consiglio-Young?
20   A.    John Coke.
21   Q.    Anyone else?
22   A.    Rachel Harmon.
23   Q.    Okay, anyone else?  Would the Supreme
24   Court liaison?
25   A.    Probably.
```

```
 1   Q.    Would Chairman Bulso, would he know?

 2              MR. STAHL:  Object to the form.

 3              THE WITNESS:  If the meeting got --

 4   if the September meeting was cancelled or

 5   postponed, sure, yes, he should know.

 6   BY MR. DOUGHERTY:

 7   Q.    Okay.  And so what's your understanding

 8   of the reason that it was postponed?  Is it

 9   because there was going to be a violation of

10   the injunction and therefore they didn't have

11   it; is that a fair assessment?

12              MR. STAHL:  Object to the form,

13   misstates testimony.

14              THE WITNESS:  What I believe -- I

15   believe what I was made aware of is that it had

16   not been properly noticed.

17   BY MR. DOUGHERTY:

18   Q.    What do you mean by not properly noticed?

19   That's what I'm trying to understand.

20   A.    There was nothing on our public facing

21   calendar to let the public know that that

22   meeting was scheduled.

23   Q.    Did the injunction require the AOC to

24   properly notice the public?

25              MR. STAHL:  Object to the form.
```

1        THE WITNESS:  So the injunction would
2   require us to either have it in person or
3   livestream it and so I'm going to assume
4   neither was capable of happening for that
5   September meeting.
6   BY MR. DOUGHERTY:
7   Q.    Does the injunction also require the AOC
8   to give proper notice to the public as to when
9   it's going to be?
10  A.    Yes.
11  Q.    What do you consider proper notice to the
12  public in advance of a meeting?  I think you
13  said 30 days; is that your testimony?
14  A.    I will stick to that answer, I think
15  that's standard.
16  Q.    Do you know if the injunction requires a
17  certain amount of notice or not?
18  A.    I don't recall.
19  Q.    Okay.  Have you spoken to Michelle
20  Consiglio-Young while she has been out on
21  maternity leave?
22  A.    Yes.
23  Q.    Have you spoken to her specifically about
24  the Advisory Commission?
25  A.    No.

```
1   Q.    So have you spoken to her about her
2   functions as liaison to the Advisory
3   Commission?
4   A.    No.
5   Q.    What -- have you spoken to her about AOC
6   business?
7   A.    Yes, strategic planning and the final
8   assessments of her team members on their goals.
9   So we do pay for performance, so she would be
10  responsible for evaluating her team members.
11  So we've talked about that.  We've talked about
12  revisions we've made to the strategic plan for
13  this next calendar performance cycle, and other
14  than that we've just talked about the baby.
15  Q.    So -- and I'm just referring to AOC
16  business, I'm not asking you anything about
17  your personal conversations with her.
18        What is pay -- you said pay for
19  performance?
20  A.    Correct.
21  Q.    What is that?
22  A.    So we do an incentive program tied to
23  those goals that I talked about earlier.  Each
24  person has an individual performance plan and
25  we assess performance based on the goals and
```

```
 1    objectives in those individual plans.  And then

 2    we rank the outcomes and reward employees for

 3    their performance.

 4    Q.    Whose responsibility was it to properly

 5    notice the Advisory Commission meeting in

 6    September?

 7              MR. STAHL:  Object to the form.

 8              THE WITNESS:  I don't know.

 9    BY MR. DOUGHERTY:

10    Q.    Was it Michelle Consiglio-Young?

11    A.    I don't know.

12    Q.    Who is on her team?

13    A.    So she oversees Charley Baldwin who is

14    legislative liaison.  She also oversees our

15    court improvement program.  I think that's

16    everyone on her team.

17    Q.    So Charley Baldwin, I only heard one

18    person's name.

19    A.    Well, Stacy Lynch is the director, if you

20    will, I may get the titles wrong, for the court

21    improvement program.  And I believe she has a

22    staff of -- oh, I forgot one other person,

23    Stephanie Ethridge who is over our safe baby

24    courts.  And then there are probably three or

25    four people that report through them.
```

1     Q.    Okay.  Do you think whether or not

2     Advisory Commission meetings are open or closed

3     to the public is important to improve the

4     administrative -- administration of justice in

5     the Tennessee courts?

6     A.    You're asking my opinion?

7     Q.    Yes.

8     A.    Okay.  So the process, as I know it, has

9     the opportunity for the public to comment.  So

10    if the goal of whether they're open or closed

11    is to ensure that the public has the

12    opportunity to comment, I think that is already

13    part of the process.

14    Q.    Yeah, and that's not my question.   I

15    didn't ask about commenting, I didn't suggest

16    that the purpose was about public commenting.

17          I said, do you think Advisory Commission

18    meetings that are closed to the public, closed

19    meetings, does that improve the administration

20    of justice?

21    A.    I think there are times when in order to

22    have candid discussion of a matter, there is a

23    need to have that discussion be closed.  In

24    terms of the public's ability to know and

25    understand what comes out of that discussion, I

1    believe that is already part of this process.

2         So I don't have an opinion one way or the

3    other whether they should be open or closed, I

4    just look at the outcomes.  And so I believe

5    that there is already process in place for the

6    outcomes for the public that promote the

7    administration of justice.

8    Q.    And so are meetings -- is it your

9    understanding that Advisory Commission meetings

10   are open or closed?

11   A.    For this particular commission, I

12   understand the history has been that at one

13   point they were open and at one point they were

14   closed.

15   Q.    And at what point is it your

16   understanding on the history were they open?

17   A.    It predates me.  I want to say maybe

18   2017, 2018, but I am not certain.

19   Q.    What is your understanding of history

20   wise when they became closed?

21   A.    I don't know why they became closed.

22   Q.    I didn't say "why," I said what is your

23   understanding of the process of getting closed

24   and why they became closed?

25   A.    I don't know.

1    Q.    Who would know that?  Would the justices

2    know that?

3              MR. STAHL:  Object to the form.

4              THE WITNESS:  Any -- whoever was

5    involved at the time.

6    BY MR. DOUGHERTY:

7    Q.    So I guess is it fair to say if they were

8    open, Advisory Commission meetings at some

9    point in the past -- I think you said they were

10   at some point, right?

11   A.    (Nodding head.)

12   Q.    If they were open, do you think they were

13   open to try to improve the administration of

14   justice?

15             MR. STAHL:  Object to the form.

16             THE WITNESS:  I don't know if there

17   was the intentionality around that or not, I

18   don't know.

19   BY MR. DOUGHERTY:

20   Q.    Why do you think they would have been

21   open previously?

22   A.    I don't -- I don't know.

23   Q.    Is there someone that you're aware of who

24   decided not to keep the meetings open any

25   longer?

```
 1    A.    I'm sorry, it predates me, I don't know.

 2    Q.    Well, you talked about the history, I'm

 3    just trying to understand, how did you have the

 4    knowledge to be able to know that historically

 5    at some point meetings of the Advisory

 6    Commission were open?

 7    A.    In the context of preparing for this

 8    deposition, I learned that at one point they

 9    were open.

10    Q.    And who did you learn that from?

11    A.    Likely legal counsel, John Coke.

12    Q.    And did you review any information that

13    would have -- evidence that they were open at

14    some point?

15    A.    No.

16    Q.    Do you know -- have you ever reviewed any

17    information as to a reason they might have been

18    open in the past at some point?

19    A.    No.

20    Q.    So is it possible that open Advisory

21    Commission meetings could improve the

22    administration of justice?

23           MR. STAHL:  Object to the form.

24           THE WITNESS:  I've never attended an

25    Advisory Commission meeting for rules, but I
```

1  would say, again, that there may be a need to

2  have candid discussion among the lawyers and

3  judges that are part of that body. And so that

4  may be problematic in an open forum. And so as

5  long as the results of that discussion are made

6  available to the public, in my opinion, that is

7  sufficient.

8  BY MR. DOUGHERTY:

9  Q.    As long as -- you're saying the public

10 comment period comes sometime after the meeting

11 happens, that that's sufficient is what you're

12 saying?

13            MR. STAHL:  Object to the form,

14 misstates testimony.

15 BY MR. DOUGHERTY:

16 Q.    Well, then you tell me what your

17 testimony is when you talk about public

18 comment.  I'm just trying to understand it.

19 Because I understood you to say before that the

20 public comment period happens after the

21 meetings; is that right?

22 A.    I think that is the way it is set up

23 today, yes.

24 Q.    Okay.  And you think that's sufficient to

25 improve the administration of justice?

1        MR. STAHL:  Object to the form.

        2        THE WITNESS:  I don't think it

        3   hinders the administration of justice.

        4   BY MR. DOUGHERTY:

        5   Q.    Well, you would agree that part of your

        6   responsibility and duties are to improve the

        7   administration of justice as director of AOC,

        8   right?

        9   A.    Yes.

       10   Q.    Statute requires you to survey and try to

       11   come up with ideas of how to do that, right?

       12   A.    Yes.

       13   Q.    So is it possible that open meetings to

       14   the public on court rulemaking is to improve

       15   the administration of justice?

       16        MR. COKE:  Object to the form.

       17        MR. STAHL:  Object to the form.

       18        THE WITNESS:  Is it possible.  I

       19   would still lean toward the need to have candid

       20   open dialogue about rule changes and that may

       21   not happen in a public forum to the level of

       22   candor needed to improve the administration of

       23   justice.

       24   BY MR. DOUGHERTY:

       25   Q.    Does transparency on rulemaking meetings

1    improve the administration of justice?
2            MR. STAHL:  Object to the form.
3            THE WITNESS:  I don't believe it's
4    not transparent.
5    BY MR. DOUGHERTY:
6    Q.    And so you think closed meetings are
7    transparent?
8            MR. STAHL:  Object to the form.
9            THE WITNESS:  So I am saying the need
10   for candid conversation improves the
11   administration of justice.  The outcomes of
12   that candid conversation are transparent to the
13   public, that also improves the administration
14   of justice.  And the ability to take in comment
15   and information from the public improves the
16   administration of justice.
17   BY MR. DOUGHERTY:
18   Q.    Would open meetings improve the
19   rulemaking process?
20   A.    It is open when it gets to the
21   legislative process.
22   Q.    No, it's not, it's a meeting?
23           MR. STAHL:  Object to the form,
24   argumentative.
25   ///

```
1   BY MR. DOUGHERTY:

2   Q.    It's a meeting.  Are meetings today open

3   prior to the preliminary injunction?

4             MR. STAHL:  I'm going to allow this

5   one last question, then I'm going to ask to

6   take a break.

7             THE WITNESS:  Are meetings open

8   prior --

9   BY MR. DOUGHERTY:

10  Q.    We're talking about Advisory Commission

11  meetings.  Were they open --

12  A.    My understanding is they have not been

13  open.

14  Q.    Okay.

15            MR. STAHL:  We're going to take a

16  break.  That was a question.  Thank you.  Take

17  a five-minute break.

18            MR. DOUGHERTY:  Just make it 11:35.

19            MR. STAHL:  Okay.

20            (Short break.)

21  BY MR. DOUGHERTY:

22  Q.    Okay, we'll go back on the record.

23        Ms. Long, what is your understanding of

24  the preliminary injunction in March; why was it

25  issued by the court?
```

Lexitas TENNESSEE
(615)595-0073

```
 1    A.    To ensure that the Advisory Commission on

 2    rules was open to the public.

 3    Q.    When you say the advisory -- you talking

 4    about meetings?

 5    A.    Meetings.

 6    Q.    So was it your understanding that prior

 7    to the injunction they were closed --

 8    A.    Yes.

 9    Q.    -- meetings, right?

10    A.    Yes.

11    Q.    Okay.  Do you know if they talk about --

12    let's go back.

13          What -- is the Advisory Commission made

14    up of -- what do they make rule recommendations

15    on?  Are there certain courts, certain

16    procedures, are you aware of that?

17               MR. STAHL:  Object to the form.

18               THE WITNESS:  So I did -- I think I

19    answered earlier that they make recommendations

20    on the rules of practice and procedure for

21    various courts and for the rules of evidence.

22    BY MR. DOUGHERTY:

23    Q.    Yeah, so it's the rules of evidence is

24    one; is that your understanding?

25    A.    Yes.
```

```
1    Q.    And is also the rules of civil procedure
2    one of the rule recommendations they make?
3    A.    Yes.
4    Q.    And the rules of criminal procedure?
5    A.    Yes.
6    Q.    Rules of juvenile procedure?
7    A.    Yes.
8    Q.    And is the last one, the fifth one, the
9    rules of appellate procedure?
10   A.    Yes.
11   Q.    When we talk about court rules of
12   practice, that's what they're actually doing?
13   A.    Yes.
14   Q.    Were you aware that the federal analog
15   has very similar rules in certain courts?
16   A.    No.
17   Q.    Have you read the pleadings about the
18   federal analog and what they do?
19   A.    Yes.
20   Q.    What does Michelle Consiglio-Young,
21   Intergovernmental -- what is her title --
22   A.    Affairs.
23   Q.    What does that mean?
24   A.    So she is our liaison to the other
25   branches of government and so she does -- she
```

1    works very closely with the legislature and

2    then other departments.  And so for court

3    improvement programs, she's working with

4    Children's Services.  For safe baby courts,

5    she's working with Human Services and

6    Children's Services as well.  So it's that

7    place that connects with other departments and

8    agencies across the state.

9    Q.    So is it fair to say then when you say

10   "intergovernmental" or what she does, some of

11   her work touches on the executive branch and

12   the legislative branch and the judicial branch?

13   A.    Yes.

14   Q.    Is that a relatively new position or has

15   that always kind of been there with the AOC?

16   A.    I think it's always -- well, since I've

17   been at the AOC it's been there.

18   Q.    Okay.  Do you know how long she served on

19   the Advisory Commission as the AOC liaison?

20   A.    I do not know.

21   Q.    Is the Advisory Commission listed

22   somewhere on the AOC website?

23   A.    It is.

24   Q.    And are there names of the people who are

25   on that commission on that particular website?

```
1    A.    Yes.
2    Q.    I think all of the -- we talked earlier
3    about the boards and commissions section of the
4    AOC website; do you recall that?
5    A.    Yes.
6    Q.    And I haven't looked last week, but I
7    think it is fair to say that most members who
8    serve on these various commissions and boards
9    are listed there on the AOC website?
10   A.    Yes.
11   Q.    Who puts that information together?
12   A.    So who serves is decided in most places
13   by the Court and they will often times put down
14   a court order for membership and then that gets
15   accumulated at the AOC.  I don't know who
16   physically puts it on the website.
17   Q.    Well, is the responsibility of liaison
18   for that particular board or commission to make
19   sure those names are on the website or is that
20   your communications group?
21   A.    I don't know.
22   Q.    Okay.  Do you all have like a flow chart
23   at the AOC because you have a lot of different
24   divisions?  I am just trying to understand how,
25   you know, delegation of duties and obligations
```

1    are carried out when you've got kind of these
2    various six divisions, what -- and you don't
3    have to tell me everything, I am just trying to
4    understand the hierarchy and how everybody
5    communicates with one another.
6    A.    So you won't find flow charts.  What you
7    will find is trust in liaisons that work with
8    these various boards and commissions to carry
9    out the functions that they always carried out.
10   We are in the process of trying to document
11   some of those processes and procedures, I call
12   it eliminating single points of failure,
13   because if something happens to Michelle
14   Consiglio-Young, someone else needs to be able
15   to pick up where she left off.  So it's not
16   written down now, but we're working toward
17   writing some of those practices and procedures
18   down.
19   Q.    Are you aware of a commission that was
20   established several years ago that put together
21   several reports on aspirations for the
22   Tennessee judicial system in the year 2030?
23   A.    I'm not.
24   Q.    Are you aware that that commission's
25   final report is on the AOC website?

1   A.    So I believe I saw a report -- I don't

2   think that's what -- I thought it was more

3   around diversity.  I don't know if we're

4   talking about the same report or not, though.

5   Q.    So as I understand it, I believe it might

6   even be in the pleadings at some point or

7   motions, I'm not sure, but I just wanted to

8   know if you were aware that -- I want to say it

9   was the mid '90s, there was a commission in

10  Tennessee by various members, private

11  attorneys, judges, you weren't aware of that?

12  I know that was several years ago.

13  A.    If you're talking about -- I'm calling it

14  a diversity report.  I have seen that one, but

15  I don't know if we're talking about the same

16  thing.

17  Q.    What I am referring to, and I don't know

18  the exact name, but I think it was Vision,

19  Tennessee Courts 2030.  I believe the year was

20  2030.  You don't recall that?

21  A.    I don't.

22  Q.    And you haven't seen that 2030 -- I am

23  just -- it may not be exactly, but you don't

24  recall seeing that 2030 report on the AOC

25  website?

```
 1   A.    No.
 2   Q.    I don't recall who the person -- the
 3   person who served in your role, the director of
 4   the AOC was, but do you ever get together or
 5   have communications with previous AOC directors
 6   that predated you?  Even going back mid '90s or
 7   the '80s?
 8   A.    So two of them are friends.  So I do have
 9   conversation with two previous directors.
10   Q.    Who are those?
11   A.    Debbie Tate and Bill Young.
12   Q.    And Ms. Tate was your -- you were deputy
13   to her, right?
14   A.    Yes.
15   Q.    Does she still serve in some capacity
16   with the AOC?
17   A.    We have her on a temporary assignment
18   right now, so yes.
19   Q.    Is that like a limited contract for
20   certain period of time?
21   A.    Yes.
22   Q.    120-day contract?
23   A.    I think so, yes.
24   Q.    Bill Young, who is Bill Young?
25   A.    Bill Young was I believe Ms. Tate's
```

LEXITAS LEGAL - TENNESSEE
(615)595-0073

```
 1    predecessor in the role.
 2    Q.    How long did Ms. Tate serve as AOC
 3    director, if you can recall?
 4    A.    I think it was seven years.
 5    Q.    And then how about Mr. Young, how long
 6    was he -- do you know?  If you don't, that's
 7    fine.
 8    A.    I don't know.
 9    Q.    Is he still living?
10    A.    Yes.
11    Q.    Does he work for the AOC?
12    A.    No.
13    Q.    Is he retired?
14    A.    Not that I'm aware of.
15    Q.    Okay.  Is he an attorney?
16    A.    Yes, he is.  I think he's working for the
17    Ethics Commission.
18    Q.    So is that a Tennessee government paid
19    position?
20    A.    Yes.
21    Q.    Bill Young?
22    A.    Yes.
23    Q.    He is an attorney?
24    A.    Yes.
25    Q.    Is Ms. Tate an attorney?
```

1    A.    Yes.

2    Q.    And is there a requirement that the

3    executive director of the AOC has to be an

4    attorney?

5    A.    Not in statute.

6    Q.    Have most of them, besides Ms. Tate and

7    Mr. Young and yourself, have most previous AOC

8    directors been attorneys?

9    A.    To my knowledge, yes.

10   Q.    Are you aware of how the Federal AOC is

11   set up with respect to the relationship with

12   the chief justices of the US Supreme Court?

13   A.    No.

14   Q.    So if I told you that the AOC in the

15   federal court does not serve at the pleasure of

16   the chief justice, Chief Justice Roberts, and

17   is a separate entity, you wouldn't have any

18   information on that or knowledge?

19   A.    No.

20   Q.    Are you aware of anyone or any report

21   that has ever suggested or recommended that the

22   AOC director and office should be separate from

23   the Tennessee Supreme Court?

24   A.    No.

25   Q.    You've never seen a report or heard about

Lexitas TENNESSEE
(615)595-0073

1    any recommendations on that?

2    A.    I think there's some opinion out there

3    that it should be led by more than just the

4    Supreme Court, in other words a group of judges

5    representing all levels of the court system,

6    but I've never seen a report, I've never seen

7    anything in writing in that regard.

8    Q.    What opinion are you referring to?

9    A.    I think there's been some discussion over

10   time about the AOC being responsible, if you

11   will, to more than just the Supreme Court.

12   Q.    So is it your understanding that the AOC

13   is just responsible for the Tennessee Supreme

14   Court?

15   A.    No, it is not my understanding.

16   Q.    Well, then why does that -- why is that

17   opinion or idea out there?

18   A.    I don't know.

19   Q.    Who -- when you say opinion, is it like

20   an Tennessee attorney general opinion; what do

21   you mean?

22   A.    No, no.  I just mean over the course of

23   time, there have been comments that I'm aware

24   of that trial judges don't get -- don't

25   perceive that they are heard when it comes to

1    how the AOC operates.  The statute clearly says

2    that the AOC director serves at the pleasure of

3    the Tennessee Supreme Court.  The realty is the

4    Tennessee Supreme Court is responsible for the

5    entire court system.  So the Tennessee Supreme

6    Court, vis-a-vis the AOC director, is

7    responsive to all levels of court.  But we

8    don't control perception.

9    Q.    What is your opinion on that, do you

10   think they -- that maybe the statute requiring

11   your position to serve, as you say, the

12   pleasure of the chief justice and the justices,

13   is that a good thing or a bad thing?

14   A.    It's a thing.

15   Q.    Right.

16   A.    I think that in terms of --

17   Q.    I'm not trying to --

18   A.    -- to get something done, having five

19   bosses is very different from having some

20   larger group of bosses, if you will.

21   Q.    I'm not trying to get you in trouble with

22   your bosses, I'm just -- I'm just talking

23   about -- I mean, because you would agree that

24   you are responsible for the administration of

25   justice and some of these kind of broad

1    concepts; would you agree with that?

2    A.    Absolutely.

3    Q.    So having five bosses, is that more

4    difficult to carry out your duties?  Or what do

5    you mean by having five bosses?  Explain that.

6    I am just trying to understand.  I don't want

7    to put words in your mouth, I don't want you to

8    talk bad about -- I'm just trying to understand

9    philosophically what your opinion is.

10   A.    Well, the AOC is the administrative arm

11   of the Tennessee Supreme Court.  The Tennessee

12   Supreme Court has five justices.

13   Q.    Right.  Do you think if would be a better

14   situation if your office, the AOC, was

15   completely separate from the Tennessee Supreme

16   Court and that you made all those decisions?

17   A.    No.

18   Q.    Okay.  And if the Feds do it that way,

19   and I don't know if they do it exactly that

20   way, but would that be something you wouldn't

21   agree or think would be a great thing or you

22   don't know right now?

23   A.    I don't know.  I don't think it would be

24   because I think our Tennessee Supreme Court is

25   very intentional about hearing and making sure

```
 1    they are responsive to all courts.

 2         I mean, we have programs across the AOC

 3    that address juvenile courts, general sessions

 4    courts, trial courts.  So there -- the

 5    processes are in place to make sure all courts

 6    are represented in what the Tennessee Supreme

 7    Court then directs.

 8    Q.    Do you think the people on the inside,

 9    attorneys, all of us at this table, justices

10    and judges think that the Tennessee judicial

11    system is a good thing or --

12              MR. STAHL:  Object to the form.

13    BY MR. DOUGHERTY:

14    Q.    -- or doing the best it can?

15    A.    The Tennessee judicial system?

16    Q.    Yeah.  Well, the courts, what you have to

17    do, what you have to do.  Do you think the

18    Tennessee courts are perceived by the members

19    of the bar and the judiciary as being a pretty

20    good system?

21    A.    Yes.

22    Q.    Do you think the public perceives the

23    Tennessee judicial system as a pretty good

24    system?

25              MR. STAHL:  Object to the form.
```

LEXITAS TENNESSEE
(615)595-0073

```
 1            THE WITNESS:  The public is kind of

 2    broad.  I think it depends on your interaction

 3    with the courts.  So you could have a negative

 4    interaction and I suppose your perception would

 5    not be positive.  I think generally, when I

 6    talk about what I do, I don't hear negative

 7    things about the Tennessee judicial system.

 8    BY MR. DOUGHERTY:

 9    Q.    Do you think there's an access to justice

10    crisis in the state of Tennessee?

11    A.    Crisis, no.

12    Q.    Do you think there's an access to justice

13    problem in the state of Tennessee?

14    A.    I think we are intentional with programs

15    to make sure that the reach of the Tennessee

16    courts is as broad as it can be from where we

17    work at the AOC, and then we work very closely

18    with all of those legal aid societies out there

19    that do provide the reach and access.  So I

20    believe that's a very positive thing for the

21    state of Tennessee.

22    Q.    Are there a lot of pro se litigants in

23    the state of Tennessee?

24    A.    I don't know.

25    Q.    That's not something that you keep track
```

Litigation TENNESSEE
(615)595-0073

```
 1    of, record wise?
 2    A.    I don't keep track of that, no.
 3    Q.    You're not required to do that under the
 4    statute?
 5    A.    No.
 6    Q.    Are you aware of the compensation system
 7    for attorneys in Tennessee for indigent
 8    representation?
 9    A.    Yes.
10    Q.    Is it good or is it bad compared to other
11    states?
12              MR. STAHL:  Object to the form.
13              THE WITNESS:  So compared to other
14    states, we compensate lawyers for their
15    representation at the lowest level of any other
16    state.
17    BY MR. DOUGHERTY:
18    Q.    So Tennessee's the worst state, right?
19              MR. STAHL:  Object to the form.
20              THE WITNESS:  We compensate at a rate
21    lower than any other state.
22    BY MR. DOUGHERTY:
23    Q.    The worst state in terms of compensation,
24    I should have clarified that.
25    A.    The lowest.
```

Lexitas TENNESSEE
(615)595-0073

1  Q.   Well, is it better to get less money or

2  more money?

3           MR. STAHL:  Object to the form, asked

4  and answered.

5           THE WITNESS:  Better to get -- so I

6  don't view it from the standpoint of the

7  attorney compensation whether or not that is

8  good or bad, I view it from the standpoint of

9  are we providing representation.  And so

10  representation continues, despite paying the

11  lowest rate in the country.

12  BY MR. DOUGHERTY:

13  Q.   Did Chief Justice Kirby think it was bad

14  enough to issue some comments recently about

15  how she wanted to improve the compensation

16  system?

17  A.   So we are currently in the process of

18  advocating to improve the compensation for

19  attorneys, yes.

20  Q.   Did Chief Justice Kirby release some

21  public comments recently?

22  A.   Yes, she did.

23  Q.   Were those on the AOC website?

24  A.   Yes, they are.

25  Q.   How is -- is the AOC, part of that

1  advocacy, as you called it, about trying to

2  increase compensation?

3  A.    Yes.

4  Q.    How -- what does that advocacy look like?

5  What does your office have to do?

6  A.    So the entire fund for indigent

7  representation is appropriated money by the

8  General Assembly.  So if there is to be an

9  increase in attorney compensation rates, it

10  will have to come from additional appropriation

11  of moneys.

12  Q.    So does that mean, when you say

13  "advocacy," trying to get more money

14  appropriated?  You don't have to pass a law,

15  right?

16  A.    No.

17  Q.    Who does the advocacy besides the AOC

18  office?

19  A.    I'm sure on this topic there will be many

20  groups advocating.  I think the TBA will

21  definitely be at the table on behalf of

22  attorneys.  You might see the PDs office, some

23  of the legal aid societies.  I'm sure there's a

24  wide swath of people that would agree.

25  Q.    Is low compensation that we're talking

```
 1    about, does that make the access to justice
 2    issue better or worse?
 3               MR. STAHL:  Object to the form.
 4               THE WITNESS:  Better or worse.  I
 5    think we could be -- I don't think it has to
 6    date, but I think if we don't address it, we
 7    could be in a position where access to justice
 8    is in jeopardy.
 9    BY MR. DOUGHERTY:
10    Q.    So appreciate you sharing the advocacy,
11    is there any kind of written materials that
12    your office has on this -- what you have to do
13    to increase the funding to get -- to
14    compensate, is there anything out there
15    physically written?
16    A.    So it is one of our budget requests.  And
17    so we have provided information to the
18    Department of Finance and Administration in
19    writing that we will be making an ask to
20    increase the rates.
21    Q.    Are the justices themselves advocating on
22    this issue?  I mentioned Justice Kirby, but are
23    they doing any advocacy along with the AOC?
24               MR. STAHL:  Object to the form.
25               THE WITNESS:  So before it appears in
```

```
 1    our budget request, the Court would have to

 2    agree with that.  And so they have.  I don't

 3    know about individual advocacy on their parts.

 4    BY MR. DOUGHERTY:

 5    Q.    How do you know they agreed with the

 6    increase of compensation?

 7    A.    We present our budget proposals to the

 8    Court in advance.

 9    Q.    When you say "we," you're talking about

10    the AOC?

11    A.    I'm talking about me.

12    Q.    You?

13    A.    Uh-huh.

14    Q.    So when you're doing a budget -- I know

15    you said that's kind of a year-long process,

16    kind of, right?

17    A.    Uh-huh.

18    Q.    You're putting numbers together, you go

19    to the justices first or at some point before

20    that gets submitted to the governor?

21    A.    That's right, I need approval.

22    Q.    Okay.  So we're just talking about the

23    compensation for attorneys right now, what the

24    article was recently that Justice Kirby spoke

25    about.
```

```
 1          What's the increase -- or proposed

 2    increase for attorney compensation on a

 3    percentage basis?

 4    A.    Well, it's $30 increase in the

 5    compensation rate.  So from $50 an hour to 80.

 6    Q.    And so currently it's $50 an hour, is

 7    that for criminal or explain that -- or is that

 8    just court appointed?  What does that mean?

 9              MR. COKE:  Object to the form.

10              THE WITNESS:  That's court appointed

11    counsel.

12    BY MR. DOUGHERTY:

13    Q.    In state courts in Tennessee?

14    A.    Yes.

15    Q.    So is that by statute or is that just how

16    it's been, the $50?

17    A.    It's by rule, supreme court rule, Rule

18    13.

19    Q.    That's Rule 13?

20    A.    Yes.

21    Q.    When was that rule promulgated?

22    A.    I don't know.

23    Q.    And so this compensation of $50 an hour,

24    is that civil or criminal?

25    A.    Both.
```

```
1    Q.    Oh, it is, okay.

2          How does that on a criminal side?  Isn't

3    the public defender's office -- don't they

4    serve that role or -- I don't understand that

5    part of it.

6          MR. COKE:  Object to form.

7          THE WITNESS:  So the public

8    defender's office does take -- undertake the

9    representation.  However, the indigent -- my

10   understanding, the indigent representation fund

11   for adult defense applied when the public

12   defender's office had a conflict on a matter,

13   and so private counsel could be engaged.

14   BY MR. DOUGHERTY:

15   Q.    I see.  So the increase in it, assuming

16   it goes through, does that require a rule

17   change of Supreme Court Rule 13?

18   A.    Yes.

19   Q.    Who makes that change?  Do the Supreme

20   Court justices make that change?

21   A.    Yes.

22   Q.    Supreme Court rules are not part of the

23   Advisory Commission, are they?

24   A.    I don't believe so, no.

25   Q.    Is there any commission or board outside
```

```
 1    of the justices themselves that make changes to
 2    supreme court rules?
 3    A.    So they will -- no, there's no entity,
 4    no.
 5    Q.    Do they do that at like certain period,
 6    cadence of the year, or is that ongoing; how
 7    does that work?
 8    A.    I think it's ongoing and they will be put
 9    out for public comment.
10    Q.    So they also put out public comment, but
11    as far as you know the Supreme Court rules are
12    not part of the Advisory Commission meeting
13    rule recommendations; is that right?
14    A.    That's right.
15    Q.    Okay.  So assuming that the rate
16    increases from $50 an hour to compensate an
17    attorney representing indigent people to 80,
18    where does that -- where would that put
19    Tennessee?
20            MR. COKE:  Object to form.
21            THE WITNESS:  It puts us kind of
22    square in the middle of other states that do
23    indigent representation in this way.
24    BY MR. DOUGHERTY:
25    Q.    How many states do indigent
```

1    representation like Tennessee?

2    A.    I don't know.

3    Q.    Approximately?

4    A.    I don't know.

5    Q.    Do you ever discuss indigent

6    representation in your -- is it the COSCA

7    group, that organization, does that ever come

8    up?

9    A.    We have not.

10   Q.    What about access to justice issues in

11   general, does that ever come up in your state

12   meeting association?

13   A.    So, yes.  Interpreters has come up in the

14   COSCA group.  I'm trying to remember.  I think

15   just interpreters and language access has been

16   an issue.

17   Q.    What about litigants having to represent

18   themselves or being pro se, does that pro se

19   litigation ever come up?

20   A.    Not that I recall.

21   Q.    Is part of the goal of increasing

22   compensation for indigent representation so

23   that we will have fewer pro se litigants?

24            MR. STAHL:  Object to the form.

25            THE WITNESS:  I don't -- I don't know

1    that that is a goal.

     2    BY MR. DOUGHERTY:

     3    Q.    Would it be fair to say that if attorneys

     4    are going to be paid more to represent people

     5    who can't afford payment, then you're going to

     6    have less indigent -- excuse me, you're going

     7    to have less pro se litigants in courts?

     8              MR. STAHL:  Object to the form.

     9              MR. COKE:  Object to the form.

    10              THE WITNESS:  Yeah, I don't know the

    11    reasons why people choose to go pro se, so I

    12    can't necessarily say that I know the answer to

    13    that.

    14    BY MR. DOUGHERTY:

    15    Q.    Is one of the reasons that people choose

    16    to go pro se because they don't have enough

    17    money to pay for a lawyer?

    18    A.    I suppose it could be one reason.

    19    Q.    Isn't that the main reason?

    20              MR. STAHL:  Object to the form.

    21              THE WITNESS:  I don't know that to be

    22    the main reason.

    23    BY MR. DOUGHERTY:

    24    Q.    You don't know that to be the main

    25    reason?

1    A.    (Shaking head.)

2    Q.    Have you ever had this discussion

3    specifically with Justice Kirby?

4    A.    No.

5    Q.    Were there any justices that opposed the

6    rate increase from $50 an hour to 80?

7              MR. COKE:  Object to the form.

8              THE WITNESS:  No.

9    BY MR. DOUGHERTY:

10   Q.    Are any of the justices opposed to having

11   Advisory Commission meetings open to the

12   public?

13             MR. STAHL:  Object to the form.

14             THE WITNESS:  I -- I don't know.

15   BY MR. DOUGHERTY:

16   Q.    Has anyone said anything to you about

17   that -- their objection to having open

18   meetings?

19   A.    No.

20   Q.    Do you personally object to having

21   Advisory Commission meetings open to the

22   public?

23   A.    Do I object?  I don't know that it

24   matters.  They are open now pursuant to court

25   order.  So no, I don't object.

```
 1    Q.    Has that ever been a discussion within
 2    the AOC office about whether or not Advisory
 3    Commission meetings should be open or closed?
 4    A.    I have not had such a discussion.
 5    Q.    You don't know anyone's opinion?  Like,
 6    for example, you don't know if Director Harmon
 7    thinks it's a good idea or bad idea?
 8    A.    I don't know her opinion.
 9    Q.    Do you know Chairman Bulso's opinion
10    whether he thinks it's a good idea or bad idea?
11    A.    I do not know.
12    Q.    Do you think if Chairman Bulso thought it
13    was a bad idea to have meetings open, would he
14    tell you as the AOC director?
15             MR. STAHL:  Object to the form.
16             THE WITNESS:  He's more likely to
17    talk with the staff liaison.  I don't interact
18    with the commission or the chairman.
19    BY MR. DOUGHERTY:
20    Q.    So that would be -- you think he would
21    tell Michelle Consiglio-Young?
22    A.    Possibly.
23    Q.    Would he tell any of the justices on the
24    Supreme Court?
25             MR. STAHL:  Object to the form.
```

```
 1              THE WITNESS:  I don't know.
 2   BY MR. DOUGHERTY:
 3   Q.    You don't think he would tell -- you
 4   don't know.
 5   A.    I don't know.
 6   Q.    Do you ever have any input with the
 7   justices when they appoint members to the
 8   Advisory Commission?
 9   A.    Do I -- say the first, do I?
10   Q.    Yeah, do -- you would agree that the
11   Tennessee Supreme Court justices appoint
12   members to serve on the Advisory Commission,
13   correct?
14   A.    Yes.
15   Q.    Do you as the AOC director have any input
16   with the justices before they appoint someone?
17   A.    No.
18   Q.    Does anyone in your office at the AOC
19   have any input on that process?
20              MR. STAHL:  Object to the form.
21              THE WITNESS:  The only input that our
22   office would have would be based on the terms
23   of the currently serving members and whether or
24   not they are eligible for reappointment.
25   ///
```

LEXITAS LEGAL TENNESSEE
(615)595-0073

```
 1    BY MR. DOUGHERTY:
 2    Q.    And that eligibility is by statute,
 3    right?
 4    A.    Yes.
 5    Q.    So you don't -- your office doesn't weigh
 6    in and say I think you all should appoint John
 7    Smith as a member to the Advisory Commission,
 8    is that right?
 9    A.    That is correct.  Or I don't.
10    Q.    And I'm talking about -- when I say
11    "you," I'm talking about your office, the AOC.
12    Who would be the person that would get involved
13    in that?
14    A.    I don't know if, for instance, Michelle
15    Consiglio-Young would have the opportunity to
16    weigh in on appointments or not.  I know on the
17    boards and commissions that I serve as liaison,
18    I do not.
19    Q.    What boards and commissions do you serve
20    as liaison?
21    A.    So I serve on the Building Commission.
22    Q.    The building?
23    A.    Yes.
24    Q.    Okay.
25    A.    I serve on the Technology Oversight
```

```
 1    Committee.  I cannot recall if I am on the
 2    Access to Justice Commission or not by name,
 3    but I attend sometimes their meetings.  I think
 4    that's all.
 5    Q.    The Building Commission, do they hold
 6    regular meetings?
 7    A.    They do.
 8    Q.    Do you all meet together in one physical
 9    location or is it through Zoom or Webinar?
10    A.    It's been Zoom.
11    Q.    Has that been since the pandemic?
12    A.    I don't -- I started in October like
13    right before, I don't recall a meeting -- well,
14    I wasn't director before then, so I don't know
15    what it was before the pandemic.
16    Q.    Are your Building meetings open to the
17    public?
18    A.    I don't -- I don't think I've ever seen a
19    public notice.  They're really about
20    maintenance of the building, like landscaping,
21    plumbing issues.
22    Q.    Right.  How about the Tech Oversight, how
23    many times a year typically do they meet?
24    A.    So it's brand new and so it has met maybe
25    three times.
```

```
1    Q.    When you say "three times," you're
2    talking about in calendar year 2023?
3    A.    Yes.
4    Q.    Where do you all meet and how do you all
5    meet?
6    A.    It's been via Zoom.
7    Q.    And are any of those meetings been open
8    to the public?
9    A.    Not to my knowledge.
10   Q.    How would you know if a meeting that you
11   were serving on would be open to the public?
12   A.    If public was a part of the meeting.  I
13   attend, so if there were members of the public
14   outside of, you know, those who are on the
15   committee was in attendance, then I would know
16   that it was open.
17   Q.    I understand that if they were physically
18   in the same room.  So my question is how would
19   you -- if you're sitting in a room and it's
20   being Zoomed out to the public, would you know?
21   Would there be a camera in the room?  How would
22   you understand that that meeting was going out
23   to the public?
24   A.    We're all joining from our own locations.
25   Q.    Sure.
```

Lexitas TENNESSEE
(615)595-0073

```
1    A.    And there's no livestreaming, if that's
2    your question.
3    Q.    That's what I'm trying to figure out.
4    How do you know -- not sitting on the side of
5    the public, you're in the room or your meetings
6    are being livestreamed, how do you as a
7    participant know that the public -- that this
8    meeting is being livestreamed to the public?
9    A.    I guess I don't know.
10   Q.    So assuming a chair didn't say, hey
11   members, this meeting's going to be
12   livestreamed -- if they told you, you would
13   know at that point, right?
14   A.    Right.
15   Q.    Would you also know if you saw a public
16   meeting notice on the AOC website that it was
17   being livestreamed?
18   A.    Yes.
19   Q.    Okay.  Any other way that you would know?
20   A.    No.
21   Q.    Okay.  So one of the other aspirational
22   goals -- are you required as the director to
23   come up with ways to expedite litigation?
24   A.    Yes.
25   Q.    How does that -- what does that look
```

```
1    like?  What things have you done in your role
2    to expedite litigation?
3    A.    I would say the entire in Korean
4    (phonetic) study of E-filing in the state is
5    one of those.
6    Q.    The E-filing?
7    A.    Yes.
8    Q.    Any other ways of expediting litigation?
9    A.    No.  We collect statistical data that
10   would inform the Court of where there may be
11   overloaded dockets and then the Court has some
12   tools available to it to address that.
13   Q.    So when you see expedited litigation, you
14   think that relates more towards particular
15   court dockets?
16   A.    Yes.
17   Q.    Are there some court dockets that are
18   slower to work through a case than other
19   dockets or courts?
20   A.    So I think there are places where
21   population growth has caused the courts to be
22   more heavily burdened than in the past.  And so
23   the 19th Judicial District comes to mind,
24   they've just got more filings -- filings than
25   they -- over the course of time.
```

```
 1    Q.     So what's the 19th Judicial District?

 2    A.     So that's Montgomery County.

 3    Q.     And what's the major city in Montgomery

 4    County?

 5    A.     Clarksville.

 6    Q.     Okay.  Is that because there has been an

 7    increase in population?

 8    A.     That's what I would argue.

 9    Q.     Well, when you're setting up your

10    processes to expedite litigation and collecting

11    all this information, how do you do that?  If

12    you have a district that has a lot more

13    filings, how does that work?  What do you do?

14    A.     To address it or get the information?

15    Q.     Well, I don't know.  I'm just trying to

16    understand, is it just your job to collect the

17    information and statistics or is it your job --

18    A.     It is my job to collect the information.

19    Q.     Once you collect the information, is it

20    your job to come up with a fix or that's not

21    your job?

22    A.     So I'm -- it's not my job.  I support the

23    Court with the information that it needs to

24    make decisions.

25    Q.     Okay.  And who would be making a decision
```

Lexitas - TENNESSEE
(615)595-0073

```
 1    let's say on information you collect from

 2    Montgomery -- you said Montgomery County?

 3    A.    Uh-huh.

 4    Q.    Who would make decisions on what to do

 5    with that information that you're collecting,

 6    would that be the justices?

 7              MR. STAHL:  Object to the form.

 8              THE WITNESS:  Yes.  So one of the

 9    things that resulted from the collection of

10    information on filings and the growth over time

11    was the request for new judicial positions.  So

12    that is something once the Court decides that

13    that is needed, then we would advocate for new

14    judicial positions through the legislature.

15    BY MR. DOUGHERTY:

16    Q.    And has that happened once the

17    information you collected and shared with the

18    justices?

19    A.    Yes.

20    Q.    Okay.  So you would think it's fair to

21    say that a big part of the director position is

22    collecting a lot of these statistics and

23    information and sharing it with justices,

24    right?

25    A.    Yes.
```

Lexitas  MIDDLE TENNESSEE
(615)595-0073

```
 1   Q.    Do you remember filing an answer in this

 2   lawsuit?

 3   A.    Yes.

 4   Q.    Who helped prepare that answer for you?

 5   A.    Rachel Harmon and the Offices of the

 6   Attorney General.

 7   Q.    Anyone else assist you with that?

 8   A.    No.

 9   Q.    Was Ms. Harmon representing you at any

10   point during this lawsuit?

11   A.    She has not represented me, no.

12   Q.    And you reviewed that answer before it

13   was filed?

14   A.    Yes.

15   Q.    Along with your attorneys?

16   A.    Yes.

17   Q.    I will segue a little bit away from the

18   Advisory Commission and talk about the

19   Tennessee Judicial Conference Committees, which

20   is a part of this lawsuit, you'll recall.

21   A.    Okay.

22   Q.    For simplicity purposes, I'm going to try

23   to keep it simple and not say Advocacy

24   Commission, just say TJC committees, if that's

25   okay.
```

LexitasⓇ TENNESSEE
(615)595-0073

```
 1    A.    Okay.
 2    Q.    What is your understanding of the TJC
 3    committees?
 4    A.    They are committees of the Judicial
 5    Conference.  We support them in the same way we
 6    do other committees, just administrative
 7    support.  So there's a staff member assigned to
 8    -- I don't want to -- I'm not certain that it's
 9    all, but most.
10    Q.    Right.  And is your -- what is your
11    office responsible for?  I mean, your office is
12    responsible for providing education for judges;
13    is that right?
14    A.    Yes.
15    Q.    Is your office responsible for providing
16    any kind of education to the Advisory
17    Commission?
18    A.    No.
19    Q.    Okay.  But you would agree that judges do
20    serve on the Advisory Commission?
21    A.    Yes.
22    Q.    And non-judges serve on the Advisory
23    Commission?
24    A.    Yes.
25    Q.    Okay.  But with the TJC committees, are
```

LEXITAS LEGAL - TENNESSEE
(615)595-0073

1    there any non-judges that serve on any of those
2    committees that you're aware of?
3    A.    There's a Bench Bar Committee, so there
4    would be non-judges on that committee, but I'm
5    not sure about others.
6    Q.    Yeah, and that's -- what's -- what's your
7    understanding of what that means, "bench bar,"
8    what does that typically mean?
9    A.    It's for joint programming, education
10   programming.
11   Q.    But --
12   A.    Between the bar associations and the
13   Court.
14   Q.    For simplicity purposes, does bench bar
15   mean you have some judges that are on a group
16   and then some non-judges, attorneys, who are in
17   the group?
18   A.    Yes.
19   Q.    And the Advisory Commission is a Bench
20   Bar Committee -- Commission, right?
21   A.    In the generic sense of the term, sure.
22   Q.    Yeah.  Do you participate or serve on any
23   of these TJC committees?
24   A.    I participate in the Executive Committee,
25   which I think I actually serve on that

```
 1    committee.  I participate with the Court

 2    Security Committee, the Weighted Caseload

 3    Committee, Trust and Confidence Committee.  I

 4    think those are the only ones I've been

 5    involved in.

 6    Q.    Are you required by statute to be on any

 7    of those committees?

 8    A.    No.

 9    Q.    Okay.  Who makes the selection as to

10    whether or not you're going to be on a

11    committee or a commission, who makes that

12    determination?

13    A.    I don't know.  I inherited all of that.

14    Q.    Have you ever asked Ms. Tate?

15    A.    No.

16    Q.    Do the justices make that decision?

17    A.    I don't think so.

18    Q.    Who would be making the decision?

19    A.    I think most likely the head of the TJC,

20    the president of the TJC.

21    Q.    Who is that a chief justice of the

22    Supreme Court?

23    A.    No.

24    Q.    Who is the head of the TJC?

25    A.    Currently it is Valerie Smith.
```

1    Q.    Okay.  Is that position elected or

2    whatever by the people that are -- by the

3    members?

4    A.    By the membership.

5    Q.    Okay.  So since you've been director, how

6    many of these various TJC meetings have you

7    been to?

8    A.    I would say four or five.  Because most

9    of them meet during a conference and so I will

10   pop in.

11   Q.    Okay.

12   A.    Or I'm asked to join just to provide

13   information.

14   Q.    Does your office also help gain speakers

15   for CLE for the judges?

16   A.    Yes.

17   Q.    Okay.  Is that something that you're

18   involved in or someone else in your office is

19   involved in?

20   A.    Someone else in my office.

21   Q.    Is that Deputy Director Harmon?

22   A.    I would say it's John Crawford, but I

23   wouldn't doubt that he consults her.  He's not

24   an attorney, so I would not doubt that he would

25   consult Deputy Harmon.

1    Q.    Do you know how Mr. Crawford makes the

2    decisions to choose certain speakers for

3    education?

4    A.    I don't think he chooses them, I think he

5    might recommend to the Education Committee.

6    There's an Education Committee for TJC.

7    Q.    Do any of those committees of the TJC, do

8    they make rule recommendations, court rule

9    recommendations like the Advisory Commission?

10   A.    No.

11   Q.    Okay.  And do you know if any of their

12   meetings are open or closed to the public?

13   A.    I don't know.

14   Q.    When you say you pop in, is that -- when

15   you say conference, are you talking about like

16   a TBA conference that happens to be taking

17   place at the same time as the TJC committee

18   meetings?  What do you mean by that, you pop

19   in?

20   A.    So I attend all of the conferences for

21   our judicial trial courts -- State Judges

22   Conference, the General Sessions Conference,

23   the Municipal Judge Conference, I'll be going

24   to that here shortly.  So I'm an attendant.  So

25   if their committees are meeting, then I'll join

1    them.

2    Q.   Okay.  Do you know if any of those

3    conference meetings that the judges have had,

4    have they ever been open to the public?

5    A.   Not that I'm aware of.  Those conferences

6    are their Judicial Education Conference, so I

7    don't believe they're open to the public.

8    Q.   Okay.  Is it your intention to provide --

9    well, are you going to provide any expert

10   testimony in this case or be designated as an

11   expert witness?

12   A.   I don't believe so.

13   Q.   Okay.  Do you know if Deputy Director

14   Harmon would be doing that?

15   A.   I don't know.

16   Q.   Okay.  Do you know if any of the

17   Tennessee Supreme Court justices will be doing

18   that?

19   A.   I don't know.

20   Q.   Okay.

21         MR. DOUGHERTY:  I'll pass the

22   witness, Mike.

23   ///

24   ///

25   ///

```
                    EXAMINATION

QUESTIONS BY MR. STAHL:

Q.    Just a few questions, Director Long.

      Do you personally as director of the AOC

control any of the conduct related to any

committee meetings that happen at the AOC?

A.    No.

Q.    Would you be able to tell a chairperson

of any committee how or what to do during their

meetings?

A.    No.  Our interaction with the chairs is

limited to implementing what they desire.

That's our interaction with the chairs.

Q.    Has any member of your office, as far as

you know, ever told a committee or a commission

when or where to hold its meeting?

A.    No.

Q.    Are the commissions that are listed on

the AOC website either statutorily or otherwise

required to hold their meetings at the AOC?

A.    At the AOC?

Q.    (Nodding head.)

A.    I don't know the answer to that.

Q.    Okay.  You're a -- your statement earlier

regarding counsel's question about public
```

Lexitas LEGAL - TENNESSEE
(615)595-0073

1    notices, you had mentioned 30 days was a time
2    frame that you thought was reasonable to post a
3    public notice if a meeting was going to be
4    public; is that right?
5    A.    Well, I said I felt like that was pretty
6    standard.  I don't know if that's reasonable.
7    Q.    Why would you feel like that's a standard
8    time frame?
9    A.    I can only draw on my experiences with
10   the Department of Health, and I know that our
11   notices for boards that were meeting in the
12   Department of Health was published in advance
13   and it was about a 30-day notice.
14   Q.    Would the AOC, as far as you know,
15   publish a public notice without permission of
16   the committee or chairperson?
17   A.    No.
18   Q.    Who -- the information contained within a
19   public notice, the public notices that you've
20   seen, what kind of information is included in a
21   public notice that you've seen?
22   A.    So date and time for a meeting.  I've
23   seen -- I believe I've seen some with proposed
24   agenda or an agenda for the meeting.  That's
25   what I recall.

1    Q.    Okay.  Would the AOC in any capacity
2    control the information on public notice
3    concerning the date and time of the meeting?
4    A.    No.
5    Q.    Would the AOC have the ability or in any
6    way control the proposed agenda of the meeting?
7    A.    No.
8    Q.    So the information you've seen on public
9    notices must come from someone outside the AOC?
10   A.    Yes.
11   Q.    And can you describe the AOC's role in
12   publishing the notice after it gets that
13   information?
14   A.    So this is where I'm not sure who handles
15   what, but I know more than likely the staff
16   liaison for whatever body we're talking about
17   would get that information, when is the next
18   meeting, what's the time, date, proposed
19   agenda, and then provide that most likely to
20   our communications team that then posts to our
21   website.
22   Q.    Do you have any reason to believe that
23   anybody within that process would change or
24   alter that information?
25   A.    Absolutely not.

```
 1    Q.    Do you think anybody within that process

 2    has the authority to change or alter that

 3    information?

 4    A.    No.

 5             MR. STAHL:  That's all I have.

 6

 7             FURTHER EXAMINATION

 8    QUESTIONS BY MR. DOUGHERTY:

 9    Q.    On that line of questioning, on those

10    public meeting notices that you've seen, is

11    there an AOC contact person listed?

12    A.    I didn't make note of that.

13    Q.    Would there be an AOC contact person

14    listed with e-mail and phone number if the

15    public has a question?

16    A.    I don't know.  There could be.

17    Q.    Who would the public call if they had a

18    question about a public meeting notice that the

19    AOC put out?

20    A.    This is speculative, but I would say

21    Barbara Peck or our web master.

22    Q.    They would call someone at the AOC,

23    right?

24    A.    Yes.

25    Q.    Does the first amendment require the
```

```
 1    Advisory Commission meetings to be open to the

 2    public?

 3              MR. STAHL:  Object to the form, legal

 4    conclusion.

 5              THE WITNESS:  I know that's what's

 6    argued in this case.  I don't know.

 7    BY MR. DOUGHERTY:

 8    Q.    You don't know?

 9    A.    I don't know.

10              MR. DOUGHERTY:  I have nothing

11    further.

12              MR. STAHL:  Great.  Do you want to

13    review the transcript or do you want to waive

14    signature?

15              MR. COKE:  I'd like to review.

16              THE WITNESS:  Okay, we'd like to

17    review.

18              THE REPORTER:  Did you want to order

19    this?

20              MR. DOUGHERTY:  Yes.

21              MR. STAHL:  Yes, we want a copy of

22    it.

23              FURTHER DEPONENT SAITH NOT

24                  (At 12:30 p.m. CST.)

25
```

```
 1              E R R A T A   P A G E
 2        I, MICHELLE LONG, having read the foregoing
    deposition, Pages 1 through 158, do hereby certify
 3  said testimony is a true and accurate transcript,
    with the following changes (if any):
 4
 5  PAGE    LINE    SHOULD HAVE BEEN
 6  _____  _____    _____
 7  _____  _____    _____
 8  _____  _____    _____
 9  _____  _____    _____
10  _____  _____    _____
11  _____  _____    _____
12  _____  _____    _____
13  _____  _____    _____
14  _____  _____    _____
15  _____  _____    _____
16  _____  _____    _____
17  _____  _____    _____
18
19
20
21              _____
                        MICHELLE LONG
22
23  _____
    Notary Public
24
    My Commission Expires: _____
25
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3   STATE OF TENNESSEE

 4   COUNTY OF SUMNER

 5          I, JENNY CHECUGA, Licensed Court Reporter,

 6   with offices in Nashville, Tennessee, and Registered

 7   Professional Reporter, hereby certify that I reported

 8   the foregoing deposition of MICHELLE LONG by machine

 9   shorthand to the best of my skills and abilities, and

10   thereafter the same was reduced to typewritten form

11   by me.

12          I further certify that I am not related to

13   any of the parties named herein, nor their counsel,

14   and have no interest, financial or otherwise, in the

15   outcome of the proceedings.

16          I further certify that in order for this
     document to be considered a true and correct copy, it
17   must bear my original signature and that any
     unauthorized reproduction in whole or in part and/or
18   transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
19   Tennessee Code Annotated 39-14-104, Theft of
     Services.
20

21

22                                                    _

23          JENNY CHECUGA, LCR, RPR
            Lexitas Legal
24          Licensed Court Reporter (TN)
            Notary Public State of Tennessee

25          My Notary Commission Expires:  5/18/2027
            LCR #690 - Expires:  6/30/2024
```

**$**

**$30** 132:4

**$50** 132:5,6,16,23 134:16 137:6

**1**

**1** 9:11

**10:20** 57:22

**11:35** 112:18

**11th** 13:25 14:2

**12** 76:15

**120-day** 119:22

**12:30** 158:24

**13** 132:18,19 133:17

**15** 48:10 71:24

**16-3-601** 58:6

**1990** 12:9

**1994** 12:14,20

**19th** 144:23 145:1

**1st** 9:17 16:19 76:12,13

**2**

**20** 97:5

**2000** 97:4

**2000s** 96:22

**2002** 96:24

**2017** 106:18

**2018** 106:18

**2019** 9:25

**2021** 25:8

**2022** 9:9,11,18 24:14,16 25:5,9, 11 31:22,23,25 33:7 40:12 43:5,6, 8 97:10,13,14,15, 18,23

**2023** 34:25 38:6 75:24 76:1 87:5, 16,17 89:18,21 94:15 97:8,12 98:8,9,18,22 99:14 100:6 142:2

**2030** 117:22 118:19,20,22,24

**25** 97:5

**26th** 38:18

**3**

**30** 77:8 102:13 155:1

**30-day** 155:13

**30th** 76:12

**4**

**45** 38:23

**8**

**8** 99:14

**80** 132:5 134:17 137:6

**80s** 119:7

**87** 64:7,8

**9**

**90s** 96:20,21 118:9 119:6

**99** 99:6

**9th** 13:12,14,17, 18,21 38:16,17

**A**

**ability** 8:8 50:16 89:2 105:24 111:14 156:5

**absence** 39:6,9

**Absolutely** 124:2 156:25

**accepted** 33:19, 20 34:6,9,11

**accepting** 34:15

**access** 22:25 23:7 36:23 39:16 50:7 57:12,14 75:4,6 126:9,12, 19 130:1,7 135:10,15 141:2

**accumulated** 116:15

**accurate** 33:12, 13

**actions** 96:9

**active** 48:7,9

**actively** 32:8

**activities** 17:15

**actual** 76:8

**added** 94:6

**additional** 48:13 83:18 94:3 129:10

**address** 33:16 125:3 130:6 144:12 145:14

**adjustment** 21:24

**adjustments** 20:14,24 21:12,14

**administration** 22:9,11,23 23:23 24:24,25 26:1,24 27:10 105:4,19 106:7 107:13 108:22 109:25 110:3,7,15,22 111:1,11,13,16 123:24 130:18

**administrative** 7:23 8:21 9:1,4 17:20,21 18:5 20:19 21:21 61:2 70:25 71:5 85:10, 22,23 86:2 91:22 105:4 124:10 148:6

**Administrator** 48:19

**administrators** 48:25 53:25

**admission** 12:19

**admissions** 13:4

**admitted** 12:23

**ADR** 77:11,13,21

**adult** 133:11

**advance** 76:7 77:1 102:12 131:8 155:12

**advances** 50:25

**advice** 44:24 45:3,7,10,13,14, 19,24 46:5

**advisory** 27:16, 22 36:23 51:9,10 52:8,14 56:9,15, 18 57:2,5,10 58:1, 8,12,15 59:5 60:6, 8,11,15,19,22 61:3,7,13,22,25 62:17 66:14 67:17 68:22 70:3,25 71:13,14 72:21 75:18,21 76:25 78:6 79:20 81:13 82:13 83:9 84:22 85:6,15,22 86:1,7 87:25 88:8,17 89:13 90:5,9,13 91:23 92:16 94:15,17 97:10,18 98:9,11,17 100:6 102:24 103:2 104:5 105:2,17 106:9 107:8 108:5,20,25 112:10 113:1,3,13 115:19,21 133:23 134:12 137:11,21 138:2 139:8,12 140:7 147:18 148:16,20,22 149:19 152:9 158:1

**advocacy** 129:1, 4,13,17 130:10,23 131:3 147:23

**advocate** 146:13

**advocating**

128:18 129:20 130:21

**affairs** 66:24 67:5, 13 114:22

**affect** 20:7,19

**afford** 136:5

**age** 96:19

**agencies** 24:22 115:8

**agenda** 155:24 156:6,19

**agree** 46:10,13,14 80:2,4 88:7,9 98:13 110:5 123:23 124:1,21 129:24 131:2 139:10 148:19

**agreed** 131:5

**ahead** 5:14 7:20

**aid** 126:18 129:23

**Alabama** 13:2,11 49:15,16

**Alabama's** 13:17

**alter** 156:24 157:2

**Amanda** 30:23

**amended** 43:8

**amendment** 157:25

**amount** 77:6 102:17

**analog** 51:14,18 114:14,18

**ancillary** 21:1

**annual** 49:8,9 52:22,24

**answers** 8:9

**anticipating** 14:23

**anyone's** 138:5

**AOC** 15:22 16:2,5, 9,11,15 17:15 18:1,10 19:12,14, 15 20:1,8,20,21 21:11,19 22:7,17

24:18 25:16 26:16 27:15,20 28:13 29:6,16 30:9,13, 14 32:20 35:21 36:10,21 37:6 39:7,11 40:2,16 41:2 43:19 44:24 47:20,24 48:5,15 50:13,19,23 51:4, 5,23 52:6 53:14 54:3 55:4,25 56:3 57:7,11 61:2,6,18 62:4,9,18 63:19 64:2,7 67:6,8,23 68:10 70:11 71:8, 10,21,25 72:3 73:10,15,19,23 74:2,5,9 75:8,11, 21 76:2,5,11,14 77:2,21 78:5,10, 22 81:19 83:19,21 84:16 86:2 88:1, 16,20 89:4,7,8 92:15 93:10,14 94:9 97:24 99:7 101:23 102:7 103:5,15 110:7 115:15,17,19,22 116:4,9,15,23 117:25 118:24 119:4,5,16 120:2, 11 121:3,7,10,14, 22 122:10,12 123:1,2,6 124:10, 14 125:2 126:17 128:23,25 129:17 130:23 131:10 138:2,14 139:15, 18 140:11 143:16 154:4,6,19,20,21 155:14 156:1,5,9 157:11,13,19,22

**AOC's** 27:2,5 156:11

**apologize** 13:24 26:1 85:19

**Appeals** 13:14,19 14:1 80:16,20

**appearance** 8:1

**appears** 130:25

**appellate** 21:13 30:25 56:7 60:25 73:7 114:9

**applied** 133:11

**appoint** 9:14 40:8 139:7,11,16 140:6

**appointed** 9:15 10:18,19,20 40:12 132:8,10

**appointment** 9:20

**appointments** 140:16

**appropriated** 129:7,14

**appropriateness** 25:23 26:4

**appropriation** 129:10

**approval** 131:21

**approximately** 31:25 71:24 135:3

**area** 63:12

**argue** 145:8

**argued** 158:6

**argumentative** 111:24

**Arkansas** 53:9

**arm** 49:4 124:10

**article** 131:24

**aspirational** 143:21

**aspirations** 117:21

**Assembly** 23:20 24:21 73:5 90:17, 24 91:8,12 129:8

**assess** 103:25

**assessment** 101:11

**assessments** 103:8

**assigned** 47:1 64:21 148:7

**assigning** 58:19

**assignment**

119:17

**assist** 39:1 55:24 56:18 75:12 88:17 147:7

**Assistance** 18:21 19:4

**assistant** 10:12, 17

**assisted** 96:25

**association** 6:4 11:12 135:12

**associations** 149:12

**assume** 13:3 43:14 88:5 89:5 102:3

**assuming** 54:19 70:2 82:3 88:5,22 133:15 134:15 143:10

**Atlanta** 14:3

**attend** 49:9 141:3 142:13 152:20

**attendance** 142:15

**attendant** 152:24

**attended** 49:12 91:7,12 108:24

**attends** 82:13

**attention** 62:24 66:4

**attorney** 5:11 12:4 120:15,23,25 121:4 122:20 128:7 129:9 132:2 134:17 147:6 151:24

**attorneys** 55:5 118:11 121:8 125:9 127:7 128:19 129:22 131:23 136:3 147:15 149:16

**attorneys'** 19:6

**audible** 6:17

audit 26:14

August 60:3

authority 15:2 22:19 157:2

aware 16:4 36:14, 16 37:10 41:6 43:1,14,24 51:8, 14 58:14,16,18 63:3 67:22 69:1 70:3,7 74:6 77:10 81:19 86:15 87:11,13 89:17,20 92:11 98:11,16 99:2,4,9 101:15 107:23 113:16 114:14 117:19,24 118:8,11 120:14 121:10,20 122:23 127:6 149:2 153:5

awareness 17:16,17 42:23 66:9

**B**

baby 103:14 104:23 115:4

back 18:8 28:8 41:11 57:21,25 112:22 113:12 119:6

bad 123:13 124:8 127:10 128:8,13 138:7,10,13

Baldwin 104:13, 17

bar 12:19 15:2 125:19 149:3,7, 12,14,20

Barbara 36:12 68:12,16 70:19 72:13 91:25 92:5 157:21

barred 12:23

based 12:10 30:15 31:13 83:14,17 103:25 139:22

basically 39:6

90:21

basis 132:3

Beautiful 49:19

began 9:25

beginning 76:10

begins 24:9

behalf 129:21

bench 149:3,7,14, 19

bids 33:25 40:16

big 146:21

Bill 119:11,24,25 120:21

bit 5:16 35:12 41:5 58:1 147:17

Bivins 59:19

BLE 71:16

board 18:8,19,23 19:9 20:6,16 63:6 71:5,13 76:24 82:19 94:23 116:18 133:25

boards 18:4,11, 13 19:18 20:15 25:18 36:4,6 57:9 58:20 64:21 65:19 66:4 71:11,14,17, 21 76:17 82:17 116:3,8 117:8 140:17,19 155:11

body 58:5 95:6 109:3 156:16

booked 63:8

booking 62:24

bosses 123:19, 20,22 124:3,5

Bowers 30:21 56:8

BPR 71:16

branch 115:11,12

branches 114:25

brand 141:24

Brandon 30:21

56:8

break 6:25 7:2,6 38:19 57:23 112:6,16,17,20

Brentwood 11:21

briefing 58:10

bringing 96:5

broad 85:17 123:25 126:2,16

broadened 34:3

brought 66:3

Buck 5:10

budget 17:24,25 19:22,23 20:4 23:10,14,15,24 24:14,15,23 25:1, 5 70:22 71:8,10, 16 85:7,16 130:16 131:1,7,14

budgetary 20:17 24:7 70:21,24 71:4 93:19

building 140:21, 22 141:5,16,20

Bulso 86:11,12, 18,23 87:2 101:1 138:12

Bulso's 138:9

burden 94:9,10, 12

burdened 144:22

business 25:7 50:17 103:6,16

**C**

cadence 69:1,4 70:2 134:6

calendar 31:21 63:22 64:3 67:21, 22,25 68:2,4,10, 14,18,20 72:8 74:7,16,17,23 75:23 76:3 78:25 89:12 100:6 101:21 103:13 142:2

calendering 63:16

California 54:6

call 17:16 48:4,21 53:17 55:17,18 94:10,12 117:11 157:17,22

called 5:3 48:5 63:15 129:1

calling 55:20 118:13

camera 93:1 142:21

Campbell 56:7

cancelled 99:20 101:4

candid 105:22 109:2 110:19 111:10,12

candidate 40:22, 23

candidates 95:6

candor 110:22

capable 102:4

capacity 94:4 95:18 119:15 156:1

capture 55:12

captures 74:21

care 46:20

career 14:8,12

carried 117:1,9

carry 117:8 124:4

case 13:13 32:3,4 33:17 34:1 35:7,8 36:15 41:7 54:11 55:13 69:6,17 86:16 87:3 144:18 153:10 158:6

Caseload 150:2

cases 55:9

caused 144:21

Center 5:11,14 48:24 49:5 54:4,

14

centralized 27:9

certification 23:5

certify 23:3

chair 85:5,9,22
86:5,7 143:10

chairman 79:10
86:12,18,23 87:2
101:1 138:9,12,18

chairperson
154:8 155:16

chairs 154:11,13

challenges 49:25

Chancery 80:10

change 133:17,
19,20 156:23
157:2

changing 72:10
74:9

channel 89:19
90:1,6,10

channels 35:10,
13,20 41:15

Charley 104:13,
17

chart 116:22

charter 96:7,23

charts 117:6

check 26:6

Chicago 12:10
49:14

chief 9:4 16:16,
17,23,24 17:1,5,7,
11 31:2,16 32:23
33:7,15 34:7,18
35:5 59:11,14,17,
21,24 95:15,17
121:12,16 123:12
128:13,20 150:21

Children's 115:4,
6

choose 136:11,15
152:2

chooses 152:4

circle 41:11

circuit 13:12,14,
17,19,21,23,25
80:13

citation 24:1

city 145:3

civil 60:25 114:1
132:24

claims 25:21

clarified 127:24

Clarksville 145:5

CLE 18:18 19:5,
15,23 20:5,15,16
48:10 71:16
151:15

clear 6:19 49:17
85:18

clemency 96:9

clerk 31:1 56:7
73:7

clerks 29:1,11

CLES 19:6

closed 105:2,10,
18,23 106:3,10,
14,20,21,23,24
111:6 113:7 138:3
152:12

closely 115:1
126:17

closer 10:9

cognizant 72:20

Coke 7:22,25 8:3
32:25 37:5,10
40:22,24 99:11
100:20 108:11
110:16 132:9
133:6 134:20
136:9 137:7
158:15

COLA 21:15,23,
25

Collaboration
39:16

collect 144:9
145:16,18,19

146:1

collected 146:17

collecting 55:6
145:10 146:5,22

collection 55:1
146:9

Columbia 32:18

combining 96:2

comment 73:7
90:23 91:2 105:9,
12 109:10,18,20
111:14 134:9,10

commented
90:5,7

commenting
105:15,16

comments
122:23 128:14,21

commission
18:19,24 27:17,22
36:24 51:10 52:8,
14 56:10,15,19
57:2,5,10,13 58:2,
8,13,15 59:6 60:6,
8,11,15,19,22
61:3,8,13,22 62:1,
17 63:6 64:18
66:14 67:17 68:22
70:3 71:1,6 72:21
75:18,22 76:24,25
77:11,14,22 78:6
79:20 81:13
82:14,19 83:10
84:22 85:1,3,6,10,
15,22 86:1,8
87:25 88:8,17
89:14 90:6,9,13
91:23 92:17
94:15,17,24 95:2,
5 97:11,18 98:9,
12,17 100:6
102:24 103:3
104:5 105:2,17
106:9,11 107:8
108:6,21,25
112:10 113:1,13
115:19,21,25
116:18 117:19
118:9 120:17
133:23,25 134:12
137:11,21 138:3,

18 139:8,12
140:7,21 141:2,5
147:18,24 148:17,
20,23 149:19,20
150:11 152:9
154:15 158:1

commission's
117:24

commissioner
10:12,17,21

commissions
18:5,11,13 25:18
36:4,7 57:9 58:20
64:22 65:19 66:5,
8 70:14 71:12,18,
21 76:17 82:18
116:3,8 117:8
140:17,19 154:18

committee 34:18,
22 51:9 56:6
141:1 142:15
149:3,4,20,24
150:1,2,3,11
152:5,6,17 154:6,
9,15 155:16

committees
147:19,24 148:3,
4,6,25 149:2,23
150:7 152:7,25

communicate
6:15 42:20 57:1
61:20,24 62:20
91:18,21,25

communicated
42:13 92:5 97:20

communicates
117:5

communicating
72:13 85:21 86:1

communication
42:10,22 64:25
67:16

communications
36:12 39:15 68:11
79:1,4 86:4 92:1
116:20 119:5
156:20

compare 29:13

compared
127:10,13

**comparing** 72:10

**compensate** 127:14,20 130:14 134:16

**compensation** 127:6,23 128:7, 15,18 129:2,9,25 131:6,23 132:2,5, 23 135:22

**competitive** 33:25

**complaint** 43:9

**complaints** 84:18,19,20

**complete** 73:4

**completely** 124:15

**compliance** 38:2 39:1 42:5,9

**comply** 37:25 42:1,14 87:21

**computer** 29:25 93:2

**concepts** 124:1

**concluded** 15:18

**conclusion** 24:9 158:4

**conduct** 50:17 154:5

**conference** 48:19 62:10,11 63:8,9,14 64:11 70:11 147:19 148:5 151:9 152:15,16,22,23 153:3,6

**conferences** 49:6,12 152:20 153:5

**conferencing** 50:16

**Confidence** 150:3

**conflict** 62:2,5,16 133:12

**conflicted** 62:19

**conflicts** 70:18

**connects** 115:7

**considered** 71:17

**Consiglio-young** 61:11,12,16,21 62:20 66:19 67:16 78:24 79:6 81:25 82:13,24,25 83:8 84:11,13,21 85:14,20 91:11 97:21 100:17,19 102:20 104:10 114:20 117:14 138:21 140:15

**consist** 17:14

**consistent** 83:23 87:21

**consult** 85:5,9 151:25

**consults** 151:23

**contact** 157:11,13

**contained** 155:18

**content** 74:21

**context** 108:7

**continue** 84:8

**continued** 39:8

**continues** 128:10

**continuing** 18:18 19:8 48:16

**continuously** 47:10

**continuum** 55:8

**contract** 119:19, 22

**contracted** 32:21

**control** 123:8 154:5 156:2,6

**conversation** 37:9 53:24 92:14 111:10,12 119:9

**conversations** 37:11 60:14

103:17

**convicted** 15:4

**copy** 158:21

**Corporation** 32:18 33:11

**correct** 9:7,12,16, 19 12:4,5 14:16, 18 15:14 19:8 21:5,22 25:11,12, 15 27:1,2,4,7 28:2 31:24 32:13 60:6 65:8 80:10,11,14, 18,20,21,24 87:6 103:20 139:13 140:9

**COSCA** 48:23,25 49:1,23 52:11,20 53:4,7 54:15 135:6,14

**cost** 21:24 93:21

**Council** 48:24

**counsel** 7:14,22 11:11 37:5 43:21 44:3,10 45:11,17 95:23 99:7 108:11 132:11 133:13

**counsel's** 154:25

**counterparts** 48:18 53:11

**country** 50:20 128:11

**county** 29:13 145:2,4 146:2

**couple** 38:24

**court** 6:6,8,17 9:16 13:4,9,12,14, 19,22,25 14:24 17:1,19 18:1 21:13 22:9,10,13, 18,19,20 23:2,3 28:14,23,25 29:10,16 30:4,9, 25 33:23,24 36:1 37:7 38:3 42:12, 14 44:25 46:6 47:2,20 48:19,24 50:3,17 52:3 53:25 54:11 55:21,22 56:7

58:19 59:10 60:25 70:17 71:11 73:7, 13,22,24 74:1,4 79:11,17,21,24 80:2,4,7,10,16,20, 23 81:1,9,12,16 82:2,8 90:16 93:11,20 94:5,9 95:7 100:24 104:15,20 110:14 112:25 114:11 115:2 116:13,14 121:12,15,23 122:4,5,11,14 123:3,4,5,6,7 124:11,12,16,24 125:7 131:1,8 132:8,10,17 133:17,20,22 134:2,11 137:24 138:24 139:11 144:10,11,15,17 145:23 146:12 149:13 150:1,22 152:8 153:17

**courtrooms** 93:24

**courts** 8:22 20:19 22:16,21,23,24 23:4,6 28:21 29:5 30:25 31:7 32:5,9 45:11,13,15,20 49:5 50:1,7,10,11 54:5,14,17,20 60:24 80:13 83:19,21 84:1 93:10,14,21 94:1 104:24 105:5 113:15,21 114:15 115:4 118:19 125:1,3,4,5,16,18 126:3,16 132:13 136:7 144:19,21 152:21

**cover** 29:5

**Crawford** 151:22 152:1

**created** 29:2 34:23 40:4 46:12 58:5

**creating** 34:17 40:1 96:3

credits 48:11

crime 15:4

criminal 60:24
80:16 114:4
132:7,24 133:2

crisis 126:10,11

CST 158:24

cues 6:16

curious 69:24
96:14

current 72:9

cycle 103:13

**D**

D-R-E-Y-Z-E-H-
N-E-R 11:1

Dalton 21:7,8
27:6 98:4,6

Dan 5:12

data 54:25 55:15
144:9

date 12:18 23:16
96:14 99:15,24
130:6 155:22
156:3,18

dates 43:14 57:6,
10 64:16 68:21,22

David 53:21

day 9:10 26:11,12,
13 47:13 94:14

days 76:7 77:1,8
102:13 155:1

DC 13:2

Debbie 119:11

Deborah 25:3

decades 96:10

December 31:25
33:8 70:6 99:25
100:1,2,9

decided 107:24
116:12

decides 146:12

decision 41:21,25
145:25 150:16,18

decisions 124:16
145:24 146:4
152:2

declaration
69:10

declarations
69:13,16

decreases 20:14

defender's 133:3,
8,12

defense 133:11

degree 12:6

degrees 12:16

delegate 42:3,8

delegated 45:2

delegating 45:6

delegation
116:25

Department 10:4,
6,11,21 11:8,9
18:10 19:16 23:22
24:23,24 26:24
27:9 43:20 96:3
130:18 155:10,12

departments
24:22 115:2,7

depending 20:5

depends 126:2

deploy 32:5

deployment
50:15

DEPONENT
158:23

deposed 6:1

deposition 5:18
15:10,21 41:6
72:18,23 86:13,15
108:8

deputy 9:22,24,25
25:13 39:5 41:4
44:20 45:12,20,25
46:4,6 47:3,18
58:16,21,23

59:15,18 60:9
61:13 67:9,13
69:9,23 86:22
90:3 94:18,22
95:23 119:12
151:21,25 153:13

describe 156:11

designated
153:10

designating
34:18

designation 71:9

designed 54:25

desire 154:12

desired 32:6

details 78:19

determination
39:25 150:12

determinations
84:10

developed 50:6

Development
39:18 96:4

dialogue 110:20

diem 26:13

diems 26:12

difficult 37:22
124:4

direct 42:8 66:22
86:4

directed 42:5

direction 22:18

director 8:24,25
9:1,3,6,9,13,21,
22,24 10:1 15:20
16:14 19:17,18
20:3,22,23 21:4
22:7 25:11,13
27:6 28:13,19
30:18 36:12 39:5,
7 40:2,18,19 41:4
43:3 44:8,20,23
45:12,20,25 46:4,
7,19 47:10,18
48:14 51:3 55:4,
25 56:8 58:16,21,

22,23 59:15,18,20
60:9,12 61:14,17
66:20,25 67:4,10,
12,13 68:11 69:9,
23 72:16,19 79:2,
5 86:22 92:1
94:18,22 98:1
104:19 110:7
119:3 120:3
121:3,22 123:2,6
138:6,14 139:15
141:14 143:22
146:21 151:5,21
153:13 154:3,4

director's 17:2
24:4

directors 40:8,13
46:24 53:14 65:2,
4 66:18 119:5,9
121:8

directs 125:7

disbanding 40:1

disciplined 15:1

discuss 18:4
44:16 49:23
65:18,21 135:5

discussed 30:8,
11,13,15,17,24
31:1,17 56:17
66:2 91:9

discussion 50:8
52:12,15 105:22,
23,25 109:2,5
122:9 137:2
138:1,4

discussions
17:22,24 19:22
21:1 93:18

display 34:15

district 6:10
144:23 145:1,12

diversity 118:3,
14

division 19:6
25:22 27:3 35:17
39:7,15,16,17
40:12 46:23 65:3
66:18,19,22,23,25

divisions 29:2

39:10,13,23 40:1,
5,9 116:24 117:2

**dockets** 144:11,
15,17,19

**document** 117:10

**Don** 95:22

**door** 55:10

**double** 62:24

**double-booked**
62:4,8

**double-booking**
63:2 64:11 67:17
70:9,13

**doubt** 151:23,24

**Dougherty** 5:7,10
7:19,24 8:4,5 33:4
34:14 45:23 46:3
57:24 79:18 81:6
82:7 85:2 87:23
89:3 101:6,17
102:6 104:9
107:6,19 109:8,15
110:4,21 111:5,17
112:1,9,18,21
113:22 125:13
126:8 127:17,22
128:12 130:9
131:4 132:12
133:14 134:24
136:2,14,23
137:9,15 138:19
139:2 140:1
146:15 153:21
157:8 158:7,10,20

**draft** 69:24

**drafted** 96:4,6,24
97:1

**drafts** 70:1

**draw** 155:9

**Dreyzehner**
10:24

**dual** 44:6

**due** 23:16

**duly** 5:4

**duties** 23:9 24:4
46:11 47:1,20
48:5 55:24 83:15

84:2,6,14,15
110:6 116:25
124:4

**duty** 82:20

---

**E**

---

**E-FAILING** 55:2

**E-FILE** 32:10

**E-FILING** 28:21,
23 29:4 31:8 32:6
34:2 50:2 53:23,
24 54:12 55:9,18
83:25 144:4,6

**e-mail** 42:9,15,16,
17 52:21,25 63:20
157:14

**earlier** 103:23
113:19 116:2
154:24

**early** 96:21 97:4

**easier** 75:6,8

**east** 29:3

**easy** 75:1

**editor** 5:13

**education** 18:19,
24 19:8 48:14,17
50:5 148:12,16
149:9 152:3,5,6
153:6

**effective** 22:10

**efficient** 22:10,22

**effort** 47:22

**elected** 10:18
151:1

**electronic** 29:25
47:25 63:9,13

**elevated** 41:3

**eligibility** 140:2

**eligible** 26:7
27:24 139:24

**eliminating**
117:12

**employed** 41:2

**employee** 67:9
78:23

**employees**
18:21,22 19:2,12,
14 20:20,22 45:3
61:6 64:5 75:9
94:4,6 104:2

**enable** 93:24

**end** 31:21,23 33:7
60:2

**engage** 47:21
62:15

**engaged** 33:23
96:5,8 133:13

**engaging** 54:11

**English** 23:1

**ensure** 22:25
50:6,9,11 105:11
113:1

**enter** 55:9

**entered** 36:15
50:3 56:23 57:1
88:6,8 92:2,6

**entering** 8:1

**enterprise** 55:20
56:3

**entire** 22:20 24:12
96:16 123:5 129:6
143:3

**entities** 20:18

**entity** 121:17
134:3

**equipment** 93:23
94:11

**equivalent** 52:13

**escapes** 54:12

**escaping** 54:9

**established** 53:5
117:20

**estimation** 50:18

**Ethics** 120:17

**Ethridge** 104:23

**evaluate** 82:24
83:8 84:5,12

**evaluating** 82:23
103:10

**evaluation** 83:7

**evaluation's**
83:17

**evaluations** 17:4,
6,9 83:4

**Evanston** 12:8

**Evette** 8:16

**evidence** 61:1
108:13 113:21,23

**exact** 96:14
118:18

**EXAMINATION**
5:6 154:1 157:7

**Examiners** 19:9
20:17

**excuse** 12:19
136:6

**execution** 96:10

**executive** 5:13
9:1 39:19 115:11
121:3 149:24

**existence** 11:17

**expanding** 33:22

**expect** 33:25

**expectation** 84:4

**expected** 83:17

**expedite** 143:23
144:2 145:10

**expedited** 144:13

**expediting** 144:8

**expense** 25:21
26:7

**expenses** 26:4,15
27:25

**experience** 14:8
47:4

**experiences**
155:9

**expert** 153:9,11

**explain** 9:13 17:8
20:2 26:3 28:16

35:23 45:8 124:5 132:7

**explained** 55:23 92:21

**explaining** 55:19

**expressed** 56:13

**extent** 27:24 42:25

**extraditions** 96:8

---

**F**

---

**F&a** 23:24 25:24, 25 26:25 27:2,8

**facilities** 10:15

**facing** 49:25 67:24 68:3,9 72:3 75:14 101:20

**fact** 6:2

**fail** 84:16

**failed** 51:17

**failure** 117:12

**fair** 14:9 21:2,3 71:23 77:6 101:11 107:7 115:9 116:7 136:3 146:20

**fairgrounds** 11:24

**fairly** 57:16

**fall** 24:11 25:8

**family** 37:24

**Farms** 11:20

**February** 9:9,11, 17 25:11 40:12 97:15

**federal** 6:7,8 13:3, 19,22 14:5 16:4, 11 22:3 51:4,8,14, 18,23 52:3,7 114:14,18 121:10, 15

**Feds** 54:16 124:18

**feeds** 68:3

**feel** 6:22 50:23 155:7

**felt** 155:5

**fewer** 135:23

**figure** 143:3

**file** 55:5

**filed** 6:5 43:5,10, 15 69:6,14,15,17, 25 147:13

**files** 97:24

**filing** 147:1

**filings** 144:24 145:13 146:10

**fill** 95:9

**final** 83:7 103:7 117:25

**Finance** 23:22 24:23,25 26:1,24 27:9 130:18

**financial** 94:8

**find** 117:6,7

**fine** 38:21,22 120:7

**finish** 14:20

**fiscal** 20:3,22 21:4 25:22 27:3,6 39:14 76:11 97:25

**five-minute** 12:17

**fix** 145:20

**Florida** 53:9

**flow** 116:22 117:6

**follow** 26:9

**foremost** 33:16

**forgetting** 19:10 39:19

**forgot** 104:22

**form** 33:1 34:10 45:21 46:1 79:15 81:4 82:6 84:24 87:19 88:24 101:2,12,25 104:7 107:3,15 108:23

109:13 110:1,16, 17 111:2,8,23 113:17 125:12,25 127:12,19 128:3 130:3,24 132:9 133:6 134:20 135:24 136:8,9,20 137:7,13 138:15, 25 139:20 146:7 158:3

**formal** 17:7 26:8 76:5

**formally** 15:1 24:10

**formed** 53:13

**formulated** 91:5

**forum** 109:4 110:21

**forward** 34:4

**frame** 155:2,8

**Francisco** 13:22

**free** 6:22

**frequently** 49:6 93:12

**Friday** 17:12,14 70:5

**friendly** 74:12,14, 19,20 75:2,4

**friends** 119:8

**fulfill** 47:11

**fulfilling** 46:18 55:24 84:2,14

**full** 8:14 26:12

**function** 22:6 60:22 79:23

**functions** 70:17 73:18 95:25 103:2 117:9

**fund** 129:6 133:10

**funding** 20:7 130:13

---

**G**

---

**gain** 151:14

**gather** 68:17

**gathering** 24:11

**gave** 15:10 33:6 41:6 86:15

**general** 7:22 23:20 24:21 44:9 45:17 63:19 69:20 73:5 80:7 85:23 90:17,24 91:8,12 122:20 125:3 129:8 135:11 147:6 152:22

**generally** 96:10 126:5

**generating** 71:15

**generic** 149:21

**Gino** 86:11

**give** 6:16 8:8 28:18 72:18 79:3 84:20 102:8

**goal** 105:10 135:21 136:1

**goals** 83:13,14,23 103:8,23,25 143:22

**good** 5:8,9 11:5 49:18 68:16 123:13 125:11,20, 23 127:10 128:8 138:7,10

**government** 11:3 32:15,18 33:11 114:25 120:18

**governor** 24:14, 19,20 25:1 95:8,9, 16,19,22,25 96:8, 13 97:6 131:20

**graduate** 12:16

**graduated** 12:9

**grand** 29:2 35:17

**great** 124:21 158:12

**ground** 5:16 8:12

**group** 19:5 52:12, 20 53:1,4,8 63:19, 22 68:18,20

116:20 122:4 123:20 135:7,14 149:15,17

**groups** 129:20

**Groupwise** 63:16,18,24,25 64:3 67:21 68:2, 13,20

**growth** 144:21 146:10

**guess** 47:5 50:3 107:7 143:9

**guideline** 26:8

**guidelines** 26:10, 16

---

**H**

**half** 49:11

**hand** 48:1

**handbook** 47:9, 13,14

**handled** 47:24

**handles** 156:14

**happen** 76:18 81:3 88:18 110:21 154:6

**happened** 87:12 146:16

**happening** 29:14 102:4

**Harmon** 39:5 41:5 44:5,20 46:4 69:9, 23 86:22 90:4 100:22 138:6 147:5,9 151:21,25 153:14

**Harmon's** 45:12

**head** 24:2 34:19 35:14 49:4 107:11 137:1 150:19,24 154:22

**headed** 56:6

**heading** 71:20

**headquarters** 49:3

**heads** 6:15

**Health** 10:4,7,11, 22 11:8,10 155:10,12

**healthcare** 10:15, 16

**hear** 38:4 126:6

**heard** 104:17 121:25 122:25

**hearing** 23:17,19, 21 124:25

**hearings** 91:8,13

**heavily** 144:22

**held** 14:8 49:13 64:17 97:11

**helped** 147:4

**helping** 41:20

**Hensley** 21:7,8 27:6 98:4

**hey** 143:10

**hierarchy** 117:4

**hinder** 8:8

**hinders** 110:3

**hinges** 35:6

**hire** 40:16

**hired** 40:18,24 45:6

**hiring** 44:11

**historically** 108:4

**history** 106:12, 16,19 108:2

**Hivner** 31:1 56:8, 9,22

**hold** 43:19,23 44:1,13 141:5 154:16,20

**holding** 44:16

**Holly** 16:16

**honest** 8:8

**hospital** 6:3 10:14 11:11 15:11

**hospitals** 6:2 10:15

**hosted** 78:5

**hotel** 49:20

**hour** 7:1 57:19 132:5,6,23 134:16 137:6

**hours** 7:2 48:10

**house** 50:17

**houses** 90:25

**HR** 20:23

**Hughes** 30:23

**Human** 115:5

---

**I**

**idea** 122:17 138:7, 10,13

**ideas** 83:22 110:11

**Illinois** 12:9

**impact** 20:21

**impediments** 31:8

**implement** 19:25 20:1 32:23 33:2 34:5

**implemented** 40:4

**implementing** 154:12

**implements** 26:22

**important** 6:14, 16 105:3

**improve** 75:5 105:3,19 107:13 108:21 109:25 110:6,14,22 111:1,18 128:15, 18

**improvement** 75:11 104:15,21 115:3

**improves** 111:10, 13,15

**improving** 32:8

**in-person** 41:23 70:10

**incentive** 103:22

**included** 22:21 155:20

**increase** 129:2,9 130:13,20 131:6 132:1,2,4 133:15 137:6 145:7

**increased** 94:4

**increases** 18:9, 12 19:12,25 20:13 134:16

**increasing** 135:21

**indication** 76:14

**indigent** 127:7 129:6 133:9,10 134:17,23,25 135:5,22 136:6

**individual** 59:3 103:24 104:1 131:3

**individuals** 25:17 30:14 64:2 81:22

**inform** 144:10

**informal** 76:6

**information** 21:17 24:12 30:18 39:17 41:19 44:17 55:12,14,21,22 56:2,14 68:15,17, 19 75:5 79:4,9,11, 12,14 81:3 82:1 108:12,17 111:15 116:11 121:18 130:17 145:11,14, 17,18,19,23 146:1,5,10,17,23 151:13 155:18,20 156:2,8,13,17,24 157:3

**informed** 52:22

**inherited** 150:13

Lexitas - TENNESSEE
(615)595-0073

inhibiting 32:4

injunction 36:15, 20 37:1,4,8,14,19 39:2 41:18,22 42:1,21 56:23 57:1,3 86:19,20, 24 87:3,9,12,18 88:6,8,11,13,23 92:2,6 98:14 101:10,23 102:1, 7,16 112:3,24 113:7

innovation 39:16 83:22

input 139:6,15,19, 21

inputted 29:24

inside 125:8

instance 140:14

intention 37:25 87:21 153:8

intentional 124:25 126:14

intentionality 107:17

interact 138:17

interaction 126:2,4 154:11,13

interconnectedness 20:12

intergovernmental 66:24 67:5,12 114:21 115:10

interim 83:5

interims 83:5

internal 26:16,18 40:21

internally 42:18

interpretation 23:5

interpreter 23:3

interpreters 23:4 135:13,15

interrupt 45:18

interviews 40:21

introduce 7:20

introduction 5:15

inventory 47:22

invested 94:11

investment 93:23 94:3

involve 35:25

involved 5:24 19:21 21:11 24:7 66:13 77:15 107:5 140:12 150:5 151:18,19

involvement 77:13

involving 6:2 77:21

issue 35:15 43:18 128:14 130:2,22 135:16

issued 81:7 112:25

issues 18:5 20:18 73:13 93:19 135:10 141:21

item 70:21,23,24 71:4

**J**

JD 12:13

Jeff 59:19

jeopardy 130:8

Jim 31:1 56:7

job 47:12 49:11 71:7 82:25 83:16 84:4,7,8 145:16, 17,18,20,21,22

John 7:22 10:24 37:5,10 40:22 100:20 108:11 140:6 151:22

join 151:12 152:25

joining 142:24

joint 149:9

Jones 8:16

Judge 152:23

judges 21:12,13 29:1 50:16 109:3 118:11 122:4,24 125:10 148:12,19 149:15 151:15 152:21 153:3

judicial 18:10 39:15,18 50:1 95:7 115:12 117:22 125:10,15, 23 126:7 144:23 145:1 146:11,14 147:19 148:4 152:21 153:6

judiciary 125:19

July 76:12,13

June 43:5,6,8 70:5 72:25 75:23, 24 76:1,12 78:12, 14,16 87:5,11,16 89:18,21 90:9 92:8 94:15 98:10, 12

justice 5:11 16:16,17,23,24 17:1,5,7,11 22:11 23:1,7 31:2,16 32:23 33:7,15 34:7 35:5 56:6 57:12,15 59:5,7, 12,14,17,19,21,24 60:2,5,15 66:12 79:17 81:14 82:9 105:4,20 106:7 107:14 108:22 109:25 110:3,7, 15,23 111:1,11, 14,16 121:16 123:12,25 126:9, 12 128:13,20 130:1,7,22 131:24 135:10 137:3 141:2 150:21

justices 30:3 34:19,21 42:20 44:14,16,25 45:4, 25 46:6 52:3 56:4 79:13 80:25 82:2 87:1 90:8 91:19,

21 107:1 121:12 123:12 124:12 125:9 130:21 131:19 133:20 134:1 137:5,10 138:23 139:7,11, 16 146:6,18,23 150:16 153:17

juvenile 60:25 114:6 125:3

**K**

keeping 50:24 64:16

key 21:17

keying 20:24

kind 5:15 8:6,7,11 17:18 21:1 29:2,3 36:10 41:9,10 44:17 46:9 47:4,8, 9 48:20 50:4 64:16,24 81:15 96:11 115:15 117:1 123:25 126:1 130:11 131:15,16 134:21 148:16 155:20

Kirby 16:16,17,23 59:24 128:13,20 130:22 131:24 137:3

Kleinfelter 69:21

knew 47:4

knowledge 108:4 121:9,18 142:9

Knoxville 12:12

Korean 144:3

**L**

Labor 96:3

lack 47:8

landscaping 141:20

language 23:2 135:15

Lexitas TENNESSEE Reporting & Litigation
(615)595-0073

**larger** 123:20

**late** 96:21

**law** 12:11 14:6
19:9 20:17 90:18
129:14

**lawsuit** 5:12,24
6:2,5 8:2 15:6,7,
13,17 43:2 44:18
51:15,17 147:2,
10,20

**lawsuits** 55:6

**lawyer** 136:17

**lawyers** 18:21
19:4 109:2 127:14

**lean** 110:19

**learn** 84:18
108:10

**learned** 30:17
33:23 50:9 108:8

**learning** 50:5

**leave** 38:9 85:13
102:21

**led** 122:3

**Lee** 59:5,7 60:2,5,
15 66:12 81:14

**left** 117:15

**legal** 11:11 14:8
18:18,24 19:8
23:5 37:5 39:17
40:19 43:21 44:24
45:3,6,10,12,14,
19,24 46:5 48:8,
16 95:23 99:7
108:11 126:18
129:23 158:3

**legislation** 96:4,7

**legislative** 24:10
96:11 104:14
111:21 115:12

**legislature** 25:9
115:1 146:14

**legs** 57:19

**lengthy** 14:7

**letter** 44:13

**level** 95:7 110:21
127:15

**levels** 122:5 123:7

**Lexis** 73:8

**liaison** 60:18
61:7,12,17,22
63:5 64:15 65:7,9,
12 66:14 78:24
79:5,9,11,17
81:15 82:9,13,18
83:9 100:24 103:2
104:14 114:24
115:19 116:17
138:17 140:17,20
156:16

**liaisons** 58:19
64:12,21,25 65:1,
16,19 66:8 96:11
117:7

**Liberty** 5:11

**licensing** 15:2

**licensure** 10:13,
14

**limited** 70:16
119:19 154:12

**limiting** 32:9

**list** 46:15 52:21
66:24

**listed** 20:15
46:20,25 71:24
75:16 83:23
115:21 116:9
154:18 157:11,14

**Listserv** 52:25

**literally** 20:24
21:17

**litigants** 22:23
23:1 126:22
135:17,23 136:7

**litigation** 14:10,
11,12,13 43:19,23
44:1,13 135:19
143:23 144:2,8,13
145:10

**lived** 8:17

**livestream** 36:1
89:1 93:24 94:5,9

102:3

**livestreamed**
70:14 77:17 78:17
88:15,22 89:22
92:9,20,23 93:22
143:6,8,12,17

**livestreaming**
35:10,13,20 36:3
37:16,20 41:11,
14,24,25 50:21,25
70:17,20,22 87:25
89:15 92:16
93:11,15 94:1
143:1

**living** 21:24 120:9

**Local** 32:15,17
33:11

**located** 11:19,20,
22 32:18

**location** 62:3,6
141:9

**locations** 62:9
142:24

**long** 5:2 8:16 15:7
16:17 38:11 46:15
57:16,25 109:5,9
112:23 115:18
120:2,5 154:3

**longer** 53:22
107:25

**Longs** 53:8

**looked** 29:3,11
74:7 94:20 116:6

**loss** 37:23

**lot** 14:9 46:11
50:7,20 116:23
126:22 145:12
146:22

**lots** 50:4 58:11

**low** 129:25

**lower** 127:21

**lowest** 127:15,25
128:11

**Lynch** 104:19

---

**M**

**made** 35:5 37:18
41:21,25 85:18
101:15 103:12
109:5 113:13
124:16

**main** 136:19,22,
24

**maintain** 13:5
48:9

**maintenance**
141:20

**major** 31:9 145:3

**make** 14:23 16:12
19:11 26:6 29:12
31:12,15,18 32:7
33:5 37:10 38:2,5
46:19 47:23 75:6
80:3,6,9,12,15,19,
22 84:10 94:11
112:18 113:14,19
114:2 116:18
125:5 126:15
130:1 133:20
134:1 145:24
146:4 150:16
152:8 157:12

**makes** 24:25
39:25 133:19
150:9,11 152:1

**making** 39:7
88:17 99:9 124:25
130:19 145:25
150:18

**male** 98:6

**management**
32:4 33:17 34:2
35:7,8 54:12
55:13

**manages** 20:3

**March** 37:2,22
38:5,15,16,17,18,
25 70:5 87:17
112:24

**Maryland** 11:20

**master** 157:21

materials 130:11

maternity 102:21

matter 43:9 51:13
105:22 133:12

matters 137:24

Mccaleb 5:13
15:6

means 149:7

medication 8:6

meet 63:7 65:1,3,
4,15 68:24 69:11
141:8,23 142:4,5
151:9

meeting 17:10,11
29:10 37:21 49:10
57:6,10 62:3,6,9,
12,18,19 65:17
66:1,3,10 68:21
70:4 74:15 75:15,
17,20 76:2,7,8
77:1,20 78:2,9,11
81:12 87:6,11,16,
25 88:14,21,22
89:1,14,18,22
90:6 92:8 94:13,
15,16,21,23
98:10,12,17,21
99:13 100:3,11
101:3,4,22 102:5,
12 104:5 108:25
109:10 111:22
112:2 134:12
135:12 141:13
142:10,12,22
143:8,16 152:25
154:16 155:3,11,
22,24 156:3,6,18
157:10,18

meeting's 143:11

meetings 17:13
18:4 36:4 49:23
50:8,13 51:6,18,
24 52:4,7,12,15
62:23 64:17,20
66:2,13,17 67:18
69:2 70:10 76:15
77:16,18,22 78:6
81:3,8,17,23 82:4,
14 88:9,12 91:4
92:19 93:15
97:11,17 100:5

105:2,18,19
106:8,9 107:8,24
108:5,21 109:21
110:13,25 111:6,
18 112:2,7,11
113:4,5,9 137:11,
18,21 138:3,13
141:3,6,16 142:7
143:5 151:6
152:12,18 153:3
154:6,10,20 158:1

member 37:24
59:9 84:25 85:3
140:7 148:7
154:14

members 27:16,
22 30:23 103:8,10
116:7 118:10
125:18 139:7,12,
23 142:13 143:11
151:3

membership
116:14 151:4

mentioned 15:11
41:4 130:22 155:1

met 28:25 98:9
141:24

Michael 7:17,18

Michelle 5:2 8:16
53:8 61:11,12,16,
20 62:20 66:19
67:16 78:24 79:6
81:25 82:12,24,25
83:8 84:10,13,21
85:14,20 91:11
97:20 100:17,18
102:19 104:10
114:20 117:13
138:21 140:14

Michigan 53:9

mid 96:20 118:9
119:6

mid-year 49:10

middle 6:10 29:4
134:22

Mike 153:22

mimics 26:19

mind 53:6 144:23

minutes 38:23

misstates 101:13
109:14

modernizing
50:3

moment 23:8
46:10

Monday 65:5
66:2,13,17

money 93:21
128:1,2 129:7,13
136:17

moneys 129:11

monitors 19:6

Montgomery
145:2,3 146:2

month 37:23,24
43:10 74:24,25
76:16

monthly 49:8

months 76:15
83:6

morning 5:8,9
58:3

motions 118:7

mouth 99:19
124:7

move 34:3 63:10
83:18,20,25 84:1,
3

moves 83:21

Municipal 152:23

_____

**N**

_____

named 59:4

names 58:11 95:8
115:24 116:19

Nashville 8:19
12:1,2 78:7

National 49:5
54:4,14

navigate 75:1,6

ne 45:5

necessarily
65:25 136:12

needed 31:8 32:7
34:3 110:22
146:13

needle 83:19,20,
21,25 84:1,3

negative 126:3,6

neglected 66:23

nod 6:15

nodding 35:14
107:11 154:22

non-judges
148:22 149:1,4,16

nonprofit 11:15,
17

normal 25:6

Northwestern
12:8

note 157:12

notes 29:8,9,12,
15,17,18,20 30:3,
7,8,10,16

notice 8:1 40:20
43:19 75:23 76:2
77:2,7,9 78:12,14,
16,20 87:6 88:21
89:11 94:14,23
101:24 102:8,11,
17 104:5 141:19
143:16 155:3,13,
15,19,21 156:2,12
157:18

noticed 99:1,2,5
101:16,18

notices 74:15
75:15,17,21 76:7
77:21,25 78:10
94:16,22 155:1,
11,19 156:9
157:10

November 23:18

number 41:15
157:14

numbers 131:18

**O**

**oath** 7:9 69:10

**object** 32:25 33:1
34:10 45:21 46:1
79:15 81:4 82:6
84:24 87:19 88:24
101:2,12,25 104:7
107:3,15 108:23
109:13 110:1,16,
17 111:2,8,23
113:17 125:12,25
127:12,19 128:3
130:3,24 132:9
133:6 134:20
135:24 136:8,9,20
137:7,13,20,23,25
138:15,25 139:20
146:7 158:3

**objection** 137:17

**objectives** 83:14
104:1

**obligation** 46:18
47:11

**obligations** 84:3,
14 116:25

**observe** 89:2,17,
21

**observed** 87:5
89:13 95:11

**observing** 41:23,
24

**occasion** 65:21

**occur** 83:17

**October** 9:25
141:12

**offer** 36:22

**offers** 28:23

**office** 7:23 8:21
12:10 15:22 20:8,
19 21:11,19,20
25:16 27:15 28:1,
6,11 29:6,22
32:21 35:23,25
36:3,21 38:8
41:16 50:24 51:23
52:7 56:21 57:7,
11 73:19 78:7

88:1,16,20 89:10
90:4 96:16 99:5
121:22 124:14
129:5,18,22
130:12 133:3,8,12
138:2 139:18,22
140:5,11 148:11,
15 151:14,18,20
154:14

**officer** 9:4

**offices** 50:13,19
147:5

**official** 65:10 91:1

**one's** 84:2

**ongoing** 134:6,8

**online** 55:6

**open** 50:10,11,13
51:5,20,24 52:4,8,
15 87:16 88:9,14,
23 105:2,10
106:3,10,13,16
107:8,12,13,21,24
108:6,9,13,18,20
109:4 110:13,20
111:18,20 112:2,
7,11,13 113:2
137:11,17,21,24
138:3,13 141:16
142:7,11,16
152:12 153:4,7
158:1

**operates** 22:17
123:1

**operation** 28:14

**opinion** 105:6
106:2 109:6
122:2,8,17,19,20
123:9 124:9
138:5,8,9

**opportunity**
54:10 105:9,12
140:15

**opposed** 137:5,
10

**order** 19:24 21:16
37:10 38:1,3 42:6,
12,14,24 58:19,24
59:2,4 60:17
73:14 81:11,15
82:3 87:22 105:21

116:14 137:25
158:18

**orders** 73:19 81:7

**organization**
48:22 49:2 135:7

**organizational**
46:22

**organizations**
14:17

**outcomes** 104:2
106:4,6 111:11

**outlines** 24:3

**overcome** 31:9

**overloaded**
144:11

**oversee** 36:10
50:13

**overseeing**
27:15,21

**oversees** 41:16
104:13,14

**oversight** 33:24
34:17 56:6 140:25
141:22

**P**

**p.m.** 158:24

**PACER** 54:16,17,
18,20,22,24

**package** 72:25
73:3,4 90:22 91:9,
13,19

**paid** 120:18 136:4

**Paige** 32:23 33:7

**pandemic** 50:4,6,
19 93:12,15,16
141:11,15

**paper** 30:6

**parole** 96:9

**part** 23:9 24:3
37:13 39:4 44:23
53:4 71:7,8 73:23
74:18 75:14 83:15
91:15,16 105:13

106:1 109:3 110:5
128:25 133:5,22
134:12 135:21
142:12 146:21
147:20

**participant** 143:7

**participate** 48:17
52:25 149:22,24
150:1

**participation**
20:25

**parties** 15:15

**parts** 46:24 131:3

**party** 15:7,12

**pass** 129:14
153:21

**passed** 90:25

**past** 81:16,23 82:4
107:9 108:18
144:22

**pay** 103:9,18
136:17

**paychecks** 21:16

**paying** 128:10

**payment** 25:24
136:5

**payments** 25:17

**pays** 21:18

**PDS** 129:22

**Peck** 36:13 68:12,
14,16 70:19 72:13
91:25 92:5,15,24
157:21

**people** 6:15 53:16
65:2 104:25
115:24 125:8
129:24 134:17
136:4,11,15 151:2

**perceive** 122:25

**perceived** 125:18

**perceives** 125:22

**percent** 99:6

**percentage**
26:13 132:3

perception 123:8
126:4

performance
17:5 82:25 103:9,
13,19,24,25 104:3

performing 84:6

period 9:23 10:5
38:9 91:2 109:10,
20 119:20 134:5

periodic 17:4
64:20

permission
155:15

person 7:20
36:22 53:21 78:17
79:3 82:5 85:25
89:14 102:2
103:24 104:22
119:2,3 140:12
157:11,13

person's 10:23
21:6 30:20 98:3
104:18

personal 103:17

personally
137:20 154:4

pertaining 47:19

philosophically
124:9

phone 53:17
157:14

phonetic 144:4

physical 30:6,24
141:8

physically 30:9
93:1 116:16
130:15 142:17

pick 6:18 53:17
117:15

place 37:19 40:6,7
49:18,19 55:5
68:16 76:16 78:3,
4 81:8,13,17,24
82:4 83:4 89:23
98:21 106:5 115:7
125:5 152:17

places 116:12
144:20

Plaintiff 5:12

plan 72:11 83:24
103:12,24

planning 103:7

plans 104:1

play 50:12

pleadings 51:12
58:10 69:5,7
72:24 92:12
114:17 118:6

pleasure 121:15
123:2,12

plumbing 141:21

point 7:1 13:6
49:17 59:8,12
67:4 79:3 88:12
90:17,23 91:3,13
106:13,15 107:9,
10 108:5,8,14,18
118:6 131:19
143:13 147:10

points 117:12

policies 26:17,22

policy 26:18,19,
20,21 77:5

pop 151:10
152:14,18

population
144:21 145:7

portion 24:19
71:11

position 8:23 9:8,
13,14 10:10,18,20
11:13 22:6 40:22
45:5 46:18 47:17
59:25 65:10 81:23
84:16 115:14
120:19 123:11
130:7 146:21
151:1

positions 14:9
146:11,14

positive 126:5,20

possibly 79:7

138:22

post 50:4 73:19
87:2 89:5,11
93:12,15 98:13
155:2

posted 73:6,14,15
74:17

posting 68:19

postponed
99:21,22,24
100:11,16 101:5,8

posts 156:20

postsecondary
12:15

potential 64:11

practice 27:17,23
47:16 51:11 56:10
57:6 58:2 60:23
71:1 80:1 113:20
114:12

practices 51:5
117:17

practicing 12:4

practitioners
10:16

pre 87:2 93:16

predated 119:6

predates 106:17
108:1

predecessor
24:15 25:2 120:1

preliminary
36:14,20 37:1,3,7,
13,19 39:2 41:18,
22 42:21 56:23,25
86:19,20 87:3,9,
12,18 88:6,7,11,
13,23 92:2,6
98:13 112:3,24

preparation
86:13

prepare 72:22
147:4

prepared 7:11

preparing 85:6
108:7

present 23:24
131:7

presents 63:3

president 11:10
150:20

pretty 77:8
125:19,23 155:5

previous 86:23
119:5,9 121:7

previously 32:21
34:5 107:21

primarily 14:15

prior 9:20 10:2,3
11:7,9 16:22 67:4
86:19 88:23
112:3,8 113:6

priorities 17:25
18:2

private 11:13,14
118:10 133:13

pro 126:22
135:18,23 136:7,
11,16

probation 96:9

problem 64:13
99:10 126:13

problematic
109:4

procedure 27:18,
23 56:11 57:6
58:3 60:24 71:2
79:25 113:20
114:1,4,6,9

procedures
113:16 117:11,17

proceedings
36:1

process 17:24
19:13 23:13 24:7
28:22 29:10 31:10
33:21 40:17 44:11
72:9,12 76:17
90:20 93:25
105:8,13 106:1,5,
23 111:19,21
117:10 128:17
131:15 139:19

TENNESSEE REPORTING SERVICES
(615)595-0073

156:23 157:1

**processed** 25:8

**processes** 22:10
28:20 117:11
125:5 145:10

**processing**
25:24

**produce** 55:16

**product** 64:1

**Professional**
18:20,23 20:6,16

**program** 18:22
19:4 103:22
104:15,21

**programming**
149:9,10

**programs** 22:25
23:3 115:3 125:2
126:14

**promote** 106:6

**promulgated**
132:21

**proper** 102:8,11

**properly** 99:1,2,5
101:16,18,24
104:4

**proposals** 131:7

**proposed** 132:1
155:23 156:6,18

**provide** 22:8,15
34:1 36:3 44:24
45:3,14,19,24
46:5 57:6,10
79:10,11,14
126:19 151:12
153:8,9 156:19

**provided** 37:3
130:17

**providing** 35:25
128:9 148:12,15

**public** 23:19 36:5
37:20 41:23
51:20,25 52:4,9,
16 67:23 68:1,3,9
70:15 72:3 74:15,
23 75:2,3,8,12,14,

15,17,20 76:1,6
77:1,2,7,17,20,22
78:9,11 87:6,17
88:14,16,21 89:11
90:23 91:2 92:9
94:13,16,21,23
101:20,21,24
102:8,12 105:3,9,
11,16,18 106:6
109:6,9,17,20
110:14,21 111:13,
15 113:2 125:22
126:1 128:21
133:3,7,11 134:9,
10 137:12,22
141:17,19 142:8,
11,12,13,20,23
143:5,7,8,15
152:12 153:4,7
154:25 155:3,4,
15,19,21 156:2,8
157:10,15,17,18
158:2

**public's** 89:2
105:24

**publicly** 73:14
93:15

**publish** 40:20
155:15

**published** 91:1
155:12

**publishing**
156:12

**purely** 55:2

**purpose** 22:6
26:23 105:16

**purposes** 15:20
16:8 147:22
149:14

**pursuant** 21:14
137:24

**put** 40:16 47:16
77:2 78:20 82:3
88:20 90:22 99:18
116:13 117:20
124:7 134:8,10,18
157:19

**puts** 76:6 116:11,
16 134:21

**putting** 78:25

131:18

___

**Q**

**qualify** 48:16

**quarterly** 68:24
69:8,11 70:2
100:3

**question** 6:14,21
7:3,5 14:21 20:10
31:11 67:20 68:5
88:3 105:14
112:5,16 142:18
143:2 154:25
157:15,18

**questioning**
57:16 157:9

**questions** 5:7
6:20 7:12 154:2,3
157:8

**quick** 35:24 50:14

**quiz** 39:21

___

**R**

**Rachel** 39:5 44:5
100:22 147:5

**rank** 104:2

**rapidly** 32:5

**rate** 127:20
128:11 132:5
134:15 137:6

**rates** 129:9
130:20

**reach** 53:3,20
126:15,19

**reached** 53:22
54:15

**read** 114:17

**real** 35:24

**realty** 123:3

**reappointment**
139:24

**rearrange** 63:11

**reason** 66:16 74:8

87:15 101:8
108:17 136:18,19,
22,25 156:22

**reasonable**
155:2,6

**reasons** 136:11,
15

**recall** 5:23 6:13
10:5,23 11:25
13:9 15:15,17
18:7,16 23:16
31:20 34:23 37:11
38:14 44:2 49:13
53:15 58:24 67:15
69:12 78:1,15
92:18 95:11,14
96:15 102:18
116:4 118:20,24
119:2 120:3
135:20 141:1,13
147:20 155:25

**receive** 18:14,16

**received** 42:24

**receiving** 81:1

**recent** 72:25

**recently** 18:7,9
95:13 128:14,21
131:24

**recommend**
60:23 152:5

**recommendation**
31:13 33:6,22
34:8 95:9

**recommendations** 19:11 25:1 31:15,
18 32:2,3,24
33:14 34:9,12,16
35:4 79:24 80:3,6,
9,12,15,19,22
81:2 90:14,15
91:4 113:14,19
114:2 122:1
134:13 152:8,9

**recommended**
121:21

**record** 8:15 57:25
112:22 127:1

**records** 28:3,6,9
29:6 62:22,23,25

**refer** 9:6 15:21 16:1,8,11 49:7 58:7,12

**reference** 16:12

**referenced** 46:9 60:18 81:14

**referencing** 59:3

**referred** 9:4

**referring** 23:25 24:18 27:8 103:15 118:17 122:8

**reform** 96:6

**regard** 68:17 122:7

**registration** 52:22,24

**regular** 141:6

**regularly** 65:4

**regulation** 10:13

**reimbursement** 25:17 26:4,11 27:15,21,25 28:4

**reimbursements** 97:23

**related** 72:21 154:5

**relates** 144:14

**relationship** 53:5,10 121:11

**relationships** 53:13

**relative** 18:8 28:19,20 79:25

**release** 128:20

**relevant** 44:18

**reliable** 55:16

**relied** 38:1,25

**remember** 9:10 54:8 78:16 92:14 96:20 99:15 135:14 147:1

**remotely** 50:17

**repeat** 27:19 46:2

**repeating** 53:6

**rephrase** 65:16 73:25 87:14

**report** 55:15 104:25 117:25 118:1,4,14,24 121:20,25 122:6

**reporter** 6:17 14:24 158:18

**reporting** 54:25 55:7

**reports** 55:16 117:21

**repository** 55:15

**represent** 5:12 135:17 136:4

**representation** 127:8,15 128:9,10 129:7 133:9,10 134:23 135:1,6,22

**represented** 7:14 125:6 147:11

**representing** 122:5 134:17 147:9

**request** 23:15 131:1 146:11

**requests** 27:16, 21 28:4 130:16

**require** 101:23 102:2,7 133:16 157:25

**required** 23:10 24:8 36:21,22 39:23 47:23 127:3 143:22 150:6 154:20

**requirement** 121:2

**requires** 23:23 102:16 110:10

**requiring** 123:10

**rescheduled** 99:3

**resolve** 62:5,15

**resolved** 70:19

**resources** 39:15 50:15 70:16

**respect** 20:18 34:7 36:20 50:25 51:5 61:21 70:10 71:11 74:14 121:11

**responsibilities** 46:12 47:21 48:6 83:16 84:7,15

**responsibility** 18:20,23 20:6,16 22:22 36:9 82:21 85:13 104:4 110:6 116:17

**responsible** 20:23 24:13 25:16 27:14,20 46:24 68:19 70:20 78:23 85:21 103:10 122:10,13 123:4, 24 148:11,12,15

**responsive** 123:7 125:1

**responsiveness** 14:19

**restate** 6:22

**resulted** 146:9

**results** 109:5

**retired** 60:2 120:13

**returned** 38:17

**revamped** 54:23

**revenue** 71:15

**review** 25:22 33:24 47:19 69:13,19 72:6,17 75:14,16 78:18 108:12 158:13,15, 17

**reviewed** 69:16, 24 72:2,15,24 92:13 108:16 147:12

**reviewing** 51:12

**reviews** 83:6

**revisions** 103:12

**reward** 104:2

**RFP** 54:11

**Roberts** 121:16

**robust** 55:13

**Roger** 16:24 31:2, 16 59:21

**role** 22:6 25:10 44:6,9,23 45:10, 12,20,25 46:6 48:14 51:3 58:15 61:21,25 65:11, 18,22 66:14 67:5 72:16,19 83:9 84:22 91:16,17 94:18,22 95:21 96:12 119:3 120:1 133:4 144:1 156:11

**roles** 96:1

**room** 62:12 63:8, 14 69:20 70:11 93:1 142:18,19,21 143:5

**rooms** 62:10 63:10 64:11

**roughly** 97:5

**rounds** 40:20

**rule** 60:23 79:25 80:3,6,9,12,15,19, 22 90:13,14 110:20 113:14 114:2 132:17,19, 21 133:16,17 134:13 152:8

**rulemaking** 110:14,25 111:19

**rules** 5:16 8:12 27:17,22 36:23,24 51:10 56:10 57:5 58:2 60:25 71:1, 13 72:21,25 73:3 79:25 80:2 90:19, 22 91:8,13,19 108:25 113:2,20, 21,23 114:1,4,6,9, 11,15 133:22

134:2,11

---

## S

**safe** 104:23 115:4

**SAITH** 158:23

**salary** 18:9,12,14, 17 19:12,21,25 20:13,24 21:12,14

**San** 13:21

**Sarah** 56:7

**schedule** 100:15

**scheduled** 62:13, 18 66:10 99:25 100:10 101:22

**schedules** 63:9, 14

**scheduling** 62:2

**school** 12:7,11 96:5,7,23

**seamlessly** 39:8

**search** 74:22,24

**section** 116:3

**security** 50:2 150:2

**segue** 147:17

**selection** 150:9

**send** 42:16 69:23 95:8

**senior** 11:10

**sense** 85:17 149:21

**separate** 74:5 121:17,22 124:15

**September** 16:19 59:24 70:5 98:17, 22 99:14,16,20 100:16 101:4 102:5 104:6

**serve** 64:18 65:12,20 82:17 95:15,18 116:8 119:15 120:2 121:15 123:11 133:4 139:12

140:17,19,21,25 148:20,22 149:1, 22,25

**served** 95:22 115:18 119:3

**serves** 61:7 79:20,22,23 116:12 123:2

**services** 25:22 27:4 30:18 36:1 39:14,17,18 40:19 115:4,5,6

**serving** 25:18 39:6 44:6 47:3 139:23 142:11

**session** 24:10

**sessions** 80:7 93:11,20 94:5,9 125:3 152:22

**set** 81:12 83:13 109:22 121:11

**setting** 145:9

**shaking** 137:1

**shape** 54:24

**share** 29:15 30:3, 7

**shared** 29:17,18 30:5,9 44:13 56:2, 13 146:17

**sharing** 41:19 130:10 146:23

**Sharon** 59:5

**short** 57:23 112:20

**shortly** 43:17 152:24

**show** 21:16

**showing** 78:10

**sic** 54:2

**side** 133:2 143:4

**signature** 158:14

**signed** 59:2

**significant** 37:23

**similar** 51:9 53:8 81:13 114:15

**simple** 147:23

**simplicity** 16:7 147:22 149:14

**single** 117:12

**sir** 8:13 12:17 15:25

**sits** 13:21

**sitting** 142:19 143:4

**situation** 76:14 124:14

**situational** 17:16 42:23 65:23 66:9

**skip** 74:25

**skipped** 41:9

**Slate** 54:2

**Slayton** 53:21

**slower** 144:18

**Smith** 140:7 150:25

**societies** 126:18 129:23

**soft** 50:15

**speak** 37:6 54:10

**speakers** 151:14 152:2

**speaking** 71:10

**special** 53:10

**specific** 9:10 16:12 28:18 64:21 67:15 91:15

**specifically** 102:23 137:3

**speculative** 157:20

**spell** 10:25

**spoke** 56:22 86:23 131:24

**spoken** 52:2,6 90:8 102:19,23 103:1,5

**spring** 34:24

**square** 5:14 134:22

**Stacy** 104:19

**staff** 82:18 95:15, 17 104:22 138:17 148:7 156:15

**Stahl** 7:17,18 33:1 34:10 45:21 46:1 57:18,21 79:15 81:4 82:6 84:24 87:19 88:24 101:2,12,25 104:7 107:3,15 108:23 109:13 110:1,17 111:2,8,23 112:4, 15,19 113:17 125:12,25 127:12, 19 128:3 130:3,24 135:24 136:8,20 137:13 138:15,25 139:20 146:7 154:2 157:5 158:3,12,21

**stand** 19:3 21:23

**standard** 77:8 102:15 155:6,7

**standing** 17:10, 11,13

**standpoint** 72:4 74:21 128:6,8

**stands** 48:23

**start** 9:8 24:6 30:13 35:24

**started** 5:15 14:11 67:9,13 97:15 141:12

**starting** 47:17

**starts** 55:9

**state** 6:6 8:14 11:3,13 14:9,15 15:2 18:14,17,20, 22 19:2 21:13 22:2 26:19,20,22 27:12 28:14,21 29:1,4 34:2,4 48:19,24 49:5,25 53:25 54:2,5,10, 14 96:6 115:8

126:10,13,21,23
127:16,18,21,23
132:13 135:11
144:4 152:21

**state's** 32:4

**statement** 154:24

**statements** 6:17

**states** 12:24 13:1,
8,12 48:18 52:18
53:3,12,23
127:11,14 134:22,
25

**statistical** 144:9

**statistics** 145:17
146:22

**status** 48:8,9

**statute** 9:3,5
21:15 23:23,25
24:3,8 26:17,20
39:23 46:10,12,
20,25 47:16,22
69:2 96:23 110:10
121:5 123:1,10
127:4 132:15
140:2 150:6

**statutes** 47:19

**statutorily**
154:19

**statutory** 55:24

**stay** 14:12

**Stephanie** 104:23

**steps** 25:9 31:11
38:1

**stick** 102:14

**sticks** 53:19

**stipulation** 7:3

**strategic** 83:24
103:7,12

**street** 11:25

**stretch** 57:18
83:14

**strike** 31:11 52:18

**structure** 46:23

**struggling** 88:3

**studied** 51:4

**study** 28:14 144:4

**submit** 23:10,14
24:8,22

**submits** 24:20

**submitted** 23:15,
17 24:15,18 25:4,
7,21,24 26:5 73:4
131:20

**submitting** 24:13

**successful** 40:23

**sufficient** 109:7,
11,24

**suggest** 105:15

**suggested**
121:21

**suggesting**
84:12

**summarize** 31:4

**Sundquist** 95:25
96:13 97:6

**Sundquist's**
95:22

**supervision** 21:9
64:6

**supervisor**
16:14,18,22 17:2

**support** 21:21
22:8,12,15 45:15
61:3 70:25 71:5
79:23 82:18
85:10,23 86:2
91:22 145:22
148:5,7

**supported** 96:11

**suppose** 79:10
85:24 126:4
136:18

**supposed** 78:2
98:16 99:13 100:3

**supreme** 9:15
13:9,12 17:1 22:9,
13,18,19 30:4
44:25 46:6 52:3
58:18 59:9 73:13,
22,24 74:1,4

79:21,24 80:4,23
81:1,9,12,16 82:2,
8 90:15 100:23
121:12,23 122:4,
11,13 123:3,4,5
124:11,12,15,24
125:6 132:17
133:17,19,22
134:2,11 138:24
139:11 150:22
153:17

**survey** 28:13,24
30:15,25 31:13
33:12 34:12 35:15
110:10

**surveying** 28:22

**surveys** 29:7

**swath** 129:24

**sworn** 5:4

**system** 21:17
22:20 28:14
29:16,25 30:9
32:4,8 33:17 34:1
35:7,8 37:7 47:25
54:11,16,17,18,
21,22 55:2,14,21,
23 56:3 63:9,13,
17,21,23 64:3
67:21 68:2,10,14
117:22 122:5
123:5 125:11,15,
20,23,24 126:7
127:6 128:16

**systems** 29:11
50:3

---

**T**

---

**table** 7:4 125:9
129:21

**takeaway** 31:5,6
34:12

**takeaways** 30:24
31:1,9,12

**taking** 89:23
152:16

**talk** 5:16 17:25
23:7 35:12 41:5
55:3 58:6 73:1
78:14 86:18

109:17 113:11
114:11 124:8
126:6 138:17
147:18

**talked** 18:11
35:16 51:22 58:1
70:8 86:12 87:1
103:11,14,23
108:2 116:2

**talking** 13:18
17:18 32:11 35:9
38:5 41:10,12
48:20 63:18 66:8
68:6,8 81:8
112:10 113:3
118:4,13,15
123:22 129:25
131:9,11,22
140:10,11 142:2
152:15 156:16

**TAOC** 15:22

**tasked** 47:19

**Tate** 25:3 119:11,
12 120:2,25 121:6
150:14

**Tate's** 25:13
119:25

**TBA** 129:20
152:16

**TCA** 58:6

**team** 30:23 38:2
39:1,4 41:20 42:7
43:20 56:25 65:17
91:16 92:4,15,25
103:8,10 104:12,
16 156:20

**teams** 29:2

**Tech** 141:22

**technological**
50:24

**technology**
28:20 30:18 32:12
33:12,24 34:17,22
39:17 41:10 50:21
51:1 56:5,14,18,
22 140:25

**temporary**
119:17

ten 5:22 14:14 15:11 57:15

Tennessee 6:3,5, 8,11 7:23 8:19,21 9:15 10:3,6,11 11:7,9,11,21 12:12,21 15:10 16:9 17:1 18:21 19:4 22:2,8,11,12, 18,19 32:19 46:5 48:8 50:23 51:10 52:14 54:16,20 55:4 73:22,24 74:1,4 79:20,24 80:3,7,10,13,16, 20,23,25 81:9,12, 16 82:2,8 89:18 90:1 93:10,14 95:16,19 96:6 105:5 117:22 118:10,19 120:18 121:23 122:13,20 123:3,4,5 124:11, 15,24 125:6,10, 15,18,23 126:7, 10,13,15,21,23 127:7 132:13 134:19 135:1 139:11 147:19 153:17

Tennessee's 127:18

term 22:2,3,4 28:23 96:16,18 149:21

terms 19:11 20:7 37:19 51:24 74:21 78:25 96:17 105:24 123:16 127:23 139:22

testified 5:4 69:10

testimony 101:13 102:13 109:14,17 153:10

thing 118:16 123:13,14 124:21 125:11 126:20

things 26:14 39:8 46:19 50:5 65:23 74:22 83:13,15, 18,24 84:17 126:7

144:1 146:9

thinks 138:7,10

thought 43:6,8 118:2 138:12 155:2

tied 103:22

time 6:22 9:23 10:5 24:11,12 36:25 38:9 43:4, 22 44:12 62:13 63:7 69:3 72:2 74:10 96:2 107:5 119:20 122:10,23 144:25 146:10 152:17 155:1,8,22 156:3,18

times 83:3 105:21 116:13 141:23,25 142:1

title 9:2 67:3 114:21

titles 104:20

TJC 147:24 148:2, 25 149:23 150:19, 20,24 151:6 152:6,7,17

TLAP 18:21 19:1, 3 20:17 71:16

today 5:19 7:9 8:9,12 15:24 16:8 72:18 92:13 109:23 112:2

told 121:14 143:12 154:15

tools 144:12

top 24:2

topic 53:25 129:19

topics 49:22 50:1, 2,12 66:7

touches 115:11

track 64:16 126:25 127:2

training 47:9,12 48:14 49:7

transcript 6:18

158:13

transitioning 44:9

transmitted 90:15,16,24

transparency 110:25

transparent 111:4,7,12

travel 26:10,11

treatment 8:7

trial 95:2,3,4,7 122:24 125:4 152:21

trouble 123:21

trust 117:7 150:3

truthful 8:8

truthfully 7:12

type 26:8 43:18 48:13

types 49:22 66:7

typically 23:14 24:6 68:25 70:4 88:1 141:23 149:8

———————

U

Uh-huh 85:4 131:13,17 146:3

ultimately 55:1

unaware 93:17

undergraduate 12:6

understand 6:21 7:8 8:11 15:23 19:20 20:9,11 24:20 27:5 29:11 33:5 53:7 65:6 85:18 101:19 105:25 106:12 108:3 109:18 116:24 117:4 118:5 124:6,8 133:4 142:17,22 145:16

understanding 16:25 17:3 22:5 35:19,22 36:19 41:13 60:21 65:8 79:19 82:12 87:15 90:12,19,21 98:20,24 99:17,23 101:7 106:9,16, 19,23 112:12,23 113:6,24 122:12, 15 133:10 148:2 149:7

understood 42:11 109:19

undertake 133:8

uniform 34:1 55:13

uniformity 31:7

United 13:8,11

University 12:8, 12

unsuccessful 97:2

update 42:25 74:10

updates 17:15, 18,19,22 18:4

user 74:12,14,18, 20 75:2,4

utilize 63:11

———————

V

vacancies 95:7, 10

vacancy 95:2,4

Valerie 150:25

vendor 32:7,11, 12,14,16,17,20 33:10,17 34:8 35:4

vendors 53:23

verbal 6:17 32:2, 24 33:6,14 34:8 35:3 42:10,11

verbally 31:17,19

Case 3:22-cv-00439    Document 121-1    Filed 12/06/24    Page 180 of 181    PageID #: 1407
Lexitas Legal TENNESSEE Index: ten..verbally
(615)595-0073

**versus** 15:6

**vets** 95:6

**vice** 11:10

**video** 50:16

**view** 34:3 37:21 55:8 68:1 128:6,8

**viewed** 51:18

**violation** 101:9

**virtual** 36:23 37:14,15,20 41:12,14

**virtually** 37:21

**vis-a-vis** 123:6

**Vision** 118:18

---

**W**

**waive** 158:13

**wanted** 73:25 118:7 128:15

**warehouse** 55:15

**watched** 89:25

**water** 49:20

**ways** 143:23 144:8

**web** 157:21

**Webinar** 141:9

**website** 36:10,11 67:23 71:20,25 72:3,7,10,12,15 73:10,12,16,20, 22,23,24 74:2,5,9, 18 75:7,11,15,21 76:2 77:21 78:10 79:1 81:20 94:17 115:22,25 116:4, 9,16,19 117:25 118:25 128:23 143:16 154:19 156:21

**week** 38:16,17,18 116:6

**weekly** 17:6,9 18:4

**weeks** 38:12,13, 24

**weigh** 140:5,16

**Weighted** 150:2

**west** 29:3

**Westlaw** 73:8

**When's** 72:2

**wide** 63:22 129:24

**widely** 22:3,4

**window** 11:5

**wise** 106:20 127:1

**wondering** 47:7, 15

**word** 34:5 47:8 99:22

**words** 99:18 122:4 124:7

**work** 8:20 10:2 11:6 19:13 32:7 34:19 38:17 40:17 59:7 93:25 115:11 117:7 120:11 126:17 134:7 144:18 145:13

**worked** 9:17 10:3 11:10,22

**Workforce** 96:3

**working** 6:3 11:3 13:10 67:9 115:3, 5 117:16 120:16

**works** 24:21 65:13 92:25 93:5, 8 115:1

**worried** 43:13

**worse** 130:2,4

**worst** 127:18,23

**writing** 31:18 117:17 122:7 130:19

**written** 117:16 130:11,15

**wrong** 13:24 65:8 104:20

---

**Y**

**year** 12:7,13,19 16:20,21 19:7 21:15 23:10 31:21 34:24 37:2 38:6 48:11 49:11 74:25 76:11 83:3 100:7 117:22 118:19 134:6 141:23 142:2

**year-long** 131:15

**years** 5:22 8:18 10:8,9 14:14 15:12 96:12,14 97:2,5 117:20 118:12 120:4

**yesterday** 72:5, 16 74:8 77:24

**Young** 119:11,24, 25 120:5,21 121:7

**Youtube** 35:10, 13,20 41:14 51:19 89:19 90:1,6,10

---

**Z**

**Zoom** 50:15,21,25 141:9,10 142:6

**Zoomed** 142:20