# EXHIBIT 6

```
 1              IN THE UNITED STATES DISTRICT FOR
               THE MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION
   _____
 3
   DAN MCCALEB, Executive Editor of
 4 THE CENTER SQUARE,

 5              Plaintiff,

 6 vs.                          Case No. 3:22-cv-00439

 7 MICHELLE LONG, in her official
   capacity as DIRECTOR of the
 8 TENNESSEE ADMINISTRATIVE OFFICE
   OF THE COURTS,
 9
                Defendant.
10 _____

11

12

13

14

15
             Deposition of:
16
             RACHEL HARMON
17
             Taken on behalf of the Plaintiff
18           October 24, 2023
             Commencing at 9:09 a.m. CST
19

20

21

22
   _____
23
                     Lexitas Legal
24            Jenny Checuga, LCR, RPR
                   555 Marriott Drive
25            Nashville, Tennessee 37214
                    (615)595-0073
```

*Lexitas*
*(615)595-0073*

```
 1              A  P  P  E  A  R  A  N  C  E  S

 2

 3    For the Plaintiff:

 4         MR. M.E. BUCK DOUGHERTY III
           Attorney at Law
 5         Liberty Justice Center
           440 North Wells Street, Suite 200
 6         Chicago, IL 60654
           (423)326-7548
 7         bdougherty@ljc.org

 8

 9    For the Defendant:

10         MR. MICHAEL M. STAHL
           Assistant Attorney General
11         Office of the Attorney General & Reporter
           PO Box 20207
12         Nashville, TN 37202-0207
           (615)741-3491
13         michael.stahl@ag.tn.gov

14

15

      For the Deponent, Rachel Harmon:
16
           MR. JOHN COKE
17         Attorney at Law
           Administrative Office of the Courts
18         511 Union Street, Suite 100
           Nashville, TN 37219
19

20

21

22

23

24

25
```

*LEXITAS TENNESSEE*
*(615)595-0073*

```
1                        I   N   D   E   X

2                                                    Page
    Examination
3   By Mr. Dougherty                                    5

4   Examination
    By Mr. Stahl                                       137
5
    Further Examination
6   By Mr. Dougherty                                   141

7

8

9
                    E   X   H   I   B   I   T   S
10
                       (None marked.)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              S T I P U L A T I O N S

2

3

4          The deposition of RACHEL HARMON was taken

5     by counsel for the Plaintiff, at the offices of

6     500 Charlotte Avenue, Nashville, Tennessee, on

7     October 24, 2023, by Notice for all purposes

8     under the Federal Rules of Civil Procedure.

9          All formalities as to caption, notice,

10    statement of appearance, et cetera, are waived.

11    All objections, except as to the form of the

12    questions, are reserved to the hearing, and

13    that said deposition may be read and used in

14    evidence in said cause of action in any trial

15    thereon or any proceeding herein.

16          It is agreed that JENNIFER CHECUGA, LCR,

17    RPR, and Court Reporter for the State of

18    Tennessee, may swear the witness, and that the

19    reading and signing of the completed deposition

20    by the witness are not waived.

21

22

23

24

25
```

*Lexitas - TENNESSEE*
*(615)595-0073*

```
 1                    *    *    *

 2                 RACHEL HARMON,

 3   was called as a witness, and having first been

 4   duly sworn, testified as follows:

 5

 6                  EXAMINATION

 7   QUESTIONS BY MR. DOUGHERTY:

 8   Q.    Good morning.

 9   A.    Good morning.

10   Q.    We just met, my name is a Buck Dougherty,

11   I'm the attorney in this case on behalf of Dan

12   McCaleb.

13         Go ahead and state your name for the

14   record.

15   A.    Rachel Harmon.

16   Q.    Ms. Harmon, have you ever had your

17   deposition taken before today?

18   A.    I have not.

19   Q.    Okay.  You were just sworn in, and do you

20   understand that you're under oath today?

21   A.    Yes.

22   Q.    Are you prepared to answer the questions

23   that I ask of you today?

24   A.    Yes.

25   Q.    All right.  Just some introduction kind
```

```
 1    of background.
 2         Did you take any medications today before
 3    your deposition that could affect your ability
 4    to give honest and truthful answers?
 5    A.    No.
 6    Q.    And at any time you can certainly inform
 7    me if you do not understand a question that I
 8    ask of you; do you understand that?
 9    A.    Yes.
10    Q.    Okay.  And also, if you want to take a
11    break at any point, you can inform me and we
12    can take a break, okay?
13    A.    Okay.
14    Q.    The only caveat with that that I would
15    just say that is if I've already asked a
16    question and you haven't given an answer, I
17    would -- we would want you to give the answer,
18    then we can take the break; do you understand?
19    A.    Understood.
20    Q.    Okay.  So those are kind of the
21    procedures.  Let's go ahead and get into some
22    background information.
23         How old are you and what is your date of
24    birth?
25    A.    I'm 45, July 16, 1978.
```

*Lexitas TENNESSEE*
(615)595-0073

```
 1    Q.    Where do you currently work?

 2    A.    With the Administration Office of the

 3    Courts.

 4    Q.    Is that the Tennessee Administration

 5    Office of the Courts?

 6    A.    It's the Tennessee Supreme Court

 7    Administration Office of the Courts.

 8    Q.    And you're aware there's also a Federal

 9    Administration Office of the Courts?

10    A.    I am.

11    Q.    And what is your current position with

12    the Tennessee AOC office?

13    A.    Deputy director.

14    Q.    Deputy director?

15    A.    Yes.

16    Q.    And when did you become the deputy

17    director?

18    A.    March 2022.  Hang on.  Yes, March 2022.

19    Q.    March 2022?

20    A.    Uh-huh.

21    Q.    And is the deputy director position, is

22    that an elected office?

23    A.    No.

24    Q.    Is that appointed by anyone or any body

25    of agency or something like that?
```

1   A.   No.

2   Q.   Okay.  So were you just promoted from

3   your previous position?

4   A.   Yes.

5   Q.   And -- so March 2022 until today.  And

6   what -- what did you do before your appointment

7   or your promotion to deputy director?

8   A.   I was general counsel with the

9   Administrative Office of the Courts.

10  Q.   And what -- what was the time frame in

11  your role as general counsel?

12  A.   I began in December 2015 and my final

13  month was July of 2022.

14  Q.   There seems to be some overlap or maybe I

15  misunderstood.

16  A.   There is overlap.

17  Q.   Okay, can you explain, because as I

18  understand it -- understood it that you became

19  deputy director in March of 2022, but you

20  apparently were also still simultaneously in

21  your role as general counsel?

22  A.   I held a dual role.

23  Q.   So for how many months did you hold a

24  dual role?

25  A.   From March of 2022 to July 2022.

```
 1   Q.    Is there any reason for that?

 2   A.    The general counsel position was vacant

 3   because I had been promoted.

 4            MR. DOUGHERTY:  And I know we have

 5   the current general counsel here today.  I'd

 6   like for him to go ahead and introduce himself

 7   and state whatever you want to state on the

 8   record.

 9            MR. COKE:  John Coke, General Counsel

10   of the Tennessee Administration Office of the

11   Courts.

12            MR. DOUGHERTY:  And as I understand,

13   Mr. Coke, you haven't entered an appearance in

14   the case, but you're here with Ms. Harmon

15   today?

16            MR. COKE:  Yes, sir.

17   BY MR. DOUGHERTY:

18   Q.    Okay.  Did you work at the Tennessee AOC

19   office prior to December 15th?

20   A.    No.

21   Q.    What did you do prior to going to the AOC

22   office?

23   A.    I worked in the Tennessee Attorney

24   General's Office.

25   Q.    And how long were you there?
```

1   A.    I joined in November 2006 and left in

2   November 2015.

3   Q.    And what was your position or positions

4   at the Tennessee AOG's Office?

5   A.    I had two.  I was appointed initially as

6   an assistant attorney general and then after a

7   number of years and a certain amount of

8   experience I was promoted to senior attorney --

9   senior assistant attorney general.

10   Q.    Okay.  What -- my understanding is they

11   have different divisions.  Were you assigned to

12   a particular division?

13   A.    I was.

14   Q.    And what division was that?

15   A.    The first division I worked in was the

16   Criminal Justice Division.  The second division

17   I worked in was the Civil Litigation and State

18   Services Division.

19   Q.    And in your role in the Criminal Justice

20   Division, what were your duties?

21   A.    Primarily handling criminal appeals in

22   the Court of Criminal Appeals and the Tennessee

23   Supreme Court.

24   Q.    And then how about your civil litigation

25   experience, what were your duties?

1    A.    Various civil litigation in both state

2    and federal courts, typically relating to human

3    resources and employment matters, as well as

4    contract disputes, things of that nature.  It

5    was very general civil.

6    Q.    Did you ever do anything with open

7    meetings or open records?

8    A.    While at the Attorney General's Office?

9    Q.    Yes.

10    A.    No.

11    Q.    Did you -- while at the Attorney

12    General's Office, did you ever handle any First

13    Amendment disputes?

14    A.    Not that I recall.

15    Q.    Okay.  Obviously you're an attorney, I

16    just want to go through some background on your

17    education.

18          You have a college degree?

19    A.    Yes.

20    Q.    And school and your graduation year is

21    fine, if you'd like to give that.

22    A.    From undergraduate?

23    Q.    Yes, please.

24    A.    Sure.  Would have been May of 2001.

25    Q.    What school did you graduate from?

Text in TENNESSEE
(615)595-0073

```
1    A.    University of South Carolina.

2    Q.    How about law school?

3    A.    Graduated in May of 2004 from Florida

4    Coastal School of Law.

5    Q.    And where is Florida Coastal School of

6    Law?

7    A.    Jacksonville.

8    Q.    2004?

9    A.    Yes.

10   Q.    What state bars are you admitted to?  If

11   you can provide the year, that would be

12   helpful?

13   A.    Sure.  October 2004 in Tennessee.

14   Q.    Are you admitted into any federal

15   district courts or courts of appeals or the

16   supreme court of the United States?

17   A.    Yes.  The three divisions in Tennessee,

18   Circuit Court of appeals and Supreme Court of

19   the United States.

20   Q.    Have you ever been formally disciplined

21   by a state bar licensing authority?

22   A.    No.

23   Q.    Have you ever been convicted of a crime?

24   A.    No.

25   Q.    Have you ever been defendant -- excuse
```

*Lexitas* TENNESSEE
(615)595-0073

```
1    me.
2          Have you ever been a defendant in a civil
3    lawsuit before?
4    A.    No.
5    Q.    Have you ever been a plaintiff in a civil
6    lawsuit before?
7    A.    No.
8    Q.    Other than your participation as an
9    attorney, have you been involved in any legal
10   claims or lawsuits of any sort?
11   A.    No.
12   Q.    And just to make it clear, is it your
13   understanding -- are you represented by counsel
14   here today?
15   A.    Yes.
16   Q.    And who is that?
17   A.    Our internal counsel is John Coke,
18   immediately to my right, and our litigation
19   counsel is Mike Stahl to his right.
20   Q.    Okay.  Just a couple more kind of
21   introductory and background questions before we
22   get into the main part of your deposition.
23          You're a nonparty to this lawsuit; you
24   understand that?
25   A.    Yes.
```

1    Q.    And under federal statutes, you're

2    entitled to receive a daily fee for your

3    attendance here at this deposition and you're

4    also entitled to receive certain mileage

5    reimbursement.

6         So what was your daily mileage fee so we

7    can calculate that to send you a check?  When

8    you came round trip today to this deposition.

9    A.    I don't know that that's necessary

10   because my office is two blocks away and I was

11   coming to my office anyway.

12   Q.    Okay.  So you walked over, you didn't

13   take a car?

14   A.    No.

15   Q.    Okay.  So you would have a daily fee and

16   what -- who should I send that check to from

17   our office in Chicago and where should I send

18   that to?

19   A.    I guess you can send it to me at my

20   office.

21   Q.    Okay.  And I can copy Mr. Stahl and

22   Mr. Coke.  I don't know I can get your e-mail,

23   but I can do that, I just want to get those

24   things out of the way.

25         Are you familiar with the Advisory

*Excel* TENNESSEE
(615)595-0073

1    Commission on the Rules of Practice and

2    Procedure created by TCA 16-3-601?

3    A.    Yes.

4    Q.    What did you first become aware of that

5    particular statute?

6    A.    Within my first year as general counsel

7    of the AOC.

8    Q.    And what year was that, just to make it

9    clear?

10   A.    Because I started in December of 2015, I

11   would suggest that 2016 would be when I really

12   learned about it.

13   Q.    In the calendar year?

14   A.    In the calendar year 2016.

15   Q.    And what do you recall from your time in

16   2016 learning about that particular commission?

17   A.    At the time the then administrative

18   director of the AOC asked me to attend as many

19   meetings hosted at our office as possible so

20   that I can get familiarity with them.  I'm

21   going to call it, for purposes of brevity, the

22   Rules Commission, that's what we typically

23   refer to it as to avoid saying that long name

24   over and over again, but the Rules Commission

25   was one of the meetings that I attended in

TENNESSEE
(615)595-0073

```
 1    2016.
 2    Q.    And today, if you just -- when we refer
 3    to it, if you want to say Advisory Commission
 4    or Commission, I think that's fine; can we
 5    agree on that?
 6    A.    Sure.
 7    Q.    And I believe when you look at the rules,
 8    when the Advisory Commission lists comments, do
 9    they refer to themselves as the Advisory
10    Commission?  Is it your understanding -- are
11    you aware of that?
12    A.    I'm not aware of that.
13    Q.    But we'll try to say Advisory Commission
14    or Commission.  And if you don't understand
15    which commission or committee I'm talking
16    about, then feel free to ask because I want to
17    make sure we're clear.
18    A.    Understood.
19    Q.    So there are a few things to unpack from
20    that.
21          First, who was the director of the AOC at
22    that time who told you to attend as many
23    Advisory Commission meetings as you could?
24    A.    Let me clarify.
25    Q.    Okay.
```

Text tabEd TENNESSEE
(615)595-0073

1    A.    She didn't it tell me to attend as many

2    Advisory commission meetings as I could, but as

3    many meetings of commissions and meetings that

4    were meeting in our office space.  The Advisory

5    Commission was one of those.  Her name was

6    Deborah Taylor Tate.  There is no hyphen, that

7    is her middle name and last name.

8    Q.    And is Ms. Deborah Taylor Tate, is she

9    still employed by the Tennessee AOC?

10   A.    She is on a 120-day contract currently.

11   She is retired, but essentially working on a

12   part-time contract to assist with a specific

13   project.

14   Q.    So you had just joined the Tennessee AOC

15   office and the director at that time wanted you

16   to attend as many meetings that were being held

17   at the AOC office; is that right?

18   A.    Yes.

19   Q.    Did you have -- we'll get into the

20   specifics of those different commissions.

21        Did you have a particular role in terms

22   of what you were required to do when you

23   attended certain meetings?

24   A.    No.

25   Q.    How many different commissions were

TENNESSEE
(615)595-0073

1  having meetings at that time at the Tennessee
2  AOC office?
3  A.    I would say we had one to two a month of
4  various commissions and committees.
5  Q.    Can you recall -- well, let me ask you
6  first, the Advisory Commission, was it having
7  meetings there at the Tennessee AOC office?
8  A.    Yes.
9  Q.    And that was in 2016?
10  A.    Yes.
11  Q.    Do you recall in 2016 how many meetings
12  they would have per year?
13  A.    No.
14  Q.    Do you know, when you came in that role,
15  had the Advisory Commission been having
16  meetings at the AOC office prior to 2016?
17  A.    I do not know.
18  Q.    Do you recall if the Advisory Commission
19  meetings in 2016 were open to the public?
20  A.    I did not know and do not know.
21  Q.    Well, what was the AOC's role -- and I
22  want to make sure -- I think you said hosted.
23        What was the Advisory -- excuse me.
24        What was the AOC's role in hosting
25  Advisory Commission meetings in 2016?

Freedom Court Reporting, A Veritext Company   1-877-373-3660

1    A.    We gave them a meeting space big enough

2    for their group to get together.

3    Q.    So that was in one of the offices or

4    conference rooms?

5    A.    We have one large conference room.

6    Q.    At that time they were physically meeting

7    in the AOC office in Nashville; is that right?

8    A.    For the one meeting that I've ever

9    attended in 2016 and beyond, they all met in

10   the physical space in our conference room.

11   Q.    And we're talking about the Advisory

12   Commission?

13   A.    Correct.

14   Q.    And so you recall at least one meeting

15   that the Advisory Commission had in 2016 that

16   was physically in the AOC office in Nashville,

17   Tennessee?

18   A.    Yes.

19   Q.    Do you recall when that meeting took

20   place in terms of what month in 2016?

21   A.    I do not.

22   Q.    And you attended; is that right?

23   A.    Yes.

24   Q.    Do you recall in 2016, did the Advisory

25   Commission have members of the private bar --

1    attorneys on it at that point?

2    A.    I don't remember any.  I don't know.

3    Q.    But would the -- excuse me.

4          Would the AOC office still have that

5    information?

6    A.    I don't know.

7    Q.    Did you see anybody that you knew at one

8    of those meetings that was a private attorney

9    in 2016?

10   A.    I don't recall anyone specifically.

11   Q.    Did the Advisory Commission in 2016 at

12   the meeting you attended, did it have any

13   judges?

14   A.    I don't recall that either.

15   Q.    How many other commissions or boards,

16   other than the Advisory Commission, did you

17   attend in 2016?

18   A.    Can you repeat that?

19   Q.    Sure.  As I understood your earlier

20   testimony, the director at that time wanted you

21   to attend as many different meetings by various

22   boards and commissions that were being held at

23   the AOC office; is that correct?

24   A.    Correct.

25   Q.    So my question is, excluding the Advisory

1    Commission right now, during the year of 2016,

2    how many other meetings that were being held at

3    the AOC office did you attend?

4    A.    Best guess today in 2023, five.

5    Q.    So five other meetings other than the

6    Advisory Commission?

7    A.    Correct.

8    Q.    Do you recall what those commissions

9    were?

10   A.    I recall the Access to Justice Committee,

11   the Alternative Dispute Resolution Committee,

12   the Second Look Commission and I know there

13   were one or two others -- oh, the Board of

14   Professional Responsibility, during only their

15   public session, and the Board of Judicial

16   Conduct, also during their public session.  I

17   don't recall any others offhand.

18   Q.    What specifically about the Board of

19   Professional Responsibility public session do

20   you recall?  Why did you make that distinction?

21   How do you recall it being public?

22   A.    Because I was asked to leave when the

23   disciplinary matters were going to be taken up

24   by the board.

25   Q.    Okay.  So when you say "public," you're

Vexitas TENNESSEE
(615)595-0073

1    not just talking about AOC employees, you're
2    talking about the public at large could observe
3    that?
4    A.    I don't know.  If I could, maybe.
5    Q.    Well, you qualified and said other than
6    the public, so I want to understand what you
7    meant by public part of the Board of
8    Professional Responsibility.
9          What made it public or what made it stand
10   out in your mind as being public, as you
11   described it?
12   A.    They were not discussing anything
13   confidential under the Rule.
14   Q.    Okay.  The Advisory Commission in the
15   2016 meeting, were they discussing anything
16   confidential?
17   A.    I don't recall the specifics of the
18   meeting.
19   Q.    Who chaired the 2016 Advisory Commission
20   meeting that you observed?
21   A.    I don't recall.
22   Q.    Were any Tennessee Supreme Court justices
23   there?
24   A.    I don't recall.
25   Q.    Do you recall if the Tennessee AOC office

*Verbatim TENNESSEE*
*(615)595-0073*

```
 1   sent out any advanced notices to the public
 2   that the Advisory Commission meeting was open
 3   to the public?
 4   A.    For the 2016 meeting that I attended?
 5   Q.    Yes.
 6   A.    I do not know.
 7   Q.    Did you have an assistant general counsel
 8   at that time?
 9   A.    I had two.
10   Q.    What were their names?
11   A.    David Byrne, B-Y-R-N-E, and Jeana Hendrix
12   H-E-N-D-R-I-X.  Her first name was J-E-A-N-A.
13   Q.    Do you recall if Mr. Byrne ever sent out
14   a public meeting notice to the public about an
15   Advisory Commission meeting in 2016?
16   A.    I do not.
17   Q.    Do you recall if Mr. Byrne ever sent out
18   an Advisory Commission meeting at any time
19   during his role as your assistant?
20   A.    David was assigned to our indigent
21   services, he would have had no reason to.
22   Q.    What about Ms. Hendrix, do you recall
23   Jeana Hendrix ever preparing or sending out a
24   public meeting notice for an Advisory
25   Commission meeting, either in 2016 or any year?
```

```
 1    A.    No.  Same reason, she would not have had
 2    any reason to.
 3    Q.    Well, if her name is on a public meeting
 4    notice as a point of contact for the Tennessee
 5    AOC, would that be accurate that she was the
 6    point of contact for the AOC office?
 7              MR. STAHL:  Object to the form.
 8    BY MR. DOUGHERTY:
 9    Q.    You can answer.
10    A.    I need to amend.  Also, there was one
11    other assistant general counsel.  Let me go
12    back to that.  Michelle Consiglio-Young,
13    C-O-N-S-I-G-L-I-O.
14    Q.    Right, and we'll talk about her in a
15    moment, but go ahead, I didn't want to
16    interrupt, but I appreciate that.
17    A.    And it's hyphenated with Young.  So I
18    recall Michelle being a person that was in that
19    Rules Commission meeting in 2016.
20          Now, back to your question about Jeana, I
21    don't recall Jeana ever having a liaison
22    position with the Rules Commission and I'm not
23    sure I understand what your question is.
24    Q.    Have you ever seen a public meeting
25    notice in advance of an open public meeting of
```

```
 1   the Advisory Commission?

 2   A.    No.

 3   Q.    You've never seen one?

 4   A.    No.

 5   Q.    If there's one on the Tennessee AOC

 6   website that there was a public meeting notice

 7   sent out, would you think that that actually

 8   happened?

 9            MR. STAHL:  Object to the form.

10            THE WITNESS:  I assume it happened,

11   but I did not see it ahead of time.

12   BY MR. DOUGHERTY:

13   Q.    And if Jeana Hendrix, if her name was on

14   that, would you assume that she was the point

15   of contact for the public?

16            MR. STAHL:  Object to the form.

17            THE WITNESS:  My assumption would be

18   that she put the notice out.

19   BY MR. DOUGHERTY:

20   Q.    Okay.  There would be no reason that

21   you're aware of that her name would be on there

22   if she didn't participate; is that correct?

23   A.    Just -- you mean participate in the

24   meeting?

25   Q.    I mean participating in notifying the
```

Veritas TENNESSEE
(615)595-0073

```
 1    public that a meeting was taking place and that
 2    the public was invited to attend.
 3    A.    I have no reason to think that.
 4    Q.    Do you ever recall reviewing a public
 5    meeting notice that went out to the public in
 6    advance of an Advisory Commission meeting?
 7    A.    No.
 8    Q.    Describe what you mean by "hosting"?
 9    What does that look like?  What does that mean
10    when the AOC hosted the Advisory Commission
11    meeting in 2016?
12    A.    Provided a gathering place for the
13    attendees to hold their meeting.
14    Q.    Is there any other agency within the
15    Tennessee government that you're aware of
16    that's ever hosted an Advisory Commission
17    meeting before?
18    A.    Not that I'm aware of.
19    Q.    So it would just be the AOC office is the
20    only one -- the only agency that you're aware
21    of that's ever hosted an Advisory Commission
22    meeting; is that right?
23    A.    That's right.
24    Q.    Do you recall if any of the meetings --
25    where the AOC office hosted meetings, were any
```

Tennessee TENNESSEE
(615)595-0073

1  of those ever livestreamed or broadcast to the
2  public in any way?
3  A.    Not to my knowledge, until the pandemic.
4  Q.    Okay, we'll talk about that in a second.
5        So I just want to understand, can you
6  give me the years that David Byrne was the
7  assistant general counsel for the Tennessee
8  AOC?
9  A.    I don't know when he started.  It was
10 several years before I began.  He left in
11 December of 2016.
12 Q.    Okay.
13 A.    He retired.
14 Q.    He retired in December of 2016?
15 A.    Uh-huh.
16 Q.    And what about Jeana Hendrix, how long
17 was she at the Tennessee AOC office?
18 A.    She was also there several years before I
19 arrived, and shortly after I got there, she
20 went to a part-time status.
21 Q.    So do you recall when she went from
22 full-time to part-time?
23 A.    It was in 2016, I don't recall when.
24 Q.    Now, was she a -- she was a full-time
25 assistant general counsel; is that right?

*Texta* TENNESSEE
(615)595-0073

```
 1    A.    Correct.
 2    Q.    When she went part-time, did she assume
 3    another role or was she still assistant general
 4    counsel?
 5    A.    She was still assistant general counsel.
 6    Q.    But just in a part-time role?
 7    A.    Correct.
 8    Q.    And then when was Michelle
 9    Consiglio-Young, when was she general counsel?
10    A.    She was never general counsel.  She was
11    assistant general counsel, but she was
12    primarily in the role of legislative liaison.
13    Q.    My apologies.
14          What was her time period as her role --
15    in her role as assistant general counsel?
16    A.    She started at the AOC roughly a year
17    before I did and she remains there today.
18    Q.    So did she also have a dual role?  What
19    was her other title?
20    A.    She is no longer in the General Counsel's
21    office, she is the division head of our
22    Intergovernmental Affairs Division.
23    Q.    But that's still within the AOC office;
24    is that right?
25    A.    Correct.
```

Tennessee TENNESSEE
(615)595-0073

```
 1    Q.    You mentioned something, you used the

 2    word "liaison."

 3          Was Michelle Consiglio-Young, was she

 4    assigned as a liaison to the Advisory

 5    Commission in 2016?

 6                MR. STAHL:  Object to the form.

 7                THE WITNESS:  I don't know.

 8    BY MR. DOUGHERTY:

 9    Q.    Was she at the meeting in 2016 that you

10    observed of the Advisory Commission?

11    A.    That is my recollection, yes.

12    Q.    What did you observe her doing?

13    A.    I recall the two of us just sitting

14    together, I don't recall her doing anything

15    specific.

16    Q.    I mean, was there anyone who formally

17    conducted the meeting or took notes?

18    A.    The chair.  And I don't recall at the

19    time who the chair was.  It probably was Lee

20    Ramsey.

21    Q.    And who is Lee Ramsey?

22    A.    Well, he is retired now, but he was a

23    staff attorney for the Tennessee Supreme Court.

24    Q.    What is your understanding of the purpose

25    of the Advisory Commission?
```

TENNESSEE
(615)595-0073

```
1    A.    To advise the Supreme Court on the rules
2    of practice and procedure in state courts in
3    Tennessee.
4    Q.    So does that mean they get together and
5    come up with recommendations on changing rules
6    or adding new rules; is that essentially their
7    function?
8    A.    I think it's -- because of the advisory
9    capacity to the Court, my memory is discussion
10   about rules that had been proposed to the
11   Commission for consideration and recommendation
12   to the Court.  I don't recall any specific new
13   rules that came out of that particular meeting
14   discussion.
15   Q.    Yeah, I'm not -- I'm sorry, I'm not
16   talking about that specific meeting in 2016.
17   So let me back up.
18         I'm talking kind of generally right now,
19   your understanding of the Advisory Commission,
20   okay?
21   A.    Okay.
22   Q.    As I understood it, they make rule
23   recommendations to the Supreme Court; is that
24   correct?
25   A.    Yes.
```

TENNESSEE
(615)595-0073

```
 1   Q.    And so is it your understanding that
 2   anyone can make recommendations to the Advisory
 3   Commission to consider rules before they make
 4   their recommandations --
 5   A.    Yes.
 6   Q.    -- to the Supreme Court?  Is that right?
 7   A.    Yes.
 8   Q.    How do people not on the Advisory
 9   Commission make rule recommendation to them?
10            MR. STAHL:  Object to the form.
11            THE WITNESS:  I don't know how they
12   come in.
13   BY MR. DOUGHERTY:
14   Q.    Okay.  Well, have you ever seen any of
15   these recommendations to the Advisory
16   Commission before?
17   A.    I recall an e-mail to the Commission
18   being discussed at some point, but I did not
19   receive the e-mail.
20   Q.    So this would have been an e-mail --
21   would it have been from a member of the
22   Tennessee Supreme Court or member of the
23   public?
24            MR. STAHL:  Object to the form.
25            THE WITNESS:  I don't remember who it
```

TexScribes TENNESSEE
(615)595-0073

```
 1    was from.

 2    BY MR. DOUGHERTY:

 3    Q.    Is it your understanding that the members

 4    who serve on the Advisory Commission, that they

 5    can come up with their own potential

 6    recommendations for the Commission to discuss?

 7    A.    Yes.

 8    Q.    Okay.  What does that process look like?

 9    A.    I don't know.

10    Q.    Do you recall how long the meeting was in

11    2016 that you observed?

12    A.    I do not.

13    Q.    Was it more than one hour?

14    A.    I don't know.

15    Q.    Are you aware that there was a

16    preliminary injunction issued in this case in

17    March of 2023?

18    A.    I'm aware there was a preliminary

19    injunction, my memory was May of 2023.

20    Q.    But you're aware that the Court in this

21    case, in this lawsuit issued a preliminary

22    injunction; is that right?

23    A.    I am.

24    Q.    What is your understanding of that

25    preliminary injunction?
```

*Nexitas* TENNESSEE
(615)595-0073

1    A.     That was a fairly long memorandum order.

2    Can you be more specific?

3    Q.     Sure.   What -- what's the purpose -- what

4    was the purpose of the injunction until the

5    trial of this case; what's supposed to take

6    place?

7    A.     So my understanding is that the Advisory

8    Commission was to publicly notice any meetings

9    it held, and if it were to close a portion in

10   whole or in part of the meeting, that they

11   needed to give notice of that as well.

12   Q.     And so the preliminary injunction, you

13   would also agree it required the Advisory

14   Commission to open the meetings to the public;

15   is that right?

16   A.     Yes.

17   Q.     And what was the role of the AOC office

18   in that process; do you know?

19   A.     No.

20   Q.     Do you know if the Tennessee AOC office

21   is supposed to provide public notice to the

22   public in advance of an Advisory Commission

23   meeting?

24   A.     Under this preliminary injunction, yes.

25   Q.     And who did you discuss that with?

TEXNET TENNESSEE
(615)595-0073

```
1    A.    I did not discuss it with anyone.
2    Q.    Who made you aware of the preliminary
3    injunction?
4    A.    My counsel.
5    Q.    Is that Mr. Coke?
6    A.    Both, actually.
7    Q.    Can you state their names, please?
8    A.    Well, actually it would have been John
9    Coke and it would have been a different
10   attorney than Mr. Stahl.  At the time, I
11   believe it was Andrew Coulam who's with the
12   AG's office.
13   Q.    And I probably should have said this in
14   the introduction.  I know when you're nodding
15   your head what you mean, but it's important for
16   the court reporter to get verbal answers, okay?
17   A.    I was not aware I was not giving you
18   verbal answers.
19   Q.    You were, but you also were nodding.  In
20   looking around, I wanted to make sure.  That's
21   not necessarily picked up by the court
22   reporter, okay?
23   A.    I understand.
24   Q.    Once they made you aware of the
25   preliminary injunction, did you have a role --
```

```
 1    or do you have a role in making sure the public
 2    notices go out to the public?
 3    A.    No.
 4    Q.    Whose role is that now?
 5    A.    Within the Tennessee AOC?
 6    Q.    Yes.
 7    A.    It would be John Coke and Michelle
 8    Consiglio-Young.  Our liaison, who is Michelle
 9    Consiglio-Young, would have primary
10    responsibility for that.
11    Q.    And why would Ms. Consiglio-Young have
12    primary responsibility?
13    A.    She is the staff liaison.
14    Q.    And when you say "staff liaison," who is
15    she the staff liaison to?
16    A.    The Advisory Commission.
17    Q.    And what does a staff liaison -- what do
18    they do?
19    A.    For this specific situation with the
20    Advisory Commission?
21    Q.    Yes.
22    A.    Okay.  Assist the Commission as needed
23    and respond to their needs for meetings and
24    other clerical support, administrative support.
25    Q.    And as far as you know, even prior to the
```

```
 1    preliminary injunction, the AOC office or
 2    someone within the AOC office has always done
 3    that for the Advisory Commission, correct?
 4    A.    I don't know always.  As long as I've
 5    been there, yes.
 6    Q.    Which goes back to at least 2016?
 7    A.    Correct.
 8    Q.    Tell me again when you started in
 9    December of --
10    A.    December of 2015.
11    Q.    Do you remember the day?
12    A.    I can say on or around December 15th.
13    Q.    Okay.  Is Ms. Consiglio-Young, has she
14    been temporarily out of the AOC office for a
15    while?
16    A.    She has.
17    Q.    How long has she been out of the office?
18    A.    Since mid August of 2023.
19    Q.    And what's the reason that she's out of
20    the office temporarily?
21    A.    Maternal leave.
22    Q.    And do you know when she'll be coming
23    back to the AOC office after her leave?
24    A.    I don't know an exact date, but I believe
25    it's going to be in early to mid December 2023.
```

```
1    Q.    Now, you said that she went out on leave
2    in mid August; is that right?
3    A.    Yes.
4    Q.    Do you know how many times per year the
5    Advisory Commission meets?
6    A.    No.
7    Q.    You're not aware that they meet
8    quarterly?
9    A.    They met more regularly when I first
10   started at the AOC, and I believe quarterly is
11   an accurate statement.
12   Q.    But you don't know and you've never known
13   the time periods or when they meet; is that
14   right?
15   A.    I am not looped in on that and haven't
16   been for most of my time at the AOC.
17   Q.    Do you recall giving your deposition --
18   excuse me, strike that question.
19         Do you recall submitting a declaration in
20   this case?
21   A.    I do.
22   Q.    How many declarations did you submit?
23   A.    Two.
24   Q.    Do you recall in one of your declarations
25   that you stated that the Rules Advisory
```

1      Commission typically meets quarterly?

2      A.     Yes.

3      Q.     And -- let me look at that.  Hang on one

4      moment.

5             And was that in the second declaration

6      that you gave on July 12, 2022?

7      A.     I don't remember which declaration.

8      Q.     Okay.  But do you remember saying that

9      the Advisory Commission typically meets

10     quarterly?

11     A.     Yes.

12     Q.     And that was in July of 2022.

13            What's different now where you don't know

14     or you don't remember?

15            MR. STAHL:  Object to the form,

16     argumentative.

17            THE WITNESS:  They haven't met

18     quarterly this year.

19     BY MR. DOUGHERTY:

20     Q.     Right, and I understand that -- so we're

21     kind of talking pre preliminary injunction at

22     this point, okay?

23     A.     Uh-huh.

24     Q.     In 2016, were you aware of any pattern of

25     meeting, be it monthly or quarterly or

1    something like that; do you recall anything in
2    2016 about that?
3    A.    I recall it being a regular quarterly
4    meeting.
5    Q.    Okay.  So you recall in 2016 the Advisory
6    Commission met quarterly, right?
7    A.    That -- that's correct.
8    Q.    Do other boards and commissions that the
9    Advisory Commission -- excuse me.
10         Do other boards and commissions that the
11   AOC office assists, do they typically meet
12   quarterly?
13   A.    Not necessarily.
14   Q.    Do some meet monthly?
15   A.    I don't know if any meet monthly.
16   Q.    Who makes those decisions?
17   A.    It depends.
18   Q.    Are you aware of any statute, for
19   example, that requires a certain either monthly
20   or quarterly meeting?
21   A.    Of any commission or just the Advisory
22   Commission.
23   Q.    Any commission.
24   A.    I don't want to assume, so I'm just going
25   to say I don't know for sure.  I do know that

```
1    there is a Supreme Court rule specific to the

2    Access to Justice Committee that I believe

3    requires a certain number of meetings for a

4    defined period of time.

5    Q.    You're not aware of any particular rule

6    or statute that requires the Advisory

7    Commission to meet so many times per year, are

8    you?

9    A.    No.

10   Q.    What is the Access to Justice Committee?

11   A.    It is a committee that was established by

12   the Supreme Court to enhance individuals'

13   access to the courts and it takes various

14   forms.  It's a very loaded question.  It can be

15   self-represented litigants, it can mean forms

16   that assist individuals attempting to get

17   divorced.  It is a committee that exists to

18   ensure that everyone who needs access to a

19   Tennessee court can get it.

20   Q.    Why is it a loaded question?

21   A.    Because they do so much, I don't know how

22   to tell you all the things they do.

23   Q.    Who came up with the name Access to

24   Justice?

25   A.    That would have been the Court when they
```

Veritext TENNESSEE
(615)595-0073

1   established it, the justices would have.

2   Q.   When you say the Court, are you referring

3   to the Tennessee Supreme Court?

4   A.   The Tennessee Supreme Court.

5   Q.   Do you know if there's a federal statute

6   called the Access to Justice Statute?

7   A.   I don't.

8   Q.   Do you know if there was a movement in

9   the mid 1990s on access to justice?

10          MR. STAHL:  Object to the form.

11          THE WITNESS:  No, sir, in the mid

12   1990s I was in high school, I was definitely

13   not paying attention to that.

14   BY MR. DOUGHERTY:

15   Q.   But in terms of using that phrase, access

16   to justice, is that unique to the Tennessee

17   Supreme Court?

18   A.   I don't think so.

19   Q.   Do the federal equivalent, do they use

20   the term access to justice?

21   A.   I don't know.

22   Q.   Does access to justice also mean that the

23   public should be able to observe what goes on

24   in courts?

25          MR. STAHL:  Object to the form.

```
 1              THE WITNESS:  I've never understood
 2    that to be a part of the mission of that
 3    committee.
 4    BY MR. DOUGHERTY:
 5    Q.    Has providing open and transparent
 6    government ever been a part of the Access to
 7    Justice mission?
 8    A.    I have never understood that to be a part
 9    of their mission.
10    Q.    Do they have a mission statement?
11    A.    I don't know.
12    Q.    Well, how do you know if it's not a part
13    of their mission?
14    A.    Tennessee Supreme Court Rule 50
15    establishes the committee and their
16    responsibilities.
17    Q.    So the Tennessee Rule -- say that again?
18    A.    Tennessee Supreme Court Rule 50.
19    Q.    So if I go to Tennessee Supreme Court
20    Rule 50, it's going to tell me what the Access
21    to Justice mission is?
22    A.    It's going to tell you the
23    responsibilities of the committee, why the rule
24    exists.  I'm using the term "mission," not sure
25    that mission is included in the rule.
```

1    Q.    Do you recall in the Tennessee AOC

2    website if there is a section for boards and

3    commissions?

4    A.    Yes.

5    Q.    And would it be fair to say that there

6    are approximately 15 to 20 different boards and

7    commissions on that website that the AOC office

8    assists?

9    A.    Yes.  Let me clarify that.

10   Q.    Uh-huh.

11   A.    There are some on there that the AOC does

12   not necessarily assist, but they are included

13   in that list because they fall under the

14   purview of the Tennessee Supreme Court.

15   Q.    What boards or commissions on the AOC

16   website that are listed does the AOC not

17   assist?

18   A.    When you say "assist," what do you mean?

19   Q.    Well, I think you used the word "assist,"

20   I'm just trying to understand what the AOC

21   office does with respect to the various boards

22   and commissions that are listed on the website.

23         So, for example, the Advisory Commission,

24   does the AOC office assist the Advisory

25   Commission?

Texticare TENNESSEE
(615)595-0073

```
1    A.    Insofar as they provide a meeting space,
2    whether that be Webinar, streaming or a
3    physical space to meet, yes, and a staff
4    liaison.
5    Q.    Well, let's talk about Webinar support.
6          Does the Advisory Commission, do they
7    always meet together in one room?
8              MR. STAHL:  Object to the form.
9              THE WITNESS:  I don't know.
10   BY MR. DOUGHERTY:
11   Q.    Well, the meeting that you observed in
12   2016, were all the members physically in person
13   in Nashville, Tennessee at the AOC office?
14   A.    I don't know that all of the members
15   were, but those that were present were in the
16   room.
17   Q.    Were there any members that were
18   participating in the meeting in 2016 that
19   participated by livestreaming or Webinar or
20   computer of some sort?
21   A.    No, not to my knowledge.
22   Q.    So what you recall, everybody from the
23   Advisory Commission meeting in 2016 were
24   physically in the AOC office room; is that
25   right?
```

TENNESSEE
(615)595-0073

```
 1    A.    That's right.

 2    Q.    What do you mean by Webinar?  How do

 3    people participate in Webinar -- I'm talking

 4    about various commissions right now, not just

 5    the Advisory Commission.

 6    A.    Webinar is just a way for the commission

 7    or committee or whatever the case may be to

 8    present their meeting virtually.

 9    Q.    So is it ever the case where -- again,

10    this is not exclusively to the Advisory

11    Commission, any board or commission, do they

12    sometimes meet where some are in their office

13    all over the state by computer?

14    A.    Yes.

15    Q.    Have you ever seen, not just the Advisory

16    Commission, any of those meetings take place

17    where members who are participating by

18    computer, Webinar, et cetera?

19    A.    I have.

20    Q.    Which -- which ones -- which meetings

21    were those that you recall?

22    A.    I don't know.

23    Q.    Do you personally serve as a liaison to

24    any board or commission?

25    A.    Just the Judicial Ethics Committee.
```

Q.    Is that the same as the Tennessee Board
of Professional Responsibility?

A.    No, the Tennessee Board of Professional
Responsibility has regulatory and disciplinary
authority over lawyers, the Board of Judicial
Conduct has disciplinary and regulatory
authority over judges, and the Judicial Ethics
Committee is an internal committee comprised of
judges of several levels of state judiciary to
provide ethical support and opinions to judges
who are needing it.

Q.    How long have you served as the AOC
liaison to the Judicial Ethics Committee?

A.    Approximately six years.

Q.    And can you tell me those -- that tame
frame, please?

A.    It would have been in 2017 or 2018 when I
took it over to current.

Q.    Are there any other AOC employees who
work with you in your capacity as a liaison to
the Judicial Ethics Committee?

A.    No.

Q.    What exactly is your role and duty as a
liaison to the Judicial Ethics Committee?

A.    Often times I'm a conduit for judges who

*Text filed in TENNESSEE*
*(615)595-0073*

```
 1    reach out with ethical questions to connect

 2    them with a member of the Judicial Ethics

 3    Committee who can assist them with their

 4    question.  And when requested by the Committee,

 5    I will support them administratively by

 6    providing a meeting space, if they need a

 7    physical meeting space, or getting them

 8    assistance for a virtual meeting.

 9    Q.    Would it be fair to say that AOC

10    employees serving as liaison -- liaisons to

11    committees or commissions, that they provide

12    administrative support?

13    A.    Yes.

14    Q.    What does that administrative support

15    look like in general?

16    A.    Very similar to what I just explained

17    with the Judicial Ethics Committee or with

18    Michelle Consiglio-Young and the Advisory

19    Commission.  We are oftentimes a conduit to

20    ensure that they have what they need for their

21    meeting to go forward or a conduit to connect

22    individuals who may need their advice or

23    services.

24    Q.    So let's say the Advisory Commission

25    wanted to have a meeting where all the members
```

```
1   were together in one room, okay?  Would the AOC
2   office be the conduit to provide that support
3   to the Advisory Commission?
4   A.    Yes.
5   Q.    And how -- and the AOC office would
6   actually provide the physical space for the
7   meeting?
8   A.    Yes.
9   Q.    Let's say the Advisory Commission wanted
10  to meet by Webinar, livestreaming, would the
11  AOC office provide the administrative support
12  to help them have that meeting that way?
13  A.    Yes.
14  Q.    And let's say the Advisory Commission
15  wanted to have a meeting that was open to the
16  public, would the AOC office assist them in
17  making that happen?
18  A.    Yes.
19  Q.    Okay.  There are different types of court
20  rules that you're aware of that the Advisory
21  Commission considers when it's making
22  recommendations?
23  A.    Yes, but my experience and interaction
24  with that Commission is relatively limited.
25  The ultimate goal is to present to the
```

TENNESSEE TEXT REPORTING
(615)595-0073

1     Tennessee Supreme Court a package of

2     recommended changes or additions or deletions

3     to really any court rule that the Tennessee

4     Supreme Court has purview over.

5     Q.    So you don't really know the breakdown of

6     the various types of rules and procedures that

7     they consider; is that right?

8     A.    Because I'm not directly connected with

9     them, no, I don't feel comfortable saying that.

10    Q.    Would you -- is it fair to say that

11    Michelle Consiglio-Young is the AOC employee

12    who has the most knowledge of what takes place

13    at Advisory Commission meetings?

14    A.    That would be my expectation, yes.

15    Q.    Did you ever talk to Michelle

16    Consiglio-Young about the preliminary

17    injunction and how that might impact the AOC

18    office?

19    A.    No, I don't think so.

20    Q.    Ever talk to Michelle Long the director

21    about how the preliminary injunction might

22    impact the AOC office?

23    A.    I recall one discussion that it affected

24    the need for public notice.

25    Q.    And when was that discussion that you had

TENNESSEE
(615)595-0073

```
 1    with Michelle Long?

 2    A.    I don't know exactly the date, but it

 3    would have been shortly after the preliminary

 4    injunction was filed.

 5    Q.    And what was discussed?

 6    A.    Just that it would impact the need to

 7    have a public notice.

 8    Q.    And did either you or Michelle Long

 9    consider if the AOC had ever provided public

10    notice in the past for Advisory Commission

11    meetings?

12              MR. STAHL:  Object to the form.

13              THE WITNESS:  We did not discuss

14    that.

15    BY MR. DOUGHERTY:

16    Q.    Did you look to see if the AOC office had

17    ever issued any public notices in the past for

18    Advisory Commission meetings?

19    A.    I did not.

20    Q.    Did you also have a discussion with any

21    of the Tennessee Supreme Court justices after

22    the preliminary injunction?

23              MR. STAHL:  Object to the form.

24              THE WITNESS:  Yes.

25    ///
```

```
1    BY MR. DOUGHERTY:

2    Q.    And tell me about those discussions and

3    who were they with?

4              MR. COKE:  I'm going to object, ask

5    her not to answer that question.

6              MR. DOUGHERTY:  Why is that?

7              MR. COKE:  Just the discussions with

8    the Court is -- the Court is the ultimate

9    attorney -- the ultimate client for Rachel and

10   our office on these discussions, so I believe

11   those are privilege and protected.

12             MR. DOUGHERTY:  You're claiming

13   privilege because of what?  What's the

14   relationship?

15             MR. COKE:  The legal -- Rachel Harmon

16   and others in our office providing the legal

17   advice to the Court on matters, and we believe

18   that constitutes attorney-client privilege.

19   BY MR. DOUGHERTY:

20   Q.    Ms. Harmon, did you provide legal advice

21   to any of the justices on the Tennessee Supreme

22   Court?

23   A.    About what?

24   Q.    After the preliminary injunction was

25   issued.
```

```
1    A.    Yes.

2    Q.    Who did you provide legal advice to?

3    A.    Holly Kirby.

4    Q.    Was Justice Kirby a chief justice at that

5    point?

6    A.    No.

7    Q.    Did Justice Kirby become chief justice on

8    September 1 of 2023?

9    A.    Yes.

10   Q.    Is providing legal advice in the job

11   description for the deputy director of the AOC?

12   A.    It can be.

13   Q.    Is providing legal advice to the

14   Tennessee Supreme Court in the deputy director

15   job description?

16   A.    Yes, it can be.

17   Q.    Is there a formal job description for the

18   deputy director of the AOC?

19   A.    There is.

20   Q.    Where could I find that?  Is that on the

21   Tennessee AOC website?

22   A.    It is within our HR Department.

23   Q.    Is there a particular statute that

24   governs the deputy director's responsibility

25   and obligations?
```

Ford & Taylor, TENNESSEE
(615)595-0073

```
 1    A.    No.
 2    Q.    Do you know if there's a statute that
 3    governs the director of the AOC's obligation --
 4    A.    Yes.
 5    Q.    I'll just ask it -- you're very clear on
 6    your answers, but just let me finish the
 7    question first.
 8          So it's your understanding that there is
 9    a state statute that governs the duties and
10    responsibilities of the director of the AOC,
11    correct?
12    A.    Yes.
13    Q.    Did you provide legal advice to director
14    Michelle Long?
15    A.    Yes.
16    Q.    When?
17    A.    In May, when the preliminary injunction
18    was issued, which I believe was May.
19    Q.    I believe it was March, but --
20    A.    Whichever month --
21    Q.    The actual date is not as important as --
22    we agree it came down in the spring of 2023,
23    correct, the preliminary injunction?
24    A.    Whichever month it came down, that's --
25    that would have been the month I would have had
```

*Veritas* — TENNESSEE
(615)595-0073

```
 1    a discussion with her.

 2    Q.    So it would have been the month that

 3    Judge Richardson issued it, that's when you

 4    would have had these discussions?

 5    A.    Yes.

 6    Q.    Is that when you would have had the

 7    discussion with Justice Holly Kirby, whenever

 8    the injunction was issued?

 9    A.    Yes.

10    Q.    That month?

11    A.    Yes.

12    Q.    Okay.  Did you have a discussion with I

13    think he was the chief justice at the time,

14    Chief Justice Paige?

15    A.    Yes.

16    Q.    And was that a separate discussion that

17    you had with Justice Kirby?

18    A.    Yes.

19    Q.    Okay.  What do you recall about that

20    discussion?

21    A.    Simply notifying him about the

22    preliminary injunction.

23    Q.    Did you also discuss that with the other

24    members of the Supreme Court at that time?

25             MR. STAHL:  Object to the form.
```

*Text tab* **TENNESSEE**
*(615)595-0073*

```
 1              THE WITNESS:  No.

 2    BY MR. DOUGHERTY:

 3    Q.    So other than Justice Paige and Justice

 4    Kirby, have you had communications with any

 5    other justices since the preliminary injunction

 6    was issued?

 7    A.    About the preliminary injunction?

 8    Q.    Yes.

 9    A.    No.

10    Q.    So it's your testimony that you've only

11    discussed the preliminary injunction with

12    Justice Kirby and Justice Paige?

13    A.    On the Supreme Court, that's correct.

14    Q.    Okay.  I want to -- I appreciate you, I

15    want to be clear.

16          Since the preliminary injunction was

17    issued in 2023, you've had discussions about

18    the injunction with Michelle Long; is that

19    right?

20    A.    Yes.

21    Q.    You've had further discussions about the

22    preliminary injunction with Justice Kirby; is

23    that right?

24    A.    Yes.

25    Q.    And you've had further discussions about
```

```
 1    the preliminary injunction with Justice Paige;

 2    is that right?

 3    A.    Yes.

 4    Q.    Any other members on the Tennessee

 5    Supreme Court, either past or current, have you

 6    had discussions about the preliminary

 7    injunction with?

 8    A.    No.

 9    Q.    Have you discussed the preliminary

10    injunction with other members of the AOC office

11    other than Michelle Long?

12    A.    John Coke and Michelle Consiglio-Young.

13    Q.    And she went on maternity leave, I

14    believe you said in May -- excuse me, in August

15    of 2023; is that right?

16    A.    Yes.

17    Q.    Have you had any discussions about the

18    preliminary injunction with Michelle

19    Consiglio-Young while she's on leave?

20    A.    No.

21    Q.    So your discussions with Michelle

22    Consiglio-Young about the preliminary

23    injunction occurred before she went on

24    maternity leave; is that right?

25    A.    Yes.
```

1    Q.    Do you know how many meetings of the
    2   Advisory Commission have been held since the
    3   preliminary injunction in 2023?
    4   A.    I don't think any.
    5   Q.    Was there one held in June of 2023?
    6   A.    I don't know.
    7   Q.    So you're not aware that there was a
    8   public meeting held in June of 2023 and it was
    9   livestreamed to the public; you're not aware of
   10   that?
   11          MR. STAHL:  Object to the form, asked
   12   and answered.
   13          THE WITNESS:  I don't deal directly
   14   with the Rules Commission, so I don't -- I
   15   don't know that.
   16   BY MR. DOUGHERTY:
   17   Q.    Well, in your discussions with Michelle
   18   Long, I think you testified that you discussed
   19   post preliminary injunction that meeting
   20   notices needed to go to the public; is that
   21   right?
   22   A.    That's correct.
   23   Q.    Do you know if a meeting notice ever went
   24   to the public post preliminary injunction about
   25   any Advisory Commission meetings?

Texcita Filed TENNESSEE
(615)595-0073

```
1    A.    I don't know that.

2    Q.    Would it have been your role to assign

3    someone in the AOC office to put out the public

4    meeting notices?

5    A.    No.

6    Q.    Would it have been Michelle Long's role

7    to assign someone to put out the meeting

8    notices?

9    A.    Yes.

10   Q.    It would be Michelle Long's

11   responsibility to do that?

12   A.    To assign someone, yes, the person

13   assigned is Michelle Consiglio-Young.

14   Q.    Right, but I just want to understand kind

15   of the hierarchy.

16         That's not something you as deputy

17   director would have actually assigned Michelle

18   Consiglio-Young?

19   A.    No.

20   Q.    That would have been Michelle Long

21   assigning Michelle Consiglio-Young?

22   A.    Yes.

23   Q.    Do you know if -- how many meetings the

24   Advisory Commission had in 2022?

25   A.    No.
```

```
 1   Q.    Do you know if those meetings were open
 2   to the public?
 3   A.    I do not know.
 4   Q.    In your discussions with Michelle Long
 5   post preliminary injunction, did the issue come
 6   up that prior meetings of the Advisory
 7   Commission had been closed?
 8              MR. STAHL:  Object to the form.
 9              THE WITNESS:  I'm sorry, can you --
10   I'm not sure I understand that question.
11   BY MR. DOUGHERTY:
12   Q.    Sure.  Post preliminary injunction you
13   testified that you had a discussion with
14   Michelle Long; is that right?
15   A.    Yes.
16   Q.    During that discussion, you discussed
17   that the AOC office would have to put out
18   public meeting notices; is that correct?
19   A.    Yes.
20   Q.    Was there any discussion about past
21   meetings being closed and why notices weren't
22   sent out in the past?
23   A.    No.
24   Q.    Why did that become an issue post
25   preliminary injunction, putting out public
```

1    meeting notices?

2    A.    I'm not sure I understand the question.

3    Q.    Well, part of the preliminary injunction

4    required the AOC office to put out public

5    meeting notices.  Why did that require you to

6    have a discussion with Michelle Long?

7    A.    My conversation with her was really

8    limited to insuring she understood that that

9    was just going to have to happen.  I don't

10   recall there being any discussion about whether

11   it had or had not been happening.

12   Q.    Had you ever had any prior discussions

13   with Michelle Long about the Advisory

14   Commission?  And when I say "prior," I'm

15   talking about pre preliminary injunction?

16   A.    Yes, we would have discussed it when the

17   lawsuit was initially filed in this matter.

18   Q.    Do you recall what you discussed when the

19   lawsuit was filed in this matter with Michelle

20   Long?

21   A.    I found the lawsuit extremely confusing

22   because it initially sought public attendance

23   at judicial education conferences and that is a

24   space where I spend a great deal of time and

25   supervise our judicial education team.

```
 1    After --
 2    Q.    Go ahead.
 3    A.    When the lawsuit was filed and I reviewed
 4    the pleadings, I remember commenting, this
 5    isn't what they think it is, in terms of the
 6    judicial education inferences, this sounds like
 7    they are more interested in the Advisory
 8    Commission.
 9    Q.    And so when you saw the first amended
10    complaint a couple weeks later, you understood
11    it better at that point, is what you're saying?
12    A.    I believe my declaration was filed in the
13    interim explaining what the judicial education
14    conferences were, and then yes, I recall seeing
15    a first amended complaint that better
16    categorized that.
17    Q.    And we'll talk a little bit later about
18    that particular statute.  And I appreciate you
19    sharing the judicial conference right now, I
20    kind of want to focus on the Advisory
21    Commission, okay?
22    A.    My understanding from your question was
23    what did I discuss with Michelle Long and
24    that's what we discussed.
25    Q.    Okay.  And it's your understanding that
```

Tex-Lar TENNESSEE
(615)595-0073

```
 1    the preliminary injunction only refers to the

 2    Advisory Commission meetings?

 3    A.    Correct.

 4    Q.    I mean, we can go as long as you want,

 5    we've been doing it about an hour and

 6    15 minutes, if you want to take a break, fine,

 7    if you don't --

 8    A.    I'm fine.

 9    Q.    Okay.  Are you aware of a similar federal

10    committee that is structured like the Tennessee

11    Advisory Commission?

12    A.    I am not.

13    Q.    Have you since become aware of it since

14    this lawsuit was filed?

15    A.    Yes.

16    Q.    Were you aware prior to the lawsuit being

17    filed that there is a similar federal committee

18    like the Tennessee Advisory Commission?

19    A.    I'm aware that there is a committee, I am

20    not aware of how similar they are.

21    Q.    You're not aware that they also make rule

22    recommendations to the United States Supreme

23    Court?

24    A.    In that regard, they may be similar.

25    Q.    Have you ever seen any of their open
```

1    meetings broadcast or either in person?

2    A.    No.

3    Q.    Did you watch the Tennessee Advisory

4    Commission meeting that was livestreamed in

5    June of 2023?

6    A.    No.

7    Q.    Does the AOC office -- strike that.

8          Are you aware of YouTube channels that

9    have court information regarding Tennessee

10   courts?

11   A.    Yes.

12   Q.    Tell me your understanding of those

13   YouTube channels.

14   A.    There are two.  There's a primary one and

15   a secondary one.  And our Communications

16   Department livestreams oral arguments on the

17   appellate level and also sometimes assists

18   other courts, like our three judge panel in

19   streaming court hearings and proceedings.  That

20   is the primary --

21   Q.    When you say a "three judge panel," are

22   you referring to the constitutional three judge

23   panel?  What do you mean by the three judge

24   panel?

25   A.    Yes, it's a relatively new statute that

```
 1    was passed by the General Assembly and creates

 2    a three judge panel on the trial level to hear

 3    certainly constitutional challenges.

 4    Q.    I think we were involved in a case right

 5    after it was created, so I'm aware of that.

 6          What -- okay.  I want to kind of unpack

 7    some of that.

 8          You said something about a communications

 9    team.  I just want to understand the YouTube

10    channels, is that under the AOC website -- the

11    AOC auspices?

12    A.    Yes.

13    Q.    And so are there certain team members

14    like communication team members that are under

15    the AOC?

16    A.    Yes.

17    Q.    Who are those team members that assist

18    with the YouTube channels?

19    A.    Primarily it is Nick Morgan and Barbara

20    Peck.

21    Q.    Are you aware of any livestreaming of

22    meetings of boards or commissions?

23    A.    I am.

24    Q.    And can you tell me those particular

25    meetings that you're aware of that have been
```

Text Capital TENNESSEE
(615)595-0073

1    livestreamed in the past?

2    A.    Access to Justice and Alternative Dispute

3    Resolution.

4    Q.    Is that the ADR Commission; also known as

5    ADR Commission?

6    A.    Correct.

7    Q.    Do they meet -- does the Access to

8    Justice, is it a commission, is it called a

9    commission?

10   A.    Yes.

11   Q.    Does it meet quarterly or monthly or do

12   you know?

13   A.    I believe Access to Justice is required

14   to meet a certain number of times based on Rule

15   50, Tennessee Supreme Court Rule 50.  I have

16   not read that rule in a while, but that is my

17   recollection.

18   Q.    Are members of the judiciary, do they

19   serve on the Access to Justice Committee?

20   A.    We would have to look at the page to see

21   who is on it, but I believe there's a good

22   mixture of judiciary, lawyers and lay people.

23   Q.    And when you say "look at the page,"

24   you're referring to the AOC website?

25   A.    Correct.

LexitasLegal TENNESSEE
(615)595-0073

```
1   Q.    What about the ADR Commission, is it made
2   up of members of the judiciary?
3   A.    I believe there are members similar to
4   the ATJ; judiciary, attorney and lay people.
5   Q.    So would it be fair to say that that's --
6   have you heard the term before "bench bar,"
7   have you ever heard that term before?
8   A.    I ever heard that term before.
9   Q.    What is your understanding of bench bar?
10  A.    My main experience with bench bar is with
11  the relationship with the Tennessee Bar
12  Association.  You're not from here, so I'll
13  just give you this:  Lawyers who are licensed
14  in Tennessee are not required to be part of the
15  bar.  So that is a -- more of a social
16  organization, it is not actually a requirement.
17  The Tennessee Bar Association and the Tennessee
18  Judiciary Partner have created a Bench Bar
19  Committee, but other than that, I'm not aware
20  of a state level Bench Bar Committee.
21  Q.    Do you have any duties in your role as
22  deputy director in preparing the budget for the
23  AOC?
24  A.    No.
25  Q.    Do you make any recommendations to the
```

*Texita* TENNESSEE
(615)595-0073

1    director, either Michelle Long or prior

2    directors on budgetary matters?

3    A.    I don't make budget recommendations.  I

4    might and do make programatic recommendations

5    that might result in a budgetary ask.

6    Q.    And tell me about those programatic

7    recommendations.

8    A.    A really good example right now is our

9    indigent services.  I have been very involved

10   since I began the AOC in indigent

11   representation.  I staffed and helped maneuver,

12   for lack of a better term, the indigent

13   representation task force in 2016 and 2017 and

14   since then have been working on increasing

15   compensation rates for indigent attorneys and

16   trying to modernize that space.

17   Q.    And has there been any change in what

18   you're trying to accomplish; has there been any

19   recent changes in those compensation levels?

20   A.    There have been incremental changes, but

21   we are -- we are poised to make a large ask for

22   the next legislative session that would be a

23   budget request to raise the compensation rates.

24   Q.    Are you having those discussions with

25   Justice Kirby about that?

Veritas TENNESSEE
(615)595-0073

1    A.    I have not had those discussions directly
2    with her yet.
3    Q.    Has Justice Kirby released any recent
4    public announcements that it's her goal to kind
5    of, what you just said, increase the
6    compensation level?
7    A.    Yes.
8              MR. STAHL:  Object to the form.
9    BY MR. DOUGHERTY:
10   Q.    Is that an Access to Justice issue?
11   A.    It is presented that way many times.
12   Q.    So even though the indigent defense might
13   not technically be under Access to Justice, you
14   consider it an Access to Justice issue?
15   A.    If you're asking me personally, yes.
16   Q.    What does Access to Justice mean to you
17   personally?
18   A.    This is going to sound very idyllic, but
19   everyone has a level playing field when they
20   come into court.
21   Q.    Kind of skipped forward after we started
22   talking about the YouTube channels.  I want to
23   kind of circle back to that, if we could.
24        Nick Morgan, what is his position over
25   the -- or involvement with the YouTube

Case 3:22-cv-00439    Document 74-1  Filed 12/06/23  Page 69 of 165 PageID #: 2634
TENNESSEE
(615)595-0073

1    channels?

2    A.    He is our digital media lead.

3    Q.    Did you have a conversation with Nick

4    Morgan post preliminary injunction about

5    livestreaming an Advisory Commission meeting?

6    A.    No.

7    Q.    Do you know if Michelle Long or Michelle

8    Consiglio-Young had communication with

9    Mr. Morgan about livestreaming the Advisory

10   Commission meeting?

11            MR. STAHL:  Object to the form.

12            THE WITNESS:  I do not.

13   BY MR. DOUGHERTY:

14   Q.    What about -- you said Barbara Peck?

15   A.    Do I know if she had conversations with

16   him about it?

17   Q.    Was that her name, Barbara Peck?

18   A.    Yes, Barbara Peck.

19   Q.    What is her role?

20   A.    She supervises Nick Morgan.  She's our

21   communications director.

22   Q.    Did you or Michelle Long have -- bring in

23   Ms. Peck about -- post preliminary injunction

24   about livestreaming an Advisory Commission

25   meeting?

```
 1              MR. STAHL:  Object to the form.
 2              THE WITNESS:  I did not.
 3    BY MR. DOUGHERTY:
 4    Q.    Well, who would have communicated to
 5    Ms. Peck about the need to fulfill the
 6    preliminary injunction on livestreaming an
 7    Advisory Commission meeting?
 8    A.    I don't know, but as I've stated,
 9    Michelle Consiglio-Young would have been our
10    primary --
11    Q.    Well, when you were communicating with
12    Michelle Long, what did you all talk about post
13    preliminary injunction with respect to
14    publicizing the meeting?
15    A.    As I've stated, I simply made sure she
16    understood that that meeting was going to have
17    to be publicly noticed.
18    Q.    So were you giving her legal advice at
19    that point?
20    A.    I'm not sure I understand the question.
21    Q.    Well, I just want to understand.  I mean,
22    you're the deputy director; is that right?
23    A.    That's correct.
24    Q.    Does Michelle Long supervise you?
25    A.    Yes.
```

```
 1    Q.    Okay.  So post preliminary injunction you
 2    wanted to make sure that your superior knew
 3    what needed to happen; is that right?
 4    A.    Yes.
 5    Q.    Why did you feel the need to make that
 6    known to her?
 7    A.    It's the responsible thing do in my
 8    position.
 9    Q.    Did you feel that she wouldn't understand
10    the preliminary injunction and what it meant?
11               MR. STAHL:  Object to the form.
12               THE WITNESS:  Not at all.
13    BY MR. DOUGHERTY:
14    Q.    So that's what I'm asking.  Were you
15    acting in a legal capacity when you were
16    advising her that the meetings -- future
17    meetings needed to be open to accord with the
18    injunction?
19    A.    I would perceive that as legal advice,
20    yes.
21    Q.    And was that what you were doing?
22    A.    Yes.
23    Q.    Do you recall her response to you
24    notifying her that future meetings needed to be
25    open?
```

1          MR. STAHL:  Object to the form.

2          THE WITNESS:  I don't recall her

3    exact response.

4    BY MR. DOUGHERTY:

5    Q.    Was there any discussion about bringing

6    in the communications group, the team, to

7    assist with notifying the public?

8    A.    No.

9    Q.    Have you ever attended -- I'm not talking

10   about the Advisory Commission at this point,

11   any meetings that have been livestreamed?

12   A.    You said you're not talking about the

13   Advisory Commission?

14   Q.    Right, any board or commission meetings

15   that have been livestreamed, have you ever

16   attended or observed any of those type

17   meetings?

18   A.    I know I have, I don't know which ones or

19   when.

20   Q.    Okay.  But I think it's your

21   understanding, or at least I just want to make

22   sure I understand it, as far as you recall, the

23   Access to Justice meetings are livestreamed to

24   the public; is that right?

25   A.    If they are not held in a physical

1    location only, I believe they are livestreamed,

2    yes.

3    Q.    And the Alternative Dispute Resolution

4    Commission, their meetings are livestreamed to

5    the public; is that right?

6    A.    If they're not held in a physical

7    location only, I believe that's correct.

8    Q.    And if they are held in a physical

9    location, would that be at the AOC office?

10   A.    Yes.

11   Q.    Do you know if Advisory Commission

12   members receive reimbursement for their

13   participation in the Advisory Commission?

14   A.    I believe they are -- like most of those

15   who volunteer and serve on Supreme Court boards

16   or commissions, they are not necessarily paid

17   for their time, but they do receive mileage and

18   maybe a meal per diem, with the exception

19   perhaps of the Board of Law Examiners, I

20   believe that is technically a part-time

21   position for graders of the exam.

22   Q.    So it's your testimony that the Advisory

23   Commission members receive mileage

24   reimbursement?

25   A.    I think that's right.

1    Q.    Is that a policy or do you know if that's

2    a statute?

3    A.    I think it's in the statute.

4    Q.    And so do you -- is it your understanding

5    that the Advisory Commission members receive a

6    per diem meal reimbursement?

7    A.    I am basing that off of the fact that

8    generally, when there is mileage provided under

9    state finance administration rules, that meal

10   per diem can be, if certain criteria are met

11   for timing and things of that nature.

12   Q.    Have you ever observed any of these

13   requests for reimbursement from Advisory

14   Commission meetings?

15   A.    No.

16   Q.    Do members submit reimbursement to the

17   AOC office?

18   A.    I don't know.

19   Q.    Is it your understanding that the

20   director, Michelle Long, her role or whoever

21   fulfills that role, is supposed to kind of

22   coordinate the reimbursement to the members?

23   A.    Our fiscal services would do that.

24   Q.    When you say "our fiscal," you're

25   referring to the AOC office Fiscal Division?

1    A.    Correct.

2    Q.    Just to simplify, the AOC somewhere

3    reimburses Advisory Commission members when

4    there's an appropriate time to reimburse them;

5    is that right?

6    A.    Yes, if they submit a reimbursement

7    request.

8    Q.    Assuming they fill their obligation and

9    submit the reimbursement, right, is what you're

10   saying?

11   A.    Yes.

12   Q.    Okay.  When did the livestreaming and the

13   YouTube channels -- do you recall when that

14   started?

15   A.    I think we have had a YouTube channel for

16   several years.  I don't know when it started.

17   I think it really became a necessity during the

18   2020 COVID-19 pandemic.  And our meetings up

19   until that point, generally, for commissions

20   and really anything else we did was in person.

21   Very little livestreaming.  Maybe a phone

22   conversation -- you know, someone put on a

23   Polycom in the middle of the table on the

24   phone, if they could not attend for some reason

25   physically.  It was really when the pandemic

1    hit that we had to pivot to virtual.

2    Q.    And so the Tennessee AOC office has had

3    livestreaming pre COVID; is that right?

4    A.    Some.

5    Q.    But it's your testimony that that really

6    didn't kind of, I guess for lack of a better

7    word, get into full swing until the pandemic?

8    A.    The Tennessee Supreme Court started

9    livestreaming before the pandemic, that was an

10   effort to modernize and allow for more public

11   access to the courts.  The trickle down effect

12   was, in my opinion, much greater and faster

13   because of the pandemic.  So the Court of

14   Appeals, Court of Criminal Appeals were

15   livestreamed on the YouTube channel.

16   Q.    You're saying the Tennessee Supreme Court

17   and the Court of Appeals or arguments were

18   livestreamed to the public pre pandemic?

19   A.    No, Tennessee Supreme Court was.

20   Q.    Okay.

21   A.    The other courts came on quickly as

22   access to the courts was problematic.  And it

23   wasn't just for public, it was so that the

24   judges could also participate as a panel.

25   Q.    Who made the decision once the pandemic

```
 1    hit to increase the use of livestreaming?
 2    A.    It was primarily the courts themselves.
 3    So Tennessee Supreme Court was already doing
 4    it, that did not change.  The presiding judge
 5    of the Court of Appeals and a presiding judge
 6    of the Court of Criminal Appeals of the two
 7    intermediate appellate courts would advise us
 8    they were ready to move to a virtual platform.
 9    How they came to that discussion or decision is
10    within their 12 members.
11    Q.    When you say they would have advised us,
12    you're referring to the AOC office?
13    A.    Yes.
14    Q.    Does the AOC and the Tennessee Supreme
15    Court share the same website?
16    A.    Yes.
17    Q.    Is there any other website that exists
18    outside of the AOC website that would service
19    or assist any other courts in the state of
20    Tennessee?
21    A.    There is an offshoot website for Access
22    to Justice.  I don't know if it is necessarily
23    a support for the courts, but it is a resource
24    tool for litigants, attorneys.
25    Q.    What do you mean by "offshoot"?
```

TennesseeTENNESSEE
(615)595-0073

A.    It's not -- it's not a Tennessee Supreme
Court, Tennessee courts website, it is more of
a resourcing website.  So it is not intended to
be a platform where we necessarily share court
opinions and put news out or articles out or
livestream events, it is more of a resource
tool.
Q.    And do you know the web address for that
Access to Justice website?
A.    Not off the top of my head.
Q.    Is there a link to it on the Tennessee
AOC website?
A.    I believe you can get through it through
the Access to Justice page.
Q.    Okay.  Who administers that Access to
Justice website?
A.    I don't know who actually makes the key
strokes happen.  I know that Anne-Louise
Wirthlin, who is our Access to Justice
director, she and her team manage that page
content.
Q.    What is her name again?
A.    Anne-Louise.  It's A-N-N-E, hyphen,
L-O-U-I-S-E.  Is that right?  And Wirthlin,
W-I-R-T-H-L-I-N.  Wirthlin, yes.

1    Q.    Is Ms. Wirthlin an AOC employee?

2    A.    She is.

3    Q.    So when you say the Access to Justice

4    website is an offshoot, I understand how you

5    described it, does the AOC -- someone within

6    the AOC office administers that website?

7    A.    Yes.  I think there's a vendor that helps

8    support that, but the content is relegated by

9    those within the AOC.

10   Q.    Okay.  I think you made a comment or part

11   of your testimony that the Advisory Commission

12   was not having quarterly meetings this year in

13   2023; is that your testimony?

14   A.    I think so.  I'm not directly involved

15   with them.  I know that there was a meeting

16   scheduled that did not happen this fall, so I

17   don't think that one has happened in the third

18   quarter.

19   Q.    Let's talk about that meeting that did

20   not happen.

21         What is your understanding of the

22   Advisory Commission third quarter meeting that

23   did not happen?

24   A.    It did not happen.  What do you mean what

25   is my understanding?

1    Q.    Well, you've -- why did it not happen?

2    A.    I don't think it was properly noticed.

3    Q.    And what leads you to that conclusion?

4    A.    I don't remember now how it came up, but

5    someone brought to my attention that there was

6    an Advisory Commission meeting.  I went to the

7    website to look, did not see a notice and --

8    I'm trying to remember the steps after that.

9    And I just remember telling -- I think it was

10   then Justice -- Chief Justice Kirby that it

11   couldn't go forward.

12   Q.    And that was because of your

13   understanding of the preliminary injunction

14   that it couldn't go forward for that reason?

15   A.    Correct.

16   Q.    Because as you understand the preliminary

17   injunction, the AOC office is required to give

18   notice to the public; is that right?

19   A.    That's right.

20   Q.    And so once you communicated this to

21   Justice Kirby, do you recall what happened

22   after that?

23   A.    Yes.  A fair amount of confusion, largely

24   because our primary liaison was on leave.

25   Q.    Is that -- I don't mean to interrupt, is

1    that Ms. Michelle Consiglio-Young?

2    A.    Yes, yes.  And I was confirming that my

3    suspicion was in fact correct.  When I learned

4    that it was, I just told the Chief Justice

5    Kirby it couldn't go forward or we could be in

6    violation of a preliminary injunction.

7    Q.    And what do you recall Justice Kirby

8    saying?

9          MR. STAHL:  Object to the form.  Do

10   you consider that legal advice?

11         THE WITNESS:  No, I don't.  She

12   understood and I indicated that we would not

13   hold the meeting.  Well, I shouldn't say we,

14   the Advisory Commission would not meet.

15   BY MR. DOUGHERTY:

16   Q.    Does Justice Kirby set the dates for

17   Advisory Commission meetings?

18   A.    No.

19         MR. STAHL:  Object to the form.

20   BY MR. DOUGHERTY:

21   Q.    Who sets the dates for Advisory

22   Commission meetings?

23   A.    I don't know.

24   Q.    Who did you communicate to that the

25   meeting cannot go forward?

Veritas TENNESSEE
(615)595-0073

```
 1    A.    John Coke, Chief Justice Kirby and then I
 2    communicated -- no, that's it.
 3    Q.    Do you know if anyone communicated with
 4    any of the members on the Advisory Commission
 5    meeting that the meeting cannot go forward?
 6              MR. STAHL:  Object to the form.
 7              THE WITNESS:  I -- I was not directly
 8    part of those conversations.  My understanding
 9    is that the new liaison -- justice liaison
10    Dwight Tarwater, who came on the court
11    September 1st, was advised that it could not go
12    forward, as was the chair Gino Bulso, as was
13    the reporter.  And I'm blanking, I think her
14    name is Kathy.
15    BY MR. DOUGHERTY:
16    Q.    When you say "reporter," you're talking
17    about Advisory Commission reporter?
18    A.    Reporter, uh-huh.
19    Q.    Would that individual be listed on the
20    website for the members?
21    A.    I don't know -- yes.  I don't know if
22    she's considered a member or just a reporter.
23    There's a distinction with that particular
24    Commission I've never fully understood, but I
25    believe she's listed separately somehow.
```

TENNESSEE
(615)595-0073

```
1    Q.    Would that person have been Lynn
2    Ridgeway?
3    A.    That's it.  I have no idea where I got
4    Kathy.
5    Q.    Do you see a list of meetings for the
6    upcoming calendar year for the Advisory
7    Commission?
8    A.    Do I see one?
9    Q.    Uh-huh.
10   A.    No.
11   Q.    Do you see a list of meeting dates for
12   any of the boards or commissions that the AOC
13   office supports?
14   A.    No.
15   Q.    Do you know when those dates are chosen
16   for any of the commission or board meetings?
17   A.    Not unless I need to be a part of the
18   meeting, which is almost never.
19   Q.    Are you aware that the Advisory
20   Commission typically tries to hold a meeting, I
21   believe it's the second Friday per quarter?
22   A.    As I've indicated in my declaration, my
23   understanding was they had a quarterly cadence,
24   I did not know anything about a second Friday.
25   Q.    So you're not aware of -- as far as you
```

1    know it's just quarterly, you don't have any

2    specifics other than quarterly; is that right?

3    A.    Correct.

4    Q.    Do you know of any other boards or

5    commissions that have certain specific cadence,

6    as you used the term, regular types of

7    meetings?

8    A.    As I've stated, I think the Access to

9    Justice is listed in Rule 50, but I'm not aware

10   of a specific cadence outside of that.

11   Q.    How does that -- I'm just trying to

12   understand internally with the AOC office, is

13   -- whoever the liaison from the AOC to a

14   particular commission or board, is it that

15   individual's responsibility to assist that

16   particular commission or board?

17   A.    Yes.

18   Q.    So this is not something that you as

19   deputy director kind of oversee; is that right?

20   A.    Correct.

21   Q.    Who assigns the individuals as liaisons

22   to the various boards and commissions?

23   A.    Many of them have already been assigned

24   and have been at the AOC for long enough and

25   work well with the groups, so the assignments

Texita TENNESSEE
(615)595-0073

1  have sort of already been made.  The AOC

2  director ultimately can determine if that's the

3  right fit for some, but there are some

4  positions that are dedicated to serving a

5  commission, Access to Justice, for example,

6  ADR, for example.  The Advisory Commission is

7  not one of those that is specifically denoted

8  as a position, we have an individual who works

9  in a job that also has the added duty of being

10  the liaison.

11  Q.    But it's your recollection and testimony

12  that Michelle Consiglio-Young has served as the

13  liaison for the Advisory Commission for several

14  years?

15  A.    Yes.

16  Q.    Is Michelle Long a liaison on any

17  particular boards or commissions?

18  A.    I don't know if she would be defined as a

19  liaison, but she is working very closely with

20  our Technology Oversight Committee.

21  Q.    Is the Technology Oversight Committee the

22  same as the communications team?

23  A.    No.

24  Q.    So Barbara Peck -- who is the

25  communications director; is that right?

```
1    A.    Correct.

2    Q.    She oversees what AOC team?

3    A.    Communications and Judicial Services, I

4    believe is the formal name.

5    Q.    Now, can you repeat the -- this other

6    division that you just referenced?

7    A.    Communications and Judicial Services.

8    Q.    No, the other one.  I think you said --

9    A.    Oh, the committee?

10   Q.    Well, I'm just trying to understand, does

11   Barbara Peck and her team at the Communications

12   and Judicial Service Division, does she oversee

13   all of the livestreaming that takes place

14   within the AOC office?

15   A.    She would ultimately be responsible for

16   the livestreaming.

17   Q.    Is there a separate communications

18   department or telecommunications department

19   that oversees any livestreaming of meetings or

20   commissions?

21   A.    No.

22   Q.    Okay.  I thought you just said something

23   about telecommunications, I may have

24   misunderstood that.

25   A.    About telecommunications?
```

```
1    Q.    Yeah, or something to that effect.  But
2    if Ms. Peck is the only individual, then -- as
3    I understand it; is that your testimony?
4    A.    Nick Morgan is the lead on the media
5    space.  He reports to Barbara Peck.  She is
6    ultimately responsible as the division
7    director.
8    Q.    Okay.  Is her position an appointed
9    position?
10   A.    No.
11   Q.    What positions within the AOC office are
12   actually appointed type positions?
13   A.    The AOC administrative director is
14   appointed and serves at the pleasure of the
15   Supreme Court.
16   Q.    And who appoints that position?
17   A.    The Supreme Court.
18   Q.    Does the AOC director serve at the
19   pleasure of the Supreme Court or the pleasure
20   of the chief justice?
21   A.    The Supreme Court.
22   Q.    That's what the statute says?
23   A.    They serve under the supervision of the
24   chief justice, but at the pleasure of the
25   Supreme Court.
```

```
 1    Q.    Okay.  Are you required, other than your
 2    CLE requirements, to go to any training with
 3    any other AOC offices in other states or even
 4    the federal AOC?
 5    A.    I am not required.
 6    Q.    Do you ever do that?
 7    A.    I have not yet as deputy director.
 8    Q.    Does the Tennessee AOC office ever look
 9    to other state offices, state AOC offices or
10    federal AOC office to get ideas or -- on
11    anything of how you all run your department?
12    A.    Yes.
13    Q.    Can you tell me about that?
14    A.    My experience has, again, been back into
15    the indigent world, I've had a lot of really
16    good conversations with Kentucky in particular.
17    Q.    Can you tell me about those conversations
18    with your Kentucky AOC counterpart?
19    A.    Yes.  My dream is to have a unified court
20    system like Kentucky so that we can take
21    advantage of many of the tools and the indigent
22    resources that they have available to them that
23    we do not as a non-unified court system.  That
24    was the general discussion.
25    Q.    And who did you have this discussion with
```

1    in the Kentucky AOC?

2    A.    It has been three or four years ago, I do

3    not know.

4    Q.    Do they call their equivalent the AOC

5    office?

6    A.    Yes.

7    Q.    Would that have been a director or deputy

8    director; do you recall the position?

9    A.    I recall it being a lawyer, I don't

10   recall the title.

11   Q.    Was this at a conference or you said a

12   telephone call?

13   A.    Telephone call.

14   Q.    What does the unified court system mean?

15   What does that mean?

16   A.    We have political subdivisions in

17   Tennessee that clearly denote levels of our

18   court system from the bottom up; municipal, our

19   city courts, our county courts then, our

20   general sessions and juvenile judges and then

21   our state courts which are our trial level and

22   then our intermediate and supreme court level.

23        They are not all budgeted under the state

24   budget appropriation.  The AOC in fact has

25   different levels of support for each of those

1    groups because of resources available to the

2    AOC.  So we have relationships with and give

3    support to all of the judges and the court

4    clerks, but the majority of our judiciary are

5    city and county officials, not state, and we

6    are a state agency.

7    Q.    Okay.  So are there courts out there or

8    commissions or boards that the AOC does not

9    support?

10   A.    I don't know that I would say we don't

11   support at all.

12   Q.    Let me rephrase that, provide

13   administrative support to?

14   A.    Once you get beyond the state trial and

15   appellate level judges, we do not provide any

16   HR function, we do not provide any budgetary

17   function.  We mostly provide judicial education

18   opportunities by statute and funds appropriated

19   by the General Assembly, but beyond that, it's

20   very limited.

21   Q.    But the AOC office provides

22   administrative support to circuit and chancery

23   court judges?

24   A.    And criminal court judges.

25   Q.    Is that a yes?

```
 1    A.     Yes.

 2    Q.     And does the AOC provide administrative

 3    support to criminal and civil appellate state

 4    judges?

 5    A.     Yes.

 6    Q.     And does the AOC provide administrative

 7    support to the Tennessee Supreme Court?

 8    A.     Yes.

 9    Q.     So does the AOC provide administrative

10    support to the general sessions courts?

11    A.     Less support, but yes.

12    Q.     What does that mean "less support;" what

13    do you mean?

14    A.     As I stated, we don't provide any HR

15    personnel support, we don't provide any

16    budgetary support and we don't have any real

17    connection beyond judicial education and the

18    inherent constitutional authority of the

19    Supreme Court, which is not the AOC's.

20    Q.     All right.  What do you mean -- explain

21    what you mean by that, the Tennessee Supreme

22    Court is not the AOC?

23    A.     The Tennessee Supreme Court is our only

24    constitutional court in Tennessee, they have

25    inherent supervisory authority over the
```

TENNESSEE
(615)595-0073

```
 1    judiciary.  The General Assembly has the
 2    ability to establish inferior courts and has
 3    done so on the state, county and municipal
 4    level, but not all of them are funded the same,
 5    receive the same level of support from the AOC.
 6    Q.    And the Tennessee Supreme Court has
 7    supervisory role over the AOC office; is that
 8    right?
 9    A.    That's right.
10    Q.    Do you know why Tennessee doesn't have a
11    unified court system like Kentucky?
12    A.    I don't know why.  I have suspicions.
13    Q.    What are those suspicions?
14    A.    Political.
15    Q.    What does that mean?
16    A.    I think there are just a lot of
17    political -- political people in local
18    government that would like the courts to stay
19    local.
20    Q.    Any of those people serve on the Advisory
21    Commission?
22    A.    I don't know.
23    Q.    So when you say it's your desire, would
24    it be more efficient in your opinion?
25    A.    Yes.
```

TENNESSEE
(615)595-0073

```
1   Q.   In terms of the AOC office being able to

2   provide administrative support to a unified

3   court system?

4   A.   If properly resourced, yes.

5   Q.   I just want to make sure this is not like

6   a personal aspiration of yours, could be both,

7   but I just want to understand that.

8   A.   It's an ongoing discussion

9   professionally.  Yes, it is a personal

10  aspiration because I have seen how well things

11  can work, but --

12  Q.   Have -- go ahead, I'm sorry.

13  A.   Conversations with other states that are

14  unified just show a different way of doing

15  things I think would be beneficial.

16  Q.   And other than Kentucky, have you had any

17  other discussions with any other AOC

18  counterparts in other states or is that it?

19  A.   I have.  I have in Arkansas, and I don't

20  remember the topic, they reached out to me.  I

21  don't remember who I spoke with either.

22  Florida, and same, I don't remember who it was.

23  Q.   Do you recall a discussion that you had

24  with the person in Arkansas what the topic was

25  about?
```

```
1    A.    I don't.

2    Q.    And then what about your discussion with

3    the AOC person in Florida?

4    A.    I don't.

5    Q.    Is there a certain -- like a conference

6    of AOC directors or deputy directors that ever

7    come together, the federal or the state,

8    anything like that, an organization?

9    A.    There is for the administrative

10   directors, it has not included the deputy

11   director.

12   Q.    What is that organization or association

13   called?

14   A.    The National Center for State Courts.

15   Q.    And do you know if they have -- what type

16   of support do they provide the Tennessee AOC

17   office?

18   A.    I don't know.

19   Q.    That's not something that in your role as

20   deputy you get involved in?

21   A.    It's not.

22   Q.    Is that something that Michelle Long gets

23   involved in?

24   A.    Yes.

25   Q.    Is there a conference like once a year
```

*Text Capital TENNESSEE*
(615)595-0073

1   that you're aware of the National Center for

2   State Courts?

3   A.    I think there's one annually.  There may

4   be others I'm not aware of.

5   Q.    Does the federal AOC have any conferences

6   for the state AOC counterparts that you're

7   aware of?

8   A.    I don't know.

9   Q.    Do other states structure their AOC

10  office like Tennessee's in terms of having the

11  director serve at the pleasure of the Supreme

12  Court?

13  A.    I don't know.

14  Q.    Do you know how the federal AOC is

15  structured vis-a-vis its relationship between

16  the director and the chief justice of the US

17  Supreme Court?

18  A.    This might be incorrect.  My

19  understanding was that the federal AOC served

20  all courts but the US Supreme Court, but I

21  don't know the level of interaction that the

22  chief justice would have.

23  Q.    To simplify that, does that mean -- is it

24  your understanding -- I realize you said you

25  might not be qualified, but is it your

```
1    understanding that the federal AOC director
2    does not serve at the pleasure of the US
3    Supreme Court justice?
4    A.    I don't know.
5    Q.    Okay.  I think you testified that you
6    have never observed a federal equivalent of a
7    committee meeting like the Tennessee Advisory
8    Commission meeting; is that right?
9    A.    I have not.
10   Q.    Before -- were you aware -- were you made
11   aware that their meetings were open to the
12   public because of this lawsuit?
13   A.    Was I made aware that what was --
14   Q.    Were you aware that the federal
15   equivalent to the Tennessee Advisory
16   Commission, that their meetings were open to
17   the public; you ever been aware of that?
18   A.    I was made aware as a result of this
19   lawsuit.
20   Q.    So that was the first time when you read
21   the pleadings in this lawsuit?
22   A.    Yes.
23   Q.    That you were aware that the Feds were
24   open to the public?
25   A.    Yes.
```

MR. STAHL:  Hey, Buck, we've been at
it for a couple of hours.
        MR. DOUGHERTY:  I'm fine, that's why
I wanted to bring it up.  It's been a couple
hours.
        MR. STAHL:  We can stretch our legs.
Let's take ten minutes.  I know you're on a
point, I don't want to break you off from your
train of thought.
        MR. DOUGHERTY:  I'm fine taking a
break.
        (Short break.)
BY MR. DOUGHERTY:
Q.    So we're back on the record, Ms. Harmon.
We're going to finish talking a little bit more
about the Advisory Commission, then we'll move
onto the other Tennessee Judicial Conference
Group, okay?
A.    Okay.
Q.    I want to go back to your declarations
that you filed in this lawsuit.
        Who helped -- or who prepared those
declarations?
A.    Then Deputy Attorney General Janet
Kleinfelter.

1    Q.    And did you have any communication with

2    Ms. Long at that point when you were completing

3    and filling out your declaration?

4    A.    I don't remember.

5    Q.    Why did you give a declaration since

6    you're not a party and Michelle Long is the

7    director?

8    A.    Because I am the supervisor over our

9    judicial education team.

10   Q.    Okay.  And with respect to the -- the

11   second complaint, your second declaration

12   regarding the first amended complaint, why did

13   you give a declaration in that -- at that point

14   as well?

15   A.    I don't remember how it happened, but

16   Janet asked me if I was able to give some

17   supplemental information and I told her I could

18   give her what I have.  And that's what resulted

19   in that supplemental declaration.

20   Q.    So just to clarify, the Advisory

21   Commission is not under your supervision?

22   A.    Correct.

23   Q.    Why didn't Michelle Consiglio-Young give

24   a declaration with respect to the allegations

25   about the Advisory Commission?

Tennessee TENNESSEE
(615)595-0073

```
 1              MR. STAHL:  Object to the form.
 2              THE WITNESS:  I don't know.
 3    BY MR. DOUGHERTY:
 4    Q.    And why did Michelle Long not give a
 5    declaration, since she was named?
 6              MR. STAHL:  Object to the form.
 7              THE WITNESS:  I don't know.
 8    BY MR. DOUGHERTY:
 9    Q.    Were Advisory Commission meetings in 2022
10    open to the public?
11    A.    I don't know.
12    Q.    How are you able to advise Justice Kirby
13    if you don't know if Advisory Commission
14    meetings were open or closed?
15    A.    My advice to Justice Kirby didn't relate
16    to whether the meetings were open or closed.
17    Q.    I thought you testified that you had a
18    communication with Justice Kirby after the
19    preliminary injunction was issued; is that
20    right?
21    A.    Yes.
22    Q.    Well, as part of the preliminary
23    injunction, the Court made a determination that
24    meetings needed to be open; is that right?
25    A.    Yes.
```

1    Q.   If the Court made that determination that

2    meetings needed to be open, would it -- the

3    logical conclusion be that the Advisory

4    Commission meetings were closed before that?

5    A.   That's a logical conclusion.

6    Q.   Was that your understanding?

7    A.   You're asking me if I knew.  I was not

8    directly participating in those meetings, I do

9    not know.  I make the logical conclusion that

10   they were not open.

11   Q.   Did Justice Kirby also confirm that

12   meetings had been closed prior to the

13   injunction?

14            MR. STAHL:  Object to the form.  Do

15   you consider that legal advice, the

16   conversation you had with her regarding this?

17            THE WITNESS:  Yes.

18            MR. STAHL:  We're going to instruct

19   her not to answer.

20   BY MR. DOUGHERTY:

21   Q.   Who closed meetings of the Advisory

22   Commission?

23   A.   I don't know.

24   Q.   Would Michelle Long know?

25   A.   I don't know.

```
 1    Q.    Would Justice Kirby know?

 2    A.    I don't know.

 3    Q.    Would Gino Bulso know?

 4    A.    I don't know.

 5    Q.    Is there anybody at the AOC office that

 6    would know whether or not Advisory Commission

 7    meetings were open or closed?

 8    A.    I don't know.

 9    Q.    How does the AOC office provide

10    administrative support to the Advisory

11    Commission when it doesn't know if its meetings

12    are open or closed?

13    A.    I don't think I speak for the entire AOC.

14    Q.    Well, you just said that you don't know

15    if anyone at the AOC office would know if

16    Advisory Commission meetings are open or

17    closed; is that right?

18    A.    I don't know what others know.  The

19    primary assistance for the Advisory Commission

20    with the AOC is Michelle Consiglio-Young, I

21    don't know what she knew or when.

22    Q.    Would Michelle Consiglio-Young be the

23    person at the AOC office who would know if

24    meetings in 2022 were open or closed?

25    A.    I think so.
```

Lexitas TENNESSEE
(615)595-0073

1   Q.   Would the justice of the Supreme Court

2   know if meetings in 2022 or open or closed?

3   A.   I don't know if all of them were or any

4   specific would.

5   Q.   Would some of them know?

6   A.   I don't know.

7   Q.   Would they know if meetings were open or

8   closed if we asked --

9           MR. STAHL:  Object to the form.

10          THE WITNESS:  Who is "they"?

11  BY MR. DOUGHERTY:

12  Q.   The Tennessee Supreme Court justices?

13  A.   I can't speak for them.

14  Q.   Do you know if the AOC had to make any

15  financial adjustments post preliminary

16  injunction to livestream the Advisory

17  Commission meetings?

18  A.   There would not have been any.

19  Q.   So when the preliminary injunction was

20  issued in 2023 in the spring, in order for the

21  AOC office to carry out what the judge said in

22  the injunction, did the AOC office already have

23  the resources to livestream the Advisory

24  Commission meetings?

25  A.   Yes.

```
 1    Q.    Do you know what budget item that might
 2    be in the AOC portion of the budget?
 3    A.    No.
 4    Q.    Have you ever seen -- let me strike that.
 5          Did you see the budget that was an
 6    exhibit to the complaint and the pleadings in
 7    this case?
 8    A.    I recall seeing it.  I have not seen it
 9    recently.
10    Q.    And as I recall, that budget was a budget
11    that the governor submits to the General
12    Assembly; is that your understanding of how
13    that works?
14    A.    Yes, there are budget requests made this
15    time of year.  The governor then decides how
16    much or what is going to get funded for his
17    budget proposal.
18    Q.    And within that broad budget that the
19    governor has that he or she submits to the
20    General Assembly, is there a portion that
21    covers the AOC and the Tennessee court system?
22    A.    Yes.
23    Q.    Within that portion, is there certain
24    money that's allocated for the YouTube channels
25    and the livestreaming or do you know?
```

```
1    A.    It is not that granular.

2    Q.    And I think you testified earlier you

3    don't -- you don't get really involved in the

4    budget, but you do have some information on it,

5    I guess?

6    A.    I have a working knowledge.

7    Q.    Okay.  Would Michelle Long know about the

8    more granular aspects, to the extent there are

9    some, in the AOC portion of the budget?

10   A.    She will know more than I will.

11   Q.    Okay.  Is there anyone else within the

12   AOC office other than you or Michelle Long that

13   would have more information about the budgetary

14   process and what the AOC submits to the

15   governor?

16   A.    Michelle Consiglio-Young and Dalton

17   Hensley.

18   Q.    Who is Dalton Hensley?

19   A.    Dalton Hensley is our fiscal director.

20   Q.    And who does he report to?

21   A.    Michelle Long.

22   Q.    And his title is fiscal director?

23   A.    Yes.

24   Q.    And -- so Michelle Consiglio-Young,

25   you're saying she would have information in
```

1    terms of any budgetary matters involving the

2    Advisory Commission or in general?

3    A.    I'm speaking more generally.  Because she

4    is our legislative Intergovernmental Affairs

5    Division director, she is intricately involved

6    in anything that's headed to the General

7    Assembly, which would include the governor's

8    budget.

9    Q.    And it would also include the rules

10   package of the Advisory Commission, right?

11   A.    Yes.

12   Q.    Let's talk a little bit about that

13   process of the rules package.

14         Is it your understanding that at some

15   point there is a public notice and comment

16   period before the rules package gets submitted

17   to the General Assembly?

18   A.    Yes.

19   Q.    Do you know how that happens?

20   A.    Proposed rules are available on the AOC

21   website.  They actually run through Jim Hivner,

22   who is the public court clerk.  The Court puts

23   out an order that the public court clerk is

24   directed to put the rules out for comment.  And

25   there's a defined period of time that they are

1    out for public comment.  And at the close, the
2    Court considers the comments and it moves
3    forward as the rules package from there that
4    gets presented to the General Assembly.
5    Q.    So in a simplified manner, Advisory
6    Commission meets quarterly, typically; is that
7    right?
8    A.    That is my understanding.
9    Q.    And they develop recommendations for
10   rules; is that right?
11   A.    Correct.
12   Q.    And then at some point those
13   recommendations are transmitted to the
14   Tennessee Supreme Court justices; is that
15   right?
16   A.    Correct.
17   Q.    And then there's a -- do the justices put
18   out -- justices make an order, you said, and
19   then public notice and comment period happens;
20   is that right?
21   A.    Correct.
22   Q.    And then once the public notice and
23   comment period closes, does the Supreme Court
24   then submit the rules package to the General
25   Assembly?

```
1   A.    Yes, but Michelle Consiglio-Young can
2   tell you more detail how that works.
3   Q.    So the public notice and comment period
4   occurs after meetings; is that your
5   understanding?
6   A.    I don't know that that always requires
7   them meeting.
8   Q.    What I mean by meetings -- when I refer
9   to meetings, I'm talking about the regular
10  meetings of the Advisory Commission, whether
11  they're quarterly or however meeting they have.
12       They make recommendations,
13  recommendations get transmitted to the Supreme
14  Court, right?
15  A.    Uh-huh.
16  Q.    And then the Supreme Court orders that
17  certain rule recommendations be submitted to
18  the public for notice and comment period,
19  correct?
20  A.    Correct.
21  Q.    And when the Supreme Court issues its
22  order.
23       Does the AOC post that order in the
24  public notice and comment period on its
25  website?
```

1    A.   Yes.  It's not -- well, let me tell where

2    you it is because I'm not sure if we're

3    speaking the same language.

4         There is a section on the AOC website

5    that is specifically for court rules and

6    specifically for proposed and then archived

7    rules.  I know the Supreme Court rules are all

8    available there.  I think that all the other

9    rules are also available there, but I have not

10   looked for those in quite some time.  So

11   they're publicly available, but I don't know

12   what you mean by public comment section.

13   Q.   Well, I thought we talked about the

14   comment -- is there a public comment period?

15   A.   Yes.

16   Q.   Okay, that's what I'm talking about, the

17   public comment period.

18   A.   Okay.

19   Q.   And the public comment period, as I

20   understand it, happens after meetings take

21   place and they make their recommendations; is

22   that your understanding?

23   A.   That is my understanding.

24   Q.   Okay.  Let's talk a little bit about -- I

25   think you referenced it a little bit earlier

1   when we talked about the Tennessee judicial

2   conferencing, your role and responsibility,

3   okay?

4   A.    Uh-huh.

5   Q.    The first complaint that was filed in mid

6   June, you I think referenced earlier -- and I

7   don't want to put words in your mouth, but you

8   referred to that as the judicial conference,

9   the education meetings; is that how you

10  understand that portion of the first lawsuit?

11  A.    Judicial education conferences is how I

12  would term that.

13  Q.    And tell me about -- is there a

14  particular statute on that, the judicial

15  conference meetings?

16  A.    There are.  We serve -- as I mentioned,

17  we work with several groups.  Statutorily, the

18  Tennessee Judicial Conference refers to the

19  trial and appellate level state judges, their

20  membership and their conferences.  The

21  Tennessee General Sessions Judges Conference

22  refers to county judges with general sessions

23  jurisdiction, their membership, their

24  conferences.  The Tennessee Council of

25  Family -- TCJFCJ [sic], Tennessee Council of

```
 1    Family and Juvenile Court Judges is also
 2    statutory, their membership, their conferences.
 3    And the municipal judges are under a fairly new
 4    Municipal Judges Act, same statutory authority.
 5    And there is also a statutory authority for
 6    Judicial Education Conferences hosted by the
 7    AOC for the county court clerks.  That is all
 8    the statutory authority I can recall at the
 9    moment.
10    Q.    Okay.  And just for simplicity while
11    we're communicating during your deposition,
12    we've just completed talking about the Advisory
13    Commission; is that right?
14    A.    Yes.
15    Q.    And the Advisory Commission had meetings
16    and there's an enabling statute for that
17    Commission, correct?
18    A.    Yes.
19    Q.    Now we're kind of segueing into talking
20    about a different type of meetings and there's
21    a different statute; would you agree with that,
22    that it governs judicial conference meetings?
23    A.    Yes.
24    Q.    Okay.  Would that be 17-3-101, that
25    sequence?
```

1    A.    It is either in Title 16 or 17, I don't

2    recall offhand.

3    Q.    For simplicity purposes for this, when

4    I'm talking about meetings of the Advisory

5    Commission meetings, we'll say that, if that's

6    okay with you.

7    A.    (Nodding head.)

8    Q.    And then when we're talking about

9    Tennessee Judicial Conference meetings,

10   different statute, we'll refer to it that way.

11   Would you -- is that simple to understand for

12   today's purposes?

13   A.    Can we call the Judicial Education

14   Conferences, TJC?

15   Q.    Okay.  For Tennessee Judicial Conference?

16   A.    Correct.

17   Q.    That's fine with me.  So we'll say

18   Advisory Commission meetings and TJC meetings.

19   A.    Great.

20   Q.    All right.  What specifically do you in

21   your role as deputy director, what do you do

22   with the TJC group and meetings?

23   A.    I work directly with our judicial

24   education team which plans and organizes their

25   judicial education conferences for the TJC.  My

1    relationship is largely related to that.  I

2    also attend various committee meetings, if

3    requested, to give a report on anything

4    occurring within the AOC that may affect a

5    particular group at TJC.  The most likely to

6    are the Executive Committee and the Presiding

7    Judges Committee.

8    Q.    Okay.  So tell me a little bit about the

9    Executive Committee of the TJC, who makes up

10   that particular group?

11   A.    It is established by statute, its

12   membership is listed in the statute and it is a

13   fairly large group of judges.  It includes all

14   levels of the state judiciary, it also has to

15   include judges from each grand division and

16   then there are certain office holders that are

17   necessarily on the Executive Committee.

18   Q.    Are there any members of any of the TJC

19   groups that are made up other than judges?

20   Stated another way, are only judges part of the

21   TJC meeting groups?

22   A.    Yes.

23   Q.    So are there any private attorneys from

24   the bar that are members of the TJC committees?

25   A.    No.

1    Q.    Okay.   In 17-3-107 it says that the duty

2    of the conference is to give consideration, and

3    I'm paraphrasing, enactment of laws and rules

4    and procedure.

5          Is it your understanding that the TJC

6    meeting groups develop rules of procedure?

7              MR. STAHL:  Hey, Buck, I just want to

8    mention, the deponent doesn't have the statute

9    in front of her.  If we can get that next time

10   we're referencing documents, it would be more

11   helpful just to make sure we're all --

12             MR. DOUGHERTY:  I'll strike that

13   question.

14   BY MR. DOUGHERTY:

15   Q.    Is it your understanding that the TJC

16   committees, do they ever formulate rules of

17   procedure?

18   A.    Related to court rules of procedure or

19   rules of procedure for the TJC operations?

20   Q.    Related to court rules of procedure.

21   A.    I have never seen that or heard that.

22   Q.    Okay.  What types of rules of procedure

23   do they do at these meetings, do they enact or

24   discuss?

25   A.    It's all about the conference itself.

```
 1    It's typically related to the business of the

 2    conference and that's really it.

 3    Q.    Well -- and let's just talk kind of big

 4    picture.

 5          So education of judges, is that part of

 6    the TJC group, team?

 7    A.    Yes, there's an Education Committee.

 8          I'm sorry, let me interrupt you, I need

 9    to amend what I said earlier.  On the Executive

10    Committee of the TJC, the attorney general is

11    invited as counsel to the conference to attend

12    or designee.  So that is a lawyer.  There's a

13    representative usually invited I think more out

14    of curtesy from the TBA, and there has

15    occasionally been someone from TLAW, which is

16    the Tennessee Lawyers Association for Women.

17    Q.    All right, so it's your understanding

18    that the Tennessee attorney general attends the

19    TJC meetings?

20    A.    Has not recently, but has in the past.

21    Q.    Does the statute authorize that the

22    Tennessee attorney general may participate in

23    the TJC meetings?

24    A.    The Tennessee attorney general is the

25    counsel to the Tennessee Judicial Conference.
```

Lexitas TENNESSEE
(615)595-0073

1    Q.    Okay.  Well, is the Tennessee attorney
2    general, when he or she does attend meetings,
3    is he or she attending as a member or as an
4    attorney?
5    A.    They're not a member of the TJC, which is
6    why I answered your question the first way the
7    way that I did, but I wanted to make sure I was
8    being very clear and transparent that there are
9    others who attend that particular meeting.
10   Those three individuals that I mentioned, when
11   they attend, they usually attend to give a
12   report about what's happening in the Attorney
13   General's Office, what's happening with the TBA
14   or what's happening with TLAW.
15   Q.    Let's back up a second.  We talked about
16   different individuals.
17         So we've got Tennessee attorney general?
18   A.    Uh-huh.
19   Q.    Who is the second person?
20   A.    The TBA president.
21   Q.    And what is -- what's the TBA?
22   A.    Tennessee Bar Association.
23   Q.    That's a voluntary organization?
24   A.    Correct.
25   Q.    And that's made up of attorneys?

1    A.    Judges, whoever.

2    Q.    Okay.  Anyone who's a licensed attorney

3    can be a member of the TBA?

4    A.    I'm not an expert on their membership,

5    but that is my understanding.

6    Q.    So the TBA president is invited to attend

7    meetings at the TJC team meetings?

8    A.    No, they're invited to attend the

9    Executive Committee meeting to give a report

10   from the TBA.

11   Q.    I see, okay.  Well, let's just -- and

12   who's the third individual?

13   A.    The president of the Tennessee Lawyers

14   Association for Women.

15   Q.    And what is the Tennessee Lawyers

16   Association for Women?

17   A.    While it's open to any licensed attorney

18   who would like to be a part of it, it's also a

19   volunteer organization, volunteer meaning it's

20   not required as part of your licensure.  It's

21   similar to the TBA, but with a focus on women

22   in the law.

23   Q.    So you have to be a woman and you have to

24   be licensed?

25   A.    You don't have to be a woman.

```
 1    Q.    Oh, you don't?  Is it a subcommittee of
 2    the TBA or is it a separate organization?
 3    A.    Separate organization.
 4    Q.    And is that present -- do they only
 5    attend limited meetings like the TBA president
 6    or do they attend as many meetings that they
 7    want?
 8    A.    They are invited to attend.  Typically
 9    there is a representative from the TBA and it
10    is typically their president.  I have not seen
11    a representative from the Attorney General's
12    Office or TLAW in a while, and I would say at
13    least a year.
14    Q.    Okay.  So are you specifically assigned
15    as the AOC liaison to the TJC Committee
16    meetings?
17    A.    No.
18    Q.    Do you personally attend those TJC
19    meetings?
20    A.    I usually personally attend the Executive
21    Committee meeting and the Presiding Judges
22    meeting.
23    Q.    There's an Executive Committee and then
24    there's a Presiding Judges Committee?
25    A.    Correct.
```

1    Q.    Okay.  And so what do you call the big --
2    is the big group just the TJC?
3    A.    TJC.
4    Q.    How many times a year does the TJC meet?
5    A.    Three.
6    Q.    Where do they meet?
7    A.    It depends.
8    Q.    Does the AOC office provide support to
9    allow them to carry out their meetings?
10   A.    Yes.
11   Q.    In what way?
12   A.    We work with the Education Committee to
13   provide the education sessions.  We work
14   directly with the invited presenters on the
15   topics that the TJC members request to have
16   education about.  We contract, make initial
17   communication with hotel venues, state parks to
18   facilitate a physical location for meeting, and
19   we handle -- help handle their reimbursements
20   for mileage, for travel, per diems for meals,
21   if they have that, and just generally make the
22   conferences happen.
23   Q.    And are there any -- I may have asked
24   this before, I just want to understand.
25         We're going to talk about TJC, the big

1    group first, okay; do you understand?

2    A.    Yes.

3    Q.    Are there any private attorneys that

4    attend those three TJC meetings every year?

5    And when I say "private attorneys," I'm saying

6    non-judges.

7    A.    I want to -- I would like to consult with

8    my counsel about this because I'm unclear if

9    there's one committee that is actually a TJC

10   committee.

11   Q.    Well, I mean --

12   A.    Otherwise I have to say I don't know, but

13   no, I am not aware.

14   Q.    We're here to try to understand what you

15   know.  So, I mean, if you don't know something,

16   if you don't recall that, then you can testify

17   to that, but I mean obviously your counsel can

18   say whatever they want to you, but I just want

19   to kind of get the framework first, try to

20   understand.

21        The TJC committees meet three times a

22   year; is that right?

23   A.    Not necessarily.

24   Q.    Okay.  Well --

25   A.    Not all committees meet every time.  The

```
 1    TJC meets three times a year.

 2    Q.    Right, that's what I'm saying, we're

 3    talking about the big TJC right now.  TJC meets

 4    three times a year?

 5    A.    TJC meets three times a year.

 6    Q.    When are those meetings?  Do they happen

 7    at certain points of the calendar year?

 8    A.    Generally in March, June and October.

 9    Q.    Do you personally attend those -- any of

10    those three meetings?

11    A.    Usually.

12    Q.    Which ones?

13    A.    Usually all of them.

14    Q.    And are they always at the AOC office or

15    are they off-site somewhere?

16    A.    No, we contract with venues, such as

17    hotels and state parks, and they are held in

18    conference areas in those locations.

19    Q.    Is that something that you coordinate

20    with vendors in your role as deputy director?

21    A.    No, our education manager does that

22    directly.

23    Q.    But is that an AOC employee, the

24    education manager?

25    A.    Yes.
```

Legal Aid of East TENNESSEE
(615)595-0073

1    Q.    So would it be fair to say that the AOC

2    coordinates with outside vendors for these

3    three meetings of the TJC each year?

4    A.    Yes.

5    Q.    Okay.  What are the three meetings; what

6    do they involve?  Do they involve just judicial

7    education or what do they involve?

8    A.    Judicial education.

9    Q.    For all three meetings?

10   A.    All three.

11   Q.    Is that -- I'm sorry, go ahead.

12   A.    The only one that is different is June,

13   that is considered the annual meeting required

14   by statute for the TJC.  It is also when the

15   AOC actually has much less of a role in the

16   planning and the execution of that conference

17   because only about a day on the front end of

18   the conference is AOC-hosted judicial education

19   and then the TBA annual conference occurs

20   typically at the same location or very nearby.

21   And the TBA plans and executes all of that.

22   Q.    And this lawsuit was filed in June; is

23   that right?

24   A.    I don't remember.

25   Q.    So are judges required to earn so many

```
 1   hours of legal education, training per year?
 2   A.    Yes.
 3   Q.    How many hours a year?
 4   A.    15 total.
 5   Q.    Is there an AOC employee who's a liaison
 6   to the TJC?
 7   A.    There are a lot of AOC employees that are
 8   considered liaisons to the TJC.
 9   Q.    Is the TJC, is that -- any of that
10   information on the AOC website?
11   A.    No, not specifically.
12   Q.    Who -- do you select the vendors, outside
13   education people for these meetings or does
14   someone within the AOC office?
15   A.    Our education team led by our education
16   manager works with the president or incoming
17   president of the TJC to identify locations
18   where we can contract to host them.
19   Q.    Well, let's go ahead and talk about those
20   other subcommittees, because I think that might
21   help.
22         You said something about an Executive
23   Committee?
24   A.    Correct.
25   Q.    What is the Executive Committee?  Are
```

```
1   they part of the TJC?

2   A.    Yes, they're all TJC members, but for the

3   exceptions I gave you earlier who are invited

4   to give a report.

5   Q.    Okay.  And all of these people are

6   judges; is that right?

7   A.    Yes.

8   Q.    Unless someone is invited in to give some

9   type of report, like the TBA president or the

10  Tennessee Lawyer Women's [sic] president?

11  A.    Yes, and the AOC director I believe is

12  also a member, although I don't know if it's an

13  ex officio capacity or not.

14  Q.    So do they meet at different times, the

15  Executive Committee from the TJC?

16  A.    The only other times that they will meet,

17  and they're not necessarily required to, but as

18  habit, is in August annually and in December

19  annually.

20  Q.    Okay.  When you say "required," is there

21  a particular statute that requires them to meet

22  in August and December?

23  A.    No, I'm saying I don't know that there's

24  any particular requirement, but I think out of

25  habit there are those two additional meetings.
```

Legal Ease TENNESSEE
(615)595-0073

```
1    Q.    So we have three TJC meetings per year;
2    is that right?
3    A.    Correct.
4    Q.    Plus two Executive Committee meetings per
5    year; is that right?
6    A.    Yes.
7    Q.    Okay.  Are the two Executive Committee
8    meetings typically in August and December, are
9    they open to the public?
10   A.    No.
11   Q.    And what distinguishes the Executive
12   Committee meetings from the three TJC meetings?
13   Stated another way, what do they do differently
14   than the big TJC meetings?
15   A.    There are five total Executive Committee
16   meetings every year.  They have an Executive
17   Committee meeting at each of the three
18   conferences.  In addition, they have the August
19   and December, I see.
20   Q.    Okay.
21   A.    And --
22   Q.    Thank you for clarifying that.
23   A.    And they are -- they're the governance
24   for the TJC, but beyond that, I can't say that
25   there's anything particularly special.
```

Lexitas TENNESSEE
(615)595-0073

1  Q.    Are they selected by the larger TJC

2  members?  The Executive Committee, I'm

3  referring to.

4  A.    Yes.

5  Q.    But in terms of the TJC, as long as

6  you're a sitting judge or retired judge, you

7  can be a member of the TJC; is that right?

8  A.    Yes.

9  Q.    Okay.  Are retired judges required to

10 have judicial training?

11 A.    Not if they have taken an active status

12 with the Board of Professional Responsibility.

13 Q.    Okay, let's segue in, I think there's

14 another -- what I'm referring to as a

15 subcommittee, and is that the Education

16 Committee?

17 A.    Yes.

18 Q.    Okay.  What's the Education Committee?

19 Who makes that up and what does it do?

20 A.    It is a committee of probably 15 judges

21 that discusses topics that other colleagues

22 have requested education on and floats ideas

23 for presenters and ultimately asks the AOC to

24 help put together those presenters and those

25 topics for upcoming conferences.

```
1    Q.    And how many times does the Education
2    Committee meet?
3    A.    Usually at all three of the conferences.
4    Q.    And then -- so they don't have two
5    additional meetings?
6    A.    No.
7    Q.    Okay.  Are members of that Executive --
8    Education Committee, are they appointed or
9    selected in any way?
10   A.    They -- most of them volunteer.  In fact
11   most of these committees, but for the Executive
12   Committee, I think, are -- they're interested
13   in the committee and they want to participate
14   and volunteer.
15   Q.    So you attend the three TJC meetings
16   every year; is that right?
17   A.    Most years I attend all three.
18   Q.    Do you ever attend any of the Executive
19   Committee meetings?
20   A.    Yes.
21   Q.    How many per year?
22   A.    If I'm at the conference, then I
23   generally attend the Executive Committee
24   meeting.
25   Q.    What about the plus two meetings in
```

```
 1   August and December?
 2   A.    It depends.  I have been to some, but I
 3   have also missed some.
 4   Q.    Did you attend any in 2022 of the -- I'm
 5   referring to the Executive Committee?
 6   A.    I did not attend August.  I did attend
 7   December.
 8   Q.    Did you attend the three TJC meetings in
 9   2022?
10   A.    Yes.
11   Q.    And have you attended the TJC meetings
12   thus far in 2023?
13   A.    No, I came late to the last conference in
14   October and I missed that one.
15   Q.    I'm confused.  I may have missed this.
16        The three TJC meetings typically in March
17   June and July; is that what you testified to?
18   A.    March, June and October.
19   Q.    My apologies.  Okay.
20        So you attended the March and June 2023
21   TJC meetings?
22   A.    Correct.
23   Q.    And you attended all three meetings,
24   March, June and October in 2022?
25   A.    Yes.
```

1      Q.    What about the Executive -- excuse me,

2      the Education Committee meetings, did you

3      attend those in 2022?

4      A.    I attended the one in March.  I have not

5      attended an education meeting since that time.

6      Q.    And then what about the one in 20 -- the

7      Education Committee meetings in 2023?

8      A.    I have not attended one since March of

9      2022, so no.

10     Q.    So does the TJC, do they make court rule

11     recommendations at their three meetings per

12     year?

13     A.    Does the TJC Executive Committee?

14     Q.    No, does the TJC, the big committee, the

15     big group, do they make rule -- court rule

16     recommendations at their three meetings?

17     A.    No.

18     Q.    Does the Executive Committee, do they

19     make court practice rule recommendations at

20     their meetings?

21     A.    No.

22     Q.    What about the Education Committee, do

23     they make court rule recommendations?

24     A.    No.

25     Q.    So it's the Advisory Commission that

1    makes the court and practice of rules

2    recommendations at their meetings, right?

3    A.    Yes.

4    Q.    Does the AOC enact certain policies

5    regarding the TJC meetings?

6    A.    We have one policy in particular related

7    to attendance at the conferences and who may

8    attend.

9    Q.    And what -- when was that policy enacted?

10   A.    I believe it was late 2021.

11   Q.    And did you have a role in enacting that

12   particular policy?

13   A.    I did.

14   Q.    Tell me about your role in enacting that

15   policy.

16   A.    I drafted it.

17   Q.    What is the policy?  What's the purpose

18   of that policy in simple terms?  I know you

19   don't have it in front of you, what's the

20   purpose of that particular policy?

21   A.    To protect the integrity of the

22   conferences and the security of the conferences

23   and to allow them to have a space for education

24   without having others involved in their

25   discussions and debate.

Lexitas of TENNESSEE
(615)595-0073

```
1   Q.    When you say "others," are you referring
2   to the public?
3   A.    Anyone.
4   Q.    Did that particular policy that you
5   drafted result in some past incident?
6   A.    Yes.
7   Q.    Tell me about that past incident.
8   A.    We had a municipal judges conference in
9   November 2021, I believe, wherein some -- I
10  think it was four or five male individuals
11  showed up at the conference and were
12  disruptive.  I was not physically in the space
13  when it occurred, but they went into the
14  education session and would not leave when
15  asked to leave.  The police had to be called
16  and they had to be removed.
17  Q.    Were these individuals reporters?
18  A.    They claimed to be.
19  Q.    Were they part of the media?
20  A.    I actually don't know.
21  Q.    Weren't the charges against these people
22  dropped?
23  A.    I don't know.
24  Q.    Is there video out there in the public
25  domain about what transpired at that November
```

1    conference?

2    A.    I don't know.

3    Q.    You've never seen any videos by the

4    reporters who were there that day?

5    A.    I have not.

6    Q.    Where was that conference held?

7    A.    Embassy Suites.  I think it was the one

8    in Franklin.

9    Q.    Were any judges threatened or hurt in any

10   way during that particular conference?

11   A.    I don't know if they were overtly

12   threatened.

13   Q.    Were there any judges that were injured

14   at that conference in Franklin?

15   A.    Not to my knowledge.

16   Q.    Would you know if one had been injured?

17   A.    I would certainly hope they would tell

18   us, but I don't know if they would.

19   Q.    You're not aware of any judge who had to

20   take some type of leave or -- because of an

21   injury, are you?

22   A.    Not to my knowledge.

23   Q.    Do you know if there's any civil

24   litigation that resulted from that incident in

25   November in Franklin?

Lexitas - TENNESSEE
(615)595-0073

```
 1   A.    Yes, there is.

 2   Q.    Can you tell me about that?

 3   A.    I don't know the current procedural

 4   posture of it.  I know that chief -- then Chief

 5   Justice Page was partied, as well as our

 6   education manager, John Crawford.

 7   Q.    And where was that lawsuit filed?

 8   A.    Middle District Federal Court in

 9   Tennessee.

10   Q.    That's the same court where the current

11   McCaleb v. Long case is filed?

12   A.    Yes.

13   Q.    Do you know the caption of that case?

14   A.    I don't.

15   Q.    Were either you or Michelle Long named as

16   parties in that lawsuit?

17   A.    No.

18   Q.    So you said former Chief Justice Page and

19   John Crawford -- is that the other person?

20   A.    Correct.

21   Q.    And John Crawford is the AOC education --

22   A.    Manager.

23   Q.    Manager.  Was Michelle Long the AOC

24   director at that point?

25   A.    No.
```

```
 1    Q.    Who was the director?

 2    A.    Deborah Taylor Tate.

 3    Q.    Did that incident in November cause

 4    Ms. Deborah Taylor Tate to retire?

 5    A.    I don't know.

 6    Q.    Was she demoted because of that incident

 7    in November?

 8    A.    I don't know.

 9    Q.    But did she take retirement shortly

10    thereafter?

11    A.    She retired in February of 2022.

12    Q.    So would that be shortly thereafter

13    November of 2021?

14    A.    I guess so.

15    Q.    Was she involved in the policy or was

16    that just you drafting it?

17    A.    It's a judicial policy, so the chief

18    justice and administrative director signed it.

19    So she was involved.

20    Q.    Do you know who signed the policy that

21    you drafted?  Would that have been Deborah

22    Taylor Tate or would that have been Michelle

23    Long?

24    A.    It would have been Michelle Long.

25    Q.    Was that signed on her first day of
```

Les Ladd, LLC  TENNESSEE
(615)595-0073

1   appointment February 1, 2022?

2   A.    It was on or about.

3   Q.    Oh is that February 1, 2022, date also

4   the same date as the budget that governor Lee

5   submitted to the General Assembly?

6   A.    I don't know.

7   Q.    There are any organizations that you are

8   involved in that kind of what he with talked

9   about before with the other states, with the

10  TJC committees that you are a part of that you

11  learn from that would be similar to what you do

12  with respect to the TJC?  And I'm talking about

13  other auto organizations and office.

14  A.    I'm not sure I follow.

15  Q.    Sure I'll rephrase that.  So we talked

16  about you had reached out or you had had

17  communications with the Kentucky, Arkansas,

18  Florida AOC offices when we were talking about

19  the Advisory Commission?

20  A.    (Nodding head.)

21  Q.    So now I'm just asking, is there an

22  equivalent TJC committee or office that you

23  reach out to with respect to your rolls on the

24  TJC committees to other states, do you do

25  anything like that?

```
1    A.    No.
2    Q.    Okay.  Where do you kind of get your
3    training to help with judges and to facilitate
4    their need with their training and legal
5    education?  What do you do; what kind of
6    training do you receive at the AOC office?
7    A.    There's no formal training, it's
8    on-the-job.
9    Q.    Okay.  Who selects the education vendors,
10   is that you as the deputy director or do the
11   judges or the members -- who makes that
12   selection?
13   A.    When you say "vendors," I want to make
14   sure I'm clear.
15   Q.    Yeah, I think you mentioned -- well, are
16   there outside education consultants who come in
17   that provide this legal education to the
18   judges?
19   A.    There are not outside consultants, there
20   may be speakers that we bring in.
21   Q.    Okay.  Who makes the decision to bring in
22   the speakers, is that an AOC function or is
23   that a judges function?
24   A.    It is the Education Committee that
25   ultimately determines that.
```

```
1    Q.    Okay.  Are any of these meetings, either
2    the TJC, Executive Committee or the Education
3    Committee, are any of their meetings ever open
4    to the public?
5    A.    No.
6    Q.    Have they ever been open to the public?
7    A.    No.
8    Q.    Have any of those meetings, have they
9    ever made court rules of procedure, to your
10   knowledge?
11   A.    No.
12   Q.    And to the best of your knowledge, court
13   rules have always been promulgated and
14   recommended through the Advisory Commission; is
15   that right?
16   A.    Not promulgated, but recommended.
17   Q.    Right, recommended.  I understand.
18         Did Michelle Long work at the AOC office
19   prior to her appointment?
20   A.    Yes.
21   Q.    How long had she been at the AOC office?
22             MR. STAHL:  Object to the form.
23             THE WITNESS:  She started in
24   October 2019.
25
```

```
 1    BY MR. DOUGHERTY:
 2    Q.    Did she start -- what was her position in
 3    2019?
 4    A.    Deputy director.
 5    Q.    That's the current position that you
 6    hold, right?
 7    A.    Yes.
 8    Q.    And then in 2022 she was promoted to
 9    director?
10    A.    Yes.
11    Q.    And you were promoted from general
12    counsel to deputy director then; is that right?
13    A.    In March of 2022 I was pro --
14    Q.    You had that dual role?
15    A.    Yes.
16    Q.    Okay.
17          MR. DOUGHERTY:  I'll pass the witness
18    right now, Mike.
19
20                  EXAMINATION
21    QUESTIONS BY MR. STAHL:
22    Q.    Ms. Harmon, does the AOC govern in any
23    way the conduct of the Advisory Commission
24    meetings?
25    A.    No.
```

```
 1    Q.    The Advisory Commission meetings, are
 2    they statutorily required to be held at the AOC
 3    offices?
 4    A.    Are they statutory required to be
 5    physically held at the AOC?
 6    Q.    (Nodding head.)
 7    A.    No.
 8    Q.    Is there any policy that requires them to
 9    be held at the AOC that you're aware of?
10    A.    No.
11    Q.    Has a committee chair, either for the
12    Advisory Commission or otherwise, ever asked
13    you personally for permission to hold or not
14    hold a meeting?
15    A.    No.
16    Q.    Are you aware of any committee chair that
17    has asked permission from any AOC employee to
18    hold or not hold a meeting?
19    A.    (Shaking head.)
20    Q.    You had mentioned earlier that one of the
21    meetings that was scheduled this year had come
22    to your attention might not have been properly
23    noticed; do you remember mentioning that?
24    A.    Yes.
25    Q.    And you mentioned speaking with Advisory
```

1    Commission members about how not publicly
2    noticing the meeting might be in violation of
3    the preliminary injunction; is that right?
4    A.    I did not speak directly with Advisory
5    Commission members, I know that others did.
6    Q.    Okay.  Would you have been able in your
7    authority as deputy director to control whether
8    or not the Advisory Commission actually held
9    its meeting, whether or not it was properly
10   noticed?
11   A.    No.
12   Q.    You mentioned that there was an Access to
13   Justice Committee; is that right?
14   A.    Yes.
15   Q.    Can you explain the differences in the
16   mission or purpose of the Access to Justice
17   Commission versus the Advisory Commission?
18   A.    Generally?
19   Q.    Uh-huh.
20   A.    I can.  Access to Justice Commission is a
21   very active and public commission intended to
22   be both a resource and an innovator for
23   individuals to access the court in whatever way
24   that looks like for them.  And they do that in
25   a variety of ways that I am not qualified to

1    speak on, it's that much.

2         The Commission, although it is a Supreme

3    Court commission, is in an advisory capacity to

4    the Supreme Court.  It operates, I would say,

5    more independently and helps the Court with

6    improvements, maybe blind spots where there are

7    places we can help with access to the courts.

8         The Advisory Commission is really that,

9    an Advisory Commission.  They are appointed to

10   receive input, discuss input, discuss ideas

11   they may have about the rules of practice and

12   procedure and to ultimately make a

13   recommendation on potential additions,

14   deletions or changes to rules of practice and

15   procedure for the court to determine what's

16   within their purview to promulgate.

17   Q.    Is it your opinion after offering that

18   explanation that the missions of those two

19   committees are different?

20   A.    I don't know if either has a specific

21   mission statement that I can recite to you

22   here.  I see them as different commissions,

23   yes.

24   Q.    Are you aware of the members that are

25   made up of the Access to Justice Commission?

Case 3:22-cv-00439   Document 126   Filed 12/11/23   Page 141 of 165 PageID #: 4606
Case 3:22-cv-00439   Document 126 Filed 12/11/23 Page 141 of 165 PageID # 4606
(615)595-0073

1   A.   Not -- I mean, I know of some that have

2   served in the past, I don't know all the

3   current members now.

4   Q.   Are you aware of the makeup of the

5   Advisory Commission and its members?

6   A.   No.  Well, with the exception of chair

7   Gino Bulso, I know he is on it.

8   Q.   In your opinion, do you believe that the

9   AOC has any authority or control over whether a

10  commission meeting under the AOC can be

11  publicly open or closed?

12  A.   No.

13              MR. STAHL:  That's all I have.

14

15                  FURTHER EXAMINATION

16  QUESTIONS BY MR. DOUGHERTY:

17  Q.   Mr. Stahl asked you to give your opinion.

18  Do you plan to serve as an expert in this case

19  on behalf of Michelle Long?

20  A.   No.

21  Q.   Have you ever made it known to Michelle

22  Long or her attorneys that you intend to serve

23  as an expert witness to give your opinion in

24  this case?

25  A.   No.

```
1    Q.    You said you didn't go or you haven't
2    spoken to any Advisory Commission members; is
3    that right?
4    A.    That's correct.
5    Q.    But you said others did.  Do you recall
6    saying that?
7    A.    Yes.
8    Q.    Who are the others?
9    A.    I don't know who spoke to them, I just
10   know that the individuals who were spoken to
11   was the new justice liaison, Dwight Tarwater;
12   the chair, Gino Bulso and the reporter, Lynn,
13   who's name I can't now recall.  That's what I
14   testified to earlier as well.
15   Q.    So others spoke to Gino Bulso?
16   A.    To let him know that the meeting was
17   going to be rescheduled.
18   Q.    And that was new Justice Tarwater; is
19   that right?
20   A.    No, I don't know who spoke directly to
21   those three individuals, I just know I was told
22   those three individuals had been notified that
23   the meeting would need to be rescheduled.
24   Q.    Who told you that they had been notified?
25   A.    John Coke.
```

Tennessee TENNESSEE
(615)595-0073

1    Q.    Would it have been someone at the AOC

2    office that would have told Bulso and Tarwater

3    that the meetings needed to be open after the

4    preliminary injunction?

5    A.    I don't know.

6    Q.    Would it have been someone from a

7    different agency other than the AOC?

8    A.    I would not suspect it would be someone

9    from a different agency, but I don't know it

10   would be an AOC employee either.

11            MR. DOUGHERTY:  I have nothing

12   further.

13            MR. STAHL:  Okay.

14            THE REPORTER:  Did you want to order

15   this?

16            MR. DOUGHERTY:  Yes.

17            MR. STAHL:  Do you want to waive

18   signature, Rachel, or do you want to review the

19   transcript for correctness before it gets sent

20   out?

21            MR. COKE:  Probably review.

22            THE WITNESS:  Review.

23            MR. STAHL:  We won't waive signature

24   then.

25            THE REPORTER:  Did you want a copy?

Legita Reporting TENNESSEE
(615)595-0073

```
1              MR. STAHL:  Yes.

2          FURTHER DEPONENT SAITH NOT

3              (At 12:02 p.m. CST.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              E R R A T A   P A G E
```

Lexitas TENNESSEE
(615)595-0073

```
1          I, RACHEL HARMON, having read the foregoing
     deposition, Pages 1 through 144, do hereby certify
2    said testimony is a true and accurate transcript,
     with the following changes (if any):
3

4    PAGE    LINE    SHOULD HAVE BEEN

5    _____  _____    _____

6    _____  _____    _____

7    _____  _____    _____

8    _____  _____    _____

9    _____  _____    _____

10   _____  _____    _____

11   _____  _____    _____

12   _____  _____    _____

13   _____  _____    _____

14   _____  _____    _____

15   _____  _____    _____

16   _____  _____    _____

17

18

19

20                   _____

21                   RACHEL HARMON

22   _____

23   Notary Public

24   My Commission Expires: _____

25
```

```
1                    REPORTER'S CERTIFICATE

2

3    STATE OF TENNESSEE

4    COUNTY OF SUMNER

5         I, JENNY CHECUGA, Licensed Court Reporter,

6    with offices in Nashville, Tennessee, and Registered

7    Professional Reporter, hereby certify that I reported

8    the foregoing deposition of RACHEL HARMON by machine

9    shorthand to the best of my skills and abilities, and

10   thereafter the same was reduced to typewritten form

11   by me.

12         I further certify that I am not related to

13   any of the parties named herein, nor their counsel,

14   and have no interest, financial or otherwise, in the

15   outcome of the proceedings.

16         I further certify that in order for this
     document to be considered a true and correct copy, it
17   must bear my original signature and that any
     unauthorized reproduction in whole or in part and/or
18   transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
19   Tennessee Code Annotated 39-14-104, Theft of
     Services.

20

21

22

23   JENNY CHECUGA, LCR, RPR
     Lexitas Legal
     Licensed Court Reporter (TN)
24   Notary Public State of Tennessee

25   My Notary Commission Expires:  5/18/2027
     LCR #690 - Expires:  6/30/2024
```

JENNIFER CHECUGA
STATE OF TENNESSEE
NOTARY PUBLIC
SUMNER COUNTY

**1**

**1** 52:8 134:1,3

**12** 38:6 77:10

**120-day** 17:10

**12:02** 144:3

**15** 43:6 62:6 122:4 125:20

**15th** 9:19 36:12

**16** 6:25 111:1

**16-3-601** 15:2

**17** 111:1

**17-3-101** 110:24

**17-3-107** 113:1

**1978** 6:25

**1990s** 41:9,12

**1st** 82:11

**2**

**20** 43:6 128:6

**2001** 11:24

**2004** 12:3,8,13

**2006** 10:1

**2015** 8:12 10:2 15:10 36:10

**2016** 15:11,14,16 16:1 18:9,11,16, 19,25 19:9,15,20, 24 20:9,11,17 21:1 22:15,19 23:4,15,25 24:19 26:11 27:11,14,23 29:5,9 30:16 32:11 36:6 38:24 39:2,5 44:12,18, 23 67:13

**2017** 46:17 67:13

**2018** 46:17

**2019** 136:24 137:3

**2020** 75:18

**2021** 129:10 130:9

133:13

**2022** 7:18,19 8:5, 13,19,25 38:6,12 58:24 99:9 101:24 102:2 127:4,9,24 128:3,9 133:11 134:1,3 137:8,13

**2023** 21:4 32:17, 19 36:18,25 52:8 53:22 55:17 56:15 57:3,5,8 63:5 79:13 102:20 127:12,20 128:7

**4**

**45** 6:25

**5**

**50** 42:14,18,20 65:15 84:9

**A**

**A-N-N-E** 78:23

**ability** 6:3 92:2

**access** 21:10 40:2,10,13,18,23 41:6,9,15,20,22 42:6,20 65:2,7,13, 19 68:10,13,14,16 72:23 76:11,22 77:21 78:9,14,15, 19 79:3 84:8 85:5 139:12,16,20,23 140:7,25

**accomplish** 67:18

**accord** 71:17

**accurate** 24:5 37:11

**Act** 110:4

**acting** 71:15

**active** 125:11 139:21

**actual** 53:21

**added** 85:9

**adding** 30:6

**addition** 124:18

**additional** 123:25 126:5

**additions** 49:2 140:13

**address** 78:8

**adjustments** 102:15

**administers** 78:15 79:6

**administration** 7:2,4,7,9 9:10 74:9

**administrative** 8:9 15:17 35:24 47:12,14 48:11 87:13 90:13,22 91:2,6,9 93:2 94:9 101:10 133:18

**administratively** 47:5

**admitted** 12:10, 14

**ADR** 65:4,5 66:1 85:6

**advance** 24:25 26:6 33:22

**advanced** 23:1

**advantage** 88:21

**advice** 47:22 51:17,20 52:2,10, 13 53:13 70:18 71:19 81:10 99:15 100:15

**advise** 30:1 77:7 99:12

**advised** 77:11 82:11

**advising** 71:16

**advisory** 14:25 16:3,8,9,13,23 17:2,4 18:6,15,18, 23,25 19:11,15,24 20:11,16,25 21:6

22:14,19 23:2,15, 18,24 25:1 26:6, 10,16,21 29:4,10, 25 30:8,19 31:2,8, 15 32:4 33:7,13, 22 35:16,20 36:3 37:5,25 38:9 39:5, 9,21 40:6 43:23, 24 44:6,23 45:5, 10,15 47:18,24 48:3,9,14,20 49:13 50:10,18 57:2,25 58:24 59:6 60:13 61:7, 20 62:2,11,18 63:3 69:5,9,24 70:7 72:10,13 73:11,13,22 74:5, 13 75:3 79:11,22 80:6 81:14,17,21 82:4,17 83:6,19 85:6,13 92:20 96:7,15 97:16 98:20,25 99:9,13 100:3,21 101:6, 10,16,19 102:16, 23 105:2,10 106:5 107:10 110:12,15 111:4,18 128:25 134:19 136:14 137:23 138:1,12, 25 139:4,8,17 140:3,8,9 141:5 142:2

**Affairs** 28:22 105:4

**affect** 6:3 112:4

**affected** 49:23

**AG's** 34:12

**agency** 7:25 26:14,20 90:6 143:7,9

**agree** 16:5 33:13 53:22 110:21

**ahead** 5:13 6:21 9:6 24:15 25:11 61:2 93:12 121:11 122:19

**allegations** 98:24

**allocated** 103:24

**Alternative** 21:11

65:2 73:3

**amend** 24:10
114:9

**amended** 61:9,15
98:12

**Amendment**
11:13

**amount** 10:7
80:23

**Andrew** 34:11

**Anne-louise**
78:18,23

**announcements**
68:4

**annual** 121:13,19

**annually** 95:3
123:18,19

**answers** 6:4
34:16,18 53:6

**AOC** 7:12 9:18,21
15:7,18 16:21
17:9,14,17 18:2,7,
16 19:7,16 20:4,
23 21:3 22:1,25
24:5,6 25:5 26:10,
19,25 27:8,17
28:16,23 33:17,20
35:5 36:1,2,14,23
37:10,16 39:11
43:1,7,11,15,16,
20,24 44:13,24
46:12,19 47:9
48:1,5,11,16
49:11,17,22 50:9,
16 52:11,18,21
53:10 56:10 58:3
59:17 60:4 63:7
64:10,11,15 65:24
66:23 67:10 73:9
74:17,25 75:2
76:2 77:12,14,18
78:12 79:1,5,6,9
80:17 83:12
84:12,13,24 85:1
86:2,14 87:11,13,
18 88:3,4,8,9,10,
18 89:1,4,24 90:2,
8,21 91:2,6,9,22
92:5,7 93:1,17
94:3,6,16 95:5,6,
9,14,19 96:1

101:5,9,13,15,20,
23 102:14,21,22
103:2,21 104:9,
12,14 105:20
107:23 108:4
110:7 112:4
117:15 118:8
120:14,23 121:1,
15 122:5,7,10,14
123:11 125:23
129:4 132:21,23
134:18 135:6,22
136:18,21 137:22
138:2,5,9,17
141:9,10 143:1,7,
10

**AOC's** 18:21,24
53:3 91:19

**AOC-HOSTED**
121:18

**AOG's** 10:4

**apologies** 28:13
127:19

**apparently** 8:20

**appeals** 10:21,22
12:15,18 76:14,17
77:5,6

**appearance** 9:13

**appellate** 63:17
77:7 90:15 91:3
109:19

**appointed** 7:24
10:5 87:8,12,14
126:8 140:9

**appointment** 8:6
134:1 136:19

**appoints** 87:16

**appropriated**
90:18

**appropriation**
89:24

**approximately**
43:6 46:14

**archived** 108:6

**areas** 120:18

**argumentative**
38:16

**arguments** 63:16
76:17

**Arkansas** 93:19,
24 134:17

**arrived** 27:19

**articles** 78:5

**asks** 125:23

**aspects** 104:8

**aspiration** 93:6,
10

**Assembly** 64:1
90:19 92:1
103:12,20 105:7,
17 106:4,25 134:5

**assign** 58:2,7,12

**assigned** 10:11
23:20 29:4 58:13,
17 84:23 117:14

**assigning** 58:21

**assignments**
84:25

**assigns** 84:21

**assist** 17:12
35:22 40:16
43:12,17,18,19,24
47:3 48:16 64:17
72:7 77:19 84:15

**assistance** 47:8
101:19

**assistant** 10:6,9
23:7,19 24:11
27:7,25 28:3,5,11,
15

**assists** 39:11
43:8 63:17

**association**
66:12,17 94:12
114:16 115:22
116:14,16

**assume** 25:10,14
28:2 39:24

**Assuming** 75:8

**assumption**
25:17

**ATJ** 66:4

**attempting** 40:16

**attend** 15:18
16:22 17:1,16
20:17,21 21:3
26:2 75:24 112:2
114:11 115:2,9,11
116:6,8 117:5,6,8,
18,20 119:4 120:9
126:15,17,18,23
127:4,6,8 128:3
129:8

**attendance** 14:3
60:22 129:7

**attended** 15:25
17:23 19:9,22
20:12 23:4 72:9,
16 127:11,20,23
128:4,5,8

**attendees** 26:13

**attending** 115:3

**attends** 114:18

**attention** 41:13
80:5 138:22

**attorney** 5:11
9:23 10:6,8,9
11:8,11,15 13:9
20:8 29:23 34:10
51:9 66:4 97:24
114:10,18,22,24
115:1,4,12,17
116:2,17 117:11

**attorney-client**
51:18

**attorneys** 20:1
67:15 77:24
112:23 115:25
119:3,5 141:22

**August** 36:18
37:2 56:14
123:18,22 124:8,
18 127:1,6

**auspices** 64:11

**authority** 12:21
46:5,7 91:18,25
110:4,5,8 139:7
141:9

**authorize** 114:21

**auto** 134:13

Case 3:22-cv-00439    Document 106    Filed 11/09/23    Page 149 of 165 PageID #: 1214
*Lexitas Legal* · *TENNESSEE* · *Index: amend..auto*
(615)595-0073

**avoid** 15:23

**aware** 7:8 15:4 16:11,12 25:21 26:15,18,20 32:15,18,20 34:2, 17,24 37:7 38:24 39:18 40:5 48:20 57:7,9 62:9,13,16, 19,20,21 63:8 64:5,21,25 66:19 83:19,25 84:9 95:1,4,7 96:10,11, 13,14,17,18,23 119:13 131:19 138:9,16 140:24 141:4

**B**

**B-Y-R-N-E** 23:11

**back** 24:12,20 30:17 36:6,23 68:23 88:14 97:14,20 115:15

**background** 6:1, 22 11:16 13:21

**bar** 12:21 19:25 66:6,9,10,11,15, 17,18,20 112:24 115:22

**Barbara** 64:19 69:14,17,18 85:24 86:11 87:5

**bars** 12:10

**based** 65:14

**basing** 74:7

**began** 8:12 27:10 67:10

**behalf** 5:11 141:19

**bench** 66:6,9,10, 18,20

**beneficial** 93:15

**big** 19:1 114:3 118:1,2,25 120:3 124:14 128:14,15

**birth** 6:24

**bit** 61:17 97:15 105:12 108:24,25 112:8

**blanking** 82:13

**blind** 140:6

**blocks** 14:10

**board** 21:13,15, 18,24 22:7 45:11, 24 46:1,3,5 72:14 73:19 83:16 84:14,16 125:12

**boards** 20:15,22 39:8,10 43:2,6,15, 21 64:22 73:15 83:12 84:4,22 85:17 90:8

**body** 7:24

**bottom** 89:18

**break** 6:11,12,18 62:6 97:8,11,12

**breakdown** 49:5

**brevity** 15:21

**bring** 69:22 97:4 135:20,21

**bringing** 72:5

**broad** 103:18

**broadcast** 27:1 63:1

**brought** 80:5

**Buck** 5:10 97:1 113:7

**budget** 66:22 67:3,23 89:24 103:1,2,5,10,14, 17,18 104:4,9 105:8 134:4

**budgetary** 67:2,5 90:16 91:16 104:13 105:1

**budgeted** 89:23

**Bulso** 82:12 101:3 141:7 142:12,15 143:2

**business** 114:1

**Byrne** 23:11,13, 17 27:6

**C**

**C-O-N-S-I-G-L-I-O** 24:13

**cadence** 83:23 84:5,10

**calculate** 14:7

**calendar** 15:13, 14 83:6 120:7

**call** 15:21 89:4,12, 13 111:13 118:1

**called** 5:3 41:6 65:8 94:13 130:15

**capacity** 30:9 46:20 71:15 123:13 140:3

**caption** 132:13

**car** 14:13

**Carolina** 12:1

**carry** 102:21 118:9

**case** 5:11 9:14 32:16,21 33:5 37:20 45:7,9 64:4 103:7 132:11,13 141:18,24

**categorized** 61:16

**caveat** 6:14

**Center** 94:14 95:1

**cetera** 45:18

**chair** 29:18,19 82:12 138:11,16 141:6 142:12

**chaired** 22:19

**challenges** 64:3

**chancery** 90:22

**change** 67:17 77:4

**changing** 30:5

**channel** 75:15 76:15

**channels** 63:8,13 64:10,18 68:22 69:1 75:13 103:24

**charges** 130:21

**check** 14:7,16

**Chicago** 14:17

**chief** 52:4,7 54:13,14 80:10 81:4 82:1 87:20, 24 95:16,22 132:4,18 133:17

**chosen** 83:15

**circle** 68:23

**circuit** 12:18 90:22

**city** 89:19 90:5

**civil** 10:17,24 11:1,5 13:2,5 91:3 131:23

**claimed** 130:18

**claiming** 51:12

**claims** 13:10

**clarify** 16:24 43:9 98:20

**clarifying** 124:22

**CLE** 88:2

**clear** 13:12 15:9 16:17 53:5 55:15 115:8 135:14

**clerical** 35:24

**clerk** 105:22,23

**clerks** 90:4 110:7

**client** 51:9

**close** 33:9 106:1

**closed** 59:7,21 99:14,16 100:4, 12,21 101:7,12, 17,24 102:2,8 141:11

**closely** 85:19

**closes** 106:23

**Coastal** 12:4,5

**Coke** 9:9,13,16
13:17 14:22 34:5,
9 35:7 51:4,7,15
56:12 82:1 142:25
143:21

**colleagues**
125:21

**college** 11:18

**comfortable** 49:9

**comment** 79:10
105:15,24 106:1,
19,23 107:3,18,24
108:12,14,17,19

**commenting**
61:4

**comments** 16:8
106:2

**commission**
15:1,16,22,24
16:3,4,8,10,13,14,
15,23 17:2,5 18:6,
15,18,25 19:12,
15,25 20:11,16
21:1,6,12 22:14,
19 23:2,15,18,25
24:19,22 25:1
26:6,10,16,21
29:5,10,25 30:11,
19 31:3,9,16,17
32:4,6 33:8,14,22
35:16,20,22 36:3
37:5 38:1,9 39:6,
9,21,22,23 40:7
43:23,25 44:6,23
45:5,6,11,16,24
47:19,24 48:3,9,
14,21,24 49:13
50:10,18 57:2,14,
25 58:24 59:7
60:14 61:8,21
62:2,11,18 63:4
65:4,5,8,9 66:1
69:5,10,24 70:7
72:10,13,14 73:4,
11,13,23 74:5,14
75:3 79:11,22
80:6 81:14,17,22
82:4,17,24 83:7,
16,20 84:14,16
85:5,6,13 92:21
96:8,16 97:16

98:21,25 99:9,13
100:4,22 101:6,
11,16,19 102:17,
24 105:2,10 106:6
107:10 110:13,15,
17 111:5,18
128:25 134:19
136:14 137:23
138:1,12 139:1,5,
8,17,20,21 140:2,
3,8,9,25 141:5,10
142:2

**commissions**
17:3,20,25 18:4
20:15,22 21:8
39:8,10 43:3,7,15,
22 45:4 47:11
64:22 73:16 75:19
83:12 84:5,22
85:17 86:20 90:8
140:22

**committee** 16:15
21:10,11 40:2,10,
11,17 42:3,15,23
45:7,25 46:8,13,
21,24 47:3,4,17
62:10,17,19 65:19
66:19,20 85:20,21
86:9 96:7 112:2,6,
7,9,17 114:7,10
116:9 117:15,21,
23,24 118:12
119:9,10 122:23,
25 123:15 124:4,
7,12,15,17 125:2,
16,18,20 126:2,8,
12,13,19,23 127:5
128:2,7,13,14,18,
22 134:22 135:24
136:2,3 138:11,16
139:13

**committees** 18:4
47:11 112:24
113:16 119:21,25
126:11 134:10,24
140:19

**communicate**
81:24

**communicated**
70:4 80:20 82:2,3

**communicating**
70:11 110:11

**communication**
64:14 69:8 98:1
99:18 118:17

**communications**
55:4 63:15 64:8
69:21 72:6 85:22,
25 86:3,7,11,17
134:17

**compensation**
67:15,19,23 68:6

**complaint** 61:10,
15 98:11,12 103:6
109:5

**completed**
110:12

**completing** 98:2

**comprised** 46:8

**computer** 44:20
45:13,18

**conclusion** 80:3
100:3,5,9

**conduct** 21:16
46:6 137:23

**conducted** 29:17

**conduit** 46:25
47:19,21 48:2

**conference** 19:4,
5,10 61:19 89:11
94:5,25 97:17
109:8,15,18,21
110:22 111:9,15
113:2,25 114:2,
11,25 120:18
121:16,18,19
126:22 127:13
130:8,11 131:1,6,
10,14

**conferences**
60:23 61:14 95:5
109:11,20,24
110:2,6 111:14,25
118:22 124:18
125:25 126:3
129:7,22

**conferencing**
109:2

**confidential**
22:13,16

**communication**
64:14 69:8 98:1
99:18 118:17

**confirm** 100:11

**confirming** 81:2

**confused** 127:15

**confusing** 60:21

**confusion** 80:23

**connect** 47:1,21

**connected** 49:8

**connection**
91:17

**consideration**
30:11 113:2

**considered**
82:22 121:13
122:8

**considers** 48:21
106:2

**Consiglio-young**
24:12 28:9 29:3
35:8,9,11 36:13
47:18 49:11,16
56:12,19,22
58:13,18,21 69:8
70:9 81:1 85:12
98:23 101:20,22
104:16,24 107:1

**constitutes**
51:18

**constitutional**
63:22 64:3 91:18,
24

**consult** 119:7

**consultants**
135:16,19

**contact** 24:4,6
25:15

**content** 78:21
79:8

**contract** 11:4
17:10,12 118:16
120:16 122:18

**control** 139:7
141:9

**conversation**
60:7 69:3 75:22
100:16

**conversations** 69:15 82:8 88:16, 17 93:13

**convicted** 12:23

**coordinate** 74:22 120:19

**coordinates** 121:2

**copy** 14:21 143:25

**correct** 19:13 20:23,24 21:7 25:22 28:1,7,25 30:24 36:3,7 39:7 53:11,23 55:13 57:22 59:18 62:3 65:6,25 70:23 73:7 75:1 80:15 81:3 84:3,20 86:1 98:22 106:11,16, 21 107:19,20 110:17 111:16 115:24 117:25 122:24 124:3 127:22 132:20 142:4

**correctness** 143:19

**Coulam** 34:11

**Council** 109:24, 25

**counsel** 8:8,11,21 9:2,5,9 13:13,17, 19 15:6 23:7 24:11 27:7,25 28:4,5,9,10,11,15 34:4 114:11,25 119:8,17 137:12

**Counsel's** 28:20

**counterpart** 88:18

**counterparts** 93:18 95:6

**county** 89:19 90:5 92:3 109:22 110:7

**couple** 13:20 61:10 97:2,4

**court** 7:6 10:22,23

12:16,18 22:22 29:23 30:1,9,12, 23 31:6,22 32:20 34:16,21 40:1,12, 19,25 41:2,3,4,17 42:14,18,19 43:14 48:19 49:1,3,4 50:21 51:8,17,22 52:14 54:24 55:13 56:5 62:23 63:9, 19 65:15 68:20 73:15 76:8,13,14, 16,17,19 77:3,5,6, 15 78:2,4 82:10 87:15,17,19,21,25 88:19,23 89:14, 18,22 90:3,23,24 91:7,19,22,23,24 92:6,11 93:3 95:12,17,20 96:3 99:23 100:1 102:1,12 103:21 105:22,23 106:2, 14,23 107:14,16, 21 108:5,7 110:1, 7 113:18,20 128:10,15,19,23 129:1 132:8,10 136:9,12 139:23 140:3,4,5,15

**courts** 7:3,5,7,9 8:9 9:11 11:2 12:15 30:2 40:13 41:24 63:10,18 76:11,21,22 77:2, 7,19,23 78:2 89:19,21 90:7 91:10 92:2,18 94:14 95:2,20 140:7

**covers** 103:21

**COVID** 76:3

**COVID-19** 75:18

**Crawford** 132:6, 19,21

**created** 15:2 64:5 66:18

**creates** 64:1

**crime** 12:23

**criminal** 10:16, 19,21,22 76:14 77:6 90:24 91:3

**criteria** 74:10

**CST** 144:3

**current** 7:11 9:5 46:18 56:5 132:3, 10 137:5 141:3

**curtesy** 114:14

_____

## D

**daily** 14:2,6,15

**Dalton** 104:16,18, 19

**Dan** 5:11

**date** 6:23 36:24 50:2 53:21 134:3, 4

**dates** 81:16,21 83:11,15

**David** 23:11,20 27:6

**day** 36:11 121:17 131:4 133:25

**deal** 57:13 60:24

**debate** 129:25

**Deborah** 17:6,8 133:2,4,21

**December** 8:12 9:19 15:10 27:11, 14 36:9,10,12,25 123:18,22 124:8, 19 127:1,7

**decides** 103:15

**decision** 76:25 77:9 135:21

**decisions** 39:16

**declaration** 37:19 38:5,7 61:12 83:22 98:3, 5,11,13,19,24 99:5

**declarations** 37:22,24 97:20,23

**dedicated** 85:4

**defendant** 12:25 13:2

**defense** 68:12

**defined** 40:4 85:18 105:25

**degree** 11:18

**deletions** 49:2 140:14

**demoted** 133:6

**denote** 89:17

**denoted** 85:7

**department** 52:22 63:16 86:18 88:11

**depends** 39:17 118:7 127:2

**deponent** 113:8 144:2

**deposition** 5:17 6:3 13:22 14:3,8 37:17 110:11

**deputy** 7:13,14, 16,21 8:7,19 52:11,14,18,24 58:16 66:22 70:22 84:19 88:7 89:7 94:6,10,20 97:24 111:21 120:20 135:10 137:4,12 139:7

**Describe** 26:8

**description** 52:11,15,17

**designee** 114:12

**desire** 92:23

**detail** 107:2

**determination** 99:23 100:1

**determine** 85:2 140:15

**determines** 135:25

**develop** 106:9 113:6

**diem** 73:18 74:6, 10

Lexitas TENNESSEE Court Reporting
(615)595-0073

diems 118:20

differences 139:15

differently 124:13

digital 69:2

directed 105:24

directly 49:8 57:13 68:1 79:14 82:7 100:8 111:23 118:14 120:22 139:4 142:20

director 7:13,14, 17,21 8:7,19 15:18 16:21 17:15 20:20 49:20 52:11,14,18 53:3, 10,13 58:17 66:22 67:1 69:21 70:22 74:20 78:20 84:19 85:2,25 87:7,13, 18 88:7 89:7,8 94:11 95:11,16 96:1 98:7 104:19, 22 105:5 111:21 120:20 123:11 132:24 133:1,18 135:10 137:4,9,12 139:7

director's 52:24

directors 67:2 94:6,10

disciplinary 21:23 46:4,6

disciplined 12:20

discuss 32:6 33:23 34:1 50:13 54:23 61:23 113:24 140:10

discussed 31:18 50:5 55:11 56:9 57:18 59:16 60:16,18 61:24

discusses 125:21

discussing 22:12,15

discussion 30:9,

14 49:23,25 50:20 54:1,7,12,16,20 59:13,16,20 60:6, 10 72:5 77:9 88:24,25 93:8,23 94:2

discussions 51:2,7,10 54:4 55:17,21,25 56:6, 17,21 57:17 59:4 60:12 67:24 68:1 93:17 129:25

Dispute 21:11 65:2 73:3

disputes 11:4,13

disruptive 130:12

distinction 21:20 82:23

distinguishes 124:11

district 12:15 132:8

division 10:12,14, 15,16,18,20 28:21,22 74:25 86:6,12 87:6 105:5 112:15

divisions 10:11 12:17

divorced 40:17

documents 113:10

domain 130:25

Dougherty 5:7,10 9:4,12,17 24:8 25:12,19 29:8 31:13 32:2 38:19 41:14 42:4 44:10 50:15 51:1,6,12, 19 55:2 57:16 59:11 68:9 69:13 70:3 71:13 72:4 81:15,20 82:15 97:3,10,13 99:3,8 100:20 102:11 113:12,14 137:1, 17 141:16 143:11, 16

drafted 129:16

130:5 133:21

drafting 133:16

dream 88:19

dropped 130:22

dual 8:22,24 28:18 137:14

duly 5:4

duties 10:20,25 53:9 66:21

duty 46:23 85:9 113:1

Dwight 82:10 142:11

———

E

e-mail 14:22 31:17,19,20

earlier 20:19 104:2 108:25 109:6 114:9 123:3 138:20 142:14

early 36:25

earn 121:25

education 11:17 60:23,25 61:6,13 90:17 91:17 98:9 109:9,11 110:6 111:13,24,25 114:5,7 118:12, 13,16 120:21,24 121:7,8,18 122:1, 13,15 125:15,18, 22 126:1,8 128:2, 5,7,22 129:23 130:14 132:6,21 135:5,9,16,17,24 136:2

effect 76:11 87:1

efficient 92:24

effort 76:10

elected 7:22

Embassy 131:7

employed 17:9

employee 49:11 79:1 120:23 122:5

138:17 143:10

employees 22:1 46:19 47:10 122:7

employment 11:3

enabling 110:16

enact 113:23 129:4

enacted 129:9

enacting 129:11, 14

enactment 113:3

end 121:17

enhance 40:12

ensure 40:18 47:20

entered 9:13

entire 101:13

entitled 14:2,4

equivalent 41:19 89:4 96:6,15 134:22

essentially 17:11 30:6

establish 92:2

established 40:11 41:1 112:11

establishes 42:15

ethical 46:10 47:1

Ethics 45:25 46:7, 13,21,24 47:2,17

events 78:6

exact 36:24 72:3

exam 73:21

EXAMINATION 5:6 137:20 141:15

Examiners 73:19

exception 73:18 141:6

exceptions 123:3

Legiscribe TENNESSEE   items.xerox.com   153
(615)595-0073

excluding 20:25

exclusively
45:10

excuse 12:25
18:23 20:3 37:18
39:9 56:14 128:1

executes 121:21

execution 121:16

Executive 112:6,
9,17 114:9 116:9
117:20,23 122:22,
25 123:15 124:4,
7,11,15,16 125:2
126:7,11,18,23
127:5 128:1,13,18
136:2

exhibit 103:6

exists 40:17
42:24 77:17

expectation
49:14

experience 10:8,
25 48:23 66:10
88:14

expert 116:4
141:18,23

explain 8:17
91:20 139:15

explained 47:16

explaining 61:13

explanation
140:18

extent 104:8

extremely 60:21

**F**

facilitate 118:18
135:3

fact 74:7 81:3
89:24 126:10

fair 43:5 47:9
49:10 66:5 80:23
121:1

fairly 33:1 110:3
112:13

fall 43:13 79:16

familiar 14:25

familiarity 15:20

Family 109:25
110:1

faster 76:12

February 133:11
134:1,3

federal 7:8 11:2
12:14 14:1 41:5,
19 62:9,17 88:4,
10 94:7 95:5,14,
19 96:1,6,14
132:8

Feds 96:23

fee 14:2,6,15

feel 16:16 49:9
71:5,9

field 68:19

filed 50:4 60:17,19
61:3,12 62:14,17
97:21 109:5
121:22 132:7,11

fill 75:8

filling 98:3

final 8:12

finance 74:9

financial 102:15

find 52:20

fine 11:21 16:4
62:6,8 97:3,10
111:17

finish 53:6 97:15

fiscal 74:23,24,25
104:19,22

fit 85:3

floats 125:22

Florida 12:3,5
93:22 94:3 134:18

focus 61:20
116:21

follow 134:14

force 67:13

form 24:7 25:9,16
29:6 31:10,24
38:15 41:10,25
44:8 50:12,23
54:25 57:11 59:8
68:8 69:11 70:1
71:11 72:1 81:9,
19 82:6 99:1,6
100:14 102:9
136:22

formal 52:17 86:4
135:7

formally 12:20
29:16

forms 40:14,15

formulate 113:16

forward 47:21
68:21 80:11,14
81:5,25 82:5,12
106:3

found 60:21

frame 8:10 46:16

framework
119:19

Franklin 131:8,
14,25

free 16:16

Friday 83:21,24

front 113:9 121:17
129:19

fulfill 70:5

fulfills 74:21

full 76:7

full-time 27:22,24

fully 82:24

function 30:7
90:16,17 135:22,
23

funded 92:4
103:16

funds 90:18

future 71:16,24

**G**

gathering 26:12

gave 19:1 38:6
123:3

general 8:8,11,21
9:2,5,9 10:6,9
11:5 15:6 23:7
24:11 27:7,25
28:3,5,9,10,11,15,
20 47:15 64:1
88:24 89:20 90:19
91:10 92:1 97:24
103:11,20 105:2,
6,17 106:4,24
109:21,22 114:10,
18,22,24 115:2,17
134:5 137:11

General's 9:24
11:8,12 115:13
117:11

generally 30:18
74:8 75:19 105:3
118:21 120:8
126:23 139:18

Gino 82:12 101:3
141:7 142:12,15

give 6:4,17 11:21
27:6 33:11 66:13
80:17 90:2 98:5,
13,16,18,23 99:4
112:3 113:2
115:11 116:9
123:4,8 141:17,23

giving 34:17
37:17 70:18

goal 48:25 68:4

good 5:8,9 65:21
67:8 88:16

govern 137:22

governance
124:23

government
26:15 42:6 92:18

governor 103:11,
15,19 104:15
134:4

Lexitas TENNESSEE court reporting
(615)595-0073

**governor's** 105:7

**governs** 52:24
53:3,9 110:22

**graders** 73:21

**graduate** 11:25

**Graduated** 12:3

**graduation** 11:20

**grand** 112:15

**granular** 104:1,8

**great** 60:24
111:19

**greater** 76:12

**group** 19:2 72:6
97:18 111:22
112:5,10,13 114:6
118:2 119:1
128:15

**groups** 84:25
90:1 109:17
112:19,21 113:6

**guess** 14:19 21:4
76:6 104:5 133:14

**H**

**H-E-N-D-R-I-X**
23:12

**habit** 123:18,25

**handle** 11:12
118:19

**handling** 10:21

**Hang** 7:18 38:3

**happen** 48:17
60:9 71:3 78:18
79:16,20,23,24
80:1 118:22 120:6

**happened** 25:8,
10 79:17 80:21
98:15

**happening** 60:11
115:12,13,14

**Harmon** 5:2,15,16
9:14 51:15,20
97:14 137:22

**head** 28:21 34:15
78:10 111:7
134:20 138:6,19

**headed** 105:6

**hear** 64:2

**heard** 66:6,7,8
113:21

**hearings** 63:19

**held** 8:22 17:16
20:22 21:2 33:9
57:2,5,8 72:25
73:6,8 120:17
131:6 138:2,5,9
139:8

**helped** 67:11
97:22

**helpful** 12:12
113:11

**helps** 79:7 140:5

**Hendrix** 23:11,22,
23 25:13 27:16

**Hensley** 104:17,
18,19

**Hey** 97:1 113:7

**hierarchy** 58:15

**high** 41:12

**hit** 76:1 77:1

**Hivner** 105:21

**hold** 8:23 26:13
81:13 83:20 137:6
138:13,14,18

**holders** 112:16

**Holly** 52:3 54:7

**honest** 6:4

**hope** 131:17

**host** 122:18

**hosted** 15:19
18:22 26:10,16,
21,25 110:6

**hosting** 18:24
26:8

**hotel** 118:17

**hotels** 120:17

**hour** 32:13 62:5

**hours** 97:2,5
122:1,3

**HR** 52:22 90:16
91:14

**human** 11:2

**hurt** 131:9

**hyphen** 17:6
78:23

**hyphenated**
24:17

**I**

**idea** 83:3

**ideas** 88:10
125:22 140:10

**identify** 122:17

**idyllic** 68:18

**immediately**
13:18

**impact** 49:17,22
50:6

**important** 34:15
53:21

**improvements**
140:6

**incident** 130:5,7
131:24 133:3,6

**include** 105:7,9
112:15

**included** 42:25
43:12 94:10

**includes** 112:13

**incoming** 122:16

**incorrect** 95:18

**increase** 68:5
77:1

**increasing** 67:14

**incremental**
67:20

**independently**
140:5

**indigent** 23:20
67:9,10,12,15
68:12 88:15,21

**individual** 82:19
85:8 87:2 116:12

**individual's**
84:15

**individuals** 40:16
47:22 84:21
115:10,16 130:10,
17 139:23 142:10,
21,22

**individuals'**
40:12

**inferences** 61:6

**inferior** 92:2

**inform** 6:6,11

**information** 6:22
20:5 63:9 98:17
104:4,13,25
122:10

**inherent** 91:18,25

**initial** 118:16

**initially** 10:5
60:17,22

**injunction** 32:16,
19,22,25 33:4,12,
24 34:3,25 36:1
38:21 49:17,21
50:4,22 51:24
53:17,23 54:8,22
55:5,7,11,16,18,
22 56:1,7,10,18,
23 57:3,19,24
59:5,12,25 60:3,
15 62:1 69:4,23
70:6,13 71:1,10,
18 80:13,17 81:6
99:19,23 100:13
102:16,19,22
139:3 143:4

**injured** 131:13,16

**injury** 131:21

**innovator** 139:22

**input** 140:10

**instruct** 100:18

insuring 60:8

integrity 129:21

intend 141:22

intended 78:3
139:21

interaction 48:23
95:21

interested 61:7
126:12

Intergovernment
al 28:22 105:4

interim 61:13

intermediate
77:7 89:22

internal 13:17
46:8

internally 84:12

interrupt 24:16
80:25 114:8

intricately 105:5

introduce 9:6

introduction
5:25 34:14

introductory
13:21

invited 26:2
114:11,13 116:6,8
117:8 118:14
123:3,8

involve 121:6,7

involved 13:9
64:4 67:9 79:14
94:20,23 104:3
105:5 129:24
133:15,19 134:8

involvement
68:25

involving 105:1

issue 59:5,24
68:10,14

issued 32:16,21
50:17 51:25 53:18
54:3,8 55:6,17
99:19 102:20

issues 107:21

item 103:1

_____

**J**

J-E-A-N-A 23:12

Jacksonville
12:7

Janet 97:24 98:16

Jeana 23:11,23
24:20,21 25:13
27:16

Jim 105:21

job 52:10,15,17
85:9

John 9:9 13:17
34:8 35:7 56:12
82:1 132:6,19,21
142:25

joined 10:1 17:14

judge 54:3 63:18,
21,22,23 64:2
77:4,5 102:21
125:6 131:19

judges 20:13
46:7,9,10,25
76:24 89:20 90:3,
15,23,24 91:4
109:19,21,22
110:1,3,4 112:7,
13,15,19,20 114:5
116:1 117:21,24
121:25 123:6
125:9,20 130:8
131:9,13 135:3,
11,18,23

judicial 21:15
45:25 46:5,7,13,
21,24 47:2,17
60:23,25 61:6,13,
19 86:3,7,12
90:17 91:17 97:17
98:9 109:1,8,11,
14,18 110:6,22
111:9,13,15,23,25
114:25 121:6,8,18
125:10 133:17

judiciary 46:9
65:18,22 66:2,4,

18 90:4 92:1
112:14

July 6:25 8:13,25
38:6,12 127:17

June 57:5,8 63:5
109:6 120:8
121:12,22 127:17,
18,20,24

jurisdiction
109:23

justice 10:16,19
21:10 40:2,10,24
41:6,9,16,20,22
42:7,21 52:4,7
54:7,13,14,17
55:3,12,22 56:1
65:2,8,13,19
67:25 68:3,10,13,
14,16 72:23 77:22
78:9,14,16,19
79:3 80:10,21
81:4,7,16 82:1,9
84:9 85:5 87:20,
24 95:16,22 96:3
99:12,15,18
100:11 101:1
102:1 132:5,18
133:18 139:13,16,
20 140:25 142:11,
18

justices 22:22
41:1 50:21 51:21
55:5 102:12
106:14,17,18

juvenile 89:20
110:1

_____

**K**

Kathy 82:14 83:4

Kentucky 88:16,
18,20 89:1 92:11
93:16 134:17

key 78:17

kind 5:25 6:20
13:20 30:18 38:21
58:14 61:20 64:6
68:4,21,23 74:21
76:6 84:19 110:19
114:3 119:19
134:8 135:2,5

Kirby 52:3,4,7
54:7,17 55:4,12,
22 67:25 68:3
80:10,21 81:5,7,
16 82:1 99:12,15,
18 100:11 101:1

Kleinfelter 97:25

knew 20:7 71:2
100:7 101:21

knowledge 27:3
44:21 49:12 104:6
131:15,22 136:10,
12

_____

**L**

L-O-U-I-S-E
78:24

lack 67:12 76:6

language 108:3

large 19:5 22:2
67:21 112:13

largely 80:23
112:1

larger 125:1

late 127:13 129:10

law 12:2,4,6 73:19
116:22

laws 113:3

lawsuit 13:3,6,23
32:21 60:17,19,21
61:3 62:14,16
96:12,19,21 97:21
109:10 121:22
132:7,16

lawsuits 13:10

lawyer 89:9
114:12 123:10

lawyers 46:5
65:22 66:13
114:16 116:13,15

lay 65:22 66:4

lead 69:2 87:4

leads 80:3

learn 134:11

learned 15:12
81:3

learning 15:16

leave 21:22 36:21,
23 37:1 56:13,19,
24 80:24 130:14,
15 131:20

led 122:15

Lee 29:19,21
134:4

left 10:1 27:10

legal 13:9 51:15,
16,20 52:2,10,13
53:13 70:18
71:15,19 81:10
100:15 122:1
135:4,17

legislative 28:12
67:22 105:4

legs 97:6

level 63:17 64:2
66:20 68:6,19
89:21,22 90:15
92:4,5 95:21
109:19

levels 46:9 67:19
89:17,25 112:14

liaison 24:21
28:12 29:2,4 35:8,
13,14,15,17 44:4
45:23 46:13,20,24
47:10 80:24 82:9
84:13 85:10,13,
16,19 117:15
122:5 142:11

liaisons 47:10
84:21 122:8

licensed 66:13
116:2,17,24

licensing 12:21

licensure 116:20

limited 48:24 60:8
90:20 117:5

link 78:11

list 43:13 83:5,11

listed 43:16,22

82:19,25 84:9
112:12

lists 16:8

litigants 40:15
77:24

litigation 10:17,
24 11:1 13:18
131:24

livestream 78:6
102:16,23

livestreamed
27:1 57:9 63:4
65:1 72:11,15,23
73:1,4 76:15,18

livestreaming
44:19 48:10 64:21
69:5,9,24 70:6
75:12,21 76:3,9
77:1 86:13,16,19
103:25

livestreams
63:16

loaded 40:14,20

local 92:17,19

location 73:1,7,9
118:18 121:20

locations 120:18
122:17

logical 100:3,5,9

long 9:25 15:23
27:16 32:10 33:1
36:4,17 46:12
49:20 50:1,8
53:14 55:18 56:11
57:18 58:20 59:4,
14 60:6,13,20
61:23 62:4 67:1
69:7,22 70:12,24
74:20 84:24 85:16
94:22 98:2,6 99:4
100:24 104:7,12,
21 125:5 132:11,
15,23 133:23,24
136:18,21 141:19,
22

Long's 58:6,10

longer 28:20

looked 108:10

looped 37:15

lot 88:15 92:16
122:7

Lynn 83:1 142:12

_____

**M**

_____

made 22:9 34:2,
24 66:1 70:15
76:25 79:10 85:1
96:10,13,18 99:23
100:1 103:14
112:19 115:25
136:9 140:25
141:21

main 13:22 66:10

majority 90:4

make 13:12 15:8
16:17 18:22 21:20
30:22 31:2,3,9
34:20 62:21 66:25
67:3,4,21 71:2,5
72:21 93:5 100:9
102:14 106:18
107:12 108:21
113:11 115:7
118:16,21 128:10,
15,19,23 135:13
140:12

makes 39:16
78:17 112:9
125:19 129:1
135:11,21

makeup 141:4

making 35:1
48:17,21

male 130:10

manage 78:20

manager 120:21,
24 122:16 132:6,
22,23

maneuver 67:11

manner 106:5

March 7:18,19
8:5,19,25 32:17
53:19 120:8
127:16,18,20,24

128:4,8 137:13

Maternal 36:21

maternity 56:13,
24

matter 60:17,19

matters 11:3
21:23 51:17 67:2
105:1

Mccaleb 5:12
132:11

meal 73:18 74:6,9

meals 118:20

meaning 116:19

meant 22:7 71:10

media 69:2 87:4
130:19

medications 6:2

meet 37:7,13
39:11,14,15 40:7
44:3,7 45:12
48:10 65:7,11,14
81:14 118:4,6
119:21,25 123:14,
16,21 126:2

meeting 17:4
19:1,6,8,14,19
20:12 22:15,18,20
23:2,4,14,15,18,
24,25 24:3,19,24,
25 25:6,24 26:1,5,
6,11,13,17,22
29:9,17 30:13,16
32:10 33:10,23
38:25 39:4,20
44:1,11,18,23
45:8 47:6,7,8,21,
25 48:7,12,15
57:8,19,23 58:4,7
59:18 60:1,5 63:4
69:5,10,25 70:7,
14,16 79:15,19,22
80:6 81:13,25
82:5 83:11,18,20
96:7,8 107:7,11
112:21 113:6
115:9 116:9
117:21,22 118:18
121:13 124:17
126:24 128:5
138:14,18 139:2,9

141:10 142:16,23

**meetings** 11:7
15:19,25 16:23
17:2,3,16,23 18:1,
7,11,16,19,25
20:8,21 21:2,5
26:24,25 33:8,14
35:23 40:3 45:16,
20 49:13 50:11,18
57:1,25 58:23
59:1,6,21 62:2
63:1 64:22,25
71:16,17,24
72:11,14,17,23
73:4 74:14 75:18
79:12 81:17,22
83:5,16 84:7
86:19 96:11,16
99:9,14,16,24
100:2,4,8,12,21
101:7,11,16,24
102:2,7,17,24
107:4,8,9,10
108:20 109:9,15
110:15,20,22
111:4,5,9,18,22
112:2 113:23
114:19,23 115:2
116:7 117:5,6,16,
19 118:9 119:4
120:6,10 121:3,5,
9 122:13 123:25
124:1,4,8,12,14,
16 126:5,15,19,25
127:8,11,16,21,23
128:2,7,11,16,20
129:2,5 136:1,3,8
137:24 138:1,21
143:3

**meets** 37:5 38:1,9
106:6 120:1,3,5

**member** 31:21,22
47:2 82:22 115:3,
5 116:3 123:12
125:7

**members** 19:25
32:3 44:12,14,17
45:17 47:25 54:24
56:4,10 64:13,14,
17 65:18 66:2,3
73:12,23 74:5,16,
22 75:3 77:10
82:4,20 112:18,24
118:15 123:2

125:2 126:7
135:11 139:1,5
140:24 141:3,5
142:2

**membership**
109:20,23 110:2
112:12 116:4

**memorandum**
33:1

**memory** 30:9
32:19

**mention** 113:8

**mentioned** 29:1
109:16 115:10
135:15 138:20,25
139:12

**mentioning**
138:23

**met** 5:10 19:9 37:9
38:17 39:6 74:10

**Michelle** 24:12,18
28:8 29:3 35:7,8
47:18 49:11,15,20
50:1,8 53:14
55:18 56:11,12,
18,21 57:17 58:6,
10,13,17,20,21
59:4,14 60:6,13,
19 61:23 67:1
69:7,22 70:9,12,
24 74:20 81:1
85:12,16 94:22
98:6,23 99:4
100:24 101:20,22
104:7,12,16,21,24
107:1 132:15,23
133:22,24 136:18
141:19,21

**mid** 36:18,25 37:2
41:9,11 109:5

**middle** 17:7 75:23
132:8

**Mike** 13:19 137:18

**mileage** 14:4,6
73:17,23 74:8
118:20

**mind** 22:10

**minutes** 62:6
97:7

**missed** 127:3,14,
15

**mission** 42:2,7,9,
10,13,21,24,25
139:16 140:21

**missions** 140:18

**misunderstood**
8:15 86:24

**mixture** 65:22

**modernize** 67:16
76:10

**moment** 24:15
38:4 110:9

**money** 103:24

**month** 8:13 18:3
19:20 53:20,24,25
54:2,10

**monthly** 38:25
39:14,15,19 65:11

**months** 8:23

**Morgan** 64:19
68:24 69:4,9,20
87:4

**morning** 5:8,9

**mouth** 109:7

**move** 77:8 97:16

**movement** 41:8

**moves** 106:2

**municipal** 89:18
92:3 110:3,4
130:8

―――――――――

**N**

**named** 99:5
132:15

**names** 23:10 34:7

**Nashville** 19:7,16
44:13

**National** 94:14
95:1

**nature** 11:4 74:11

**nearby** 121:20

**necessarily**
34:21 39:13 43:12
73:16 77:22 78:4
112:17 119:23
123:17

**necessity** 75:17

**needed** 33:11
35:22 57:20 71:3,
17,24 99:24 100:2
143:3

**needing** 46:11

**news** 78:5

**Nick** 64:19 68:24
69:3,20 87:4

**nodding** 34:14,19
111:7 134:20
138:6

**non-judges**
119:6

**non-unified**
88:23

**nonparty** 13:23

**notes** 29:17

**notice** 23:14,24
24:4,25 25:6,18
26:5 33:8,11,21
49:24 50:7,10
57:23 80:7,18
105:15 106:19,22
107:3,18,24

**noticed** 70:17
80:2 138:23
139:10

**notices** 23:1 35:2
50:17 57:20 58:4,
8 59:18,21 60:1,5

**noticing** 139:2

**notified** 142:22,
24

**notifying** 25:25
54:21 71:24 72:7

**November** 10:1,2
130:9,25 131:25
133:3,7,13

**number** 10:7 40:3
65:14

**O**

**oath** 5:20

**object** 24:7 25:9, 16 29:6 31:10,24 38:15 41:10,25 44:8 50:12,23 51:4 54:25 57:11 59:8 68:8 69:11 70:1 71:11 72:1 81:9,19 82:6 99:1, 6 100:14 102:9 136:22

**obligation** 53:3 75:8

**obligations** 52:25

**observe** 22:2 29:12 41:23

**observed** 22:20 29:10 32:11 44:11 72:16 74:12 96:6

**occasionally** 114:15

**occurred** 56:23 130:13

**occurring** 112:4

**occurs** 107:4 121:19

**October** 12:13 120:8 127:14,18, 24 136:24

**off-site** 120:15

**offering** 140:17

**offhand** 21:17 111:2

**office** 7:2,5,7,9, 12,22 8:9 9:10,19, 22,24 10:4 11:8, 12 14:10,11,17,20 15:19 17:4,15,17 18:2,7,16 19:7,16 20:4,23 21:3 22:25 24:6 26:19, 25 27:17 28:21,23 33:17,20 34:12 36:1,2,14,17,20, 23 39:11 43:7,21,

24 44:13,24 45:12 48:2,5,11,16 49:18,22 50:16 51:10,16 56:10 58:3 59:17 60:4 63:7 73:9 74:17, 25 76:2 77:12 79:6 80:17 83:13 84:12 86:14 87:11 88:8,10 89:5 90:21 92:7 93:1 94:17 95:10 101:5,9,15,23 102:21,22 104:12 112:16 115:13 117:12 118:8 120:14 122:14 134:13,22 135:6 136:18,21 143:2

**offices** 19:3 88:3, 9 134:18 138:3

**officials** 90:5

**officio** 123:13

**offshoot** 77:21,25 79:4

**oftentimes** 47:19

**on-the-job** 135:8

**ongoing** 93:8

**open** 11:6,7 18:19 23:2 24:25 33:14 42:5 48:15 59:1 62:25 71:17,25 96:11,16,24 99:10,14,16,24 100:2,10 101:7, 12,16,24 102:2,7 116:17 124:9 136:3,6 141:11 143:3

**operates** 140:4

**operations** 113:19

**opinion** 76:12 92:24 140:17 141:8,17,23

**opinions** 46:10 78:5

**opportunities** 90:18

**oral** 63:16

**order** 33:1 102:20 105:23 106:18 107:22,23 143:14

**orders** 107:16

**organization** 66:16 94:8,12 115:23 116:19 117:2,3

**organizations** 134:7,13

**organizes** 111:24

**overlap** 8:14,16

**oversee** 84:19 86:12

**oversees** 86:2,19

**Oversight** 85:20, 21

**overtly** 131:11

**P**

**p.m.** 144:3

**package** 49:1 105:10,13,16 106:3,24

**paid** 73:16

**Paige** 54:14 55:3, 12 56:1

**pandemic** 27:3 75:18,25 76:7,9, 13,18,25

**panel** 63:18,21, 23,24 64:2 76:24

**paraphrasing** 113:3

**parks** 118:17 120:17

**part** 13:22 22:7 33:10 42:2,6,8,12 60:3 66:14 79:10 82:8 83:17 99:22 112:20 114:5 116:18,20 123:1 130:19 134:10

**part-time** 17:12 27:20,22 28:2,6 73:20

**participate** 25:22, 23 45:3 76:24 114:22 126:13

**participated** 44:19

**participating** 25:25 44:18 45:17 100:8

**participation** 13:8 73:13

**partied** 132:5

**parties** 132:16

**Partner** 66:18

**party** 98:6

**pass** 137:17

**passed** 64:1

**past** 50:10,17 56:5 59:20,22 65:1 114:20 130:5,7 141:2

**pattern** 38:24

**paying** 41:13

**Peck** 64:20 69:14, 17,18,23 70:5 85:24 86:11 87:2, 5

**people** 31:8 45:3 65:22 66:4 92:17, 20 122:13 123:5 130:21

**perceive** 71:19

**period** 28:14 40:4 105:16,25 106:19, 23 107:3,18,24 108:14,17,19

**periods** 37:13

**permission** 138:13,17

**person** 24:18 44:12 58:12 63:1 75:20 83:1 93:24 94:3 101:23 115:19 132:19

Lexitas TENNESSEE Court Reporting
(615)595-0073

personal 93:6,9

personally 45:23
68:15,17 117:18,
20 120:9 138:13

personnel 91:15

phone 75:21,24

phrase 41:15

physical 19:10
44:3 47:7 48:6
72:25 73:6,8
118:18

physically 19:6,
16 44:12,24 75:25
130:12 138:5

picked 34:21

picture 114:4

pivot 76:1

place 19:20 26:1,
12 33:6 45:16
49:12 86:13
108:21

places 140:7

plaintiff 13:5

plan 141:18

planning 121:16

plans 111:24
121:21

platform 77:8
78:4

playing 68:19

pleadings 61:4
96:21 103:6

pleasure 87:14,
19,24 95:11 96:2

point 6:11 20:1
24:4,6 25:14
31:18 38:22 52:5
61:11 70:19 72:10
75:19 97:8 98:2,
13 105:15 106:12
132:24

points 120:7

poised 67:21

police 130:15

policies 129:4

policy 74:1 129:6,
9,12,15,17,18,20
130:4 133:15,17,
20 138:8

political 89:16
92:14,17

Polycom 75:23

portion 33:9
103:2,20,23 104:9
109:10

position 7:11,21
8:3 9:2 10:3 24:22
68:24 71:8 73:21
85:8 87:8,9,16
89:8 137:2,5

positions 10:3
85:4 87:11,12

post 57:19,24
59:5,12,24 69:4,
23 70:12 71:1
102:15 107:23

posture 132:4

potential 32:5
140:13

practice 15:1
30:2 128:19 129:1
140:11,14

pre 38:21 60:15
76:3,18

preliminary
32:16,18,21,25
33:12,24 34:2,25
36:1 38:21 49:16,
21 50:3,22 51:24
53:17,23 54:22
55:5,7,11,16,22
56:1,6,9,18,22
57:3,19,24 59:5,
12,25 60:3,15
62:1 69:4,23 70:6,
13 71:1,10 80:13,
16 81:6 99:19,22
102:15,19 139:3
143:4

prepared 5:22
97:22

preparing 23:23
66:22

present 44:15
45:8 48:25 117:4

presented 68:11
106:4

presenters
118:14 125:23,24

president 115:20
116:6,13 117:5,10
122:16,17 123:9,
10

presiding 77:4,5
112:6 117:21,24

previous 8:3

primarily 10:21
28:12 64:19 77:2

primary 35:9,12
63:14,20 70:10
80:24 101:19

prior 9:19,21
18:16 35:25 59:6
60:12,14 62:16
67:1 100:12
136:19

private 19:25 20:8
112:23 119:3,5

privilege 51:11,
13,18

pro 137:13

problematic
76:22

procedural 132:3

procedure 15:2
30:2 113:4,6,17,
18,19,20,22 136:9
140:12,15

procedures 6:21
49:6

proceedings
63:19

process 32:8
33:18 104:14
105:13

Professional
21:14,19 22:8
46:2,3 125:12

professionally

93:9

programatic
67:4,6

project 17:13

promoted 8:2 9:3
10:8 137:8,11

promotion 8:7

promulgate
140:16

promulgated
136:13,16

properly 80:2
93:4 138:22 139:9

proposal 103:17

proposed 30:10
105:20 108:6

protect 129:21

protected 51:11

provide 12:11
33:21 44:1 46:10
47:11 48:2,6,11
51:20 52:2 53:13
90:12,15,16,17
91:2,6,9,14,15
93:2 94:16 101:9
118:8,13 135:17

provided 26:12
50:9 74:8

providing 42:5
47:6 51:16 52:10,
13

public 18:19
21:15,16,19,21,25
22:2,6,7,9,10
23:1,3,14,24 24:3,
24,25 25:6,15
26:1,2,4,5 27:2
31:23 33:14,21,22
35:1,2 41:23
48:16 49:24 50:7,
9,17 57:8,9,20,24
58:3 59:2,18,25
60:4,22 68:4 72:7,
24 73:5 76:10,18,
23 80:18 96:12,
17,24 99:10
105:15,22,23
106:1,19,22

107:3,18,24
108:12,14,17,19
124:9 130:2,24
136:4,6 139:21

**publicizing** 70:14

**publicly** 33:8
70:17 108:11
139:1 141:11

**purpose** 29:24
33:3,4 129:17,20
139:16

**purposes** 15:21
111:3,12

**purview** 43:14
49:4 140:16

**put** 25:18 58:3,7
59:17 60:4 75:22
78:5 105:24
106:17 109:7
125:24

**puts** 105:22

**putting** 59:25

---

**Q**

**qualified** 22:5
95:25 139:25

**quarter** 79:18,22
83:21

**quarterly** 37:8,10
38:1,10,18,25
39:3,6,12,20
65:11 79:12 83:23
84:1,2 106:6
107:11

**question** 6:7,16
20:25 24:20,23
37:18 40:14,20
47:4 51:5 53:7
59:10 60:2 61:22
70:20 113:13
115:6

**questions** 5:7,22
13:21 47:1 137:21
141:16

**quickly** 76:21

---

**R**

**Rachel** 5:2,15
51:9,15 143:18

**raise** 67:23

**Ramsey** 29:20,21

**rates** 67:15,23

**reach** 47:1 134:23

**reached** 93:20
134:16

**read** 65:16 96:20

**ready** 77:8

**real** 91:16

**realize** 95:24

**reason** 9:1 23:21
24:1,2 25:20 26:3
36:19 75:24 80:14

**recall** 11:14 15:15
18:5,11,18 19:14,
19,24 20:10,14
21:8,10,17,20,21
22:17,21,24,25
23:13,17,22
24:18,21 26:4,24
27:21,23 29:13,
14,18 30:12 31:17
32:10 37:17,19,24
39:1,3,5 43:1
44:22 45:21 49:23
54:19 60:10,18
61:14 71:23 72:2,
22 75:13 80:21
81:7 89:8,9,10
93:23 103:8,10
110:8 111:2
119:16 142:5,13

**receive** 14:2,4
31:19 73:12,17,23
74:5 92:5 135:6
140:10

**recent** 67:19 68:3

**recently** 103:9
114:20

**recite** 140:21

**recollection**
29:11 65:17 85:11

**recommendation**
30:11 31:9 140:13

**recommendation
s** 30:5,23 31:2,4,15
32:6 48:22 62:22
66:25 67:3,4,7
106:9,13 107:12,
13,17 108:21
128:11,16,19,23
129:2

**recommended**
49:2 136:14,16,17

**record** 5:14 9:8
97:14

**records** 11:7

**refer** 15:23 16:2,9
107:8 111:10

**referenced** 86:6
108:25 109:6

**referencing**
113:10

**referred** 109:8

**referring** 41:2
63:22 65:24 74:25
77:12 125:3,14
127:5 130:1

**refers** 62:1
109:18,22

**regard** 62:24

**regular** 39:3 84:6
107:9

**regularly** 37:9

**regulatory** 46:4,6

**reimburse** 75:4

**reimbursement**
14:5 73:12,24
74:6,13,16,22
75:6,9

**reimbursements**
118:19

**reimburses** 75:3

**relate** 99:15

**related** 112:1
113:18,20 114:1
129:6

**relating** 11:2

**relationship**
51:14 66:11 95:15
112:1

**relationships**
90:2

**released** 68:3

**relegated** 79:8

**remains** 28:17

**remember** 20:2
31:25 36:11 38:7,
8,14 61:4 80:4,8,9
93:20,21,22 98:4,
15 121:24 138:23

**removed** 130:16

**repeat** 20:18 86:5

**rephrase** 90:12
134:15

**report** 104:20
112:3 115:12
116:9 123:4,9

**reporter** 34:16,22
82:13,16,17,18,22
142:12 143:14,25

**reporters** 130:17
131:4

**reports** 87:5

**representation**
67:11,13

**representative**
114:13 117:9,11

**represented**
13:13

**request** 67:23
75:7 118:15

**requested** 47:4
112:3 125:22

**requests** 74:13
103:14

**require** 60:5

**required** 17:22
33:13 60:4 65:13
66:14 80:17 88:1,
5 116:20 121:13,
25 123:17,20

125:9 138:2,4

**requirement** 66:16 123:24

**requirements** 88:2

**requires** 39:19 40:3,6 107:6 123:21 138:8

**rescheduled** 142:17,23

**Resolution** 21:11 65:3 73:3

**resource** 77:23 78:6 139:22

**resourced** 93:4

**resources** 11:3 88:22 90:1 102:23

**resourcing** 78:3

**respect** 43:21 70:13 98:10,24 134:12,23

**respond** 35:23

**response** 71:23 72:3

**responsibilities** 42:16,23 53:10

**responsibility** 21:14,19 22:8 35:10,12 46:2,4 52:24 58:11 84:15 109:2 125:12

**responsible** 71:7 86:15 87:6

**result** 67:5 96:18 130:5

**resulted** 98:18 131:24

**retire** 133:4

**retired** 17:11 27:13,14 29:22 125:6,9 133:11

**retirement** 133:9

**review** 143:18,21, 22

**reviewed** 61:3

**reviewing** 26:4

**Richardson** 54:3

**Ridgeway** 83:2

**role** 8:11,21,22,24 10:19 17:21 18:14,21,24 23:19 28:3,6,12,14,15, 18 33:17 34:25 35:1,4 46:23 58:2, 6 66:21 69:19 74:20,21 92:7 94:19 109:2 111:21 120:20 121:15 129:11,14 137:14

**rolls** 134:23

**room** 19:5,10 44:7,16,24 48:1

**rooms** 19:4

**roughly** 28:16

**round** 14:8

**rule** 22:13 30:22 31:9 40:1,5 42:14, 17,18,20,23,25 49:3 62:21 65:14, 15,16 84:9 107:17 128:10,15,19,23

**rules** 15:1,22,24 16:7 24:19,22 30:1,5,6,10,13 31:3 37:25 48:20 49:6 57:14 74:9 105:9,13,16,20,24 106:3,10,24 108:5,7,9 113:3,6, 16,18,19,20,22 129:1 136:9,13 140:11,14

**run** 88:11 105:21

———————

**S**

———————

**SAITH** 144:2

**scheduled** 79:16 138:21

**school** 11:20,25 12:2,4,5 41:12

**secondary** 63:15

**section** 43:2 108:4,12

**security** 129:22

**segue** 125:13

**segueing** 110:19

**select** 122:12

**selected** 125:1 126:9

**selection** 135:12

**selects** 135:9

**self-represented** 40:15

**send** 14:7,16,17, 19

**sending** 23:23

**senior** 10:8,9

**separate** 54:16 86:17 117:2,3

**separately** 82:25

**September** 52:8 82:11

**sequence** 110:25

**serve** 32:4 45:23 65:19 73:15 87:18,23 92:20 95:11 96:2 109:16 141:18,22

**served** 46:12 85:12 95:19 141:2

**serves** 87:14

**service** 77:18 86:12

**services** 10:18 23:21 47:23 67:9 74:23 86:3,7

**serving** 47:10 85:4

**session** 21:15,16, 19 67:22 130:14

**sessions** 89:20 91:10 109:21,22 118:13

**set** 81:16

**sets** 81:21

**shaking** 138:19

**share** 77:15 78:4

**sharing** 61:19

**she'll** 36:22

**short** 97:12

**shortly** 27:19 50:3 133:9,12

**show** 93:14

**showed** 130:11

**sic** 109:25 123:10

**signature** 143:18, 23

**signed** 133:18,20, 25

**similar** 47:16 62:9,17,20,24 66:3 116:21 134:11

**simple** 111:11 129:18

**simplicity** 110:10 111:3

**simplified** 106:5

**simplify** 75:2 95:23

**simply** 54:21 70:15

**simultaneously** 8:20

**sir** 9:16 41:11

**sitting** 29:13 125:6

**situation** 35:19

**skipped** 68:21

**social** 66:15

**sort** 13:10 44:20 85:1

**sought** 60:22

**sound** 68:18

**sounds** 61:6

**South** 12:1

**space** 17:4 19:1, 10 44:1,3 47:6,7 48:6 60:24 67:16 87:5 129:23 130:12

**speak** 101:13 102:13 139:4 140:1

**speakers** 135:20, 22

**speaking** 105:3 108:3 138:25

**special** 124:25

**specific** 17:12 29:15 30:12,16 33:2 35:19 40:1 84:5,10 102:4 140:20

**specifically** 20:10 21:18 85:7 108:5,6 111:20 117:14 122:11

**specifics** 17:20 22:17 84:2

**spend** 60:24

**spoke** 93:21 142:9,15,20

**spoken** 142:2,10

**spots** 140:6

**spring** 53:22 102:20

**staff** 29:23 35:13, 14,15,17 44:3

**staffed** 67:11

**Stahl** 13:19 14:21 24:7 25:9,16 29:6 31:10,24 34:10 38:15 41:10,25 44:8 50:12,23 54:25 57:11 59:8 68:8 69:11 70:1 71:11 72:1 81:9, 19 82:6 97:1,6 99:1,6 100:14,18 102:9 113:7

**stand** 22:9

**start** 137:2

**started** 15:10 27:9 28:16 36:8 37:10 68:21 75:14,16 76:8 136:23

**state** 5:13 9:7 10:17 11:1 12:10, 21 30:2 34:7 45:13 46:9 53:9 66:20 74:9 77:19 88:9 89:21,23 90:5,6,14 91:3 92:3 94:7,14 95:2, 6 109:19 112:14 118:17 120:17

**stated** 37:25 70:8, 15 84:8 91:14 112:20 124:13

**statement** 37:11 42:10 140:21

**states** 12:16,19 62:22 88:3 93:13, 18 95:9 134:9,24

**status** 27:20 125:11

**statute** 15:5 39:18 40:6 41:5,6 52:23 53:2,9 61:18 63:25 74:2,3 87:22 90:18 109:14 110:16,21 111:10 112:11,12 113:8 114:21 121:14 123:21

**statutes** 14:1

**statutorily** 109:17 138:2

**statutory** 110:2,4, 5,8 138:4

**stay** 92:18

**steps** 80:8

**streaming** 44:2 63:19

136:22 137:21 141:13,17 143:13, 17,23 144:1

**stretch** 97:6

**strike** 37:18 63:7 103:4 113:12

**strokes** 78:18

**structure** 95:9

**structured** 62:10 95:15

**subcommittee** 117:1 125:15

**subcommittees** 122:20

**subdivisions** 89:16

**submit** 37:22 74:16 75:6,9 106:24

**submits** 103:11, 19 104:14

**submitted** 105:16 107:17 134:5

**submitting** 37:19

**suggest** 15:11

**Suites** 131:7

**superior** 71:2

**supervise** 60:25 70:24

**supervises** 69:20

**supervision** 87:23 98:21

**supervisor** 98:8

**supervisory** 91:25 92:7

**supplemental** 98:17,19

**support** 35:24 44:5 46:10 47:5, 12,14 48:2,11 77:23 79:8 89:25 90:3,9,11,13,22 91:3,7,10,11,12, 15,16 92:5 93:2 94:16 101:10 118:8

**supports** 83:13

**supposed** 33:5, 21 74:21

**supreme** 7:6 10:23 12:16,18 22:22 29:23 30:1, 23 31:6,22 40:1, 12 41:3,4,17 42:14,18,19 43:14 49:1,4 50:21 51:21 52:14 54:24 55:13 56:5 62:22 65:15 73:15 76:8, 16,19 77:3,14 78:1 87:15,17,19, 21,25 89:22 91:7, 19,21,23 92:6 95:11,17,20 96:3 102:1,12 106:14, 23 107:13,16,21 108:7 140:2,4

**suspect** 143:8

**suspicion** 81:3

**suspicions** 92:12,13

**swing** 76:7

**sworn** 5:4,19

**system** 88:20,23 89:14,18 92:11 93:3 103:21

---

**T**

**table** 75:23

**takes** 40:13 49:12 86:13

**taking** 26:1 97:10

**talk** 24:14 27:4 44:5 49:15,20 61:17 70:12 79:19 105:12 108:24 114:3 118:25 122:19

**talked** 108:13 109:1 115:15 134:8,15

**talking** 16:15 19:11 22:1,2 30:16,18 38:21 45:3 60:15 68:22

Lexitas - TENNESSEE Sounds Reporting
(615)595-0073

72:9,12 82:16
97:15 107:9
108:16 110:12,19
111:4,8 120:3
134:12,18

**tame** 46:15

**Tarwater** 82:10
142:11,18 143:2

**task** 67:13

**Tate** 17:6,8 133:2,
4,22

**Taylor** 17:6,8
133:2,4,22

**TBA** 114:14
115:13,20,21
116:3,6,10,21
117:2,5,9 121:19,
21 123:9

**TCA** 15:2

**TCJFCJ** 109:25

**team** 60:25 64:9,
13,14,17 72:6
78:20 85:22 86:2,
11 98:9 111:24
114:6 116:7
122:15

**technically** 68:13
73:20

**Technology**
85:20,21

**telecommunicati
ons** 86:18,23,25

**telephone** 89:12,
13

**telling** 80:9

**temporarily**
36:14,20

**ten** 97:7

**Tennessee** 7:4,6,
12 9:10,18,23
10:4,22 12:13,17
17:9,14 18:1,7
19:17 22:22,25
24:4 25:5 26:15
27:7,17 29:23
30:3 31:22 33:20
35:5 40:19 41:3,4,

16 42:14,17,18,19
43:1,14 44:13
46:1,3 49:1,3
50:21 51:21
52:14,21 56:4
62:10,18 63:3,9
65:15 66:11,14,17
76:2,8,16,19 77:3,
14,20 78:1,2,11
88:8 89:17 91:7,
21,23,24 92:6,10
94:16 96:7,15
97:17 102:12
103:21 106:14
109:1,18,21,24,25
111:9,15 114:16,
18,22,24,25
115:1,17,22
116:13,15 123:10
132:9

**Tennessee's**
95:10

**term** 41:20 42:24
66:6,7,8 67:12
84:6 109:12

**terms** 17:21 19:20
41:15 61:5 93:1
95:10 105:1 125:5
129:18

**testified** 5:4
57:18 59:13 96:5
99:17 104:2
127:17 142:14

**testify** 119:16

**testimony** 20:20
55:10 73:22 76:5
79:11,13 85:11
87:3

**thing** 71:7

**things** 11:4 14:24
16:19 40:22 74:11
93:10,15

**thought** 86:22
97:9 99:17 108:13

**threatened**
131:9,12

**time** 6:6 8:10
15:15,17 16:22
17:15 18:1 19:6
20:20 23:8,18
25:11 28:14 29:19

34:10 37:13,16
40:4 54:13,24
60:24 73:17 75:4
96:20 103:15
105:25 108:10
113:9 119:25
128:5

**times** 37:4 40:7
46:25 65:14 68:11
118:4 119:21
120:1,4,5 123:14,
16 126:1

**timing** 74:11

**title** 28:19 89:10
104:22 111:1

**TJC** 111:14,18,22,
25 112:5,9,18,21,
24 113:5,15,19
114:6,10,19,23
115:5 116:7
117:15,18 118:2,
3,4,15,25 119:4,9,
21 120:1,3,5
121:3,14 122:6,8,
9,17 123:1,2,15
124:1,12,14,24
125:1,5,7 126:15
127:8,11,16,21
128:10,13,14
129:5 134:10,12,
22,24 136:2

**TLAW** 114:15
115:14 117:12

**today** 5:17,20,23
6:2 8:5 9:5,15
13:14 14:8 16:2
21:4 28:17

**today's** 111:12

**told** 16:22 81:4
98:17 142:21,24
143:2

**tool** 77:24 78:7

**tools** 88:21

**top** 78:10

**topic** 93:20,24

**topics** 118:15
125:21,25

**total** 122:4 124:15

**train** 97:9

**training** 88:2
122:1 125:10
135:3,4,6,7

**transcript** 143:19

**transmitted**
106:13 107:13

**transparent** 42:5
115:8

**transpired**
130:25

**travel** 118:20

**trial** 33:5 64:2
89:21 90:14
109:19

**trickle** 76:11

**trip** 14:8

**truthful** 6:4

**type** 72:16 87:12
94:15 110:20
123:9 131:20

**types** 48:19 49:6
84:6 113:22

**typically** 11:2
15:22 38:1,9
39:11 83:20 106:6
114:1 117:8,10
121:20 124:8
127:16

———————

**U**

**uh-huh** 7:20
27:15 38:23 43:10
82:18 83:9 107:15
109:4 115:18
139:19

**ultimate** 48:25
51:8,9

**ultimately** 85:2
86:15 87:6 125:23
135:25 140:12

**unclear** 119:8

**undergraduate**
11:22

**understand** 5:20

6:7,8,18 8:18 9:12 13:24 16:14 22:6 24:23 27:5 34:23 38:20 43:20 58:14 59:10 60:2 64:9 70:20,21 71:9 72:22 79:4 80:16 84:12 86:10 87:3 93:7 108:20 109:10 111:11 118:24 119:1,14, 20 136:17

**understanding** 10:10 13:13 16:10 29:24 30:19 31:1 32:3,24 33:7 53:8 61:22,25 63:12 66:9 72:21 74:4, 19 79:21,25 80:13 82:8 83:23 95:19, 24 96:1 100:6 103:12 105:14 106:8 107:5 108:22,23 113:5, 15 114:17 116:5

**understood** 6:19 8:18 16:18 20:19 30:22 42:1,8 60:8 61:10 70:16 81:12 82:24

**unified** 88:19 89:14 92:11 93:2, 14

**unique** 41:16

**United** 12:16,19 62:22

**University** 12:1

**unpack** 16:19 64:6

**upcoming** 83:6 125:25

---

**V**

**vacant** 9:2

**variety** 139:25

**vendor** 79:7

**vendors** 120:20 121:2 122:12 135:9,13

**venues** 118:17 120:16

**verbal** 34:16,18

**versus** 139:17

**video** 130:24

**videos** 131:3

**violation** 81:6 139:2

**virtual** 47:8 76:1 77:8

**virtually** 45:8

**vis-a-vis** 95:15

**voluntary** 115:23

**volunteer** 73:15 116:19 126:10,14

---

**W**

**W-I-R-T-H-L-I-N** 78:25

**waive** 143:17,23

**walked** 14:12

**wanted** 17:15 20:20 34:20 47:25 48:9,15 71:2 97:4 115:7

**watch** 63:3

**ways** 139:25

**web** 78:8

**Webinar** 44:2,5, 19 45:2,3,6,18 48:10

**website** 25:6 43:2,7,16,22 52:21 64:10 65:24 77:15,17,18,21 78:2,3,9,12,16 79:4,6 80:7 82:20 105:21 107:25 108:4 122:10

**weeks** 61:10

**Whichever** 53:20, 24

**Wirthlin** 78:19,24, 25 79:1

**woman** 116:23,25

**women** 114:16 116:14,16,21

**Women's** 123:10

**word** 29:2 43:19 76:7

**words** 109:7

**work** 7:1 9:18 46:20 84:25 93:11 109:17 111:23 118:12,13 136:18

**worked** 9:23 10:15,17

**working** 17:11 67:14 85:19 104:6

**works** 85:8 103:13 107:2 122:16

**world** 88:15

---

**Y**

**year** 11:20 12:11 15:6,8,13,14 18:12 21:1 23:25 28:16 37:4 38:18 40:7 79:12 83:6 94:25 103:15 117:13 118:4 119:4,22 120:1,4, 5,7 121:3 122:1,3 124:1,5,16 126:16,21 128:12 138:21

**years** 10:7 27:6, 10,18 46:14 75:16 85:14 89:2 126:17

**Young** 24:17

**Youtube** 63:8,13 64:9,18 68:22,25 75:13,15 76:15 103:24