# Exhibit

# 1

# McCALEB

## vs.

## LONG

---

# DAN MCCALEB

# October 13, 2023



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073|
tn.scheduling@lexitaslegal.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

DAN McCALEB, Executive Editor
of THE CENTER SQUARE,
          Plaintiff,

                          Case No. 3:22-cv-00439
vs.
                          Judge Richardson
MICHELLE LONG, in her
official capacity as       Magistrate Judge
DIRECTOR of the TENNESSEE   Frensley
ADMINISTRATIVE OFFICE OF
THE COURTS,
          Defendant.
_____




          Videoconference Deposition of:
          DAN McCALEB
          Taken on behalf of the Defendants
          October 13, 2023

          Commencing at 11:57 a.m.




_____
     Deborah H. Honeycutt, LCR, Associate Reporter
               Lexitas Legal TENNESSEE
               1015 Avery Park Circle
                Smyrna, TN 37167
                  (615)595-0073

A P P E A R A N C E S

For the Plaintiff:
          MR. M.E. BUCK DOUGHERTY III
          MR. JAMES McQUAID
          Attorneys at Law
          Liberty Justice Center
          440 N. Wells Street, Suite 200
          Chicago, Illinois 60654
          (312)637-2280
          bdougherty@libertyjusticecenter.org.
          jmcquaid@libertyjusticecenter.org


For the Defendants:

          MR. MICHAEL M. STAHL
          Attorney at Law
          Senior Assistant Attorney General
          P.O. Box 20207
          Nashville, Tennessee  37202-0207
          (615)253-5463
          michael.stahl@ag.tn.gov


Also present:

          MS. BRIDGET CONLAN, Liberty Justice Center

S T I P U L A T I O N S

The videoconference deposition of DAN McCALEB was taken by counsel for the Defendants, by Notice, with all participants appearing at their respective locations, on October 13, 2023, for all purposes under the Tennessee Rules of Civil Procedure.

All objections, except as to the form of the question, are reserved to the hearing, and said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding herein.

It is agreed that Deborah H. Honeycutt, Notary Public and Licensed Court Reporter for the State of Tennessee, may swear the witness remotely, and that the reading and signing of the completed deposition by the witness is waived.

* * *

THE REPORTER:  Good morning.  My name is Deborah Honeycutt.  I am a stenographic reporter with Lexitas Legal TENNESSEE.  My license number is 472.

Today's date is October 13, 2023, and the time is approximately 11:57 a.m. Central time.

This is the deposition of Dan McCaleb in the matter of Dan McCaleb, Executive Editor of The Center Square vs. Michelle Long, in her official capacity as Director of the Tennessee Administrative Office of the Courts, filed in the District Court for the Middle District of Tennessee, Nashville Division.  The Case Number is 3:22-cv-00439.

This deposition is being taken by videoconference, and the oath will be administered remotely by me.  Any digital exhibits marked during this deposition will be deemed as "original" for purposes of said deposition.

At this time, I will ask counsel to identify yourselves and state whom you represent. If you have any objections with the procedures I've outlined, please state so when you introduce yourself.  We will start with the noticing attorney.

MR. STAHL: Michael Stahl, representing Michelle Long, the defendant.

MR. DOUGHERTY: Buck Dougherty representing the plaintiff, Dan McCaleb. And just one objection for the record. I don't recall this being noticed as a video-recorded deposition which I believe is required under the Rules. We're going to reserve the right to raise that if it's to be recorded, but I just want to get that for the record.

THE REPORTER: I am recording that for my purposes only, Mr. Dougherty.

MR. DOUGHERTY: Thank you.

MR. McQUAID: And James McQuaid also for Plaintiff, Dan McCaleb.

* * *

DAN McCALEB was called as a witness, and after having been duly sworn, testified as follows:

EXAMINATION
QUESTIONS BY MR. STAHL:

Q. Okay. Mr. McCaleb, we'll begin. Can you state your name for the record.

A. Dan McCaleb.

Q. And you understand that you're under oath today, sir, right?

A. I do, yes.

Q. And are you represented by counsel?

A. I am.

Q. And who is that?

A. Liberty Justice Center, Buck Dougherty, Mr. Buck Dougherty, lead counsel.

Q. Okay. Thank you. Have you ever given a deposition or provided testimony in a court case before?

A. I gave one deposition many, many years ago, 18 or 19 years ago.

Q. What was that case? Do you remember?

A. The case name or number I don't remember. I remember some very few details but no.

Q. Well, let me just go over some procedures so that we are on the same page since it's been a while. The first is that if you can't hear me or you don't understand a question please let me know. It's really important that you understand the questions that I'm asking before you give your answer. So if that comes up, if there's technology issues because we're remote or whatever, just feel

free to let me know, please. If you don't understand something or need clarification, I can definitely help you with that. It's best if you let me finish my question before you start to give your answer for a couple of reasons. One, so that you know the question that I'm asking and then, two, so that the court reporter can be sure to get down what everyone is saying because if people start talking over each other, the transcript just gets a little bit messy.

In that vein, it's also important that you give verbal responses. So sometimes during depositions people will shake their heads or give uh-huh or huh-uh answers. And, again, that's hard for the transcript to reflect. So please do your best to give verbal responses.

If you need a break, that's perfectly fine. Just let me know. We can take a break. I don't think this will take all that long, but if at any time you feel like you need a break, that's perfectly fine. You can let me know or let your attorney know. The only thing that I ask is that if I have asked you a question already, that you answer that question before we go on break. Does that sound good?

A. Yes.

Q. Great. As far as your mental condition today, is there reason why you believe you can't give full and complete answers?

A. No.

Q. Are you under any medication or substances that would impair your ability to give honest testimony?

A. No.

Q. Have you talked with anyone in preparation for today's deposition?

A. My attorney.

Q. Anyone else?

A. No.

Q. Have you reviewed anything in preparation for today's deposition?

A. I have reviewed some of our filings, our amended lawsuit, and my declarations.

Q. And Buck mentioned before we went on the record that you didn't have anything with you today but I'll just ask again for the transcript. Did you bring anything with you today?

A. I brought printouts of what I just mentioned but I don't have them on me here, no.

Q. Okay. Let's just go through some

biographical information. What's your address?

A. My personal address is 726 Windsor Drive, Crystal Lake, Illinois.

Q. So you're a resident of Illinois then?

A. Yes.

Q. Do you have any other addresses in any other states?

A. No.

Q. Are you a resident of any other state?

A. No.

Q. What is your occupation?

A. Journalist.

Q. How long have you been doing that?

A. More than 30 years.

Q. Are you an independent journalist, or do you work for someone?

A. I work for The Center Square.

Q. Okay. And how long have you worked for them?

A. Since 2017, although we weren't known as The Center Square in 2017.

Q. What were you known as in 2017?

A. Illinois News Network.

Q. And when you say that you're now known as The Center Square, was that because you changed your business license or just the name or what

precipitated the change from the Illinois News Network to Center Square?

A. Well, in 2017 when I joined, we were covering just Illinois only. And then we expanded our coverage to across the country and Illinois News Network didn't work for Tennessee or Pennsylvania, for example.

Q. Okay. Before you worked for Illinois News Network, where did you work?

A. I worked for Shaw Media.

Q. Was that also in Tennessee -- or in Illinois?

A. Yes, Illinois. I was in Illinois. Illinois and Iowa, yes.

Q. All right. Do you know why we are here today?

A. Yes.

Q. What is your understanding of why we're here today?

A. I am giving a deposition in a lawsuit against Defendant Michelle Long.

Q. And what is the purpose of that lawsuit?

A. To open up the Bench Bar Advisory Commission in Tennessee to public scrutiny, essentially.

Q. When you say public scrutiny, are you limiting that to press or is it your understanding

that this lawsuit would apply to the entirety of the public?

A. The press and the public.

Q. Okay. The caption in the lawsuit says that you are the plaintiff as executive editor of The Center Square. So is it your understanding that you are filing this suit as a private citizen or as a member of the press?

A. As a member of the press.

Q. Have you reviewed all the pleadings in this case?

A. Yes.

Q. Do you agree with everything that's been filed on your behalf?

A. Yes.

Q. Why did you initiate this lawsuit?

A. As a 30-plus-year journalist I believe in open government. When I learned that this was closed, I asked the question, what are they hiding, as I would in any situation. So I looked into it further and thought it was appropriate to get the meetings open.

Q. When you say you learned that they were closed, how did you learn that they were closed?

A. I think my first information about it had to

do with Ms. Long's statement or a policy position that she put out that had to do with concerns about safety and security and closing -- was it the Tennessee Judicial Conference? I started looking into it after that.

Q. So you believe that you saw a policy from Michelle Long that indicated that the Tennessee Rules Advisory Commission on Practice and Procedure were closed to the public?

MR. DOUGHERTY: Object to the form of the question.

BY MR. STAHL:

Q. You can answer.

A. Okay. No. No. Initially it was the Tennessee Judicial Conference, I think is what the name of it is. I think it came from Michelle Long, yes.

Q. But that was a policy that you saw that indicated that the Judicial Conference was closed to members of the public?

A. I don't know if you'd call it a policy or a rule or whatever but the Judicial Conference was closed.

Q. Well, what would you call it?

A. I guess if they're acting on the policy, I'd

call it a rule that was put in place.

Q. And where did you see this rule?

A. On the Tennessee judicial website, tncourts.gov, I believe it is.

Q. When was the last time you saw this policy? Or the rule?

A. When I reviewed my filings, I believe.

Q. When did you review those filings?

A. Over the course of this week.

Q. So within the past week you saw a policy or a rule on the Tennessee Judicial website from Michelle Long that said the Tennessee Judicial Conference was closed to members of the public?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: I have reviewed a lot of documents in the past week, so I guess I can't state specifically. I definitely read something related to concerns over security and safety for members of the Tennessee Judicial Conference.

BY MR. STAHL:

Q. Was this lawsuit filed in the last week?

A. No.

Q. Do you remember when you filed this lawsuit?

A. June of 2022.

Q. Okay. So what caused you to believe prior to June of 2022 that the Tennessee Commission on the Rules of Practice and Procedure were closed to the public?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: I want to say it started with that, with -- with -- I'm sorry -- with the -- the policy or the rule from Ms. Long.

BY MR. STAHL:

Q. So, just to be clear, prior to June of 2022, you saw a policy or a rule on the Tennessee Judicial website from Ms. Long saying that the Tennessee Judicial Commission was closed to the public and you assumed that the Tennessee Rules of Practice and Procedure Commission was also closed to the public?

A. No, I did not assume that.

Q. So what made you file this lawsuit to open the meetings of the Tennessee Advisory Commission on the Rules of Practice and Procedure?

A. I started looking into it further and one of the things I recall saying is that this, semantics, you call it the Advisory Commission, Bench Bar Committee, that they were supposed to meet periodically. But I did not -- I couldn't find

anywhere on this judicial website any advisories of any meetings and so that drew more suspicion from me.

Q. Okay. So you said you looked into it further and you said that you didn't see any notices indicating that the Commission meetings were open to the public; is that right?

A. Correct. Or -- yes, correct. But if memory serves, I didn't even see any -- not just open to the public, but any schedules of meetings.

Q. Okay. And why does the lack of scheduled meetings indicate that meetings aren't open to the public?

A. Well, experience in 30 years of journalism. I have gone to a lot of government websites. I have attended a lot of government meetings. And if meetings are open to the public, there's generally supposed to be public notice.

Q. So you say generally. Does that mean there are instances when that's not the case?

A. The public meetings I think there needs to be public notice.

Q. So when there wasn't public notice that you could find about the Tennessee Commission on the Rules of Practice and Procedure, did you do anything

else to confirm that those meetings weren't open to the public?

A. Did I do anything else? I kept looking, kept digging, I think, kept investigating. In terms of specifics, I don't recall exactly what I did.

Q. Well, that's difficult for me to understand that you think you did stuff but you can't tell me what you did. So I've got to keep asking some questions about that. So you said you kept digging. What did that mean?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: I kept searching this particular website, and I think I went to the State of Tennessee's website, and I just kept looking, what's going on. I had the question what's going on here? Why are these meetings not -- why is there not public notices for these meetings? That's, essentially, it.

Q. Okay. So when you didn't see the public notice for the meetings, you continued to look for the public notice meetings on that website you visited and other state websites; is that fair?

A. Yes. Actually, I looked at the federal judiciary website and I noticed something very

similar to the Tennessee Bench Bar Committee and noticed that they were open as well. Or that they were open, excuse me, not as well.

Q. Okay. So after not finding a public notice for the Tennessee Advisory Rule Commission meetings, did you do anything else to confirm whether those meetings were open to the public?

A. I think I have answered the question. I kept looking. But yes, that was the end of it.

Q. Okay. Well, thinking you answer my question and answering my questions sometimes is different for different people. So I'm trying to get some good clarity on this.

You looked online for public notices of the Tennessee Advisory Commission meetings in multiple places; you couldn't find the meeting notices; and so you filed suit; is that right?

A. Yes, eventually.

Q. Did you ever call anyone and ask them, either in the state government or the Tennessee judiciary, about the public notice or lack thereof?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: Can you repeat it?

//

BY MR. STAHL:

Q. Did you ever call anyone in the Tennessee state government or the Tennessee judiciary to ask or confirm why you couldn't find a public notice for the Tennessee Commission meetings on Rules of Practice and Procedure?

A. Not that I recall, no.

Q. Did you email anyone asking that same question?

A. Within Tennessee state government, not that I recall, no.

Q. Have you ever been a named plaintiff before?

A. No.

Q. Have you ever been a named defendant before?

A. No.

Q. Your pleadings in this case indicate that you are the executive editor at The Center Square organization; is that right?

A. Yes.

Q. I think The Center Square website has you listed as vice president of news and content, though. Can you explain that discrepancy?

A. I am vice president of news and content for the Franklin News Foundation, which is the 501(c)(3) non-profit that publishes The Center Square, and

other things.

Q. So are you still an executive editor at Center Square?

A. Yes.

Q. And what does it mean to be an executive editor at The Center Square?

A. I am the top editor. I make final decisions on editorial judgment issues.

Q. Do you have a particular area that you work within for The Center Square in doing your editorial comments, meaning sports, politics, anything like that, or is it just general editorial purview?

A. We're focused on government news.

Q. Okay. How many employees are there at The Center Square?

A. I think we are at about 27 or 28 right now.

Q. Okay. And is that organization online only, or do they have a print or video arm?

A. We -- we do do some video. We are print only -- or, excuse me -- online only. We do not have a print arm.

Q. And you said that The Center Square was born out of the Illinois News Network in 2017; is that right?

A. I joined Illinois News Network in 2017. We

launched The Center Square in 2019.

Q. And was The Center Square a completely separate organization when you launched it or was it the same as the Illinois News Network under just a new name?

A. We folded Illinois News Network into The Center Square.

Q. Who hired you to The Center Square?

A. It's the same person who hired me to Illinois News Network. Chris Krug.

Q. And who is he? Is he the founder of The Center Square?

A. He is the president of the Franklin News Foundation which publishes The Center Square.

Q. Is The Center Square registered as a business in Tennessee?

A. I honestly don't know the answer to that question. Well, I think we have tax status. I think that's the best I can say.

Q. And what is the organizational structure between The Center Square and Franklin News?

A. The organizational structure, Franklin News is the 501(c)(3) nonprofit that publishes The Center Square. I do report up to the president of the Franklin News Foundation. We also have other

**Page 21**

separate websites that some of which that I'm directly involved in, that also go up to the Franklin News Foundation.

Q. Is the president of the Franklin News Foundation Chris Krug?

A. Correct, yes.

Q. Okay. To the best of your knowledge, is Franklin News registered as a business in Tennessee?

A. I don't know.

Q. Do you have the ability to hire and fire people as executive editor of The Center Square?

A. Yes.

Q. Do you decide what gets reported on?

A. Ultimately, if there is question about it, yes. But I don't get involved in every single daily news coverage decision.

Q. So maybe you can walk me through. How does a news article get published on The Center Square? Is it assigned by you to a reporter? Does someone come to you with an idea? How does that the process work?

A. It's a combination.

Q. A combination of what?

A. A combination of me or other editors assigning stories to reporters or reporters going up

**Page 22**

to editors saying I think we should cover this today. We have a daily ongoing what we call a news budget. Not a financial budget. A news budget. Here's the stories that we can work on and we have daily meetings to discuss the options.

Q. And do you give final approval on what gets approved for a story, meaning, what gets funded to investigate that story, or do you only give final approval for what gets printed on the website? How does that work?

A. We have 27, 28 staff on The Center Square. We publish, I don't know, anywhere in the neighborhood of 70 stories a day. I don't give final approval on every single story. More controversial stories, I might. If something comes to my attention, I'll say we need to go get that, but I do not give final approval on every single story. No, I couldn't possibly.

Q. Do you assign stories to reporters?

A. Yes.

Q. Did you assign anyone or have you ever assigned anyone to do a story or an article on the Tennessee Commission on the Rules of Practice and Procedure?

A. Not directly assign. I made staff aware of

**Page 23**

the lawsuit.

Q. Can you explain to me what you mean when you say you made them aware of the lawsuit?

A. I let staff know that we -- not me personally -- as the executive of The Center Square, we're filing a lawsuit.

Q. Prior to filing the lawsuit, had you ever edited or wrote an article about the Tennessee Commission on Rules of Practice and Procedure?

A. Me personally, no.

Q. Had you ever prior to the lawsuit assigned anyone to write an article or cover a story in some way about the Tennessee Commission on Rules of Practice and Procedure?

A. No.

Q. Have you written about this case online or anywhere in print?

A. Me personally?

Q. Yes.

A. No.

Q. Have you commented about this case in any video or audio platform?

A. No.

Q. Have you written any articles regarding public access under the First Amendment?

**Page 24**

A. Public access in general? Not specific to this case, I guess is what I'm asking?

Q. That's right.

A. Yes. I'm sure I have, plenty of times.

Q. Can you think of any of them?

A. Can I have a second or a moment to consider? Can you repeat the question first so I know what I'm considering?

Q. I am trying to figure out if you've ever written about the First Amendment's right to public access in any online forum or print forum or anything like that in general?

A. I'm sure I have. I would have to get back to you on that, though. In the moment nothing is immediately coming to mind.

Q. Okay. If the Advisory Commission on the Rules of Practice and Procedure in Tennessee were open to the public, would you attend those?

A. Me personally, no.

Q. Yes.

A. No. Me personally, I would not attend them in person. I'm in Chicago or the Chicago suburb. I'm in Illinois. I would not come attend them in person. I would certainly at least initially observe them if they were available via Zoom or a

Case 3:22-cv-00439    Document 74-1    Filed 12/15/23    Page 8 of 21 PageID #: 2662

Zoom-like platform.

Q.   So would you be satisfied with an electronic recording of the videos in terms of public access?

MR. DOUGHERTY:  Object to the form of the question.

THE WITNESS:  No.

BY MR. STAHL:

Q.   So you wouldn't attend them but you would expect them to be electronically recorded?

MR. DOUGHERTY:  Object to the form of the question.

THE WITNESS:  Live webcast, plus open to in-person observation.

BY MR. STAHL:

Q.   So you say recorded.

A.   I'm a little confused by when you use the term "recorded".

Q.   What about the term "recording" is confusing you?

A.   Well, you can live webcast a hearing and then put up a recording of the live webcast of the hearing at some point after the fact, or you can not live webcast it and then you can just put up a recording of it at some point after the fact.  So I just want to differentiate between the two.  Live

webcast is a term I'm using for actually seeing it as it's going on.

Q.   Okay.  So you have no intention of ever physically attending a Tennessee Commission meeting on the Rules of Practice and Procedure?

A.   Me personally?

Q.   Yes.

A.   No immediate intention, no.  I might happen to find myself needing to.

Q.   Would you expect to send someone to cover those meetings if they were open to the public?

MR. DOUGHERTY:  Object to the form of the question.

THE WITNESS:  Can you repeat the question?

BY MR. STAHL:

Q.   If the meetings were open to the public, would you as executive editor of The Center Square expect to send a reporter or someone on behalf of The Center Square to observe those meetings in person?

A.   That's very possible, yes.

Q.   Have you ever tried to do that before?

A.   Specific to this case?  No.

Q.   Okay.  Not specific to this case, but in your

time as editor of any organization, your 30 years of journalism as you put it, have you ever assigned anyone to attend the Tennessee Commission on Rules of Practice and Procedure in person?

A.   Not that I recall.

Q.   And, to be clear, you've never written anything about the Tennessee Rules of Practice and Procedure in your time as a journalist?

A.   Me personally?

Q.   Yes.

A.   No.

Q.   Do you host or contribute regularly to any podcasts?

A.   Yes.

Q.   What podcast is that?

A.   I'm on four podcasts.

Q.   Okay.  What are those?

A.   America in Focus.  Illinois in Focus. Wisconsin in Focus.  And Education in Focus.

Q.   Have you ever discussed the Tennessee Advisory Commission on Rules of Practice and Procedure in any of those podcasts?

A.   No.

Q.   What is heartlandernews.com?

A.   I don't know.

Q.   When you decided to file suit in this case, did you need anyone's permission to do that as executive editor of The Center Square?

MR. DOUGHERTY:  Object to the form of the question.

THE WITNESS:  No.  I alerted my publisher that we were going to do it, just for communication sake.

BY MR. STAHL:

Q.   When you say --

A.   Not permission.

Q.   -- your publisher, do you mean Chris Krug?

A.   Yes.

Q.   So you never spoke to him about the case prior to deciding to file?

A.   I don't recall.

Q.   Have you ever been to Tennessee, Mr. McCaleb?

A.   Yes.

Q.   And what did you come to Tennessee for?

A.   The last time I was in Tennessee was actually for a First Amendment conference.

Q.   When was that?

A.   2017 or 2018.

Q.   Have you ever attempted to attend any other Tennessee State Commission meetings other than the

Tennessee Commission on Rules of Practice and Procedure?

A. Me personally?

Q. Yes.

A. No.

Q. Have you ever sent any reporters on your behalf as an editor, either at The Center Square or as an editor at another journalistic platform, to Tennessee State Commission meetings other than the Tennessee meeting on Rules of Practice and Procedure?

A. So I got the first part. Tennessee Commission meetings or like any kind of Tennessee meetings, like legislative meetings, or be specific. Are you talking about the judiciary?

Q. I'm talking about Tennessee State Commission meetings, so any commission representing the State of Tennessee in any capacity.

A. I guess I'm a little confused by what you mean by commission. Would that include legislative-type of meetings or like committees of legislature, et cetera? I'm just trying to get a better understanding of what you're asking.

Q. Sure. No. I can appreciate that. Well, let me ask you this.

Are you aware of how many commissions there are in Tennessee under the Tennessee Supreme Court?

A. I know I have seen a number. I want to say it was between 15 and 20.

Q. Okay. So limiting my question to those 15 to 20 committees, have you sent anyone on your behalf or as an editor either at The Center Square or any other organization that you've ever worked for as a journalist to any of those other commission meetings except the Tennessee Commission on Rules of Practice and Procedure?

A. No. It wasn't until I realized that these meetings were closed that it piqued my curiosity.

Q. What piqued your curiosity?

A. When government to tries to close meetings, from my 30-plus years of experience, it piques my curiosity. What are they trying to hide, I ask myself.

Q. So any time that your learn of a government meeting that's not open to the public you file suit?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: No. I think this was my first lawsuit --

//

BY MR. STAHL:

Q. Okay.

A. -- on behalf of The Center Square.

Q. Well, now you just qualified it. Your first lawsuit on behalf of The Center Square. Does that mean --

A. No. My first lawsuit, yes.

Q. Okay.

A. I'm saying it's not me personally. But yeah. I have not filed any other lawsuits, here or in previous experiences.

Q. There was a June 9th, 2023 meeting of the Commission for the Tennessee Rules of Practice and Procedure that was recorded and placed on YouTube. Did you watch that?

A. I did.

Q. Have you ever served as member on any state board or commission in Tennessee?

A. No.

Q. What about Chicago or, rather, Illinois?

A. Like -- repeat the question specifically to Chicago or Illinois.

Q. Have you ever served as a member on any state board or commission in Illinois?

A. No.

Q. Do you believe that there is an access to justice crisis in Tennessee?

A. Problem, yes. Crisis, maybe so. That's, you know -- that's subjective, I guess.

Q. It is subjective. And I'm just asking for your opinion. What leads you to believe that there is an access to justice problem and/or crisis in your opinion?

A. If you were -- I guess, in terms of the data, there's plenty of people who don't have the means to hire an attorney to represent them. That would be true in Tennessee and many states across the country. I can't unequivocally say every state but certainly that is an issue.

Q. Do you have any data that's Tennessee specific to support that statement?

A. No specific data, no.

Q. Have you talked with anyone who is a Tennessee resident who has expressed to you that they have trouble hiring a lawyer in Tennessee?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: Who they personally had -- repeat the question. I'm sorry.

//

BY MR. STAHL:

Q. Have you ever talked with anyone who is a Tennessee resident who has expressed their difficulty in hiring a lawyer in Tennessee?

A. No.

Q. Do you know what a pro se litigant is, Mr. McCaleb?

A. Yes.

Q. Are you a pro se litigant?

A. No.

Q. In your opinion, does this suit involve the rights of pro se litigants?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: Go ahead and answer.

BY MR. STAHL:

Q. Yes, you can answer.

A. Yes.

Q. In what way?

A. Pro se litigants, more than maybe other litigants who have representation, have a more difficult time understanding, accessing, et cetera, with the court system. And by opening these meetings up to the public and a journalist to cover these meetings, they have a better opportunity to

understand the court system.

Q. Have you ever spoken with any Tennessee resident who has acted as a pro se litigant in a lawsuit?

A. No.

Q. Have you ever talked to a Tennessee resident who has expressed to you their desire to attend the Tennessee Commission on Rules of Practice and Procedure?

A. No.

Q. As a journalist and as someone who you mentioned attended a conference on the First Amendment, have you read the first amendment to the Constitution?

A. Yes.

Q. Why do you think that particular amendment requires the State of Tennessee to open its Advisory Commission meetings to the public?

A. Well, I'm not a lawyer. I'm not a constitutional lawyer. But as a 30-year journalist, you've learned some things here and there. And when policy decisions are being made that can affect a certain body or can affect the taxpayers and voters and general public, that general public should have access to those meetings in my experience.

Q. Where is that found in the First Amendment?

A. Again, I'm not a lawyer. I'm not a constitutional lawyer.

Q. I understand. And I don't really want to go back and forth on this, but I'm going to keep asking. You've read the First Amendment?

A. Yes.

Q. Right?

A. Yes.

Q. What part of the First Amendment supports your claim that the State of Tennessee is required to open its Advisory Commission meeting to the public?

A. They have a right to petition the government to access of the government. Again, that's the best I can do on that one.

Q. Are you familiar with the Tennessee Administrative Office of the Courts, otherwise referred to in these pleadings as the AOC?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: Yes. Yes. I know it as the TAOC but same thing I guess, yes.

BY MR. STAHL:

Q. Yes. That's what I'm talking about. So I'm

just going to ask you have you ever talked to any member of the TAOC?

A. No.

Q. We mentioned earlier that the TAOC website lists and I think you numbered 15 to 20 different commissions. Do you remember talking about that?

A. Yes. And that was an educated guess but yes.

Q. Sure. And it doesn't have to be perfect.

A. Yes.

Q. Do you have an opinion as to whether or not the Advisory Commission meetings are meaningfully different from the work being done in any of those other commissions?

MR. DOUGHERTY: I object to the form of the question.

THE WITNESS: Well, I've watched one of these Advisory Commission meetings. I have not watched any of the other ones, so I can't speak for the other ones.

BY MR. STAHL:

Q. If you learned that those other commission meetings were not open to the public, would you expect to file suit under the First Amendment to have those meetings open as well?

A. I guess it would depend on what the

committees are supposed to do. If they are setting policy or recommending policy for the courts to follow or for potential legislation then yes.

Q. How would you know if a committee was creating or recommending policy?

A. Well, I guess by digging into it, by asking questions. If memory serves, these committees in Tennessee mirror or very closely mirror the same committees in the federal judiciary. And looking into the -- I haven't done this so I can't speak to it, but the mirrored committee meeting at the federal level and its similar name at the state level, I guess you could assume, we don't like to assume, that it's doing something similar that the Federal Judiciary Committee has done.

Q. Okay. So I think we walked through this a little bit earlier. But I asked you what you had done to investigate the Tennessee Rules of Practice and Procedure Commission prior to filing suit to have those meetings open to the public.

And if I'm right, you hadn't attended any of those; you hadn't watched any of those; so how did you know that that committee was creating policy or recommending policy that would require that committee to be open to the public?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: The Advisory Commission, the Bench Bar Commission, is what you're referring to?

BY MR. STAHL:

Q. Yes.

A. I know what commission you're talking about. Please ask me the question again.

Q. Well, I'm trying to understand your earlier statement that you wouldn't necessarily file suit if you learn that a commission was not open to the public unless that commission was creating policy or recommending policy. And I'm trying to understand how you learned or what led you to believe that the Tennessee Commission on Rules of Practice and Procedure satisfied those terms, that it created policy or advised on policy.

A. I think just by this committee's name itself.

Q. So if a committee has a name that you think indicates it creates policy or recommends policy, you automatically believe that that meeting should be open to the public under the First Amendment?

A. Yes.

Q. Do you know if the federal analog to the

Tennessee Rules of Practice and Procedure, the Federal Rules Advisory Commission, live stream their meetings?

A. If you look under the federal version of the Tennessee Commission.

Q. Yes.

A. I guess I honestly, I'm not positive, but I think they do. But that's -- I have not watched one, a live committee meeting of the Federal Policy Committee.

Q. Have you ever attempted to watch one, done a search for it on the YouTube or on the federal websites?

A. I did do searches on the federal websites. And I seem to recall -- I can't say specifically that they were live webcasts but I do recall seeing some either YouTube video or some video of the conference meetings.

Q. If you were to learn that the Federal Advisory Commission doesn't live stream their meetings but records them and puts them on a platform such as YouTube after the fact, would that change your opinion as to whether the Tennessee Commission on Rules of Practice and Procedure could do the same?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: No.

BY MR. STAHL:

Q. So if the Federal Advisory Commission were electronically recording their meetings and putting them on a platform after the fact, not live streaming them, would you file suit under the First Amendment to have them open their meeting to the public?

MR. DOUGHERTY: Object to the form of the question.

THE WITNESS: I'd think long and hard about it, yes.

BY MR. STAHL:

Q. Did you review your expert's opinion in this case, Mr. Barton?

A. I was on the live stream of his deposition. I did get distracted at times, so I can't say I heard every single word from start to finish, but I heard large chunks of it.

Q. There was a portion, a statement made in that opinion, that said the Tennessee Rules of Procedure have a direct effect on every citizen in the state of Tennessee. Do you agree with that statement?

A.   I'm sorry, I'm going to have to ask you to repeat it one more time.

Q.   Mr. Barton's opinion made a statement that the Tennessee Rules of Procedure have a direct effect on every citizen in the state of Tennessee and I was just wondering if you agree with that statement?

A.   I can't say one way or the other.  I think it has a direct effect on many people in the state of Tennessee.  I would need to probably hear arguments for and against to say whether or not I agreed with that 100 percent.

Q.   Do you believe that the Tennessee Rules of Procedure affect you as a citizen of Illinois?

A.   Only insomuch as governments close meetings, if no one challenge that, more governments will close meetings.  And so it could yes, indirectly, yes.

Q.   Well, I don't mean the meetings.  I mean the actual Tennessee Rules of Procedure for filing a suit, if you're a citizen of Tennessee and you're involved in the court system, the Tennessee Rules of Procedure would apply to you.

But would they apply to you, Mr. McCaleb, as a citizen of Illinois?

A.   Not that I'm aware of.

Q.   Who is John Styf?  And I may not be saying that last name right, S-t-y-f.

A.   Styf.

Q.   Styf.  Who is Mr. John Styf?

A.   He is a reporter for The Center Square.

Q.   How do you know him?

A.   He is an employee of mine.

Q.   Does he report to you?

A.   Up through the chain.  I'm not his direct supervisor.

Q.   Have you ever had conversations with him?

A.   Yes.  I'm in meetings every day with him and the whole staff, yes.

Q.   Have you ever discussed this case with him?

A.   I made him aware of the case, and I made him aware of the court's ruling back in March.

Q.   So to your best recollection, has he written anything about this case?

A.   Yes.

Q.   Did you provide any editorial comment about that?

MR. DOUGHERTY:  Object to the form of the question.

THE WITNESS:  I provided a statement

through -- I think it was through Liberty Justice Center.

BY MR. STAHL:

Q.   So prior to his publishing anything about this case, you wouldn't have edited anything that he would have written?

A.   About this case?

Q.   Yes.

A.   No.  I stepped aside.  I need -- because I am part of the case, I needed to recuse myself from the editing process.

Q.   Okay.  Do you know if Mr. Styf lives in Tennessee?

A.   He does not.

Q.   Who is J.D. Davidson?

A.   J.D. Davidson is John Styf's direct supervisor.

Q.   Does he live in Tennessee?

A.   No.

Q.   Are you aware of anything that Mr. Davidson might have written about this case?

A.   Not aware.  I don't think he has, but I can't say that for sure.

Q.   Who is Steve Wilson?

A.   Steve Wilson was John Styf's previous

supervisor.

Q.   So am I to assume that Mr. Wilson doesn't work at The Center Square anymore?

A.   No.  He does.  We went through a restructure.  We went through a restructure.

Q.   Okay.  Have you ever talked to Steve Wilson about this case?

A.   Only to confirm that he was, in fact, John Styf's supervisor when the lawsuit was filed.

Q.   Okay.  Is he a Tennessee citizen?

A.   No.

Q.   Has Mr. Wilson written about the case that you're aware of?

A.   Not that I'm aware of.  I don't think so.

Q.   Does Mr. Styf at your direction -- has he ever traveled to Tennessee to write or research a story?

MR. DOUGHERTY:  Object to the form of the question.

THE WITNESS:  I don't know the answer to that question.

BY MR. STAHL:

Q.   So is it possible that you would have directed him --

A.   I'm sorry.  I didn't -- no.  No, I have not.

I did not direct him.

Q.   Okay.  Just one more question I think, Mr. McCaleb.

Have you ever been convicted of a felony?

A.   No.

MR. STAHL:  Okay.  Buck, why don't you go ahead and if I've got anything else I'll do it at the end, but I think I'm done for now.

MR. DOUGHERTY:  Okay.  Thank you, Mike.

EXAMINATION

QUESTIONS BY MR. DOUGHERTY:

Q.   Mr. McCaleb, there was a line of questioning that Mr. Stahl asked you about Advisory Commission being recorded versus live stream.  Do you recall that line of questioning?

A.   Yes.

Q.   Would you assign any of your reporters to cover Advisory Commission meetings if they were open to the public?

A.   Yes, particularly in this case.

Q.   Is it important as part of your lawsuit that meetings be open contemporaneously to the public when they are actually occurring?

A.   Yes.

Q.   And then just to follow up, you talked about at the end there on some of the questioning when Mr. Styf wrote about this case.  Do you recall that?

A.   Yes, this case, this lawsuit.  Yes.

Q.   Mr. Stahl asked you some questions.  And so the comments that you did give to Mr. Styf about this case, were they in your capacity as the plaintiff?

A.   Yes.

Q.   And when you say you felt you needed to recuse yourself, by that did you mean you didn't then give a comment and then have editorial control over the story itself; is that correct?

A.   I did not.  It was the reporters and the reporters' editors' decision whether to include the statement, the full statement, partial statement, not include it at all.

Q.   Is that kind of part of the normal journalistic code of ethics --

A.   Yes.

Q.   -- since you're pretty involved in the story that your news agency is reporting on, you kind of stay out of the editorial process?

A.   Yes.

MR. DOUGHERTY:  I don't have anything

further, Mike.

EXAMINATION

QUESTIONS BY MR. STAHL:

Q.   Just one more question, Mr. McCaleb.

Have you ever been hired to give an expert opinion for any reason in any lawsuit?

A.   No.

MR. STAHL:  Well, that's all I have.

MR. DOUGHERTY:  All right.  I guess we can go off the record.  We'll take a copy of the transcript whenever you can get it.  And really appreciate you-all's help for covering these.

* * *

THE REPORTER:  Mr. Stahl, you are ordering this transcript?

MR. STAHL:  Yes, please.

THE REPORTER:  Reading and signing?

MR. DOUGHERTY:  We'll waive the signing.  You have an opportunity to look through your transcript and then sign if everything is fine, but I think it's fine to waive.

THE WITNESS:  I'm okay with waiving.

FURTHER DEPONENT SAITH NOT

(Proceedings concluded at 1:01 p.m.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF DAVIDSON

I, Deborah H. Honeycutt, Licensed Court Reporter, with offices in Hermitage, Tennessee, hereby certify that I reported the foregoing videoconference deposition of DAN McCALEB by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me.  I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature, and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

Deborah H. Honeycutt, LCR
Licensed Court Reporter
Notary Public State of Tennessee

My Notary Public Commission Expires: 07/09/24
LCR # 472 - Expires: June 30, 2024

**1**

**100** 41:12

**11:57** 4:8

**13** 4:7

**15** 30:4,5 36:5

**18** 6:14

**19** 6:14

**1:01** 47:25

**2**

**20** 30:4,6 36:5

**2017** 9:19,20,21 10:3
19:23,25 28:23

**2018** 28:23

**2019** 20:1

**2022** 13:25 14:2,11

**2023** 4:7 31:12

**27** 19:16 22:11

**28** 19:16 22:11

**3**

**30** 9:14 15:14 27:1

**30-plus** 30:16

**30-plus-year** 11:17

**30-year** 34:20

**3:22-cv-00439** 4:15

**4**

**472** 4:6

**5**

**501(c)(3)** 18:24 20:23

**7**

**70** 22:13

**726** 9:2

**9**

**9th** 31:12

**A**

**a.m.** 4:8

**ability** 8:7 21:10

**access** 23:25 24:1,11
25:3 32:1,7 34:25 35:15

**accessing** 33:22

**acted** 34:3

**acting** 12:25

**actual** 41:20

**address** 9:1,2

**addresses** 9:6

**administered** 4:17

**Administrative** 4:12
35:18

**advised** 38:18

**advisories** 15:1

**Advisory** 10:22 12:8
14:19,23 17:5,15 24:16
27:21 34:17 35:12 36:11,
17 38:3 39:2,20 40:5
45:14,19

**affect** 34:22,23 41:14

**agency** 46:22

**agree** 11:13 40:25 41:6

**agreed** 41:11

**ahead** 33:15 45:7

**alerted** 28:6

**amended** 8:18

**amendment** 23:25
28:21 34:13,16 35:1,6,10
36:23 38:23 40:9

**Amendment's** 24:10

**America** 27:18

**analog** 38:25

**and/or** 32:7

**answering** 17:11

**answers** 7:14 8:4

**anymore** 44:3

**anyone's** 28:2

**AOC** 35:19

**apply** 11:1 41:23,24

**approval** 22:6,9,14,17

**approved** 22:7

**approximately** 4:8

**area** 19:9

**arguments** 41:10

**arm** 19:18,21

**article** 21:18 22:22 23:8,
12

**articles** 23:24

**assign** 22:19,21,25
45:18

**assigned** 21:19 22:22
23:11 27:2

**assigning** 21:25

**assume** 14:17 37:13,14
44:2

**assumed** 14:15

**attempted** 28:24 39:11

**attend** 24:18,21,23 25:8
27:3 28:24 34:7

**attended** 15:16 34:12
37:21

**attending** 26:4

**attention** 22:16

**attorney** 4:25 7:22 8:12
32:11

**audio** 23:22

**automatically** 38:22

**aware** 22:25 23:3 30:1
42:1,16,17 43:20,22
44:13,14

**B**

**back** 24:13 35:5 42:17

**Bar** 10:22 14:23 17:1
38:4

**Barton** 40:17

**Barton's** 41:3

**begin** 5:24

**behalf** 11:14 26:19 29:7
30:6 31:3,5

**Bench** 10:22 14:23 17:1
38:4

**biographical** 9:1

**bit** 7:10 37:17

**board** 31:18,24

**body** 34:23

**born** 19:22

**break** 7:17,18,20,24

**bring** 8:22

**brought** 8:23

**Buck** 5:3 6:8,9 8:19 45:6

**budget** 22:3

**business** 9:25 20:15
21:8

**C**

**call** 12:21,24 13:1 14:23
17:19 18:2 22:2

**called** 5:19

**capacity** 4:12 29:18 46:7

**caption** 11:4

**case** 4:15 6:11,15,16
11:11 15:20 18:16 23:16,
21 24:2 26:24,25 28:1,14
40:17 42:15,16,19 43:5,
7,10,21 44:7,12 45:21
46:3,4,7

**caused** 14:1

**Center** 4:11 6:8 9:17,20,
24 10:2 11:6 18:17,20,25
19:3,6,10,15,22 20:1,2,7,
8,12,14,15,21,23 21:11,
18 22:11 23:5 26:18,20
28:3 29:7 30:7 31:3,5
42:6 43:2 44:3

**Central** 4:8

**cetera** 29:22 33:22

**chain** 42:10

*Lexitas — TENNESSEE*
(615)595-0073
*Index: 100..chain1*

challenge 41:16

change 10:1 39:23

changed 9:24

Chicago 24:22 31:20,22

Chris 20:10 21:5 28:12

chunks 40:21

citizen 11:7 40:24 41:5, 14,21,25 44:10

claim 35:11

clarification 7:2

clarity 17:13

clear 14:11 27:6

close 30:15 41:15,17

closed 11:19,24 12:9,19, 23 13:13 14:3,14,16 30:13

closely 37:8

closing 12:3

code 46:19

combination 21:22,23, 24

comment 42:21 46:12

commented 23:21

comments 19:11 46:6

commission 10:22 12:8 14:2,14,16,19,23 15:6,24 17:5,15 18:5 22:23 23:9, 13 24:16 26:4 27:3,21 28:25 29:1,9,13,16,17,20 30:9,10 31:13,18,24 34:8,18 35:12 36:11,17, 21 37:19 38:3,4,8,12,13, 16 39:2,5,20,24 40:5 45:14,19

commissions 30:1 36:6,13

committee 14:24 17:1 37:4,11,15,23,25 38:20 39:9,10

committee's 38:19

committees 29:21 30:6 37:1,7,9

communication 28:8

complete 8:4

completely 20:2

concerns 12:2 13:19

concluded 47:25

condition 8:2

conference 12:4,15,19, 22 13:12,20 28:21 34:12 39:18

confirm 16:1 17:6 18:4 44:8

confused 25:16 29:19

confusing 25:18

Constitution 34:14

constitutional 34:20 35:3

contemporaneously 45:23

content 18:21,23

continued 16:21

contribute 27:12

control 46:12

controversial 22:15

conversations 42:12

convicted 45:4

copy 47:11

correct 15:8 21:6 46:13

counsel 4:21 6:5,9

country 10:5 32:13

couple 7:5

court 4:13 6:11 7:7 30:2 33:23 34:1 41:22

court's 42:17

courts 4:13 35:18 37:2

cover 22:1 23:12 26:10 33:24 45:19

coverage 10:5 21:16

covering 10:3 47:13

created 38:17

creates 38:21

creating 37:5,23 38:13

crisis 32:2,3,7

Crystal 9:3

curiosity 30:13,14,17

---

**D**

---

daily 21:15 22:2,5

Dan 4:9,10 5:4,15,18 6:1

data 32:9,15,17

date 4:7

Davidson 43:15,16,20

day 22:13 42:13

Deborah 4:4

decide 21:13

decided 28:1

deciding 28:15

decision 21:16 46:15

decisions 19:7 34:22

declarations 8:18

deemed 4:19

defendant 5:2 10:20 18:14

depend 36:25

DEPONENT 47:24

deposition 4:9,16,19,20 5:6 6:11,13 8:11,16 10:19 40:18

depositions 7:13

desire 34:7

details 6:17

differentiate 25:25

difficult 16:6 33:22

difficulty 33:4

digging 16:4,9 37:6

digital 4:18

direct 40:24 41:4,9 42:10 43:16 45:1

directed 44:24

direction 44:15

directly 21:2 22:25

Director 4:12

discrepancy 18:22

discuss 22:5

discussed 27:20 42:15

distracted 40:19

District 4:13,14

Division 4:15

documents 13:17

Dougherty 5:3,12,13 6:8,9 12:10 13:14 14:5 16:11 17:22 25:4,10 26:12 28:4 30:21 32:21 33:13 35:20 36:14 38:1 40:1,11 42:23 44:18 45:9,12 46:25 47:10,19

drew 15:2

Drive 9:2

duly 5:19

---

**E**

---

earlier 36:4 37:17 38:10

edited 23:8 43:5

editing 43:11

editor 4:10 11:5 18:17 19:2,6,7 21:11 26:18 27:1 28:3 29:7,8 30:7

editorial 19:8,10,12 42:21 46:12,23

editors 21:24 22:1

editors' 46:15

educated 36:7

Education 27:19

effect 40:24 41:5,9

electronic 25:2

electronically 25:9 40:6

email 18:8

employee 42:8

employees 19:14

end 17:9 45:8 46:2

entirety 11:1

*Lexitas - TENNESSEE*    Index: challenge..entiretyi2
(615)595-0073

**essentially** 10:23 16:19

**ethics** 46:19

**eventually** 17:18

**EXAMINATION** 5:22 45:11 47:3

**excuse** 17:3 19:20

**executive** 4:10 11:5 18:17 19:2,5 21:11 23:5 26:18 28:3

**exhibits** 4:18

**expanded** 10:4

**expect** 25:9 26:10,19 36:23

**experience** 15:14 30:16 34:25

**experiences** 31:11

**expert** 47:6

**expert's** 40:16

**explain** 18:22 23:2

**expressed** 32:19 33:3 34:7

---

**F**

**fact** 25:22,24 39:22 40:7 44:8

**fair** 16:23

**familiar** 35:17

**federal** 16:24 37:9,12,15 38:25 39:2,4,9,12,14,19 40:5

**feel** 6:25 7:20

**felony** 45:4

**felt** 46:10

**figure** 24:9

**file** 14:18 28:1,15 30:20 36:23 38:11 40:8

**filed** 4:13 11:14 13:22,24 17:17 31:10 44:9

**filing** 11:7 23:6,7 37:19 41:20

**filings** 8:17 13:7,8

**final** 19:7 22:6,8,14,17

**financial** 22:3

**find** 14:25 15:24 17:16 18:4 26:9

**finding** 17:4

**fine** 7:17,21 47:21,22

**finish** 7:4 40:20

**fire** 21:10

**Focus** 27:18,19

**focused** 19:13

**folded** 20:6

**follow** 37:3 46:1

**form** 12:10 13:14 14:5 16:11 17:22 25:4,10 26:12 28:4 30:21 32:21 33:13 35:20 36:14 38:1 40:1,11 42:23 44:18

**forum** 24:11

**found** 35:1

**Foundation** 18:24 20:14,25 21:3,5

**founder** 20:11

**Franklin** 18:24 20:13,21, 22,25 21:3,4,8

**free** 7:1

**full** 8:4 46:16

**funded** 22:7

---

**G**

**gave** 6:13

**general** 19:12 24:1,12 34:24

**generally** 15:17,19

**give** 6:23 7:4,12,13,16 8:4,7 22:6,8,13,17 46:6, 12 47:6

**giving** 10:19

**good** 4:3 7:25 17:13

**government** 11:18 15:15,16 17:20 18:3,10 19:13 30:15,19 35:14,15

**governments** 41:15,16

**Great** 8:2

**guess** 12:25 13:17 24:2 29:19 32:4,9 35:23 36:7, 25 37:6,13 39:7 47:10

---

**H**

**happen** 26:8

**hard** 7:14 40:13

**heads** 7:13

**hear** 6:20 41:10

**heard** 40:20,21

**hearing** 25:20,22

**heartlandernews.com** 27:24

**hide** 30:17

**hiding** 11:19

**hire** 21:10 32:11

**hired** 20:8,9 47:6

**hiring** 32:20 33:4

**honest** 8:7

**honestly** 20:17 39:7

**Honeycutt** 4:4

**host** 27:12

**huh-uh** 7:14

---

**I**

**idea** 21:20

**identify** 4:22

**Illinois** 9:3,4,22 10:1,4,5, 8,11,12 19:23,25 20:4,6, 9 24:23 27:18 31:20,22, 24 41:14,25

**immediately** 24:15

**impair** 8:7

**important** 6:22 7:11 45:22

**in-person** 25:13

**include** 29:20 46:15,17

**independent** 9:15

**indicating** 15:6

**indirectly** 41:17

**information** 9:1 11:25

**initially** 12:14 24:24

**initiate** 11:16

**insomuch** 41:15

**instances** 15:20

**intention** 26:3,8

**introduce** 4:24

**investigate** 22:8 37:18

**investigating** 16:4

**involve** 33:11

**involved** 21:2,15 41:22 46:21

**Iowa** 10:13

**issue** 32:14

**issues** 6:25 19:8

---

**J**

**J.D.** 43:15,16

**James** 5:14

**John** 42:2,5 43:16,25 44:8

**joined** 10:3 19:25

**journalism** 15:14 27:2

**journalist** 9:12,15 11:17 27:8 30:9 33:24 34:11,20

**journalistic** 29:8 46:19

**judgment** 19:8

**judicial** 12:4,15,19,22 13:3,11,12,20 14:12,14 15:1

**judiciary** 16:25 17:20 18:3 29:15 37:9,15

**June** 13:25 14:2,11 31:12

**justice** 6:8 32:2,7 43:1

---

**K**

**kind** 29:13 46:18,22

*Lexitas - TENNESSEE*    *Index: essentially..kindi3*
*(615)595-0073*

**knowledge** 21:7

**Krug** 20:10 21:5 28:12

---

**L**

**lack** 15:11 17:21

**Lake** 9:3

**large** 40:21

**launched** 20:1,3

**lawsuit** 8:18 10:19,21 11:1,4,16 13:22,24 14:18 23:1,3,6,7,11 30:24 31:5, 7 34:4 44:9 45:22 46:4 47:7

**lawsuits** 31:10

**lawyer** 32:20 33:4 34:19, 20 35:2,3

**lead** 6:9

**leads** 32:6

**learn** 11:24 30:19 38:12 39:19

**learned** 11:18,23 34:21 36:21 38:15

**led** 38:15

**Legal** 4:5

**legislation** 37:3

**legislative** 29:14

**legislative-type** 29:21

**legislature** 29:22

**level** 37:12,13

**Lexitas** 4:5

**Liberty** 6:8 43:1

**license** 4:5 9:25

**limiting** 10:25 30:5

**listed** 18:21

**lists** 36:5

**litigant** 33:6,9 34:3

**litigants** 33:12,20,21

**live** 25:12,20,21,23,25 39:2,9,16,20 40:7,18 43:18 45:15

**lives** 43:12

**long** 4:11 5:2 7:19 9:13, 18 10:20 12:7,16 13:12 14:9,13 40:13

**Long's** 12:1

**looked** 11:20 15:4 16:24 17:14

**lot** 13:16 15:15,16

---

**M**

**made** 14:18 22:25 23:3 34:22 40:22 41:3 42:16

**make** 19:7

**March** 42:17

**marked** 4:18

**matter** 4:10

**Mccaleb** 4:9,10 5:4,15, 18,24 6:1 28:17 33:7 41:24 45:3,13 47:5

**Mcquaid** 5:14

**meaning** 19:11 22:7

**meaningfully** 36:11

**means** 32:10

**Media** 10:10

**medication** 8:6

**meet** 14:24

**meeting** 17:16 26:4 29:10 30:20 31:12 35:12 37:11 38:22 39:9 40:9

**meetings** 11:22 14:19 15:2,6,10,12,16,17,21 16:1,17,18,21,22 17:5,7, 15 18:5 22:5 26:11,17,20 28:25 29:9,13,14,17,21 30:9,13,15 33:24,25 34:18,25 36:11,17,22,24 37:20 39:3,18,21 40:6 41:15,17,19 42:13 45:19, 23

**member** 11:8,9 31:17,23 36:2

**members** 12:20 13:13, 19

**memory** 15:8 37:7

**mental** 8:2

**mentioned** 8:19,23 34:12 36:4

**messy** 7:10

**Michael** 5:1

**Michelle** 4:11 5:2 10:20 12:7,16 13:11

**Middle** 4:14

**Mike** 45:9 47:1

**mind** 24:15

**mine** 42:8

**mirror** 37:8

**mirrored** 37:11

**moment** 24:6,14

**morning** 4:3

**multiple** 17:15

---

**N**

**named** 18:12,14

**Nashville** 4:14

**necessarily** 38:11

**needed** 43:10 46:10

**needing** 26:9

**neighborhood** 22:13

**Network** 9:22 10:2,6,9 19:23,25 20:4,6,10

**news** 9:22 10:1,5,8 18:21,23,24 19:13,23,25 20:4,6,10,13,21,22,25 21:3,4,8,16,18 22:2,3 46:22

**non-profit** 18:25

**nonprofit** 20:23

**normal** 46:18

**notice** 15:18,22,23 16:21,22 17:4,21 18:4

**noticed** 5:6 16:25 17:2

**notices** 15:5 16:18 17:14,16

**noticing** 4:25

**number** 4:5,15 6:16 30:3

**numbered** 36:5

---

**O**

**oath** 4:17 6:2

**object** 12:10 13:14 14:5 16:11 17:22 25:4,10 26:12 28:4 30:21 32:21 33:13 35:20 36:14 38:1 40:1,11 42:23 44:18

**objection** 5:5

**objections** 4:23

**observation** 25:13

**observe** 24:25 26:20

**occupation** 9:11

**occurring** 45:24

**October** 4:7

**Office** 4:13 35:18

**official** 4:11

**ongoing** 22:2

**online** 17:14 19:17,20 23:16 24:11

**open** 10:22 11:18,22 14:18 15:6,9,12,17 16:1 17:2,3,7 24:18 25:12 26:11,17 30:20 34:17 35:12 36:22,24 37:20,25 38:12,23 40:9 45:19,23

**opening** 33:23

**opinion** 32:6,8 33:11 36:10 39:23 40:16,23 41:3 47:7

**opportunity** 33:25 47:20

**options** 22:5

**ordering** 47:16

**organization** 18:18 19:17 20:3 27:1 30:8

**organizational** 20:20,22

**original** 4:19

**outlined** 4:24

*Lexitas - TENNESSEE*
*(615)595-0073*

*Index: knowledge..outlinedi4*

**P**

**p.m.** 47:25

**part** 29:12 35:10 43:10 45:22 46:18

**partial** 46:16

**past** 13:10,17

**Pennsylvania** 10:6

**people** 7:8,13 17:12 21:11 32:10 41:9

**percent** 41:12

**perfect** 36:8

**perfectly** 7:17,21

**periodically** 14:25

**permission** 28:2,11

**person** 20:9 24:22,24 26:21 27:4

**personal** 9:2

**personally** 23:5,10,18 24:19,21 26:6 27:9 29:3 31:9 32:23

**petition** 35:14

**physically** 26:4

**piqued** 30:13,14

**piques** 30:16

**place** 13:1

**places** 17:16

**plaintiff** 5:4,15 11:5 18:12 46:8

**platform** 23:22 25:1 29:8 39:22 40:7

**pleadings** 11:10 18:16 35:19

**plenty** 24:4 32:10

**podcast** 27:15

**podcasts** 27:13,16,22

**point** 25:22,24

**policy** 12:1,6,18,21,25 13:5,10 14:9,12 34:22 37:2,5,23,24 38:13,14, 18,21 39:9

**politics** 19:11

**portion** 40:22

**position** 12:1

**positive** 39:7

**possibly** 22:18

**potential** 37:3

**Practice** 12:8 14:3,15,20 15:25 18:6 22:23 23:9,14 24:17 26:5 27:4,7,21 29:1,10 30:10 31:13 34:8 37:18 38:16 39:1,24

**precipitated** 10:1

**preparation** 8:10,15

**president** 18:21,23 20:13,24 21:4

**press** 10:25 11:3,8,9

**pretty** 46:21

**previous** 31:11 43:25

**print** 19:18,19,21 23:17 24:11

**printed** 22:9

**printouts** 8:23

**prior** 14:1,11 23:7,11 28:15 37:19 43:4

**private** 11:7

**pro** 33:6,9,12,20 34:3

**problem** 32:3,7

**Procedure** 12:8 14:3,16, 20 15:25 18:6 22:24 23:9,14 24:17 26:5 27:4, 8,22 29:2,11 30:11 31:14 34:9 37:19 38:17 39:1,24 40:23 41:4,14,20,23

**procedures** 4:23 6:18

**proceedings** 47:25

**process** 21:20 43:11 46:23

**provide** 42:21

**provided** 6:11 42:25

**public** 10:23,24 11:2,3 12:9,20 13:13 14:4,14,16 15:7,10,13,17,18,21,22, 23 16:2,18,20,22 17:4,7, 14,21 18:4 23:25 24:1,

10,18 25:3 26:11,17 30:20 33:24 34:18,24 35:13 36:22 37:20,25 38:13,23 40:10 45:20,23

**publish** 22:12

**published** 21:18

**publisher** 28:7,12

**publishes** 18:25 20:14, 23

**publishing** 43:4

**purpose** 10:21

**purposes** 4:20 5:12

**purview** 19:12

**put** 12:2 13:1 25:21,23 27:2

**puts** 39:21

**putting** 40:6

**Q**

**qualified** 31:4

**question** 6:21 7:4,6,23, 24 11:19 12:11 13:15 14:6 16:12,16 17:8,10,23 18:9 20:18 21:14 24:7 25:5,11 26:13,15 28:5 30:5,22 31:21 32:22,24 33:14 35:21 36:15 38:2,9 40:2,12 42:24 44:19,21 45:2 47:5

**questioning** 45:13,16 46:2

**questions** 5:23 6:23 16:9 17:11 37:7 45:12 46:5 47:4

**R**

**raise** 5:8

**read** 13:18 34:13 35:6

**Reading** 47:18

**realized** 30:12

**reason** 8:3 47:7

**reasons** 7:5

**recall** 5:5 14:22 16:5

18:7,11 27:5 28:16 39:15,16 45:15 46:3

**recollection** 42:18

**recommending** 37:2,5, 24 38:14

**recommends** 38:21

**record** 5:5,10,25 8:20 47:11

**recorded** 5:9 25:9,15,17 31:14 45:15

**recording** 5:11 25:3,18, 21,24 40:6

**records** 39:21

**recuse** 43:10 46:11

**referred** 35:19

**referring** 38:4

**reflect** 7:15

**registered** 20:15 21:8

**regularly** 27:12

**related** 13:18

**remember** 6:15,16,17 13:24 36:6

**remote** 6:25

**remotely** 4:18

**repeat** 17:24 24:7 26:14 31:21 32:24 41:2

**report** 20:24 42:9

**reported** 21:13

**reporter** 4:3,4 5:11 7:7 21:19 26:19 42:6 47:15, 18

**reporters** 21:25 22:19 29:6 45:18 46:14

**reporters'** 46:15

**reporting** 46:22

**represent** 4:22 32:11

**representation** 33:21

**represented** 6:5

**representing** 5:1,4 29:17

**require** 37:24

required 5:7 35:11

requires 34:17

research 44:16

reserve 5:8

resident 9:4,9 32:19 33:3 34:3,6

responses 7:12,16

restructure 44:4,5

review 13:8 40:16

reviewed 8:15,17 11:10 13:7,16

rights 33:12

rule 12:22 13:1,2,6,11 14:9,12 17:5

Rules 5:7 12:8 14:3,15, 20 15:25 18:5 22:23 23:9,13 24:17 26:5 27:3, 7,21 29:1,10 30:10 31:13 34:8 37:18 38:16 39:1,2, 24 40:23 41:4,13,20,22

ruling 42:17

## S

S-T-Y-F 42:3

safety 12:3 13:19

SAITH 47:24

sake 28:8

satisfied 25:2 38:17

scheduled 15:11

schedules 15:10

scrutiny 10:23,24

search 39:12

searches 39:14

searching 16:13

security 12:3 13:19

semantics 14:22

send 26:10,19

separate 20:3 21:1

served 31:17,23

serves 15:9 37:7

setting 37:1

shake 7:13

Shaw 10:10

sign 47:21

signing 47:18,19

similar 17:1 37:12,14

single 21:15 22:14,17 40:20

sir 6:3

situation 11:20

sound 7:25

speak 36:18 37:10

specific 24:1 26:24,25 29:14 32:16,17

specifically 13:18 31:21 39:15

specifics 16:5

spoke 28:14

spoken 34:2

sports 19:11

Square 4:11 9:17,20,24 10:2 11:6 18:17,20,25 19:3,6,10,15,22 20:1,2,7, 8,12,14,15,21,24 21:11, 18 22:11 23:5 26:18,20 28:3 29:7 30:7 31:3,5 42:6 44:3

staff 22:11,25 23:4 42:14

Stahl 5:1,23 12:12 13:21 14:10 18:1 25:7,14 26:16 28:9 31:1 33:1,16 35:24 36:20 38:6 40:4,15 43:3 44:22 45:6,14 46:5 47:4, 9,15,17

start 4:25 7:4,8 40:20

started 12:4 14:7,21

state 4:22,24 5:25 9:9 13:17 16:14,23 17:20 18:3,10 28:25 29:9,16,17 31:17,23 32:13 34:17 35:11 37:12 40:24 41:5,9

statement 12:1 32:16 38:11 40:22,25 41:3,7 42:25 46:16

states 9:7 32:12

status 20:18

stay 46:23

stenographic 4:4

stepped 43:9

Steve 43:24,25 44:6

stories 21:25 22:4,13,15, 19

story 22:7,8,14,18,22 23:12 44:17 46:13,21

stream 39:2,20 40:18 45:15

streaming 40:8

structure 20:20,22

stuff 16:7

Styf 42:2,4,5 43:12 44:15 46:3,6

Styf's 43:16,25 44:9

subjective 32:4,5

substances 8:6

suburb 24:22

suit 11:7 17:17 28:1 30:20 33:11 36:23 37:19 38:11 40:8 41:21

supervisor 42:11 43:17 44:1,9

support 32:16

supports 35:10

supposed 14:24 15:18 37:1

Supreme 30:2

suspicion 15:2

sworn 5:20

system 33:23 34:1 41:22

## T

talked 8:10 32:18 33:2 34:6 36:1 44:6 46:1

talking 7:8 29:15,16 35:25 36:6 38:8

TAOC 35:23 36:2,4

tax 20:18

taxpayers 34:23

technology 6:24

Tennessee 4:5,12,14 10:6,11,23 12:4,7,15 13:3,11,12,20 14:2,12, 13,15,19 15:24 17:1,5, 15,20 18:2,3,5,10 20:16 21:8 22:23 23:8,13 24:17 26:4 27:3,7,20 28:17,19, 20,25 29:1,9,10,12,13, 16,18 30:2,10 31:13,18 32:2,12,15,19,20 33:3,4 34:2,6,8,17 35:11,17 37:8,18 38:16 39:1,5,23 40:23,25 41:4,5,10,13, 20,21,22 43:13,18 44:10, 16

Tennessee's 16:15

term 25:17,18 26:1

terms 16:4 25:3 32:9 38:17

testified 5:20

testimony 6:11 8:8

thereof 17:21

thing 7:22 35:23

things 14:22 19:1 34:21

thinking 17:10

thought 11:21

time 4:8,21 7:20 13:5 27:1,8 28:20 30:19 33:22 41:2

times 24:4 40:19

tncourts.gov 13:4

today 6:3 8:3,20,22 10:15,18 22:2

today's 4:7 8:11,16

top 19:7

transcript 7:9,15 8:21 47:12,16,21

traveled 44:16

trouble 32:20

true 32:12

*Lexitas — TENNESSEE* *Index: required..truei6*
*(615)595-0073*

**U**

**uh-huh** 7:14

**Ultimately** 21:14

**understand** 6:2,21,22 7:2 16:6 34:1 35:4 38:10, 14

**understanding** 10:17, 25 11:6 29:23 33:22

**unequivocally** 32:13

**V**

**vein** 7:11

**verbal** 7:12,16

**version** 39:4

**versus** 45:15

**vice** 18:21,23

**video** 19:18,19 23:22 39:17

**video-recorded** 5:6

**videoconference** 4:17

**videos** 25:3

**visited** 16:23

**voters** 34:23

**W**

**waive** 47:19,22

**waiving** 47:23

**walk** 21:17

**walked** 37:16

**watch** 31:15 39:11

**watched** 36:16,18 37:22 39:8

**webcast** 25:12,20,21,23 26:1

**webcasts** 39:16

**website** 13:3,11 14:13 15:1 16:14,15,22,25 18:20 22:9 36:4

**websites** 15:15 16:23 21:1 39:13,14

**week** 13:9,10,17,22

**Wilson** 43:24,25 44:2,6, 12

**Windsor** 9:2

**Wisconsin** 27:19

**wondering** 41:6

**word** 40:20

**work** 9:16,17 10:6,9 19:9 21:21 22:4,10 36:12 44:3

**worked** 9:18 10:8,10 30:8

**write** 23:12 44:16

**written** 23:16,24 24:10 27:6 42:18 43:6,21 44:12

**wrote** 23:8 46:3

**Y**

**years** 6:13,14 9:14 15:14 27:1 30:16

**you-all's** 47:13

**Youtube** 31:14 39:12,17, 22

**Z**

**Zoom** 24:25

**Zoom-like** 25:1

Lexitas - TENNESSEE
(615)595-0073

Index: uh-huh..Zoom-likei7