# Exhibit

# 3

# McCALEB

# vs.

# LONG

## MICHELLE CONSIGLIO-YOUNG

## November 16, 2023



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073|
tn.scheduling@lexitaslegal.com

IN THE UNITED STATES DISTRICT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

DAN MCCALEB, Executive Editor
of THE CENTER SQUARE,

            Plaintiff,

vs.                          Case No. 3:22-cv-00439

MICHELLE LONG, in her official
capacity as DIRECTOR of the
TENNESSEE ADMINISTRATIVE OFFICE
OF THE COURTS,

            Defendant.

_____




        Deposition of:
        MICHELLE CONSIGLIO-YOUNG
        Taken on behalf of the Plaintiff
        November 16, 2023

        Commencing at 9:24 a.m. CST






_____
                Lexitas Legal
            Michelle Cessna, LCR, RPR
                (615)595-0073

**Page 2**

        A P P E A R A N C E S


For the Plaintiff:

        MR. M. E. BUCK DOUGHERTY, III
        Attorney at Law
        Liberty Justice Center
        440 N. Wells Street, Suite 200
        Chicago, IL 60654
        (312)637-2280
        bdougherty@libertyjusticecenter.org



For the Defendant:

        MR. MICHAEL M. STAHL
        Attorney at Law
        Office of the Attorney General
        PO Box 20207
        Nashville, TN 37202-0207
        (615)741-3491
        michael.stahl@ag.tn.gov



For the Administrative Office of the Courts:

        MR. JOHN COKE
        Attorney at Law
        Administrative Office of the Courts
        511 Union Street, Suite 600
        Nashville, TN 37219
        john.coke@tncourts.gov

**Page 3**

                I  N  D  E  X
                                              Page
Examination
By Mr. Dougherty                                5

Examination
By Mr. Stahl                                   73
Examination
By Mr. Dougherty                               81




            E X H I B I T S

                (None offered.)

**Page 4**

S T I P U L A T I O N S

        The deposition of MICHELLE CONSIGLIO-YOUNG was taken by counsel for the Plaintiff, at the offices of 500 Charlotte Avenue, Nashville, Tennessee, on November 16, 2023, for all purposes under the Tennessee Rules of Civil Procedure.

        All formalities as to caption, notice, statement of appearance, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing, and that said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding herein.

        It is agreed that MICHELLE CESSNA, LCR, RPR, and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are waived.

* * *

MICHELLE CONSIGLIO-YOUNG, was called as a witness, and having first been duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. DOUGHERTY:

Q. Good morning.

A. Good morning.

Q. Can you please state your name for the record?

A. Sure, my name is Michelle Consiglio-Young.

Q. And have you ever had your deposition taken before today?

A. No.

Q. Okay. And do you understand that you're under oath?

A. Yes, sir.

Q. Okay. And you're prepared to answer the questions that I ask of you today?

A. Yes, sir.

Q. Are you represented by counsel?

A. I am represented by the Attorney General's Office and our general counsel.

Q. Okay. And I know that we have Mr. Stahl. If you want to share his name on the record.

A. Oh, John Coke, our general counsel for the Administrative Office of the Courts.

Q. Thank you. And I probably should have mentioned that, you know, it's really important when you're giving a deposition that we -- we all get in habits, I do it myself, where we nod or give nonverbal kind of nodding our heads, so it's important that we give verbal statements so she can pick up everything. Okay?

A. I understand.

Q. And, you know, any time you need to take a break, we can do that. I don't anticipate this going, you know, all day, probably not. Half a day at the most. But if you do need a break, we can take it at any time. The only stipulation or caveat I would have is if I've already asked a question that you go ahead and answer it first before we take a break --

A. Sure.

Q. -- okay?

A. That's fine.

Q. All right. Where do you work?

A. I work at the Administrative Office of the Courts.

Q. And what is your position at the AOC?

A. I am a division director of the Intergovernmental Affairs Division within the Administrative Office of the Courts.

Q. And can you explain a little bit about the Intergovernmental Affairs Division, what do they do?

A. Sure. I oversee several programs within my division. One being legislative affairs for the Administrative Office of the Courts. Another being juvenile matters within the Administrative Office of the Courts. We have the three judge panel system within our division and also the Court Approvement Program is also within my division, which deals with juvenile matters.

Q. Okay. When did you start your position with the AOC?

A. I came to the AOC January of 2015.

Q. And what was your title or role in January of 2015?

A. It was assistant general counsel and legislative liaison.

Q. And then so did you get promoted or have

a different position after that?

A. Yes. I kind of gone up the -- the ranks, but yes, I got promoted -- gosh, what year was that? 2018? 2019? 2019, I believe.

Q. So what was your new position in 2019 with the AOC?

A. The director of the Intergovernmental Affairs Division, which was newly created in 2019.

Q. So that's your current position?

A. Correct.

Q. So you've been in that role approximately four years?

A. Yes.

Q. And you said that's a new position, so you're the first director of governmental affairs?

A. Yes.

Q. Okay. And when you were assistant general counsel from 2015 to 2019, who was the general counsel at that point?

A. When I first started it was David Haines. And then shortly thereafter Rachel Harmon joined the AOC and became it -- the general counsel.

Q. And now Ms. Harmon is the deputy director; is that right?

A. Correct.

Q. Who do you report directly to?

A. I report directly to Director Michelle Long.

Q. And do you have employees under you that report directly to you?

A. Yes.

Q. I mean, you don't have to give all their names unless there are only a couple. How many -- how many roughly do you have --

A. I have 11 total. But I have 3 supervisors that report directly to me, and it's -- there are 8 that report to their various supervisors.

Q. What are the three supervisors' names?

A. Charlie Baldwin, Stacy Lynch, and Stephanie Etheridge.

Q. Okay. So you don't report directly to Deputy Director Harmon and she doesn't report to you, correct?

A. Correct, I do not report to her directly.

Q. Before you came to the AOC in 2015, what type of work did you do before then?

A. I worked at the Attorney General's Office.

Q. In what capacity?

A. I was an assistant attorney general in the criminal division.

Q. How long were you in that role?

A. I was in that role two years.

Q. So that takes us back to, like -- about ten years to 2013, I guess?

A. Correct.

Q. Were you in private practice or did you do anything before your position with the Attorney General's Office?

A. Before that I clerked for the Court of Criminal Appeals for Judge Robert Wedemeyer.

Q. Okay.

A. And I had started that directly after law school, so...

Q. Well, let's go ahead and get into your education. That's a good segue.

So where is your undergraduate degree from and what year?

A. I graduated from Boston University in 2005.

Q. And then how about your JD?

A. I graduated from University of Tennessee College of Law in 2011.

Q. Okay. And what was the date of your first Bar admission?

A. November 2011.

Q. And that -- that's in Tennessee?

A. Correct.

Q. Are you admitted to any other state Bars?

A. No.

Q. How about any other court admissions that you might hold?

A. No. Just Tennessee.

Q. Okay. Have you ever been formally disciplined by the Tennessee State Bar licensing authority?

A. No.

Q. And have you ever been convicted of a crime?

A. No.

Q. Have you ever been a party to a lawsuit before?

A. No.

Q. Okay. You told us a little bit about your position as intergovernmental affairs. Can you kind of go into a little more detail,

kind of what you do and how that relates to your role on the Advisory Commission?

A. Sure. You know, I oversee the legislative process for the court system, which is mainly the role that correlates with the -- the Advisory Commission and why I'm the staff attorney/liaison for the AOC. And that is because the rules package must go through the legislative process to be approved. So it just made sense within our office when liaisons were changing to just add me to that so that I would be aware of what was going on through the Rules Commission and could carry that through the legislative process which is required by statute.

Q. So do you also report to anyone over in the legislative branch?

A. No.

Q. Okay. You're there and you're -- as I understand it, and correct me if I'm wrong, you're there to kind of facilitate the Advisory Commission and its rules package with the legislative body; is that right?

A. That's correct.

Q. And what does that look like -- and we'll

talk about meetings in a second. But what does that look like on a day-to-day basis? Do you have to have -- do you go to sessions, to legislative session? Do you have to testify? What does that look like?

A. When legislature's in session, I do attend daily on behalf of the court system to various committee meetings, meetings with legislators as requested and testimony as requested within the Legislative Committee meetings.

Q. Do they ever request testimony from you?

A. Yes.

Q. And have you given testimony before the legislative body?

A. Yes, on a number of different topics. It just varies depending on what's before the Committee and what is of interest to the legislators in that particular meeting.

Q. Is that -- are those transcripts available with the Tennessee legislative body somewhere?

A. Everything is filed online. They have a pretty extensive record of all of the Legislative Committees that occur within a

legislative session.

Q. Do you recall when the last time you gave any testimony before the legislature?

A. It was this past legislative session, which was in January. And that -- I guess the last time was fairly close to the end of session, which was in April of this past year.

Q. Is the legislative session -- what is it, January through what?

A. Typically it's through April or May. It just depends on when they -- how much business they have and when they want to adjourn. This past year ended in April.

Q. The testimony that you gave in April, was that related to the Advisory Commission?

A. No.

Q. What was that related to?

A. It was related to legislation that we sponsored, but -- that was filed within the legislature, but it was not related to the Rules Commission.

Q. When you say "we," are you referring to the AOC?

A. Yes, I'm sorry, the AOC.

Q. What type of legislation does the AOC

sponsor?

A. We -- it varies. There are various topics. A lot of times it has to do with various procedures perhaps within the AOC. The legislation that was the most talked about this past year was adding new judges, so we do file legislation requesting new judge positions when we deem that necessary. And that was the topic that I had testified on in April.

Q. And is that kind of in an advocacy role that you're advocating on behalf of the AOC that we need -- the AOC needs new judges and therefore you're making that request; is that how that works?

A. That's correct.

Q. Do you recall when the last time you gave testimony to the legislature about the Advisory Commission?

A. No. I -- I have not given testimony about the Advisory Commission in my recent memory.

Q. Do you know if any members of the Advisory Commission have ever given testimony before the legislature?

A. Typically it's the chair of the Advisory

Commission that will testify if requested; however, that request does not -- I don't believe in the past couple of legislative sessions that they've requested any testimony from any member of the Advisory Commission.

Q. And we'll come back, as I said, a little bit in a moment about -- we'll go more in depth about the Advisory Commission.

When did you first hear about the lawsuit that -- the reason you're here today to testify?

A. I don't recall the exact date, but it was after it had been filed and when the Attorney General's Office had notified our general counsel about it. Our general counsel had notified me and others within our office.

Q. So who would that have been? Would that --

A. John Coke.

Q. Okay. So you think that was fairly close in time after the lawsuit was filed?

A. Yes.

Q. When -- do you recall -- or let me ask: Are you aware that there's a preliminary injunction that was issued in this case?

A. Yes.

Q. When did you first become aware of the preliminary injunction?

A. I became aware when it was filed after -- when the AG's Office had sent it to notify our office.

Q. Did Director Long notify you of the preliminary injunction?

A. No. General Counsel John Coke did.

Q. And what was your understanding of the preliminary injunction at that point?

A. At that point it was that basically we needed to have a -- a public option for the next commission meeting that would occur, that we need to either make that available via livestream or in person.

Q. And by "public option" you mean public access, right?

A. Correct.

Q. Have you ever seen a copy of the preliminary injunction?

A. Yes.

Q. And was that when you were first notified of it when you got a copy?

A. Yes.

Q. Who provided you a copy of the preliminary injunction?

A. I believe that was our General Counsel John Coke.

Q. What was your understanding of the preliminary injunction in terms of who it applied to?

A. My understanding is that it would apply to the Commission as a whole, as well as our office and the parties to the -- to the lawsuit.

Q. Director Long, would it apply to Director Long?

A. Yes.

Q. So you would agree then it was a fairly broad preliminary injunction in terms of who it applied to?

MR. STAHL: Object to the form.

THE WITNESS: Could you restate that?

BY MR. DOUGHERTY:

Q. Yeah. I think you said, and I don't want to put words in your mouth, that -- you said -- well, let me just ask you this way: The preliminary injunction applied to the members of the Commission, right?

A. Yes.

Q. Did the preliminary injunction apply to Director Long?

MR. STAHL: Object to the form.

THE WITNESS: I'm not sure if it applies to her directly or it just with her connection as far as her role as the director of the Administrative Office of the Courts and how it's -- our Advisor Commission is overseen.

BY MR. DOUGHERTY:

Q. Did the preliminary --

A. -- in our office.

Q. I'm sorry, go ahead.

A. Just within our office.

Q. Did the preliminary injunction apply to AOC employees?

MR. STAHL: Object to the form.

THE WITNESS: As an employee of the AOC, we would follow the preliminary injunction requirements.

BY MR. DOUGHERTY:

Q. Did the preliminary injunction apply to the Tennessee Supreme Court justices?

MR. STAHL: Object to the form.

THE WITNESS: I'm -- I'm not sure.

BY MR. DOUGHERTY:

Q. Did the Tennessee preliminary -- excuse me, let me strike that question.

Did the preliminary injunction apply to Director Long's attorneys?

A. As far as the Attorney General's Office that who represents her, is that?

Q. Just in general, just attorneys?

A. I'm not sure if I can answer that.

Q. Okay. When's the last time you've read that preliminary injunction?

A. I -- I did review it this week.

Q. What other materials did you review in preparation for this deposition?

A. Just the preliminary injunction and the original filing of -- of the lawsuit.

Q. Did you review the first amended complaint?

A. Yes, uh-huh.

Q. Okay. All right. Are you familiar -- let's go ahead and deal with the Advisory Commission.

Are you familiar with the Advisory Commission on the rules of practice and procedure created by TCA 16-3-601?

A. Yes, sir.

Q. And are commission members typically listed on the AOC website?

A. Yes.

Q. Describe your role with the Advisory Commission.

A. Sure. My role is the AOC liaison to the Advisory Commission. It's -- primarily it's logistical responsibilities. Like I had said earlier, mostly so that there is a staff member of the AOC that is aware of the commission that can assist them in just various scheduling needs or other types of needs for the Commission, as well as making sure that that -- the ultimate rules package gets filed and is sought -- seen through the legislative process.

Q. Are you considered a member of the Advisory Commission?

A. No.

Q. So explain -- and you kind of talked about it -- what does a liaison do to the Advisory Commission? Which is what you are, right?

A. Yes, yes. Because the Advisory Commission is attached to the Commission of the Administrative Office of the Courts for the logistical needs and is appointed by the Tennessee Supreme Court, the liaison role just ensures that their work is -- that they are able to do their work as far as having meeting space and just other, you know, requests from the Commission to be supportive of the chair and the reporter and just to be in communication with them throughout the rules package process and then ultimately to take that and make sure it gets approved through the legislature.

Q. Do logistical needs include providing public access to any meetings?

A. It -- it includes what is required or what's needed for the Commission.

Q. If meetings were to be open, let's say for example, would a logistical need that you would provide in making sure that the public is notified of a meeting?

A. I would be sure that that -- that the -- whoever within our office that would need to be involved with that, that that would occur, yes.

Q. So it would occur through the AOC, right?

A. Yes.

Q. And you used the term "logistical needs." Is that kind of like -- is it fair to say that's kind of the administrative support?

A. Yes, that's what I was going to say, logistical administrative can be interchangeable.

Q. Okay. What is your understanding -- let's back up.

How long have you served as a liaison to the Advisory Commission?

A. I was trying to think back on that and it -- it was either sometime in 2016 or 2017 that I became the liaison for the -- the AOC with the Advisory Commission.

Q. And you started with the AOC in 2015?

A. Uh-huh.

Q. Do you recall --

A. Yes. Sorry, I didn't mean to --

Q. No, no, you're fine.

Do you recall who the -- when you joined in 2015, do you recall who the liaison at that time was for the AOC -- excuse me, for the Advisory Commission?

A. Yes, her name is Jeana Hendrix, and she was Assistant General Counsel with the AOC at the time.

Q. Do you recall when you joined in 2015 when Jeana Hendrix was the liaison, do you know if any Advisory Commission meetings were open to the public?

A. I don't recall specifically, but there were open meetings at that time, I believe. But I wasn't involved then, so I couldn't say definitively.

Q. So when you joined, you recall that there were open Advisory Commission meetings?

A. Yes.

Q. And explain, how do you recall that? What do you recall about those open meetings?

A. I don't recall specifics, it's -- I just recall my involvement as far as when the rules package was completed that I would then take it, you know, to the legislator -- to the legislature for that approval process. So I would sit in on meetings here and there just to have an understanding of the particular rules package for that year.

Q. So even before you became a liaison to the Advisory Commission you sat in on Advisory Commission meetings?

A. Yes.

Q. What years were -- were those?

A. 2015, 2016.

Q. Were -- and you say they were open to the public. Were they open to the public via livestreaming or in person, how did that work?

A. I don't recall specifically which method, because I was not the liaison at the time.

Q. Well, I mean, do you recall people from the public sitting around a conference room? I'm just trying to understand, do you recall anything like that?

A. I'm sorry, I just don't remember.

Q. Assuming that the -- well, you say those meetings were open to the public, right?

A. As far as I can recall, there were -- was an open option for the meetings.

Q. Do you ever recall seeing a public meeting notice in advance of one of those meetings that you attended?

A. I do recall some being on our website, but I couldn't tell you specifically which meeting.

Q. Sure. Would -- would Jeana Hendrix be the AOC person responsible for generating that

public meeting notice at that point?

A. I do not know if she specifically was the one responsible or if there was another person in the office at the time. I just couldn't tell you definitively.

Q. But definitely it would have been some AOC employee, right?

A. I believe it would have, but because it wasn't me at the time, I -- I can't tell you for sure.

Q. Was it announced at the meetings that you were at that were open to the public that it was open to the public? I mean, was there some kind of communication on the record, do you recall?

A. I don't recall, I'm sorry.

Q. Okay. Who was the chief justice in -- during this time period that you recall these open meetings, do you know? Do you recall who the chief justice was?

A. Justice Lee was the chief justice when I had started the AOC. And she was the chief justice for the first year, so that was there. I don't know if that answers your question.

Q. Okay. Did you recall who the chair was

at that point during those first years of your AOC employment?

A. I'm sorry, I just don't remember off the top of my head.

Q. So when you became the liaison, did Ms. Hendrix move on to something else? What did she do?

A. There was just a shift within our office of various roles and duties. And at the time I -- because I had taken on the legislative roles that there was just a -- a change made to put me in that liaison role and move her to other roles. But I couldn't say specifically what her roles were at that time.

Q. So let's fast forward a little bit. You go on the Advisory Commission. What year was that again, please?

A. It was either 2016 or 2017. I'm sorry I don't remember exactly.

Q. When you started in -- as the liaison on behalf of the AOC for the Advisory Commission, were meetings open at this point to the public?

A. Yes.

Q. Were you responsible for putting out any advanced public meeting notices?

A. It varied because of the various different people who worked in our office at the time. However, I did notify the communications division or if there was another -- I think it had been a paralegal at the time that had posted notices before. It just kind of varied based on the people at the office and what roles they were in, but I -- I would -- I do recall requesting, you know, the notice to be put on our website prior to meeting, yes.

Q. You did that as a liaison?

A. I would -- I told -- I would be sure to relay that information to those in our office who would post that information.

Q. And would -- who was the director of the AOC at that point?

A. It was Deborah Taylor Tate.

Q. And did you report directly to Ms. Tate?

A. At that time I reported to our general counsel, who then was Rachel Harmon. And then that was my direct -- my direct report was to her, so...

Q. So who assigned you to make sure that public meeting notices got posted? Was that Harmon or someone else?

A. It -- it was our General Counsel Rachel Harmon that made the changes of who would be the liaison to the Commission.

Q. Do you recall in those public meeting notices that was posted then was there ever a name of the AOC employee that was provided for the public to contact?

A. In the public meeting notices, them specifically I cannot recall that; however, on our website we do have and have consistently had the AOC liaison name on the commission page on our website.

Q. On the commission page of members?

A. Yes.

Q. Okay. In terms of public meeting notices, if one went out, let's say, five or ten years ago, would it still be on the AOC website?

A. That is more of an IT question. But if it -- if there were records kept of it, then yes, there would be a -- a record of the ones that were posted.

Q. Do you know how the Commission is appointed, the members?

A. I do. I know that they are appointed by

the Tennessee Supreme Court.

Q. And are there attorneys in private practice that are members of the Advisory Commission?

A. Yes.

Q. Are there government attorneys that are members of the Advisory Commission?

A. Yes.

Q. Are there law school faculty attorneys/attorneys that are members of the Advisory Commission?

A. Currently not members, but there -- there's a reporter.

Q. What is the reporter's role on the Advisory Commission?

A. The reporter keeps the official records of the Advisory Commission's business.

Q. And so, you as the liaison, try to help me distinguish your role from the reporter's role.

A. It -- I do not keep the minutes or the -- any record of what occurs in those meetings, that is up to the reporter. That's within the reporter's role.

My role is -- compared to the reporter is

purely administrative. Just to be sure that the reporter has any information as far as meeting space or Zoom links, access to the meeting for the members just to be sure that that reporter has the information that they need.

Q. Are there minutes -- are they ever posted publicly from the meetings?

A. Not to my knowledge.

Q. Where are they kept?

A. They are housed within the Tennessee Supreme Court building and they are -- there's electronic records. And I'm not sure if there are paper records still or not, but that was something that has -- a duty that's been within the Tennessee Supreme Court building with the Appellate Court clerk's office, I believe.

Q. When you say there are electronic records of minutes of the Advisory Commission, what do you mean?

A. Just the meeting records which would be their agendas, minutes, any attachments any proposals from the members. Those would be included in the -- in the records that -- for each Commission meeting.

Q. Have minutes been kept for every meeting since you've been liaison?

A. Yes.

Q. Is that a requirement in the statute or is that just practice?

A. I cannot recall if that is a statutory requirement, but it has been the practice.

Q. Okay. So even prior to you being a liaison, the meetings that you did attend, did you observe someone keeping minutes?

A. Yes, the -- there has always been a reporter of the Advisory Commission keeping minutes and other documentation.

Q. How is the reporter selected?

A. The reporter is selected by the Tennessee Supreme Court.

Q. Do the members -- like for example, let's say there's a meeting, do they look back at the proposed minutes and then approve them or how does that work? How do the minutes get approved?

A. The Commission approves the minutes from the prior meeting at wherever their current meeting is. So if they meet in June, they are approving the minutes of the March meeting.

Q. Okay. Are there members of the judiciary that are on the Commission?

A. They are not members, voting members, but they are liaisons for their particular court.

Q. What's a voting member?

A. They are not voting members.

Q. I understand. I'm just saying what is a voting member?

A. Oh, a voting member is the official members appointed by the Tennessee Supreme Court pursuant to their ability via statute to do that.

Q. When the Tennessee Supreme Court appoints someone, do they -- in an order, for example, do they say that they're a member or do they say that they're a voting member?

A. I don't recall. I would have to look at one of their orders to -- to say that specifically. I'm not sure.

Q. Does the statute make a distinction between a member of the Advisory Commission and a voting member?

A. I -- I do not know.

Q. And does the statute provide for the term of those members that are appointed? Are you

aware of how that works?

A. I would need to brush up on the statute language exactly, I can't recall.

Q. Okay. And so, does the Advisory Commission have regular meetings?

A. Yes.

Q. And during your experience as liaison, what's been the typical cadence of meetings each year?

A. It's quarterly.

Q. And was it quarterly in 2015 and 2016 prior to you becoming liaison?

A. As far as I can recall, yes.

Q. What -- and you say quarterly. Can you explain what that means?

A. Sure. At least recently and I do believe prior, say the Commission has a meeting, for example, March, June, September and December each year.

Q. And as the -- do you know how long that's been in practice, that March, June, September, December cadence?

A. It has varied slightly over the years. Sometimes it will be February rather than March and sometimes it will be May rather than June,

depending on the members' availability sometimes.

But as far as I can recall back to 2017, 2016, it was in that March, June, September vicinity. But like I said, it may be February, May. You know, just kind of depending.

Q. In 2022 did the Advisory Commission meet in March?

A. As far as I recall, yes. However, I would need to look to make sure that wasn't a meeting that, you know, got cancelled or that they didn't have.

Q. Did the Advisory Commission -- let's ask it a different way.

Did they have quarterly meetings in the calendar year 2022?

A. Yes.

Q. Did you attend all four of those 2022 meetings?

A. I believe I did. But to confirm, I would have to look at my calendar to be sure I didn't miss one. But I believe I was at all four of those. I'm typically at the meetings unless I'm scheduled out of town or there's another conflict. But I do try to make those priority.

Q. And to the best of your recollection, in 2022 were the four meetings in March, June, September and December?

A. Yes.

Q. And were the dates in 2022, was it the second Friday in March, June, September and December when they met?

A. Those were the dates -- that second Friday of the month was the date set by the chair. And unless there was some conflict, those would have been the dates that they met.

Q. So that -- you recall that would have been the case in 2022?

A. Yes.

Q. And was the chair in 2022 Mr. Bulso?

A. Yes, Gina Bulso.

Q. And in 2023, which is the year we're in --

A. Uh-huh.

Q. -- had there been quarterly meetings of the Advisory Commission?

A. There were -- I do know there was a March and a June meeting. And then I was out on maternity leave starting August.

Q. Did you attend the March 2023 Advisory

Commission meeting?

A. Yes.

Q. And was it open or closed to the public?

A. It was closed.

Q. And then the -- did you attend the June 2023 Advisory Commission meeting?

A. Yes.

Q. Was it open or closed to the public?

A. It was open.

Q. Why was it open?

A. It was open due to the preliminary injunction order.

Q. And do you recall seeing a public meeting notice in advance of that June meeting?

A. There was a public meeting notice that posted on our website, the AOC website.

Q. Is that public meeting notice still to the best of your recollection posted?

A. I believe it should still be there, yes.

Q. Is that -- did that public meeting notice, is that something that you kind of oversaw or how did that take place?

A. I did inform our communications division to post -- to one, create the link for the livestreaming for that meeting, as well as

posted on the website.

Q. Were any of the 2022 quarterly meetings open to the public?

A. They were not.

Q. Okay. And when did you go on maternity leave?

A. It was August 21st of this year.

Q. So was there a September Advisory Commission meeting of 2023?

A. I believe there was one scheduled, but I was not -- I was on leave when it was scheduled to occur.

Q. Do you know if that meeting occurred or not?

A. I believe it did not occur.

Q. And do you know why it didn't occur?

A. I don't.

Q. Did anyone inform you that -- that it didn't occur because they weren't able to get out a public meeting notice in time?

A. No.

Q. Okay. You've not had any discussion with anyone at the AOC about that?

A. No, I have not.

Q. How about have you had any discussion

with any of the Advisory Commission members about that?

A. No.

Q. Is there -- are you aware of another meeting in 2023 besides March and June? Is there one upcoming that you're aware of?

A. There is a December meeting upcoming. I believe it's December 8th.

Q. And does that follow that second Friday cadence, quarterly cadence?

A. Yes.

Q. Is there a public meeting notice of the December upcoming meeting on the AOC website?

A. Yes, I believe that it has been posted.

Q. Have you seen that or you just heard that? How do you know?

A. I did check it because I will be back from maternity leave for that meeting, and so I wanted to check to see if there was one up -- if it had been put on the website, and it is on there.

Q. Did you actually oversee that while you were on maternity leave or did you just check it just to make sure?

A. I did not facilitate that -- the creation

of that, but I was aware that it had happened and I checked it to be sure it was posted.

Q. Do you know who facilitated that public meeting notice at the AOC office?

A. It was both our General Counsel John Coke and Charlie Baldwin, who has assumed my role essentially while I've been out on leave.

Q. Let's kind of backtrack a little bit. So I think you said 2015 to 2016 you sat in on some meetings?

A. Uh-huh.

Q. And the -- your recollection, they were open to the public?

A. Yes.

Q. At what point did those Advisory Commission meetings become closed to the public?

A. I believe it was 2018.

Q. I'm sorry?

A. 2018. It was after I had taken over as liaison. There was -- meetings were open to the public, as far as I can recall. And there was a meeting that we had that there was a member of the public who had attended in person who was there and became unruly and combative

with the Commission. And after that, the -- the Tennessee Supreme Court took the matter up for discussion and then the meetings were closed after that incident.

Q. And what -- where was this particular meeting in 2018?

A. I wish I could recall the exact date. I do believe it was 2018 and the meeting was at the Administrative Office of the Courts, it was in our conference room. And members of the public would come periodically, sometimes we didn't have any and sometimes some would request to come.

And that particular meeting there was a member of the public who attended, and he was interested in a topic that was being discussed by the Commission. And during that discussion, he was speaking kind of out of term, you know, without being called on or outside of the public comment period that was allowed and essentially became very assertive with the members and -- and the meeting was stopped and he was asked to leave.

Q. Do you recall how many members of the public were at that particular meeting in 2018?

A. I believe it was just that gentleman and his son.

Q. Do you recall his name?

A. I don't. I'm sorry.

Q. When you say "combative," do you mean -- what do you mean? Was it verbal combativeness --

A. Yes.

Q. -- or physical?

A. It was verbal. He did leave his chair -- or, you know, get up from his chair while he was having this discussion, which kind of escalated the -- the tone that was going on in there in his interaction with the members. So it -- yeah, it just became more of an aggressive action on his part. Clearly he was upset with a topic that was being discussed.

Q. Do you recall the topic?

A. No.

Q. Do you recall who the chair was at that time at that meeting?

A. I believe the chair was Allen Wade then.

Q. Is Mr. Wade currently a member on the Advisory Commission?

A. Yes.

Q. Were there four quarterly meetings in 2018?

A. Yes. As far as I remember there were.

Q. And you were at this meeting in 2018?

A. I was at that meeting, yes.

Q. Who was the chief justice of the Supreme Court at that time in 2018?

A. It was Justice Jeff Bivins at that time.

Q. So did the Chairman Wade ask this person that was being verbal -- verbally combative to leave? Did he -- did the person leave?

A. I don't recall who exactly asked him to leave; however, he was asked to leave. We did have to have several people help escort him out. And I can't remember if security was called at that meeting or not. I -- I do believe that building security was made aware.

Q. Do you recall if any formal charges, criminal charges were brought against this person?

A. I -- I do not believe that there were formal criminal charges.

Q. So the person that was verbally combative was never prosecuted to the best of your recollection?

A. Correct, I do not believe that he was.

Q. And so, I guess, was there a member of the Tennessee Supreme Court that was attending that particular meeting?

A. Yes.

Q. And who was that?

A. It was Justice Holly Kirby.

Q. So Justice Kirby was the Supreme Court liaison on the Commission in 2018?

A. She was.

Q. Justice Kirby is now the Chief Justice of the Supreme Court?

A. Yes, she is.

Q. So you said something about the -- the justices at that point, they made the call, they made the decision to close meetings. Explain what -- explain what happened after that.

A. After the meeting where the person got combative -- and Justice Kirby was in attendance in that meeting, so she had seen it firsthand, the -- as far as I am aware, she took that matter back to the Supreme Court for discussion, and we at the AOC were told that the meetings would no longer be open after

that. And that was really my interaction with that. They were -- I was informed that they would be closed.

Q. How were you told? How were the members of the Commission told that from now on they were going to be closed, the meetings?

A. I don't recall exactly. I do know that if our General Counsel Rachel Harmon at the time had told me that there was no need to put public notice out because they were going to be closed the next meeting after that incident. And I cannot recall if Justice Kirby told the members directly or if a member of our office told them that we -- that they would be closed. I just don't remember exactly.

Q. But that decision would have come from either the justices or the AOC office to the Advisory Commission?

A. One of the two, yes, would have told either the Commission as a whole or the chair and the chair would have relayed that to the Commission.

Q. So the Chair, Mr. Wade, didn't make that decision?

A. No.

Q. Did -- was it reported, do you recall, that meetings were going to be closed and formally in the minutes?

A. I do not recall. I would have to look back at the minutes to see if they were -- if there was any mention.

Q. Where are the minutes kept?

A. Like I had said earlier, they're housed within the Tennessee Supreme Court building overseen by the Appellate Court Clerk's Office, so there is -- whether they're electronic or paper filed.

Q. And the clerk is James Hivner, I believe, right?

A. Yes.

Q. And Mr. Hivner is a member of the Advisory Commission?

A. Yes. I just couldn't recall if he was a voting member or not voting member. He is on the Commission.

Q. Did they have a distinction between voting members and members when you first became liaison?

A. I'm not sure if there was a formal distinction, but the judge liaisons are members

but they don't -- they don't have a vote. So sometimes the terminology "member," "voting member" would be used just to distinguish, okay, we're having votes and the voting members would be the ones participating; however, the -- like for example, the judicial members are members of the court -- of the Commission, they just don't vote on the matters that they are -- that's presented within that commission.

Q. I -- I may not -- you may have answered the question, I'm just not quite clear. Do you know definitively when this voting member versus member, when that became part of the culture of the Advisory Commission?

A. No. I wouldn't say that there is a culture of that, it's more just a -- the Commission looks toward the judicial members just for insight into various proposals or just kind of on-the-ground experience within the courtroom.

Q. Okay. That distinction is not made on the AOC website, though, it list members, right?

A. It lists members, and I believe it lists the -- I know it lists the judge members, but I

believe it says for that the court, the various courts that they're members -- that they represent on the Commission.

Q. Does it say courts or does it just say judicial liaisons?

A. It may just say judicial liaisons, but I believe their titles have what their judge -- which court they're on.

Q. Does it make a distinction on the AOC website between voting members and members? And if you don't know, that's okay.

A. I should know, but I do not recall.

Q. Did you create the list of members that are on -- that's on the website?

A. No.

Q. Did someone that you oversee or supervise create that document?

A. There is an employee within our office that maintains and creates all the rosters for the various court commissions; however, that person -- I do not oversee that person.

Q. So up until that point of 2018 when the one individual became verbally combative, had there been any other problems with the Advisory Commission meetings being open to the public

that you saw?

A. Not that I experienced, no.

Q. Was there any discussion at that point in 2018 when that incident happened about having the public not physically be present but to view it by any type of livestreaming?

A. I was not privy to those discussions or involvement of them.

Q. Was the Advisory Commission doing livestreaming in 2018?

A. I do not believe so. We did have option for members to join virtually if needed; however, majority of the people then would come -- would travel to the AOC office here in Nashville and majority were in person.

Q. So those meetings where everybody got together at the AOC office --

A. Uh-huh.

Q. -- was that in 2017?

A. Yes.

Q. 2015?

A. As far as I can recall.

Q. 2016?

A. That was the norm prior to 2020.

Q. Okay. That -- I was going to go into

that.

A. Uh-huh.

Q. So it -- did that coincide with COVID when the Advisory Commission meetings then went by virtual?

A. Yes, when all the COVID restrictions occurred and we were still having meetings, they were a hundred percent virtual because of what had occurred in 2020. But that was when it shifted to a hundred percent virtual. Prior to that, they were in person.

Q. So now from COVID on, the Advisory Commission itself, they meet virtually, right?

A. It has continued to be virtual since the 2020 meetings, yes.

Q. Was there ever discussion about let's go back to open meetings virtually since we wouldn't have a problem with someone interrupting?

A. There were not any discussions prior to this lawsuit within the Commission that I recall.

Q. That issue never came up?

A. It just didn't come up, correct.

Q. If we need to take a break --

A. No I'm okay.

(WHEREUPON, an off-the-record discussion was held.)

BY MR. DOUGHERTY:

Q. How is that livestreaming working with Advisory Commission meetings kind of post COVID?

A. Livestreaming or the virtual meetings with the members?

Q. Why don't you -- I'm using the term. Why don't you tell me what do you understand by virtual meetings? What does that mean?

A. So since 2020 we've had meetings via Zoom. So our office would generate the Zoom link and send it to the members. The Zoom link typically had not been something that's been given out other than to the members.

Q. Right.

A. And that's all that was generated was the Zoom link sent out to the members. Post the preliminary injunction, we did generate a livestreaming link for this past June -- at least when I -- before I went on leave it was for the June meeting, which was the meeting -- the only meeting it would apply to post the

preliminary injunction based on the timing, so...

Q. So to the best of your knowledge, post preliminary injunction, there's only been one meeting that's been open to the public by livestreaming and that was in June?

A. Correct.

Q. And public meeting notice to the best of your recollection has already been posted in advance of the December meeting; is that right?

A. Yes.

Q. And so, that will be the second post preliminary injunction meeting that will be open to the public?

A. Yes.

Q. And you will be in attendance at the December one?

A. That is the plan.

Q. In terms of your office, the AOC and what you do with providing administrative support, was there any additional labor or work or cost associated with providing the Zoom link to the public for the June meeting?

A. The livestreaming link --

Q. Yes.

A. -- to the public? As far as cost, no. We did need to enlist a member of our communications division to create that because the way that the livestreaming is set up is outside of my division or the Advisory Commission, so the communications division within our office sets all that up. And I -- one of the employees there I had contacted to create a livestreaming link for it.

Q. To the best of your recollection, providing that livestreaming link to the public, did that -- is that going to cost the AOC more funds than if they did not provide livestreaming to the public?

A. To my knowledge, no. However, it does require the use of a communications division employee that was previously not involved with the commission meetings.

Q. So that -- and you do that as the -- in your role as the liaison?

A. I do communicate with the communications department -- division employee.

Q. Okay. What goes on in the Advisory Commission meeting? What's the purpose of the Advisory Commission?

A. The purpose is to discuss rule -- court rule proposals and/or needs and make recommendations of possible changes to the court.

Q. Do they -- does the Advisory Commission discuss and make potential rule recommendations regarding the criminal rules and procedure in Tennessee?

A. Yes. If that is a topic that comes up and is requested or -- by a member of the public or another member of the government or member of the Commission, they would discuss the rules of criminal procedure and make recommendations as to changes if there are any to the Court.

Q. What about proposed recommendations to the civil rules of procedure, does that come up?

A. Yes.

Q. What about the rules of appellate procedure?

A. Yes.

Q. What about the rules of evidence?

A. Yes.

Q. And what about the juvenile rules of

procedure?

A. Yes, occasionally.

Q. So is it fair to say that those are the five categories of proposed rules that the Advisory Commission discusses?

A. Yes, those are the five.

Q. Are there any more other than those five?

A. No.

Q. Okay. Let's -- walk me through, in general, how this happens in terms of the proposed rules -- and my understanding, and you can tell us, at some point there's a -- there's a public comment period and then at some point there's -- but you've referred to the rules package?

A. Uh-huh.

Q. And at some point the legislature votes on it. So can you just kind of roughly explain that process?

A. Sure. It typically goes for a calendar year, so there is -- the June meeting would be the last meeting that rules -- proposed rules would be sent to the Supreme Court for consideration. So from the September meetings to the June meetings would be your -- your year

of what would be considered in a rules package for -- that would be sent to the Supreme Court.

Q. And that's because the Tennessee government cycle is July through June; is that the reason?

A. It probably was based on that at some point, but it does also coincide with being able to have public comment and then having a rules package for January enough time to be -- for the consideration in there. So that is -- for the rules I think may be more the reason why it goes -- the September meeting would be the start of the new package and June would be the end.

Q. So and that's because the general assembly comes in January, right?

A. Correct.

Q. Okay. Go ahead, I didn't mean to interrupt.

A. No, no problem.

So once the rule -- Advisory Commission has settled on proposals, they -- that is compiled, is sent to the attorneys for the Supreme Court, who are also liaisons on the -- on the Commission, they will make sure that

everything is cohesive and together. They send that to the Supreme Court for consideration as far as the recommendations.

The Supreme Court will take the recommendations and they may add or subtract or whatnot, but they will then put out those recommendations for public comment. And there's always a public comment period that -- it varies, but it's -- typically it's not less than 60 days. There's always a comment period for the public.

And then the Supreme Court gets those comments back. They take all that into consideration, and they file an order of proposed rules for that -- we call it the rules package. I mean, that may not -- it's not more of an internal term, it's not an official term. But they issue the order of the proposed rules that -- based on the recommendations and public comment.

And then I take certified copies of those orders plus the proposed amendments to the rules, I file them with the -- on behalf of the Supreme Court, but I file them with the clerks at the House and the Senate that -- which is

required by statute to do so. And you have to do it from when they gavel in -- between when they gavel in and January 31st. So typically is a couple weeks that you can file them. And then those certified copies of the orders and the amendments are considered via rule resolution, which is -- which I make sure is written up and filed by the legislature.

Q. And you -- you've answered exactly like I asked you to, which was general. I just now want to kind of go back and unpack that just a little bit.

A. Uh-huh.

Q. So the June meeting, as I understand it, you've said that's kind of the last of the term of the Advisory Commission meetings; is that right?

A. Yes.

Q. And that's when the final proposed rule recommendations to the extent there are any --

A. Right.

Q. -- that's when they're made?

A. Yes.

Q. How are they made in June? Does the Advisory Commission have like a list? Do you

write it? Does a reporter write it? How does that work?

A. It -- it's really ongoing. So there may be rules that they approved to recommend to the Court in the September prior. So it -- and those will not come up again in June, it's just they're -- they are -- the reporter kind of keeps a record -- well, keeps a record of what officially is recommended by the Commission. That's all compiled by the reporter in conjunction with the Supreme Court liaisons. And it's really between them of how the form -- the format of how that gets to the Court.

Q. So and then do you all send that -- when I saw "you all," does the Advisory Commission, either the reporter or you or the chair, does that get transmitted to the justices in June?

A. It's -- the reporter puts it together as far as I know or, like I said, works with the Supreme Court liaison, the Supreme Court attorneys or the liaisons, and they determine how it gets relayed to the Court.

Q. And then the Supreme Court around September through maybe November, that's when the public comment period is?

A. It varies every year, but typically, yes, it would be -- they -- they typically take it into consideration from that June meeting through August. And then in the past it's been some where between September and November that they'll put out the rules for comment.

Q. So there's a lag period between June and then whenever they start the public comment period?

A. It's a review period for the Court. That's the time that they take to review the recommendations.

Q. So it is a -- there is a lag period between that time?

A. And you can call it that, but I don't know that it's necessarily a lag period. It's just part of the process.

Q. Well, the Supreme Court is not -- doesn't send out public comment notices in June, right?

A. No.

Q. And you said typically that public comment period lasts, you said, 60 days?

A. It's 60 days minimum. I've not ever seen it less than that.

Q. Is that -- do you know if that's by

statute or just custom in practice?

A. I can't recall if it's statute or within the rules themselves, but it's definitely practice within the Court.

Q. So let's say this September to November, roughly, comment period, when comments come back about the proposed rules, what does the Supreme Court do? Do they send it back to the Advisory Commission or do they act on it? How does that work?

A. I mean, I can't speak definitively for the Court. I can just say that sometimes they -- I mean, they take the recommendations or comments by the public into consideration. They have in the past sent rules back to the Commission, and they've also made changes themselves to the recommendations for consideration by the legislature. It just varies.

Q. Without consulting the Advisory Commission?

A. Correct.

Q. And so, after the public comment period, is it Tennessee Supreme Court or is it you that then takes the rules package to the general

assembly?

A. I facilitate it on behalf of the Supreme Court. So I essentially represent their requirement to do so. I will be the one to physically bring it over and file and make sure it goes through the process. But it is a requirement that the Court -- the Supreme Court does that, but I'm their --

Q. And when you say "requirement," you mean a statutory requirement?

A. Yes.

Q. So when you -- when do you typically submit the rules package to the general assembly? Is that around January when they --

A. It's almost always in January.

Q. Right, when they begin their term?

A. Correct.

Q. So once you get the rules package to the general assembly in January, is there anything else that you do?

A. I will -- I file the -- the orders and the certified copies with the clerks, and then I draft the res -- rule resolutions for whichever resolution -- whichever rules that are being proposed to be amended. And I will

send those rule resolution drafts to the member of the legislature who will sponsor those resolutions. And it varies kind of year to year, but typically it's the chair of the Judiciary Committee that I would go through and then they -- they take those drafts from there and consult with their legislative legal services attorneys for official drafting.

Q. So you typically submit the rules package to the chair on the Judicial Committee?

A. It's a rule resolution --

Q. Okay.

A. -- that must be filed. It's -- the way that the legislature approves the rules is via --

Q. I see.

A. -- resolution. So they have to have that drafted and then filed officially within the rule -- resolution filing process so that it's in the -- in the system to -- to be acted upon.

Q. So is it fair to say the rules resolution, that's just more of a summary of the entire rules package?

A. It -- there is a separate resolution for every category of court rule that is being

amended.

Q. And you typically do provide the Judiciary Committee chair with the rules resolution?

A. Yes, it's typically the -- either the Senate judiciary chair or the House, civil or criminal, it -- obviously criminal rules will go through the Criminal Justice Committee --

Q. Oh, okay.

A. -- civil rules will go through the Civil Justice Committee. So I just facilitate to make sure whichever particular rule package amendments we have that they go to the correct judiciary chair in the House.

Q. Is there a committee for every -- all five different proposed rules; criminal, civil, appellate, evidence and juvenile?

A. There are -- the way the legislature is currently set up, there are just two -- there's a Criminal and a Civil Judiciary Committee. And the clerk of the House and the clerk of the Senate determine which committee the rules get -- rule resolutions get sent to.

However, we know just from past experience, obviously, civil ones will go to

civil and criminal would go to the Criminal Committee. So we just be sure to talk to those chairs prior so that they're aware of the rule resolutions.

Q. How long does that process take from January through -- does that take through March or April? What does that look like for you?

A. It just depends on when the legislature schedules the rule resolutions to be heard. They are scheduled to be heard in the committees, and so it's really just dependent on the chair of the committee and when they want to schedule it. So we could hear them in January or we could hear them closer to the end of session. It just depends on preference of the chair.

THE REPORTER: And could we take a quick restroom break?

MR. DOUGHERTY: Sure.

(Short break.)

BY MR. DOUGHERTY:

Q. We're back on the record.

Are you aware of Federal Advisory Committee meetings that are similar to the Tennessee Advisory Commission?

A. I can't say that I'm very familiar with them.

Q. Have you become familiar with the Federal Advisory Committees from this lawsuit?

A. Only what's referenced in the lawsuit. I have not looked it up separately.

Q. And that's never something the Federal Advisory Committee that's ever come up in Advisory Commission meetings?

A. Not that I recall.

Q. Do you go to conferences in your position with the AOC to other either state AOC conferences or federal AOC conferences?

A. I go to the AOC's judicial conferences, yes.

Q. Is that -- is that a state -- on the state or what is that?

A. On the state level. There are various conferences for the different levels of judges, and I attend those.

Q. How often do those usually take place?

A. It varies per judicial conference, but it's either two or three times a year.

Q. You talking about the Tennessee judicial conference?

A. Yes.

Q. And so, are you saying that other state AOC offices and employees come together at these conferences?

A. What do you mean other state?

Q. Well, I guess what I'm trying to ask is: Do you have an opportunity as the Tennessee AOC departmental government liaison, are there other states that have equivalent jobs that you're able to communicate with to see what they do?

A. I do not know. And no, typically we do not confirm with other state AOCs.

Q. Do you have any interaction with the federal AOC?

A. No.

Q. Does the Advisory Commission members, do they have opportunities to do conferences with other either state judicial conferences or federal advisory?

A. Not that I'm aware of.

Q. Okay. Do you personally take a role in making rule recommendations or is your role just to provide administrative support to the Advisory Commission?

A. I do not make rule recommendations, it's purely administrative.

Q. And you may have said, but how does that happen? Let's say a rule comes and someone wants to change Rule 12 of Civil Procedure, do the members debate it, talk about it, does someone write a paper about it? What does that look like?

A. It varies on how it comes up. It can come up via a member or a request from a legislator or another member of the public. It really varies. But the Commission will typically add it to the agenda for the -- for the next meeting, whatever meeting would be in closest proximity to that request. And the Commission members discuss it and decide if it warrants further discussion or reference to a subcommittee within the Commission or -- or they just don't want -- don't deem it necessary to discuss further.

Q. How would a member of the public make a suggestion to get on the agenda of the Advisory Commission?

A. They could do that in various ways by either e-mailing the AOC. They could e-mail

the contact, you know, me or another person via the names on the website or they could reach out directly to the reporter or the chair. It just depends on -- and it's varied in the past. We have had requests from members of the public before for discussion of items.

Q. Do members of the public know they have that option? I mean, is that something that the AOC regularly broadcasts to the public?

A. Other than the public access to the page on the website, I don't know that there's anything specific.

Q. Has there ever been anything on the AOC website that announces to the public that if they want to make a suggestion proposed rule change, they could do so?

A. I don't know if that's ever been something that's been on our website. I can't say that it was or wasn't.

Q. So it's not something that affirmatively the AOC reaches out to the public, it just kind of comes up occasionally?

A. The page is open to the public. And so if a member of the public had a question, they're always free to reach out to contacts

provided on that page.

Q. And is your contact provided on the page?

A. Yes.

Q. Okay. That's pre injunction?

A. Correct.

Q. What about reimbursements of Advisory Commission members, is that something that you provide administrative support for for expenses?

A. I have in the past; however, recently I don't recall anyone requesting a reimbursement for mileage or anything like that because our meetings happen virtual.

Q. And that's been going on pre preliminary injunction?

A. Correct.

Q. Do you recall getting the litigation hold letter when this lawsuit was filed by either Director Long or someone within the AOC?

A. I don't remember exactly if I received a litigation hold letter or if it was just our director and I was just informed of the pending litigation.

Q. And so, was it your understanding that all records and e-mails and everything was

supposed to be preserved now that there was litigation?

A. Yes.

Q. To the best of your recollection and knowledge that has it actually taken place, everything's been preserved?

A. As far as I know, yes.

Q. Did you participate personally in -- with Director Long or in her answer that was filed in this lawsuit?

A. No.

Q. Have you ever seen her answer that was filed in this lawsuit?

A. I do believe I saw it after it was filed, but I don't recall exactly.

Q. Do you recall seeing Director Harmon's two declarations that were filed early when the lawsuit was filed?

A. I do believe I saw them, but I don't recall the details.

Q. Did you assist in preparing those declarations --

A. No.

Q. -- for Ms. Harmon?

And you said no?

A. Correct, no.

Q. Do you provide -- in your role with the AOC, do you provide legal advice to the justices of the Supreme Court?

A. In various capacities I have in the past on various topics.

Q. But what are those topics and capacities?

A. It -- majority is with legislative topics.

Q. Related to the Advisory Commission rules package?

A. No. Just other legislative duties that I provide.

Q. Could you give me an example? Is there something you could give me an example?

A. Sure. Just the legislation that is either filed, proposed statutory amendment that may affect court process and I will talk to the Court about that. And there are lots of times it's legal in nature but not related to the Advisory Commission, just other proposals that get filed by members of legislature.

Q. So that's more in your capacity as intergovernmental affairs director?

A. That's correct.

Q. Do you know if deputy Harmon provides legal advice to the justices of the Supreme Court?

A. I believe she does, yes.

Q. Do you know in what capacity?

MR. STAHL: Object to the form.

THE WITNESS: No.

BY MR. DOUGHERTY:

Q. Do you know if Director Long provides legal advice to the justices?

A. I can't -- I can't answer that definitively.

Q. So you don't know; is that right?

A. I don't know.

MR. DOUGHERTY: I think I'll pass the witness, Mike.

MR. STAHL: Okay.

EXAMINATION

QUESTIONS BY MR. STAHL:

Q. Ms. Young, just a few questions.

Prior to the closing of the meetings and the virtual meetings that occurred when COVID started in 2020, I think you mentioned that most of the meetings occurred in person and

they occurred in a conference room at the AOC offices; is that right?

A. That's correct.

Q. How big is that conference room?

A. I'm not good with measurement. I would say there's a -- it's fairly large. There's a large conference table that seats roughly 20 or so. It can probably -- I do believe it can accommodate about 50 people com -- maybe not so comfortably, but that could be in there.

Q. And how many members of the Committee and other people like yourself from the AOC are typically present at or were typically present when the meetings were held in person?

A. We would have roughly ten members of the Commission. Probably more than that before -- before COVID we had good attendance. I would say majority of the members would be in attendance.

And then as far as members of the AOC, it would -- myself, possibly a member of our tech division to just handle any technology needs in there. But that would be it, typically. There weren't a lot of members of the AO -- other employees of the AOC that would attend.

Q. Okay. In your experience prior to 2020 when the meetings went virtual and they were still in person and you mentioned that there was the one incident with the member of the public who had come in, how did that member of the public come into the AOC offices? Is there a security area that they need to request permission to come through in order to go to the offices or are members of the public just able to walk in?

A. No, the -- that member of the public did have to check in in our -- the security kiosk that's in the lobby of our building. We -- sometimes we would know if a member of the public was going to attend because they would reach out prior and request to attend so we could give the information to the security desk, but sometimes they'd just show up. And so they would say, we're here for commission meeting, we would basically verify that, allow them to come up and then they would go through our second -- our own security -- our own doors to our -- to the AOC and they would be allowed into the meeting.

Q. Okay. When the meetings were in person

and when you attended, were they always held in the same conference room or were they held in different rooms?

A. Always the same conference room.

Q. Is that the biggest conference room that's available?

A. Yes.

Q. You mentioned a member of the IT department for the AOC sometimes being at these meetings to facilitate IT needs. I'm wondering in your -- in the AOC's role as administrative support for the Advisory Commission meeting, if a member was to show up in person prior to 2020, were they given a computer? Were they expected to provide their own? Would they be provided with writing supplies if they wanted to take notes? What did that look like?

A. Just the member of the public that --

Q. No, a member of the Committee.

A. Oh, anybody. They would typically bring their own if they kept information on a computer or whatnot, but the AOC would typically provide copies of the agenda and any documents that would be considered in that meeting as requested. I would typically have

copies available, but members, in my experience, usually brought either on a computer they would just keep electronic documents of how they kept up with it or they would bring their own that they already printed out and reviewed prior to the meeting.

Q. Okay. Now that the meetings are virtual, does the AOC provide any computers or hardware, tech support to facilitate those meetings?

A. To facilitate the meetings we'll provide the links and whatnot. But as far as any hardware to anybody, no, we don't provide that.

Q. Okay. You mentioned that the -- that there's a portion of the Rules Committee process where there is a public comment period. I think you mentioned that you've never seen it to where that comment period was less than 60 days but it could be more; is that right?

A. Yes, in my experience it has been 60 days. It could be more. I won't say it's never been less than 60 days, but in my experience it's been 60 days. That's been the minimum.

Q. Are you aware of any public comment that has found its way to the Supreme Court during that public comment period on any Rules Committee recommendations?

MR. DOUGHERTY: Object to the form.

THE WITNESS: Yes, there have been public comments.

BY MR. STAHL:

Q. How were those comments provided to the Supreme Court during that period as far as, you know?

A. They are -- there is a form that you can fill out on the AOC -- the Court website as far as the -- when that public comment notice goes out, there is an ability to file a -- a comment. And that is also within that Appellate Court clerk's office, but there is a form on the website that you can enter your comments or, I believe, you can upload a document as well if you already have comments pre -- you know, written on a Word document or whatnot. But then the Appellate Court clerk's office compiles those.

Q. Okay. Since your -- you've taken up this role as liaison for the rules Advisory Commission, has a member of the public ever contacted you about attending a meeting?

A. Yes. I mean, prior to 2020 there have -- there were members of the public that required -- that requested to attend. I don't know I can give you a specific example, but it has happened.

Q. Since 2020 has any member of the public contacted you about attending a meeting?

A. No.

Q. Do you make any decisions about rules Advisory Commission, policies or actions of the Committee?

A. No.

Q. Have you ever witnessed the Committee requesting someone come and speak to them in any capacity?

A. Yes. I've witnessed a legislator asking to come and address the Committee, the Commission. That has happened in the past.

Q. You also mentioned that there are subcommittees as part of the Rules Commission; is that right?

A. Correct.

Q. Are they standing committees or are they committees as necessary?

A. They have been standing committees; however, it is up to the chair whether or not to dissolve a committee or create one as needed. Create a new one.

Q. Do you know what the standing committees are -- subcommittees, I'm sorry?

A. I can't recall all of them, but they basically breakdown into categories. So there is civil, criminal, appellate, evidence. I don't believe there's a juvenile one at the moment.

Q. Have you witnessed any meetings between the members of those subcommittees?

A. No, I have not attended any of those subcommittee meetings.

Q. Do members of the subcommittee meet at the AOC offices as far as you know?

A. Since subcommittees were created, to my knowledge, they have all been virtual meetings.

Q. Since they've been created have any of those subcommittees requested AOC technical support to conduct those virtual meetings?

A. I do not know.

MR. STAHL: I think that's all I've got.

///

EXAMINATION
BY MR. DOUGHERTY:
Q.   Brief follow-up.
   Does providing livestreaming access of Advisory Commission meetings to the public elevate any crowding problems from in-person attendance?
**A.   It could.  It just depends, I suppose. But livestreaming would eliminate the need of someone attending in person.**
Q.   I mean, if there's a small conference room and you can only fit 60 people in, for example, of the public, it would be better if you had unlimited amount of people, which they could do that through livestreaming, right?
   MR. STAHL:  Object to the form.
   **THE WITNESS:  The livestreaming does give that option.**
BY MR. DOUGHERTY:
Q.   Okay.
   MR. DOUGHERTY:  That's all I've got.
   MR. STAHL:  Great.  Okay.
   THE REPORTER:  Do you want to order this?
   MR. DOUGHERTY:  Yeah.

   THE REPORTER:  Do you want it regular delivery or sooner?
   MR. DOUGHERTY:  Can I get it before?
   (WHEREUPON, an off-the-record discussion was held.)
   MR. DOUGHERTY:  What about Tuesday or Wednesday, the 27th or 28th?
   THE REPORTER:  Yeah.
   MR. STAHL:  Yeah, we'll take a copy. Same order.  And she's going to waive signature.  Thank you.
   FURTHER DEPONENT SAITH NOT
   (Proceeding concluded at 11:16 a.m. CST)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE
COUNTY OF SUMNER
   I, MICHELLE CESSNA, Licensed Court Reporter, with offices in Nashville, Tennessee, hereby certify that I reported the foregoing deposition of MICHELLE CONSIGLIO-YOUNG by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me.
   I further certify that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.
   I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

MICHELLE CESSNA, LCR, RPR
Lexitas Legal
Licensed Court Reporter (TN)
Notary Public State of Tennessee

LCR #864 - Expires:  6/30/2024

**1**

**11** 9:13

**11:16** 82:13

**12** 68:5

**16-3-601** 20:25

**2**

**20** 74:7

**2005** 10:24

**2011** 11:2,5

**2013** 10:9

**2015** 7:20,22 8:20 9:24 23:15,21 24:2 25:3 34:11 40:9 49:21

**2016** 23:12 25:3 27:18 34:11 35:4 40:9 49:23

**2017** 23:12 27:18 35:3 49:19

**2018** 8:4 40:18,20 41:6,8, 25 43:2,4,7 44:9 48:22 49:4,10

**2019** 8:4,5,9,20

**2020** 49:24 50:9,15 51:13 73:24 75:1 76:14 79:1,6

**2022** 35:7,16,18 36:2,5, 13,15 38:2

**2023** 36:17,25 37:6 38:9 39:5

**21st** 38:7

**27th** 82:7

**28th** 82:7

**3**

**3** 9:13

**31st** 58:3

**5**

**50** 74:9

**6**

**60** 57:10 60:22,23 77:18, 20,21,22 81:12

**8**

**8** 9:15

**8th** 39:8

**A**

**a.m.** 82:13

**ability** 33:11 78:13

**access** 17:18 22:14 31:3 69:10 81:4

**accommodate** 74:9

**act** 61:9

**acted** 63:20

**action** 42:16

**actions** 79:10

**add** 12:11 57:5 68:13

**adding** 15:6

**additional** 52:21

**address** 79:17

**adjourn** 14:12

**administrative** 6:4,25 7:5,11,13 19:8 22:1 23:3, 5 31:1 41:9 52:20 67:24 68:2 70:8 76:11

**admission** 11:4

**admissions** 11:10

**admitted** 11:8

**advance** 25:19 37:14 52:10

**advanced** 27:25

**advice** 72:3 73:2,10

**Advisor** 19:9

**advisory** 12:2,6,21 14:15 15:17,20,23,25 16:5,8 20:21,23 21:5,8, 18,22,24 23:10,14,23 24:4,11,24 27:16,21

30:3,7,11,15,17 31:19 32:12 33:21 34:4 35:7,13 36:21,25 37:6 38:8 39:1 40:15 42:24 45:18 46:17 47:14 48:24 49:9 50:4,12 51:6 53:5,23,25 54:5 55:5 56:21 58:16,25 59:15 61:9,20 65:23,25 66:4,8,9 67:17,20,25 68:22 70:6 72:10,21 76:12 78:23 79:10 81:5

**advocacy** 15:10

**advocating** 15:11

**affairs** 7:4,7,10 8:8,17 11:24 72:24

**affect** 72:18

**affirmatively** 69:20

**AG's** 17:5

**agenda** 68:13,22 76:23

**agendas** 31:22

**aggressive** 42:16

**agree** 18:15

**ahead** 6:19 10:19 19:13 20:21 56:18

**Allen** 42:22

**allowed** 41:20 75:23

**amended** 20:17 62:25 64:1

**amendment** 72:17

**amendments** 57:22 58:6 64:13

**amount** 81:14

**and/or** 54:2

**announced** 26:11

**announces** 69:14

**answers** 26:24

**anticipate** 6:14

**AO** 74:24

**AOC** 7:2,19,20 8:6,24 9:24 12:7 14:23,24,25 15:4,11,12 19:16,19 21:3,7,11 22:24 23:13, 15,22,25 25:25 26:7,22 27:2,21 28:16 29:6,11,17 37:16 38:23 39:13 40:4

44:24 45:17 47:22 48:9 49:14,17 52:19 53:13 66:12,13 67:3,7,15 68:25 69:9,13,21 70:19 72:3 74:1,12,20,25 75:6,23 76:9,22 77:8 78:11 80:16,20

**AOC's** 66:14 76:11

**AOCS** 67:13

**Appeals** 10:15

**appellate** 31:17 46:10 54:20 64:17 78:15,20 80:8

**applied** 18:7,17,24

**applies** 19:6

**apply** 18:8,12 19:2,15,22 20:4 51:25

**appointed** 22:2 29:24,25 33:10,25

**appoints** 33:13

**approval** 24:19

**approve** 32:19

**approved** 12:9 22:11 32:21 59:4

**Approvement** 7:15

**approves** 32:22 63:14

**approving** 32:25

**approximately** 8:12

**April** 14:7,10,13,14 15:9 65:7

**area** 75:7

**assembly** 56:16 62:1, 14,19

**assertive** 41:21

**assigned** 28:23

**assist** 21:12 71:21

**assistant** 7:23 8:19 10:4 23:25

**assumed** 40:6

**Assuming** 25:14

**attached** 21:25

**attachments** 31:22

attend 13:7 32:9 35:18 36:25 37:5 66:20 74:25 75:15,16 79:3

attendance 44:21 52:16 74:17,19 81:7

attended 25:20 40:24 41:15 76:1 80:13

attending 44:3 78:25 79:7 81:10

attorney 5:24 10:1,4,13 16:13 20:6

attorney/liaison 12:7

attorneys 20:5,8 30:2,6 56:23 59:21 63:8

attorneys/attorneys 30:10

August 36:24 38:7 60:4

authority 11:15

availability 35:1

aware 12:12 16:24 17:2, 4 21:11 34:1 39:4,6 40:1 43:17 44:22 65:3,23 67:21 77:24

**B**

back 10:8 16:6 23:8,11 32:18 35:3 39:17 44:23 46:5 50:17 57:13 58:11 61:7,8,15 65:22

backtrack 40:8

Baldwin 9:18 40:6

Bar 11:4,14

Bars 11:8

based 28:7 52:1 56:6 57:19

basically 17:12 75:20 80:7

basis 13:2

begin 62:16

behalf 13:7 15:11 27:21 57:23 62:2

big 74:4

biggest 76:5

bit 7:6 11:23 16:7 27:15 40:8 58:12

Bivins 43:8

body 12:23 13:15,21

Boston 10:23

branch 12:17

break 6:14,17,20 50:25 65:18,20

breakdown 80:7

bring 62:5 76:20 77:5

broad 18:16

broadcasts 69:9

brought 43:19 77:2

brush 34:2

building 31:12,16 43:17 46:9 75:13

Bulso 36:15,16

business 14:11 30:17

**C**

cadence 34:8,22 39:10

calendar 35:16,21 55:20

call 44:15 57:15 60:15

called 5:3 41:19 43:16

cancelled 35:11

capacities 72:5,7

capacity 10:3 72:23 73:5 79:15

carry 12:13

case 16:25 36:13

categories 55:4 80:7

category 63:25

caveat 6:18

certified 57:21 58:5 62:22

chair 15:25 22:7 26:25 36:10,15 42:10,11,20,22 45:20,21,23 59:16 63:4, 10 64:3,6,14 65:12,16 69:3 80:1

Chairman 43:9

chairs 65:3

change 27:11 68:5 69:16

changing 12:11

charges 43:18,19,22

Charlie 9:18 40:6

check 39:17,19,23 75:12

checked 40:2

chief 26:17,20,21,22 43:6 44:11

civil 54:17 64:6,10,16,20, 25 65:1 68:5 80:8

clear 47:11

clerk 46:13 64:21

clerk's 31:17 46:10 78:15,20

clerked 10:14

clerks 57:24 62:22

close 14:6 16:20 44:16

closed 37:3,4,8 40:16 41:4 45:3,6,11,14 46:2

closer 65:14

closest 68:15

closing 73:22

cohesive 57:1

coincide 50:3 56:7

Coke 6:3 16:19 17:9 18:4 40:5

College 11:2

combative 40:25 42:5 43:10,23 44:20 48:23

combativeness 42:6

comfortably 74:10

comment 41:20 55:13 56:8 57:7,8,10,20 59:25 60:6,8,19,22 61:6,23 77:15,17,24 78:1,12,14

comments 57:13 61:6, 14 78:5,7,17,18

commission 12:2,6,13, 22 14:15,21 15:18,20,23 16:1,5,8 17:14 18:9,25 19:9 20:22,24 21:2,6,8, 11,14,18,22,25 22:7,16 23:10,14,23 24:4,11,24, 25 27:16,21 29:3,11,13, 23 30:4,7,11,15 31:19,25 32:12,22 33:2,21 34:5,17 35:7,13 36:21 37:1,6 38:9 39:1 40:16 41:1,17 42:24 44:9 45:5,18,20,22 46:17,20 47:7,9,14,17 48:3,25 49:9 50:4,13,21 51:6 53:6,18,24,25 54:5, 12 55:5 56:21,25 58:16, 25 59:9,15 61:9,16,21 65:25 66:9 67:17,25 68:12,16,18,23 70:7 72:10,21 74:16 75:19 76:12 78:24 79:10,18,20 81:5

Commission's 30:17

commissions 48:20

committee 13:8,10,18 63:5,10 64:3,8,11,15,20, 22 65:2,12,24 66:8 74:11 76:19 77:14 78:2 79:11, 13,17 80:2

committees 13:25 65:11 66:4 79:23,24,25 80:4

communicate 53:21 67:10

communication 22:9 26:14

communications 28:4 37:23 53:3,6,16,21

compared 30:25

compiled 56:23 59:10

compiles 78:21

complaint 20:18

completed 24:17

computer 76:14,22 77:3

computers 77:8

concluded 82:13

conduct 80:21

conference 25:10 41:10 66:22,25 74:1,4,7 76:2,4, 5 81:11

*Lexitas - TENNESSEE*        *Index: attend..conferencei2*
*(615)595-0073*

conferences 66:11,13, 14,19 67:4,18,19

confirm 35:20 67:13

conflict 35:25 36:10

conjunction 59:11

connection 19:7

consideration 55:24 56:10 57:2,14 60:3 61:14,18

considered 21:17 56:1 58:6 76:24

Consiglio-young 5:2, 13

consistently 29:10

consult 63:7

consulting 61:20

contact 29:7 69:1 70:2

contacted 53:8 78:25 79:7

contacts 69:25

continued 50:14

convicted 11:17

copies 57:21 58:5 62:22 76:23 77:1

copy 17:20,24 18:1 82:9

correct 8:11 9:3,22,23 10:10 11:7 12:20,24 15:15 17:19 44:1 50:24 52:7 56:17 61:22 62:17 64:13 70:5,16 72:1,25 74:3 79:22

correlates 12:5

cost 52:21 53:1,12

counsel 5:23,25 6:3 7:23 8:20,21,25 16:15 17:9 18:3 23:25 28:20 29:1 40:5 45:8

couple 9:11 16:3 58:4

court 7:15 10:14 11:10 12:4 13:7 19:23 22:3 30:1 31:12,16,17 32:16 33:4,11,13 41:2 43:7 44:3,8,12,23 46:9,10 47:7 48:1,8,20 54:1,4,15 55:23 56:2,24 57:2,4,12,

24 59:5,11,13,20,22,23 60:10,18 61:4,8,12,24 62:3,7 63:25 72:4,18,19 73:3 77:25 78:8,11,15,20

courtroom 47:20

courts 6:4 7:1,5,11,13 19:8 22:1 41:9 48:2,4

COVID 50:3,6,12 51:7 73:23 74:17

create 37:24 48:13,17 53:3,9 80:2,3

created 8:8 20:25 80:17, 19

creates 48:19

creation 39:25

crime 11:18

criminal 10:5,15 43:19, 22 54:7,13 64:7,8,16,20 65:1 80:8

crowding 81:6

CST 82:13

culture 47:14,16

current 8:10 32:23

custom 61:1

cycle 56:4

___

**D**

daily 13:7

date 11:3 16:12 36:9 41:7

dates 36:5,8,11

David 8:22

day 6:15,16

day-to-day 13:2

days 57:10 60:22,23 77:18,20,21,22

deal 20:21

deals 7:16

debate 68:6

Deborah 28:17

December 34:18,22 36:3,7 39:7,8,13 52:10,

17

decide 68:16

decision 44:16 45:16,24

decisions 79:9

declarations 71:17,22

deem 15:8 68:19

definitively 24:9 26:5,6 47:12 61:11 73:12

degree 10:21

delivery 82:2

department 53:22 76:9

departmental 67:8

dependent 65:11

depending 13:17 35:1,6

depends 14:11 65:8,15 69:4 81:8

DEPONENT 82:12

deposition 5:14 6:7 20:14

depth 16:7

deputy 9:1,21 73:1

Describe 21:5

desk 75:18

detail 11:25

details 71:20

determine 59:21 64:22

direct 28:21

directly 9:4,5,8,14,20,23 10:17 19:6 28:18 45:13 69:3

director 7:3 8:7,16 9:2,5, 21 17:7 18:12 19:3,7 20:5 28:15 70:19,22 71:9,16 72:24 73:9

disciplined 11:14

discuss 54:1,6,12 68:16, 20

discussed 41:16 42:17

discusses 55:5

discussion 38:22,25 41:3,17 42:12 44:24 49:3 50:16 51:3 68:17 69:6

82:5

discussions 49:7 50:20

dissolve 80:2

distinction 33:20 46:21, 25 47:21 48:9

distinguish 30:19 47:3

division 7:3,4,7,10,15,16 8:8 10:5 28:4 37:23 53:3, 5,6,16,22 74:22

document 48:17 78:18, 19

documentation 32:13

documents 76:24 77:4

doors 75:22

DOUGHERTY 5:7 18:20 19:10,21 20:1 51:4 65:19,21 73:8,15 78:3 81:2,19,21,25 82:3,6

draft 62:23

drafted 63:18

drafting 63:8

drafts 63:1,6

due 37:11

duly 5:4

duties 27:9 72:12

duty 31:15

___

**E**

e-mail 68:25

e-mailing 68:25

e-mails 70:25

earlier 21:10 46:8

early 71:17

education 10:20

electronic 31:13,18 46:11 77:3

elevate 81:6

eliminate 81:9

employee 19:18 26:7 29:6 48:18 53:17,22

**employees** 9:7 19:16 53:8 67:3 74:25

**employment** 27:2

**end** 14:6 56:14 65:14

**ended** 14:13

**enlist** 53:2

**ensures** 22:4

**enter** 78:16

**entire** 63:23

**equivalent** 67:9

**escalated** 42:13

**escort** 43:14

**essentially** 40:7 41:21 62:3

**Etheridge** 9:19

**everything's** 71:6

**evidence** 54:23 64:17 80:8

**exact** 16:12 41:7

**EXAMINATION** 5:6 73:19 81:1

**excuse** 20:2 23:22

**expected** 76:15

**expenses** 70:9

**experience** 34:7 47:19 64:25 75:1 77:2,19,22

**experienced** 49:2

**explain** 7:6 21:20 24:13 34:15 44:17 55:18

**extensive** 13:24

**extent** 58:20

---

**F**

**facilitate** 12:21 39:25 62:2 64:11 76:10 77:9,10

**facilitated** 40:3

**faculty** 30:9

**fair** 23:2 55:3 63:21

**fairly** 14:6 16:20 18:15 74:6

**familiar** 20:20,23 66:1,3

**fast** 27:15

**February** 34:24 35:5

**federal** 65:23 66:3,7,13 67:15,20

**file** 15:6 57:14,23,24 58:4 62:5,21 78:13

**filed** 13:23 14:19 16:13, 21 17:4 21:15 46:12 58:8 63:13,18 70:18 71:9,13, 14,17,18 72:17,22

**filing** 20:16 63:19

**fill** 78:11

**final** 58:19

**fine** 6:23 23:19

**firsthand** 44:22

**fit** 81:12

**follow** 19:19 39:9

**follow-up** 81:3

**form** 18:18 19:4,17,24 59:12 73:6 78:3,10,16 81:16

**formal** 43:18,22 46:24

**formally** 11:13 46:3

**format** 59:13

**forward** 27:15

**found** 77:25

**free** 69:25

**Friday** 36:6,9 39:9

**funds** 53:13

---

**G**

**gave** 14:2,14 15:16

**gavel** 58:2,3

**general** 5:25 6:3 7:23 8:20,21,24 10:4 16:14,15 17:9 18:3 20:8 23:25 28:19 29:1 40:5 45:8 55:10 56:15 58:10 61:25 62:13,19

**General's** 5:25 10:1,13 16:14 20:6

**generate** 51:14,21

**generated** 51:19

**generating** 25:25

**gentleman** 42:1

**Gina** 36:16

**give** 6:9,10 9:10 72:14,15 75:17 79:4 81:18

**giving** 6:7

**good** 5:8,9 10:20 74:5,17

**gosh** 8:3

**government** 30:6 54:11 56:4 67:8

**governmental** 8:16

**graduated** 10:23 11:1

**Great** 81:22

**guess** 10:9 14:5 44:2 67:6

---

**H**

**habits** 6:8

**Haines** 8:22

**Half** 6:16

**handle** 74:22

**happen** 68:4 70:13

**happened** 40:1 44:17 49:4 79:5,18

**hardware** 77:8,12

**Harmon** 8:23 9:1,21 28:20,25 29:2 45:8 71:24 73:1

**Harmon's** 71:16

**head** 27:4

**heads** 6:9

**hear** 16:9 65:13,14

**heard** 39:15 65:9,10

**held** 51:3 74:14 76:1,2 82:5

**Hendrix** 23:24 24:3 25:24 27:6

**Hivner** 46:13,16

**hold** 11:11 70:17,21

**Holly** 44:7

**House** 57:25 64:6,14,21

**housed** 31:11 46:8

**hundred** 50:8,10

---

**I**

**important** 6:6,10

**in-person** 81:6

**incident** 41:4 45:11 49:4 75:4

**include** 22:13

**included** 31:24

**includes** 22:15

**individual** 48:23

**inform** 37:23 38:18

**information** 28:13,14 31:2,5 75:17 76:21

**informed** 45:2 70:22

**injunction** 16:25 17:3,8, 11,21 18:2,6,16,24 19:2, 15,19,22 20:4,11,15 37:12 51:21 52:1,4,13 70:4,15

**insight** 47:18

**interaction** 42:14 45:1 67:14

**interchangeable** 23:6

**interest** 13:18

**interested** 41:16

**intergovernmental** 7:4, 7 8:7 11:24 72:24

**internal** 57:17

**interrupt** 56:19

**interrupting** 50:19

**involved** 22:23 24:8 53:17

**involvement** 24:16 49:8

**issue** 50:23 57:18

**issued** 16:25

*Lexitas* — *TENNESSEE*
*(615)595-0073*

*Index: employees..issued* [4]

**items** 69:6

**J**

**James** 46:13

**January** 7:20,22 14:5,9
56:9,16 58:3 62:14,15,19
65:6,14

**JD** 10:25

**Jeana** 23:24 24:3 25:24

**Jeff** 43:8

**jobs** 67:9

**John** 6:3 16:19 17:9 18:4
40:5

**join** 49:12

**joined** 8:24 23:20 24:2,
10

**judge** 7:14 10:15 15:7
46:25 47:25 48:7

**judges** 15:6,12 66:19

**judicial** 47:6,17 48:5,6
63:10 66:14,22,24 67:19

**judiciary** 33:1 63:5 64:3,
6,14,20

**July** 56:4

**June** 32:24 34:18,21,25
35:4 36:2,6,23 37:6,14
39:5 51:22,24 52:6,23
55:21,25 56:4,13 58:14,
24 59:6,17 60:3,7,19

**justice** 26:17,20,21,23
43:6,8 44:7,8,11,20
45:12 64:8,11

**justices** 19:23 44:15
45:17 59:17 72:4 73:2,10

**juvenile** 7:12,17 54:25
64:17 80:9

**K**

**keeping** 32:10,12

**kind** 6:9 8:2 11:25 12:1,
21 15:10 21:20 23:2,3
26:14 28:6 35:6 37:21
40:8 41:18 42:12 47:19
51:6 55:18 58:11,15 59:7

63:3 69:21

**kiosk** 75:12

**Kirby** 44:7,8,11,20 45:12

**knowledge** 31:9 52:3
53:15 71:5 80:18

**L**

**labor** 52:21

**lag** 60:7,13,16

**language** 34:3

**large** 74:6,7

**lasts** 60:22

**law** 10:17 11:2 30:9

**lawsuit** 11:20 16:9,21
18:11 20:16 50:21 66:4,5
70:18 71:10,13,18

**leave** 36:24 38:6,11
39:18,23 40:7 41:23
42:10 43:11,13 51:23

**Lee** 26:21

**legal** 63:7 72:3,20 73:2,
10

**legislation** 14:18,25
15:5,7 72:16

**legislative** 7:10,24 12:4,
9,14,17,23 13:4,10,15,
21,25 14:1,4,8 16:3
21:16 27:10 63:7 72:8,12

**legislator** 24:18 68:11
79:16

**legislators** 13:9,19

**legislature** 14:3,20
15:17,24 22:12 24:19
55:17 58:8 61:18 63:2,14
64:18 65:8 72:22

**legislature's** 13:6

**letter** 70:18,21

**level** 66:18

**levels** 66:19

**liaison** 7:24 21:7,21 22:3
23:9,13,21 24:3,23 25:8
27:5,12,20 28:11 29:3,11
30:18 32:2,9 34:7,12
40:21 44:9 46:23 53:20

59:20 67:8 78:23

**liaisons** 12:10 33:4
46:25 48:5,6 56:24
59:11,21

**licensing** 11:15

**link** 37:24 51:15,20,22
52:22,24 53:9,11

**links** 31:3 77:11

**list** 47:22 48:13 58:25

**listed** 21:3

**lists** 47:24,25

**litigation** 70:17,21,23
71:2

**livestream** 17:16

**livestreaming** 25:6
37:25 49:6,10 51:5,8,22
52:6,24 53:4,9,11,14
81:4,9,15,17

**lobby** 75:13

**logistical** 21:9 22:2,13,
18 23:1,5

**long** 9:6 10:6 17:7 18:12,
13 19:3 23:9 34:20 65:5
70:19 71:9 73:9

**Long's** 20:5

**longer** 44:25

**looked** 66:6

**lot** 15:3 74:24

**lots** 72:19

**Lynch** 9:18

**M**

**made** 12:10 27:11 29:2
43:17 44:15,16 47:21
58:22,24 61:16

**maintains** 48:19

**majority** 49:13,15 72:8
74:18

**make** 17:15 22:11 28:23
33:20 35:10,25 39:24
45:23 48:9 54:2,6,13
56:25 58:7 62:5 64:12
68:1,21 69:15 79:9

**making** 15:13 21:14
22:19 67:23

**March** 32:25 34:18,21,24
35:4,8 36:2,6,22,25 39:5
65:6

**materials** 20:13

**maternity** 36:24 38:5
39:18,23

**matter** 41:2 44:23

**matters** 7:12,17 47:8

**means** 34:15

**measurement** 74:5

**meet** 32:24 35:7 50:13
80:15

**meeting** 13:19 17:14
22:5,20 25:19,23 26:1
27:25 28:10,24 29:4,8,15
31:3,4,21,25 32:1,18,23,
24,25 34:17 35:11 36:23
37:1,6,13,14,15,17,20,25
38:9,13,20 39:5,7,12,13,
18 40:4,23 41:6,8,14,22,
25 42:21 43:4,5,16 44:4,
19,21 45:11 51:24,25
52:5,8,10,13,23 53:24
55:21,22 56:12 58:14
60:3 68:14 75:20,24
76:12,25 77:6 78:25 79:7

**meetings** 13:1,8,11
22:14,17 24:4,7,11,14,
20,25 25:15,17,20 26:11,
19 27:22 30:22 31:8 32:9
34:5,8 35:15,19,23 36:2,
20 38:2 40:10,16,21 41:3
43:1 44:16,25 45:6 46:2
48:25 49:16 50:4,7,15,17
51:6,8,12,13 53:18
55:24,25 58:16 65:24
66:9 70:13 73:22,23,25
74:14 75:2,25 76:10
77:7,9,10 80:11,14,18,21
81:5

**member** 16:5 21:10,17
33:5,8,9,15,16,21,22
40:24 41:15 42:23 44:2
45:13 46:16,19 47:2,3,
12,13 53:2 54:10,11,12
63:1 68:10,11,21 69:24
74:21 75:4,5,11,14 76:8,
13,18,19 78:24 79:6

**members** 15:22 18:24

21:2 29:13,24 30:3,7,10, 12 31:4,23 32:17 33:1,3, 6,10,25 39:1 41:10,22,24 42:14 45:4,13 46:22,25 47:4,6,7,17,22,24,25 48:2,10,13 49:12 51:9, 15,17,20 67:17 68:6,16 69:5,7 70:7 72:22 74:11, 15,18,20,24 75:9 77:1 79:2 80:12,15

**members'** 35:1

**memory** 15:21

**mention** 46:6

**mentioned** 6:6 73:24 75:3 76:8 77:13,16 79:19

**met** 36:7,11

**method** 25:7

**Michelle** 5:2,12 9:5

**Mike** 73:16

**mileage** 70:12

**minimum** 60:23 77:23

**minutes** 30:21 31:7,19, 22 32:1,10,13,19,20,22, 25 46:3,5,7

**moment** 16:7 80:10

**month** 36:9

**morning** 5:8,9

**mouth** 18:22

**move** 27:6,12

### N

**names** 9:11,17 69:2

**Nashville** 49:15

**nature** 72:20

**necessarily** 60:16

**needed** 17:13 22:16 49:12 80:3

**newly** 8:8

**nod** 6:8

**nodding** 6:9

**nonverbal** 6:9

**norm** 49:24

**notes** 76:17

**notice** 25:19 26:1 28:9 37:14,15,17,21 38:20 39:12 40:4 45:10 52:8 78:12

**notices** 27:25 28:6,24 29:5,8,16 60:19

**notified** 16:14,16 17:23 22:20

**notify** 17:5,7 28:3

**November** 11:5 59:24 60:5 61:5

**number** 13:16

### O

**oath** 5:18

**Object** 18:18 19:4,17,24 73:6 78:3 81:16

**observe** 32:10

**occasionally** 55:2 69:22

**occur** 13:25 17:14 22:23, 24 38:12,15,16,19

**occurred** 38:13 50:7,9 73:23,25 74:1

**occurs** 30:22

**off-the-record** 51:2 82:4

**office** 5:25 6:4,25 7:5,11, 13 10:2,13 12:10 16:14, 16 17:5,6 18:10 19:8,12, 14 20:6 22:1,22 26:4 27:8 28:2,7,13 31:17 40:4 41:9 45:13,17 46:10 48:18 49:14,17 51:14 52:19 53:7 78:15,21

**offices** 67:3 74:2 75:6,9 80:16

**official** 30:16 33:9 57:17 63:8

**officially** 59:9 63:18

**on-the-ground** 47:19

**ongoing** 59:3

**online** 13:23

**open** 22:17 24:4,7,11,14 25:4,5,15,17 26:12,13,19

27:22 37:3,8,9,10,11 38:3 40:13,21 44:25 48:25 50:17 52:5,14 69:23

**opportunities** 67:18

**opportunity** 67:7

**option** 17:13,17 25:17 49:11 69:8 81:18

**order** 33:14 37:12 57:14, 18 75:8 81:23 82:10

**orders** 33:18 57:22 58:5 62:21

**original** 20:16

**oversaw** 37:22

**oversee** 7:9 12:3 39:22 48:16,21

**overseen** 19:9 46:10

### P

**package** 12:8,22 21:15 22:10 24:17,22 55:15 56:1,9,13 57:16 61:25 62:13,18 63:9,23 64:12 72:11

**panel** 7:14

**paper** 31:14 46:12 68:7

**paralegal** 28:5

**part** 42:16 47:13 60:17 79:20

**participate** 71:8

**participating** 47:5

**parties** 18:10

**party** 11:20

**pass** 73:15

**past** 14:4,7,13 15:6 16:3 51:22 60:4 61:15 64:24 69:4 70:10 72:5 79:18

**pending** 70:22

**people** 25:9 28:2,7 43:14 49:13 74:9,12 81:12,14

**percent** 50:8,10

**period** 26:18 41:20 55:13 57:8,10 59:25 60:7,9,10,13,16,22 61:6,

23 77:15,17 78:1,8

**periodically** 41:11

**permission** 75:8

**person** 17:16 25:6,25 26:3 40:24 43:9,11,20,23 44:19 48:21 49:15 50:11 69:1 73:25 74:14 75:3,25 76:13 81:10

**personally** 67:22 71:8

**physical** 42:9

**physically** 49:5 62:5

**pick** 6:11

**place** 37:22 66:21 71:5

**plan** 52:18

**point** 8:21 17:11,12 26:1 27:1,22 28:16 40:15 44:15 48:22 49:3 55:12, 13,17 56:7

**policies** 79:10

**portion** 77:14

**position** 7:2,18 8:1,5,10, 15 10:12 11:24 66:11

**positions** 15:7

**possibly** 74:21

**post** 28:14 37:24 51:6, 20,25 52:3,12

**posted** 28:6,24 29:5,22 31:7 37:16,18 38:1 39:14 40:2 52:9

**potential** 54:6

**practice** 10:11 20:24 30:3 32:5,7 34:21 61:1,4

**pre** 70:4,14 78:19

**preference** 65:15

**preliminary** 16:24 17:3, 8,11,21 18:2,6,16,24 19:2,11,15,19,22 20:2,4, 11,15 37:11 51:21 52:1, 4,13 70:14

**preparation** 20:14

**prepared** 5:20

**preparing** 71:21

**present** 49:5 74:13

Lexitas - TENNESSEE
(615)595-0073

Index: members' .. present\[6]

presented 47:9

preserved 71:1,6

pretty 13:24

previously 53:17

primarily 21:8

printed 77:5

prior 28:10 32:8,23 34:12,17 49:24 50:10,20 59:5 65:3 73:22 75:1,16 76:13 77:6 79:1

priority 35:25

private 10:11 30:2

privy 49:7

problem 50:18 56:20

problems 48:24 81:6

procedure 20:25 54:7, 13,17,21 55:1 68:5

procedures 15:4

proceeding 82:13

process 12:4,9,14 21:16 22:10 24:19 55:19 60:17 62:6 63:19 65:5 72:18 77:15

Program 7:15

programs 7:9

promoted 7:25 8:3

proposals 31:23 47:18 54:2 56:22 72:21

proposed 32:19 54:16 55:4,11,22 57:15,18,22 58:19 61:7 62:25 64:16 69:15 72:17

prosecuted 43:24

provide 22:19 33:24 53:13 64:2 67:24 70:8 72:2,3,13 76:15,23 77:8, 10,12

provided 18:1 29:6 70:1, 2 76:16 78:7

providing 22:13 52:20, 22 53:11 81:4

proximity 68:15

public 17:13,17 22:14,19 24:5 25:5,10,15,18 26:1,

12,13 27:22,25 28:24 29:4,7,8,15 37:3,8,13,15, 17,20 38:3,20 39:12 40:3,13,17,22,24 41:11, 15,20,25 45:10 48:25 49:5 52:5,8,14,23 53:1, 12,14 54:11 55:13 56:8 57:7,8,11,19 59:25 60:8, 19,21 61:14,23 68:11,21 69:5,7,9,10,14,21,23,24 75:5,6,9,11,15 76:18 77:15,24 78:1,5,12,24 79:2,6 81:5,13

publicly 31:8

purely 31:1 68:2

purpose 53:24 54:1

pursuant 33:11

put 18:22 27:12 28:10 39:20 45:9 57:6 60:6

puts 59:18

putting 27:24

## Q

quarterly 34:10,11,14 35:15 36:20 38:2 39:10 43:1

question 6:19 20:3 26:24 29:19 47:11 69:24

questions 5:7,21 73:20, 21

quick 65:18

## R

Rachel 8:23 28:20 29:1 45:8

ranks 8:2

reach 69:2,25 75:16

reaches 69:21

read 20:10

reason 16:10 56:5,11

recall 14:2 15:16 16:12, 23 23:17,20,21 24:2,6, 10,13,14,15,16 25:7,9, 11,16,18,21 26:15,16,18, 19,25 28:9 29:4,9 32:6

33:17 34:3,13 35:3,9 36:12 37:13 40:22 41:7, 24 42:3,18,20 43:12,18 45:7,12 46:1,4,18 48:12 49:22 50:22 61:2 66:10 70:11,17 71:15,16,20 80:6

received 70:20

recent 15:20

recently 34:16 70:10

recollection 36:1 37:18 40:12 43:25 52:9 53:10 71:4

recommend 59:4

recommendations 54:3,6,14,16 57:3,5,7,19 58:20 60:12 61:13,17 67:23 68:1 78:2

recommended 59:9

record 5:11 6:2 13:24 26:14 29:21 30:22 59:8 65:22

records 29:20 30:16 31:13,14,18,21,24 70:25

reference 68:17

referenced 66:5

referred 55:14

referring 14:22

regular 34:5 82:1

regularly 69:9

reimbursement 70:11

reimbursements 70:6

related 14:15,17,18,20 72:10,20

relates 12:1

relay 28:13

relayed 45:21 59:22

remember 25:13 27:3, 19 43:3,15 45:15 70:20

report 9:4,5,8,14,15,20, 21,23 12:16 28:18,21

reported 28:19 46:1

reporter 22:8 30:13,16, 23,25 31:2,5 32:12,14,15

59:1,7,10,16,18 65:17 69:3 81:23 82:1,8

reporter's 30:14,19,24

represent 48:3 62:3

represented 5:23,24

represents 20:7

request 13:12 15:13 16:2 41:13 68:10,15 75:7,16

requested 13:9,10 16:1, 4 54:10 76:25 79:3 80:20

requesting 15:7 28:9 70:11 79:14

requests 22:6 69:5

require 53:16

required 12:14 22:15 58:1 79:3

requirement 32:4,7 62:4,7,9,10

requirements 19:20

res 62:23

resolution 58:7 62:24 63:1,11,17,19,22,24 64:4

resolutions 62:23 63:3 64:23 65:4,9

responsibilities 21:9

responsible 25:25 26:3 27:24

restate 18:19

restrictions 50:6

restroom 65:18

review 20:12,13,17 60:10,11

reviewed 77:6

Robert 10:15

role 7:21 8:12 10:6,7 12:2,5 15:10 19:7 21:5,7 22:3 27:12 30:14,19,20, 24,25 40:6 53:20 67:22, 23 72:2 76:11 78:23

roles 27:9,11,13,14 28:8

room 25:10 41:10 74:1,4 76:2,4,5 81:12

**rooms** 76:3

**rosters** 48:19

**roughly** 9:12 55:18 61:6 74:7,15

**rule** 54:1,2,6 56:21 58:6, 19 62:23 63:1,11,19,25 64:12,23 65:3,9 67:23 68:1,4,5 69:15

**rules** 12:8,12,22 14:21 20:24 21:15 22:9 24:16, 21 54:7,13,17,20,23,25 55:4,11,14,22 56:1,9,11 57:15,18,23 59:4 60:6 61:3,7,15,25 62:13,18,24 63:9,14,21,23 64:3,7,10, 16,22 72:10 77:14 78:1, 23 79:9,20

### S

**SAITH** 82:12

**sat** 24:24 40:9

**schedule** 65:13

**scheduled** 35:24 38:10, 11 65:10

**schedules** 65:9

**scheduling** 21:12

**school** 10:18 30:9

**seats** 74:7

**security** 43:15,17 75:7, 12,17,22

**segue** 10:20

**selected** 32:14,15

**Senate** 57:25 64:6,22

**send** 51:15 57:1 59:14 60:19 61:8 63:1

**sense** 12:10

**separate** 63:24

**separately** 66:6

**September** 34:18,21 35:4 36:3,6 38:8 55:24 56:12 59:5,24 60:5 61:5

**served** 23:9

**services** 63:8

**session** 13:4,6 14:1,4,7, 8 65:15

**sessions** 13:3 16:4

**set** 36:9 53:4 64:19

**sets** 53:7

**settled** 56:22

**share** 6:2

**shift** 27:8

**shifted** 50:10

**short** 65:20

**shortly** 8:23

**show** 75:18 76:13

**signature** 82:11

**similar** 65:24

**sir** 5:19,22 21:1

**sit** 24:20

**sitting** 25:10

**slightly** 34:23

**small** 81:11

**son** 42:2

**sooner** 82:2

**sought** 21:16

**space** 22:6 31:3

**speak** 61:11 79:14

**speaking** 41:18

**specific** 69:12 79:4

**specifically** 24:6 25:7, 22 26:2 27:13 29:9 33:19

**specifics** 24:15

**sponsor** 15:1 63:2

**sponsored** 14:19

**Stacy** 9:18

**staff** 12:6 21:10

**Stahl** 6:1 18:18 19:4,17, 24 73:6,17,20 78:6 80:23 81:16,22 82:9

**standing** 79:23,25 80:4

**start** 7:18 56:13 60:8

**started** 8:22 10:17 23:15 26:22 27:20 73:24

**starting** 36:24

**state** 5:10 11:8,14 66:12, 16,17,18 67:2,5,13,19

**statements** 6:10

**states** 67:9

**statute** 12:15 32:4 33:11, 20,24 34:2 58:1 61:1,2

**statutory** 32:6 62:10 72:17

**Stephanie** 9:19

**stipulation** 6:18

**stopped** 41:22

**strike** 20:3

**subcommittee** 68:18 80:14,15

**subcommittees** 79:20 80:5,12,17,20

**submit** 62:13 63:9

**subtract** 57:5

**suggestion** 68:22 69:15

**summary** 63:22

**supervise** 48:16

**supervisors** 9:14,16

**supervisors'** 9:17

**supplies** 76:16

**support** 23:3 52:20 67:24 70:8 76:12 77:9 80:21

**supportive** 22:7

**suppose** 81:8

**supposed** 71:1

**Supreme** 19:23 22:3 30:1 31:12,16 32:16 33:10,13 41:2 43:6 44:3, 8,12,23 46:9 55:23 56:2, 24 57:2,4,12,24 59:11, 20,23 60:18 61:8,24 62:2,7 72:4 73:2 77:25 78:8

**sworn** 5:4

**system** 7:14 12:4 13:7 63:20

### T

**table** 74:7

**takes** 10:8 61:25

**talk** 13:1 65:2 68:6 72:18

**talked** 15:5 21:20

**talking** 66:24

**Tate** 28:17,18

**Taylor** 28:17

**TCA** 20:25

**tech** 74:21 77:9

**technical** 80:20

**technology** 74:22

**ten** 10:9 29:17 74:15

**Tennessee** 11:1,6,12,14 13:21 19:23 20:2 22:3 30:1 31:11,16 32:15 33:10,13 41:2 44:3 46:9 54:8 56:3 61:24 65:25 66:24 67:7

**term** 23:1 33:24 41:18 51:10 57:17 58:15 62:16

**terminology** 47:2

**terms** 18:6,16 29:15 52:19 55:10

**testified** 5:4 15:9

**testify** 13:4 16:1,11

**testimony** 13:9,12,14 14:3,14 15:17,19,23 16:4

**time** 6:13,17 14:2,6 15:16 16:21 20:10 23:22 24:1,7 25:8 26:4,9,18 27:9,14 28:3,5,19 38:20 42:21 43:7,8 45:9 56:9 60:11,14

**times** 15:3 66:23 72:19

**timing** 52:1

**title** 7:21

**titles** 48:7

**today** 5:15,21 16:10

**told** 11:23 28:12 44:24 45:4,5,9,12,14,19

**tone** 42:13

**top** 27:4

**topic** 15:8 41:16 42:17, 18 54:9

**topics** 13:16 15:3 72:6,7, 9

**total** 9:13

**town** 35:24

**transcripts** 13:20

**transmitted** 59:17

**travel** 49:14

**Tuesday** 82:6

**type** 9:25 14:25 49:6

**types** 21:13

**typical** 34:8

**typically** 14:10 15:25 21:2 35:23 51:16 55:20 57:9 58:3 60:1,2,21 62:12 63:4,9 64:2,5 67:12 68:13 74:13,23 76:20,23,25

---

**U**

---

**uh-huh** 20:19 23:16 36:19 40:11 49:18 50:2 55:16 58:13

**ultimate** 21:15

**ultimately** 22:10

**undergraduate** 10:21

**understand** 5:17 6:12 12:20 25:11 33:7 51:11 58:14

**understanding** 17:10 18:5,8 23:7 24:21 55:11 70:24

**University** 10:23 11:1

**unlimited** 81:14

**unpack** 58:11

**unruly** 40:25

**upcoming** 39:6,7,13

**upload** 78:17

**upset** 42:17

---

**V**

---

**varied** 28:1,7 34:23 69:4

**varies** 13:17 15:2 57:9 60:1 61:19 63:3 66:22 68:9,12

**verbal** 6:10 42:6,10 43:10

**verbally** 43:10,23 48:23

**verify** 75:20

**versus** 47:13

**vicinity** 35:5

**view** 49:6

**virtual** 50:5,8,10,14 51:8, 12 70:13 73:23 75:2 77:7 80:18,21

**virtually** 49:12 50:13,17

**vote** 47:1,8

**votes** 47:4 55:17

**voting** 33:3,5,6,8,9,16,22 46:19,22 47:2,4,12 48:10

---

**W**

---

**Wade** 42:22,23 43:9 45:23

**waive** 82:10

**walk** 55:9 75:10

**wanted** 39:19 76:16

**warrants** 68:17

**ways** 68:24

**website** 21:3 25:21 28:10 29:10,12,18 37:16 38:1 39:13,20 47:22 48:10,14 69:2,11,14,18 78:11,16

**Wedemeyer** 10:15

**Wednesday** 82:7

**week** 20:12

**weeks** 58:4

**whatnot** 57:6 76:22 77:11 78:20

**When's** 20:10

**whichever** 62:24 64:12

**witnessed** 79:13,16 80:11

**wondering** 76:10

**Word** 78:19

**words** 18:22

**work** 6:24,25 9:25 22:4,5 25:6 32:20 52:21 59:2 61:10

**worked** 10:1 28:2

**working** 51:5

**works** 15:14 34:1 59:19

**write** 59:1 68:7

**writing** 76:16

**written** 58:8 78:19

**wrong** 12:20

---

**Y**

---

**year** 8:3 10:22 14:7,13 15:6 24:22 26:23 27:16 34:9,19 35:16 36:17 38:7 55:21,25 60:1 63:3,4 66:23

**years** 8:13 10:7,9 25:2 27:1 29:17 34:23

**Young** 73:21

---

**Z**

---

**Zoom** 31:3 51:14,15,20 52:22

Case 3:22-cv-00439    Document 74-2    Filed 12/15/23    Page 32 of 32    PageID #: 2765

*Lexitas - TENNESSEE*
*(615)595-0073*

Index: tone..Zoom9