# Exhibit

# 1

# MCCALEB

## vs.

# LONG

---

# GINO BULSO

# October 09, 2023



.
Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073|
tn.scheduling@lexitaslegal.com

IN THE UNITED STATES DISTRICT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

DAN McCALEB, Executive
Editor of
THE CENTER SQUARE,

                   Case No. 3:22-cv-00439

   Plaintiff,

   vs.                Judge Richardson

                   Magistrate Judge
MICHELLE LONG, in her    Frensley
official capacity as
DIRECTOR of the
TENNESSEE ADMINISTRATIVE
OFFICE OF THE COURTS,

   Defendant.

_____

Deposition of:

GINO BULSO

Taken on behalf of the Plaintiff
October 9, 2023

_____

Saba McKinley, LCR, RPR, CRI

---

**Page 2**

A P P E A R A N C E S

For the Plaintiff:

           M. E. BUCK DOUGHERTY III
           Attorney at Law
           LIBERTY JUSTICE CENTER
           440 N. Wells Street
           Suite 200
           Chicago, Illinois 60654
           423.326.7548
           Bdougherty@ljc.org

For the Defendant:
           MICHAEL M. STAHL
           Senior Assistant Attorney General
           OFFICE OF THE ATTORNEY
           GENERAL & REPORTER
           Federal Habeas Corpus Division
           P.O. Box 20207
           Nashville, Tennessee 37202
           615.253.5463
           Michael.stahl@ag.tn.gov

Also Present:
           For Witness Bulso
           ASHLEY CARTER
           Attorney at Law
           Senior Assistant Attorney General
           STATE OF TENNESSEE
           ATTORNEY GENERAL
           315 Deaderick Street
           Nashville, Tennessee 37243
           615.741.7932

---

**Page 3**

APPEARANCES CONTINUED:

           For Witness Bulso
           CAROLYN U. SMITH
           Deputy Attorney General
           Education and Employment Division
           315 Deaderick Street
           Nashville, Tennessee 37243
           615.532.2578
           Carolyn.Smith@ag.tn.gov

---

**Page 4**

I N D E X

                        Page
Examination
  By Mr. Dougherty           6
  By Mr. Stahl              77
  By Mr. Dougherty           79
  By Mr. Stahl              81

E X H I B I T S

(None marked)

```
 1
 2        S T I P U L A T I O N S
 3
 4        The deposition of GINO BULSO was taken by counsel
 5   for the Plaintiff, by Notice, at the John Sevier State
 6   Office Building, 500 Dr. Martin Luther King, Jr.
 7   Boulevard, Nashville, Tennessee, on October 9, 2023, for
 8   all purposes under the Federal Rules of Civil Procedure.
 9        All formalities as to caption, notice, statement
10   of appearance, et cetera, are waived.  All objections,
11   except as to the form of the question, are reserved for
12   the hearing, and that said deposition may be read and
13   used in evidence in said cause of action in any trial
14   thereon or any proceeding herein.
15        It is agreed that SABA MC KINLEY, LCR, RPR, CRI,
16   may swear the witness, and that the reading and signing
17   of the completed deposition by the witness are waived.
18
19
20
21
22
23
24
25
```

```
 1              * * *
 2              GINO BULSO,
 3   was called as a witness, and after having been first
 4   duly sworn, testified as follows:
 5
 6              EXAMINATION
 7   QUESTIONS BY MR. DOUGHERTY:
 8   Q  Good morning, Mr. Bulso.
 9   A  Good morning.
10   Q  Have you ever had your deposition taken before
11   today?
12   A  Yes.
13   Q  When was that?
14   A  Several times.
15   Q  Can you recall those times and in what -- what
16   the reason was?
17   A  Sure.  I believe I gave several depositions in
18   litigation with a adverse party named Ken Nelson, who
19   was a defendant in a fraudulent transfer case that I
20   filed.  He filed some type of an action against me, and
21   I think there were one or two depositions in that case.
22   Q  And that litigation that was filed by
23   Mr. Nelson, that was against you in your capacity as an
24   attorney?
25   A  Yes and no.  I was an attorney.  He sued me as
```

```
 1   a party, claiming some type of malicious prosecution.
 2   Q  Okay.
 3   A  And it was a deposition that was given, I
 4   think, here in Nashville.  At some point, the case was
 5   dismissed and refiled in Wisconsin.  Before that case
 6   was dismissed, I may have testified again.  And then
 7   there was another action brought by parties from
 8   San Francisco in which I was deposed.
 9        MR. DOUGHERTY:  I tell you what.  Let's go off
10   the record for a second.
11
12        (Discussion off the record)
13
14   BY MR. DOUGHERTY:
15   Q  Mr. Bulso, I appreciate that.  I should have
16   probably clarified.
17        You're an attorney; is that correct?
18   A  Yes.
19   Q  When I asked that question, I was referring to
20   you specifically being part of a deposition, giving your
21   deposition.
22        Did you understand that correctly?
23   A  Yes.
24   Q  Okay.  I'll try to clarify that next time.
25        Do you understand, Mr. Bulso, that you are
```

```
 1   under oath here today?
 2   A  Yes.
 3   Q  Are you prepared to answer the questions that I
 4   ask of you today?
 5   A  To the best of my ability.
 6   Q  Okay.  Have you taken any medications before
 7   your deposition today that could affect your ability to
 8   give honest and truthful answers?
 9   A  No.
10   Q  Will you inform me if you do not understand a
11   question had that I ask of you today?
12   A  Yes.
13   Q  I will try to clarify that to the best of my
14   ability.
15        And then, I know you're an experienced
16   attorney, it's my understanding.  So any time you need
17   to take a break, feel free and we can.
18   A  All right.
19   Q  Then just a couple other points.
20        Obviously, in giving depositions, it's very
21   important to give audible, verbal responses.
22        Do you understand that?
23   A  Yes.
24   Q  I know quite frequently, as a matter of habit,
25   we all kind of nod our heads.  It's important, for the
```

1  court reporter, for you to give audible and verbal
2  answers.
3      Okay?
4  **A   Understood.**
5      Q   You understand the procedures we've outlined
6  here today for conducting your deposition?
7  **A   Could you ask that again?**
8      Q   Sure.  Do you understand the procedures we've
9  gone over for conducting your deposition today?
10 **A   I presume they're in accordance with the**
11 **Federal Rules of Civil Procedure.**
12     Q   That's correct.  I meant kind of general
13 guidelines; if you need a break, those simple kind of
14 common sense things.
15     Do you understand that?
16 **A   I do.**
17     Q   Can you please state your full name for the
18 record?
19 **A   Eugene Nicholas Bulso, Jr.**
20     Q   You go by Gino; is that correct?
21 **A   Correct.**
22     Q   Okay.  How old are you and what is your date of
23 birth?
24 **A   61.  December 25, 1961.**
25     Q   Where do you live, Mr. Bulso?

1  **A   Brentwood, Tennessee.**
2      Q   How long have you lived there?
3  **A   28 years.**
4      Q   Okay.  Where do you work?
5  **A   I work at Bulso PLC.  155 Franklin Road, Suite**
6  **400, Brentwood, Tennessee.**
7      Q   You're an attorney; is that correct?
8  **A   Yes.**
9      Q   Are there any other attorneys in practice with
10 you at your firm?
11 **A   Yes.**
12     Q   How many other attorneys are in practice with
13 you?
14 **A   Three.**
15     Q   What are their names?
16 **A   Paul Krog, Nicholas Bulso, and Niko Tsiouvaras.**
17     Q   The other Nicholas Bulso, that a relative?
18 **A   Yes.**
19     Q   Is he your son?
20 **A   Exactly.**
21     Q   Okay.  Does he go by "Junior" or "the third" or
22 anything like that?
23 **A   He goes by Nicholas.**
24     Q   Okay.  What other law firms have you been
25 associated with prior to your current firm?

1  **A   Boult Cummings Conners & Berry, and Leader**
2  **Bulso & Nolan PLC.**
3      Q   Can you give me the approximate years when you
4  were with Boult Cummings?
5  **A   1986 to May 2008.**
6      Q   And the other firm that you gave, what was that
7  name again?
8  **A   Leader Bulso & Nolan.**
9      Q   Approximately what years were you associated
10 with that firm?
11 **A   2008 to 2020.**
12     Q   How long again have you been associated with
13 your current firm, Bulso PLC?
14 **A   Since its formation in about May of 2020.**
15     Q   Where did you go to undergraduate school?
16 **A   Cornell college.**
17     Q   What year did you graduate from Cornell?
18 **A   1983.**
19     Q   What school -- what law school did you attend
20 and graduate from?
21 **A   Emory.**
22     Q   In Atlanta?
23 **A   Yes.**
24     Q   What was your graduation year?
25 **A   1986.**

1      Q   How many state bar licenses do you currently
2  carry?
3  **A   One.**
4      Q   And what is that?
5  **A   Tennessee.**
6      Q   Do you recall the year of your first admission?
7  **A   Yes.**
8      Q   What is that?
9  **A   1986.**
10     Q   Are you admitted to any other courts besides
11 the state of Tennessee courts?
12 **A   Yes.**
13     Q   What are those?
14 **A   In the federal system, the U.S. Supreme Court,**
15 **the U.S. Court of Appeals for the 6th Circuit, U.S.**
16 **Court of Appeals for the 5th Circuit, U.S. Court of**
17 **Appeals for the 4th circuit.**
18     **The Middle District of Tennessee.  The Eastern**
19 **District of Tennessee, the Western District of**
20 **Tennessee, the Eastern District of Arkansas, the**
21 **Southern District of Texas, the Eastern District of**
22 **Wisconsin.**
23     **And those are the ones that I can recall right**
24 **now.**
25     Q   You did a better job that I did.  I typically

1 have to look at my plaques on the wall to figure that
2 out.
3    Have you ever been formally disciplined by a
4 state bar licensing authority?
5  **A Yes.** **A No.**
6  Q Have you ever been disciplined by a court that
7 you're admitted in?
8  **A I have not.**
9  Q Have you ever been convicted of a crime?
10 **A I have not.**
11 Q Other than the Ken Nelson matter that you
12 described, have you ever been sued before?
13 **A In the San Francisco matter that I mentioned**
14 **earlier.**
15 Q Is that the Ken Nelson matter?
16 **A That's a different case.**
17 Q Okay. Let's try -- I just want to get this for
18 the record.
19 **A Sure.**
20 Q Can you tell me the name of the litigation and
21 what court in what you refer to as Ken Nelson
22 litigation?
23 **A That was Nelson vs. Bulso, originally filed in**
24 **the Davidson County Chancery Court and later filed in**
25 **the Eastern District of Wisconsin.**

1  Q Do you happen to recall the case number or
2 anything like that?
3  **A I do not.**
4  Q Do you recall the year when that was filed?
5  **A I do not.**
6  Q How did that litigation conclude?
7  **A It was dismissed.**
8  Q You were a defendant in that case?
9  **A Correct.**
10 Q That was a civil matter?
11 **A Yes.**
12 Q You refer to something -- the San Francisco
13 litigation; is that correct?
14 **A Right. There was an action, San Francisco**
15 **Residence club versus Leader Bulso & Nolan PLC. I**
16 **believe I was individually named in that case as well.**
17 Q When was that lawsuit filed?
18 **A Sometime around 2014 or '15.**
19 Q Did that conclude, that case conclude?
20 **A It was dismissed on summary judgment.**
21 Q What court was that in?
22 **A Ultimately, it was in the Northern District of**
23 **Alabama.**
24 Q You say "ultimately." Was it in another court
25 before it got transferred?

1  **A Yes.**
2  Q What court was that?
3  **A As I recall, it was originally filed in state**
4  **court in Marin County, California. It was removed to**
5  **the Northern District of California, Federal District**
6  **Court, and then transferred to Alabama.**
7  Q Okay. Are you represented by counsel today?
8  **A Yes.**
9  Q Who represents you?
10 **A Ashley Carter.**
11 Q Ms. Carter's here today, correct?
12 **A Yes.**
13 Q How did you learn of your deposition today,
14 that it was going to be taken today?
15 **A I was advised by counsel.**
16 Q Okay. As a nonparty to this lawsuit, you're
17 entitled, under federal statute, to receive a daily fee
18 for your attendance plus mileage reimbursement. I
19 believe I may have sent an email either -- last week to
20 the other -- Mr. Stahl's group, who represents Director
21 Long.
22    Where should I send your check for your
23 appearance today and your mileage fee, number one? Who
24 should I send that to?
25 **A You can send that to me at the firm.**

1    MR. DOUGHERTY: Is that okay, Ms. Carter?
2    MS. CARTER: Yes.
3 BY MR. DOUGHERTY:
4  Q You've already given -- can you go ahead and
5 give me that address once again?
6  **A Sure. It's Bulso PLC. 155 Franklin Road,**
7  **Suite 400, Brentwood, Tennessee 37027.**
8  Q And then, should I calculate your mileage
9 reimbursement from your office to this office and then
10 back to be able to send you a check?
11 **A That would be fine.**
12 Q Okay.
13 **A It should be -- it will be nine miles either**
14 **way.**
15 Q Okay. Great.
16    All right. Mr. Bulso, are you familiar with
17 the Advisory Commission on the Rules of Practice and
18 Procedure that was created by Tennessee Code annotated
19 16-3-601?
20 **A Yes.**
21 Q What is that?
22 **A It's a commission that the General Assembly**
23 **created to advise the Supreme Court on rules of practice**
24 **and procedure.**
25 Q When you say "the Supreme Court," you're

1 referring to Tennessee Supreme Court; is that right?
2    A  Yes.
3    Q  Are the members of that commission typically
4 listed on the Tennessee Administrative Office of the
5 Courts' website?
6        MS. CARTER:  Can I just make a clarification
7 for the record --
8        MR. DOUGHERTY:  Yes.
9        MS. CARTER:  -- as we're going into this?
10       So I just want to clarify that you've noticed
11 him in his individual capacity.  That's -- to the extent
12 he knows, he's welcome to testify to it, but I just want
13 to make sure that it's clear on the record that he's not
14 testifying for the commission in the deposition today.
15       MR. DOUGHERTY:  I think that's correct.  I
16 think the reason for Mr. Bulso's testimony is in his,
17 which we'll get into, his capacity as chair of the
18 Advisory Commission.
19       MS. CARTER:  Right.  But he's not here to
20 testify on behalf of the commission as its chair.  He's
21 here to testify as an individual.
22       So I just want to make certain that as we go
23 through, he's providing whatever knowledge he has to you
24 just for clarification purposes.
25       MR. DOUGHERTY:  Okay.

1 BY MR. DOUGHERTY:
2    Q  Can you describe the commission?
3    A  A commission is a group of attorneys and judges
4 appointed by the Tennessee Supreme Court pursuant to
5 16-3-601 to assist it in modifying Rules of Civil and
6 Criminal Procedure.
7    Q  We'll get to those different committees in a
8 moment.
9       So I think you said this already, but there are
10 members of the judiciary that serve on the commission.
11    A  In an ex officio capacity, yes.
12    Q  What does that mean?
13    A  It means they're nonvoting members.
14    Q  But they're on the actual Advisory Commission,
15 the judicial members?
16    A  I'm not sure exactly how to answer that.  I
17 know that the statute gives the Supreme Court the
18 authority to appoint members to the commission.  I know
19 that we've got attorneys who vote on proposals that come
20 before the commission, and that we have judges who are
21 involved in the meetings but who do not actually vote.
22       When you say that they're members of the
23 commission, I'm not exactly sure I can answer that
24 specifically.
25    Q  Have you ever gone to the AOC website and seen

1 the names that were listed for the Advisory Commission
2 on that website?
3    A  Yes.
4    Q  Does it list names of judicial members?
5    A  I don't know.
6    Q  I've actually viewed it this morning.  I will
7 give you some names, and you can tell me if they are
8 members of the judiciary.
9       Okay?
10   A  Sure.
11   Q  So it list you as the chair, Gino Bulso, and
12 that's correct?
13   A  It is.
14   Q  How long have you been the chair for the
15 Advisory Commission?
16   A  The last two years.
17   Q  Do you recall the year or the day that you were
18 appointed to the commission as chair?
19   A  Not the specific date, no.
20   Q  Would it have been 2020 or after that?
21   A  It was either in 2020 or 2021.
22   Q  In your current appointment as chair of the
23 Advisory Commission, how long is the term?
24   A  My understanding is it's one year.
25   Q  Did you serve as chair in 2022?

1    A  Yes.
2    Q  Was that for the full year?
3    A  Yes.
4    Q  Did you serve as chair in 2021?
5    A  At least for part of the year, I believe so.
6    Q  You were appointed, you think, halfway or part
7 of the way through 2021; is that your testimony?
8    A  No.  My testimony is that I was appointed, I
9 believe, either in 2020 or 2021.  I don't recall
10 specifically which year it was.
11   Q  Okay.  Are you -- is it your understanding
12 you're to chair the full year in 2023?
13   A  My understanding is that I'm to be chair so
14 long as the Supreme Court wants me to be.  And at some
15 point, if they decide to fill that role with some other
16 person, then obviously they'll issue an order doing
17 that.
18       But I serve at the pleasure of the Supreme
19 Court as chair.
20   Q  So earlier you testified that your term was one
21 year.  By that you mean, as I understand it from what
22 you just said, it's a rolling one year until you're
23 notified that you're no longer chair?
24   A  I'm not sure I'd say it quite that way.
25   Q  I'm just trying to understand.  I just wanted

1 to clarify that point.
2   A   Sure.  I was appointed by the Supreme Court to
3 be chair of the Advisory Commission, and then at least
4 once or possibly twice since I was initially appointed,
5 the Supreme Court liaison has asked me to continue in
6 that role.  And I've agreed to do so.
7   Q   How does the Supreme Court communicate with you
8 about that?
9   A   Principally through the liaison.
10   Q   Do they -- do any of the members of the Supreme
11 Court communicate with you by email regarding your role
12 as chair?
13   A   I do not believe I've ever exchanged an email
14 with anyone on the Supreme Court about that, no.
15   Q   And you never exchanged email with Director
16 Michelle Long of the Tennessee AOC about your --
17 regarding your role as chair?
18   A   Not that I recall.
19   Q   We'll get to the other members.  It's my
20 understanding that there are some AOC staff members that
21 serve on the commission; is that correct?
22   A   I do not believe that it is.
23   Q   Okay.  Then let's unpack that.
24       Can you explain that?
25   A   I don't believe there's anyone at the AOC who

1 is actually on the commission.
2   Q   Okay.  So my understanding, from looking at the
3 website this morning, it lists AOC staff contact
4 Michelle Consiglio-Young.
5       Do you know her?
6   A   Yes.
7   Q   Does she attend Advisory Commission meetings?
8   A   Yes.
9   Q   What is her role on the Advisory Commission, or
10 what is her role when she does attend the meetings?
11   A   Her role is that of a facilitator.
12   Q   Okay.  Can you explain what that means?
13   A   Sure.  Our meetings are conducted remotely, and
14 so there is a Zoom link that is hosted for the meeting,
15 and Michelle typically is in charge of hosting the
16 remote connection.  So she'll circulate a link to the
17 reporter for the commission, who will then circulate
18 to the other commission members.
19       And then Michelle will be virtually online
20 throughout the meeting to manage the connection.
21   Q   Does Ms. Young -- is it fair to say she
22 provides administrative support to the Advisory
23 Commission?
24   A   Yes.
25   Q   Now, when you said that -- we'll get in, a

1 little bit later, to meetings being open to the public.
2 But when you said that your meetings are remote, what
3 did you mean by that?
4   A   What I meant was that currently, when we
5 conduct meetings of the Advisory Commission, that the
6 members of the commission are not in the same place.
7 Rather, they're meeting through a Internet connection.
8   Q   When did the remote meetings of the Advisory
9 Commission, when did that begin?
10   A   Well, as long as I've been on the commission,
11 at least some portion of the meeting has been remote.
12   Q   Would that have been in 2020?
13   A   Can you clarify?
14   Q   Did the remote Advisory Commission meetings
15 begin in 2020?
16   A   No.
17   Q   Did they begin in 2021?
18   A   No.
19   Q   Did they begin in 2022?
20   A   No.
21   Q   Did they begin in 2023?
22   A   No.
23   Q   Okay.  I'm just trying to understand.  When did
24 the remote meetings start, when you all were in
25 different places having your meeting?

1   A   Well, as I stated a moment ago, for as long as
2 I've been on the commission, at least some portion of
3 the meeting has been remote.
4   Q   Okay.  Were you on the commission in any other
5 capacity prior to your serving as chair?
6   A   Yes.
7   Q   Tell us what -- when that was and what was your
8 role.
9   A   I was initially appointed as a member of the
10 commission, I believe, in 2016.
11   Q   So, in 2016, you were not the chair; is that
12 correct?
13   A   That is correct.
14   Q   How many years do you recall serving prior to
15 being appointed chair?
16   A   I would estimate four to five years.
17   Q   When you started in 2016 with your initial
18 appointment to the Advisory Commission, is it your
19 testimony that you all held meetings remotely?
20   A   In part, yes.
21   Q   Okay.  Were there some times where you met
22 physically, in person?
23   A   What I mean by "in part" is that the way the
24 meetings were conducted were through videoconference.
25 So we have a room of commission members in Nashville who

1 would be joined by videoconference with other members
2 who were meeting together in the same room in Memphis,
3 and a third group of members meeting in Knoxville. And
4 also there sometimes were members who participated by
5 telephone.
6      So that was a hybrid of having some members in
7 person; yet, meeting, in part, being conducted remotely
8 through videoconference.
9    Q  In 2016, when you met -- did your group meet
10 here in the Nashville area?
11   A  Yes.
12   Q  What office did you meet at?
13   A  At the AOC.
14   Q  The Tennessee AOC office?
15   A  Yes.
16   Q  That was in 2016?
17   A  Yes.
18   Q  Do you recall who the chair was of the Advisory
19 Commission when you were first appointed?
20   A  I do.
21   Q  Who was that?
22   A  Jim Doran.
23      (Stenographer interrupts for
24      clarification.)
25      THE WITNESS:  D-O-R-A-N.

1 BY MR. DOUGHERTY:
2    Q  Is Mr. Doran still on the commission?
3    A  No.
4    Q  When he was chair, was he -- what did he do --
5 strike that question.
6      When he was chair, was he a private attorney or
7 was he a judge?
8    A  He was an attorney.
9    Q  Was he in private practice in the Nashville
10 area?
11   A  Yes.
12   Q  Do you know if he is still practicing law in
13 Tennessee?
14   A  I believe so, yes.
15   Q  Do you know what firm he's with?
16   A  I believe I do.
17   Q  Can you name it, please?
18   A  I believe he's with what is now Holland &
19 Knight.
20   Q  Who was the executive director of the Tennessee
21 AOC in 2016, when you were first appointed?
22   A  I do not remember.
23   Q  Was it Michelle Long?
24   A  I do not believe it was, no.
25   Q  Do you know the current deputy director, Rachel

1 Harmon, of the Tennessee AOC?
2    A  I know of her.
3    Q  Does she ever participate in you all's meetings
4 currently?
5    A  I do not recall Rachel ever being in one of our
6 meetings.
7    Q  Do you recall if she was working with the AOC
8 in 2016, when you were first appointed?
9    A  I do not.
10   Q  You do not recall, or you do not know?
11   A  I do not recall.
12   Q  When you were first appointed in 2016, were any
13 of those meetings ever open to the public?
14   A  I'm not sure.
15   Q  Do you ever -- you don't ever recall the
16 Advisory Commission discussing whether the meeting
17 should or should not be open to the public?
18   A  Correct.
19   Q  Do you ever recall seeing a public meeting
20 notice for any of those meetings beginning in 2016?
21   A  I do not recall seeing such a notice.
22   Q  Was there someone on the Tennessee AOC staff
23 that provided administrative support during these
24 meetings for you?
25   A  Yes.

1    Q  Who was that?
2    A  Michelle Consiglio.
3    Q  So she's currently providing administrative
4 support.  I think that's your testimony, correct?
5    A  I believe she's currently on maternity leave.
6 But when she's not on maternity leave, yes, she is.
7    Q  I think you're right.  She'll be back in
8 November, is my understanding.
9      It's also your testimony when you joined the
10 Advisory Commission in 2016, Ms. Young was there
11 participating in your meetings?
12   A  I believe so.  I believe she was participating
13 then in the same respect that she participates now.
14   Q  And that would be providing administrative
15 support?
16   A  Yes.
17   Q  From 2016 through 2022, during your time
18 serving on the commission, were any of those meetings
19 ever open to the public?
20   A  I'm not sure.
21   Q  How would you know if they were open to the
22 public?
23   A  I mean, if someone had told me, I presume that
24 I would know.
25   Q  If there were a public meeting notice still

1 posted on the Tennessee AOC website that says there's a
2 meeting that's open to the public, would you think that
3 that meeting probably was open to the public?
4   A  I'm not sure.
5   Q  Let me rephrase it.
6       Were there any members of the public that
7 physically came in to any of the offices that you
8 observed during these meetings?
9   A  I do not recall that happening.
10   Q  Do you ever recall seeing some type of video
11 setup that allowed the meetings to be broadcast to the
12 public from 2016 to 2022?
13   A  I do not recall that.
14   Q  We'll go through some more names later.  I want
15 to go kind of back -- more names of the current
16 commission members.
17       Okay?
18   A  Sure.
19   Q  Are there different subcommittees of the
20 Tennessee Advisory Commission?
21   A  No.
22   Q  Can you give me a summary of what the
23 commission does in terms of the various court rules that
24 it reviews potential rules?
25   A  Sure.  In summary, there will be proposals made

1 by members of the commission or by other attorneys or
2 judges across Tennessee, or by others, to modify an
3 existing rule of evidence, appellate procedure, civil
4 procedure, criminal procedure, or juvenile procedure.
5       And then we will, at a Advisory Commission
6 meeting, typically assign the proposal to one of our
7 standing committees.  And then the committee will
8 discuss the proposal amongst itself and then report at
9 the next Advisory Commission meeting as to what their
10 recommendation would be with regard to the proposal.
11       We will then, at some point, vote on whether to
12 adopt a rule change, and if so, that is prepared by the
13 AOC and presented to the Supreme Court.
14   Q  Is there a committee to make recommendations
15 for the Criminal Rules of Tennessee Procedure?
16   A  We have a committee on the Rules of Criminal
17 Procedure.  I'm not sure that I would characterize that
18 what that committee does is recommendations.  They will
19 investigate a proposed rule change and then report at a
20 Advisory Commission meeting.  And then one or more
21 members of that committee may make a motion to adopt a
22 rule change, at which point it's debated by the entire
23 commission.
24   Q  Does the Tennessee Advisory Commission make
25 rule recommendations on the Criminal Rules of Procedure?

1       MS. CARTER:  I'm sorry.  Can you just repeat
2 that last question?
3       MR. DOUGHERTY:  Sure.
4 BY MR. DOUGHERTY:
5   Q  Does the Tennessee Advisory Commission on the
6 Rules of Practice and Procedure make recommendations to
7 the Tennessee Supreme Court regarding the Criminal Rules
8 of Procedure?
9   A  Yes.
10   Q  Does the Tennessee Advisory Commission make
11 rule recommendation to the Supreme Court regarding the
12 Civil Rules of Procedure?
13   A  We do.
14   Q  Does the Tennessee Advisory Commission make
15 rule recommendations to the Supreme Court regarding the
16 Appellate Rules of Procedure?
17   A  Yes.
18   Q  Does the Tennessee Advisory Commission make
19 rule recommendations to the Supreme Court regarding the
20 Rules of Evidence?
21   A  Yes.
22   Q  Does the Tennessee Advisory Commission make
23 rule recommendations to the Supreme Court regarding the
24 Juvenile Rules of Procedure?
25   A  We do.

1   Q  How do you communicate -- how does the Advisory
2 Commission communicate these rule recommendations to the
3 Tennessee Supreme Court?
4   A  Through the AOC.
5   Q  So once a rule recommendation is made, the
6 Advisory Commission will communicate those
7 recommendations directly to the AOC?
8   A  I wouldn't characterize it that way.
9   Q  Well, you just said that.  I just want to
10 understand it.
11       Can you explain how that process works?
12   A  Well, if there is a firm vote by a majority of
13 the members of the Advisory Commission on a proposed
14 rule change, somehow, administratively, that is prepared
15 by the AOC.  And then from that point, it's communicated
16 to the full Supreme Court.
17   Q  Does Michelle Consiglio-Young, once a vote has
18 been taken on a rule change, does she then go back to
19 the AOC, or do you, as chair, communicate with the AOC
20 as far as the rule change?
21   A  To the Supreme Court?
22   Q  To the AOC.
23   A  Well, Michelle's present at the meetings, so
24 she knows what happened.
25   Q  Yeah.  I'm just trying to understand the

1 process.
2    Let's say the commission makes a vote --
3    A  Yeah.
4    Q  -- for a rule recommendation.  Do you then, as
5 chair, get on your email and send an email to someone at
6 the AOC office?
7    A  No.
8    Q  Does -- is it your understanding that
9 Ms. Michelle Consiglio-Young, since she's present, does
10 she then go back to the AOC and communicate that to the
11 director, for example?
12    A  I don't know.
13    Q  But it's your understanding that the AOC is the
14 next point of contact who receives the rule
15 recommendations from the Advisory Commission?
16    A  I think that's fair.  I would also add that we
17 do have a reporter that's appointed by the Supreme Court
18 for the Advisory Commission, and so there likely is some
19 involvement between Michelle at the AOC and our reporter
20 on actually packaging the rule and communicating it to
21 the full Supreme Court.
22    Q  Who is the current reporter for the Tennessee
23 Advisory Commission?
24    A  Lynn Zehrt.
25    Q  How do you spell her last name?

1    A  I believe it's Z-E-R-T.
2    Q  Would her name be listed, Ms. Zehrt's name,
3 would it be listed on the website that sets out the
4 names for the Advisory Commission members?
5    A  I don't know.
6    Q  I see it.  Lynn Zehrt, would it be Z-E-H-R-T?
7    A  Yes.  I left out the H.
8    Q  And the same Lynn Zehrt that is a professor at
9 Belmont University College of Law?
10    A  She is.
11    Q  Was she, Ms. Zehrt, the reporter when you first
12 joined in 2016?
13    A  No.
14    Q  Do you recall who the reporter was then?
15    A  I do not.
16    Q  So by "reporter," does that mean an individual
17 who is taking notes?  Is that what Ms. Zehrt does?
18    A  I don't know whether she takes notes.  The
19 function of the reporter is to prepare agenda for the
20 meetings, to take minutes of the meetings, to take the
21 role at meetings.
22    Q  Is it your understanding that Ms. Zehrt would
23 take the minutes, the meeting minutes?
24    A  Yes.  She does currently.
25    Q  She also is the one who handles putting the

1 agenda together?
2    A  Correct.
3    Q  Who determines the agenda for each meeting?
4    A  Working together, the reporter and the chair.
5    Q  So you work with Ms. Zehrt to come up with an
6 agenda for the next meeting?
7    A  Exactly.
8    Q  In 2016, when you first joined, how frequently
9 were meetings held of the Advisory Commission?
10    A  Quarterly.
11    Q  Has that always been the case, quarterly
12 meetings?
13    A  It's been the case ever since I've been on the
14 commission.
15    Q  Who determines when those quarterly meetings
16 are going to be held?
17    A  The chair.
18    Q  Since you became the chair of the Advisory
19 Commission, you would make that determination, the date
20 and time when meetings are to be held; is that correct?
21    A  Yes.
22    Q  What is your role as chair?
23    A  To conduct meetings of the Advisory Commission.
24    Q  Do you, as chair, have any other communication
25 in between quarterly meetings with the other members on

1 the commission?
2    MS. CARTER:  Object to form.
3    THE WITNESS:  From time to time, I would say
4 so.
5 BY MR. DOUGHERTY:
6    Q  During these communications in between
7 quarterly meetings, do you discuss business, Advisory
8 Commission business with other members?
9    A  If I understood your question correctly, yes.
10    Q  Do you have these discussions with other
11 members in between quarterly meetings by email?
12    A  On some occasions.
13    Q  Do you still keep -- do you have those emails?
14    A  I'm not sure.
15    Q  When did you first become aware of this lawsuit
16 that you're currently giving a deposition in?
17    A  Probably at some point within the last six
18 months or so.
19    Q  You only became aware of this lawsuit within
20 the last six months?
21    A  I believe that's what I said, yes.
22    Q  Has anyone from the AOC office reached out to
23 you with a litigation hold letter?
24    A  I have not receive a litigation hold letter
25 from anyone.

1   Q   When you became aware of this litigation six
2  months ago, did you discuss with the other members on
3  the Advisory Commission if they should hold on to
4  emails?
5   A   I did not.
6   Q   How did you prepare for this deposition?
7   A   Met with counsel.
8   Q   That would be Ms. Carter?
9   A   Correct.
10   Q   Have you ever served on any other boards or
11  commissions in Tennessee, other than the Advisory
12  Commission?
13   A   Yes.
14   Q   What are those other boards and commissions?
15   A   I was on the board of the directors for Pope
16  John Paul II High School, on the board of the St. Thomas
17  More Society of Middle Tennessee.
18       There are probably others that I've been on as
19  well.
20   Q   Have you ever served on any other boards or
21  commissions where the AOC office provides administrative
22  support, other than the Advisory Commission?
23   A   Not that I recall.
24   Q   Are you aware of similar meetings held by the
25  federal courts and the federal advisory committees?

1   A   No.
2   Q   You're not aware of any of those meetings and
3  what they do with regard to making federal rules?
4   A   Correct.
5   Q   You've never seen any or observed any of those
6  federal advisory committee rule-making meetings?
7   A   Correct.
8   Q   When was the first time you ever became aware
9  of those federal advisory committee meetings?
10   A   Likely sometime during law school.
11   Q   Is it your testimony you've never had that
12  discussion with your current Tennessee Advisory
13  Commission meetings regarding what the federal advisory
14  committee meetings do?
15   A   I believe that's true.
16   Q   In 2022, you were the chair of the Tennessee
17  Advisory Commission; is that right?
18   A   Yes.
19   Q   Were there quarterly meetings held during that
20  year, 2022?
21   A   Yes.
22   Q   Was there a quarterly meeting in March of 2022
23  that was held?
24   A   Well, we have to check the record, but I
25  believe so.

1   Q   Was that meeting open to the public?
2   A   I don't know.
3   Q   You wouldn't know if the public was able to
4  watch it?
5   A   Well, first, I've told you that I'm not able to
6  testify for certain that there was a meeting in March of
7  2022.  Even if there were such a meeting, I do not know
8  whether the AOC or anyone else made any provision for
9  public participation in that meeting.
10   Q   Was that March 2022 meeting held remotely among
11  the members of the Advisory Commission?
12   A   If there was such a meeting, it was held
13  remotely, yes.
14   Q   Where were you when you participated in that
15  meeting?
16   A   Well, I do not recall that there was a meeting
17  in March of 2022, even if there were, I could not,
18  sitting here, tell you where I was.
19   Q   Of the four quarterly meetings in March of
20  2022, were any of those open to the public?
21   A   I don't know.
22   Q   Did you see any of the public participating in
23  those meetings?
24   A   No.
25   Q   Was the June 2023 Advisory Commission meeting

1  open to the public?
2   A   Depends on what you mean by "open to the
3  public."
4   Q   Was the June 9, 2023, Advisory Commission
5  meeting livestreamed to the public?
6   A   My understanding is that it was.
7   Q   Why is that, your understanding?  How do you
8  know?
9   A   Based on discussions with Michelle.
10   Q   Is that Michelle Consiglio-Young?
11   A   Yes.
12   Q   What did she tell you about that June 9, 2023,
13  meeting?
14   A   Well, at some point, Michelle advised me,
15  perhaps the other members of the commission, that Judge
16  Richardson had issued some type of an injunction that
17  provided for livestreaming of our Advisory Commission
18  meetings.  And she wanted to make sure that the members
19  of the commission were aware that the meetings were
20  going to be livestreamed.
21   Q   Did Michelle Consiglio-Young tell you during
22  any of the quarterly meetings of 2022 that those were
23  going to be livestreamed?
24   A   I don't recall.
25   Q   Did you have a discussion with the members on

1 the Advisory Commission about the June 9, 2023, meeting
2 being livestreamed to the public?
3    A    No.
4    Q    When is the -- did the Advisory Commission have
5 a meeting in September of 2023?
6    A    We did not.
7    Q    Do you know why?
8    A    I believe so.
9    Q    And why is that?
10    A    My understanding is that the AOC had intended
11 to issue some type of a public notice regarding the
12 meeting.  But I think, in part, because Michelle was on
13 maternity leave, the notice was not sent out when
14 perhaps it otherwise would have been sent out.
15        And we made the decision, in light of the
16 absence of that public notice, just to move the agenda
17 items from the September 2023 meeting to the
18 December 2023 meeting.
19    Q    Was that meeting supposed to be held on
20 September 8th, 2023?
21    A    I believe that is correct.
22    Q    At the end of the June 9th, 2023, livestream
23 meeting, you said to the public that it was going to be
24 held on September 8th, 2023, correct?
25    A    I don't know.

1    Q    Have you ever watched that livestreamed video?
2    A    I have not.
3    Q    Are you aware that the Tennessee courts have
4 YouTube pages that you can watch the videos?
5    A    I'm aware that one can watch oral arguments
6 from the Supreme Court and the Court of Appeals on a
7 YouTube channel.
8    Q    Were you aware that people can also watch the
9 June 9, 2023, meeting that was livestreamed to the
10 public?
11    A    I'm aware of that, yes.
12    Q    Have you ever watched that video?
13    A    I have not.
14    Q    By having that June 9, 2023, meeting
15 livestreamed to the public, did it cause you, as
16 chair -- or did it burden you in terms of how you
17 conducted the meeting?
18    A    You've got two questions in there, counsel.
19    Q    I apologize. I will strike that.
20        Having the June 9, 2023, meeting livestreamed,
21 did that burden the meeting, from your perspective as
22 chair?
23    A    I can't say that I know exactly what you mean
24 by "burden the meeting."
25    Q    Did it cause you more stress, more problems in

1 terms of the way the meeting was conducted?
2    A    Having the meeting livestreamed in June 2023
3 did not cause me any stress. It did not cause me any
4 problems.
5    Q    So is it your testimony that the meeting that
6 was livestreamed in June 2023 was very similar to other
7 meetings that you've overseen?
8    A    I have not testified to that, no.
9    Q    Well, is there any difference between the
10 June 9, 2023, meeting that was livestreamed to any other
11 meetings that you've chaired?
12    A    I'm sure there are, yes.
13    Q    Well, can you tell me what those differences
14 are?
15    A    Sure.  I mean, at some meetings, we simply
16 discuss proposed rule changes.  At other meetings, we
17 actually vote on adopting amendments or recommending the
18 adoption of amendments to the Supreme Court.
19    Q    Did the June 9, 2023, meeting, the fact that it
20 was livestreamed, did that interfere with the meeting
21 itself?
22    A    It did not.
23    Q    Have you ever discussed with other members
24 whether meetings should be open or closed to the public?
25    A    Could you repeat that?

1    Q    Yeah.  Have you ever discussed with other
2 members on the Advisory Commission whether meetings
3 should be open or closed to the public?
4    A    No.
5    Q    You've never had that discussion?
6    A    Correct.
7    Q    Have the members themselves ever had that
8 discussion amongst themselves?
9        MS. CARTER:  Object to the form.
10        THE WITNESS:  I don't mow.
11 BY MR. DOUGHERTY:
12    Q    Have you ever observed anybody talking about
13 whether meetings should be open or closed the public?
14    A    Are you excluding discussions with counsel?
15    Q    I'm certainly -- not your discussions with
16 counsel.
17        I'm saying:  Have you ever observed, at any
18 point during your chairmanship, other individuals on the
19 commission discussing whether that meeting should be
20 opened or closed?
21    A    I have not, no.
22    Q    You mentioned a preliminary injunction that
23 Judge Richardson issued.  When was the first time you
24 became aware of the preliminary injunction?
25    A    I'm not sure.

1    Q   Do you recall when Ms. Consiglio-Young told you
2 about the preliminary injunction prior to the June 9,
3 2023, meeting?
4    **A   I think, as I testified earlier, it's been at**
5 **least six months that I've known about it.  It could be**
6 **longer.**
7    Q   Okay.  So when Ms. Michelle Consiglio-Young
8 first told you about the preliminary injunction, was
9 that the first time you heard about the lawsuit?
10    **A   I believe so.**
11    Q   As part of your legal practice, do you do any
12 first amendment work?
13    **A   I do not believe I've ever handled a first**
14 **amendment case.**
15    Q   I probably should have clarified.  Free speech,
16 first amendment work?
17        You've never handled free speech, first
18 amendment work?
19    **A   I do not believe I've ever had a case involving**
20 **the first amendment or the right to free speech.**
21    Q   What is the nature of your law practice,
22 Mr. Bulso?
23    **A   Commercial litigation.**
24    Q   I know that's kind of a broad area.  Can you
25 expand on that a little bit?  What are the types of

1 cases you typically get involved in?
2    **A   We get involved in business disputes.  I've**
3 **handled cases involving commercial/residential real**
4 **estate, federal estate securities, franchise litigation,**
5 **transportation litigation, warranty fraud, Consumer**
6 **Protection Act, breach of contract, other types of**
7 **commercial disputes.**
8    Q   Now, on the website that I viewed this morning
9 that list the members of the Advisory Commission, it
10 list a vice chair.  Her name is Catherine Clayton.
11        Do you know Ms. Clayton?
12    **A   Yes.**
13    Q   How long has she been the vice chair?
14    **A   I believe Cathy has been vice chair for as long**
15 **as I have been chair.**
16    Q   Was she also on the committee when you first
17 joined in 2016?
18    **A   If by "committee" you mean commission, no.**
19    Q   Correct.  So Ms. Clayton came on the Advisory
20 Commission after you had been appointed in 2016?
21    **A   I believe so, yes.**
22    Q   Did you make Ms. Clayton vice chair, or does
23 the Supreme Court make that appointment?
24    **A   The Supreme Court makes that appointment.**
25    Q   So not only -- it's my understanding -- I just

1 want to understand this.
2        The Supreme Court appoints the members to the
3 Advisory Commission, correct?
4    **A   It does.**
5    Q   And the Supreme Court appoints the specific
6 roles, like chair and vice chair; is that correct?
7    **A   Precisely.**
8    Q   Okay.  Does the Tennessee Supreme Court also
9 make the appointment on the judicial liaisons?
10    **A   It does.**
11    Q   Does the Tennessee Supreme Court make an
12 appointment on the Supreme Court liaison?
13    **A   I believe it does.**
14    Q   Do you know why there's a distinction between
15 judicial liaisons and Supreme Court liaison?
16    **A   Well, it may be that "judicial liaison" refers**
17 **to judges who are not on the Supreme Court.  And the**
18 **Supreme Court liaison refers to a liaison who is.**
19    Q   Makes sense.  I just was curious.  When you
20 look at the website, it makes a clear distinction.  Have
21 you ever looked at the website that lists your Advisory
22 Commission before, on the AOC website?
23    **A   I have a vague recollection of having seen it**
24 **several years ago.**
25    Q   Currently, it lists, under the judicial

1 liaison, the first person is Chancellor William Cole.
2    **A   Sure.**
3    Q   And was Chancellor Cole on the Advisory
4 Commission in 2016?
5    **A   I don't recall.**
6    Q   You don't know if he was there when you first
7 joined or if he came later?
8    **A   I do not.**
9    Q   The -- and it lists him as a chancellor.  He's
10 a chancellor in chancery court, as you understand it?
11    **A   He is.**
12    Q   James Hivner.  Who is Mr. Hivner?
13    **A   He's the clerk.**
14    Q   Would that be the clerk of the Tennessee
15 appellate courts?
16    **A   Exactly.**
17    Q   Is Mr. Hivner a judge?
18    **A   I do not believe so.**
19    Q   Is Mr. Hivner an attorney?
20    **A   I'm sure he is.**
21    Q   Okay.  The next person under judicial liaison
22 category on the website is Judge Carma Dennis McGee.  Do
23 you know Judge McGee?
24    **A   I do.**
25    Q   What court is Judge McGee -- what court does

1 she oversee?
2    A  Court of Criminal Appeals.
3    Q  Do you know what county?
4    A  I'm not sure the Court of Criminal Appeals is
5 restricted to a county.
6    Q  Okay.  So she's on the Court of Criminal
7 Appeals?
8    A  Yes.
9    Q  Do you know if she's in the west, east, or
10 middle grand division?
11    A  That, I'm not sure of.
12    Q  Are appointments made by the Tennessee Supreme
13 Court Advisory Commission made based on the grand
14 divisions, east, west and middle?
15    A  I believe that is certainly a factor that the
16 Supreme Court takes into account.
17    Q  Do you know if that's a required factor in the
18 statute?
19    A  Yes.
20    Q  It's your understanding that is a required
21 factor in the statute?
22    A  No, it's not.
23    Q  It's not?
24    A  No.
25    Q  So you think the Supreme Court just makes that

1 their own decision to do that, have the representatives
2 from each grand division?
3    A  I might express that a bit differently.  I
4 would say that the statute that you referred to earlier,
5 16-3-601, vests the Supreme Court with the authority to
6 appoint members to the Advisory Commission, and the
7 Supreme Court has the discretion about whom to appoint.
8        So it could, according to the statute, appoint
9 all the members from one grand division.  But in
10 practice, I believe it has appointed members from all
11 three grand divisions.
12    Q  Currently, the current members that serve on
13 the Advisory Commission of which you chair, is there a
14 equal breakdown of members between east, west and middle
15 grand divisions?
16    A  I have not looked at it statistically, but my
17 sense would be that each grand division is well
18 represented on the commission.
19    Q  The next individual under judicial liaisons is
20 Judge Camille McMullen of Memphis, Tennessee.  Do you
21 know Judge McMullen?
22    A  Yeah.
23    Q  In what court does Judge McMullen serve?
24    A  Also the Court of Criminal Appeals.
25    Q  Where?

1    A  Court of Criminal Appeals.
2    Q  Also the Court of Criminal Appeals?
3    A  (No audible response from witness.)
4    Q  But Chancellor Cole would be in the lower trial
5 chancery court; is that right?
6    A  Correct.  He's out in Hardeman County, McNairy
7 County, that area.
8    Q  The last judicial liaison listed is Judge
9 Jennifer Smith of Nashville.  Do you know Judge Smith?
10    A  Yes.
11    Q  What court does she oversee?
12    A  She's in a trial-level court.
13    Q  Do you know if that's circuit court or general
14 sessions or chancery court?
15    A  I am not certain.
16    Q  But you think it's a trial-level court?
17    A  I do.
18    Q  And then there's one Supreme Court liaison,
19 justice, Dwight Tarwater; is that right?
20    A  That's correct.
21    Q  I believe he started his tenure as Supreme
22 Court justice on September 1, 2023; is that right?
23    A  Yes.
24    Q  So has he participated yet in any Advisory
25 Commission meetings?

1    A  No.
2    Q  That would be because the September meeting,
3 you all did not have it, right?
4    A  That is correct.
5    Q  When is the December meeting?  When is it
6 scheduled for?
7    A  It is scheduled for the second Friday of
8 December.
9    Q  Do you have a date on that?
10    A  As I'm sitting here, I do not recall the date,
11 no.
12    Q  Its looks like that might be December the 8th,
13 on my calendar.  But you said the second Friday; is that
14 your testimony?
15    A  Yes.
16    Q  Are Advisory Commission meetings typically held
17 on the second Friday of each month?
18    A  For the last -- well, no.
19        For the last few years, we have held the
20 meetings at 9:00 a.m. on the second Friday of March,
21 June, September, and December.
22    Q  Since when have you done that?
23    A  At least for the last several years.
24    Q  Since you've been there, since 2016?
25    A  No.  I wouldn't say that.

1    Q    Well, can you recall when you started this
2 March, June, September, December?  Can you recall what
3 year that was when that began?
4    A    That's been the case ever since I've been on
5 the commission.
6    Q    You've been on the commission since 2016.
7    A    Correct.
8    Q    So has this March, June, September, December
9 staggering of quarterly meetings happened since 2016?
10    A    Yes.
11    Q    Since you're not having a meeting in September
12 in 2023, is the Advisory Commission communicating as to
13 what you might otherwise be doing in your meeting?  Are
14 you communicating online with each other, emailing with
15 each other?
16    MS. CARTER:  Object the form.
17    THE WITNESS:  Yeah.  I'll have to ask you to
18 rephrase the question, please.
19 BY MR. DOUGHERTY:
20    Q    Since you're not going to have quarterly
21 meetings in 2023 because there's no September meeting,
22 is Advisory Commission business being conducted in
23 another form or fashion?
24    A    Well, I disagree with the predicate of your
25 question, but the answer is no.

1    Q    You disagree that there was no meeting in
2 September of 2023?
3    A    I do not disagree with that.
4    Q    Well, what do you disagree with, the predicate
5 of the question?
6    A    The predicate of your question was, "Since
7 quarterly meetings are not being held in 2023."  It's
8 inaccurate and I disagree with it.
9    Q    Okay.  How many meetings are going to be held
10 in 2023?
11    A    Three.
12    Q    Does three meetings in 2023 satisfy the
13 quarterly meeting standard?
14    A    Yes.
15    Q    It does?
16    A    (No audible response from witness.)
17    Q    And how is that?
18    A    Because of the nature of what a quarterly
19 meeting is.  A quarterly is a meeting that's held every
20 three months, and our meetings in 2003 (sic) have been
21 held every three months.
22    Therefore, they are quarterly meetings.
23    Q    You said "2003."  We're referring to 2023.
24    A    Exactly.
25    Q    Okay.  When did you -- when were the meetings

1 in 2023?
2    A    We had one in March.  We had on in June.  We'll
3 have one in December.
4    Q    From June meeting until the December meeting,
5 how many months is that?
6    A    Six.
7    Q    So then, you would agree that there haven't
8 been meetings in 2023 every three months?
9    A    I will agree that there was no September
10 quarterly meeting.
11    Q    But it's your testimony there will only be
12 three meetings in September -- excuse me -- three
13 meeting in 2023?
14    A    That is correct.
15    Q    The next would be in the second Friday in
16 December?
17    A    Yes.
18    Q    At 9:00 a.m.?
19    A    Exactly.
20    Q    That will be livestreamed to the public, right?
21    A    I don't know.
22    Q    You're waiting for Ms. Michelle Consiglio-Young
23 to tell you?
24    A    I am not waiting on anything, counsel.
25    Q    Did you receive a copy of the preliminary

1 injunction?
2    A    Well, let me answer it this way.
3    At some point, I went on PACER and got the
4 preliminary injunction.
5    Q    Did anyone from the Tennessee Administrative
6 Office of Courts provide you with a copy of the
7 preliminary injunction?
8    A    I do not recall.
9    Q    You don't recall if Ms. Consiglio-Young
10 provided you with a copy of the preliminary injunction?
11    A    Correct.  I do not believe that anyone at the
12 AOC provided me a copy of the preliminary injunction.
13 It's possible, but I just do not recall it.
14    MS. CARTER:  Counsel, when you have a minute,
15 if we can take five minutes for a comfort break, that
16 would be great.
17    MR. DOUGHERTY:  Yeah.  We can go ahead and do
18 that.  There's no question on the table.  That's fine.
19    It's 10:05.  When do you want to come back?
20    MS. CARTER:  I'm just going to run down to the
21 ladies' room.
22    MR. DOUGHERTY:  We can do 10 minutes or 15.  It
23 doesn't matter to me.
24    MS. CARTER:  That's fine.
25    MR. DOUGHERTY:  We will be back at 10:15.

1    We'll take a break now, Mr. Bulso.
2       (Whereupon, a recess was taken
3       from 10:06 a.m. to 10:12 a.m.)
4       MR. DOUGHERTY:  We're back on the record, Mr.
5  Bulso.
6  BY MR. DOUGHERTY:
7    Q   What is the process, from your understanding,
8  once the Advisory Commission transmits the rule
9  recommendations to the AOC office?
10      What happens after that?
11   **A   Well, I would not characterize it as what**
12 **happens as a transmission from the Advisory Commission**
13 **to the AOC.  That is a bit of a seamless process because**
14 **the AOC is in the meetings when the rule recommendations**
15 **are adopted.**
16      **And once we vote on and approve a proposed**
17 **change to the rules, I do not know by what process the**
18 **AOC notifies the Supreme Court of that.**
19   Q   Understood.
20      Is it your understanding -- and I'm trying to
21 get to if the General Assembly is involved at any point
22 after the Advisory Commission's rule recommendations.
23   **A   Sure.**
24   Q   So is the General Assembly involved at any
25 point after the Advisory Commission makes -- votes and

1  makes its rule recommendations?
2    **A   Yes.**
3    Q   Can you tell me what your understanding of that
4  process is, that the General Assembly then gets involved
5  at some point?
6    **A   Sure.  At some point, the Supreme Court will**
7  **propose changes to the rules of civil or criminal**
8  **procedure, and those proposals are sent to the General**
9  **Assembly by way of resolutions.  And in order for any**
10 **rule change to go into affect, the rule change has to be**
11 **approved by resolution in the House and in the Senate.**
12   Q   And then is that when the rule becomes final,
13 at some point?
14   **A   I think the rule becomes effective once those**
15 **resolutions have been adopted.**
16   Q   By the General Assembly?
17   **A   Yes.**
18   Q   Is that typically in July, maybe July 1st of
19 each year?
20   **A   I believe the effective date on those**
21 **resolutions typically is July 1 of each year.**
22   Q   Is the public ever notified at any point?  Is
23 there some type of public and notice comment period
24 after the commission makes its recommendations?
25   **A   Yes.**

1    Q   What is your understanding of that process?
2    **A   That at some point, when the Supreme Court**
3  **decides that it is contemplating a rule change, that it**
4  **will put the proposed change out for public comment.**
5    Q   Are you, as chair, or is the Advisory
6  Commission involved in that process with the Supreme
7  Court?
8    **A   No.**
9    Q   Does that happen immediately and
10 contemporaneously, when the Advisory Commission votes on
11 its recommendations?
12   **A   No.**
13   Q   That happens after?
14   **A   Yes.**
15   Q   Do you know how long after?
16   **A   I do not.**
17   Q   Does the public notice and comment period, is
18 that predate when the Supreme Court sends the proposed
19 rule to the general assembly?
20   **A   Yes.**
21   Q   Are you, as chair, or any members of the
22 Advisory Commission involved in that process with the
23 General Assembly or the public notice and comment
24 period?
25   **A   Yes.**

1    Q   How?
2    **A   In my role as chairman of the Advisory**
3  **Commission, I have, in the past, appeared at meetings of**
4  **the Civil Justice Subcommittee to the extent testimony**
5  **would be necessary before the House on the proposed rule**
6  **changes.**
7    Q   How many times have you appeared at hearings to
8  provide testimony on proposed rule changes?
9    **A   At least twice.**
10   Q   Do you recall when that was?
11   **A   Sometime between 2020 or -- strike that.**
12      **Sometime likely between 2018 and today.**
13   Q   How were you notified that your testimony at
14 these hearings were necessary?
15   **A   Well, let me amend that question slightly,**
16 **'cause there have been times when I've gone and I**
17 **haven't actually testified.**
18      **What occurs is that Michelle tells me that, on**
19 **a particular day, a rules package will be presented to**
20 **the subcommittee or the full committee of the Civil**
21 **Justice Committee and the House, and then I will be**
22 **present in that testimony is necessary.**
23      **But in every instance previously, before this**
24 **year, I've been notified by Michelle that the package is**
25 **going to be submitted, and myself, either as vice chair**

1 or chair, would be there in case testimony were
2 necessary.
3    Q   When you say "Michelle," you're referring to
4 Michelle Consiglio-Young of the AOC?
5    A   Correct.
6    Q   You said you were -- how long did you serve as
7 vice chair?
8    A   For at least a year, possibly two years.
9    Q   Does the Advisory Commission, are they required
10 to do any kind extra training above and beyond your
11 normal CLE-required hours?
12    A   No.
13    Q   Are there ever any kind of meetings about what
14 the federal equivalent advisory committees is doing or
15 not doing?
16    A   I have never been a party to any such meeting.
17    Q   The rule recommendations that the Tennessee
18 Advisory Commission evaluates, is there ever any
19 consideration with what the federal rules -- what
20 they're doing in the federal rules?
21    A   Sure.
22    Q   Can you elaborate on that, please?
23    A   (No audible response from witness.)
24    Q   And let just ask a couple questions as a
25 lead-in.

1      It's my understanding that the Tennessee rules
2 can make its own rules for court procedure; is that
3 correct?
4    A   (No audible response from witness.)
5    Q   Assuming the process is -- goes through the
6 process.
7    A   Let me answer it this way.
8    Q   Sure.
9    A   I mean, in Title 16, the General Assembly has
10 vested the Tennessee Supreme Court with the authority to
11 promulgate rules for all the civil and criminal courts.
12 That's what happens in Tennessee.
13    Q   I understand that Tennessee does not have to
14 follow what the federal rules, what they do.  You would
15 agree with that?
16    A   A hundred percent.
17    Q   Is it fair to say that, historically, the
18 Tennessee rules somewhat mirror the federal rules?
19    A   In some respects.
20    Q   So would that typically be who -- your
21 commission would look to see what the federal rules are
22 doing?  That would be kind of your guide post, so to
23 speak; would you agree with that?
24    A   Not as you've stated it.  I would say that we
25 look at federal rules of civil procedure.  We look at

1 other states' rules of civil procedure, and try to look
2 at what would be the best practice for the state of
3 Tennessee.
4    Q   What would you say the percentage of Tennessee
5 rules are that follow the federal rules?  Would it be,
6 like, 90 percent of the Tennessee rules are about the
7 same as the federal equivalent rules?  Would that be a
8 fair number?
9    A   I doubt it.  I think it would be lower than
10 that.
11    Q   You think it would be lower than that?  What do
12 you think it would be?
13    A   Well, we have to go rule by rule.  If you look
14 at Rule 4 on service of process, they are similar, but
15 they're not identical.  If you look at Rule 6 on timing,
16 they are similar, but they're not identical.  If you
17 look at Rule 8 on pleadings, they are similar, but
18 they're not identical.  If you look at the process under
19 Rule 12, they're similar, but they're not identical.
20      If you get to Rule 26 and you're dealing with
21 discovery of fact witnesses and expert witnesses,
22 they're similar, but not identical.  If you look at Rule
23 38 on the practice of jury selection, once again,
24 they're similar, but they're not identical.
25      So I would have a very difficult time believing

1 that 90 percent of our state rules are the same as what
2 we've got in the federal rules.
3    Q   When the Advisory Commission is coming up with
4 its rule recommendations, does it look to the federal
5 rules to say, "What are the feds doing?  Do we want to
6 do that or not want to do that?"
7      Is that part of your process?
8    A   We certainly have had members that propose
9 changes based on what's going on in federal courts.
10    Q   Do you know why that is?
11    A   Sure.  Because sometimes the federal rules have
12 a process or procedure that would benefit litigation in
13 Tennessee.
14    Q   Now, as part of the rules that are published,
15 once they're a adopted by the General Assembly, there's
16 usually -- as I understand it, in the rules, there's,
17 like, a comment section that says, "Advisory
18 Commission."
19      Do you know what I'm referring to?
20    A   I do.
21    Q   Is that the Advisory Commission on the Rules of
22 Practice and Procedure that you chair?
23    A   It is.
24    Q   Who publishes that?  Is that something that you
25 get involved in?  Does the AOC get involved in it?  How

1  does that get transmitted to some type of published rule
2  when you have the Advisory Commission comments?
3      A  It's something that we vote on in the Advisory
4  Commission.  If we adopt a new rule or amend an existing
5  rule, often there is a comment that explains why that
6  change was made.
7          And so what we send through the AOC to the
8  Supreme Court will be not just a proposed rule change,
9  but a proposed Advisory Commission comment.  And
10  ultimately, that will follow all the way through the
11  process and be part of the resolution, as presented to
12  the General Assembly.
13         If it's adopted, it becomes part of the
14  official rule package.
15     Q  So any time --
16         Are all proposed rule changes, do they -- do
17  they come with an Advisory Commission comment?
18     A  Many times, yes.
19     Q  But not all the time; is that your testimony?
20     A  I think that's correct, yes.
21     Q  Do you ever look at when the AOC sends out for
22  the public notice and comment period -- well, let me
23  back up.
24         Who sends that out, the public notice and
25  comment period, to the public?

1  opinions from the Tennessee Supreme Court, would I go to
2  the same AOC website or would I go to a different
3  website?
4      A  The same website.
5      Q  Okay.  Do you ever get with Michelle
6  Consiglio-Young at the beginning of a calendar year to
7  map out agendas or meetings notices?  Do you do anything
8  like that at the beginning of each calendar year?
9      A  Well, I've never done what you've asked, but I
10  have met with Michelle about other things.
11     Q  Related to the Advisory Commission?
12     A  Probably.
13     Q  How often do you meet with Michelle
14  Consiglio-Young regarding the Advisory Commission?
15     A  I'd say, over the seven years that I've been on
16  the commission, maybe two or three times.
17     Q  Two or three times total?
18     A  Yes.
19     Q  Is that when she tells you about a package that
20  the General Assembly may be considering, a rules
21  package?
22     A  No.
23     Q  Okay.  What were those two or three times?
24  What were they related to?
25     A  Well, just likely how to make the commission

1      A  I'm not sure.
2      Q  Is it on the AOC website, typically?
3      A  I don't know.
4      Q  You've never looked?
5      A  Correct.
6      Q  Do you know if the Tennessee Supreme Court and
7  the AOC, if they share the same website?
8      A  I'm not sure how to answer that, but what I can
9  tell you is that the Tennessee Administrative Office of
10  the Courts maintains the website.  And part of the
11  website reflects arguments in front of the Supreme
12  Court, opinions issued by the Supreme Court, arguments
13  before the Court of Appeals, opinions from the court of
14  Appeals.
15         So when you say, "Do they share the same
16  website," I'm not really sure.
17     Q  If I wanted to pull up the Advisory Commission
18  on the Rules of Practice and Procedure on the AOC
19  website, would I go to the AOC website?
20     A  If you wanted to do what?
21     Q  To look at the Advisory Commission names and
22  members, would I go to the AOC website?
23     A  As far as I'm aware, the names of the
24  commission members are posted on the AOC website.
25     Q  If I wanted to look up oral arguments or

1  operate as efficiently as possible, whether we should
2  use the committee structure, whether we should have
3  subcommittees, who we should perhaps assign to
4  committees to make sure that they're evenly and
5  appropriately staffed.
6      Q  Okay.  I think you said -- I want to make sure
7  I understood this.
8          Did you say in your earlier testimony that you
9  serve at the pleasure of the Tennessee Supreme Court?
10     A  I did say that.
11     Q  Is that language, is that in the statute?
12     A  Yes.
13     Q  It is?
14     A  It is implicitly in 16-3-601.
15     Q  I think, as I recall, the AOC director uses
16  that language, "Serves at the pleasure of the chief
17  justice of the Supreme Court"; would that be correct?
18     A  I don't know.
19     Q  But you're saying implicitly, you, as the
20  chair -- who do you serve at the pleasure of, the
21  Supreme Court or the Chief Justice?
22     A  The Supreme Court.
23     Q  Tell me how that is implicit.  What does that
24  mean?  What do you do vis-à-vis your relationship with
25  the Supreme Court members?

1    A   Well, the statute states explicitly that it's
2  the Supreme Court who appoints the members.  So at any
3  day, the Supreme Court could decide to appoint someone
4  else.
5    Q   Okay.  So do you -- let's say through a year,
6  and you're about to have four quarterly meetings.
7    A   All right.
8    Q   Would you ever communicate with any members of
9  the Supreme Court during the course of that year about
10  potential Advisory Commission roles?
11       MS. CARTER:  Object to form.
12       THE WITNESS:  I've never done that about a
13  rule.  But, I mean, certainly I've had communications
14  with our Supreme Court liaison over times about other
15  things.
16  BY MR. DOUGHERTY:
17    Q   How do you communicate with your Supreme Court
18  liaison?  Do you do it while you're at the meeting or at
19  a later time?
20    A   By telephone, typically.
21    Q   Who was the Supreme Court liaison in 2022 from
22  the Supreme Court?
23    A   Justice Lee.
24    Q   How often did you communicate by telephone with
25  Justice Lee during the 2022 calendar year?

1    A   Likely once or twice.
2    Q   Once or twice?
3    A   (Witness nods head up and down.)
4    Q   Do you recall what the nature of those calls
5  were about?
6    A   Yes.  Questions about reappointment as chair.
7  Reappointment to the commission.
8    Q   Why would you communicate with Justice Lee
9  about that, those issues?
10    A   Because it's -- the Supreme Court appoints the
11  members of the commission.  It's the Supreme Court who
12  appoints the chair, the vice chair, the reporter, and
13  the other offices of the commission.
14    Q   Well, do you ever -- have you, in the past,
15  ever communicated with any members of the Supreme Court
16  about the Advisory Commission, other than the Supreme
17  Court liaison?
18    A   No.
19    Q   So your point of communication in the past has
20  always been with the individual who's named as the
21  Supreme Court liaison?
22    A   Correct.
23    Q   I'm not talking about communications you might
24  have at a bar function.  I'm only referring, when I talk
25  about these communications, related to the Advisory

1  Commission and your duties.
2    A   That's the way I understood your question.
3    Q   Okay.  Did Justice Lee have any information or
4  comments back to you during your one or two meetings
5  with her in 2022?
6    A   I don't believe I had any meetings with you.
7    Q   Well, I think -- my understanding, I said, "How
8  many meeting in 2022 by telephone," and I think you
9  said, "One or two."
10       Was that your testimony?
11    A   My testimony was intended to be that I spoke
12  with her by phone once or twice.  They were not
13  meetings --
14    Q   Okay.
15    A   -- in person.
16    Q   The one or two times in 2022 when you spoke by
17  phone with Justice Lee, do you recall what information
18  Justice Lee said to you or gave to you?
19    A   In general, yes.
20    Q   Okay.  What was that?
21    A   Had to do with reappointment as chairman of the
22  commission, possibly reappointment to the commission
23  itself.
24    Q   Were you calling Justice Lee, at that point, to
25  see if you were going to be reappointed, or you were

1  requesting reappointment?
2       Explain that a little bit, please.
3    A   I don't believe I called her.  Most likely, she
4  called me.
5    Q   Okay.  When she called you during those one or
6  two times, what did she say?
7    A   In words or in substance, "The Supreme Court
8  would like you to continue to serve on the commission.
9  The Supreme Court would like you to continue to serve as
10  chair."
11       Something to that effect.
12    Q   Do you recall in 2022 when that happened, those
13  one or two times?
14    A   I do not.
15    Q   I'm going to jump back to the -- what I viewed
16  on the AOC website this morning, okay, regarding the
17  Advisory Commission and the members that are listed.
18       There's another heading.  It says -- and we
19  talked about Justice Tarwater, who was just appointed to
20  the Supreme Court.  I think Justice Lee retired.
21       Is that accurate?
22    A   She did.
23    Q   There's a heading here that says, "Assigned
24  staff attorney (criminal)," and the individual is
25  Elizabeth Ryan, Supreme Court staff attorney.

1      What is Ms. Ryan's role on the Advisory
2 Commission?
3      A  Let me answer it this way.
4         I don't know that she's actually on the
5 commission.  I know that Elizabeth is in our meetings,
6 along with Jeff Zager, as counsel, and they participate
7 in the meetings there.  They do not vote on proposed
8 rule changes, but they provide expertise and guidance on
9 various issues.
10      Q   Well, if someone's not on the commission, how
11 do they get to go to the meetings?  I don't understand
12 that.
13         Can you explain that?
14         MS. CARTER:  I'm going to object to the form.
15         Go ahead.
16         THE WITNESS:  My explanation is that the
17 Tennessee Supreme Court has authority to decide who the
18 members of the commission are and how the meetings
19 proceed, and that, at some level, the Supreme Court has
20 determined that having those in the position of
21 Elizabeth Ryan and Jeff Zager would be helpful to the
22 commission's business.
23         And so they have, since I can remember, been in
24 attendance at the meetings.
25 BY MR. DOUGHERTY:

1      Q   How long has Ms. Ryan been in attendance at the
2 meetings?
3      A  For as long as I can remember.
4      Q   What does she do?  What is your understanding
5 of Ms. Ryan's role at these meetings?
6      A  To lend expertise to the subject matter of the
7 discussions.
8      Q   Is Ms. Ryan a judge, or she a practicing
9 attorney?  Do you know?
10      A  I do know, and she's an attorney.  She's not a
11 judge.
12      Q   Okay.  The other person, it says, "Assigned
13 staff attorney (civil), Jeff Zager."  I think you
14 mentioned his name.  You are saying Mr. Zager
15 participates in all the meetings?
16      A  He's participated in all of the meetings that I
17 can remember, yes.
18      Q   Okay.  Mr. Zager would have participated in
19 quarterly meetings in 2022?
20      A  Yes.
21      Q   Did Ms. Ryan participate in the quarterly
22 meetings in 2022?
23      A  I believe so.
24      Q   Did Mr. Zager participate in the meetings thus
25 far in 2023?

1      A  I'm not entirely sure, but I believe so.
2      Q   Did Ms. Ryan participate in the meetings thus
3 far in 2023?
4      A  I believe so.
5      Q   Just to confirm, the reporter, Ms. Zehrt, did
6 she participate in the meetings in 2022?
7      A  I'm not sure.
8      Q   Do you know when she was appointed to the
9 Advisory Commission?
10      A  It was, I believe, either in 2022 or 2023.
11      Q   I believe, as I understand your testimony, you
12 said that the Supreme Court makes appointments of
13 members to the Advisory Commission; is that accurate?
14      A  That's what I testified to, yes.
15      Q   Do they enter any type of judicial order when
16 they make these appointments?  Are you aware?
17      A  Yes, I am aware.  Yes, they do.
18      Q   Do they make judicial orders when they appoint
19 judicial liaisons to the Advisory Commission?
20      A  I believe so.
21      Q   Do they make judicial orders when they appoint
22 and assign staff attorneys?  For example, Ms. Ryan or
23 Mr. Zager?
24      A  I'm not sure.
25      Q   Okay.  Do they make judicial orders when they

1 appoint a reporter, like Ms. Zehrt, for example?
2      A  I believe so.
3      Q   Okay.  Do they make judicial orders when they
4 appoint someone like an AOC contact, like Ms. Michelle
5 Consiglio-Young?
6      A  I'm not sure.
7      Q   As far as you recall, Ms. Michelle
8 Consiglio-Young has served at least until you have been
9 on the commission, since 2016?
10      A  That's my memory.
11      Q   Okay.  Are all of the other people that are
12 listed on the AOC website for the Advisory Commission,
13 other than judicial liaisons, are all those individuals
14 in private practice?  Are they private attorneys?
15         MS. CARTER:  Object to the form.
16         THE WITNESS:  For the most part.
17 BY MR. DOUGHERTY:
18      Q   The only one I don't see, from what I'm seeing,
19 it says "ESQ" after pretty much everything.  What is
20 your understanding of ESQ?
21      A  It's an abbreviation for the word "esquire."
22      Q   What does that mean?  Does that mean an
23 attorney?
24      A  It's a suffix that oftentimes you'll see
25 appended to the name of an attorney.

1   Q   There's a Representative William Lamberth of
2   Nashville, Tennessee that does not have the "ESQ" next
3   to his name. Who is Representative Lamberth?
4   **A  He's a member of the Advisory Commission, and**
5   **also a member of the Tennessee House of Representatives.**
6   Q   Is Representative Lamberth an attorney? Do you
7   know?
8   **A  I do know. Yes, he is an attorney.**
9   Q   He is an attorney?
10  **A  (Witness nods head up and down.)**
11  Q   Is he -- do you know what -- is he with a
12  particular firm that you're aware of?
13  **A  He has his own firm in Sumner County.**
14  Q   Andree Blumstein is listed here. As I recall,
15  Ms. Blumstein is the current solicitor general; is that
16  right?
17  **A  That is correct.**
18      MR. DOUGHERTY: I think someone else,
19  Mr. Stahl, may have some questions.
20      I'll pass the witness, Mike.
21          EXAMINATION
22  BY MR. STAHL:
23  Q   Representative Bulso, have you ever personally
24  denied a member of the public the option of attending an
25  Advisory Commission meeting?

1   **A  I have not.**
2   Q   Do commission members ever disagree about
3   proposed rule changes?
4   **A  Yes.**
5   Q   Does the commission ever assign subcommittees
6   to examine proposed rule changes?
7   **A  We have committees. We have no subcommittees.**
8   Q   You mentioned earlier that you'll testify
9   before the House or the General Assembly about proposed
10  rule changes that may have gone up through the AOC to
11  the Tennessee Supreme Court; is that right?
12  **A  Yes.**
13  Q   When you are at those proceedings, whether you
14  testify or not, do you know if those proceedings are
15  open to the public?
16  **A  I do.**
17  Q   Are they?
18  **A  They are.**
19  Q   Have you ever been involved in a commission
20  meeting where you noticed that members of the public
21  were present?
22  **A  I do not recall such a meeting.**
23  Q   As chair of the Advisory Commission, do you
24  believe that honest and frank discussions among the
25  members is in the committee's best interest?

1   **A  Yes.**
2   Q   Have you ever had a rule change that you
3   submitted through the AOC to the Tennessee Supreme Court
4   that the General Assembly denied?
5   **A  By the Supreme Court?**
6   Q   Uh-huh.
7   **A  Yes.**
8   Q   Have you ever noticed that a submitted proposed
9   rule change and the advisory comments that you said you
10  most often submit with those have been amended or
11  changed in any way before being accepted?
12  **A  That has happened as well.**
13      MR. STAHL: That's all I have.
14          EXAMINATION
15  BY MR. DOUGHERTY:
16  Q   When did these changes -- what years did that
17  occur, where the Supreme Court either denied -- well,
18  when did the Supreme Court deny a proposed rule change
19  that the Advisory Commission made?
20  **A  My recollection is that that occurred with**
21  **regard to a proposed change regarding mandatory**
22  **disclosure under Rule 26.**
23  Q   Do you recall what year that might have been?
24  **A  No. I could not recall the year that occurred.**
25  Q   Would there be a record somewhere on the AOC

1  website or the Supreme Court orders? Do you know?
2   **A  I know that there would be a written record**
3   **that a rule was proposed to the Supreme Court, and that**
4   **the Supreme Court did not adopt it.**
5   Q   Where would that be? Would that be in your
6   typically Lexis/Westlaw search, or where would that be?
7   **A  Well, it would be in a number of places. It**
8   **would be a written record of what the commission**
9   **approved. There'd be some writing of the communication**
10  **of that action to the Supreme Court, and then there**
11  **would be, perhaps, no further action by the Supreme**
12  **Court on putting that proposed rule out for public**
13  **comment or change.**
14  Q   Do you recall what year it was when there was
15  a -- the Supreme Court rewrote the recommended rule or
16  changed it somehow? Do you recall when that would have
17  been?
18  **A  I can't recall the precise year.**
19  Q   But you're saying it would -- it's your
20  understanding that there would be some type of record of
21  what the Advisory Commission recommended versus what was
22  actually enacted?
23  **A  Absolutely.**
24  Q   Were -- those times when the Supreme Court
25  either made a change or denied, were you ever required

1 to testify before the General Assembly?

2   **A   I don't recall.**

3       MR. DOUGHERTY:  I don't think I have anything

4 else.

5       MR. STAHL:  I just have one more question.

6              EXAMINATION

7 BY MR. STAHL:

8    Q   Does every meeting result in a vote?

9   **A   No.**

10      MR. STAHL:  That's all I have.

11      MR. DOUGHERTY:  We're on the same schedule, an

12 hour and 45 minutes for both of our first depos.

13      MS. CARTER:  You have the right to read and

14 sign, so do you want to read and sign your deposition?

15      **THE WITNESS:  No, I'll waive it.**

16      THE STENOGRAPHER:  Do you want a copy of the

17 transcript?

18      MR. DOUGHERTY:  Yes, I do.

19      We're off the record.

20

21          (At 10:47 a.m. Central Time,

22           proceedings concluded.)

23

24

25

1              REPORTER'S CERTIFICATE

2

3 STATE OF TENNESSEE

4 COUNTY OF DAVIDSON

5       I, Saba Mc Kinley, court reporter, with offices

6 in Clarksville, Tennessee, hereby certify that I

7 reported the foregoing deposition of GINO BULSO by

8 machine shorthand to the best of my skills and

9 abilities, and thereafter the same was reduced to

10 typewritten form by me.

11       I am not related to any of the parties named

12 herein, nor related to their counsel, and have no

13 interest, financial or otherwise, in the outcome of the

14 proceedings.

15       I further certify that in order for this document

to be considered a true and correct copy, it must bear

16 my original signature, and that any unauthorized

reproduction in whole or in part and/or transfer of this

17 document is not authorized, will not be considered

authentic, and will be in violation of Tennessee Code

18 Annotated 3-914-104, Theft of Services.

19

20

21

22

     SABA MC KINLEY, LCR, RPR, CRI

23   Licensed Court Reporter

     Registered Professional Reporter

24   Certified Reporting Instructor

25

     LCR #843 - Expires:   6/30/2024

**1**

**1** 51:22 58:21
**10** 56:22
**10:05** 56:19
**10:06** 57:3
**10:12** 57:3
**10:15** 56:25
**10:47** 81:21
**12** 63:19
**15** 14:18 56:22
**155** 10:5 16:6
**16-3-601** 16:19 18:5 50:5 68:14
**1961** 9:24
**1983** 11:18
**1986** 11:5,25 12:9
**1st** 58:18

**2**

**2003** 54:20,23
**2008** 11:5,11
**2014** 14:18
**2016** 24:10,11,17 25:9,16 26:21 27:8,12,20 28:10, 17 29:12 34:12 35:8 46:17,20 48:4 52:24 53:6,9 76:9
**2018** 60:12
**2020** 11:11,14 19:20,21 20:9 23:12,15 60:11
**2021** 19:21 20:4,7,9 23:17
**2022** 19:25 23:19 28:17 29:12 38:16,20,22 39:7, 10,17,20 40:22 69:21,25 71:5,8,16 72:12 74:19,22 75:6,10
**2023** 20:12 23:21 39:25 40:4,12 41:1,5,17,18,20, 22,24 42:9,14,20 43:2,6,

10,19 45:3 51:22 53:12, 21 54:2,7,10,12,23 55:1, 8,13 74:25 75:3,10
**25** 9:24
**26** 63:20 79:22
**28** 10:3

**3**

**37027** 16:7
**38** 63:23

**4**

**4** 63:14
**400** 10:6 16:7
**45** 81:12
**4th** 12:17

**5**

**5th** 12:16

**6**

**6** 63:15
**61** 9:24
**6th** 12:15

**8**

**8** 63:17
**8th** 41:20,24 52:12

**9**

**9** 40:4,12 41:1 42:9,14,20 43:10,19 45:2
**90** 63:6 64:1
**9:00** 52:20 55:18
**9th** 41:22

**A**

**a.m.** 52:20 55:18 57:3

81:21
**abbreviation** 76:21
**ability** 8:5,7,14
**absence** 41:16
**Absolutely** 80:23
**accepted** 79:11
**accordance** 9:10
**account** 49:16
**accurate** 72:21 75:13
**Act** 46:6
**action** 6:20 7:7 14:14 80:10,11
**actual** 18:14
**add** 33:16
**address** 16:5
**administrative** 17:4 22:22 27:23 28:3,14 37:21 56:5 66:9
**administratively** 32:14
**admission** 12:6
**admitted** 12:10 13:7
**adopt** 30:12,21 65:4 80:4
**adopted** 57:15 58:15 64:15 65:13
**adopting** 43:17
**adoption** 43:18
**adverse** 6:18
**advise** 16:23
**advised** 15:15 40:14
**advisory** 16:17 17:18 18:14 19:1,15,23 21:3 22:7,9,22 23:5,8,14 24:18 25:18 27:16 28:10 29:20 30:5,9,20,24 31:5, 10,14,18,22 32:1,6,13 33:15,18,23 34:4 35:9, 18,23 36:7 37:3,11,22,25 38:6,9,12,13,17 39:11,25 40:4,17 41:1,4 44:2 46:9, 19 47:3,21 48:3 49:13 50:6,13 51:24 52:16 53:12,22 57:8,12,22,25 59:5,10,22 60:2 61:9,14, 18 64:3,17,21 65:2,3,9,

17 66:17,21 67:11,14 69:10 70:16,25 72:17 73:1 75:9,13,19 76:12 77:4,25 78:23 79:9,19 80:21
**affect** 8:7 58:10
**agenda** 34:19 35:1,3,6 41:16
**agendas** 67:7
**agree** 55:7,9 62:15,23
**agreed** 21:6
**ahead** 4 56:17 73:15
**Alabama** 14:23 15:6
**all's** 27:3
**allowed** 29:11
**amend** 60:15 65:4
**amended** 79:10
**amendment** 45:12,14, 16,18,20
**amendments** 43:17,18
**Andree** 77:14
**annotated** 16:18
**answers** 8:8 9:2
**AOC** 18:25 21:16,20,25 22:3 25:13,14 26:21 27:1,7,22 29:1 30:13 32:4,7,15,19,22 33:6,10, 13,19 36:22 37:21 39:8 41:10 47:22 56:12 57:9, 13,14,18 61:4 64:25 65:7,21 66:2,7,18,19,22, 24 67:2 68:15 72:16 76:4,12 78:10 79:3,25
**apologize** 42:19
**Appeals** 12:15,16,17 42:6 49:2,4,7 50:24 51:1, 2 66:13,14
**appearance** 15:23
**appeared** 60:3,7
**appellate** 30:3 31:16 48:15
**appended** 76:25
**appoint** 18:18 50:6,7,8 69:3 75:18,21 76:1,4

**appointed** 18:4 19:18
20:6,8 21:2,4 24:9,15
25:19 26:21 27:8,12
33:17 46:20 50:10 72:19
75:8

**appointment** 19:22
24:18 46:23,24 47:9,12

**appointments** 49:12
75:12,16

**appoints** 47:2,5 69:2
70:10,12

**appropriately** 68:5

**approve** 57:16

**approved** 58:11 80:9

**approximate** 11:3

**Approximately** 11:9

**area** 25:10 26:10 45:24
51:7

**arguments** 42:5 66:11,
12,25

**Arkansas** 12:20

**Ashley** 15:10

**assembly** 16:22 57:21,
24 58:4,9,16 59:19,23
62:9 64:15 65:12 67:20
78:9 79:4 81:1

**assign** 30:6 68:3 75:22
78:5

**Assigned** 72:23 74:12

**assist** 18:5

**Assuming** 62:5

**Atlanta** 11:22

**attend** 11:19 22:7,10

**attendance** 15:18 73:24
74:1

**attending** 77:24

**attorney** 6:24,25 7:17
8:16 10:7 26:6,8 48:19
72:24,25 74:9,10,13
76:23,25 77:6,8,9

**attorneys** 10:9,12 18:3,
19 30:1 75:22 76:14

**audible** 8:21 9:1 51:3
54:16 61:23 62:4

**authority** 13:4 18:18
50:5 62:10 73:17

**aware** 36:15,19 37:1,24
38:2,8 40:19 42:3,5,8,11
44:24 66:23 75:16,17
77:12

---

**B**

**back** 16:10 28:7 29:15
32:18 33:10 56:19,25
57:4 65:23 71:4 72:15

**bar** 12:1 13:4 70:24

**based** 40:9 49:13 64:9

**began** 53:3

**begin** 23:9,15,17,19,21

**beginning** 27:20 67:6,8

**behalf** 17:20

**believing** 63:25

**Belmont** 34:9

**benefit** 64:12

**Berry** 11:1

**birth** 9:23

**bit** 23:1 45:25 50:3 57:13
72:2

**Blumstein** 77:14,15

**board** 37:15,16

**boards** 37:10,14,20

**Boult** 11:1,4

**breach** 46:6

**break** 8:17 9:13 56:15
57:1

**breakdown** 50:14

**Brentwood** 10:1,6 16:7

**broad** 45:24

**broadcast** 29:11

**brought** 7:7

**Bulso** 6:2,8 7:15,25 9:19,
25 10:5,16,17 11:2,8,13
13:23 14:15 16:6,16
19:11 45:22 57:1,5 77:23

**Bulso's** 17:16

**burden** 42:16,21,24

**business** 36:7,8 46:2
53:22 73:22

---

**C**

**calculate** 16:8

**calendar** 52:13 67:6,8
69:25

**California** 15:4,5

**called** 6:3 72:3,4,5

**calling** 71:24

**calls** 70:4

**Camille** 50:20

**capacity** 6:23 17:11,17
18:11 24:5

**Carma** 48:22

**carry** 12:2

**Carter** 15:10 16:1,2 17:6,
9,19 31:1 36:2 37:8 44:9
53:16 56:14,20,24 69:11
73:14 76:15 81:13

**Carter's** 15:11

**case** 6:19,21 7:4,5 13:16
14:1,8,16,19 35:11,13
45:14,19 53:4 61:1

**cases** 46:1,3

**category** 48:22

**Catherine** 46:10

**Cathy** 46:14

**Central** 81:21

**chair** 17:17,20 19:11,14,
18,22,25 20:4,12,13,19,
23 21:3,12,17 24:5,11,15
25:18 26:4,6 32:19 33:5
35:4,17,18,22,24 38:16
42:16,22 46:10,13,14,15,
22 47:6 50:13 59:5,21
60:25 61:1,7 64:22 68:20
70:6,12 72:10 78:23

**chaired** 43:11

**chairman** 60:2 71:21

**chairmanship** 44:18

**chancellor** 48:1,3,9,10
51:4

**chancery** 13:24 48:10
51:5,14

**change** 30:12,19,22
32:14,18,20 57:17 58:10
59:3,4 65:6,8 79:2,9,18,
21 80:13,25

**changed** 79:11 80:16

**channel** 42:7

**characterize** 30:17 32:8
57:11

**charge** 22:15

**check** 15:22 16:10 38:24

**chief** 68:16,21

**circuit** 12:15,16,17 51:13

**circulate** 22:16,17

**civil** 9:11 14:10 18:5 30:3
31:12 58:7 60:4,20
62:11,25 63:1 74:13

**claiming** 7:1

**clarification** 17:6,24
25:24

**clarified** 7:16 45:15

**clarify** 7:24 8:13 17:10
21:1 23:13

**Clayton** 46:10,11,19,22

**CLE-REQUIRED** 61:11

**clear** 17:13 47:20

**clerk** 48:13,14

**closed** 43:24 44:3,13,20

**club** 14:15

**Code** 16:18

**Cole** 48:1,3 51:4

**college** 11:16 34:9

**comfort** 56:15

**comment** 58:23 59:4,17,
23 64:17 65:5,9,17,22,25
80:13

**comments** 65:2 71:4
79:9

**commercial** 45:23 46:7

**commercial/
residential** 46:3

Lexitas Court Reporting & Litigation Support
(615)595-0073

**commission** 16:17,22 17:3,14,18,20 18:2,3,10, 14,18,20,23 19:1,15,18, 23 21:3,21 22:1,7,9,17, 18,23 23:5,6,9,10,14 24:2,4,10,18,25 25:19 26:2 27:16 28:10,18 29:16,20,23 30:1,5,9,20, 23,24 31:5,10,14,18,22 32:2,6,13 33:2,15,18,23 34:4 35:9,14,19,23 36:1, 8 37:3,12,22 38:13,17 39:11,25 40:4,15,17,19 41:1,4 44:2,19 46:9,18, 20 47:3,22 48:4 49:13 50:6,13,18 51:25 52:16 53:5,6,12,22 57:8,12,25 58:24 59:6,10,22 60:3 61:9,18 62:21 64:3,18,21 65:2,4,9,17 66:17,21,24 67:11,14,16,25 69:10 70:7,11,13,16 71:1,22 72:8,17 73:2,5,10,18 75:9,13,19 76:9,12 77:4, 25 78:2,5,19,23 79:19 80:8,21

**commission's** 57:22 73:22

**commissions** 37:11,14, 21

**committee** 30:7,14,16, 18,21 38:6,9,14 46:16,18 60:20,21 68:2

**committee's** 78:25

**committees** 18:7 30:7 37:25 61:14 68:4 78:7

**common** 9:14

**communicate** 21:7,11 32:1,2,6,19 33:10 69:8, 17,24 70:8

**communicated** 32:15 70:15

**communicating** 33:20 53:12,14

**communication** 35:24 70:19 80:9

**communications** 36:6 69:13 70:23,25

**conclude** 14:6,19

**concluded** 81:22

**conduct** 23:5 35:23

**conducted** 22:13 24:24 25:7 42:17 43:1 53:22

**conducting** 9:6,9

**confirm** 75:5

**connection** 22:16,20 23:7

**Conners** 11:1

**consideration** 61:19

**Consiglio** 28:2

**Consiglio-young** 22:4 32:17 33:9 40:10,21 45:1,7 55:22 56:9 61:4 67:6,14 76:5,8

**Consumer** 46:5

**contact** 22:3 33:14 76:4

**contemplating** 59:3

**contemporaneously** 59:10

**continue** 21:5 72:8,9

**contract** 46:6

**convicted** 13:9

**copy** 55:25 56:6,10,12 81:16

**Cornell** 11:16,17

**correct** 7:17 9:12,20,21 10:7 14:9,13 15:11 17:15 19:12 21:21 24:12,13 27:18 28:4 35:2,20 37:9 38:4,7 41:21,24 44:6 46:19 47:3,6 51:6,20 52:4 53:7 55:14 56:11 61:5 62:3 65:20 66:5 68:17 70:22 77:17

**correctly** 7:22 36:9

**counsel** 15:7,15 37:7 42:18 44:14,16 55:24 56:14 73:6

**county** 13:24 15:4 49:3,5 51:6,7 77:13

**couple** 8:19 61:24

**court** 9:1 12:14,15,16 13:6,21,24 14:21,24 15:2,4,6 16:23,25 17:1 18:4,17 20:14,19 21:2,5,

7,11,14 29:23 30:13 31:7,11,15,19,23 32:3, 16,21 33:17,21 42:6 43:18 46:23,24 47:2,5,8, 11,12,15,17,18 48:10,25 49:2,4,6,13,16,25 50:5,7, 23,24 51:1,2,5,11,12,13, 14,16,18,22 57:18 58:6 59:2,7,18 62:2,10 65:8 66:6,12,13 67:1 68:9,17, 21,22,25 69:2,3,9,14,17, 21,22 70:10,11,15,17,21 72:7,9,20,25 73:17,19 75:12 78:11 79:3,5,17,18 80:1,3,4,10,12,15,24

**courts** 12:10,11 37:25 42:3 48:15 56:6 62:11 64:9 66:10

**Courts'** 17:5

**created** 16:18,23

**crime** 13:9

**criminal** 18:6 30:4,15, 16,25 31:7 49:2,4,6 50:24 51:1,2 58:7 62:11 72:24

**Cummings** 11:1,4

**curious** 47:19

**current** 10:25 11:13 19:22 26:25 29:15 33:22 38:12 50:12 77:15

---

### D

**D-O-R-A-N** 25:25

**daily** 15:17

**date** 9:22 19:19 35:19 52:9,10 58:20

**Davidson** 13:24

**day** 19:17 60:19 69:3

**dealing** 63:20

**debated** 30:22

**December** 9:24 41:18 52:5,8,12,21 53:2,8 55:3, 4,16

**decide** 20:15 69:3 73:17

**decides** 59:3

**decision** 41:15 50:1

**defendant** 6:19 14:8

**denied** 77:24 79:4,17 80:25

**Dennis** 48:22

**deny** 79:18

**Depends** 40:2

**depos** 81:12

**deposed** 7:8

**deposition** 6:10 7:3,20, 21 8:7 9:6,9 15:13 17:14 36:16 37:6 81:14

**depositions** 6:17,21 8:20

**deputy** 26:25

**describe** 18:2

**determination** 35:19

**determined** 73:20

**determines** 35:3,15

**difference** 43:9

**differences** 43:13

**differently** 50:3

**difficult** 63:25

**directly** 32:7

**director** 15:20 21:15 26:20,25 33:11 68:15

**directors** 37:15

**disagree** 53:24 54:1,3,4, 8 78:2

**disciplined** 13:3,6

**disclosure** 79:22

**discovery** 63:21

**discretion** 50:7

**discuss** 30:8 36:7 37:2 43:16

**discussed** 43:23 44:1

**discussing** 27:16 44:19

**discussion** 7:12 38:12 40:25 44:5,8

**discussions** 36:10 40:9 44:14,15 74:7 78:24

**dismissed** 7:5,6 14:7,20

TENNESSEE Index of commission dismissed3
(615)595-0073

**disputes** 46:2,7

**distinction** 47:14,20

**District** 12:18,19,20,21 13:25 14:22 15:5

**division** 49:10 50:2,9,17

**divisions** 49:14 50:11, 15

**Doran** 25:22 26:2

**doubt** 63:9

**DOUGHERTY** 6:7 7:9, 14 16:1,3 17:8,15,25 18:1 26:1 31:3,4 36:5 44:11 53:19 56:17,22,25 57:4,6 69:16 73:25 76:17 77:18 79:15 81:3,11,18

**duly** 6:4

**duties** 71:1

**Dwight** 51:19

---

**E**

**earlier** 13:14 20:20 45:4 50:4 68:8 78:8

**east** 49:9,14 50:14

**Eastern** 12:18,20,21 13:25

**effect** 72:11

**effective** 58:14,20

**efficiently** 68:1

**elaborate** 61:22

**Elizabeth** 72:25 73:5,21

**email** 15:19 21:11,13,15 33:5 36:11

**emailing** 53:14

**emails** 36:13 37:4

**Emory** 11:21

**enacted** 80:22

**end** 41:22

**enter** 75:15

**entire** 30:22

**entitled** 15:17

**equal** 50:14

**equivalent** 61:14 63:7

**ESQ** 76:19,20 77:2

**esquire** 76:21

**estate** 46:4

**estimate** 24:16

**Eugene** 9:19

**evaluates** 61:18

**evenly** 68:4

**event** 60:22

**evidence** 30:3 31:20

**EXAMINATION** 6:6 77:21 79:14 81:6

**examine** 78:6

**exchanged** 21:13,15

**excluding** 44:14

**excuse** 55:12

**executive** 26:20

**existing** 30:3 65:4

**expand** 45:25

**experienced** 8:15

**expert** 63:21

**expertise** 73:8 74:6

**explain** 21:24 22:12 32:11 72:2 73:13

**explains** 65:5

**explanation** 73:16

**explicitly** 69:1

**express** 50:3

**extent** 17:11 60:4

**extra** 61:10

---

**F**

**facilitator** 22:11

**fact** 43:19 63:21

**factor** 49:15,17,21

**fair** 22:21 33:16 62:17 63:8

**familiar** 16:16

**fashion** 53:23

**federal** 9:11 12:14 15:5, 17 37:25 38:3,6,9,13 46:4 61:14,19,20 62:14, 18,21,25 63:5,7 64:2,4,9, 11

**feds** 64:5

**fee** 15:17,23

**feel** 8:17

**figure** 13:1

**filed** 6:20,22 13:23,24 14:4,17 15:3

**fill** 20:15

**final** 58:12

**fine** 16:11 56:18,24

**firm** 10:10,25 11:6,10,13 15:25 26:15 32:12 77:12, 13

**firms** 10:24

**follow** 62:14 63:5 65:10

**form** 36:2 44:9 53:16,23 69:11 73:14 76:15

**formally** 13:3

**formation** 11:14

**franchise** 46:4

**Francisco** 7:8 13:13 14:12,14

**frank** 78:24

**Franklin** 10:5 16:6

**fraud** 46:5

**fraudulent** 6:19

**free** 8:17 45:15,17,20

**frequently** 8:24 35:8

**Friday** 52:7,13,17,20 55:15

**front** 66:11

**full** 9:17 20:2,12 32:16 33:21 60:20

**function** 34:19 70:24

---

**G**

**gave** 6:17 11:6 71:18

**general** 9:12 16:22 51:13 57:21,24 58:4,8,16 59:19,23 62:9 64:15 65:12 67:20 71:19 77:15 78:9 79:4 81:1

**Gino** 6:2 9:20 19:11

**give** 8:8,21 9:1 11:3 16:5 19:7 29:22

**giving** 7:20 8:20 36:16

**Good** 6:8,9

**graduate** 11:17,20

**graduation** 11:24

**grand** 49:10,13 50:2,9, 11,15,17

**great** 16:15 56:16

**group** 15:20 18:3 25:3,9

**guidance** 73:8

**guide** 62:22

**guidelines** 9:13

---

**H**

**habit** 8:24

**halfway** 20:6

**handled** 45:13,17 46:3

**handles** 34:25

**happen** 14:1 59:9

**happened** 32:24 53:9 72:12 79:12

**happening** 29:9

**Hardeman** 51:6

**Harmon** 27:1

**head** 70:3 77:10

**heading** 72:18,23

**heads** 8:25

**heard** 45:9

**hearings** 60:7,14

**held** 24:19 35:9,16,20

Exhibit C - Tennessee Index disputes..held
(615)595-0073

37:24 38:19,23 39:10,12 41:19,24 52:16,19 54:7, 9,19,21

**helpful** 73:21

**High** 37:16

**historically** 62:17

**Hivner** 48:12,17,19

**hold** 36:23,24 37:3

**Holland** 26:18

**honest** 8:8 78:24

**hosted** 22:14

**hosting** 22:15

**hour** 81:12

**hours** 61:11

**House** 58:11 60:5,21 77:5 78:9

**hundred** 62:16

**hybrid** 25:6

---

**I**

**identical** 63:15,16,18, 19,22,24

**II** 37:16

**immediately** 59:9

**implicit** 68:23

**implicitly** 68:14,19

**important** 8:21,25

**inaccurate** 54:8

**individual** 17:11,21 34:16 50:19 70:20 72:24

**individually** 14:16

**individuals** 44:18 76:13

**inform** 8:10

**information** 71:3,17

**initial** 24:17

**initially** 21:4 24:9

**injunction** 40:16 44:22, 24 45:2,8 56:1,4,7,10,12

**instance** 60:23

**intended** 41:10 71:11

**interest** 78:25

**interfere** 43:20

**Internet** 23:7

**interrupts** 25:23

**investigate** 30:19

**involved** 18:21 46:1,2 57:21,24 58:4 59:6,22 64:25 78:19

**involvement** 33:19

**involving** 45:19 46:3

**issue** 20:16 41:11

**issued** 40:16 44:23 66:12

**issues** 70:9 73:9

**items** 41:17

---

**J**

**James** 48:12

**Jeff** 73:6,21 74:13

**Jennifer** 51:9

**Jim** 25:22

**job** 12:25

**John** 37:16

**joined** 25:1 28:9 34:12 35:8 46:17 48:7

**Jr** 9:19

**judge** 26:7 40:15 44:23 48:17,22,23,25 50:20,21, 23 51:8,9 74:8,11

**judges** 18:3,20 30:2 47:17

**judgment** 14:20

**judicial** 18:15 19:4 47:9, 15,16,25 48:21 50:19 51:8 75:15,18,19,21,25 76:3,13

**judiciary** 18:10 19:8

**July** 58:18,21

**jump** 72:15

**June** 39:25 40:4,12 41:1,

22 42:9,14,20 43:2,6,10, 19 45:2 52:21 53:2,8 55:2,4

**Junior** 10:21

**jury** 63:23

**justice** 51:19,22 60:4,21 68:17,21 69:23,25 70:8 71:3,17,18,24 72:19,20

**juvenile** 30:4 31:24

---

**K**

**Ken** 6:18 13:11,15,21

**kind** 8:25 9:12,13 29:15 45:24 61:10,13 62:22

**Knight** 26:19

**knowledge** 17:23

**Knoxville** 25:3

**Krog** 10:16

---

**L**

**ladies'** 56:21

**Lamberth** 77:1,3,6

**language** 68:11,16

**law** 10:24 11:19 26:12 34:9 38:10 45:21

**lawsuit** 14:17 15:16 36:15,19 45:9

**lead-in** 61:25

**Leader** 11:1,8 14:15

**learn** 15:13

**leave** 28:5,6 41:13

**Lee** 69:23,25 70:8 71:3, 17,18,24 72:20

**left** 34:7

**legal** 45:11

**lend** 74:6

**letter** 36:23,24

**level** 73:19

**Lexis/westlaw** 80:6

**liaison** 21:5,9 47:12,15, 16,18 48:1,21 51:8,18

69:14,18,21 70:17,21

**liaisons** 47:9,15 50:19 75:19 76:13

**licenses** 12:1

**licensing** 13:4

**light** 41:15

**link** 22:14,16

**list** 19:4,11 46:9,10

**listed** 17:4 19:1 34:2,3 51:8 72:17 76:12 77:14

**lists** 22:3 47:21,25 48:9

**litigation** 6:18,22 13:20, 22 14:6,13 36:23,24 37:1 45:23 46:4,5 64:12

**live** 9:25

**lived** 10:2

**livestream** 41:22

**livestreamed** 40:5,20, 23 41:2 42:1,9,15,20 43:2,6,10,20 55:20

**livestreaming** 40:17

**long** 10:2 11:12 15:21 19:14,23 20:14 21:16 23:10 24:1 26:23 46:13, 14 59:15 61:6 74:1,3

**longer** 20:23 45:6

**looked** 47:21 50:16 66:4

**lower** 51:4 63:9,11

**Lynn** 33:24 34:6,8

---

**M**

**made** 29:25 32:5 39:8 41:15 49:12,13 65:6 79:19 80:25

**maintains** 66:10

**majority** 32:12

**make** 17:6,13,22 30:14, 21,24 31:6,10,14,18,22 35:19 40:18 46:22,23 47:9,11 62:2 67:25 68:4, 6 75:16,18,21,25 76:3

**makes** 33:2 46:24 47:19, 20 49:25 57:25 58:1,24 75:12

---

Lexitas Legal TENNESSEE                    Index: helpful..makesi5
(615)595-0073

**making** 38:3

**malicious** 7:1

**manage** 22:20

**mandatory** 79:21

**map** 67:7

**March** 38:22 39:6,10,17, 19 52:20 53:2,8 55:2

**Marin** 15:4

**maternity** 28:5,6 41:13

**matter** 8:24 13:11,13,15 14:10 56:23 74:6

**Mcgee** 48:22,23,25

**Mcmullen** 50:20,21,23

**Mcnairy** 51:6

**means** 18:13 22:12

**meant** 9:12 23:4

**medications** 8:6

**meet** 25:9,12 67:13

**meeting** 22:14,20 23:7, 11,25 24:3 25:2,3,7 27:16,19 28:25 29:2,3 30:6,9,20 34:23 35:3,6 38:22 39:1,6,7,9,10,12, 15,16,25 40:5,13 41:1,5, 12,17,18,19,23 42:9,14, 17,20,21,24 43:1,2,5,10, 19,20 44:19 45:3 52:2,5 53:11,13,21 54:1,13,19 55:4,10,13 61:16 69:18 71:8 77:25 78:20,22 81:8

**meetings** 18:21 22:7,10, 13 23:1,2,5,8,14,24 24:19,24 27:3,6,13,20,24 28:11,18 29:8,11 32:23 34:20,21 35:9,12,15,20, 23,25 36:7,11 37:24 38:2,6,9,13,14,19 39:19, 23 40:18,19,22 43:7,11, 15,16,24 44:2,13 51:25 52:16,20 53:9,21 54:7,9, 12,20,22,25 55:8,12 57:14 60:3 61:13 67:7 69:6 71:4,6,13 73:5,7,11, 18,24 74:2,5,15,16,19, 22,24 75:2,6

**member** 24:9 77:4,5,24

**members** 17:3 18:10,13,

15,18,22 19:4,8 21:10, 19,20 22:18 23:6 24:25 25:1,3,4,6 29:6,16 30:1, 21 32:13 34:4 35:25 36:8,11 37:2 39:11 40:15,18,25 43:23 44:2,7 46:9 47:2 50:6,9,10,12, 14 59:21 64:8 66:22,24 68:25 69:2,8 70:11,15 72:17 73:18 75:13 78:2, 20,25

**memory** 76:10

**Memphis** 25:2 50:20

**mentioned** 13:13 44:22 74:14 78:8

**met** 24:21 25:9 37:7 67:10

**Michelle** 21:16 22:4,15, 19 26:23 28:2 32:17 33:9,19 40:9,10,14,21 41:12 45:7 55:22 60:18, 24 61:3,4 67:5,10,13 76:4,7

**Michelle's** 32:23

**middle** 12:18 37:17 49:10,14 50:14

**Mike** 77:20

**mileage** 15:18,23 16:8

**miles** 16:13

**minute** 56:14

**minutes** 34:20,23 56:15, 22 81:12

**mirror** 62:18

**modify** 30:2

**modifying** 18:5

**moment** 18:8 24:1

**month** 52:17

**months** 36:18,20 37:2 45:5 54:20,21 55:5,8

**morning** 6:8,9 19:6 22:3 46:8 72:16

**motion** 30:21

**move** 41:16

**mow** 44:10

## N

**named** 6:18 14:16 70:20

**names** 10:15 19:1,4,7 29:14,15 34:4 66:21,23

**Nashville** 7:4 24:25 25:10 26:9 51:9 77:2

**nature** 45:21 54:18 70:4

**Nelson** 6:18,23 13:11, 15,21,23

**Nicholas** 9:19 10:16,17, 23

**Niko** 10:16

**nod** 8:25

**nods** 70:3 77:10

**Nolan** 11:2,8 14:15

**nonparty** 15:16

**nonvoting** 18:13

**normal** 61:11

**Northern** 14:22 15:5

**notes** 34:17,18

**notice** 27:20,21 28:25 41:11,13,16 58:23 59:17, 23 65:22,24

**noticed** 17:10 78:20 79:8

**notices** 67:7

**notified** 20:23 58:22 60:13,24

**notifies** 57:18

**November** 28:8

**number** 14:1 15:23 63:8 80:7

## O

**oath** 8:1

**object** 36:2 44:9 53:16 69:11 73:14 76:15

**observed** 29:8 38:5 44:12,17

**occasions** 36:12

**occur** 79:17

**occurred** 79:20,24

**occurs** 60:18

**office** 16:9 17:4 25:12,14 33:6 36:22 37:21 56:6 57:9 66:9

**offices** 29:7 70:13

**official** 65:14

**officio** 18:11

**oftentimes** 76:24

**online** 22:19 53:14

**open** 23:1 27:13,17 28:19,21 29:2,3 39:1,20 40:1,2 43:24 44:3,13 78:15

**opened** 44:20

**operate** 68:1

**opinions** 66:12,13 67:1

**option** 77:24

**oral** 42:5 66:25

**order** 20:16 58:9 75:15

**orders** 75:18,21,25 76:3 80:1

**originally** 13:23 15:3

**outlined** 9:5

**oversee** 49:1 51:11

**overseen** 43:7

## P

**PACER** 56:3

**package** 60:19,24 65:14 67:19,21

**packaging** 33:20

**pages** 42:4

**part** 7:20 20:5,6 24:20,23 25:7 41:12 45:11 64:7,14 65:11,13 66:10 76:16

**participate** 27:3 73:6 74:21,24 75:2,6

**participated** 25:4 39:14 51:24 74:16,18

TENNESSEE index: making - participated 6
(615)595-0073

participates 28:13 74:15

participating 28:11,12 39:22

participation 39:9

parties 7:7

party 6:18 7:1 61:16

pass 77:20

past 60:3 70:14,19

Paul 10:16 37:16

people 42:8 76:11

percent 62:16 63:6 64:1

percentage 63:4

period 58:23 59:17,24 65:22,25

person 20:16 24:22 25:7 48:1,21 71:15 74:12

personally 77:23

perspective 42:21

phone 71:12,17

physically 24:22 29:7

place 23:6

places 23:25 80:7

plaques 13:1

PLC 10:5 11:2,13 14:15 16:6

pleadings 63:17

pleasure 20:18 68:9,16, 20

point 7:4 20:15 21:1 30:11,22 32:15 33:14 36:17 40:14 44:18 56:3 57:21,25 58:5,6,13,22 59:2 70:19 71:24

points 8:19

Pope 37:15

portion 23:11 24:2

position 73:20

possibly 21:4 61:8 71:22

post 62:22

posted 29:1 66:24

potential 29:24 69:10

practice 10:9,12 16:17, 23 26:9 31:6 45:11,21 50:10 63:2,23 64:22 66:18 76:14

practicing 26:12 74:8

precise 80:18

Precisely 47:7

predate 59:18

predicate 53:24 54:4,6

preliminary 44:22,24 45:2,8 55:25 56:4,7,10, 12

prepare 34:19 37:6

prepared 8:3 30:12 32:14

present 32:23 33:9 60:22 78:21

presented 30:13 60:19 65:11

presume 9:10 28:23

pretty 76:19

previously 60:23

Principally 21:9

prior 10:25 24:5,14 45:2

private 26:6,9 76:14

problems 42:25 43:4

procedure 9:11 16:18, 24 18:6 30:3,4,15,17,25 31:6,8,12,16,24 58:8 62:2,25 63:1 64:12,22 66:18

procedures 9:5,8

proceed 73:19

proceedings 78:13,14 81:22

process 32:11 33:1 57:7,13,17 58:4 59:1,6, 22 62:5,6 63:14,18 64:7, 12 65:11

professor 34:8

promulgate 62:11

proposal 30:6,8,10

proposals 18:19 29:25 58:8

propose 58:7 64:8

proposed 30:19 32:13 43:16 57:16 59:4,18 60:5,8 65:8,9,16 73:7 78:3,6,9 79:8,18,21 80:3, 12

prosecution 7:1

Protection 46:6

provide 56:6 60:8 73:8

provided 27:23 40:17 56:10,12

providing 17:23 28:3,14

provision 39:8

public 23:1 27:13,17,19 28:19,22,25 29:2,3,6,12 39:1,3,9,20,22 40:1,3,5 41:2,11,16,23 42:10,15 43:24 44:3,13 55:20 58:22,23 59:4,17,23 65:22,24,25 77:24 78:15, 20 80:12

published 64:14 65:1

publishes 64:24

pull 66:17

purposes 17:24

pursuant 18:4

put 59:4

putting 34:25 80:12

Q

quarterly 35:10,11,15,25 36:7,11 38:19,22 39:19 40:22 53:9,20 54:7,13, 18,19,22 55:10 69:6 74:19,21

question 7:19 8:11 26:5 31:2 36:9 53:18,25 54:5, 6 56:18 60:15 71:2 81:5

questions 6:7 8:3 42:18 61:24 70:6 77:19

proposal 30:6,8,10

R

Rachel 26:25 27:5

reached 36:22

read 81:13,14

real 46:3

reappointed 71:25

reappointment 70:6,7 71:21,22 72:1

reason 6:16 17:16

recall 6:15 12:6,23 14:1, 4 15:3 19:17 20:9 21:18 24:14 25:18 27:5,7,10, 11,15,19,21 29:9,10,13 34:14 37:23 39:16 40:24 45:1 48:5 52:10 53:1,2 56:8,9,13 60:10 68:15 70:4 71:17 72:12 76:7 77:14 78:22 79:23,24 80:14,16,18 81:2

receive 15:17 36:24 55:25

receives 33:14

recess 57:2

recollection 47:23 79:20

recommendation 30:10 31:11 32:5 33:4

recommendations 30:14,18,25 31:6,15,19, 23 32:2,7 33:15 57:9,14, 22 58:1,24 59:11 61:17 64:4

recommended 80:15, 21

recommending 43:17

record 7:10,12 9:18 13:18 17:7,13 38:24 57:4 79:25 80:2,8,20 81:19

refer 13:21 14:12

referred 50:4

referring 7:19 17:1 54:23 61:3 64:19 70:24

refers 47:16,18

refiled 7:5

TENNESSEE COURT REPORTERS - elexitalie@gmail.com - participates - refiled7
(615)595-0073

**reflects** 66:11

**regard** 30:10 38:3 79:21

**reimbursement** 15:18 16:9

**related** 67:11,24 70:25

**relationship** 68:24

**relative** 10:17

**remember** 26:22 73:23 74:3,17

**remote** 22:16 23:2,8,11, 14,24 24:3

**remotely** 22:13 24:19 25:7 39:10,13

**removed** 15:4

**repeat** 31:1 43:25

**rephrase** 29:5 53:18

**report** 30:8,19

**reporter** 9:1 22:17 33:17,19,22 34:11,14,16, 19 35:4 70:12 75:5 76:1

**Representative** 77:1,3, 6,23

**representatives** 50:1 77:5

**represented** 15:7 50:18

**represents** 15:9,20

**requesting** 72:1

**required** 49:17,20 61:9 80:25

**Residence** 14:15

**resolution** 58:11 65:11

**resolutions** 58:9,15,21

**respect** 28:13

**respects** 62:19

**response** 51:3 54:16 61:23 62:4

**responses** 8:21

**restricted** 49:5

**result** 81:8

**retired** 72:20

**reviews** 29:24

**rewrote** 80:15

**Richardson** 40:16 44:23

**Road** 10:5 16:6

**role** 20:15 21:6,11,17 22:9,10,11 24:8 34:21 35:22 60:2 73:1 74:5

**roles** 47:6 69:10

**rolling** 20:22

**room** 24:25 25:2 56:21

**rule** 30:3,12,19,22,25 31:11,15,19,23 32:2,5, 14,18,20 33:4,14,20 43:16 57:8,14,22 58:1, 10,12,14 59:3,19 60:5,8 61:17 63:13,14,15,17,19, 20,22 64:4 65:1,4,5,8,14, 16 69:13 73:8 78:3,6,10 79:2,9,18,22 80:3,12,15

**rule-making** 38:6

**rules** 9:11 16:17,23 18:5 29:23,24 30:15,16,25 31:6,7,12,16,20,24 38:3 57:17 58:7 60:19 61:19, 20 62:1,2,11,14,18,21,25 63:1,5,6,7 64:1,2,5,11, 14,16,21 66:18 67:20

**run** 56:20

**Ryan** 72:25 73:21 74:1,8, 21 75:2,22

**Ryan's** 73:1 74:5

---

**S**

**San** 7:8 13:13 14:12,14

**satisfy** 54:12

**schedule** 81:11

**scheduled** 52:6,7

**school** 11:15,19 37:16 38:10

**seamless** 57:13

**search** 80:6

**section** 64:17

**securities** 46:4

**selection** 63:23

**Senate** 58:11

**send** 15:22,24,25 16:10 33:5 65:7

**sends** 59:18 65:21,24

**sense** 9:14 47:19 50:17

**September** 41:5,17,20, 24 51:22 52:2,21 53:2,8, 11,21 54:2 55:9,12

**serve** 18:10 19:25 20:4, 18 21:21 50:12,23 61:6 68:9,20 72:8,9

**served** 37:10,20 76:8

**Serves** 68:16

**service** 63:14

**serving** 24:5,14 28:18

**sessions** 51:14

**sets** 34:3

**setup** 29:11

**share** 66:7,15

**she'll** 22:16 28:7

**sic** 54:20

**sign** 81:14

**similar** 37:24 43:6 63:14, 16,17,19,22,24

**simple** 9:13

**simply** 43:15

**sitting** 39:18 52:10

**slightly** 60:15

**Smith** 51:9

**Society** 37:17

**solicitor** 77:15

**someone's** 73:10

**son** 10:19

**Southern** 12:21

**speak** 62:23

**specific** 19:19 47:5

**specifically** 7:20 18:24 20:10

**speech** 45:15,17,20

**spell** 33:25

**spoke** 71:11,16

**St** 37:16

**staff** 21:20 22:3 27:22 72:24,25 74:13 75:22

**staffed** 68:5

**staggering** 53:9

**Stahl** 77:19,22 79:13 81:5,7,10

**Stahl's** 15:20

**standard** 54:13

**standing** 30:7

**start** 23:24

**started** 24:17 51:21 53:1

**state** 9:17 12:1,11 13:4 15:3 63:2 64:1

**stated** 24:1 62:24

**states** 69:1

**states'** 63:1

**statistically** 50:16

**statute** 15:17 18:17 49:18,21 50:4,8 68:11 69:1

**stenographer** 25:23 81:16

**stress** 42:25 43:3

**strike** 26:5 42:19 60:11

**structure** 68:2

**subcommittee** 60:4,20

**subcommittees** 29:19 68:3 78:5,7

**subject** 74:6

**submit** 79:10

**submitted** 60:25 79:3,8

**substance** 72:7

**sued** 6:25 13:12

**suffix** 76:24

**Suite** 10:5 16:7

**summary** 14:20 29:22, 25

**Sumner** 77:13

**support** 22:22 27:23 28:4,15 37:22

**supposed** 41:19

**Supreme** 12:14 16:23,25 17:1 18:4,17 20:14,18 21:2,5,7,10,14 30:13 31:7,11,15,19,23 32:3, 16,21 33:17,21 42:6 43:18 46:23,24 47:2,5,8, 11,12,15,17,18 49:12,16, 25 50:5,7 51:18,21 57:18 58:6 59:2,6,18 62:10 65:8 66:6,11,12 67:1 68:9,17,21,22,25 69:2,3, 9,14,17,21,22 70:10,11, 15,16,21 72:7,9,20,25 73:17,19 75:12 78:11 79:3,5,17,18 80:1,3,4,10, 11,15,24

**sworn** 6:4

**system** 12:14

---
### T

**table** 56:18

**takes** 34:18 49:16

**taking** 34:17

**talk** 70:24

**talked** 72:19

**talking** 44:12 70:23

**Tarwater** 51:19 72:19

**telephone** 25:5 69:20,24 71:8

**tells** 60:18 67:19

**Tennessee** 10:1,6 12:5, 11,18,19,20 16:7,18 17:1,4 18:4 21:16 25:14 26:13,20 27:1,22 29:1,20 30:2,15,24 31:5,7,10,14, 18,22 32:3 33:22 37:11, 17 38:12,16 42:3 47:8,11 48:14 49:12 50:20 56:5 61:17 62:1,10,12,13,18 63:3,4,6 64:13 66:6,9 67:1 68:9 73:17 77:2,5 78:11 79:3

**tenure** 51:21

**term** 19:23 20:20

**terms** 29:23 42:16 43:1

**testified** 6:4 7:6 20:20

43:8 45:4 60:17 75:14

**testify** 17:12,20,21 39:6 78:8,14 81:1

**testifying** 17:14

**testimony** 17:16 20:7,8 24:19 28:4,9 38:11 43:5 52:14 55:11 60:4,8,13,22 61:1 65:19 68:8 71:10,11 75:11

**Texas** 12:21

**There'd** 80:9

**things** 9:14 67:10 69:15

**Thomas** 37:16

**time** 7:24 8:16 28:17 35:20 36:3 38:8 44:23 45:9 63:25 65:15,19 69:19 81:21

**times** 6:14,15 24:21 60:7,16 65:18 67:16,17, 23 69:14 71:16 72:6,13 80:24

**timing** 63:15

**Title** 62:9

**today** 6:11 8:1,4,7,11 9:6,9 15:7,11,13,14,23 17:14 60:12

**told** 28:23 39:5 45:1,8

**total** 67:17

**training** 61:10

**transcript** 81:17

**transfer** 6:19

**transferred** 14:25 15:6

**transmission** 57:12

**transmits** 57:8

**transmitted** 65:1

**transportation** 46:5

**trial** 51:4

**trial-level** 51:12,16

**true** 38:15

**truthful** 8:8

**Tsiouvaras** 10:16

**type** 6:20 7:1 29:10 40:16 41:11 58:23 65:1

75:15 80:20

**types** 45:25 46:6

**typically** 12:25 17:3 22:15 30:6 46:1 52:16 58:18,21 62:20 66:2 69:20 80:6

---
### U

**U.S.** 12:14,15,16

**Uh-huh** 79:6

**ultimately** 14:22,24 65:10

**undergraduate** 11:15

**understand** 7:22,25 8:10,22 9:5,8,15 20:21, 25 23:23 32:10,25 47:1 48:10 62:13 64:16 73:11 75:11

**understanding** 8:16 19:24 20:11,13 21:20 22:2 28:8 33:8,13 34:22 40:6,7 41:10 46:25 49:20 57:7,20 58:3 59:1 62:1 71:7 74:4 76:20 80:20

**understood** 9:4 36:9 57:19 68:7 71:2

**University** 34:9

**unpack** 21:23

---
### V

**vague** 47:23

**verbal** 8:21 9:1

**versus** 14:15 80:21

**vested** 62:10

**vests** 50:5

**vice** 46:10,13,14,22 47:6 60:25 61:7 70:12

**video** 29:10 42:1,12

**videoconference** 24:24 25:1,8

**videos** 42:4

**viewed** 19:6 46:8 72:15

**virtually** 22:19

**vis-à-vis** 68:24

**vote** 18:19,21 30:11 32:12,17 33:2 43:17 57:16 65:3 73:7 81:8

**votes** 57:25 59:10

---
### W

**waiting** 55:22,24

**waive** 81:15

**wall** 13:1

**wanted** 20:25 40:18 66:17,20,25

**warranty** 46:5

**watch** 39:4 42:4,5,8

**watched** 42:1,12

**website** 17:5 18:25 19:2 22:3 29:1 34:3 46:8 47:20,21,22 48:22 66:2, 7,10,11,16,19,22,24 67:2,3,4 72:16 76:12 80:1

**week** 15:19

**west** 49:9,14 50:14

**Western** 12:19

**William** 48:1 77:1

**Wisconsin** 7:5 12:22 13:25

**witnesses** 63:21

**word** 76:21

**words** 72:7

**work** 10:4,5 35:5 45:12, 16,18

**working** 27:7 35:4

**works** 32:11

**writing** 80:9

**written** 80:2,8

---
### Y

**year** 11:17,24 12:6 14:4 19:17,24 20:2,5,10,12, 21,22 38:20 53:3 58:19, 21 60:24 61:8 67:6,8

TENNESSEE
(615)595-0073
Index: supposed..year9

69:5,9,25 79:23,24
80:14,18

**years** 10:3 11:3,9 19:16
24:14,16 47:24 52:19,23
61:8 67:15 79:16

**Young** 22:21 28:10

**Youtube** 42:4,7

---

**Z**

**Z-E-H-R-T** 34:6

**Z-E-R-T** 34:1

**Zager** 73:6,21 74:13,14,
18,24 75:23

**Zehrt** 33:24 34:6,8,11,17,
22 35:5 75:5 76:1

**Zehrt's** 34:2

**Zoom** 22:14

*Lexitas TENNESSEE*                                    *Index: years..Zoomi10*
(615)595-0073